IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| MOREHOUSE ENTERPRISES, LLC | ) | |
| d/b/a BRIDGE CITY ORDNANCE, GUN | ) | |
| OWNERS OF AMERICA, INC., | ) | |
| and GUN OWNERS FOUNDATION, | ) | |
| | ) | Case No. _____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES; UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE; | ) | |
| STEVEN M. DETTELBACH in his official | ) | |
| capacity as THE DIRECTOR OF ATF, and HANS | ) | |
| HUMMEL, in his official capacity as | ) | |
| THE DIRECTOR OF INDUSTRY OPERATIONS | ) | |
| FOR THE SAINT PAUL FIELD DIVISION OF | ) | |
| THE ATF, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Now come Plaintiffs, by and through Counsel, and for their Complaint state as follows:

1. Plaintiffs bring this action seeking a preliminary injunction to preserve the status quo, followed by a declaratory judgment and permanent injunctive relief, restraining Defendants from further implementing or otherwise enforcing a Department of Justice ("DOJ") "zero tolerance" policy that was first promulgated in 2022 for partisan purposes and, since then, has been wielded as a political weapon by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to revoke the federal firearms licenses ("FFL") of numerous gun dealers across the nation. As grounds therefor, Plaintiffs allege the following:

## JURISDICTION AND VENUE

2.   The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702, and 28 U.S.C. § 1331. This Court has authority to grant the remedy Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

3.   Venue is proper in this district pursuant to 5 U.S.C. § 703, and 28 U.S.C. § 1391(b)(2) and (e).

## PARTIES

4.   Plaintiff Morehouse Enterprises, LLC d/b/a Bridge City Ordnance ("BCO") is a North Dakota limited liability company, which holds active Type 01 (dealer, issued in 2019, FFL# 3-45-003-01-5G-01253 the "Retail License") and Type 07 (manufacturer, issued in 2022 FFL# 3-45-003-07-5J-01603 the "Manufacturing License") Federal Firearms Licenses ("FFL").  As such, BCO is an entity regulated by federal law administered by Defendant ATF.  BCO is located and has had its principal place of business in Valley City, North Dakota since its licensure in 2019.

5.   Morehouse/BCO is the first named Plaintiff in another case pending before this Court, *Morehouse, et al. v. ATF, et al.*, 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022), currently on appeal in the Eighth Circuit (Docket 22-2812).

6.   A short time after that lawsuit was filed, BCO was the subject of an administrative compliance inspection conducted by ATF in February of 2023.  That inspection was the first compliance inspection ever conducted by ATF with respect to either of the BCO licenses.

7.   On May 23, 2023, ATF issued a Notice of its intent to revoke both of BCO's licenses.  That notice was based solely on minor technical and recordkeeping errors in BCO's business activities which allegedly occurred under the BCO Retail License.  *See* Exhibit 1.

8.   Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.

9.   Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOF was formed in 1983, and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country and within this district.

10. Together, GOA and GOF have more than 2 million members and supporters across the country, including residents of the district of North Dakota.  Among these more than 2 million members and supporters, GOA and GOF represent numerous FFLs (both entities and individuals), along with numerous GOA Industry Partners, which consist of manufacturers and other companies within the firearms industry and community.

11. GOA also maintains the Caliber Club, a "partnership program" comprised of more than five thousand gun stores and shooting ranges across the country.  *See* https://www.gunowners.org/caliber-club-gun-stores-ranges/. Each of these gun stores have one or more federal firearms licenses. GOA has Caliber Club members who hold federal firearms licenses in every state. In other words, GOA and GOF represent the interests of many thousands of FFL holders across the country, all of whom are subject to and affected by Defendants' "zero tolerance" enactments.

12. Plaintiff BCO is a member of GOA and also a participant in GOA's Caliber Club.

13. Some of GOA and GOF's members and supporters, like Plaintiff BCO, have been, are being, and will be subjected to and irreparably harmed by the "zero tolerance" policy challenged here.

14. GOA has heard from at least one of its members who lives near Plaintiff BCO, who uses BCO as that member's primary gun store, and who reports that BCO is the only "real" retail gun store in Valley City. This member reports that the other FFLs in Valley City are very small, usually only maintain part time hours at best, and/or their owners have some primary business other than firearms. *See* Declaration of Erich Pratt, Exhibit 2. This particular member advised that, if Bridge City Ordnance's FFLs were revoked and BCO were forced to stop selling firearms, the member would have to expend significant additional resources in the form of time and travel to traverse a much further distance in order to acquire constitutionally protected arms.

15. Defendant U.S. Department of Justice ("DOJ") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530. DOJ is the agency responsible for enforcing federal firearms laws.

16. Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226. ATF is delegated authority to enforce federal gun control laws. *See* 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a); 26 U.S.C. § 7801(a)(2)(A).

17. Defendant Steven M. Dettelbach is the Director of ATF, is sued in his official capacity, and is responsible for overseeing the agency's promulgation of the agency action challenged herein.

18. Defendant Hans Hummel is the Director of Industry Operations for the Saint Paul Field Division of the ATF, is sued in his official capacity, and is responsible for implementing and

enforcing the agency's action challenged herein against Plaintiff BCO.  Further, he is actively engaged in direct enforcement of the zero tolerance policy.

## BACKGROUND

### I.      The Gun Control Act of 1968

19. The Gun Control Act (GCA), 18 U.S.C. § 921 *et seq.* as amended, is Congress's primary means of regulating the interstate commerce in firearms.

20. The GCA traces its regulation of firearm commerce to the Federal Firearms Act of 1938 (FFA), which Congress repealed in 1968 via the Omnibus Crime Control and Safe Streets Act, later replacing the FFA with the GCA.  *See* 82 Stat. 234; 82 Stat. 1213.

21. The original FFA created an unprecedented licensing scheme which criminalized the interstate shipment or receipt of firearms by those not licensed under federal law.  The FFA also established the precursors to certain categories of so-called "prohibited persons" – those individual citizens who were categorically barred by federal law from possessing firearms or ammunition – that would later appear in the GCA.  *See* 52 Stat. 1251.

22. The GCA ultimately retained many of the FFA's provisions and expanded the scope of federal firearm regulation.

23. Notable among the GCA's provisions are its restrictions on unlicensed interstate and foreign firearm commerce, firearm serial number marking requirements, expansion and codification of "prohibited persons" at 18 U.S.C. § 922(g), and licensing and recordkeeping requirements for those federally licensed to engage in the firearm business.

24. Congress and the Attorney General have delegated administration of the GCA to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  28 U.S.C. § 599A; 28 C.F.R. § 0.130(a).

## II.  Licensing Requirements Under the GCA

25. The GCA established a regulatory framework for Federal Firearms Licensees (FFLs), those licensed to engage in the business of manufacturing, dealing, or importing firearms or ammunition.

26. Absent an FFL, the GCA criminalizes business activities relating to the manufacture, dealing, or importation of firearms.  18 U.S.C. § 922(a)(1).  Federal criminal penalties include both misdemeanor and felony penalties, including sentences of up to 30 years in prison.  *See* 18 U.S.C. § 924.

27. In order to obtain a manufacturer's, dealer's, or importer's FFL to avoid criminal penalties under the GCA, an applicant must display business intent – that is, a devotion of "time, attention, and labor … as a regular course of trade or business" with either the "principal objective of livelihood and profit" or to "predominantly earn a profit," depending on the type of business.  18 U.S.C. § 921(a)(21).

28. Not every person who is eligible to purchase, own, and possess a firearm is eligible to be an FFL.  *See* 18 U.S.C. § 923(d).

29. The ATF issues FFLs on a shall-issue basis, provided an applicant meets certain statutory criteria.  18 U.S.C. § 923(d)(1).

30. But the ATF giveth, and the ATF taketh away.  In addition to issuing FFLs, Congress also authorized the Attorney General, and by delegation the ATF, to revoke FFLs if certain conditions are met.  18 U.S.C. § 923(e) provides that:

> The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter....

31. Although Congress did not define the term "willfully" as used in the GCA, Congress added the term to Section 923(e) via the Firearms Owners Protection Act of 1986, 100 Stat. 449, as a

protective measure for FFLs, given the ATF's history of capricious FFL revocations and prosecutions, as discussed in greater detail *infra*.

32. In situations where ATF revokes licenses, firearms businesses cannot survive, livelihoods are lost, and employees are left jobless, as any attempt to conduct further business incurs severe criminal liability under the GCA. *See* 18 U.S.C. § 924.

## III.    Recordkeeping Requirements Under the GCA

33. FFLs are subject to a litany of state and federal laws and regulations governing the conduct of their business activities.

34. For example, FFLs must maintain extensive documentary records of the acquisition and disposition of firearms in their inventory.  18 U.S.C. § 923(g)(1)(A).

35. FFLs must also maintain additional records of firearm transfers to non-licensees – that is, ordinary customers.  27 C.F.R. § 478.124.  Although these firearms transfer records originally included fewer than 30 information items, such as information that identified a specific purchaser, the DOJ has, by regulation, incrementally and massively increased the data required on modern firearms transaction records to over 100 distinct data points, although Congress has never enacted any requirement that FFLs gather or maintain this information.

36. Generally, FFLs cannot transfer a firearm to a non-licensee without the completion of a background check, through the FBI's National Instant Criminal Background Check System ("NICS"), which was created in 1998, in order to ensure the non-licensee transferee is not a "prohibited person."  18 U.S.C. § 922(t)(1).  However, Congress exempted some non-licensee transferees from background checks provided the non-licensee displays a state-issued permit that satisfactorily indicates the non-licensee has already undergone an equivalent background check and is not a "prohibited person."  18 U.S.C. § 922(t)(3).

37. FFLs must maintain records of acquisitions and dispositions indefinitely, until the discontinuation of business.  27 C.F.R. § 478.129(b).  When an FFL discontinues business or its license is revoked by ATF, the FFL is required to transfer to the ATF *all* of its original records concerning firearms acquisitions, dispositions, and the detailed records concerning citizens who have purchased firearms.

38. FFLs' records are subject to periodic ATF inspections to ensure compliance and, as needed, in response to a firearm "trace request" during a criminal investigation.  18 U.S.C. § 923(g)(1)(B).

39. Although these warrantless compliance inspections may occur at most once per year, 18 U.S.C. § 923(g)(1)(B)(ii)(I), the actual rate of compliance inspection is much less frequent than the annual statutory maximum.

40. Good-faith, clerical, and ultimately harmless errors in FFL recordkeeping are a statistical inevitability.  For example, ATF's published data concerning its compliance inspections in 2020 reflects that it conducted 5,823 and found and reported errors in 43.7% of those inspections.  *See* https://www.atf.gov/firearms/firearms-compliance-inspection-results.  ATF's compliance inspections for 2022 increased over 2020 by 1,156 inspections to 6,979 inspections, and ATF's data reflects that it found and reported errors in 45.5% of the inspected FFLs.  *See* https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022.  In 2020, ATF reported that, of those FFLs where errors were found and reported, ATF revoked the licenses of 40, while 96 either discontinued business or surrendered their licenses (5.3%).  In contrast, ATF reported that, as a result of its 2022 compliance inspections, it revoked 90 FFLs while a whopping 1,037 FFLs "discontinued" their operations (36%).  *Id*.

IV.    **The Purpose of the GCA Statutory Scheme**

41. In the wake of several high-profile political assassinations,[1] Congress passed the GCA with the stated intent of preventing the criminal use of firearms.

42. Congress's statement of legislative intent reads as follows:

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title. [82 Stat. 1213-14.]

43. Consequently, the overarching purpose of the GCA's licensing scheme is to prevent the use of firearms in primarily intrastate crimes, by prohibiting certain categories of individuals from possessing firearms or ammunition, and establishing a burdensome record keeping requirements needed solely to facilitate the government's tracing of individuals who use firearms in crimes following a dealer transfer,[2] and also to be used as a tool by ATF against FFLs to facilitate its license revocation activities.

44. The GCA's purpose, as framed by the statement of Congressional intent, was not to destroy American businesses or the "Second Amendment Supply Chain," yet that is what ATF has been using it to accomplish.

---

[1] *See* https://www.atf.gov/rules-and-regulations/gun-control-act (noting JFK, RFK Sr., and MLK).
[2] Whether this statutory scheme comports with the original public understanding of the Second Amendment remains to be seen after *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  While Plaintiffs do not endorse the constitutionality of the underlying GCA, the constitutionality of the statutory scheme itself is not at issue in this litigation.

**ATF's New "Zero Tolerance" Policy**

45. On June 23, 2021, the "Biden-Harris Administration" announced a purported "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety."[3]  Part of that "strategy" was "establishing zero tolerance for rogue gun dealers that willfully violate the law," described as "a new policy to underscore zero tolerance for willful violations of the law by federally licensed firearms dealers that put public safety at risk.  Absent extraordinary circumstances that would need to be justified to the Director, ATF will seek to revoke the licenses of dealers the first time that they violate federal law by willfully 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records, such as a firearms transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to permit ATF to conduct an inspection in violation of the law."

46. Acting pursuant to the President's politicized "strategy" to put gun dealers out of business, an ATF Acting Assistant Director issued a July 14, 2021 memorandum[4] to ATF field leadership, stating that, "effective immediately," ATF personnel should begin revoking licenses for certain types of recordkeeping violations "absent extraordinary circumstances," and reporting that "ATF will be amending ATF O 5370.1D, Federal Firearms Administrative Policy and Procedures to incorporate these requirements.  This 2021 memorandum stated that, with respect to five categories of violations by FFLs, they "shall result in a revocation recommendation…."  *Id*.

---

[3] https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/
[4] https://www.ammoland.com/wp-content/uploads/2021/07/USDOJ-Memorandum-on-ATF-O-5370-Federal-Firearms-Administrative-Action-Policy-and-Procedures.pdf

47. Then, as promised, on January 28, 2022 ATF promulgated a heavily revised ATF Order 5370.1E[5] (Exhibit 3), entitled "Federal Firearms Administrative Policy and Procedures," replacing its prior 2019 version 5370.1D (Exhibit 4).[6]

48. The ATF Administrative Action Policy ("AAP") is the internal ATF document that purports to "provide[] fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees (FFLs)."

49. In other words, the AAP is an "if this, then that" set of guidelines for use by ATF personnel to impose adverse action on FFLs for recordkeeping and other errors.

50. Historically, the AAP has been an internal document that ATF has refused to make publicly available.  Instead, ATF concealed this document, keeping a secret its priorities, and treating FFLs as enemies, rather than sharing ATF's concerns and priorities with FFLs as partners so that they can improve and ensure compliance in key areas.

51. The policies advanced in the ATF AAP are not required by any Congressionally enacted statute, but rather are created and implemented entirely by the Executive Branch, without public or congressional input.

52. Generally, and with certain exceptions,[7] the AAP lays out three possible scenarios (other than taking no action) for various types of violations found during an inspection of an FFL: (i) a Warning Letter, (ii) a Warning Conference, and (iii) Revocation pursuant to 18 U.S.C. § 923(e).

---

[5] https://www.gunowners.org/wp-content/uploads/2022-ATF-O.5370.1E-Federal-Firearms-Administrative-Action-Policy-Procedures-1.pdf
[6] https://www.gunowners.org/wp-content/uploads/2019-ATF-O.5370.1D-Federal-Firearms-Administrative-Action-Policy-Procedures.pdf
[7] In certain situations not relevant here, ATF can issue civil fines or temporarily suspend a license. *See* Exhibit 3 at 8.

**ATF's Harsh Change in Policy Between the 2019 AAP and 2022 AAP**

53. The revised 2022 AAP (revision E) adopts a much harsher stance than did the 2019 AAP (revision D). Significantly, Congress did not enact any new laws during this period which might have established some authority for ATF to create a materially "enhanced" AAP.

54. For example, whereas the 2019 AAP stated that "ATF **may** revoke a federal firearms license under **appropriate circumstances** based on an initial **set** of violations" (Exhibit 4 at 6), the 2022 AAP states that ""ATF **will** revoke a federal firearms license, absent **extraordinary circumstances** on initial violations…." Exhibit 3 at 6.

55. And whereas the 2019 AAP stated that "[n]ot every repeat violation is per se a willful violation," and that "[a] single, or even a few, inadvertent errors … may not amount to 'willful' failures, even when the FFL knew of the legal requirement" (Exhibit 4 at 6), the 2022 AAP eliminates this language, harshly warning only that "ATF does not have to establish a history of prior violations to establish willfulness." Exhibit 3 at 6.

56. Indeed, the 2022 AAP makes clear that, with respect to certain categories of violations, "[o]ne instance of a violation … does not constitute extraordinary circumstances and will not be an acceptable reason for an alternate recommendation" other than revocation. Exhibit 3 at 9, 11.

57. Additionally, the 2022 AAP makes numerous specific changes, ratcheting up the severity of penalties for various offenses, as compared to the 2019 AAP. For example, under the 2019 AAP, "failure to conduct a [National Instant Background Check ("NICS")] check or obtain an alternate permit" merited a Warning Conference (Exhibit 4 at 5), but under the 2022 AAP, the same offense results in an automatic Revocation (Exhibit 3 at 7).

58. Likewise, for a dealer who even runs a NICS check but merely forgets "to retrieve a … response," such an unintentional oversight merited only a Warning Letter in 2019 (Exhibit 4 at 4),

yet jumps **two levels** of severity to an automatic Revocation in 2022 (Exhibit 3 at 7) – *even if it turns out that the purchaser was fully eligible to purchase the firearm*.

### The 2022 AAP Removes Virtually All Discretion from ATF Field Personnel

59. Not only did the 2022 AAP severely increase the penalties associated with various infractions, but also it almost entirely prohibits the exercise of any discretion on the part of ATF field personnel.

60. Historically, ATF field personnel have had significant discretion to consider the totality of any given situation and to craft and appropriate remedy based on a unique set of facts.  Indeed, for many years the AAP has *required* this very practice, explaining that "[e]ach inspection has unique and sometimes complex circumstances," and that "even in cases where violations appear willful, the field should consider mitigating factors," including (i) willingness and ability to "maintain voluntary compliance," (ii) whether the FFL represents "a threat to public safety" or will "contribute to violent crime and/or other criminal activities," (iii) whether the FFL is "taking responsibility for violations and willing to work with ATF to correct them," (iv) whether the violations "directly impact[] the traceability of firearms," and (v) whether the violations "have a nexus to persons prohibited from possessing firearms."  Exhibit 4 at 7.a.3.

61. Although the 2022 AAP still contains this mitigating factor language as a carry-over from prior versions, the 2022 AAP in reality enacts a very different regime.  Now, rather than ATF field personnel considering unique cases and crafting appropriate remedies, the 2022 AAP orders that "revocation is the assumed action, unless extraordinary circumstances exist…."  Exhibit 3 at 7.a.4.

62. In fact, in a case where ATF field personnel believe revocation is inappropriate, they have *no discretion* to take alternative action.  Rather, they first must create a detailed report substantiating their recommendation of alternate action, then have it approved by the "Director of

Industry Operations" within their ATF Field Division and, if approved, it is then "submitted to the [Monitored Case Program] for [Deputy Assistant Director for Industry Operations] approval" at ATF headquarters in Washington, D.C.  *See* Exhibit 3 at 7.h.  *See also* ATF July 14, 2021 letter at 2 ("Inspections where the Director, Industry Operations determines an alternate recommendation to revocation is appropriate shall continue to be routed to the Deputy Assistant Director, Industry Operations, Office of Field Operations (DAD(IO)). The DAD(IO) will approve or deny the recommendation and advise the field division. accordingly.").

63.  It is no wonder, then, that last year ATF found "extraordinary circumstances" and provided alternate resolutions in only 4.7 percent of revocation cases.  *See* https://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-policy.

64. Expressing their concern in a letter to ATF Director Restaino, 25 members of the House of Representatives noted that, under ATF's new "zero tolerance" policy, "[l]ocal ATF field agents have shared they feel pressured to take actions against individual businesses that they do not feel are appropriate or in the interest of public safety," that "[s]ome have even reported that ATF field divisions are being pitted against each other and being forced to compete on the number of licenses revoked," and that "ATF Directors of Industry Operations, who oversee revocation proceedings, are being told to press forward with this escalating quota system or face professional repercussions."[8]

65. In fact, ATF administrative investigators no longer are permitted to have any role at all with respect to determining whether an FFL acted willfully or whether its license should be

---

[8] https://biggs.house.gov/sites/evo-subsites/biggs.house.gov/files/evo-media-document/Congressman%20Biggs%20Letter%20to%20ATF%206.29.22_0.pdf

revoked.  Rather, the role of field staff under the 2022 AAP is entirely administrative –cataloging violations and entering them into ATF's computer system, the "Spartan"[9] database.

66. Thus, when asked in a recent revocation hearing whether, "[i]n preparing the report of violations, is the issue of willfulness even a factor?" the ATF inspector responded "I input data, and Spartan does the figuring."  *See* Exhibit 5, Transcript of Revocation Hearing of Goodlettsville Gun Shop, Mar. 7, 2023, at 70-71.

67. When asked a clarifying question "in this report of violations that you did … are you … commenting on the question of whether or not the violation … was done willfully?"  the ATF inspector answered "No, sir.  Not my job."  *Id*. at 73.

68. Later, when asked "[y]ou don't even get into the issue of whether or not the error was intentional or reckless or just a human error?" the ATF inspector answered "no," unless the FFL directly refused to comply with record keeping requirements.  *Id*. at 75-76.

69. When pressed again why ATF had "charged a single disposition out of roughly 7,000" transactions, the ATF inspector responded "Spartan does the configuring."  *Id*. at 80.

70. When further pressed "[d]id you have any role in the decision …  regarding your compliance inspection?" the ATF inspector said "No. … Spartan does. … It assesses the errors and – and after the adverse action policy apparently that is input into Spartan, it – recommends – makes a recommendation."  *Id*. at 109.

---

[9] "Spartan is a system for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), that serves as the case management system and database for creating, tracking, and collecting investigative information and inspections in support of ATF's regulatory, strategic, law enforcement mission, program initiatives, and tactical field activities."  *See* https://www.justice.gov/d9/2023-02/atf_spartan_pia_-_final.pdf.

71. The DOJ Office of Inspector General ("OIG") confirms this state of affairs, stating that "when an IOI enters inspection results into Spartan, the system prompts the IOI with a recommendation consistent with the Administrative Action Policy."[10]  *Id*. at 57.

72. Upon information or belief, under the current AAP, the finding of "willfulness" necessary to initiate revocation of an FFL is made not by any human being, but rather an ATF computer algorithm.

73. In other words, willfulness is no longer *found* by an individual based on facts, circumstances, and the exercise of human judgment.  Rather, it is *presumed* by computer software, based on nothing more than the category of recordkeeping violations that are discovered and fed into the computer system.

**The 2022 AAP Was Deliberately Designed to Greatly Increase FFL Revocations**

74. The 2022 AAP, then, represents a one-way ratchet in favor of license revocation – designed and intended from the ground up to put as many firearm dealers as possible out of business, not only ruining livelihoods but also impeding Americans' ready access to constitutionally protected firearms in the process.

75. The 2022 AAP represents a clear redirection of ATF's mission – from *regulating* the firearms industry to seeking to *eliminate* it.  Indeed, prior to the 2022 AAP, ATF previously described its inspection program as being designed "**to ensure** compliance," "**to educate** licensees on the specific requirements of [] laws and regulations," to "**assist** with business practices designed to improve compliance" and, if violations are discovered, "**to guide** the FFL into correction of such violations and to ensure future compliance…."  ATF May 2014 Fact Sheet, https://www.atf.gov/file/11136/download (emphasis added).  ATF continued that, only when an

---

[10] *See* https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf.

FFL "demonstrates a lack of commitment to improving … business practices," this "may require revocation of the FFL." *Id.*

76. The current AAP, however, is not designed to ensure, educate, assist, or guide.  Rather, it pursues revocation as its primary goal and political agenda.

77. Adding insult to injury, not only has ATF implemented the 2022 AAP with respect to new inspections and revocations of FFLs, but also ATF has *reopened old cases*, revoking the licenses of gun stores to whom ATF previously issued a Warning Letter or held a Warning Conference, and who subsequently have rectified their mistakes.[11]

78. This policy of reopening closed cases and retroactively imposing new punishments is in direct contradiction of a 2013 DOJ OIG report that raised concerns with that very same, unfair tactic.  DOJ Office of Inspector General, "Evaluation and Inspections Division. Review of ATF's Actions in Revoking the Federal Firearms License of Guns & Ammo," Sept. 2013, https://www.oversight.gov/sites/default/files/oig-reports/e1308.pdf at 17.

79. As ATF itself reports, the Biden Administration's "zero tolerance" policy, as implemented in ATF's revised 2022 AAP, has achieved the desired results – a massive increase in the number of FFLs who are having their licenses revoked or otherwise are terminating their licenses.   Indeed, "ATF revoked 92 licenses in 2022, the most since 2008," which "more than triples the number of licenses revoked in 2021," even though "a similar number of dealers were inspected" both years. C. Barton, "New data shows ATF gun store revocations at highest rate in 16 years," *The Trace*, Oct. 5, 2022,  https://www.usatoday.com/story/news/investigations/2022/10/05/atf-crackdown-gun-shops-new-data/8186091001/.

---

[11] https://biggs.house.gov/sites/evo-subsites/biggs.house.gov/files/evo-media-document/Congressman%20Biggs%20Letter%20to%20ATF%206.29.22_0.pdf

80. In addition to revocations, ATF has coerced and intimidated an ever increasing number of FFLs into "voluntarily" ceasing operations.  https://www.atf.gov/rules-and-regulations/enhanced-regulatory-enforcement-policy.  In fact, the number of FFLs who discontinued business following a compliance inspection increased from 96 in 2020 to 789 in 2021 (the year that "zero tolerance" was adopted) to 1,037 in 2022,[12] an overall increase of more than 1,000%.  *See* Exhibit 6.

81. Moreover, due to the lag in time from inspection to revocation, the astronomical increase in revocations almost certainly will continue to increase.

**ATF's Recently Issued 2023 AAP Is Not Materially Different from the 2022 AAP**

82. A recent DOJ OIG report recounts that "ATF stated that in January 2023 it issued a revised FFL Administrative Action Policy (ATF Order 5370.1F), which ATF also provided for [OIG] review."[13]  *Id*. at 56.

83. However, the OIG report explains that the changes from the prior 2022 version predominately involve the process by which FFL revocations are reviewed by ATF headquarter personnel.  *Id.*

84. The OIG report notes that "[w]e compared ATF's revised policy with previous policy versions and note that it does not represent a significant departure from ATF's prior policy."  *Id*. at 57.

85. Upon information or belief, ATF's 2022 AAP and its new 2023 AAP are substantially and materially identical as pertains to the standards taking various adverse actions including revocations, and as is pertinent to the Notice of Revocation issued to Plaintiff BCO, and generally

---

[12] *See* https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022.

[13] *See* https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf.

to Plaintiffs' claims in this case.   If anything, the 2023 AAP is even more restrictive and overbearing than the 2022 AAP.

86. Thus, this Complaint uses the terms "AAP" to refer to the policies announced in the 2022 AAP and, upon information or belief, still represented in the 2023 AAP.

87. Of course, ATF's 2023 AAP is not immune from judicial review simply because ATF keeps it close to the vest.   Rather, as the Seventh Circuit has written, "[a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes."   *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009).

### Background on the Statutory Requirement of Willfulness

88. ATF's 2022 AAP notes that "ATF must establish willfulness to proceed with revocation under 18 U.S.C. § 923(e)."   *Id.* at 7.e.1.   *See also* Section 923(e) (emphasis added) ("The Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has **willfully** violated any provision of this chapter or any rule or regulation prescribed by the Attorney General under this chapter").

89. Section 923(e)'s "willful" language was no accident, but rather was a deliberate addition to the statute by Congress as part of the 1986 Firearms Owners' Protection Act ("FOPA"), 100 Stat. 449 – Pub. L. No. 99-308.[14]

90. Prior to FOPA, there had been a series of congressional hearings into the highly questionable enforcement practices that had been taking place by ATF against FFLs.

---

[14] *See* https://www.congress.gov/99/statute/STATUTE-100/STATUTE-100-Pg449.pdf.

91.    For example, in an April 1980 Senate Appropriations hearing, Democratic Senator Dennis

DeConcini recounted prior testimony from a series of witnesses, explaining that most "BATF cases

… involved defendants who had no criminal intent, but were enticed by Bureau agents into

violating technical requirements which the defendants did not know existed." *See* Exhibit 7 at 7-

8.[15]    Making matters worse, numerous pieces of testimony also showed ATF moving to revoke

licenses after numerous licensees were acquitted of criminal charges in federal court. *Id*. at 8.

("Like Mr. Moorhead, Mr. Phillips was acquitted when the Federal judge directed a verdict of not

guilty. The Bureau then proceeded to attempt to revoke his license…."); *see also Id*. at 14.

92.    Senator DeConcini concluded that "the problem appeared far more serious and widespread

than I had thought possible," surmising that ATF "had, for all intents and purposes, abandoned

any attempt to respect the rights of our citizens." *Id*. at 9.    Senator DeConcini then referenced his

statements from July of 1979, where he opined that "I predict that Congressional action of a dire

sort will be forthcoming.    We are reaching the point with BATF where the wrongs it perpetrates

on innocent citizens is beginning to outweigh the good it does in other areas.    The time has come

for basic and dramatic changes within BATF.    Also, the time has come to make some revisions in

the Gun Control Act of 1968." *Id*. at 10.

93. A February 1982 Report entitled "The Right to Keep and Bear Arms" from the Senate

Subcommittee on the Constitution later noted that, while the Gun Control Act had been enacted to

keep certain persons like felons from acquiring arms, most of ATF's prosecutions "involve citizens

with no police record whatsoever," based "upon technical *malum prohibitum* charges[] of

individuals who lack all criminal intent and knowledge."[16]    *See* Exhibit 8.

---

[15] *See* https://www.govinfo.gov/app/details/CHRG-96shrg64664Op2/CHRG-
96shrg64664Op2/summary.
[16] *See* https://constitution.org/1-Constitution/2ll/2ndschol/87senrpt.pdf at 25.

94. That same report stated that ATF's "amply documented" practices "leave little doubt that the Bureau has disregarded the rights guaranteed by the constitution and laws of the United States." *Id*. at 27. Specifically, the report found that the ATF "trampled upon the second amendment by chilling the exercise of the right to keep and bear arms," that it "offended the fourth amendment by unreasonably searching and seizing private property," and finally, that it "ignored the Fifth Amendment by taking private property without just compensation and by entrapping honest citizens without regard for their right to due process of law." *Id*.

95. Further, the Appropriations Subcommittee heard testimony "establishing that approximately 75 percent of BATF gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." *Id*.

96. A later June 1982 Senate Report referenced these earlier hearings and findings, stating that they formed "the mandate for the additional civil liberty guarantees to the Gun Control Act of 1968" that were being proposed in S.1030, which would be enacted as FOPA in a later congressional session. *See* Exhibit 9 at 14.[17]

97. When advocating for FOPA's passage four years later, Representative Harold Volkmer (the bill's sponsor in the House) stated that "the Gun Control Act provided the open door to make easy cases against unsuspecting persons. With the **strict liability** provided by the act, even the most **trivial and unintentional misstep** would do.… This potential for abuses continues today."[18]

98. Representative Volkmer continued, opining that the "intent of the [GCA], not to place undue or unnecessary federal restrictions on law abiding citizens with respect to the acquisition,

---

[17] *See* http://johniharris.com/wp-content/uploads/2017/10/FOPA-Senate-Report-97-476.pdf.
[18] 132 Cong. Rec. 6841, https://www.congress.gov/99/crecb/1986/04/09/GPO-CRECB-1986-pt5-7-1.pdf (emphasis added).

possession, or use of firearms was clearly violated by the **technical enforcement practices** being utilized … The need [for FOPA] is not based upon hypotheticals, but upon civil rights abuses perpetrated [by ATF] against real people. These abuses were documented in six years of hearings before two different committees, and deserve our attention." *Id*. at 6481, 6489 (emphasis added).

99. In response to Congress's repeated and heavy criticism, ATF then-Director G. R. Dickerson wrote a letter to Senator DeConcini, agreeing that it was time for ATF "to reexamine our practices, policies, motivations and techniques," and that ATF's mission instead should be not to target the "inadvertent violations" by well-intentioned dealers but instead "to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms." *See* Letter to Senator DeConcini from ATF Director G. R. Dickerson, Sept. 7, 1979, Exhibit 7 at 6.

**ATF's Misuse of "Willfully" to Include Unintentional Paperwork Mistakes**

100. As ATF's 2022 AAP states, "the term willful means a purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation." Exhibit 3 at 5.c. *See also Sturdy v. Bentsen*, 1997 U.S. App. LEXIS 27671, *4 (8th Cir. 1997) (unpublished) ("To show a willful violation, the BATF had to prove [the FFL] knew of the legal record-keeping requirements and 'purposefully disregarded' or was 'indifferent to' them.").

101. Faced with the addition of FOPA's statutory "willfulness" standard, ATF was forced to get creative about how to demonstrate that an FFL had "willfully" committed an unintentional and inadvertent technical, recordkeeping, or paperwork violation.

102. The 2019 AAP provided **three ways** that "ATF can establish the knowledge element of willfulness" – (i) a history of similar violations brought to the FFL's attention by ATF, (ii) prior "acknowledgement of Federal firearms regulations" in prior inspection reports, and (iii) statements or admissions by the FFL. Exhibit 4 at 7.3.e.a-c.

103.     The 2022 AAP, however, adds three new categories, now listing **six ways** to demonstrate willfulness: (i) "publications and information provided to the FFL which explain the FFL's legal responsibilities," (ii) a history of past compliance by the FFL with the same regulation, and (iii) by "demonstrate[ing] that the FFL has substantial experience as an FFL."  Exhibit 3 at 7.e.4.d-f.

104.     ATF does not further explain how any of these factors demonstrates any actual "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" necessary to prove willfulness.

105.     Nevertheless, based on factors (ii) and (iii), ATF believes that a lengthy history of an FFL *following* the rules should be used to prove that the FFL "willfully" *failed to follow* the rules when a mistake or oversight inevitably occurs.  In other words, the longer and more faithfully an FFL has followed the rules, the more severely it can be punished for an inevitable inadvertent slip up, leading to a perverse incentive structure where a history of good behavior is grounds for more serious punishment.

106.     Likewise, with respect to factor (i), when ATF initially grants a license, ATF personnel are required to provide the new licensee with a copy of the ATF Federal Firearms Regulations Reference Guide, a 237-page document.[19]  The FFL is then made to sign a special form that ATF has created, entitled "Acknowledgement of Federal Firearms Regulations," attesting that the FFL has received and understands the rules set forth in the manual.[20]

---

[19]     https://www.atf.gov/firearms/docs/guide/federal-firearms-regulations-reference-guide-2014-edition-atf-p-53004/download.
[20]     *See* 2019 ATF Industry Operations Manual, Chapter B.  "Firearms Application Inspections," 34.d(8)(b)   https://www.scribd.com/document/575603256/ATF-2019-IOM#   ("The IOI shall thoroughly review the Acknowledgment of Federal Firearms Regulations with the applicant. Have the applicant sign and date the acknowledgement electronically in Spartan.").

107.     The purpose for ATF requiring formal acknowledgement of receipt of the Regulations Reference Guide is devious on the part of ATF – nothing more than a way to *manufacture evidence* that can later be used against the FFL to revoke its license – specifically, on the theory that the one-time provision of this manual represents "publications and information provided to the FFL which explain the FFL's legal responsibilities" (2022 AAP).  *See, e.g.*, ATF Warning Letter to Damien Ristaino, August 1, 2016, at 7 ("Mr. Damien Ristaino, indicated that he understood all of the information provided by signing and dating the Acknowledgement of the Federal Firearms Rules and Regulations (Exhibit #03)."); *see also* Exhibit 10, ATF January 13, 2022 Notice of Revocation to MAX, LLC, at 6 ("ATF introduced a signed Acknowledgements [sic] of Federal Firearms Regulations demonstrating that ATF had reviewed the legal requirements applicable to the Federal firearms licensee.").

108.     This ATF tactic – revoking a federal firearms license on the basis that a licensee agreed, often years in the past, to have understood every nuance of a regulatory scheme hundreds of pages long – is a bit like revoking a lawyer's admission to a court for failure to use the proper size font in a brief, on the theory that his admission application attested that he had read and understood the local rules.  It is also like revoking the driver's license of a person who fails to use his turn signal, alleging that he acted in "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation."  After all, several decades ago, the DMV handed that driver a manual with hundreds of pages of nuanced rules and regulations.

109.     On the contrary, just as no reasonable person would characterize the lawyer's or the driver's honest mistakes as "willful," neither is an FFL's technical or paperwork or recordkeeping violation "willful."  Of course, this case involves ATF – not a reasonable person.

110.     ATF Director of Industry Operations Hans Hummel of the St. Paul Field Office (who almost certainly will be the hearing officer in Plaintiff BCO's administrative hearing) recently opined in a 2022 revocation letter that "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … ***is irrelevant*** to the standard of willfulness."  Exhibit 10, at 6 (emphasis added).

111.     Yet this is ***precisely*** what FOPA and Section 923(g)'s standard of willfulness were intended by Congress to prevent.  Recall, Representative Harold Volkmer (FOPA's sponsor) stated that FOPA was necessary to avoid "the strict liability provided by the act," where "even the most trivial and unintentional misstep would do."  *See* 132 Cong. Rec. 6841.

112.     "Human mistakes" and "harmless misunderstandings" simply do not, as a matter of law, amount to a "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation."

113.     In other words, the AAP and DIO Hummel's statements directly conflict with both the statutory text and the explicit Congressional purpose of FOPA.

114.     In another instance, the AAP takes the position that repeat paperwork violations are evidence of willfulness, particularly after the ATF has given prior notice to the FFL that the errors are a violation of the law.  Exhibit 3 at 6.  Yet ATF is clearly aware that such human errors happen and are unavoidable, and typically pose no real risk to public safety or ATF's ability to trace firearms.  For example, in the AAP, ATF provides that a warning letter (the lowest form of adverse action) is not appropriate unless an FFL has "5 percent or more errors" on the FFL's acquisition records.  *Id*. at 7.c.(1).   Similarly, the complete failure to record "valid and complete" or even "any" transferee information on the Form 4473 Firearms Transaction Record does not warrant a Warning Letter, so long as Form 4473s with errors constitute less than "10 percent" of the total

number forms.  *Id.*  at 7.c.(4-5).   Even so, ATF uses that first compliance inspection and warning as a basis to set the trap to subsequently assert "willfulness" under its non-Congressional "repeat violation" doctrine.  *Id*. at 7.e.(4)(a).

115.     Further clarifying ATF's hardline position, the AAP specifically deletes language from the 2019 AAP, which previously had stated that "not every repeat violation is per se a willful violation. A single, or even a few inadvertent errors in *failing to complete* forms may not amount to 'willful' failures, even when the FFL knew of the legal requirement to complete the forms." Exhibit 4 at 7.3.1.

116.     This deletion was intentional.  In fact, ATF recently has undertaken to revoke the FFL of one dealer merely for *forgetting to transcribe* the Tennessee Instant Check System ("TICS") Number on an ATF Form 4473, with respect to gun sales that had been approved. Adding insult to injury, it turns out that the TICS Number actually had been stapled to the very same Form 4473, requiring only that the document be flipped to the next page to obtain the information.  Moreover, an ATF agent testified that the transcription omissions had in no way affected ATF's ability to determine the chain of custody of the firearms.

117.     To sum up:  first, according to ATF, a **history of compliance** indicates an FFL's knowledge of recordkeeping duties, meriting revocation.  Second, a **history of noncompliance** shows an FFL's deliberate intention not to improve its behavior, warranting revocation.  And third, **no history** either way is irrelevant, as even a single violation merits revocation.

118.     In other words, under the AAP, all roads lead to revocation.

### Unsurprisingly, ATF Does Not Hold Itself to the Same Standards of Perfection

119.     It should come as no surprise, but ATF does not hold itself to the same standards of perfection with respect to firearm recordkeeping.

120.     **Christopher Lee Yates**.  For example, in 2019, Christopher Lee Yates, an ATF contractor, was convicted or stealing *thousands of firearms* from ATF's Martinsburg, West Virginia headquarters, over the course of *several years*.[21]  Even when caught, the theft was not discovered by ATF headquarters, but instead by tracing firearms Yates stole and sold.

121.     As part of the Yates scandal, criminal investigators discovered that ATF personnel had deliberately signed "certif[ied] … reports" falsely stating that countless firearms had been destroyed, even though the same firearms were later were recovered on the streets (clearly not destroyed).[22]

122.     If these same violations had been committed by an FFL, license revocation would be swift for having made "a false or fictitious written statement in the FFL's required records," or "inventory … for which disposition could not be accounted for…."  Exhibit 3, 2022 AAP at e.6.d and j.  Yet upon information or belief, not one ATF employee was ever punished for the Yates fiasco.

123.     Even though Plaintiff GOA submitted a FOIA request to ATF in November of 2019 (more than 3.5 years ago), seeking more information regarding the Yates case (FOIA # 2020-0097), ATF has yet to respond.

124.     **NFRTR**.  Another example of ATF's atrocious firearm recordkeeping is the National Firearms Registration and Transfer Record ("NFRTR"), the registry of all firearms registered pursuant to the National Firearms Act of 1934 (machineguns, silencers, etc.).  In 2007, the DOJ OIG issued a report entitled "The Bureau of Alcohol, Tobacco, Firearms and Explosives'

---

[21] *See* https://www.justice.gov/usao-ndwv/pr/former-contract-security-guard-atf-facility-sentenced-14-years-stealing-and-selling.
[22] *See* https://www.jsonline.com/story/news/investigations/2019/06/13/atf-looking-guns-and-glock-parts-stolen-and-sold-guard/1425467001/.

National Firearms Registration and Transfer Record,"[23] summarizing that "NFA Branch staff members do not process applications or enter data uniformly into the NFRTR. *See* Exhibit 11. The staff's variations in completing these tasks result in *errors in NFRTR records, reports, and queries* as well as inconsistent decisions on NFA weapons registration and transfer applications." *Id*. at v.

125.      In fact, the OIG reported that, comparing the records from ATF and FFLs, ***it is almost always the FFL with the accurate records, while ATF's records are erroneous***:   "In our survey of IOIs, 46.5 percent (139 of 299) reported that they found a discrepancy between the NFRTR inventory report and a licensee's inventory 'always' or 'most of the time.'  Further, 44.4 percent of respondents (133 of 299) said that the discrepancy was due to an error in the NFRTR 'always' or 'most of the time.'  In comparison, no respondents reported that the error was 'always' on the part of the licensee, and only 2 percent (6 of 299) reported that the error was on the part of the licensee 'most of the time.'"  *Id*. at vii.

126.      This is not a new phenomenon.  Rather, the magnitude of ATF's recordkeeping errors in the NFRTR cannot be understated.   As far back as 1995, then-NFA Branch Chief Thomas Busey openly conceded that "our error rate was between 49 and 50 percent, so you can imagine what the accuracy of the NFRTR could be, if your error rate's 49 to 50 percent."[24]

127.      Chief Busey then beamed that ATF's error rate, under his watch, had been reduced to "below 8 percent" (*id*. at 3:25) – an error rate that would never be permitted of any FFL.  But Chief Busey then demurred "[t]hat's common errors and critical errors.  *We do a little finagling upstairs* on what we consider.  A common error is an error in the database entry, but it doesn't

---

[23] *See* https://oig.justice.gov/sites/default/files/legacy/reports/ATF/e0706/final.pdf.
[24] *See* http://www.nfaoa.org/documents/1997testimony.pdf;
https://www.youtube.com/watch?v=bO6BQVAZpwU (at 3:14).

affect the lookup.  It wouldn't hurt an agent.  It doesn't really have any damage." *Id*. at 3:27 (emphasis added).

128.     Yet the 2022 AAP, in contrast, requires revocation even in cases of what Chief Busey would categorize as a "common error" – one that does not impede the tracing of a firearm, lead to a felon obtaining a firearm, or cause any harm to public safety.

129.     In spite of this monumental level of error in the NFRTR (that had not improved as of the 2007 OIG report), Chief Busey stated that ATF's policy was to commit what has been called "institutional perjury":  "when we testify in court, we testify that the [NFRTR] database is 100 percent accurate.  That's what we testify to, and we will always testify to that.  As you probably well know, that may not be 100 percent true." *Id*. at 1:15.

130.     Chief Busey continued that, when tracing lawful firearm ownership under the National Firearms Act, ATF was unable to rely on the NFRTR, stating that "You're basing your warrants on it.  You're basing your entries on it.  And you certainly don't want a Form 4 waved in your face when you go in there, showing that the guy does have a legally registered Type II weapon." *Id.* at 1:52.

131.     Chief Busey then joked, noting with a smile that ATF has used bad information to kick down the doors of innocent people: "I've heard that's happened.  I'm not sure." *Id*. at 2:04.

132.     When later attempting to walk back his statements when they were made public (*i.e.*, expressing remorse only when he got caught), Chief Busey reportedly claimed that "[t]his was a mis-statement of the facts on my part.  What I meant was that the database does contain errors that are contributable [sic] to human causes (misspelled names, inverted serial numbers),

but what we do testify to is the accuracy of the search we perform and the results gained from that search."[25]

133.     Hypocritically, the NFRTR's errors are the very sort of "human cause[]" errors that the AAP penalizes with automatic revocation of licenses.

134.     It would appear that ATF's St. Paul DIO Hummel (quoted *supra*) would have no sympathy for Chief Busey's NFA Division, and instead argue would that ATF's own error-ridden database actually represents something done willfully, in violation of a known legal duty.  As noted, DIO Hummel believes that "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … is irrelevant to the standard of willfulness," and shows "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" on the part of ATF's own personnel.

135.     Again, ATF's inept NFRTR recordkeeping would result in mandatory and immediate revocation, were ATF held to the same standards to which it holds FFLs.  Of course, "rules for thee, but not for me."

136.     **Fast and Furious**.  Perhaps ATF's most spectacular failure (in <u>recent</u> history, that is) was its infamous Operation Fast and Furious, where the agency "allowed illegal gun sales [purportedly] in order to track the sellers and purchasers, who were believed to be connected to Mexican drug cartels."[26]  Of course, ATF did not "track" anything, and usually had no idea as to the whereabouts of the trafficked firearms until, for example, one was used on December 14, 2010 to murder U.S. Customs and Border Protections Agent Brian Terry.

---

[25] *See* https://www.gunowners.com/ip06.htm.  Plaintiffs have been unable to locate the original source for this later statement, but intend to pursue obtaining it through a FOIA request and/or discovery in this matter.
[26] *See* https://www.cnn.com/2013/08/27/world/americas/operation-fast-and-furious-fast-facts/index.html.

137.     If any FFL had been involved in or permitted such willful violations of the Gun Control Act, or kept such shoddy records, license revocation would have been the least of its worries.  Yet, to date, no ATF personnel have faced any serious repercussion for the Fast and Furious debacle.

138.     **ATF Makes the Same Errors for which it Revokes Licenses**.  As with ATF's open admissions about the error-ridden NFRTR, ATF personnel readily admit that they are not immune from committing the very same clerical errors for which they revoke licenses.  *See* Exhibit 5, Transcript of Revocation Hearing of Goodlettsville Gun Shop, Mar. 7, 2023, at 85-86 (ATF IOI admitting that she had accidentally misspelled the name of a firearm importer in her Report of Violations and that, *if the FFL had made the same mistake*, it would have been a *"willful" chargeable violation for falsifying records*).

139.     One might respond that ATF does not hold a federal firearms license, and thus is not bound by the statutory and regulatory recordkeeping requirements that apply to licensees.  *Au contraire*.  For reasons unknown, the ATF in fact has, in the past, maintained at least four of its very own Federal Firearms Licenses.[27]

140.     In February of 2021, Plaintiff GOA submitted a FOIA request to ATF, seeking information about these ATF FFLs, including a copy of ATF's "A&D" bound books of acquisitions and dispositions (FOIA # 2022-0169).  However, to date, ATF has not responded to that request.

141.     What is more, as of April 2021 (just two months after GOA's FOIA request was filed), ATF's nationwide list of FFLs that it publishes on its website no longer includes those FFLs held by ATF.

---

[27] *See* https://www.atf.gov/firearms/docs/undefined/0920-ffl-list-district-columbiaxlsx/download.

142.     In sum, ATF's own horrible history of unaccountable firearm recordkeeping shows that the agency would *never* itself be able to achieve anywhere close to the standard of perfection that the ATF through its unrealistic AAP demands from the nation's FFLs.

143.     At bottom, the 2022 AAP is a deliberate attempt by ATF to revert to the very same, highly questionable tactics and practices from more than four decades ago – tactics that were repudiated on a bipartisan basis in Congress, and which directly led to enactment of the FOPA in 1986.[28]

144.     Ignoring both the plain text and the unambiguous intent of FOPA's addition of "willfulness" to the statute, ATF's 2022 AAP results in a situation where ***every single*** violation of any statutory or regulatory requirement by an FFL can be characterized by ATF as "willful," potentially leading to the loss of a license and livelihood even for entirely minor, technical, paperwork violations, tempered only by ATF's exercise of unbridled discretion.  *See* Exhibit 3, 2022 AAP at 7.e.2 ("ATF may … revoke for any other willful first-time violation as it deems appropriate.").

145.     Since basic human error inevitably results in paperwork mistakes being made, this means that ATF believes itself to have the authority eventually to revoke every single federal firearms license in the country – regardless of whether merely "inadvertent violations" were involved, and irrespective of whether the revocation is "to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms."

---

[28] Interestingly, notwithstanding President Biden and the ATF implementing the Administration's "zero tolerance" policy, President Biden voted for the 1986 FOPA when he was a Senator. *See* https://www.nbcnews.com/politics/2020-election/biden-voted-nra-when-senate-nation-were-very-different-n997311.

146.     ATF has strayed far afield from the "enforcement objective of ATF … to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms." *See* Letter to Senator DeConcini from ATF Director G. R. Dickerson, Sept. 7, 1979, Exhibit 7 at p5. ATF's anti-gun and anti-FFL agenda is reflected by the foreseeable outcome of its published policies – the slow but certain elimination of the Second Amendment supply chain.

**ATF Compliance Inspection of Plaintiff BCO**

147.     Plaintiff BCO holds two Federal Firearms Licenses, a Type 01 dealer's license acquired in June of 2019 (# 3-45-003-01-5G-01253), and a Type 07 manufacturer's license acquired in 2022 (# 3-45-003-07-5J-01603).

148.     Since receiving its Tyle 01 license in 2019, Plaintiff BCO *has never been inspected* by ATF as part of an annual compliance inspection pursuant to 18 U.S.C. § 923(g)(1)(B)(ii), which provides that "[t]he Attorney General may inspect or examine the inventory and records of a licensed importer, licensed manufacturer, or licensed dealer without such reasonable cause or warrant for ensuring compliance with the record keeping requirements of this chapter … not more than once during any 12-month period….").

149.     Then, on July 5, 2022, Plaintiff BCO brought suit in this Court against Defendants in *Morehouse, et al. v. ATF, et al.*, 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022), currently on appeal in the Eighth Circuit (Docket 22-2812), challenging an ATF rulemaking promulgated April 26, 2022, 2021R-05F, 87 FR 24652, and effective on August 24, 2022, entitled "Definition of 'Frame or Receiver' and Identification of Firearms."

150.     Suddenly, after years without a compliance inspection, BCO found itself the subject of an administrative compliance inspection conducted by ATF in February of 2023. *See* Declaration of Tanner Morehouse, Exhibit 12.

151.    On February 22, 2023, ATF Industry Operations Investigator ("IOI") Jacob Temp presented himself at Bridge City Ordnance, announcing that ATF was undertaking an administrative compliance inspection.  *Id*. at ¶ 8.

152.    When initially discussing the BCO inspection that was to take place, ATF IOI Temp jokingly stated that ATF personnel had discussed whether the inspection of BCO would appear to be in retaliation for BCO having sued ATF in this Court.  *Id*. at ¶ 9.

153.    In fact, IOI Temp recounted that, at least initially, *ATF had planned to delay any inspection of Plaintiff BCO by at least three years*, during the time the existing litigation was pending.  *Id*. at ¶ 10.

154.    However, it would appear that was then and this is now, and ATF decided to inspect BCO in spite of how it would appear, and potentially even as retribution for BCO having dared to stand up to the federal government.

155.    After conducting a three-day inspection that lasted through February 24, 2023, IOI Temp issued a "Report of Violations" dated March 6, 2023.  Exhibit 13.

156.    IOI Temp's investigation involved a complete audit of BCO's Acquisition and Disposition ("A&D") book. *Id*. at ¶ 12.  As part of that audit, IOI Temp verified that *every single one* of BCO's approximately 2,700 firearm acquisitions and 2,470 dispositions was properly documented, meaning that *every single firearm was accounted for*.  *Id*. at ¶ 15.

157.    IOI Temp expressed his approval at that result in particular, noting that BCO had done quite well in its overall level of compliance.  *Id*. at ¶ 13.

158.    Although BCO had held two firearm licenses, including one for nearly four years, and in that time, had conducted thousands of firearm transactions (each of which was accounted for), IOI Temp identified only **five violations** that allegedly occurred.  Exhibit 13 at 2.

34

159.     **Three** of these were transcription errors.  On one occasion, BCO had forgotten to record that it had returned a firearm to a customer who had brought it in for gunsmithing services. *Id*. at 5.  On a second occasion, BCO had mistakenly written a customer's social security number, instead of the NICS Transaction Number ("NTN"), in box "27b" on a Form 4473.  *Id*.  And in a third case, BCO had mistakenly transcribed an NTN, which was "missing a digit." *Id*.

160.     The other **two** violations found by ATF involved a single transaction on August 25, 2022.  *Id*. at 5.  The first was for "sale or delivery to out of state resident," where "licensee transferred handgun … to a Georgia Resident." *Id.*

161.     With respect to the same sale was a second alleged violation for a "failure to complete a NICS/POC background check," where "licensee failed to contact NICS prior to transfer of firearm, Licensee recorded Georgia Weapons Carry License." *Id.*

162.     Then, on May 23, 2023, ATF issued a Notice of its intent to revoke both of BCO's licenses.  Exhibit 1.

163.     This Notice of Revocation was signed by Hans C. Hummel, Director, Industry Operations.

164.     Although the Notice of Revocation applies to *both* of BCO's licenses (Type 1 dealer and Type 07 manufacturer), it does not allege that ATF has found any recordkeeping violations with respect to the Type 07 license.

165.     Whereas ATF's March 6, 2023 Report of Violations had identified five errors, ATF identified **three violations** in its Notice of Revocation.  These three alleged violations involved only **two transactions**.

166.     **First**, ATF alleges that, on August 25, 2022, BCO "willfully sold or delivered a firearm other than a rifle or a shotgun to a person not licensed by the GCA and who Licensee

knows or has reasonable cause to believe does not reside in the state in which Licensee's place of business or activity is located..." *See* Exhibit 1.

167.     **Second**, and with respect to that same August 25, 2022 transaction, ATF alleges that BCO "willfully transferred a firearm to an unlicensed person without first contacting the National Instant Criminal Background Check System ("NICS") and obtaining a unique identification number before allowing the transfer..." *Id*.

168.     **Third**, ATF alleges that BCO "willfully made a false entry in, failed to make appropriate entry in, or failed to properly maintain any record of importation, production shipment, receipt sale or other disposition as required by the GCA..." *Id*. This violation allegedly includes three errors (only one of which was listed in the prior Report of Violations): (i) a mistranscribed NTN number, (ii) a failure to document a denied NICS transaction at 2:54 pm, and (iii) another failure to document a denied NICS transaction at 3:22 pm. All three violations were on the same day, for the same person, and on the same Form 4473.

169.     As discussed below, none of these violations in any way impacted public safety, risked the transfer of a firearm to a prohibited person, or thwarted law enforcement's ability to trace any firearm.

**Transfer of Handgun to Out-of-State Resident**

170.     DIO Hummel's first stated basis for ATF's revocation of BCO's license is a single transfer of a handgun to a resident of Georgia. Exhibit 1 at 2.

171.     In pertinent part, 27 C.F.R. § 478.99(a) provides that a "licensed dealer … shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in … the State in which the licensee's place of business or activity is located," except that "the foregoing provisions of this paragraph (1) shall

not apply to the sale or delivery of a rifle or shotgun … to a resident of a State other than the State in which the licensee's place of business or collection premises is located if the requirements of § 478.96(c) [eligible person] are fully met…."

172.     In other words, firearm dealers are prohibited from transferring handguns (and "stripped" frames/receivers which often are used to assemble complete firearms[29]) to unlicensed residents of other states but, at the same time, they are allowed to transfer rifles and shotguns.

173.     The purported purpose for this requirement, colloquially known as the interstate handgun transfer ban, is because FFLs cannot be expected to know the laws of other states, with respect to whether a particular handgun lawfully may be possessed by a resident of any given state.

174.     However, this justification is not implicated in this case.  The State of Georgia does not impose any type restrictions or magazine size limitations with respect to the handguns owned by its residents.

175.     Moreover, although listed in the Notice of Revocation, this alleged violation cannot form the basis for the ATF Notice of Revocation against BCO.  Rather, under the 2019 AAP, the "[t]ransfer of a firearm other than a rifle or shotgun (including a frame or receiver) to an out-of-state resident" merited only a "Warning Conference," not revocation.  *See id*. at 7.d.4.a.  Likewise, under the 2022 AAP, the same offense still warrants a "Warning Conference," not a revocation.[30] *See id*. at 7.d.4.a.  Thus, to the extent that ATF lists this violation (out-of-state transfer) as the basis for its Notice of Revocation, that decision is contrary to the agency's own policy expressed in the AAP, and thus is by definition arbitrary and capricious agency action.

---

[29] *See* https://www.atf.gov/file/60686/download.
[30] Upon information or belief, this treatment of this offense is based on ATF's belief that the transfer of a handgun to an out-of-state resident who is eligible to possess it both under federal law and the law of his state is not an event that triggers the concerns (prohibited persons obtaining firearms, public safety, tracing problems) that led to Congress's enactment of the GCA.

**Use of Georgia Permit in Lieu of NICS Check**

176.     DIO Hummel's second basis for revocation of BCO's licenses is for one instance of having "recorded" a "Georgia Weapons Carry License" in lieu of contacting the NICS background check system.  Exhibit 1 at 2.

177.      Interestingly enough, 18 U.S.C. § 922(t)(3) states that no NICS check is required for a firearm transfer where "(i) such other person has presented to the licensee a permit that (I) allows such other person to possess or acquire a firearm; and (II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and (ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law."

178.     Pursuant to that statute, ATF maintains a "Permanent Brady Permit Chart" of states where the possession of a concealed carry license or similar firearm permit qualifies the holder to purchase firearms from FFLs without a NICS check.[31]

179.     Both North Dakota "Concealed weapons permits issued on or after December 1, 1999" and "Georgia firearms licenses" (a/k/a "Georgia Weapons Carry License") qualify for this NICS exemption, colloquially known by ATF as "Brady alternates."

180.     The only purported problem with BCO's alleged violation, then, is that the Georgia permit was not a valid NICS alternative *in North Dakota*, as it was not issued "by the State in which the transfer is to take place."

---

[31] *See* https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart.

181.     Even so, the Georgia carry permit was sufficient to prove that the transferee in the Georgia sale was a transferee *eligible to possess firearms*, and thus that the buyer would have passed a NICS check.

182.     Indeed, neither ATF's Report of Violations or Notice of Revocation claim that the Georgia buyer was ineligible, or that BCO has ever made a firearm transfer to a prohibited person. Thus, and again, the Georgia sale does not in way impact public safety or ATF's ability to trace the firearm that was transferred.

183.     Under the 2019 AAP, "failure to conduct a NICS check or obtain an alternate permit" merited only a "Warning Conference."  Exhibit 4 at 7.c.12.

184.     Under the 2022 AAP, however, the same offense, "failure to conduct a NICS check or obtain alternative permit," including "acceptance of an invalid alternate permit or nonqualifying alternative permit in lieu of NICS," jumped in severity, purportedly now warranting automatic revocation.  Exhibit 3 at 7.e.6.b.

185.     In other words, under the 2019 AAP, Plaintiff BCO's alleged violation would merit at most a Warning Conference.  However, under the current AAP, ATF claims that very same violation warrants automatic Revocation.  Further, under the 2019 AAP, ATF could conduct a Warning Conference without any finding that the alleged violation was willful.

186.     As noted above, ATF does not make its administrative action policies known to the public, and thus there was no way for Plaintiff BCO to be aware of this secret, internal policy change – from Warning Conference to Revocation for the exact same alleged error.

187.     Yet "[a]n agency may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox TV Stations, Inc*., 556 U.S. 502, 515 (2009).

188.     To Plaintiffs' knowledge, ATF has offered no justification as to why its old policy (Warning Conference) was erroneous or lacking, or why its new policy (Revocation) is necessary or appropriate.   The available evidence demonstrates that this substantial change in ATF's revocation policy was the proximate result of the "Biden-Harris" political agenda, rather than the result of any policy change enacted by Congress.

**Failure to Properly Record Certain Information**

189.     Third and perhaps most audaciously, DIO Hummel's Notice of Revocation accuses Plaintiff BCO of having "willfully made a false entry in, failed to make appropriate entry in, or failed to properly maintain" certain records.  Exhibit 1 at 2-3.

190.     DIO Hummel references three different pieces of information, each of which pertains to the same firearm transfer, on the same day, to the same individual, on the same ATF Form 4473.

191.     First, that BCO "failed to document DENIED transaction at 2:54 pm."

192.     Second, that BCO "failed to document DENIED transaction at 3:22 pm."

193.     Third, that BCO provided an "invalid NTN" in "Form 4473 box 27.b."

194.     BCO's first two attempts to run the transferee through the NICS system failed, resulting in a "DENIED" response from NICS, presumably based *__erroneously__* on the record of a similar person (such as a felon) with the same name to the transferee.  Exhibit 1 at 3.

195.     On the third attempt, BCO and the transferee included the transferee's social security number (optional but not required on the Form 4473), as evidenced by ATF's Report of Violation, which recounts that "licensee recorded transferee's social security number" in "Item 27b."  Exhibit 13 at 5.

196.     On this third attempt with the transferee's social security number, the FBI NICS system issued a "PROCEED" result, meaning that the transferee had cleared the background check.

197.      In other words, it was the *FBI's erroneous denials based on the government's incomplete or inaccurate* computerized information that required the provision of additional voluntary information that neither the transferee nor the FFL was required to provide to NICS. Nonsensically, DIO Hummel now faults Plaintiff BCO for failing to have annotated the transferee's Form 4473 to account for the errors that were solely the fault of the FBI and its NICS system.

198.     Then, with respect to the third, approved NICS check, DIO Hummel's Notice of Revocation faults BCO for "willfully" recording a "invalid NTN" on the Form 4473.  Exhibit 1 at pp. 2-3.

199.     As IOI Temp's Report of Violations recounts, this involved a mere transcription error, where "the NTN number is missing a digit."  Exhibit 13 at 5.

200.     Importantly, whereas IOI Temp in his Report of Violations found "no evidence the NTN was falsified but [rather was] recorded on the form incorrectly," DIO Hummel apparently disagreed with that assessment, and is now alleging in the Notice of Revocation that BCO "willfully made a false entry…."  Exhibit 13 at 2.

201.     It is unclear how DIO Hummel would be able to arrive at this conclusion that BCO acted "willfully," without having conducted the inspection of BCO or ever having spoken with BCO.

202.     Rather, it appears that DIO Hummel merely *assumed* "willfulness" based on the AAP – and what ATF's Spartan system dictated through its artificial, or perhaps fabricated, algorithms.

203.     Nevertheless, IOI Temp's actual observations and conclusions that BCO *did not* act willfully undermine and impeach DIO Hummel's unsubstantiated allegations.

### BCO Has No History of Violations

204.     As noted *supra*, BCO has never been subject to a prior ATF compliance inspection.

205.     Thus, BCO has never been found to have made *any* recordkeeping or administrative errors during the time it has held its licenses.

206.     The two isolated transactions that are the subject of ATF's Notice of Revocation thus stand alone out of *thousands* of transfers made by BCO over *several years* (a microscopically small error rate of .00087, as compared to the NFRTR's 50 percent error rate).

207.     No ATF document or other communication to BCO makes any reference to any prior similar violations by BCO (*i.e.*, accepting a Brady alternate permit in lieu of NICS, or failing to record a NICS denial).

208.     Nor does the ATF Notice of Revocation allege that ATF has any reason to believe that BCO will commit the same alleged error again and that BCO would not, if given the opportunity, be able to avoid making similar administrative errors in the future.

209.     Nor is there any indication from ATF's Notice of Revocation that the agency ever considered any of the "mitigating factors" contained in the AAP.  Exhibit 3 at 7.a.3.

210.     Had ATF done so, those factors would have weighed heavily in BCO's favor here (willing/able to achieve voluntary compliance, no threat to public safety or contribution to criminal activities, no lack of traceability of the firearm, no nexus to a prohibited person).

211.     In fact, IOI Temp specifically noted mitigating factors in his Report of Violations, noting that there was "no evidence" that BCO had intentionally mistranscribed an NTN.

212.     In sum, "[o]ther than the violations themselves, there was no evidence that petitioners displayed a disregard for the regulations.  In fact, the evidence shows the opposite." *Jim's Pawn Shop, Inc. v. Bowers*, 2008 U.S. Dist. LEXIS 97199 (E.D. N.C. Sept. 16, 2008), *23.

**Judicial Review Is Appropriate Now, Irrespective of ATF's Inevitable Revocation of BCO's Licenses**

213.     18 U.S.C. § 923(f)(3) provides that the Unites States District Court for the district of the principal place of business of the petitioner shall have jurisdiction to hear complaints for a *de novo* judicial review of the Attorney General's findings regarding the revocation of a firearms license.

214.     This complaint is being filed in advance of the ATF administrative revocation hearing, and thus obviously in advance of the 60 day deadline contained within 18 U.S.C. § 923(f)(3).

215.     However, due to the nature of the claims asserted in this complaint, Section 923 is not implicated, and judicial review is appropriate now, for several reasons.

216.     First, Plaintiffs in this action are not challenging the likely revocation of Plaintiff BCO's license that has not yet occurred, but instead bring a *facial challenge* to ATF's 2022 AAP (and any successor AAP) as being contrary to the statutory text as a matter of law, irrespective of how it might be applied in any particular case.  The AAP (an ATF "Order") is "final agency action" under the APA, irrespective of the particular revocation proceedings in Plaintiff BCO's case. Plaintiffs' claims are advanced on behalf of thousands similarly situated FFLs across the country, in addition to BCO, who have, are, and will face ATF compliance inspections, warning letters, warning conferences, and revocations under the legally flawed 2022 AAP.

217.    Second, Plaintiffs assert claims independent of any claim under § 923(f)(3), including under the Administrative Procedures Act and the Second Amendment.  None of these claims (especially constitutional ones) could be brought in an administrative hearing before ATF, as administrative hearing officers have no authority to resolve APA or constitutional claims.

218.    Third, the Supreme Court notes that, "[a]s we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'"  *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016).  *See also Sackett v. EPA*, 566 U.S. 120, 127 (2012) (plaintiff need not "wait for the Agency to drop the hammer").

219.    Fourth, Plaintiffs have serious reasons to question the fairness and impartiality of the Saint Paul Field Division of the ATF.  For starters, IOI Temp recounted to BCO about how those within the ATF office had joked about how the inspection of BCO would seem like retaliation for having challenged other ATF actions in this Court.  The fact that ATF's compliance inspection of Plaintiff BCO corresponds closely in time with Plaintiffs' litigation in this Court – after never before having been subjected to such an inspection – at a minimum certainly raises red flags with respect to retaliation and selective prosecution.  Indeed, the same ATF Saint Paul Field Division committed, just months ago, "as plain a violation of due process as this Court has seen." *Streicher's, Inc. v. Hummel*, 2023 U.S. Dist. LEXIS 68898 (Dist. MN Apr. 20, 2023), *7.  Worst still, as noted above, DIO Hummel overruled IOI Temp's conclusion that there had been no "falsify[cation]," alleging instead (without evidentiary support) that Plaintiff BCO "willfully" falsified its records. *Cf*. Exhibit 13 with Exhibit 1.

220.    Fifth, waiting for ATF's inevitable final revocation of Plaintiff BCO's licenses will result in irreparable harm not only to BCO but also to members and supporters of GOA and GOF.

Whereas ATF's internal policy traditionally has been to agree to a stay of revocation pending judicial review, ATF now (as part of its "zero tolerance" push to revoke licenses as efficiently as possible) *refuses* to agree to stays, meaning that dealers are left in the untenable position of seeking emergency judicial review.  *See, e.g., The Tactical Edge, LLC v. Garland*, No. 3:23-cv-00544 (M.D. TN June 1, 2023) (concluding that "923(f)(2) does not require the Attorney General to stay the revocation of a license during the pendency of district court proceedings," but "wonder[ing] why [ATF] did not voluntarily agree to postpone revocation of Plaintiff's license").

221.     Sixth, Plaintiffs contend that the lone, isolated violations that are the subject of ATF's Notice of Revocation in this case fail – as a matter of law – to establish that Plaintiff BCO "willfully" violated any of its recordkeeping requirements.  Indeed, when considering *identical violations* (transfer of a firearm "to a person who [the FFL] knew or had reasonable cause to believe does not reside in the state" and "not contacting NICS with respect to the transfers"), another court in this Circuit recently rejected ATF's revocation of an FFL.  *Streicher's, Inc.* at *10. As Judge Magnuson noted, "ATF has cited no court decisions in which a federal firearms license has been revoked for conduct akin to that at issue here: a small number of violations and the licensee's first violations of the particular type." *Id*. at 13 (noting that cases generally are premised on "repeated failure[s]" and a "large number of violations" and "multiple instances").  Finding that "the public interest requires the uniform application of the federal firearms laws," and "the revocation here is contrary to that principle," Judge Magnuson implicitly rejected the 2022 AAP which changes ATF policy and adopts a strict-liability revocation for even single instances of a violation.  *Id*. at 14.

222.     For each of these reasons, BCO (much less GOA and GOF) need not wait for ATF to actually revoke BCO's licenses.

**DIO Hummel Cannot Legitimately Serve as BCO's Hearing Officer**

223.     Upon information and belief, DIO Hummel will be the hearing officer at BCO's revocation hearing.  *See Streicher's, Inc. v. Hummel*, No. 23-995 (PAM/ECW), 2023 U.S. Dist. LEXIS 68898, at *5 (D. Minn. Apr. 20, 2023) (DIO "Hans Hummel, director of the ATF's St. Paul field office, served as the hearing officer.").[32]

224.     There, DIO Hummel was responsible for the underlying revocation decision, yet was allowed to act as his own judge and jury in a hearing challenging the same to revoke the *Streicher's* FFL.

225.     Upon information or belief, this has become common practice for ATF in recent years – having an ATF employee serve as a purportedly impartial hearing officer during revocation proceedings, after the very same employee issued the Notice of Revocation accusing the FFL of wrongdoing.

226.     Upon information or belief, ATF permits this practice on the theory that APA regulations "do not apply to [revocation] hearings," which "are informal in nature," because "a federal firearms licensing hearing is subject to *de novo* judicial review in district court…."  ATF "Hearing Procedures Relating to Federal Firearms Licensees" (2010R-2T), 75 Fed. Reg. 48632 at 48363.

227.     Nevertheless, ATF's procedures also explain that, before choosing a hearing officer, the "hearing officer's impartiality and/or prior relationship with or knowledge of the applicant or licensee will be considered," including "whether there is reasonable cause to believe that the

---

[32] Amazingly, and undisclosed to the FFL in *Streicher's*, DIO Hummel's wife, Theresa Hummel, represented the ATF at the hearing.  *Id*.

hearing officer's ability to conduct a fair and impartial inquiry is impaired by the hearing officer's prior knowledge of the case or interactions with the applicant/licensee." *Id*. at 48363.

228.     Upon information or belief, ATF does not follow that policy.

229.     ATF's policy further states that "[t]o ensure impartiality, the hearing officer will generally be appointed from outside the applicant's/licensee's division." *Id*. at 48363.

230.     Upon information or belief, ATF does not follow that policy.

231.     ATF's policy further states that "[a]n individual should decline to act as a hearing officer in a particular case if he/she is not fully confident that he/she can administer a fair and impartial proceeding.  If, at any time after being designated as hearing officer for a case, the officer determines that he/she cannot administer a fair and impartial proceeding, the hearing officer should immediately recuse himself or herself from the matter." *Id*. at 48364).

232.     Upon information or belief, ATF does not follow that policy.

233.     DIO Hummel is not some small player in the BCO proceedings, but instead he is the very same official who made the decision to revoke BCO's licenses, but expectedly will sit in judgment of his own decision.

234.     This practice will deny BCO the benefit of an impartial, neutral, and detached hearing officer.

235.     This Circuit has held that "a hearing officer must be impartial for an administrative agency to meet the requirements of due process." *Deretich v. Office of Admin. Hearings*, 798 F.2d 1147, 1152 (8th Cir. 1986) (citation omitted).  *See also Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997) (*citing Gibson v. Berryhill*, 411 U.S. 564, 569 (1973)) ("[t]he basic requirement of constitutional due process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer.").

236.     And, "as the Supreme Court has recognized, 'not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness.'" *Dyas v. Lockhart*, 705 F.2d 993, 996 (8th Cir. 1983). *See also Rapides Par. Sch. Bd.*, 118 F.3d at 1052 ("decision makers are constitutionally unacceptable … when a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.").

237.     DIO Hummel fails that standard, routinely sitting on both sides of the equation, not only as the person who decides to revoke an FFL's license, but also then sitting in judgment of his own decisions.

### Allegations Pertaining to Irreparable Harm

238.     If the 2022 AAP (including any successor AAP) is not enjoined, and BCO's FFLs are revoked, BCO will be unable to manufacture or sell firearms, and will be forced to go out of business.

239.     In addition to BCO, many other FFLs across the country, who are represented by GOA and GOF, have experienced, are experiencing, and will experience the same "zero tolerance" policy revocation as is occurring to BCO, which similarly will drive many of them out of business from the resulting inability to deal in firearms without violating federal law.

240.     This Circuit has found irreparable harm "when one's allegedly unlawful actions will ... cause another's ongoing business to terminate absent an injunction." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987). In general, "[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040

(8th Cir. 2016) (*quoting Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).

241.     BCO, like other FFLs represented by GOA and GOF, has no adequate remedy at law, as "money damages" are not available under the APA. S*ee Dep't of the Army v. Blue Fox*, 525 U.S. 255, 119 S. Ct. 687, 142 L. Ed. 2d 718, (1999) (money damages unavailable under APA). S*ee also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ("economic harm is not generally considered irreparable. But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable.").

242.     Likewise, Plaintiffs cannot obtain damages for their constitutional claims because "Congress has not waived sovereign immunity for constitutional claims against the United States." *Manos v. Fed. Bureau of Prisons*, 2020 U.S. Dist. LEXIS 21370, at *8 (D. Minn. Jan. 14, 2020). *See Laswell v. Brown*, 683 F.2d 261, 268 (8th Cir. 1982).

243.     In addition to the licensees they represent, other GOA and GOF members and supporters will be irreparably harmed by the loss of the gun stores whose licenses are revoked by ATF under its new "zero tolerance" policy.  Many gun owners will lose their preferred local gun stores, and will be forced to drive additional miles, at additional time and expense (often significant), to a different store more distant from their homes.  This infringes their constitutional right to keep and bear arms, just as a law banning cell phones and requiring a person to drive to the local library to post a Tweet would violate the First Amendment right to speech.

244.     As time passes, and ATF successfully revokes more and more FFLs, their diminishing numbers will have a real impact on the ability of law-abiding persons to acquire firearms, as the supply of firearms itself is diminished.  This indisputably represents an

infringement of the right to keep and bear arms, and a planned abolition and reduction of the Second Amendment supply chain.

245.     Courts in this Circuit recognize that "loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[.]" *Smith v. Starr, Warden*, 2022 U.S. Dist. LEXIS 85760, at *18 (D. Minn. Mar. 7, 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  And because GOA and GOF's members and supporters have a constitutional right to purchase and otherwise acquire firearms, their ability to purchase a firearm is infringed by the AAP.  And even a "minimal" infringement is still an infringement on a constitutional right.

246.     Specifically with respect to Plaintiff BCO, in Valley City, North Dakota, where BCO maintains its place of business, the ATF lists just six other FFLs.[33]

247.     Yet, upon information or belief, none of these licensees is a "gun store" in the traditional sense, as is BCO.  As discussed, *supra*, one of GOA's members, who lives in North Dakota, reports to GOA that BCO is the only "real" gun store in Valley City, and that the other gun stores in Valley City are very small, usually only maintain part time hours, and/or have some other primary business other than firearms.  *See* Declaration of Erich Pratt, Exhibit 2.

248.     Thus, were BCO's licenses revoked, this member (along with many others) would have to expend significant additional resources in time and travel to drive a much further distance in order to acquire constitutionally protected arms.

249.     As the district court in Tactical Edge found, ATF revocation orders result in "very harsh consequences" – *i.e.*, irreparable harm.  *The Tactical Edge, LLC v. Garland*, No. 3:23-cv-00544 (M.D. TN June 1, 2023) at 6.

---

[33] *See* https://www.atf.gov/firearms/docs/undefined/0523-ffl-list-north-dakotaxlsx/download.

## FIRST CAUSE OF ACTION
## (VIOLATION OF APA 5 U.S.C. § 706(2)(A))
## ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW

250.    All of the foregoing allegations are realleged as if fully set forth herein.

251.    The AAP challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

252.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A).

253.    A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

254.    Here, ATF has failed to consider BCO's long history of compliance with the statutory scheme and regulatory requirements, throughout thousands of transactions.

255.    ATF has failed to consider the mitigating factors from the AAP, which weigh heavily in favor of Plaintiff BCO.

256.    ATF has failed to consider that BCO's alleged violations have no nexus to public safety, prohibited persons, or impaired tracing.

257.    ATF has failed to consider BCO's ability to correct its unintentional mistakes, and to avoid making similar errors in the future.

258.    ATF has failed to have an actual human being consider the merits of BCO's case, instead assigning the determination of "willfulness" to a computer program.

259.    ATF has failed to consider that IOI Temp found that BCO had not acted willfully.

260.    An agency's departure from prior practice can serve as an additional basis for finding an agency's action to be arbitrary and capricious.

261.     Here, the current AAP is a stark departure from the 2019 AAP, elevating the punishment for Plaintiff BCO's alleged violation from Warning Conference to Revocation, without any notice to BCO or the public.  Further, this severe change reflects a policy choice that was not enacted by Congress but rather was a political edict from the Executive branch.

262.     Additionally, the AAP and ATF's "zero tolerance" policy conflicts with the statute as enacted and intended by Congress.  Imposing a strict liability standard, the 2022 AAP rejects the statutory concept of "willfulness," entirely eliminating the exercise of all discretion by ATF field personnel, putting the decision to revoke into the hands of an ATF computer program, and ultimately circumventing what Congress established as public policy in the 1986 Firearm Owners Protection Act in order to stop ATF's prior abuses that mirror what it is doing now.

263.     ATF's AAP takes the position that, regardless of whether there are actually any facts to establish "willfulness," ATF will presume that certain violations establish willfulness and "shall result in a revocation recommendation," and that "revocation is the presumed action" for certain offenses, regardless of the state of mind of a licensee.

264.     The AAP results in a situation where honest mistakes, misunderstandings, and human error can form the basis for license revocation, even though none is in any way "willful."

265.     The AAP creates a weapon that ATF is wielding against the firearm industry (a constitutionally protected community), creating a situation where most (if not all) well-intentioned dealers at some point will commit an inadvertent slip up, subjecting their license to revocation, cabined only by the good graces of ATF field personnel who choose to exercise their discretion not to report certain violations.

266.     The AAP creates standards and policies that expand the basis for FFL adverse actions, including revocations, beyond what Congress provided for in 18 U.S.C. § 923, making those changes *ultra vires* and outside the scope of the authority of an administrative agency.

267.     The AAP permits punishment of unintentional violations that, like those alleged of BCO, do not even meet the stated purpose of the Biden-Harris "zero tolerance" policy, at least as presented to the public, to go after FFLs who "put public safety at risk."

268.     The AAP conflicts with the unambiguously stated intent of Congress in enacting FOPA, prior to which "the strict liability provided by the act, even the most trivial and unintentional misstep would do."  In other words, the AAP returns to and re-creates the very state of affairs that FOPA was explicitly designed to prevent.

**SECOND CAUSE OF ACTION**
**(SECOND AMENDMENT)**
**RIGHT TO KEEP AND BEAR ARMS – ACQUISITION OF ARMS**

269.     All of the foregoing allegations are realleged as if fully set forth herein.

270.     Ratified in 1791, the Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

271.     BCO has a right to manufacture, acquire, and sell firearms, which are protected "arms."   Correspondingly, Americans who are part of "the people" have the right to acquire, purchase, own, and possess firearms to "keep and bear."  Those rights exist independent of and existed prior to their recognition in the United States Constitution. Those rights are protected by the Second Amendment's "shall not be infringed" mandate.

272.     As a vendor, BCO is able to bring claims on behalf of its customers. *Craig v. Boren*, 429 U.S. 190, 195 (1976).  But even so, at least one member of GOA wishes to purchase firearms from BCO, but will be deprived of doing so by the AAP.

273.     If BCO's licenses, or either of them, are revoked under an unlawful enforcement policy that violates the United States Constitution, it will infringe not only the rights of BCO, its owners, and responsible persons, but also the rights of BCO's customers, including GOA and GOF's members and supporters.

274.     Similarly, the AAP is being used to target many other FFLs, some of which are members and supporters of GOA and GOF, or members of the Caliber Club.  The AAP will inevitably put many of these gun stores out of business, affecting the ability of many other GOA and GOF members and supporters to acquire firearms.

275.     Whereas a district court in *United States v. Price*, 2022 U.S. Dist. LEXIS 186571, at *6 (S.D. W. Va. Oct. 12, 2022) noted that the placement of a serial number on a firearm is an example of "commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession," ATF's actions under the AAP to put hundreds of American gun stores out of business undoubtedly "implicate[s] an individual's right of possession," raising the cost and increasing the difficulty (and thus infringing) the constitutional right to acquire arms.

276.     The text of the Second Amendment covers the manufacture, purchase and sale of firearms and ammunition.  *See Lynchburg Range & Training, LLC v. Northam*, 2020 Va. Cir. LEXIS 57, *6 (Lynchburg Cir. Ct. 2020) ("the right to keep and bear arms 'inclu[des] the otherwise lawful possession, carrying, transportation, sale, or transfer of firearms….'"); *Tony Kole & Ghost Indus., LLC v. Vill. of Norridge*, 2017 U.S. Dist. LEXIS 178248, at *29 (N.D. Ill. Oct. 27, 2017) ("The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas

Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ("Our citizens have always been free to make, vend, and export arms.").

277.     A contrary finding – *i.e.*, that there is a right to acquire and possess arms but not to manufacture or sell them – is akin to a finding that there is a right to *sit* on a jury, but no right to *have* a jury in a criminal trial.  On the contrary, Second Amendment protected commerce in arms is merely two sides of the same constitutional coin.

278.     The rights protected under the Second Amendment include the right to engage in the commerce and/or business of being a gun dealer, gun manufacturer and/or operating a gun range (businesses that invariably also possess FFLs as part of their operations). *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.")

279.     The AAP represents an infringement of individual gun owners' ability to exercise their right to keep and bear arms because they, including GOA and GOF's members and supporters, rely on licensees such as BCO in order to purchase firearms.  Indeed, there can be no commercial manufacture of firearms without ATF licensure.  And for those firearms that are manufactured commercially (*i.e.*, about 99.9% of them), they cannot be distributed to the American public other than through federally licensed dealers.

280.     Thus, ATF almost entirely controls Americans' access to firearms through the GCA's licensure scheme.  The AAP is deliberately and intentionally designed to bottleneck that constitutionally guaranteed pipeline.

281.     Reducing the availability of firearms, and imposing additional hurdles to lawful gun ownership, infringes citizens' rights under the Second Amendment including the individual right of self-defense. *See New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111, 2133 (2022).

282.     As the Supreme Court explained in *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126.

283.     Under *Bruen*, the question of what the Nation's historical tradition of firearms regulation included is generally limited to the historical precedent at the time of the Second Amendment's adoption.  *Bruen* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."  The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.").

284.     As of 1791, there was no national historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

285.     As of 1791, there was no national historical tradition of government regulation of the commercial sales of firearms.

286.     Certainly, there is no historical tradition of revoking licenses, limiting the ability of persons to offer for sale, and thereby restricting Americans' access to arms, based on nothing more than unintentional, technical, or paperwork violations like those at issue here.

287.     As of 1868 (even though that is not a relevant time period here),[34] there was no national historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

288.     Yet absent clear evidence from ATF that firearms licensing schemes for manufacturers and dealers was part of this Nation's historical tradition of firearms regulation as of 1791, the ATF is not authorized to prohibit or deny anyone the right to engage in commerce, manufacturing, retail sales or other commercial activities that are or may be protected by the scope of the Second Amendment.

289.     For that simple reason – that there is no broad and enduring historical tradition supporting the challenged agency action – the AAP is invalid on its face.

_____

[34] Although *Bruen* references 1868, it does so only because it is the date of ratification of the 14th Amendment.  This case, however, involves the federal government, and thus 1791 is unequivocally the correct date of focus.  Moreover, with respect to whether post-founding historical sources have any role at all to play in the analysis, the Supreme Court technically left the question open, finding it unnecessary to its decision in *Bruen*.  142 S. Ct. at 2138.  Nevertheless, as the Court has repeatedly made clear, even prior to *Bruen*, that Reconstruction-era historical sources are to be used (at most) only as *confirmation* of a historical tradition that was *already* in existence during the founding.  For example, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), the Court rejected the fact that "more than 30 States" had enacted a certain type of legislation in the mid-to-late 19th century, explaining that even such a pattern "cannot by itself establish an early American tradition." *Id.* at 2258-59; *see also Bruen* at 2137 (using 1800s sources only "as mere confirmation of what the Court thought already had been established"); *id.* at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.  On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'"); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020).

290.     But what is more, *Bruen* declared unconstitutional a New York State handgun permit licensing scheme which vested subjective and unbridled discretion and authority in government officials to approve or deny an application for a handgun permit.  *See Bruen* at 2123.

291.     Although the government can be expected to argue as much, *Bruen* categorically **_did not find_** that licensing and permitting statutes are generally constitutional.  At least one federal court has called such a reading of *Bruen* "just disingenuous."[35] Rather, *Bruen* explicitly rejected a subset of such regimes that "grant[] open-ended discretion to licensing officials," because that was the only issue before the Court.  *Id.* at 2161.

292.     The AAP defies that principle, asserting ATF authority to revoke a licensee based on any subjective criteria or factors external to the enumerated standard of "willfulness" contained in 18 U.S.C. § 923(e).

293.     ATF's policies write the phrase "willfully violated" out of the statute entirely, making it more difficult for citizens to obtain firearms, train with them, and maintain them for lawful purposes, including self-defense.

294.     Thus, the AAP's assertion of unbridled and "open-ended discretion" to ATF licensing officials (and computer programs), so that they can revoke licenses at will for minor errors that are not covered by the statute, violates *Bruen* on its face.

### THIRD CAUSE OF ACTION
### (FIFTH AMENDMENT DUE PROCESS)
### RETALIATORY/VINDICTIVE PROSECUTION

295.     All of the foregoing allegations are realleged as if fully set forth herein.

---

[35] *See Antonyuk, et al. v. Hochul*, *et al.,* No. 1:22-cv-00986 (N.D.N.Y.), ECF 73, Hearing Transcript (https://bit.ly/3WPtBwo) at 60:10-15.

296.      "Vindictive prosecution occurs when a prosecutor seeks to punish a defendant solely for exercising a valid legal right." *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004).

297.      "Such prosecution constitutes a violation of due process." *Id*.

298.      "In order to demonstrate prosecutorial vindictiveness, a defendant must show that the … indictment … was sought in retaliation for exercising constitutional or statutory rights." *United States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015).

299.      "A defendant can prove such impermissible prosecutorial vindictiveness with objective evidence of the prosecutor's 'vindictive or improper motive.'" *Id*.

300.      Although "[i]t is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right," "[a] vindictive or improper motive may be proved either by direct or circumstantial evidence." *Leathers* at 961.

301.      There is – already – significant circumstantial evidence of retaliatory prosecution here.

302.      First, after years without a compliance inspection (in fact, having never had a compliance inspection), BCO suddenly was the subject of an administrative compliance inspection conducted by ATF in February of 2023, shortly after BCO brought suit against ATF in this Court.

303.      Second, as alleged, *supra*, when initially discussing the BCO inspection that was to take place, IOI Temp stated that ATF personnel had discussed that the inspection of BCO might appear to be retaliatory for BCO having sued ATF in this Court.  Thus, ATF's own personnel recognize *at least* some circumstantial evidence ("the appearance of corruption") exists in this case, acknowledging that ATF's prosecution of BCO might appear to a reasonable observer to be vindictive.

304.     Third, IOI Temp in fact recounted that, at least initially, ATF had planned to delay any inspection of Plaintiff BCO by at least three years, during the time the existing litigation was pending.  The fact that those plans were changed indicates that ATF deliberately and intentionally chose to target BCO, even with the full knowledge that BCO had brought suit challenging another ATF policy.

305.     Fourth, reducing the possibility that the inspection of BCO was any coincidence, this is not the only case where ATF has shown up for a compliance inspection shortly after being sued.  Shortly after CTC HGC, LLC brought suit against ATF in the Western District of Texas (22-cv-01063) (filed Oct. 19, 2022), challenging the AAP, ATF began a compliance inspection on June 26, 2023.  https://twitter.com/michaeldcargill/status/1673481931151777793.

306.     Fifth, as of January of 2023, ATF reported a total of 543 federal firearm licenses in North Dakota, 641 in South Dakota, 1,655 in Minnesota, and 1,829 in Wisconsin (however ATF's St. Paul Field Division only covers approximately half that state).  Meanwhile, in the last twelve months (June 2022 through May of 2023), ATF's St. Paul Division has performed only 73 compliance inspections (roughly 2 percent).  *See* https://www.atf.gov/firearms/firearms-compliance-inspection-results.

307.     Sixth, as alleged, *supra*, ATF has a history of seeking to revoke the licenses of those who challenge the agency's abusive practices in federal court.  *See* Exhibit 7 at 1-2.

308.     Seventh, by seeking to revoke BCO's FFLs for alleged willful violations, DIO Hummel overruled IOI Temp's finding that that certain errors discovered in the BCO audit were not deliberate.

309.     Indeed, "'a defendant may, in rare instances, rely upon a presumption of vindictiveness'… if he provides sufficient evidence to show 'a reasonable likelihood of vindictiveness exists.'" *Chappell*, 779 F.3d at 879.

310.     Moreover, "It need not necessarily appear that the vindictive prosecution was instituted on account of malice or ill will toward the particular defendant involved." *United States v. Partyka*, 561 F.2d 118, 123 (8th Cir. 1977).

311.     Here, it plainly appears that the ATF's prosecution of a compliance inspection, and later revocation proceedings, was instituted because of BCO's prior litigation to vindicate its constitutional and statutory rights in this Court.

312.     The available evidence indicates that ATF has begun to target its political opponents for retribution, as punishment for standing up to a rogue agency.

313.     Finally, ATF's notice that BCO's licenses are being revoked is vindictive because BCO's alleged violations, as a matter of law, were not "willful" and thus were not unlawful.

### FOURTH CAUSE OF ACTION
### (FIFTH AMENDMENT DUE PROCESS)
### SELECTIVE PROSECUTION

314.     All of the foregoing allegations are realleged as if fully set forth herein.

315.     Defendant's actions against Plaintiff further constitute Selective Prosecution

316.     "In order to make out a prima facie case of selective prosecution, [litigants] must show: (1) that they were singled out for prosecution while others similarly situated were not prosecuted for similar conduct; and (2) that the decision to prosecute was based on an impermissible motive such as … an attempt by the defendant to secure other constitutional rights." *United States v. Kelley*, 152 F.3d 881, 885-886 (8th Cir. 1998); *see also United States v. Catlett*, 584 F.2d 864, 866 (8th Cir. 1978).

317.     A plaintiff's claim must be "at least colorable." *Office of Foreign Assets Control v. Voices in the Wilderness,* 329 F. Supp. 2d 71, 84 (D.D.C. 2004).

318.     A selective prosecution claim lies not only in criminal trials in courts, but in regulatory enforcement actions as well. *Id*.

319.     A showing of probable cause defeats a claim for selective prosecution in the criminal context. *Hartman v. Moore*, 547 U.S. 250, 265 (2006).   However, in a regulatory enforcement action, a mere showing that probable cause may have existed for an enforcement action does not defeat a claim for selective prosecution:  "a plaintiff subjected to adverse regulatory action for allegedly retaliatory reasons must show not that the regulators lacked probable cause, but that other, similarly situated individuals were not subjected to such action." *Gearin v. City of Maplewood*, 780 F. Supp. 2d 843, 859 (D. Minn. 2011).

320.     The AAP leads to a situation where ATF has the ability to inspect any FFL and just about any license, on the basis that every FFL is comprised of human beings that commit human error which ATF can claim to be willful.  *See United States v. Johnson*, 874 F.3d 571, 578 (7th Cir. 2017) (Hamilton, J., dissenting) ("Since virtually everyone violates traffic laws at least occasionally, the upshot of these decisions is that police officers, if they are patient, can eventually pull over almost anyone they choose, order the driver and all passengers out of the car, and then ask for permission to search the vehicle without first making clear the detention is over.").

321.     As alleged, *supra*, ATF's St. Paul Field Division has audited only about 2 percent of total FFLs within its jurisdiction within the past twelve months.  And in that same time period, ATF has revoked only two licenses.[36]  The statistical probability of that occurring to any other FFL is .0005 (five tenths of one percent).

---

[36] *See* https://www.atf.gov/firearms/firearms-compliance-inspection-results.

322.     It thus appears that ATF selected BCO specifically to be the target of an ATF compliance inspection, thereafter drumming up whatever minor technical violations that could be used purportedly to establish "willfulness" under the AAP, and thus to put BCO out of business for having brought suit against ATF in this Court.

323.     Upon information or belief, no other FFL in BCO's area was similarly targeted by ATF for inspection and revocation.

### FIFTH CAUSE OF ACTION
### (FIRST AMENDMENT)
### ACCESS TO COURTS

324.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

325.     The First Amendment protects the right of citizens "to petition the government for redress of grievances." U.S. CONST. amend. I.

326.     This right includes the right of access to petition the courts: "access to the courts is a fundamental right of every citizen....  An individual's constitutional right of access to the courts cannot be impaired, either directly ... or indirectly, by threatening or harassing an [individual] in retaliation for filing lawsuits." *Harrison v. Springdale Water & Sewer Com*., 780 F.2d 1422, 1427-1428 (8th Cir. 1986).

327.     "Government action designed to prevent an individual from utilizing legal remedies may infringe upon the First Amendment right to petition the courts." *Whisman ex rel. Whisman v. Rinehart*, 119 F.3d 1303, 1313 (8th Cir. 1997).

328.     "This right of court access cannot be impaired, either directly or indirectly … [by] 'retaliatory action [taken] against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in

the future.'" *Western Nat'l Mut. Ins. Co. v. Lennes (In re Workers' Compensation Refund)*, 46 F.3d 813, 822 (8th Cir. 1995).

329.     "The right applies not only to the actual denial of access to the courts, but also to situations in which the plaintiff has been denied meaningful access by some impediment put up by the defendant." *A.J. v. Tanksley*, 94 F. Supp. 3d 1061, 1073 (E.D. Mo. 2015).

330.     To establish a claim that a government official violated a plaintiff's constitutional right to access the courts, a plaintiff must show that the defendant acted with some intentional motivation to restrict their access to the courts. *Id*.

331.     As noted by IOI Temp, a rational observer might conclude that it appears ATF's intent behind the inspection of BCO and its subsequent notice to revoke BCO's licenses was to punish BCO for exercising its right to petition in this Court to defend statutory and constitutional rights.

332.     ATF's inspection of BCO and subsequent attempt to revoke BCO's licenses thus appears designed and intended to send a clear message – do not challenge ATF's authority, or else.

333.     In addition to Plaintiff BCO, Plaintiffs GOA and GOF likewise have an interest in the claims asserted in the Third through Fifth Causes of Action, as GOA and GOF routinely litigate on behalf of the interests of their members and supporters across the country, one of whom ATF appears to have retaliated against in this case.

334.     The Second Amendment does not permit the wholesale elimination of commerce in arms, or its concentration in a few large and anti-gun multinational corporations (such as Walmart) that refuse to sell most guns aside from a few shotguns and bolt-action rifles.  On the contrary, the market for firearms – like the marketplace of ideas – should be robust and decentralized.

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Grant a stay to enforcement of the proposed revocation of either or both of Plaintiff BCO's federal firearms licenses, pending the final resolution of this action;

2.      Issue an injunction halting ATF proceedings to revoke Plaintiff Bridge City Ordnance's federal firearms licenses under the AAP;

3.      Declare that the Defendants are not authorized under any statute or law to revoke either or both of Plaintiff Bridge City Ordnance's federal firearms licenses based on the findings and allegations set forth in the ATF Notice of Revocation;

4.      Issue an injunction preliminarily and permanently enjoining Defendants' misuse of the "willful" requirement in the Gun Control Act;

5.      Issue an injunction preliminarily and permanently enjoining the use of Defendants' "Zero Tolerance" policies regarding FFLs, including ATF Order 5370.1E and 5370.1F (and any more current version of the AAP) as contrary to law and constitutional right;

6.      Declare that the Defendants have acted unconstitutionally, arbitrarily, capriciously, and contrary to law, in the establishment of and/or application of standards for revocation of federal firearm licenses;

7.      Grant Plaintiffs an award of their attorneys' fees and expenses in these proceedings pursuant to applicable federal law; and

8.      Grant Plaintiffs such other additional or alternative relief which this Court deems just and proper.

Dated: July 11, 2023.

*/s/ Robert J. Olson*
Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440 (T)
stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

*Counsel for Plaintiffs*