Y4
.Ap 6/2
Al 1/4/PT.2

1033

96 Y4
Ap6/2
Al 1/4
pt.2

GOVERNMENT
Storage

FEB 5 1981

FARRELL LIBRARY
KANSAS STATE UNIVERSITY

KSU LIBRARIES
A11900 467470

# Senate Hearing

*Before the Committee on Appropriations*

# Oversight Hearings on Bureau of Alcohol, Tobacco and Firearms

*Fiscal Year* 1981

96th CONGRESS, SECOND SESSION

**SPECIAL HEARING—Part 2**
Department of the Treasury
Nondepartmental Witnesses



Exhibit 7



# OVERSIGHT HEARINGS ON BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

# HEARING

BEFORE A

## SUBCOMMITTEE OF THE COMMITTEE ON APPROPRIATIONS UNITED STATES SENATE

NINETY-SIXTH CONGRESS

SECOND SESSION

SPECIAL HEARING—PART 2
Department of the Treasury
Nondepartmental Witnesses

Printed for the use of the Committee on Appropriations

U.S. GOVERNMENT PRINTING OFFICE
64-664 O    WASHINGTON : 1980

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

## COMMITTEE ON APPROPRIATIONS

SUBCOMMITTEE ON TREASURY, POSTAL SERVICE, AND GENERAL GOVERNMENT

LAWTON CHILES, Florida, *Chairman*

DENNIS DeCONCINI, Arizona
DALE BUMPERS, Arkansas
WARREN G. MAGNUSON, Washington
*ex officio*

HARRISON SCHMITT, New Mexico
PAUL LAXALT, Nevada
MILTON R. YOUNG, North Dakota
*ex officio*

*Professional staff*
J. MICHAEL HALL
BURKETT VAN KIRK (*Minority*)

*Administrative staff*
DENISE G. CHMIEL

(II)

# CONTENTS

| | Page |
|---|---|
| Nondepartmental witnesses: | |
| Opening remarks of Senator DeConcini | 1 |
| Opening prepared statement of Senator DeConcini | 3 |
| Letter from G. R. Dickerson, Director, BATF | 5 |
| Remarks of: | |
| Senator Schmitt | 12 |
| Senator Domenici | 12 |
| Statement of: | |
| Paul A. Hayes | 13 |
| Mrs. Paul A. Hayes | 14 |
| Firearms transaction records | 15 |
| Memorandum from Herschel N. Stewart | 27 |
| Statement of Ron Koch | 29 |
| Letter and draft stipulation by R. E. Thompson, U.S. attorney | 31 |
| Letter from: | |
| Dr. William S. Lovekin | 34 |
| Mrs. Paul A. Hayes | 36 |
| Statement of: | |
| Donald Vingino, Tuscon, Ariz | 38 |
| Gene Lane | 38 |
| Patrick Mulcahey, Columbia, S.C. | 44 |
| Article from the Washingtonian, "The Fat Man and the Gun Collector" | 51 |
| Letter from: | |
| John G. Krogman, Acting Director, BATF | 61 |
| G. R. Dickerson | 65 |
| Information forms on firearms sales | 66 |
| Neal Knox, executive director, National Rifle Association | 71 |
| Erwin Grombacher | 73 |
| Judge Saul A. Epton (Retired) | 73 |
| Judge Edward D. Resenberg | 75 |
| Thomas P. Koeberle | 76 |
| Randall Callender | 78 |
| J. Curtis Earl | 80 |
| Richard T. Melcher | 82 |
| Patricia M. Koval | 86 |
| John M. Sando | 87 |
| Appellant's opening brief | 90 |
| Brief of appellee | 113 |
| Department of the Treasury: | |
| Bureau of Alcohol, Tobacco and Firearms: | |
| Statement of: | |
| G. R. Dickerson, Director, BATF | 119 |
| Richard J. Davis, Assistant Secretary for Enforcement and Operations, Department of the Treasury | 119 |
| Prepared statement of G. R. Dickerson | 121 |
| Firearms program document | 133 |
| Opinion on use of "Strawman" in firearms sales | 153 |
| Circular on "Strawman" transactions | 162 |
| Notice on sales of firearms at organized gunshows | 163 |
| Result of task force study | 165 |
| Order on return of confiscated firearms | 167 |

iv

| | Page |
|---|---|
| Department of the Treasury—Continued | |
|   Bureau of Alcohol, Tobacco and Firearms—Continued | |
|     Directive on firearms administrative actions and criminal actions | 171 |
|     Public affairs guidelines | 176 |
|     Statement of: | |
|       Marvin Dessler | 190 |
|       Stephen Higgins | 193 |
|       Philip McGuire | 194 |
|     Questions submitted by Senator DeConcini | 198 |
|     Letter from: | |
|       David J. Anderson | 204 |
|       Michael D. Hawkins and Virginia A. Mathis | 205 |
|       Michael D. Hawkins and Linda A. Drake | 207 |
|       David J. Anderson | 209 |
|     Memorandums from William C. Lawrence | 216 |
|     Summary of investigation relating to: | |
|       Paul A. Hayes | 217 |
|       Patrick M. Mulcahey | 225 |
|       Donald Vingino | 227 |
|     Letter from Neal Knox | 236 |
|     Excerpt from Code of Federal Regulations | 238 |
|     Letter from Bill Garrison | 244 |

# OVERSIGHT HEARINGS ON BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

THURSDAY, APRIL 17, 1980

U.S. SENATE,
SUBCOMMITTEE ON TREASURY, POSTAL SERVICE, AND
GENERAL GOVERNMENT,
*Washington, D.C.*

The subcommittee met at 2 p.m., in room S–146, the Capitol, Hon. Dennis DeConcini presiding.

Present: Senators DeConcini, Schmitt, and Domenici.

## NONDEPARTMENTAL WITNESSES

STATEMENTS OF:
  PAUL HAYES
  WILLIE HAYES

ACCOMPANIED BY RON KOCH

Senator DECONCINI. The Appropriations Subcommittee on Treasury and Postal Services and General Government will come to order at this time. I would like the record to show my appreciation to Senator Lawton Chiles and the staff of the committee for their assistance in relation to these hearings. This hearing is a followup to hearings which I chaired in July of last year, during which the subcommittee heard testimony relating to allegations of civil liberties abuses by the Bureau of Alcohol, Tobacco and Firearms.

At that time we heard testimony from a number of citizens who maintained that they had been wronged by agents or supervisors of the Bureau of Alcohol, Tobacco and Firearms. We heard from David Moorhead, a disabled Vietnam veteran who had been VA-trained as a gunsmith. Mr. Moorhead described how he had been arrested, charged with felonious possession of a supposed machinegun, and forced out of business by agents of the Bureau. The subcommittee received for the record a transcript of his trial, wherein Federal District Judge Hughe Bownes dismissed all charges, found Mr. Moorhead innocent as a matter of law, and apologized to him on behalf of the United States.

We also heard testimony from Curtis Earl, a Phoenix, Ariz., firearms dealer. Mr. Earl established that he had been charged with no less than 21 counts of conspiracy and unlawful dealings in firearms, based on transactions which he had cleared with Bureau personnel beforehand. He testified that when the Bureau took the 21 charges before the grand

(1)

jury, the grand jury refused to issue an indictment on any of them. Notwithstanding this, the Bureau had continued to withhold firearms confiscated from him and was now seeking to revoke his dealer's licenses based upon those same charges.

We also heard from A. W. Phillips, a Virginia dealer, who was charged with a strawman sale in which a local BATF agent, acting undercover, purchased a firearm from him stating that he was going to transfer it to an out-of-State agent. Mr. Phillips was then charged as though he—rather than the first agent—had transferred the firearm to the nonresident. Like Mr. Moorhead, Mr. Phillips was acquitted when the Federal judge directed a verdict of not guilty. The Bureau then proceeded to attempt to revoke his license, eventually—and to its credit—giving up this attempt.

The subcommittee also heard the testimony of R. C. Lindsey of Florida. Mr. Lindsey established that agents of the Bureau had refused to renew his license as a firearms dealer, informing him that they would force him to hire an attorney to defend it. The license was denied following an administrative hearing before an administrative law judge. Mr. Lindsey testified that he then discovered that the supposed impartial administrative judge had, in fact, been previously involved in the effort to deny his license and had advised BATF agents in writing in regard to the merits of his defense. We received court records showing that, after this discovery, the Bureau withdrew all attempts to deny his license and stipulated to an order compelling its issuance.

Finally, we heard testimony from Vernon Acree, a former Commissioner of Customs and veteran of over two decades of Federal law enforcement, who had undertaken a study of BATF activities in Virginia and Maryland. Mr. Acree concluded that 75 to 80 percent of BATF cases brought in those States involved defendants who had no criminal intent, but were enticed by Bureau agents into violating technical requirements which the defendants did not know existed. We also received into the record an extensive study of BATF activities which indicated, among other things, that BATF had been confiscating large numbers of collector's items under the guise that they were "intended to be used in" various technical offenses. Based on a study of BATF's records over a 2-year period, when the Bureau was publicly stating that guns used in crime were primarily handguns and disproportionately "Saturday Night Specials," it concluded that 60 percent of the Bureau gun confiscations were not handguns and 96 percent did not meet its own definition of "Saturday Night Special."

We then heard testimony from Richard Davis, Assistant Secretary of the Treasury of Criminal Enforcement and G. R. Dickerson, Director of the Bureau of Alcohol, Tobacco and Firearms. Mr. Dickerson, who had taken over as director of the Bureau in early 1979, assured the subcommittee that he would not tolerate abuses of civil liberties. He outlined various reforms which had been undertaken, beginning some months before. Among these were the establishment of an independent Office of Inspections, to supervise agents and conduct integrity checks; a requirement that all investigations of licensed dealers or of gun shows be cleared by Mr. Dickerson or his deputy; and plans to clearly inform

dealers of what the Bureau expected of them in relation to strawman sales. Mr. Dickerson further assured the subcommittee that he would not countenance the use of administrative proceedings—whether for license revocation or to confiscate firearms collections—as a punitive measure undertaken where criminal penalties are dismissed.

At the close of the testimony against BATF, I frankly stated that I was shocked. The problem appeared far more serious and widespread than I had thought possible. Indeed, the picture painted was one of an agency that had, for all intents and purposes, abandoned any attempt to respect the rights of our citizens. After hearing the assurances by the Bureau, I stated that I was encouraged by the willingness of Mr. Dickerson to move the Bureau in the right direction in the future. At the same time, I warned that he would examine the hearing record carefully and watch for the proposed reforms and their affect; in the event that changes did not appear to take place, I was willing to initiate what might be considered drastic action to protect, where necessary, the rights of our citizens.

The purpose of these hearings today is to determine whether the problems outlined in the July 1979 hearings have indeed been alleviated and whether the Bureau's reforms have had the effect of fundamentally changing its approach to legitimate firearms owners in this Nation. I will introduce, for the record at this point, a copy of my statement during the July 1979 hearings, together with a copy of a letter to myself from Director Dickerson, in which Mr. Dickerson outlines his reforms and restates the desire of BATF to move in the direction of efficient and professional law enforcement.

[The information follows:]

### OPENING STATEMENT BY SENATOR DENNIS DECONCINI

#### OVERSIGHT HEARINGS ON THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS—JULY 12, 1979

Good morning ladies and gentlemen; the subcommittee will come to order.

This is the second day of hearings on allegations that the Bureau of Alcohol, Tobacco and Firearms has exceeded its mandate in enforcing the Gun Control Act of 1968, and has violated the civil rights of citizens through improper investigatory and arrest procedures.

Frankly, I was shocked by yesterday's testimony. The problem appears much greater in scope and more acute to intensity than I had imagined. It is a sobering experience to listen to average, law-abiding citizens present evidence of conduct by an official law enforcement agency of the Federal Government which borders on the criminal. If the behavior of BATF agents described yesterday is typical and accurate, it raises a fundamental question about the organization and operation of BATF.

Democracy is a fragile and delicate system; it does not take much to crush it. Every society must have order; every society must have law. However, the maintenance of law and order in a democracy must be balanced against the rights of individuals. Those rights are critical to the continued existence of a free and open society. Thus, the task of law enforcement officials is really a dual one. Not only are they charged by society with the task of enforcing the law, but just as important they must protect the rights of citizens. A law enforcement agency that tramples the rights of citizens is a danger to our system of government.

The testimony offered yesterday together with supporting documentary data is extremely disquieting. It paints the picture of a law enforcement agency that has, for all practical purposes, abandoned its obligation to protect the rights of American citizens. It suggest that, BATF officials have decided that the second amemdment guarantee to

4

American citizens that they should be able to own and bear arms is either bad or irrelevant. The testimony indicates that BATF has moved against honest citizens and criminals with equal vigor simply because they have taken the view that individuals who are interested in firearms are either criminal or close to it.

\* \* \* \* \* \* \*

If these allegations are true, BATF is an agency that needs to be saved from itself. If it continues down the road it has been following, I predict that congressional action of a dire sort will be forthcoming. We are reaching the point with BATF where the wrongs it perpetrates on innocent citizens is beginning to outweigh the good it does in other areas. The time has come for basic and dramatic changes within BATF. Also, the time has come to make some revisions in the Gun Control Act of 1968.

LETTER FROM G. R. DICKERSON, DIRECTOR, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, DEPARTMENT OF THE TREASURY

September 7, 1979

Honorable Dennis DeConcini
United States Senate
Washington, D. C. 20510

Dear Senator DeConcini:

I want to thank you and your committee for the opportunity to participate in the oversight hearings on the Bureau of Alcohol, Tobacco and Firearms during the week of July 9, 1979. These hearings were conducted in a fair and impartial manner. I cannot say that listening to the charges, allegations, and accusations regarding this agency and our employees was a pleasant experience; it was not. However, every Federal agency, and particularly law enforcement agencies, must be subject to the scrutiny of the public and the oversight of Congress. The primary enforcement objective of ATF in the firearms area is to prevent the criminal misuse of firearms and illegal criminal trafficking in firearms. The combination of a firearm and a violent criminal or mental incompetent too often results in a crime of irreversible and tragic consequences.

These hearings have had a real effect. They have caused ATF to place even greater emphasis on the efforts underway over the last several years to reexamine our practices, policies, motivations and techniques. We are taking positive action to correct problems. On the other hand, in some areas we have found that the allegations present an incomplete or inaccurate account of events and in those cases, we are providing additional information to ensure the accuracy of the record.

My primary focus however will not be on the past. My emphasis will be on the steps ATF must take to prevent future problems and to ensure fair and equitable enforcement of the law. The following is a brief summary of the steps we are taking in this regard:

- We established a task force with the responsibility for developing a comprehensive national firearms policy. This policy will be consistent with the intent of Congress as stated in the preamble to the Gun Control Act. Upon completion, it will be disseminated to each ATF inspector, special agent, and manager, and will be available to the firearms industry and other interested organizations and individuals.

6

- We are reorganizing the Office of Inspection to ensure that every allegation and accusation of wrongdoing or abuse by ATF employees is investigated promptly and objectively. We are establishing a proactive integrity program. Strong disciplinary action will be taken in those cases in which it is warranted. At the same time, we have an equal responsibility to move expeditiously to exonerate those employees against whom accusations are determined to be unfounded.

- We are also reorganizing the Office of Criminal Enforcement to establish the position of Regional Director of Investigations (RDI) in four locations. The RDI's will be located in New York, Atlanta, Chicago, and San Francisco. The establishment of a strong management capability at the field level will ensure that personnel are operating within the constraints of policy guidelines and good law enforcement practices.

- As I testified at the hearings, investigations of licensed gun dealers or utilization of the "straw man" investigative technique is not permitted without the specific approval of the Director of ATF or his designee. We have developed an industry circular (see enclosure 1) which will be disseminated to Federal firearms licensees explaining the "straw man transaction" and the responsibilities of the licensees under the Gun Control Act. This should prevent inadvertent violations by gun dealers who are unaware of their responsibilities in regard to sales to prohibited persons. We will also reemphasize current strong ATF guidelines to ensure that such investigations are properly conducted.

- ATF has been criticized for past activities and policy regarding gun shows and sales at gun shows by licensed dealers. At the same time, gun shows have been a source of crime guns. For example, the weapon used by Sara Jane Moore in her assault on President Ford was purchased at a gun show. Significant changes in gun show policy were made 10 months ago to ensure that these investigations are limited and conducted only under appropriate circumstances. At the same time, it is possible that our efforts to control the movement of crime guns might be more successful if federally licensed firearms dealers were permitted to conduct business at gun shows provided recordkeeping functions are performed,

that the dealer is a resident of and maintains his business in the State of the gun show, and that all other provisions of the Act are met. We are now reviewing the law and regulations to determine if we can permit sales by dealers at gun shows within the existing law. While regulatory changes without a change in law may be difficult to accomplish, we nevertheless are actively pursuing this alternative. We will advise you of our progress in this matter and provide you a copy of our findings.

- We have also reviewed the requirements in regard to the seizure of destructive devices, machineguns, cannons, etc. Not all unregistered National Firearms Act weapons must be forfeited to the Government and disposed of pursuant to law. Under the NFA, certain firearms can be removed from the Act if the Director of ATF determines that the firearm is not likely to be used as a weapon or that it may be altered in such a way that it no longer meets the definition of "firearm." Weapons falling into these two categories may be lawfully retained by the owners and may not be subject to seizure. You may also be aware that ATF has, in the case of weapons that cannot be altered or otherwise removed from the Act, permitted the donation of unregistered weapons to governmental entities such as Federal, State, or local museums in lieu of abandonment or seizure. For those remaining items that cannot be handled in the manner described above, we plan to explore other alternatives. We will keep you advised of our progress in this matter.

- ATF has been criticized for careless handling of seized firearms. Along these lines, we are reemphasizing the requirement to handle and maintain all seized firearms in such a manner as to ensure their preservation in their original condition prior to seizure. Further, it is now our policy to seize only those firearms involved in criminal activity or criminal investigation as opposed to the seizure of the entire stock or collection.

- ATF has been criticized for failure to develop a definition of a dealer or "engaging in the business." Although the term "engaging in the business" is not defined by statute, the courts have had no difficulty construing the term and have generally held it to mean an activity which occupies one's time, attention, and labor for the purpose of livelihood or profit. While an

actual profit from the sales of firearms need not be proved, a willingness to deal, a profit motive, and a greater degree of activity than occasional sales by a hobbyist must be shown for purposes of a conviction.

Nevertheless, in order to ensure agreement and consistency as to what constitutes "engaging in the business", we are developing an advance notice of proposed rulemaking inviting comments from the public on how this term should be defined. Regulations would subsequently be developed if an acceptable definition can be agreed upon.

- A question arose at the hearings regarding the appropriateness of ATF taking civil action against an individual or licensee such as the seizure of firearms or revocation of a license after the criminal case has been dismissed. It was implied that this civil action might be taken as a punitive or retaliatory measure against innocent individuals or dealers. It was suggested that it may be more appropriate to take civil action first to be followed by the criminal action. This matter is not entirely within the discretion of ATF. The courts have taken varying positions on the timeliness of such actions. One position is that to proceed administratively against any individual who is also the subject of criminal action would jeopardize his rights by requiring him to divulge information in an administrative hearing that could possibly jeopardize his defense in a criminal prosecution. ATF is reviewing this matter with the objective of developing guidelines in this area. I will say now that it is not our policy to use administrative action as a punitive measure in cases in which criminal action fails.

- As a result of the hearings, we are making a thorough review of our guidelines and policy on publicity and public affairs. Many of our ATF orders on this subject date back to the early seventies. Of course, all publicity on investigative matters and cases in the prosecutive process are subject to the guidelines put forth by the Attorney General. These require that "public out-of-court comments regarding investigations, indictments, arrests, and ongoing litigation, should be minimal, consistent with the Department of Justice responsibility of keeping the public informed." As an interim measure, we have forwarded a copy (see enclosure 2) of the Department of Justice directive

9

to every ATF Special Agent in Charge. We plan to revise our policy and have recently reorganized our Office of Public Affairs.

- Throughout the hearings, there was discussion of various forms of entrapment of innocent, law-abiding citizens by ATF. ATF attempted to clarify the misunderstanding over the issue of entrapment in a recent letter to Senator Hayakawa. The following passage from our letter to Senator Hayakawa appears to be pertinent:

> "We emphasize that it is not the practice of ATF to conduct an undercover investigation regarding unlawful sales by firearms licensees unless there is reason to believe that the licensee has previously made unlawful sales. If the firearms licensee is reluctant to deal with the undercover agent, ATF immediately terminates its investigation. Furthermore, it is the Bureau's practice to permit the firearms licensee himself to suggest the medium of a straw purchaser to consummate the sale.
>
> Thus, it is strictly prohibited for ATF undercover agents to encourage, as opposed to merely provide the opportunity for, such unlawful sales of firearms. In all instances, ATF agents seek to comply with the rules laid down by the Supreme Court concerning entrapment. In United States v. Russell, 411 U.S. 433, 435-436 (1973), the United States Supreme Court ruled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play. Of course, any defendant having been unlawfully entrapped into commission of a crime has a valid defense to the prosecution."

I have provided a copy of this letter as enclosure 3.

A number of other useful suggestions, issues, and recommendations were raised at the hearings. The following is a summary of some of those recommendations and the status of ATF action on each:

> "... BATF ought to take a clear and public stand on whether and at what point a strawman sale is illegal."

10

> The courts have already established ample precedent regarding the use of the straw man investigative technique. Our industry circular regarding the straw man transaction should provide ample guidance to dealers and the public.

"... the destructive device statutes pertaining to devices readily restored to automatic fire and parts from which a destructive device can be constructed need clarification."

> We will review the appropriate sections of the statute to determine if clarification is warranted.

"... restrict improper incentives to informants. Some of the more serious abuses relating to entrapment involve informants of questionable character who were given incentives to entrap individuals."

> We have already discussed the issue of entrapment in some detail. It is now and always has been against the policy of this agency to use entrapment. It is legally and morally wrong. We know of no instance in which the courts have held that ATF illegally entrapped anyone. As stated previously, entrapment provides a valid defense against prosecution. It is strictly prohibited for ATF agents to encourage, as opposed to merely provide the opportunity for, unlawful sales of firearms. ATF, like every other law enforcement agency, uses informants. Some informants are not of high moral character. Some are convicted felons. However, these are frequently the very individuals who have firsthand knowledge of illicit gun traffic. Precautions are taken in the use of informants within an investigation. Backgrounds are reviewed and a criminal record check is made. If the informant's information appears questionable, ATF may request that the informant subject himself to a polygraph test. Informants are often paid; however, ATF does not set a "price" on any suspect or attempt to "buy" a conviction.

"... restrict forfeitures of property. Abuses of the forfeiture power are not limited to firearms laws, but occur generally throughout the field of tax law enforcement."

> ATF policy restricts the use of the forfeiture power. It is not our policy, for example, to routinely seize a collector's entire collection or a licensed dealer's entire stock in trade.

> "... restrict prosecution use of prejudicial publicity. The agency has been most obvious in providing by formal order encouragement to seek publicity which damages the individual's reputation and influences judges and juries."

As stated above, our guidelines on publicity are being reviewed. The purpose of this review is to ensure their fairness and consistency with Department of Justice guidelines.

> "... grant additional protection to agents against reprisals for refusals to engage in illegal activities."

I believe the Civil Service Reform Act provides ample protection for employees. I know of no instance in which an ATF employee has been directed to commit an illegal act. There will be none under my direction. If there is any merit to allegations that employees of this Bureau have been directed to commit illegal acts, they should be brought to my attention or to the attention of the Department of Justice for prosecution.

> "... expand civil remedies available to injured parties. A civil remedy for entrapment ought to be recognized. The Government should be prohibited from indemnifying an agent should a judgment be obtained against him."

Entrapment is prohibited in ATF in both criminal and civil proceedings. The scope of the remainder of this suggestion goes beyond the purview of ATF.

We hope that this information and the information provided for the record is useful to you in your continuing oversight of ATF operations. Without being defensive, we have tried to shed additional light on those actions that we have found to be defensible. In those instances where we have found our prior activities, practices, and policies not in keeping with good law enforcement practices or no longer appropriate, we have been or are in the process of developing new policies and procedures. We will continue to review our activities to ensure that they meet the highest standards of professionalism.

I believe that this review process, and the development of reasonable policy and guidelines, and the organizational changes I am making will ensure that ATF as an institution achieves those high standards. I have now been in ATF approximately 6 months. I have found the personnel to be capable and dedicated to the protection of society against criminals. I have found the programs to be generally sound. Where there are exceptions, I am taking remedial action. I believe that the best means to ensure

12

that abuses do not occur and that morale remains at a high
level is to institute positive, affirmative programs.
We have done this not only in firearms enforcement but
also in explosives, arson, alcohol, and tobacco smuggling.

Please let me know if we can provide more information to
complete the record or to assist in your review.

Sincerely yours,



Director

Senator DeConcini. Since the transmission of these assurances, the subcommittee has received disquieting reports that the Bureau's ways may not have been changed, that it may have continued to expend public monies in attempts to damage law-abiding citizens, to confiscate firearms in excess of its lawful powers and to misuse administrative proceedings with the aim of punishing persons acquitted of wrongdoing. We will initially take the opportunity to hear from several persons who have come forward with evidence of continued behavior of this type and then hear from representatives of the Bureau in relation to their reforms and recent performance.

Senator Schmitt, we are very pleased to have you here. Do you have any opening statement?

Senator Schmitt. I do not, Senator. I appreciate your opening statement. I think that you have outlined the problems we are faced with very well. The "strawman" type efforts seem to have gone astray. I am happy to know that one of your witnesses will be Mr. Paul Hayes. He and his wife have been subjected to these kind of activities and I think you will find their testimony in the New Mexico experience very enlightening. Senator Domenici, not a member of the committee, has joined us and may have a remark or two.

Senator DeConcini. Do you have any opening remarks, Senator?

Senator Domenici. Mr. Chairman, I didn't if you intended to take Paul and Willie Hayes as witnesses earlier on, I was just going to introduce them to you. Senator Schmitt knows them well. I just have a few observations based upon their contentions and certainly I do not intend to participate. Before you do call them I want to indicate my personal appreciation to you and the subcommittee for your continual concern in this area and I do hope that the testimony of these two citizens, if what they have told Senator Schmitt and I is basically the fact, and I have no reason to believe that it is not, will be helpful in your continued effort to see that the employees of the Federal Government, even though they are in law enforcement and have a difficult job, behave in a normal and reasonable manner and have not been abusive or overreaching. So, if you intend to call them, I will introduce them.

Senator DeConcini. We will call them at this time because of your presence, Senator Domenici, and Senator Schmitt. We will call Paul

and Willie Hayes—if you will please come forward—and with their attorney. Senator Domenici?

Senator DOMENICI. Mr. Chairman, might I first say that while I don't know Paul and Willie Hayes personally, I have known of them for a long time. They have known my family, including my father, for many years, but more importantly, the friends that they have in our State have contacted me on a number of occasions concerned about what was happening to them, and based upon their past lives that these friends know about they indicated a genuine concern about their well-being. Basically they have been, I think the right word is dragged through the wheels of justice by the Bureau of Alcohol, Tobacco and Firearms. Because of this ordeal this gentlemen's health is broken, he spent $17,000 defending himself, and still is not rid of the problem.

As I understand it, the Bureau had such a wonderful case it took the jury 7 minutes to decide that they were innocent. That hasn't ended the matter. They thought it did, but apparently they are still involved. Much of their property has still not been returned to them, things that they need. They still can't conduct their business.

I tried in my own way—and I don't like to ever interfere in matters that are pending of a criminal nature—but I tried to find out what the case is about and to offer some moral support. I am confident that there is a better way to handle problems of this type, and I am sure they will be sincere in their testimony today. I don't believe they have lengthy prepared statements. I think they just want to tell you and Senator Schmitt, and the entire Appropriations Committee and the Senate—want to tell you what has happened to them and I appreciate your taking time to listen to them. Thank you very much, Mr. Chairman, and Senator Schmitt.

Senator SCHMITT. Just to thank Senator Domenici for his words and the Hayes for coming and sharing with the committee their problem. I think it is one which may have deeper roots than just the actions of individuals of the Department that they have had to deal with. There may be a pressure that comes just from the bureaucracy, itself, that forces these kind of things to happen more frequently than they ever should.

Also, a question of equity is raised. If under criminal statute persons are aquitted of an accusation, how do we insure that the bureaucracy does not continue to take this to lower and lower standards of proof until finally they win.

I have some questions about it. I don't have any answers but I certainly have some questions in my mind of whether this is an equitable way for the wheels of justice to turn.

Welcome, folks.

Senator DECONCINI. Thank you, Senator Schmitt and Senator Domenici for your interest in this area. We are pleased to have you, Mr. and Mrs. Hayes, with your attorney. Whoever would like to testify in behalf of the experience that you have had, please proceed.

Mr. HAYES. Both?

Senator DECONCINI. Yes; you may.

Mr. HAYES. We have been in business in rural New Mexico for 29 years.

14

Senator DeConcini. Where is that?

Mr. Hayes. About 20 miles south of Albuquerque.

Senator DeConcini. Is that where you live now?

Mr. Hayes. Yes; I have been a licensed gun dealer for more than 20 years and had no problems ever until April 1978. Since I had this open-heart surgery, I have a lapse of memory. So I may forget what I say. If I do, she can correct me. The doctor——

Senator Schmitt. She has had a license to do that for a number of years. [Laughter.]

Mr. Hayes. The doctor said I may never be better, but I hope to become, better as far as memory is concerned.

In April 1968——

Mrs. Hayes. 1978.

Mr. Hayes. 1978, they used the "strawman" tactic on us. I am sure you are all familiar with what that is. They started with eight or nine counts of illegally selling of firearms. They contended that I knew that I was selling that gun to an out-of-State resident. I did no such thing. The man had a New Mexico license and signed it, and the purchaser was from New Mexico with a valid license. I have the forms here to prove it, where he signed.

[The information follows:]