97th Congress
2d Session

COMMITTEE PRINT

# THE RIGHT TO KEEP AND BEAR ARMS

————

R E P O R T

OF THE

SUBCOMMITTEE ON THE CONSTITUTION

OF THE

COMMITTEE ON THE JUDICIARY

UNITED STATES SENATE

NINETY-SEVENTH CONGRESS

SECOND SESSION



FEBRUARY 1982

Printed for the use of the Committee on the Judiciary

——

U.S. GOVERNMENT PRINTING OFFICE
88-618 O  WASHINGTON : 1982

For sale by the Superintendent of Documents, U. S. Government Printing Office
Washington, D.C. 20402<sub>(pg.II)</sub>

*Exhibit 8*

COMMITTEE ON THE JUDICIARY

STROM THURMOND, South Carolina, *Chairman*

CHARLES McC. MATHIAS, Jr., Maryland
PAUL LAXALT, Nevada
ORRIN G. HATCH, Utah
ROBERT DOLE, Kansas
ALAN K. SIMPSON, Wyoming
JOHN P. EAST, North Carolina
CHARLES E. GRASSLEY, Iowa
JEREMIAH DENTON, Alabama
ARLEN SPECTER, Pennsylvania

JOSEPH R. BIDEN, Jr., Delaware
EDWARD M. KENNEDY, Massachusetts
ROBERT C. BYRD, West Virginia
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont
MAX BAUCUS, Montana
HOWELL HEFLIN, Alabama

VINTON De VANE LIDE, *Chief Counsel*
QUENTIN CROMMELIN, *Jr., Staff Director*

———

SUBCOMMITTEE ON THE CONSTITUTION

ORRIN G. HATCH, Utah, *Chairman*

STROM THURMOND, South Carolina
CHARLES E. GRASSLEY, Iowa

DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont

STEPHEN J. MARKMAN, *Chief Counsel and Staff Director*
RANDALL RADER, *General Counsel*
PETER E. ORNSBY, *Counsel*
ROBERT FEIDLER, *Minority Counsel*(pg.III)

# C O N T E N T S

—————

Preface, by Senator Orrin G. Hatch, chairman, U.S. Senate Judiciary Committee, Subcommittee on the Constitution, from the State of Utah . . . . . . . . . . . . . . V

Preface, by Senator Dennis DeConcini, ranking minority member, U.S. Senate Judiciary Committee, Subcommittee on the Constitution, from the State of Arizona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IX

History: Second amendment right to "keep and bear arms" . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Appendix: Case law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Enforcement of Federal firearms laws from the perspective of the second amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Other Views of the second amendment:

Does the Second Amendment mean what it says?, by David J. Steinberg, executive director, National Council for a Responsible Firearms Policy . . . 24

National Coalition to ban handguns statement on the Second Amendment, by Michael K. Beard, executive director, and Samuel S. Fields, legal affairs coordinator, National Coalition to Ban Handguns . . . . . . . . . . 27

Historical Bases of the Right to Keep and Bear Arms, by David T. Hardy, partner in the Law Firm Sando & Hardy . . . . . . . . . . . . . . . . . . . . . . 45

The Fourteenth Amendment and the Right To Keep and Bear Arms: The Intent of the Framers, by Stephen P. Halbrook, Ph.D., attorney and counselor at law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

The Second Amendment to the United States Constitution Guarantees an Individual Right To Keep and Bear Arms, by James J. Featherstone, Esq., General Counsel, Richard E. Gardner, Esq., and Robert Dowlut, Esq., Office of the General Counsel, National Rifle Association of America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

The Right To Bear Arms: The Development of the American Experience, by John Levin, assistant professor, Chicago-Kent College of Law, Illinois Institute of Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Standing Armies and Armed Citizens: An Historical Analysis of The Second Amendment, by Roy G. Weatherup, J.D., 1972 Stanford University; member of the California Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Gun control legislation, by the Committee on Federal Legislation, the Association of the Bar of the city of New York . . . . . . . . . . . . . . . . . 171 (pg.V)

PREFACE

"To preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them." (Richard Henry Lee, Virginia delegate to the Continental Congress, initiator of the Declaration of Independence, and member of the first Senate, which passed the Bill of Rights.)

"The great object is that every man be armed . . . Everyone who is able may have a gun." (Patrick Henry, in the Virginia Convention on the ratification of the Constitution.)

"The advantage of being armed . . . the Americans possess over the people of all other nations . . . Notwithstanding the military establishments in the several Kingdoms of Europe, which are carried as far as the public resources will bear, the governments are afraid to trust the people with arms." (James Madison, author of the Bill of Rights, in his Federalist Paper No. 26.)

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (Second Amendment to the Constitution.)

In my studies as an attorney and as a United States Senator, I have constantly been amazed by the indifference or even hostility shown the Second Amendment by courts, legislatures, and commentators. James Madison would be startled to hear that his recognition of a right to keep and bear arms, which passed the House by a voice vote without objection and hardly a debate, has since been construed in but a single, and most ambiguous, Supreme Court decision, whereas his proposals for freedom of religion, which he made reluctantly out of fear that they would be rejected or narrowed beyond use, and those for freedom of assembly, which passed only after a lengthy and bitter debate, are the subject of scores of detailed and favorable decisions. Thomas Jefferson, who kept a veritable armory of pistols, rifles and shotguns at Monticello, and advised his nephew to forsake other sports in favor of hunting, would be astounded to hear supposed civil libertarians claim firearm ownership should be restricted. Samuel Adams, a handgun owner who pressed for an amendment stating that the "Constitution shall never be construed . . . to prevent the people of the United States who are peaceable citizens from keeping their own arms," would be shocked to hear that his native state today imposes a year's sentence, without probation or parole, for carrying a firearm without a police permit.(pg.VI)

This is not to imply that courts have totally ignored the impact of the Second Amendment in the Bill of Rights. No fewer than twenty-one decisions by the courts of our states have recognized an individual right to keep and bear arms, and a majority of these have not only recognized the right but invalidated laws or regulations which abridged it. Yet in all too many instances, courts or commentators have sought, for reasons only tangentially related to constitutional history, to construe this right out of existence. They argue that the Second Amendment's words "right of the people" mean "a right of the state"—apparently overlooking the impact of those same words when used in the First and Fourth Amendments. The "right of the people" to assemble or to be free from unreasonable searches and seizures is not contested as an individual guarantee. Still they ignore consistency and claim that the right to "bear arms" relates only to military uses. This not only violates a consistent constitutional reading of "right of the people" but also ignores that the second

amendment protects a right to "keep" arms. These commentators contend instead that the amendment's preamble regarding the necessity of a "well regulated militia . . . to a free state" means that the right to keep and bear arms applies only to a National Guard. Such a reading fails to note that the Framers used the term "militia" to relate to every citizen capable of bearing arms, and that Congress has established the present National Guard under its power to raise armies, expressly stating that it was not doing so under its power to organize and arm the militia.

When the first Congress convened for the purpose of drafting a Bill of Rights, it delegated the task to James Madison. Madison did not write upon a blank tablet. Instead, he obtained a pamphlet listing the State proposals for a bill of rights and sought to produce a briefer version incorporating all the vital proposals of these. His purpose was to incorporate, not distinguish by technical changes, proposals such as that of the Pennsylvania minority, Sam Adams, or the New Hampshire delegates. Madison proposed among other rights that "That right of the people to keep and bear arms shall not be infringed; a well armed and well regulated militia being the best security of a free country; but no person religiously scrupulous of bearing arms shall be compelled to render military service in person." In the House, this was initially modified so that the militia clause came before the proposal recognizing the right. The proposals for the Bill of Rights were then trimmed in the interests of brevity. The conscientious objector clause was removed following objections by Elbridge Gerry, who complained that future Congresses might abuse the exemption to excuse everyone from military service.

The proposal finally passed the House in its present form: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed.:" In this form it was submitted into the Senate, which passed it the following day. The Senate in the process indicated its intent that the right be an individual one, for private purposes, by rejecting an amendment which would have limited the keeping and bearing of arms to bearing "For the common defense".

The earliest American constitutional commentators concurred in giving this broad reading to the amendment. When St. George (pg.VII) Tucker, later Chief Justice of the Virginia Supreme Court, in 1803 published an edition of Blackstone annotated to American law, he followed Blackstone's citation of the right of the subject "of having arms suitable to their condition and degree, and such as are allowed by law" with a citation to the Second Amendment, "And this without any qualification as to their condition or degree, as is the case in the British government." William Rawle's "View of the Constitution" published in Philadelphia in 1825 noted that under the Second Amendment: "The prohibition is general. No clause in the Constitution could by a rule of construction be conceived to give to Congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretense by a state legislature. But if in blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both." The Jefferson papers in the Library of Congress show that both Tucker and Rawle were friends of, and corresponded with, Thomas Jefferson. Their views are those of contemporaries of Jefferson, Madison and others, and are entitled to special weight. A few years later, Joseph Story in his "Commentaries on the Constitution" considered the right to keep and bear arms as "the palladium of the liberties of the republic", which deterred tyranny and enabled the citizenry at large to overthrow it should it come to pass.

Subsequent legislation in the second Congress likewise supports the interpretation of the Second Amendment that creates an individual right. In the Militia Act of 1792, the second Congress defined "militia of the United States" to include almost every free adult male in the United States. These persons were obligated by law to possess a firearm and a minimum supply of ammunition and

military equipment. This statute, incidentally, remained in effect into the early years of the present century as a legal requirement of gun ownership for most of the population of the United States. There can be little doubt from this that when the Congress and the people spoke of a "militia", they had reference to the traditional concept of the entire populace capable of bearing arms, and not to any formal group such as what is today called the National Guard. The purpose was to create an armed citizenry, which the political theorists at the time considered essential to ward off tyranny. From this militia, appropriate measures might create a "well regulated militia" of individuals trained in their duties and responsibilities as citizens and owners of firearms.

If gun laws in fact worked, the sponsors of this type of legislation should have no difficulty drawing upon long lists of examples of crime rates reduced by such legislation. That they cannot do so after a century and a half of trying—that they must sweep under the rug the southern attempts at gun control in the 1870-1910 period, the northeastern attempts in the 1920-1939 period, the attempts at both Federal and State levels in 1965-1976—establishes the repeated, complete and inevitable failure of gun laws to control serious crime.

Immediately upon assuming chairmanship of the Subcommittee on the Constitution, I sponsored the report which follows as an effort to study, rather than ignore, the history of the controversy over the right to keep and bear arms. Utilizing the research capabilities (pg.VIII) of the Subcommittee on the Constitution, the resources of the Library of Congress, and the assistance of constitutional scholars such as Mary Kaaren Jolly, Steven Halbrook, and David T. Hardy, the subcommittee has managed to uncover information on the right to keep and bear arms which documents quite clearly its status as a major individual right of American citizens. We did not guess at the purpose of the British 1689 Declaration of Rights; we located the Journals of the House of Commons and private notes of the Declaration's sponsors, now dead for two centuries. We did not make suppositions as to colonial interpretations of that Declaration's right to keep arms; we examined colonial newspapers which discussed it. We did not speculate as to the intent of the framers of the second amendment; we examined James Madison's drafts for it, his handwritten outlines of speeches upon the Bill of Rights, and discussions of the second amendment by early scholars who were personal friends of Madison, Jefferson, and Washington and wrote while these still lived. What the Subcommittee on the Constitution uncovered was clear—and long-lost—proof that the second amendment to our Constitution was intended as an individual right of the American citizen to keep and carry arms in a peaceful manner, for protection of himself, his family, and his freedoms. The summary of our research and findings forms the first portion of this report.

In the interest of fairness and the presentation of a complete picture, we also invited groups which were likely to oppose this recognition of freedoms to submit their views. The statements of two associations who replied are reproduced here following the report of the Subcommittee. The Subcommittee also invited statements by Messrs. Halbrook and Hardy, and by the National Rifle Association, whose statements likewise follow our report.

When I became chairman of the Subcommittee on the Constitution, I hoped that I would be able to assist in the protection of the constitutional rights of American citizens, rights which have too often been eroded in the belief that government could be relied upon for quick solutions to difficult problems.

Both as an American citizen and as a United States Senator I repudiate this view. I likewise repudiate the approach of those who believe to solve American problems you simply become something other than American. To my mind, the uniqueness of our free institutions, the fact that an American citizen can boast freedoms unknown in any other land, is all the more reason to resist any erosion of our individual rights. When our ancestors forged a land "conceived in liberty", they

did so with musket and rifle. When they reacted to attempts to dissolve their free institutions, and established their identity as a free nation, they did so as a nation of armed freemen. When they sought to record forever a guarantee of their rights, they devoted one full amendment out of ten to nothing but the protection of their right to keep and bear arms against government interference. Under my chairmanship the Subcommittee on the Constitution will concern itself with a proper recognition of, and respect for, this right most valued by free men.

ORRIN G. HATCH,
*Chairman,*
*Subcommittee on the Constitution.*

JANUARY 20, 1982.(pg.IX)

The right to bear arms is a tradition with deep roots in American society. Thomas Jefferson proposed that "no free man shall ever be debarred the use of arms," and Samuel Adams called for an amendment banning any law "to prevent the people of the United States who are peaceable citizens from keeping their own arms." The Constitution of the State of Arizona, for example, recognizes the "right of an individual citizen to bear arms in defense of himself or the State."

Even though the tradition has deep roots, its application to modern America is the subject of intense controversy. Indeed, it is a controversy into which the Congress is beginning, once again, to immerse itself. I have personally been disappointed that so important an issue should have generally been so thinly researched and so minimally debated both in Congress and the courts. Our Supreme Court has but once touched on its meaning at the Federal level and that decision, now nearly a half-century old, is so ambiguous that any school of thought can find some support in it. All Supreme Court decisions on the second amendment's application to the States came in the last century, when constitutional law was far different than it is today. As ranking minority member of the Subcommittee on the Constitution, I, therefore, welcome the effort which led to this report—a report based not only upon the independent research of the subcommittee staff, but also upon full and fair presentation of the cases by all interested groups and individual scholars.

I personally believe that it is necessary for the Congress to amend the Gun Control Act of 1968. I welcome the opportunity to introduce this discussion of how best these amendments might be made.

The Constitution subcommittee staff has prepared this monograph bringing together proponents of both sides of the debate over the 1968 Act. I believe that the statements contained herein present the arguments fairly and thoroughly. I commend Senator Hatch, chairman of the subcommittee, for having this excellent reference work prepared. I am sure that it will be of great assistance to the Congress as it debates the second amendment and considers legislation to amend the Gun Control Act.

DENNIS DECONCINI,
*Ranking Minority Member,*
*Subcommittee On the Constitution.*

JANUARY 20, 1982.(pg.1)

HISTORY: SECOND AMENDMENT RIGHT TO "KEEP AND BEAR ARMS"

The right to keep and bear arms as a part of English and American law antedates not only the Constitution, but also the discovery of firearms. Under the laws of Alfred the Great, whose reign began in 872 A.D., all English citizens from the nobility to the peasants were obliged to privately purchase weapons and be available for military duty.[1] This was in sharp contrast to the feudal system as it evolved in Europe, under which armament and military duties were concentrated in the nobility. The body of armed citizens were known as the "fyrd".

While a great many of the Saxon rights were abridged following the Norman conquest, the right and duty of arms possession was retained. Under the Assize of Arms of 1181, "the whole community of freemen" between the ages of 15 and 40 were required by law to possess certain arms, which were arranged in proportion to their possessions.[2] They were required twice a year to demonstrate to Royal Officials that they were appropriately armed. In 1253, another Assize of Arms expanded the duty of armament to include not only freeman, but also villeins, who were the English equivalent of serfs. Now all "citizens, burgesses, free tenants, villeins and others from 15 to 60 years of age" were obliged to be armed.[3] While on the Continent the villeins were regarded as little more than animals hungering for rebellion, the English legal system not only permitted, but affirmatively required them, to be armed.

The thirteenth century saw further definitions of this right as the long bow, a formidable armor-piercing weapon, became increasingly the mainstay of British national policy. In 1285, Edward I commanded that all persons comply with the earlier Assizes and added that "anyone else who can afford them shall keep bows and arrows".[4] The right of armament was subject only to narrow limitations. In 1279, it was ordered that those appearing in Parliament or other public assemblies "shall come without all force and armor, well and peaceably".[5] In 1328, the statute of Northampton ordered that no one use their arms in "affray of the peace, nor to go nor ride armed by day or by night in fairs, markets, nor in the presence of the justices or other ministers".[6] English courts construed this ban consistently with the general right of private armament as applying only to wearing of arms "accompanied with such circumstances as are apt to terrify the people".[7] In 1369, the King ordered that the sheriffs of London require all citizens "at leisure time on holidays" to "use in their recreation bowes and arrows" and to stop all other games which might distract them from this practice.[8]

The Tudor kings experimented with limits upon specialized weapons—mainly crossbows and the then-new firearms. These measures were not intended to disarm the citizenry, but on the contrary, to prevent their being diverted from longbow practice by (pg.2) sport with other weapons which were considered less effective. Even these narrow measures were shortlived. In 1503, Henry VII limited shooting (but not possession) of crossbows to those with land worth 200 marks annual rental, but provided an exception for those who "shote owt of a howse for the lawefull defens of the same".[9] In 1511, Henry VIII increased the property requirement to 300 marks. He also expanded the requirement of longbow ownership, requiring all citizens to "use and exercyse shootyng in longbowes, and also have a bowe and arrowes contynually" in the house.[10] Fathers were required by law to purchase bows and arrows for their sons between the age of 7 and 14 and to train them in longbow use.

In 1514 the ban on crossbows was extended to include firearms.[11] But in 1533, Henry reduced the property qualification to 100 pounds per year; in 1541 he limited it to possession of

small firearms ("of the length of one hole yard" for some firearms and "thre quarters of a yarde" for others)[12] and eventually he repealed the entire statute by proclamation.[13] The later Tudor monarchs continued the system and Elizabeth added to it by creating what came to be known as "train bands", selected portions of the citizenry chosen for special training. These trained bands were distinguished from the "militia", which term was first used during the Spanish Armada crisis to designate the entire of the armed citizenry.[14]

The militia continued to be a pivotal force in the English political system. The British historian Charles Oman considers the existence of the armed citizenry to be a major reason for the moderation of monarchical rule in Great Britain; "More than once he [Henry VIII] had to restrain himself, when he discovered that the general feeling of his subjects was against him.... His 'gentlemen pensioners' and his yeomen of the guard were but a handful, and bills or bows were in every farm and cottage".[15]

When civil war broke out in 1642, the critical issue was whether the King or Parliament had the right to control the militia.[16] The aftermath of the civil war saw England in temporary control of a military government, which repeatedly dissolved Parliament and authorized its officers to "search for, and seize all arms" owned by Catholics, opponents of the government, "or any other person whom the commissioners had judged dangerous to the peace of this Commonwealth".[17]

The military government ended with the restoration of Charles II. Charles in turn opened his reign with a variety of repressive legislation, expanding the definition of treason, establishing press censorship and ordering his supporters to form their own troops, "the officers to be numerous, disaffected persons watched and not allowed to assemble, and their arms seized".[18] In 1662, a Militia Act was enacted empowering officials "to search for and seize all arms in the custody or possession of any person or persons whom the said lieutenants or any two or more of their deputies shall judge dangerous to the peace of the kingdom".[19] Gunsmiths were ordered to deliver to the government lists of all purchasers.[20] These confiscations were continued under James II, who directed them particularly against the Irish population: "Although the (pg.3) country was infested by predatory bands, a Protestant gentleman could scarcely obtain permission to keep a brace of pistols."[21]

In 1668, the government of James was overturned in a peaceful uprising which came to be known as "The Glorious Revolution". Parliament resolved that James had abdicated and promulgated a Declaration of Rights, later enacted as the Bill of Rights. Before coronation, his successor William of Orange, was required to swear to respect these rights. The debates in the House of Commons over this Declaration of Rights focused largely upon the disarmament under the 1662 Militia Act. One member complained that "an act of Parliament was made to disarm all Englishmen, who the lieutenant should suspect, by day or night, by force or otherwise—this was done in Ireland for the sake of putting arms into Irish hands." The speech of another is summarized as "militia bill—power to disarm all England—now done in Ireland." A third complained "Arbitrary power exercised by the ministry.... Militia—imprisoning without reason; disarming—himself disarmed." Yet another summarized his complaints "Militia Act—an abominable thing to disarm the nation...."[22]

The Bill of Rights, as drafted in the House of Commons, simply provided that "the acts concerning the militia are grievous to the subject" and that "it is necessary for the public Safety that the Subjects, which are Protestants, should provide and keep arms for the common defense; And that the Arms which have been seized, and taken from them, be restored."[23] The House of Lords changed this to make it a more positive declaration of an individual right under English law: "That the subjects which are Protestant may have arms for their defense suitable to their conditions and as allowed by law."[24] The only limitation was on ownership by Catholics, who at that time composed only a few percent of the British population and were subject to a wide variety of punitive

legislation. The Parliament subsequently made clear what it meant by "suitable to their conditions and as allowed by law". The poorer citizens had been restricted from owning firearms, as well as traps and other commodities useful for hunting, by the 1671 Game Act. Following the Bill of Rights, Parliament reenacted that statute, leaving its operative parts unchanged with one exception—which removed the word "guns" from the list of items forbidden to the poorer citizens.[25] The right to keep and bear arms would henceforth belong to all English subjects, rich and poor alike.

In the colonies, availability of hunting and need for defense led to armament statues comparable to those of the early Saxon times. In 1623, Virginia forbade its colonists to travel unless they were "well armed"; in 1631 it required colonists to engage in target practice on Sunday and to "bring their peeces to church."[26] In 1658 it required every householder to have a functioning firearm within his house and in 1673 its laws provided that a citizen who claimed he was too poor to purchase a firearm would have one purchased for him by the government, which would then require him to pay a reasonable price when able to do so.[27] In Massachusetts, the first session of the legislature ordered that not only freemen, but also indentured servants own firearms and in 1644 it imposed a stern 6 shilling fine upon any citizen who was not armed.[28] (pg.4)

When the British government began to increase its military presence in the colonies in the mid-eighteenth century, Massachusetts responded by calling upon its citizens to arm themselves in defense. One colonial newspaper argued that it was impossible to complain that this act was illegal since they were "British subjects, to whom the privilege of possessing arms is expressly recognized by the Bill of Rights" while another argued that this "is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defense".[29] The newspaper cited Blackstone's commentaries on the laws of England, which had listed the "having and using arms for self preservation and defense" among the "absolute rights of individuals." The colonists felt they had an absolute right at common law to own firearms.

Together with freedom of the press, the right to keep and bear arms became one of the individual rights most prized by the colonists. When British troops seized a militia arsenal in September, 1774, and incorrect rumors that colonists had been killed spread through Massachusetts, 60,000 citizens took up arms.[30] A few months later, when Patrick Henry delivered his famed "Give me liberty or give me death" speech, he spoke in support of a proposition "that a well regulated militia, composed of gentlemen and freemen, is the natural strength and only security of a free government...." Throughout the following revolution, formal and informal units of armed citizens obstructed British communication, cut off foraging parties, and harassed the thinly stretched regular forces. When seven states adopted state "bills of rights" following the Declaration of Independence, each of those bills of rights provided either for protection of the concept of a militia or for an express right to keep and bear arms.[31]

Following the revolution but previous to the adoption of the Constitution, debates over militia proposals occupied a large part of the political scene. A variety of plans were put forth by figures ranging from George Washington to Baron von Steuben.[32] All of the proposals called for a general duty of all citizens to be armed, although some proposals (most notably von Steuben's) also emphasized a "select militia" which would be paid for its services and given special training. In this respect, this "select militia" was the successor of the "trained bands" and the predecessor of what is today the "national guard". In the debates over the Constitution, von Steubon's proposals were criticized as undemocratic. In Connecticut one writer complained of a proposal that "this looks too much like Baron von Steubon's militia, by which a standing army was meant and intended."[33] In Pennsylvania, a delegate argued "Congress may give us a select militia which will, in fact, be a standing army—or Congress, afraid of a general militia, may say there will be no militia at all. When

a select militia is formed, the people in general may be disarmed."[34] Richard Henry Lee, in his widely read pamphlet "Letters from the Federal Farmer to the Republican" worried that the people might be disarmed "by modelling the militia. Should one fifth or one eighth part of the people capable of bearing arms be made into a select militia, as has been proposed, and those the young and ardent parts of the community, possessed of little or no property, the former will answer all the purposes of an army, while the latter will be defenseless." He (pg.5) proposed that "the Constitution ought to secure a genuine, and guard against a select militia," adding that "to preserve liberty, it is essential that the whole body of the people always possess arms and be taught alike, especially when young, how to use them."[35]

The suspicion of select militia units expressed in these passages is a clear indication that the framers of the Constitution did not seek to guarantee a State right to maintain formed groups similar to the National Guard, but rather to protect the right of individual citizens to keep and bear arms. Lee, in particular, sat in the Senate which approved the Bill of Rights. He would hardly have meant the second amendment to apply only to the select militias he so feared and disliked.

Other figures of the period were of like mind. In the Virginia convention, George Mason, drafter of the Virginia Bill of Rights, accused the British of having plotted "to disarm the people—that was the best and most effective way to enslave them", while Patrick Henry observed that "The great object is that every man be armed" and "everyone who is able may have a gun".[36]

Nor were the antifederalist, to whom we owe credit for a Bill of Rights, alone on this account. Federalist arguments also provide a source of support for an individual rights view. Their arguments in favor of the proposed Constitution also relied heavily upon universal armament. The proposed Constitution had been heavily criticized for its failure to ban or even limit standing armies. Unable to deny this omission, the Constitution's supporters frequently argued to the people that the universal armament of Americans made such limitations unnecessary. A pamphlet written by Noah Webster, aimed at swaying Pennsylvania toward ratification, observed

> Before a standing army can rule, the people must be disarmed; as they are in almost every kingdom in Europe. The supreme power in America cannot enforce unjust laws by the sword, because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretense, raised in the United States.[37]

In the Massachusetts convention, Sedgwick echoed the same thought, rhetorically asking if an oppressive army could be formed or "if raised, whether they could subdue a Nation of freemen, who know how to prize liberty, and who have arms in their hands?"[38] In Federalist Paper 46, Madison, later author of the Second Amendment, mentioned "The advantage of being armed, which the Americans possess over the people of all other countries" and that "notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as the public resources will bear, the governments are afraid to trust the people with arms."

A third and even more compelling case for an individual rights perspective on the Second Amendment comes from the State demands for a bill of rights. Numerous state ratifications called for adoption of a Bill of Rights as a part of the Constitution. The first such call came from a group of Pennsylvania delegates. Their proposals, which were not adopted but had a critical effect on future debates, proposed among other rights that "the people have (pg.6) a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed,

or a real danger of public injury from individuals."[39] In Massachusetts, Sam Adams unsuccessfully pushed for a ratification conditioned on adoption of a Bill of Rights, beginning with a guarantee "That the said Constitution shall never be construed to authorize Congress to infringe the just liberty of the press or the rights of conscience; or to prevent the people of the United States who are peaceable citizens from keeping their own arms...."[40] When New Hampshire gave the Constitution the ninth vote needed for its passing into effect, it called for adoption of a Bill of Rights which included the provision that "Congress shall never disarm any citizen unless such as are or have been in actual rebellion".[41] Virginia and North Carolina thereafter called for a provision "that the people have the right to keep and bear arms; that a well regulated militia composed of the body of the people trained to arms is the proper, natural and safe defense of a free state."[42]

When the first Congress convened for the purpose of drafting a Bill of Rights, it delegated the task to James Madison. Madison did not write upon a blank tablet. Instead, he obtained a pamphlet listing the State proposals for a Bill of Rights and sought to produce a briefer version incorporating all the vital proposals of these. His purpose was to incorporate, not distinguish by technical changes, proposals such as that of the Pennsylvania minority, Sam Adams, and the New Hampshire delegates. Madison proposed among other rights that:

> "The right of the people to keep and bear arms shall not be infringed; a well armed and well regulated militia being the best security of a free country; but no person religiously scrupulous of bearing arms shall be compelled to render military service in person."[43]

In the House, this was initially modified so that the militia clause came before the proposal recognizing the right. The proposals for the Bill of Rights were then trimmed in the interests of brevity. The conscientious objector clause was removed following objections by Elbridge Gerry, who complained that future Congresses might abuse the exemption for the scrupulous to excuse everyone from militia service.

The proposal finally passed the House in its present form: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." In this form it was submitted into the Senate, which passed it the following day. The Senate in the process indicated its intent that the right be an individual one, for private purposes, by rejecting an amendment which would have limited the keeping and bearing of arms to bearing "for the common defense".

The earliest American constitutional commentators concurred in giving this broad reading to the amendment. When St. George Tucker, later Chief Justice of the Virginia Supreme Court, in 1803 published an edition of Blackstone annotated to American law, he followed Blackstone's citation of the right of the subject "of having (pg. 7) arms suitable to their condition and degree, and such as are allowed by law" with a citation to the Second Amendment, "And this without any qualification as to their condition or degree, as is the case in the British government".[44] William Rawle's "View of the Constitution" published in Philadelphia in 1825 noted that under the Second Amendment

> The prohibition is general. No clause in the Constitution could by a rule of construction be conceived to give to Congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretense by a state

legislature. But if in blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both."[45]

The Jefferson papers in the Library of Congress show that both Tucker and Rawle were friends of, and corresponded with Thomas Jefferson. This suggests that their assessment, as contemporaries of the Constitution's drafters, should be afforded special consideration.

Later commentators agreed with Tucker and Rawle. For instance, Joseph Story in his "Commentaries on the Constitution" considered the right to keep and bear arms as "the palladium of the liberties of the republic", which deterred tyranny and enabled the citizenry at large to overthrow it should it come to pass.[46]

Subsequent legislation in the Second Congress likewise supports the interpretation of the second amendment that creates an individual right. In the Militia Act of 1792, the second Congress defined "militia of the United States" to include almost every free adult male in the United States. These persons were obliged by law to possess a firearm and a minimum supply of ammunition and military equipment.[47] This statute, incidentally remained in effect into the early years of the present century as a legal requirement of gun ownership for most of the population of the United States. There can be little doubt from this that when the Congress and the people spoke of a "militia", they had reference to the traditional concept of the entire populace capable of bearing arms, and not to any formal group such as what is today called the National Guard. The purpose was to create an armed citizenry, such as the political theorists at the time considered essential to ward off tyranny. From this militia, appropriate measures might create a "well regulated militia" of individuals trained in their duties and responsibilities as citizens and owners of firearms.

The Second Amendment as such was rarely litigated prior to the passage of the Fourteenth Amendment. Prior to that time, most courts accepted that the commands of the federal Bill of Rights did not apply to the states. Since there was no federal firearms legislation at this time, there was no legislation which was directly subject to the Second Amendment, if the accepted interpretations were followed. However, a broad variety of state legislation was struck down under state guarantees of the right to keep and bear arms and even in a few cases, under the Second Amendment, when it came before courts which considered the federal protections applicable to the states. Kentucky in 1813 enacted the first carrying concealed weapon statute in the United States; in 1822 the Kentucky (pg.8) Court of Appeals struck down the law as a violation of the state constitutional protection of the right to keep and bear arms: "And can there be entertained a reasonable doubt but the provisions of that act import a restraint on the right of the citizen to bear arms? The court apprehends it not. The right existed at the adoption of the Constitution; it then had no limit short of the moral power of the citizens to exercise it, and in fact consisted of nothing else but the liberty of the citizen to bear arms."[48] On the other hand, a similar measure was sustained in Indiana, not upon the grounds that a right to keep and bear arms did not apply, but rather upon the notion that a statute banning only concealed carrying still permitted the carrying of arms and merely regulated one possible way of carrying them.[49] A few years later, the Supreme Court of Alabama upheld a similar statute but added "We do not desire to be understood as maintaining, that in regulating the manner of wearing arms, the legislature has no other limit than its own discretion. A statute which, under the pretense of regulation, amounts to a destruction of that right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional."[50] When the Arkansas Supreme Court in 1842 upheld a carrying concealed weapons statute, the chief justice explained that the statute would not "detract anything from the power of the people to defend their free state and the established institutions of the country. It prohibits only the wearing of certain arms

concealed. This is simply a regulation as to the manner of bearing such arms as are specified", while the dissenting justice proclaimed "I deny that any just or free government upon earth has the power to disarm its citizens.[51]

Sometimes courts went farther. When in 1837, Georgia totally banned the sale of pistols (excepting the larger pistols "known and used as horsemen's pistols") and other weapons, the Georgia Supreme Court in *Nunn v. State* held the statute unconstitutional under the Second Amendment to the federal Constitution. The court held that the Bill of Rights protected natural rights which were fully as capable of infringement by states as by the federal government and that the Second Amendment provided "the right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not merely such as are used by the militia, shall not be infringed, curtailed, or broken in on, in the slightest degree; and all this for the important end to be attained: the rearing up and qualifying of a well regulated militia, so vitally necessary to the security of a free state."[52] Prior to the Civil War, the Supreme Court of the United States likewise indicated that the privileges of citizenship included the individual right to own and carry firearms. In the notorious *Dred Scott* case, the court held that black Americans were not citizens and could not be made such by any state. This decision, which by striking down the Missouri Compromise did so much to bring on the Civil War, listed what the Supreme Court considered the rights of American citizens by way of illustrating what rights would have to be given to black Americans if the Court were to recognize them as full fledged citizens:(pg.9)

> It would give to persons of the negro race, who are recognized as citizens in any one state of the Union, the right to enter every other state, whenever they pleased.... and it would give them full liberty of speech in public and in private upon all subjects upon which its own citizens might meet; to hold public meetings upon political affairs, and to keep and carry arms wherever they went.[53]

Following the Civil War, the legislative efforts which gave us three amendments to the Constitution and our earliest civil rights acts likewise recognized the right to keep and bear arms as an existing constitutional right of the individual citizen and as a right specifically singled out as one protected by the civil rights acts and by the Fourteenth Amendment to the Constitution, against infringement by state authorities. Much of the reconstruction effort in the South had been hinged upon the creation of "black militias" composed of the armed and newly freed blacks, officered largely by black veterans of the Union Army. In the months after the Civil War, the existing southern governments struck at these units with the enactment of "black codes" which either outlawed gun ownership by blacks entirely, or imposed permit systems for them, and permitted the confiscation of firearms owned by blacks. When the Civil Rights Act of 1866 was debated members both of the Senate and the House referred to the disarmament of blacks as a major consideration.[54] Senator Trumbull cited provisions outlawing ownership of arms by blacks as among those which the Civil Rights Act would prevent;[55] Senator Sulsbury complained on the other hand that if the act were to be passed it would prevent his own state from enforcing a law banning gun ownership by individual free blacks.[56] Similar arguments were advanced during the debates over the "anti-KKK act"; its sponsor at one point explained that a section making it a federal crime to deprive a person of "arms or weapons he may have in his house or possession for the defense of his person, family or property" was "intended to enforce the well-known constitutional provisions guaranteeing the right in the citizen to 'keep and bear arms'."[57] Likewise, the debates over the Fourteenth Amendment

Congress frequently referred to the Second Amendment as one of the rights which it intended to guarantee against state action.[58]

Following adoption of the Fourteenth Amendment, however, the Supreme Court held that that Amendment's prohibition against states depriving any persons of their federal "privileges and immunities" was to be given a narrow construction. In particular, the "privileges and immunities" under the Constitution would refer only to those rights which were not felt to exist as a process of natural right, but which were created solely by the Constitution. These might refer to rights such as voting in federal elections and of interstate travel, which would clearly not exist except by virtue of the existence of a federal government and which could not be said to be "natural rights".[59] This paradoxically meant that the rights which most persons would accept as the most important—those flowing from concepts of natural justice—were devalued at the expense of more technical rights. Thus when individuals were charged with having deprived black citizens of their right to freedom (pg.10) of assembly and to keep and bear arms, by violently breaking up a peaceable assembly of black citizens, the Supreme Court in *United States v. Cruikshank*[60] held that no indictment could be properly brought since the right "of bearing arms for a lawful purpose" is "not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." Nor, in the view of the Court, was the right to peacefully assemble a right protected by the Fourteenth Amendment: "The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. In fact, it is and has always been one of the attributes of citizenship under a free government.... It was not, therefore, a right granted to the people by the Constitution." Thus the very importance of the rights protected by the First and Second Amendment was used as the basis for the argument that they did not apply to the states under the Fourteenth Amendment. In later opinions, chiefly *Presser v. Illinois*[61] and *Miller v. Texas*,[62] the Supreme Court adhered to the view. *Cruikshank* has clearly been superseded by twentieth century opinions which hold that portions of the Bill of Rights—and in particular the right to assembly with which *Cruikshank* dealt in addition to the Second Amendment—are binding upon the state governments. Given the legislative history of the Civil Rights Acts and the Fourteenth Amendment, and the more expanded views of incorporation which have become accepted in our own century, it is clear that the right to keep and bear arms was meant to be and should be protected under the civil rights statutes and the Fourteenth Amendment against infringement by officials acting under color of state law.

Within our own century, the only occasion upon which the Second Amendment has reached the Supreme Court came in *United States v. Miller*.[63] There, a prosecution for carrying a sawed off shotgun was dismissed before trial on Second Amendment grounds. In doing so, the court took no evidence as to the nature of the firearm or indeed any other factual matter. The Supreme Court reversed on procedural grounds, holding that the trial court could not take judicial notice of the relationship between a firearm and the Second Amendment, but must receive some manner of evidence. It did not formulate a test nor state precisely what relationship might be required. The court's statement that the amendment was adopted "to assure the continuation and render possible the effectiveness of such [militia] forces" and "must be interpreted and applied with that end in view", when combined with the court's statement that all constitutional sources "show plainly enough that the militia comprised all males physically capable of acting in concert for the common defense.... these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time,"[64] suggests that at the very least private ownership by a person capable of self defense and using an ordinary privately owned firearm must be protected by the Second Amendment. What the Court did not do in *Miller* is even more striking: It did not suggest that the

lower court take evidence on whether Miller belonged to the National Guard or a similar group. The hearing was to be on the nature of the (pg.11) firearm, not on the nature of its use; nor is there a single suggestion that National Guard status is relevant to the case.

The Second Amendment right to keep and bear arms therefore, is a right of the individual citizen to privately posses and carry in a peaceful manner firearms and similar arms. Such an "individual rights" interpretation is in full accord with the history of the right to keep and bear arms, as previously discussed. It is moreover in accord with contemporaneous statements and formulations of the right by such founders of this nation as Thomas Jefferson and Samuel Adams, and accurately reflects the majority of the proposals which led up to the Bill of Rights itself. A number of state constitutions, adopted prior to or contemporaneously with the federal Constitution and Bill of Rights, similarly provided for a right of the people to keep and bear arms. If in fact this language creates a right protecting the states only, there might be a reason for it to be inserted in the federal Constitution but no reason for it to be inserted in state constitutions. State bills of rights necessarily protect only against action by the state, and by definition a state cannot infringe its own rights; to attempt to protect a right belonging to the state by inserting it in a limitation of the state's own powers would create an absurdity. The fact that the contemporaries of the framers did insert these words into several state constitutions would indicate clearly that they viewed the right as belonging to the individual citizen, thereby making it a right which could be infringed either by state or federal government and which must be protected against infringement by both.

Finally, the individual rights interpretation gives full meaning to the words chosen by the first Congress to reflect the right to keep and bear arms. The framers of the Bill of Rights consistently used the words "right of the people" to reflect individual rights—as when these words were used to recognize the "right of the people" to peaceably assemble, and the "right of the people" against unreasonable searches and seizures. They distinguished between the rights of the people and of the state in the Tenth Amendment. As discussed earlier, the "militia" itself referred to a concept of a universally armed people, not to any specifically organized unit. When the framers referred to the equivalent of our National Guard, they uniformly used the term "select militia" and distinguished this from "militia". Indeed, the debates over the Constitution constantly referred to organized militia units as a threat to freedom comparable to that of a standing army, and stressed that such organized units did not constitute, and indeed were philosophically opposed to, the concept of a militia.

That the National Guard is not the "Militia" referred to in the second amendment is even clearer today. Congress has organized the National Guard under its power to "raise and support armies" and not its power to "Provide for organizing, arming and disciplining the Militia".[65] This Congress chose to do in the interests of organizing reserve military units which were not limited in deployment by the strictures of our power over the constitutional militia, which can be called forth only "to execute the laws of the Union, suppress insurrections and repel invasions." The modern National Guard was specifically intended to avoid status as the constitutional militia, a distinction recognized by 10 U.S.C. Sec 311(a).(pg.12)

The conclusion is thus inescapable that the history, concept, and wording of the second amendment to the Constitution of the United States, as well as its interpretation by every major commentator and court in the first half-century after its ratification, indicates that what is protected is an individual right of a private citizen to own and carry firearms in a peaceful manner.

REFERENCES

[1.] Charles Hollister, Anglo-Saxon Military Institutions 11-42 (Oxford University Press 1962); Francis Grose, Military Antiquities Respecting a History of the British Army, Vol. I at 1-2 (London, 1812).

[2.] Grose, supra, at 9-11; Bruce Lyon, A Constitutional and Legal History of Medieval England 273 (2d. ed. New York 1980).

[3.] J. J. Bagley and P. B. Rowley, A Documentary History of England 1066-1540, Vol. 1 at 155-56 (New York 1965).

[4.] Statute of Winchester (13 Edw. I c. 6). See also Bagley and Rowley, supra at 158.

[5.] 7 Ed. I c. 2 (1279).

[6.] Statute of Northampton (2 Edw. III c. 3).

[7.] Rex v. Knight, 90 Eng. Rep. 330; 87 Eng. Rep. 75 (King's Bench, 1686).

[8.] E. G. Heath, The Grey Goose Wing 109 (London, 1971).

[9.] 19 Hen. VII c. 4 (1503).

[10.] 3 Hen. VIII c. 13 (1511).

[11.] 64 Hen. VIII c. 13 (1514).

[12.] 33 Hen. VIII c. 6 (1514).

[13.] Noel Perrin, Giving Up the Gun 59-60 (Boston, 1979).

[14.] Jim Hill, The Minuteman in War and Peace 26-27 (Harrisburg, 1968).

[15.] Charles Oman, A History of the Art of War in the Sixteenth Century 288 (New York, 1937).

[16.] William Blackstone, Commentaries, Vol. 2 at 412 (St. George Tucker, ed., Philadelphia 1803).

[17.] "An Act for Settling the Militia," Ordinances and Acts of the Interregnum, Vol. 2 1320 (London, HMSO 1911).

[18.] 8 Calendar of State Papers (Domestic), Charles II, No. 188, p. 150.

[19.] 14 Car. II c. 3 (1662).

[20.] Joyce Malcolm, Disarmed: The Loss of the Right to Bear Arms in Restoration England, at 11 (Mary Ingraham Bunting Institute, Radcliffe College 1980).

[21.] Thomas Macaulay, The History of England from the Accession of Charles II, Vol. II at 137 (London, 1856).

[22.] Phillip, Earl of Hardwicke, Miscellaneous State Papers from 1501-1726, vol. 2 at 407-17 (London, 1778).

[23.] J. R. Western, Monarchy and Revolution: The English State in the 1680's, at 339 (Totowa, N.J., 1972).

[24.] Journal of the House of Commons from December 26, 1688, to October 26, 1693, at 29. (London, 1742). The Bill of Rights was ultimately enacted in this form. 1 Gul. and Mar., Sess. 2, c. 2 (1689).

[25.] Joyce Malcolm, supra, at 16.

[26.] William Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia from the First Session of the Legislature in 1619, at pp. 127, 173-74 (New York, 1823).

[27.] Id.

[28.] William Brigam, The Compact with the Charter and Laws of the Colony of New Plymouth, 31, 76 (Boston, 1836).

[29.] Oliver Dickerson, ed., Boston Under Military Rule, 61, 79, (Boston, 1936).

[30.] Steven Patterson, Political Parties in Revolutionary Massachusetts, at 103 (Univ. of Wisconsin Press, 1973).

[31.] See Sprecher, The Lost Amendment, 51 A.B.A.J. 554, 665 (1965).

[32.] The most extensive studies of these militia proposals are John McAuley Palmer, Washington, Lincoln, Wilson: Three War Statesmen (New York, 1930); Frederick Stern, Citizen Army (New York, 1957); John Mahon, The American Militia: Decade of Decision 1789-1800 (Univ of Florida, 1960).

[33.] Merrill Jensen, ed., The Documentary of History of the Ratification of the Constitution, vol. 3 at 378 (Madison, Wisc.).

[34.] Id., vol. 2 at 508. (pg.13)

[35.] Walter Bennett, ed., Letters from the Federal Farmer to the Republican, at 21, 22, 124 (Univ. of Alabama Press, 1975).

[36.] Debates and other Proceedings of the Convention of Virginia, . . . taken in shorthand by David Robertson of Petersburg, at 271, 275 (2d ed. Richmond, 1805).

[37.] Noah Webster, "An Examination into the Leading Principles of the Federal Constitution . . .", in Paul Ford, ed., Pamphlets on the Constitution of the United States, at 56 (New York, 1888).

[38.] Johnathan Elliott, ed., Debates in the Several State Conventions on the Adoption of the Federal Constitution, vol. 2 at 97 (2d ed., 1888).

[39.] Merrill Jensen, supra, vol. 2 at 597-98.

[40.] Debates and Proceedings in the Convention of the Commonwealth of Massachusetts, at 86-87 (Peirce & Hale, eds., Boston, 1850); 2 B. Schwartz, the Bill of Rights 675 (1971).

[41.] Documents Illustrative of the Formation of the Union of the American States, at 1026 (Washington, D.C.: GPO, 1927).

[42.] Id. at 1030.

[43.] Annals of Congress 434 (1789).

[44.] St. George Tucker, ed., Blackstone's Commentaries, Volume 1 at 143 n. 40, 41 (Philadelphia, 1803).

[45.] William Rawle, A View of the Constitution 125-6 (2d ed., Philadelphia, 1803).

[46]   Joseph Story, Commentaries on the Constitution, vol. 2 at 746 (1833).

[47]   Act of May 8, 1792; Second Cong., First Session, ch. 33.

[48]   Bliss v. Commonwealth, 12 Ken. (2 Litt.) 90, 92 (1822).

[49]   State v. Mitchell, (3 Black.) 229.

[50]   State v. Reid, 1 Ala. 612, 35 Am. Dec. 44 (1840).

[51]   State v. Buzzard, 4 Ark. 18, 27, 36 (1842). The Arkansas Constitutional provision at issue was narrower than the second amendment, as it protected keeping and bearing arms "for the common defense." Id. at 34.

[52]   Nunn v. State, 1 Ga. 243, 251 (1846).

[53]   Dred Scott v. Sandford, 60 U.S. 691, 705.

[54]   The most comprehensive work in this field of constitutional law is Steven Halbrook, the Jurisprudence of the Second and Fourteenth Amendments (Institute for Humane Studies, Menlo Park, California, 1979), reprinted in 4 George Mason L. Rev. 1 (1981).

[55]   Cong. Globe, 39th Congress, 1st Sess., pt. 1, p. 474 (Jan. 29, 1866).

[56]   Id. at 478.

[57]   H.R. Rep. No. 37, 41st Cong., 3d sess., p. 3 (1871).

[58]   See generally Halbrook, supra, at 42-62.

[59]   Slaughterhouse Cases, 83 U.S. 36 (L873).

[60]   United States v. Cruikshank, 92 U.S. 542 (1876).

[61]   Presser v. Illinois, 116 U.S. 252 (1886).

[62]   Miller v. Texas, 153 U.S. 535 (1894).

[63]   United States v. Miller, 307 U.S. 175 (1939).

[64]   Id. at 178, 179.

[65]   H.R. Report No. 141, 73d Cong., 1st sess. at 2-5 (1933).(pg.14)

APPENDIX

CASE LAW

The United States Supreme Court has only three times commented upon the meaning of the second amendment to our constitution. The first comment, in *Dred Scott*, indicated strongly that the right to keep and bear arms was an individual right; the Court noted that, were it to hold free blacks to be entitled to equality of citizenship, they would be entitled to keep and carry arms wherever they went. The second, in *Miller*, indicated that a court cannot take judicial notice that a short-barrelled shotgun is covered by the second amendment—but the Court did not indicate that National Guard status is in any way required for protection by that amendment, and indeed defined "militia" to include all citizens able to bear arms. The third, a footnote in *Lewis v. United States*, indicated only that "these legislative restrictions on the use of firearms"—a ban on possession by felons—were permissable. But since felons may constitutionally be deprived of many of the rights of citizens, including that of voting, this dicta reveals little. These three comments constitute all significant explanations of the scope of the second amendment advanced by our Supreme Court. The case of *Adam v. Williams* has been cited as contrary to the principle that the second amendment is an individual right. In fact, that reading of the opinion comes only in Justice Douglas's dissent from the majority ruling of the Court.

The appendix which follows represents a listing of twenty-one American decisions, spanning the period from 1822 to 1981, which have analysed right to keep and bear arms provisions in the light of statutes ranging from complete bans on handgun sales to bans on carrying of weapons to regulation of carrying by permit systems. Those decisions not only explained the nature of such a right, but also struck down legislative restrictions as violative of it, are designated by asterisks.

*20th century cases*

1. * *State v. Blocker*, 291 Or. 255, — — — P.2d — — — (1981).

"The statute is written as a total proscription of the mere possession of certain weapons, and that mere possession, insofar as a billy is concerned, is constitutionally protected."

"In these circumstances, we conclude that it is proper for us to consider defendant's 'overbreadth' attack to mean that the statute swept so broadly as to infringe rights that it could not reach, which in this setting means the right to possess arms guaranteed by sec 27."

2. * *State v. Kessler*, 289 Or. 359, 614 P.2d 94, at 95, at 98 (1980).

"We are not unmindful that there is current controversy over the wisdom of a right to bear arms, and that the original motivations for such a provision might not seem compelling if debated as (pg.15) a new issue. Our task, however, in construing a constitutional provision is to respect the principles given the status of constitutional guarantees and limitations by the drafters; it is not to abandon these principles when this fits the needs of the moment."

"Therefore, the term 'arms' as used by the drafters of the constitutions probably was intended to include those weapons used by settlers for both personal and military defense. The term 'arms' was not limited to firearms, but included several handcarried weapons commonly used for defense. The term 'arms' would not have included cannon or other heavy ordnance not kept by militia-men or private citizens."

3. *Motley v. Kellogg*, 409 N.E.2d 1207, at 1210 (Ind. App. 1980) (motion to transfer denied 1-27-1981).

"[N]ot making applications available at the chief's office effectively denied members of the community the opportunity to obtain a gun permit and bear arms for their self-defense."

4. *Schubert v. DeBard*, 398 N.E.2d 1339, at 1341 (Ind. App. 1980) (motion to transfer denied 8-28-1980).

"We think it clear that our constitution provides our citizenry the right to bear arms for their self-defense."

5. *Taylor v. McNeal*, 523 S.W.2d 148, at 150 (Mo. App. 1975).

"The pistols in question are not contraband. * * * Under Art. I, sec 23, Mo. Const. 1945, V.A.M.S., every citizen has the right to keep and bear arms in defense of his home, person and property, with the limitation that this section shall not justify the wearing of concealed arms."

6. * *City of Lakewood v. Pillow*, 180 Colo. 20, 501 P.2d 744, at 745 (en banc 1972).

"As an example, we note that this ordinance would prohibit gunsmiths, pawnbrokers and sporting goods stores from carrying on a substantial part of their business. Also, the ordinance appears to prohibit individuals from transporting guns to and from such places of business. Furthermore, it makes it unlawful for a person to possess a firearm in a vehicle or in a place of business for the purpose of self-defense. Several of these activities are constitutionally protected. Colo. Const. art. II, sec 13."

7. * *City of Las Vegas v. Moberg*, 82 N.M. 626, 485 P.2d 737, at 738 (N.M. App. 1971).

"It is our opinion that an ordinance may not deny the people the constitutionally guaranteed right to bear arms, and to that extent the ordinance under consideration is void."

8. *State v. Nickerson*, 126 Mt. 157, 247 P.2d 188, at 192 (1952).

"The law of this jurisdiction accords to the defendant the right to keep and bear arms and to use same in defense of his own home, his person and property."

9. *People v. Liss*, 406 Ill. 419, 94 N.E. 2d 320, at 323 (1950).

"The second amendment to the constitution of the United States provides the right of the people to keep and bear arms shall not be infringed. This of course does not prevent the enactment of a law against carrying concealed weapons, but it does indicate it should be kept in mind, in the construction of a statute of such character, that it is aimed at persons of criminal instincts, and for the prevention of crime, and not against use in the protection of person or property."(pg.16)

10. * *People v. Nakamura*, 99 Colo. 262, at 264, 62 P.2d 246 (en banc 1936).

"It is equally clear that the act wholly disarms aliens for all purposes. The state ... cannot disarm any class of persons or deprive them of the right guaranteed under section 13, article II of the Constitution, to bear arms in defense of home, person and property. The guaranty thus extended is meaningless if any person is denied the right to posses arms for such protection."

11. * *Glasscock v. City of Chattanooga*, 157 Tenn. 518, at 520, 11 S.W. 2d 678 (1928).

"There is no qualifications of the prohibition against the carrying of a pistol in the city ordinance before us but it is made unlawful 'to carry on or about the person any pistol,' that is, any sort of pistol in any sort of manner. *** [W]e must accordingly hold the provision of this ordinance as to the carrying of a pistol invalid."

12. * *People v. Zerillo*, 219 Mich. 635, 189 N.W. 927, at 928 (1922).

"The provision in the Constitution granting the right to all persons to bear arms is a limitation upon the power of the Legislature to enact any law to the contrary. The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff."

13 * *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, at 224 (1921).

"We are of the opinion, however, that 'pistol' ex vi termini is properly included within the word 'arms,' and that the right to bear such arms cannot be infringed. The historical use of pistols as 'arms' of offense and defense is beyond controversy."

"The maintenance of the right to bear arms is a most essential one to every free people and should not be whittled down by technical constructions."

14. * *State v. Rosenthal*, 75 VT. 295, 55 A. 610, at 611 (1903).

"The people of the state have a right to bear arms for the defense of themselves and the state. *** The result is that Ordinance No. 10, so far as it relates to the carrying of a pistol, is inconsistent with and repugnant to the Constitution and the laws of the state, and it is therefore to that extent, void."

15. * In re *Brickey*, 8 Ida. 597, at 598-99, 70 p. 609 (1902).

"The second amendment to the federal constitution is in the following language: 'A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed.' The language of section 11, article I of the constitution of Idaho, is as follows: 'The people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right by law.' Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages."

*19th century cases*

16. * *Wilson v. State*, 33 Ark. 557, at 560, 34 Am. Rep. 52, at 54 (1878).

"If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the (pg.17) penitentiary and gallows, and not by a general deprivation of constitutional privilege."

17. * *Jennings v. State*, 5 Tex. Crim. App. 298, at 300-01 (1878).

"We believe that portion of the act which provides that, in case of conviction, the defendant shall forfeit to the county the weapon or weapons so found on or about his person is not within the scope of legislative authority. * * * One of his most sacred rights is that of having arms for his own defence and that of the State. This right is one of the surest safeguards of liberty and self-preservation."

18. * *Andrews v. State*, 50 Tenn. 165, 8 Am. Rep. 8, at 17 (1871).

"The passage from Story shows clearly that this right was intended, as we have maintained in this opinion, and was guaranteed to and to be exercised and enjoyed by the citizen as such, and not by him as a soldier, or in defense solely of his political rights."

19. * *Nunn v. State*, 1 Ga. (1 Kel.) 243, at 251 (1846).

"'The right of the people to bear arms shall not be infringed.' The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State."

20. *Simpson v. State*, 13 Tenn. 356, at 359-60 (1833).

"But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, [the statute of Northampton,] or portion of the common law, our constitution has completely abrogated it; it says, 'that the freemen of this State have a right to keep and bear arms for their common defence.' Article II, sec. 26. * * * By this clause of the constitution,

an express power is given and secured to all the free citizens of the State to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived, that it would be going much too far, to impair by construction or abridgement a constitutional privilege, which is so declared; neither, after so solumn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed, such a necessarily consequent operation as terror to the people to be incurred thereby; we must attribute to the framers of it, the absence of such a view."

21. *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, at 92, and 93, 13 Am. Dec. 251 (1822).

"For, in principle, there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise."

"But it should not be forgotten, that it is not only a part of the right that is secured by the constitution; it is the right entire and complete, as it existed at the adoption of the constitution; and if any portion of that right be impaired, immaterial how small the part may be, and immaterial the order of time at which it be done, it is equally forbidden by the constitution."(pg.18)

The following represents a list of twelve scholarly articles which have dealt with the subject of the right to keep and bear arms as reflected in the second amendment to the Constitution of the United States. The scholars who have undertaken this research range from professors of law, history and philosophy to a United States Senator. All have concluded that the second amendment is an individual right protecting American citizens in their peaceful use of firearms.

BIBLIOGRAPHY

Hays, THE RIGHT TO BEAR ARMS, A STUDY IN JUDICIAL MISINTERPRETATION, 2 Wm. & Mary L. R. 381 (1960)

Sprecher, THE LOST AMENDMENT, 51 Am. Bar Assn. J. 554 & 665 (2 parts) (1965)

Comment, THE RIGHT TO KEEP AND BEAR ARMS; A NECESSARY CONSTITUTIONAL GUARANTEE OR AN OUTMODED PROVISION OF THE BILL OF RIGHTS? 31 Albany L. R. 74 (1967)

Levine & Saxe, THE SECOND AMENDMENT: THE RIGHT TO BEAR ARMS, 7 Houston L. R. 1 (1969)

McClure, FIREARMS AND FEDERALISM, 7 Idaho L. R. 197 (1970)

Hardy & Stompoly, OF ARMS AND THE LAW, 51 Chi.-Kent L. R. 62 (1974)

Weiss, A REPLY TO ADVOCATES OF GUN CONTROL LAW, 52 Jour. Urban Law 577 (1974)

Whisker, HISTORICAL DEVELOPMENT AND SUBSEQUENT EROSION OF THE RIGHT TO KEEP AND BEAR ARMS, 78 W. Va. L. R. 171 (1976)

Caplan, RESTORING THE BALANCE: THE SECOND AMENDMENT REVISITED, 5 Fordham Urban L. J. 31 (1976)

Caplan, HANDGUN CONTROL: CONSTITUTIONAL OR UNCONSTITUTIONAL?, 10 N.C. Central L. J. 53 (1979)

Cantrell, THE RIGHT TO BEAR ARMS, 53 Wis. Bar Bull. 21 (Oct. 1980)

Halbrook, THE JURISPRUDENCE OF THE SECOND AND FOURTEENTH AMENDMENTS, 4 Geo. Mason L. Rev. 1 (1981)(pg.19)

Enforcement of Federal Firearms Laws From the
Perspective of the Second Amendment

Federal involvement in firearms possession and transfer was not significant prior to 1934, when the National Firearms Act was adopted. The National Firearms Act as adopted covered only fully automatic weapons (machine guns and submachine guns) and rifles and shotguns whose barrel length or overall length fell below certain limits. Since the Act was adopted under the revenue power, sale of these firearms was not made subject to a ban or permit system. Instead, each transfer was made subject to a $200 excise tax, which must be paid prior to transfer; the identification of the parties to the transfer indirectly accomplished a registration purpose.

The 1934 Act was followed by the Federal Firearms Act of 1938, which placed some limitations upon sale of ordinary firearms. Persons engaged in the business of selling those firearms in interstate commerce were required to obtain a Federal Firearms License, at an annual cost of $1, and to maintain records of the name and address of persons to whom they sold firearms. Sales to persons convicted of violent felonies were prohibited, as were interstate shipments to persons who lacked the permits required by the law of their state.

Thirty years after adoption of the Federal Firearms Act, the Gun Control Act of 1968 worked a major revision of federal law. The Gun Control Act was actually a composite of two statutes. The first of these, adopted as portions of the Omnibus Crime and Safe Streets Act, imposed limitations upon imported firearms, expanded the requirement of dealer licensing to cover anyone "engaged in the business of dealing" in firearms, whether in interstate or local commerce, and expanded the recordkeeping obligations for dealers. It also imposed a variety of direct limitations upon sales of handguns. No transfers were to be permitted between residents of different states (unless the recipient was a federally licensed dealer), even where the transfer was by gift rather than sale and even where the recipient was subject to no state law which could have been evaded. The category of persons to whom dealers could not sell was expanded to cover persons convicted of any felony (other than certain business-related felonies such as antitrust violations), persons subject to a mental commitment order or finding of mental incompetence, persons who were users of marijuana and other drugs, and a number of other categories. Another title of the Act defined persons who were banned from possessing firearms. Paradoxically, these classes were not identical with the list of classes prohibited from purchasing or receiving firearms.

The Omnibus Crime and Safe Streets Act was passed on June 5, 1968, and set to take effect in December of that year. Barely two weeks after its passage, Senator Robert F. Kennedy was assassinated while campaigning for the presidency. Less than a week after (pg.20) his death, the second bill which would form part of the Gun Control Act of 1968 was introduced in the House. It was reported out of Judiciary ten days later, out of Rules Committee two weeks after that, and was on the floor barely a month after its introduction. the second bill worked a variety of changes upon the original Gun Control Act. Most significantly, it extended to rifles and shotguns the controls which had been imposed solely on handguns, extended the class of persons prohibited from possessing firearms to include those who were users of marijuana and certain other drugs, expanded judicial review of dealer license revocations by mandating a de novo hearing once an appeal was taken, and permitted interstate sales of rifles and shotguns only where the parties resided in contiguous states, both of which had enacted legislation permitting such sales. Similar legislation was passed by the Senate and a conference of the Houses produced a bill which was essentially a modification of the

House statute. This became law before the Omnibus Crime Control and Safe Streets Act, and was therefore set for the same effective date.

Enforcement of the 1968 Act was delegated to the Department of the Treasury, which had been responsible for enforcing the earlier gun legislation. This responsibility was in turn given to the Alcohol and Tobacco Tax Division of the Internal Revenu Service. This division had traditionally devoted itself to the pursuit of illegal producers of alcohol; at the time of enactment of the Gun Control Act, only 8.3 percent of its arrests were for firearms violations. Following enactment of the Gun Control Act the Alcohol and Tobacco Tax Division was retitled the Alcohol, Tobacco and Firearms Division of the IRS. By July, 1972 it had nearly doubled in size and became a complete Treasury bureau under the name of Bureau of Alcohol, Tobacco and Firearms.

The mid-1970's saw rapid increases in sugar prices, and these in turn drove the bulk of the "moonshiners" out of business. Over 15,000 illegal distilleries had been raided in 1956; but by 1976 this had fallen to a mere 609. The BATF thus began to devote the bulk of its efforts to the area of firearms law enforcement.

Complaints regarding the techniques used by the Bureau in an effort to generate firearms cases led to hearings before the Subcommittee on Treasury, Post Office, and General Appropriations of the Senate Appropriations Committee in July 1979 and April 1980, and before the Subcommittee on the Constitution of the Senate Judiciary Committee in October 1980. At these hearings evidence was received from various citizens who had been charged by BATF, from experts who had studied the BATF, and from officials of the Bureau itself.

Based upon these hearings, it is apparent that enforcement tactics made possible by current federal firearms laws are constitutionally, legally, and practically reprehensible. Although Congress adopted the Gun Control Act with the primary object of limiting access of felons and high-risk groups to firearms, the overbreadth of the law has led to neglect of precisely this area of enforcement. For example the Subcommittee on the Constitution received correspondence from two members of the Illinois Judiciary, dated in 1980, indicating that they had been totally unable to persuade BATF to accept cases against felons who were in possession of (pg.21) firearms including sawed-off shotguns. The Bureau's own figures demonstrate that in recent years the percentage of its arrests devoted to felons in possession and persons knowingly selling to them have dropped from 14 percent down to 10 percent of their firearms cases. To be sure, genuine criminals are sometimes prosecuted under other sections of the law. Yet, subsequent to these hearings, BATF stated that 55 percent of its gun law prosecutions overall involve persons with no record of a felony conviction, and a third involve citizens with no prior police contact at all.

The Subcommittee received evidence that BATF has primarily devoted its firearms enforcement efforts to the apprehension, upon technical malum prohibitum charges, of individuals who lack all criminal intent and knowledge. Agents anxious to generate an impressive arrest and gun confiscation quota have repeatedly enticed gun collectors into making a small number of sales—often as few as four—from their personal collections. Although each of the sales was completely legal under state and federal law, the agents then charged the collector with having "engaged in the business" of dealing in guns without the required license. Since existing law permits a felony conviction upon these charges even where the individual has no criminal knowledge or intent numerous collectors have been ruined by a felony record carrying a potential sentence of five years in federal prison. Even in cases where the collectors secured acquittal, or grand juries failed to indict, or prosecutors refused to file criminal charges, agents of the Bureau have generally confiscated the entire collection of the potential defendant upon the ground that he intended to use

it in that violation of the law. In several cases, the agents have refused to return the collection even after acquittal by jury.

The defendant, under existing law is not entitled to an award of attorney's fees, therefore, should he secure return of his collection, an individual who has already spent thousands of dollars establishing his innocence of the criminal charges is required to spend thousands more to civilly prove his innocence of the same acts, without hope of securing any redress. This, of course, has given the enforcing agency enormous bargaining power in refusing to return confiscated firearms. Evidence received by the Subcommittee on the Constitution demonstrated that Bureau agents have tended to concentrate upon collector's items rather than "criminal street guns". One witness appearing before the Subcommittee related the confiscation of a shotgun valued at $7,000. Even the Bureau's own valuations indicate that the value of firearms confiscated by their agents is over twice the value which the Bureau has claimed is typical of "street guns" used in crime. In recent months, the average value has increased rather than decreased, indicating that the reforms announced by the Bureau have not in fact redirected their agents away from collector's items and toward guns used in crime.

The Subcommittee on the Constitution has also obtained evidence of a variety of other misdirected conduct by agents and supervisors of the Bureau. In several cases, the Bureau has sought conviction for supposed technical violations based upon policies and interpretations of law which the Bureau had not published in the Federal Register, as required by 5 U.S.C. § 552. For instance, beginning in 1975, Bureau officials apparently reached a judgment that (pg.22) a dealer who sells to a legitimate purchaser may nonetheless be subject to prosecution or license revocation if he knows that that individual intends to transfer the firearm to a nonresident or other unqualified purchaser. This position was never published in the Federal Register and is indeed contrary to indications which Bureau officials had given Congress, that such sales were not in violation of existing law. Moreover, BATF had informed dealers that an adult purchaser could legally buy for a minor, barred by his age from purchasing a gun on his own. BATF made no effort to suggest that this was applicable only where the barrier was one of age. Rather than informing the dealers of this distinction, Bureau agents set out to produce mass arrests upon these "straw man" sale charges, sending out undercover agents to entice dealers into transfers of this type. The first major use of these charges, in South Carolina in 1975, led to 37 dealers being driven from business, many convicted on felony charges. When one of the judges informed Bureau officials that he felt dealers had not been fairly treated and given information of the policies they were expected to follow, and refused to permit further prosecutions until they were informed, Bureau officials were careful to inform only the dealers in that one state and even then complained in internal memoranda that this was interfering with the creation of the cases. When BATF was later requested to place a warning to dealers on the front of the Form 4473, which each dealer executes when a sale is made, it instead chose to place the warning in fine print upon the back of the form, thus further concealing it from the dealer's sight.

The Constitution Subcommittee also received evidence that the Bureau has formulated a requirement, of which dealers were not informed that requires a dealer to keep official records of sales even from his private collection. BATF has gone farther than merely failing to publish this requirement. At one point, even as it was prosecuting a dealer on this charge (admitting that he had no criminal intent), the Director of the Bureau wrote Senator S. I. Hayakawa to indicate that there was no such legal requirement and it was completely lawful for a dealer to sell from his collection without recording it. Since that date, the Director of the Bureau has stated that that is not the Bureau's position and that such sales are completely illegal; after making that statement, however,

he was quoted in an interview for a magazine read primarily by licensed firearms dealers as stating that such sales were in fact legal and permitted by the Bureau. In these and similar areas, the Bureau has violated not only the dictates of common sense, but of 5 U.S.C. Sec 552, which was intended to prevent "secret lawmaking" by administrative bodies.

These practices, amply documented in hearings before this Subcommittee, leave little doubt that the Bureau has disregarded rights guaranteed by the constitution and laws of the United States.

It has trampled upon the second amendment by chilling exercise of the right to keep and bear arms by law-abiding citizens.

It has offended the fourth amendment by unreasonably searching and seizing private property.(pg.23)

It has ignored the Fifth Amendment by taking private property without just compensation and by entrapping honest citizens without regard for their right to due process of law.

The rebuttal presented to the Subcommittee by the Bureau was utterly unconvincing. Richard Davis, speaking on behalf of the Treasury Department, asserted vaguely that the Bureau's priorities were aimed at prosecuting willful violators, particularly felons illegally in possession, and at confiscating only guns actually likely to be used in crime. He also asserted that the Bureau has recently made great strides toward achieving these priorities. No documentation was offered for either of these assertions. In hearings before BATF's Appropriations Subcommittee, however, expert evidence was submitted establishing that approximately 75 percent of BATF gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations. (In one case, in fact, the individual was being prosecuted for an act which the Bureau's acting director had stated was perfectly lawful.) In those hearings, moreover, BATF conceded that in fact (1) only 9.8 percent of their firearm arrests were brought on felons in illicit possession charges; (2) the average value of guns seized was $116, whereas BATF had claimed that "crime guns" were priced at less than half that figure; (3) in the months following the announcement of their new "priorities", the percentage of gun prosecutions aimed at felons had in fact fallen by a third, and the value of confiscated guns had risen. All this indicates that the Bureau's vague claims, both of focus upon gun-using criminals and of recent reforms, are empty words.

In light of this evidence, reform of federal firearm laws is necessary to protect the most vital rights of American citizens. Such legislation is embodied in S. 1030. That legislation would require proof of a willful violation as an element of a federal gun prosecution, forcing enforcing agencies to ignore the easier technical cases and aim solely at the intentional breaches. It would restrict confiscation of firearms to those actually used in an offense, and require their return should the owner be acquitted of the charges. By providing for award of attorney's fees in confiscation cases, or in other cases if the judge finds charges were brought without just basis or from improper motives, this proposal would be largely self-enforcing. S. 1030 would enhance vital protection of constitutional and civil liberties of those Americans who choose to exercise their Second Amendment right to keep and bear arms.