

**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record

## June 2007

### Report Number I-2007-006

*Exhibit 11*

# EXECUTIVE DIGEST

## INTRODUCTION

On June 26, 1934, Congress passed the National Firearms Act (NFA) to limit the availability of machine guns, short-barreled shotguns, short-barreled rifles, sound suppressors (silencers), and other similar weapons that were often used by criminals during the Prohibition Era.[1]  The NFA imposed a tax on the manufacture, import, and distribution of NFA weapons and required a registry of "all NFA firearms in the United States that were not under the control of the United States [government]."[2]  The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) collects the taxes and maintains NFA weapon possession records in a central registry – an electronic database called the National Firearms Registration and Transfer Record (NFRTR), which contains records on almost 2 million weapons.[3]  ATF's NFA Branch (under the Firearms and Explosives Services Division, Office of Enforcement Programs and Services) maintains the NFRTR and processes all applications to make, manufacture, import, register, and transfer NFA weapons.

Congress expanded the scope of the NFA through the Gun Control Act (GCA) of 1968 to include destructive devices (bombs, incendiary devices such as flash bang grenades, and weapons with a bore of greater than one-half inch), frames and receivers that can convert a semi-automatic weapon into an automatic weapon firing multiple shots with one function of the trigger, and other concealable weapons.[4]  The GCA restricts registrations of

---

[1] 26 U.S.C. § 5845 (1986).

[2] 26 U.S.C. § 5845.  NFA applicants must pay a $200 tax each time they make or transfer an NFA weapon.  Further, manufacturers, importers, and dealers must pay a Special Occupational Tax (SOT) to do business in NFA weapons and are licensed as Special Occupational Taxpayers.  Manufacturers and importers are taxed $1,000 each year and dealers are taxed $500.

[3] The NFRTR was automated in 1983.

[4] The GCA also defined the term "firearm" to exclude antique firearms or any devices (excluding machine guns and destructive devices) that could be classified as collectors' items.  26 U.S.C. § 5845.  Flash bang grenades are non-lethal, pyrotechnic distraction devices used by law enforcement agencies, the military, and movie and television productions.

---

U.S. Department of Justice                                                                    i
Office of the Inspector General
Evaluation and Inspections Division

NFA weapons to only makers, manufacturers, and importers.[5]  Private citizens or individuals who meet eligibility under the NFA are allowed to purchase, sell, possess, and transfer only previously registered NFA weapons.  Further, the GCA called for a 30-day amnesty period ending December 1, 1968, where anyone possessing an NFA weapon could register the weapon without consequence.  However, any NFA weapon not registered during the amnesty is considered contraband, cannot be registered, and must be forfeited or voluntarily surrendered to ATF.

On May 19, 1986, Congress passed the Firearms Owners' Protection Act to prohibit possession of machine guns that were not legally possessed prior to its enactment.  Thus, the Firearms Owners' Protection Act allowed newly manufactured machine guns to be available only to the U.S. government (such as the U.S. military) and law enforcement entities after May 19, 1986.

NFA weapons and their owners must be registered with the NFRTR, and whenever possession is transferred (through sale, rental, gift, or bequest) the registration must be updated.  An owner is required to retain the approved NFA weapons application form as proof of a weapon's registration and make it available to ATF upon request.[6]  Manufacturers, importers, and makers of NFA weapons also are required to register each newly made, manufactured, or imported weapon.  Law enforcement agencies are allowed to register weapons that have been seized or voluntarily surrendered to the U.S. government.

The Office of the Inspector General (OIG) examined ATF's effectiveness in maintaining the records of registrations and transfers of NFA weapons in the NFRTR.  The OIG conducted the review in response to requests from members of Congress who had received letters from citizens expressing concern about the accuracy and completeness of the NFRTR.  These citizens asserted that errors in the NFRTR and errors in decisions by NFA Branch employees left NFA weapons owners vulnerable to unjust convictions for violating the NFA.

---

[5]  NFA weapons makers are unlicensed individuals who usually make one weapon at a time for individual use.  NFA weapons manufacturers are licensed to manufacture weapons for sale and pay an annual Special Occupational Tax.

[6]  26 U.S.C. § 5841(e).

U.S. Department of Justice                                                                                          ii
Office of the Inspector General
Evaluation and Inspections Division

**RESULTS IN BRIEF**

We found that since 2004, the NFA Branch has improved significantly the timeliness of both processing NFA weapons applications and responding to customer inquiries. However, continuing management and technical deficiencies contribute to inaccuracies in the NFRTR database. For example, NFA Branch staff do not process applications or enter data into the NFRTR in a consistent manner, which leads to errors in records and inconsistent decisions on NFA weapons applications. In addition, the NFA Branch has a backlog of record discrepancies between the NFRTR and inventories of federal firearms licensees that were identified during ATF compliance inspections. Further, the NFRTR's software programming is flawed and causes technical problems for those working in the database. The lack of consistency in procedures and the backlog in reconciling discrepancies, combined with the technical issues, result in errors in the records, reports, and queries produced from the NFRTR. These errors affect the NFRTR's reliability as a regulatory tool when it is used during compliance inspections of federal firearms licensees. However, we did not find evidence that individual weapons owners or federal firearms licensees had been sanctioned or criminally prosecuted because of errors in the database, as asserted in the citizens' letters.

The NFA Branch Chief has recently initiated several actions to reduce errors in the NFRTR, such as hiring additional staff, training staff, improving communication with staff, and revising a procedures manual. The NFA Branch Chief and the Assistant Director of the Office of Enforcement Programs and Services both stated that lack of funding precluded other significant actions such as correcting and upgrading the programming for the NFRTR and implementing online submission of applications.

Our main findings are summarized below.

**The NFA Branch has improved the timeliness of processing NFA applications and responding to customer inquiries.**

The NFA Branch has decreased the amount of time it takes to process NFA weapons applications and improved responsiveness to customer inquiries. Between 2004 and 2006, the average processing time for all eight types of NFA weapons applications decreased collectively from 30 days to 8 days.[7] In the same time period, the average processing time for the four

---

[7] The eight types of NFA weapons applications are Form 5320.20, Application to Transport Interstate or to Temporarily Export Certain NFA Firearms; Form 1, Application to Make and Register a Firearm; Form 2, Notice of Firearms Manufactured or Imported; Form

types of applications used by individual weapons owners (Forms 1 and 4) and NFA weapons dealers (Forms 3 and 5) for registering and transferring NFA weapons decreased collectively from 39 days to 10 days.  Specifically, processing time for Form 1 decreased from 99 days to 28 days; for Form 4, from 81 days to 9 days; for Form 3, from 30 days to 4 days; and for Form 5, 30 days to 9 days.  The NFA Branch Chief attributed the improved processing times to the hiring of more contractor Data Entry Clerks, who enter data from the paper forms into the NFRTR, thereby freeing other staff to focus on reviewing the content of the applications.  The NFA Branch has improved its process for responding to customer inquiries by hiring contractor Customer Service Representatives to staff the telephones and answer questions, usually within 24 hours, from the public and ATF personnel.

To further improve customer service, the NFA Branch established a working relationship with the National Firearms Act Trade and Collectors Association (NFATCA), which represents NFA weapons dealers, manufacturers, importers, and owners.  To build that relationship, the NFA Branch hosted a meeting with members of the NFATCA executive board in 2006 to demonstrate Branch operations and discuss NFA and NFRTR issues.  The NFA Branch and the NFATCA also collaborated to write a handbook on the NFA and the weapons registration process, which ATF plans to make available on its website.  However, we found that the ATF website's generally poor structure makes it difficult to navigate or locate relevant information and is a potential barrier to the electronic handbook's use.

In interviews, NFATCA representatives told us that the process for registering and transferring NFA weapons had "vastly improved" and that members of the NFA weapons industry spoke highly of NFA Branch staff, praising the staff's progress in minimizing the time to process and approve an application.

ATF Industry Operations Investigators (IOI) and ATF Special Agents we surveyed and interviewed were satisfied with the timeliness of the NFA Branch's response to their requests for inventory reports and records checks from the NFRTR.  IOIs use inventory reports during inspections of federal firearms licensees and Special Agents use results from records checks during criminal investigations.  The NFA Branch usually completed

---

3, Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer; Form 4, Application for Tax-Paid Transfer and Registration of a Firearm; Form 5, Application for Tax-Exempt Transfer and Registration of a Firearm; Form 9, Application and Permit for Permanent Exportation of a Firearm; and Form 10, Application for Registration of Firearms Acquired by Certain Government Entities.

U.S. Department of Justice                                                                                     iv
Office of the Inspector General
Evaluation and Inspections Division

inventory reports 2 to 4 days after the Investigators' requests and records checks 2 to 3 days after the Special Agents' requests, with urgent checks completed within 1 day.

**NFA Branch staff do not process NFA weapons applications or enter data into the NFRTR in a consistent manner.**

We found that because of inadequate standard operating procedures, training, and communication, NFA Branch staff members do not process applications or enter data uniformly into the NFRTR.  The staff's variations in completing these tasks result in errors in NFRTR records, reports, and queries as well as inconsistent decisions on NFA weapons registration and transfer applications.

The NFA Branch does not provide staff with a comprehensive standard operating procedures manual.  The NFA Branch Chief inherited an undated manual of standard operating procedures when he assumed his position in 2005.  The manual was under revision at the time of our review, but the NFA Branch Chief told us that he has not had enough staff to complete the revision.

None of the staff members we interviewed had ever received a copy of this manual as a resource to help them perform their duties.  Instead, the procedural memorandums and directives provided to NFA Branch staff as guidance were usually specific to one issue and did not cover the basic information needed to process applications and enter data into the NFRTR. For example, NFA Branch staff stated that they did not have adequate written direction on how to enter data such as abbreviations in the NFRTR, how to maintain application files, how often to contact applicants with pending applications, the proper method for fixing or working around NFRTR technical flaws, and who has responsibility for correcting errors in NFRTR records.  Therefore, staff members relied on each other or on managers to verbally explain what they believed were the procedures for processing applications and navigating the NFRTR database.

Additionally, training for new NFA Branch staff members is ad hoc and not uniform.  Staff members told us that because of the inadequate training it was difficult to become familiar with the NFRTR and navigate easily through the database, a vital skill needed to process applications and conduct records checks.  Staff also believed that inadequate training hampered their ability to learn about the NFA and the process for registering and transferring NFA weapons.  Incomplete and inaccurate training could lead to errors in the NFRTR and in decisions based on the NFRTR.  For example, supervisors' inadequate training led to variations in

U.S. Department of Justice                                                      v
Office of the Inspector General
Evaluation and Inspections Division

their direction and inconsistent decisions about approving or disapproving NFA weapons registration and transfer applications.  Since taking over in 2005, the NFA Branch Chief has provided some training opportunities to staff, including sessions on NFA weapons and NFA-related legal issues, as well as access to NFA weapons industry conferences.  However, staff stated that training must be more comprehensive and frequent.

Further, the NFA Branch does not have systematic methods for managers to communicate with staff to keep them informed of NFA and NFRTR issues.  Most staff members told us they were comfortable asking questions of Section Chiefs and the NFA Branch Chief but needed more structured and regular forms of communication to stay current on changes in NFA weapons regulations.  Staff members said that they sporadically received e-mails and memorandums from managers on administrative, procedural, or NFA issues.  However, there were no regular staff meetings or established communication methods, even though staff told us that they would welcome such regular interaction.  Without coordinated and regular communication, Branch managers could not update the staff on the complex regulations and issues surrounding NFA weapons or ensure that direction was given in a standard manner.  In March 2007, after the fieldwork for our review had concluded, the NFA Branch Section Chiefs began conducting monthly staff meetings to improve the flow of information within the Branch.

**The NFA Branch is not promptly correcting a backlog of NFRTR errors identified during inspections of federal firearms licensees.**

The NFA Branch is not promptly correcting discrepancies between the NFRTR records and licensee inventories.  The NFA Branch is responsible for addressing the errors and discrepancies, identified by IOIs during compliance inspections of federal firearms licensees.[8]  However, there are no established guidelines for the Branch on reconciling the errors within a certain amount of time, and as of March 2007 the Branch had a backlog of 61 discrepancy reports to reconcile.  This means that some corrections to records do not get made before a licensee receives their next inspection, which could be 3 years later.  At the time of our review, the NFA Branch Chief had assigned one staff member to work part-time on the backlog.

We found that discrepancies between the NFRTR and inventories of federal firearms licensees were frustrating and time consuming for IOIs as

---

[8]  Compliance inspections examine whether a federal firearms licensee is complying with federal firearms laws.  During inspections, licensees must account for all weapons that they have bought or sold, and verify they have reported multiple sales and firearms thefts to ATF.

U.S. Department of Justice                                                                          vi
Office of the Inspector General
Evaluation and Inspections Division

well as disconcerting for licensees.  While most discrepancies could be resolved quickly during inspections if the licensees could produce the transfer and registration paperwork, about one of four discrepancies could not be resolved without research by NFA Branch staff.  According to the NFA Branch Chief, the discrepancies made the NFA Branch look incompetent and could be disruptive to licensees' operations because of the time licensees must devote to resolving discrepancies between their inventories and the NFRTR.

In our survey of IOIs, 46.5 percent (139 of 299) reported that they found a discrepancy between the NFRTR inventory report and a licensee's inventory "always" or "most of the time."  Further, 44.4 percent of respondents (133 of 299) said that the discrepancy was due to an error in the NFRTR "always" or "most of the time."  In comparison, no respondents reported that the error was "always" on the part of the licensee, and only 2 percent (6 of 299) reported that the error was on the part of the licensee "most of the time."

IOIs stated that many licensees were worried about any identified discrepancy because ATF could refer licensees to ATF Special Agents for violations of the NFA and GCA discovered during compliance inspections. However, we found that errors in the NFRTR have not resulted in inappropriate administrative or criminal sanctions against individual weapons owners or licensees.  IOIs told us they only refer cases involving discrepancies to ATF Special Agents for investigation when the discrepancy cannot be resolved or when the IOI suspects there is a deliberate violation of the NFA.  We found that IOIs referred cases infrequently to Special Agents and between 2000 and 2006 only 15 federal firearms licensees were charged criminally for violating only the NFA.  While IOIs can note NFA violations in the report of the compliance inspection, they cannot issue administrative sanctions for NFA violations alone.  In 2006, ATF conducted 7,292 compliance inspections and issued 12,176 violations.  Of that total number, less than 1 percent (53) was for NFA violations.[9]  From our interviews, data analyses, and survey, we identified no instances in which an NFRTR error resulted in inappropriate seizure of an NFA weapon or in inappropriate criminal consequences to an individual weapons owner or federal firearms licensee.  We asked the NFATCA for examples of its members' weapons being inappropriately seized because of inaccuracies in the NFRTR, and we received none in response.

---

[9]  Violations of the GCA and the Firearms Owner's Protection Act are those most frequently cited during compliance inspections of federal firearms licensees.  These violations could include not reporting multiple sales to one individual, selling a firearm to a minor, or not properly filling out an ATF Form 4473 (a firearms transaction record).

**The NFRTR database has technical problems, and the NFA Branch considers the programming to be flawed.**

The NFRTR's programming has not been modified since 1997 when ATF converted the original 1983 electronic database to an Oracle platform. Several NFA Branch personnel described the NFRTR programming as obsolete, or becoming obsolete, and identified flaws that make it difficult to work with the database and to ensure that decisions based on NFRTR reports and queries are correct. The flaws include: (1) older NFRTR records with empty data fields can improperly exclude the records from search results, (2) the NFRTR can erroneously generate two separate records for one weapon, (3) the system lacks controls to prevent inconsistent data entry, (4) the system lists incorrect owners of NFA weapons on queries and reports, and (5) when multiple weapons are registered on a single form, a change entered in the NFRTR for one weapon incorrectly applies the change to all the weapons listed on that form.

For the last 5 years, ATF would not make system enhancements to the NFRTR because ATF planned to integrate many of the databases of its National Tracing Center, Firearms and Explosives Imports Branch, and NFA Branch. The goal of the Firearms Integrated Technology (FIT) project was to allow access to information in the various databases through a single entry point. Content of the individual databases would not be affected. ATF received budget allocations in fiscal year (FY) 2001 and FY 2002 for FIT; however, ATF reallocated the funding to another priority mission, which exhausted the funding by 2004. Any continued work on FIT was dependent on congressionally earmarked funds (which were exhausted during 2005) and the acquisition of specific funds to perform specific tasks. ATF's subsequent funding requests for FIT have not been successful. ATF requested additional funds for NFRTR improvements for FY 2008, but funding was not included in the President's budget. To address some technical issues, in 2006 the NFA Branch Chief created a permanent Information Technology Specialist position to determine the full capability of the NFRTR database, develop additional queries and reports, and determine the best approach to correcting errors in NFRTR records.

**ATF has not completed two vital projects to improve the NFRTR, which limits the NFA Branch's ability to correct or prevent discrepancies.**

ATF has initiated, but has not completed due to budget constraints, two projects that would improve the accuracy of the NFRTR and increase the efficiency of the NFA Branch. The first project involves scanning (or imaging) all NFA weapons transfer and registration applications since 1934

into digital files in a database and establishing an indexing system to search this new database. The second project, titled e-Forms, is creating an electronic filing system for individual weapons owners and federal firearms licensees to submit NFA weapons applications online.

We found that ATF has 1-year's backlog worth of NFA weapons applications to image and index. In 2005, the NFA Branch had four contractors working on imaging and indexing, and the backlog was only 6 months. In June 2006, budget cuts forced ATF to reduce the number of contractors to two, which has increased the backlog significantly. Reduction of this backlog is important because NFA Branch staff use the imaging database to quickly and easily locate specific forms, perform a complete search of a weapon's ownership history, and verify registration of NFA weapons.

ATF also has not completed the e-Forms project it initiated in 2004. The capability for individual weapons owners and federal firearms licensees to submit applications online would reduce data entry errors by NFA Branch personnel, detect errors on applicant's registration and transfer forms before entry into the NFRTR, and allow importers and manufacturers to check the status of forms they submitted electronically for processing. ATF expects the e-Forms system to free up limited staff resources in the NFA Branch by reducing the number of paper forms that must be keyed into the NFRTR.

In FY 2002, ATF received funding for the e-Forms project and developed the requirements document for an electronic filing system and a prototype of the system. In February 2006, the ATF demonstrated the prototype at a firearms industry trade show and received enthusiastic responses from industry members. However, because of budget constraints, ATF suspended the project before the system was finalized and implemented. ATF estimated that it needed $13,964,870 to complete the e-Forms system and to operate it for the first 2 years and that $200,000 would be needed to operate it each year thereafter.

U.S. Department of Justice                                                                      ix
Office of the Inspector General
Evaluation and Inspections Division

## CONCLUSIONS AND RECOMMENDATIONS

We concluded that the NFA Branch has made significant improvements to its processing of NFA weapons applications and its responsiveness to inquiries from the public and ATF personnel. However, management infrastructure and information technology issues persist that contribute to errors in the NFRTR and affect its reliability as a regulatory tool. NFA Branch staff do not process applications or enter data into the NFRTR in a consistent manner, leading to errors in records and inconsistent decisions on NFA weapons applications. The NFA Branch also has a backlog of discrepancies in its records that it is not able to resolve in a timely manner due to a shortage in staff resources. Further, the NFRTR database has software programming flaws that cause errors in records and reports.

Despite the concerns of both the citizens who wrote the letters to Congress that prompted our review and federal firearms dealers that errors in the NFRTR leave them vulnerable to unwarranted sanctions and criminal charges, we concluded, based on ATF documents and interviews with ATF personnel and NFA weapons industry representatives, that errors in NFRTR records have not resulted in inappropriate criminal charges against individuals or licensees. ATF does not have the authority to issue sanctions to federal firearms licensees for violations of only the NFA found during inspections.

To help improve the processing of NFA applications and reduce errors in the NFRTR, we recommend that ATF:

1. Improve the ATF website by making it easier to find NFA information, such as frequently asked questions, application forms and instructions, NFA Branch contact information, and the NFA handbook.

2. Develop and disseminate to all NFA Branch staff a comprehensive standard operating procedures manual that includes all NFA weapons application processes, NFRTR processes, and data entry codes and abbreviations.

3. Develop uniform and structured training for staff members that includes standard operating procedures and hands-on experience with the NFRTR. Ensure that all NFA Branch staff members attend the training and that the staff trainers are themselves properly trained. Provide training for the Section Chiefs on supervisory techniques.

U.S. Department of Justice                                                                      x
Office of the Inspector General
Evaluation and Inspections Division

4. Establish regular and recurring methods of communication to NFA Branch staff.

5. Resolve discrepancies between the NFRTR and inventories of federal firearms licensees in a timely manner.

6. Develop and implement an action plan to fix technical programming flaws and errors in the NFRTR.

7. Develop and implement an action plan for eliminating the backlog of imaging and indexing forms for the imaging database.

8. Develop and implement an action plan for completing the e-Forms project.

U.S. Department of Justice                                          xi
Office of the Inspector General
Evaluation and Inspections Division

# TABLE OF CONTENTS

**LIST OF ACRONYMS**

**BACKGROUND** ...................................................................................................1

**PURPOSE, SCOPE, AND METHODOLOGY OF THE OIG REVIEW** .........8

**RESULTS OF THE REVIEW** ...............................................................11

    **The NFA Branch has improved the timeliness of processing NFA applications and responding to customer inquiries** ......................................................................11

        The NFA Branch has decreased the time it takes to process applications ..........................................................11

        The NFA Branch has improved the process for responding to customer inquiries........................................13

        The NFA Branch is working with the NFA industry ............15

        ATF field staff reported satisfaction with NFA Branch customer service.............................................................16

    **NFA Branch staff do not process NFA weapons applications or enter data into the NFRTR in a consistent manner** ............18

        The NFA Branch does not have a comprehensive standard operating procedures manual..............................18

        Training is inadequate, especially for new employees .........21

        Managers' communication with staff is sporadic ...............23

        NFA Branch actions to address identified needs.................23

**The NFA Branch is not promptly correcting a backlog of errors in NFRTR records identified during inspections of federal firearms licensees** ........................................................25

    Discrepancies between the NFRTR and licensees' inventories delay completion of inspections and erode confidence in the NFRTR ........................................26

        *Discrepancies are frustrating and time consuming for IOIs* ....................................................27

        *Discrepancies are disconcerting for licensees* .............29

    Errors or discrepancies in the NFRTR have not resulted in inappropriate criminal prosecutions to NFA weapons owners and licensees ........................................................30

    NFA Branch action to address backlog of discrepancy reports ............................................................32

**The NFRTR database has technical problems and the NFA Branch considers the programming to be flawed** .......32

    Older NFRTR records have empty data fields......................34

    Some NFA weapons have multiple records in the NFRTR....35

    The NFRTR does not have system controls over data entry, so consistency is not ensured ...................................35

    The NFRTR does not always indicate the correct owner of the weapon on queries and reports .....................36

    When multiple NFA weapons are registered on the same application form, modifications to one weapon's record affect all of the weapons registered on that form......37

    NFA Branch action to address technical issues .................38

**ATF has not completed two vital projects to improve the NFRTR, which limits the NFA Branch's capability to correct or prevent discrepancies** .........................................39

ATF has a backlog of NFA weapons applications to be imaged and indexed ...................................................39

ATF has not completed the e-Forms project ......................40

**CONCLUSIONS AND RECOMMENDATIONS** ........................................42

**APPENDIX I:    NFA APPLICATION FORMS AND TRANSACTION PROCESSES** ..................................................45

**APPENDIX II:   OIG SURVEY QUESTIONS TO INDUSTRY OPERATIONS INVESTIGATORS** ..................................48

**APPENDIX III: THE BUREAU OF ALCOHOL, TOBACCO, FIRARMS AND EXPLOSIVES' RESPONSE** ................51

**APPENDIX IV: OIG'S ANALYIS OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES' RESPONSE** ..................................................56

# ACRONYMS

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| CSR | Customer Service Representative |
| FIT | Firearms Integrated Technology |
| FTB | Firearms Technology Branch |
| FY | Fiscal year |
| GCA | Gun Control Act |
| IOI | Industry Operations Investigator |
| IT | Information technology |
| NCIC | National Crime Information Center |
| NFA | National Firearms Act |
| NFATCA | National Firearms Act Trade and Collectors Association |
| NFRTR | National Firearms Registration and Transfer Record |
| NRA | National Rifle Association |
| OIG | Office of the Inspector General |
| SHOT | Shooting, Hunting, and Outdoor Trade |
| SOT | Special Occupational Tax |

# BACKGROUND

On June 26, 1934, Congress passed the National Firearms Act (NFA), since amended, to limit the availability of machine guns, short-barreled shotguns, short-barreled rifles, sound suppressors (silencers), and other similar weapons that were often used by criminals during the Prohibition Era.[10]  The NFA imposed a tax on the manufacture, import, and distribution of NFA weapons and required a registry of "all NFA firearms in the United States that were not under the control of the United States [government]."[11]  The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) collects the taxes and maintains NFA weapon registration records in a central registry.  This central registry, called the National Firearms Registration and Transfer Record (NFRTR), consists of all registration documents, attachments to those documents, and an electronic database that includes information from many of the documents and that enables computerized searches of the registry.[12]

Congress expanded the scope of the NFA through the Gun Control Act (GCA) of 1968 to include destructive devices (e.g., explosive and incendiary bombs, flash bang grenades, and weapons with a bore of greater than one-half inch in diameter), machine gun frames or receivers, and conversion kits for machine guns.[13]  The GCA restricts registrations of NFA weapons to only makers, manufacturers, and importers.[14]  Private citizens or individuals who meet eligibility under the NFA are allowed to purchase, sell, possess, and transfer only previously registered NFA weapons.  Further, the GCA

---

[10]  26 U.S.C. § 5845 (1986).

[11]  26 U.S.C. § 5845.  NFA applicants must pay a $200 tax each time they make or transfer an NFA weapon.  Further, manufacturers, importers, and dealers must pay a Special Occupational Tax (SOT) to do business in NFA weapons and are licensed as Special Occupational Taxpayers.  Manufacturers and importers are taxed $1,000 each year and dealers are taxed $500.

[12]  The NFRTR was automated in 1983.

[13]  The GCA also defined the term "firearm" to exclude antique firearms or any devices (excluding machine guns and destructive devices) that could be classified as collectors' items.  26 U.S.C. § 5845.  Flash bang grenades are non-lethal, pyrotechnic distraction devices used by law enforcement agencies, the military, and movie and television productions.  Receivers can convert a semi-automatic weapon into an automatic weapon firing multiple shots with on function of the trigger.

[14]  NFA weapons makers are unlicensed individuals who usually make one weapon at a time for individual use.  NFA weapons manufacturers are licensed to manufacture weapons for sale and pay an annual Special Occupational Tax.

called for a 30-day amnesty period ending December 1, 1968, where anyone possessing an NFA weapon could register the weapon without consequence. However, any NFA weapon not registered during the amnesty is considered contraband, cannot be registered, and must be forfeited or voluntarily surrendered to ATF.  On May 19, 1986, Congress passed the Firearms Owners' Protection Act to prohibit possession of machine guns that were not legally possessed prior to its enactment.  Thus, the Firearms Owners' Protection Act allowed newly manufactured machine guns to be available only to the U.S. government (such as the U.S. military) and law enforcement entities after May 19, 1986.

NFA weapons must be registered with the NFRTR, and whenever ownership is transferred (through sale, rental, gift, or bequest) the transfer must be approved in advance by ATF and then updated in the registry.  A registrant is required to retain the approved NFA weapons application form as proof of a weapon's registration and make it available to ATF upon request.[15]  Manufacturers, importers, and makers of NFA weapons also are required to register each newly made, manufactured, or imported weapon. Law enforcement agencies are allowed to register weapons that have been seized or voluntarily surrendered to the U.S. government.

As of November 2006, the NFRTR contained registrations for 1,906,786 weapons.  The total number of weapons included 1,186,138 destructive devices, 391,532 machine guns, 150,364 silencers, 95,699 short barreled shotguns, 33,518 short barreled rifles, 48,443 weapons categorized as "any other weapons," and 1,082 "unknown" devices or weapons not classified in the other categories.[16]  Figure 1 illustrates the breakdown of the weapons in the NFRTR.

---

[15] 26 U.S.C. § 5841(e).

[16] Of the 1,186,138 destructive devices in the NFRTR, 77.4 percent (918,517) are flash bang grenades.  The category "unknown" includes older weapons or devices registered with ATF before the NFRTR was automated that are not clearly identified or do not fit in any other category of weapon.  According to 26 U.S.C. § 5845 (1986), "any other weapon" means "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire.  Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition."

**Figure 1:  Weapons in the NFRTR as of November 2006**



Source:  ATF, NFRTR data

Each record in the NFRTR contains the make, model, and serial number of the weapon, the date of its registration, and the name and address of the person entitled to possess the weapon.  Each record also includes the transaction history for the weapon.  For weapons registered prior to 1983, the NFRTR contains record entries of the three most recent transactions.[17]  After 1983, the records contain all transactions.  Another database linked to the NFRTR database contains electronic images of the related application forms for both pre- and post-1983 registered weapons.

Possessing an unregistered NFA weapon or one that is registered to someone else is punishable by a $250,000 fine and 10 years imprisonment.[18]  The NFA weapon is subject to forfeiture, and if convicted

---

[17]  When the NFRTR was automated in 1983, the NFA Branch chose to focus on entering all transaction information for newly registered weapons, so NFA Branch staff entered only the three most recent records for each NFA weapon registered prior to 1983.  A full transaction history of a pre-1983 weapon is available in the imaging database, which contains scanned copies of original application forms.  All transactions of an NFA weapon registered after 1983 are entered into the NFRTR.

[18]  26 U.S.C. § 5871, 18 U.S.C. § 3571.

of a criminal violation of the NFA the possessor will be prohibited from receiving or possessing firearms.[19]

In 2006, ATF seized 3,030 NFA weapons, including 1,280 machine guns, 550 sawed-off shotguns and rifles, 571 silencers, 415 destructive devices, and 214 devices categorized as "any other weapons." These totals included unregistered NFA weapons seized during criminal investigations as well as registered and unregistered NFA weapons seized as a result of compliance inspections of federal firearms licensees.

**ATF's NFA Branch**

The NFA Branch, under ATF's Firearms and Explosives Services Division, Office of Enforcement Programs and Services, maintains the NFRTR and processes applications, requests for information, and notices associated with the manufacture, registration, transfer, and transportation of NFA weapons. In 2006, the NFA Branch processed and entered 402,151 NFA weapons applications forms into the NFRTR. The NFA Branch assists registrants of NFA weapons and members of the firearms industry in complying with federal law and regulations regarding the possession, transport, and transfer of NFA weapons; reports of loss or theft of an NFA weapon or registration document; and other issues regarding changes concerning NFA weapons registration. Additionally, the NFA Branch conducts queries of the NFRTR to support compliance inspections and criminal investigations.

<u>NFA Branch Staffing and Duties</u>

In 2005, NFA Branch operations relocated to Martinsburg, West Virginia, from Washington, D.C., leaving only the Program Manager at ATF headquarters. As of March 2007, the NFA Branch had a staff of 20 ATF personnel and 12 contractors. The NFA Branch is authorized to have a complement of 16 Examiners, 8 Specialists, 1 Special Occupational Tax (SOT) Specialist, and 1 Information Technology (IT) Specialist. As of March 2007, it had only 10 Examiners, 4 Specialists, 1 SOT Specialist, and 1 IT Specialist. Also, 1 of the 10 Examiners was working in ATF's Explosives Licensing Center due to a staffing shortage in that organization, and 1 of the 4 Specialists was detailed to ATF headquarters. Table 1 shows the staffing levels and summarizes the duties of each position.

---

[19]  26 U.S.C. § 5872, 18 U.S.C. § 922(g)(1).

**Table 1:  NFA Branch Staffing Levels as of March 2007**

| Position | Number of Employees on Board | Number of Employees Authorized | Duties |
|---|---|---|---|
| *ATF Personnel* | | | |
| Branch Chief | 1 | 1 | Supervises the NFA Branch.  Decides policy and program changes. |
| Section Chief | 2 | 2 | Supervises Legal Instrument Examiners. |
| Program Manager (Washington, D.C.) | 1 | 1 | Advises the Branch Chief and other officials on policy decisions, NFA Branch program direction, and proposed changes to the NFRTR system. |
| Specialist | 4 | 8 | Performs records checks and produces inventory reports for ATF Special Agents and IOIs.  (One Specialist is detailed to ATF headquarters.) |
| Special Occupational Tax (SOT) Specialist | 1 | 1 | Reviews and processes SOT applications and renewals. |
| Legal Instrument Examiner | 10 | 16 | Processes NFA applications.  (One Examiner works in ATF's Explosives Licensing Center due to a staffing shortage.) |
| IT Specialist | 1 | 1 | Develops additional queries of the NFRTR, develops methods to fix errors in the NFRTR, and tracks Branch productivity. |
| *Contractors* | | | |
| Data Entry Clerk | 7 | N/A | Enters application data from paper forms into NFRTR. |
| Imaging Contractor (National Tracing Center) | 2 | N/A | Scans and indexes NFRTR documents into an electronic imaging database. |
| Customer Service Representative | 3 | N/A | Receives NFA-related phone calls and answers questions from the NFA community and ATF field offices. |

Source:  ATF

Figure 2 shows the structure of the NFA Branch as of March 2007.

**Figure 2:  NFA Branch Organizational Chart**



Note:  ATF's National Tracing Center – which traces the history of recovered crime guns for federal, state, local, and international enforcement agencies – manages an imaging services contract for all ATF branches.

<u>NFA Weapon Registration Process</u>

To register a new NFA weapon or transfer a registered NFA weapon, applicants must complete an ATF application form and submit it to the NFA Branch for review and approval.  Only licensed manufacturers, licensed importers, or makers of NFA weapons may register an NFA weapon.  Private citizens can apply for a transfer of a previously registered NFA weapon if the transfer is by sale, gift, or bequest.  The NFA Branch staff receives NFA weapons application forms, checks them for completeness, and enters the transaction information into the NFRTR.  NFA Branch Examiners check the information in the database against the paper applications for accuracy and verify the applicants' compliance with state and federal regulations.  If an application is incomplete or incorrect, the Examiner sends a correction letter to the applicant and allows 30 days for the applicant to submit additional information.  If the application is approved, the Examiner retains a copy for the NFA Branch records and sends the original application back

to the applicant, who is required to maintain it as proof of registration.  The copied forms are "imaged" into an electronic database by contractors and then stored in the NFA Branch archives.  See Appendix I for a full list of NFA application forms and transaction processes.

NFA Weapons Records Checks and Inventory Report Requests

NFA Branch Specialists respond to requests for records checks and inventory reports from ATF Special Agents and Industry Operations Investigators (IOI).[20]  IOIs request NFA weapons inventory reports as part of compliance inspections they conduct of federal firearms licensees.  Special Agents submit request forms for records checks of NFA weapons owners or specific NFA weapons related to their investigations.  An NFA Branch Specialist searches the NFRTR database using multiple queries to find the record for the individual or weapon and returns a search report to the Agent.

**Funding for NFRTR Improvements**

In fiscal year (FY) 2001, Congress appropriated $2 million for management and technical improvements at ATF's NFA Branch, Firearms and Explosives Imports Branch, and National Licensing Center.[21]  ATF used this funding for system development activities to consolidate and standardize separate information technology (IT) systems, streamline IT processes, and improve information access and usefulness for both ATF and the public.[22]  In FY 2002, Congress provided another $2 million to ATF for the three branches and also provided $500,000 specifically to improve the NFRTR.  To reduce processing time for NFRTR transactions, ATF used the funding to support imaging and indexing records within the NFRTR and linking the records to a retrieval system.[23]  ATF also used the funds to develop the requirements document for an electronic filing system for three NFA forms and the prototype system and to modify the prototype based on feedback received from the NFA weapons industry.

---

[20] IOIs conduct inspections of federal firearms licensees for compliance with federal firearms laws and regulations.

[21] The Firearms and Explosives Imports Branch reviews and processes applications for the importation of firearms, ammunition, and explosives into the United States.  The National Licensing Center, now called the Federal Firearms Licensing Center, reviews and processes applications for federal firearms licenses.  The center also maintains a searchable federal firearms licensee database.

[22] House Report 107-152.

[23] House Report 107-152.

# PURPOSE, SCOPE, AND METHODOLOGY
# OF THE OIG REVIEW

**Purpose**

The Office of the Inspector General (OIG) conducted this review to examine ATF's effectiveness in maintaining the records of registrations and transfers of NFA weapons in the NFRTR.  Members of Congress and the Inspector General had received letters from citizens expressing concern about the accuracy and completeness of the NFRTR and the administration of the NFA Branch.  Generally, the concerns were that:  (1) errors in NFRTR records leave citizens vulnerable to unjust convictions on NFA-related charges; (2) interpretation of regulations and paperwork by NFA Branch employees expose citizens to, or resulted in, unjust enforcement of the NFA; and (3) NFA Branch staff made errors and mistakes while processing applications and failed to update the NFRTR to reflect approved transfers.

**Scope and Methodology**

The review focused on the operations of the NFA Branch, which is responsible for maintaining the NFRTR and processing NFA weapons applications.  Our fieldwork, conducted from September 2006 through January 2007, included in-person and telephone interviews, a site visit to the NFA Branch in West Virginia, data analyses, document reviews, a survey, and a demonstration of the NFRTR database.

<u>Interviews</u>

We interviewed 58 ATF officials and staff, 10 contractors, 2 board members of the National Firearms Act Trade and Collectors Association (NFATCA), a representative from the National Rifle Association (NRA), and a federal firearms licensee.  Table 2 lists the officials and staff interviewed.

**Table 2:  Officials Interviewed**

| Site | Official(s) Interviewed |
|---|---|
| ATF Headquarters, Washington, D.C. | Assistant Director, Office of Enforcement Programs and Services |
|  | Deputy Assistant Director, Office of Enforcement Programs and Services |
|  | Associate Chief Counsel, Firearms, Explosives, and Arson Division |
|  | NFA Branch Program Manager |
|  | Former ATF Specialist, NFA Branch |
|  | ATF Specialist, NFA Branch, detailed to HQ |
|  | Former Legal Instrument Examiner, NFA Branch |
|  | Deputy Chief, Field Management Staff, Field Operations |
| ATF, Martinsburg, WV | Deputy Chief, Firearms and Explosives Division |
|  | NFA Branch Chief |
|  | Chief, National Tracing Center Division |
|  | Deputy Chief, National Tracing Center Division |
|  | Firearms and Explosives Imports Branch Chief |
|  | Section Chief (2) |
|  | Specialist (3) |
|  | Legal Instrument Examiner (6) |
|  | Data Entry Clerk, Contractor (3) |
|  | Customer Service Representative, Contractor (3) |
|  | Contracting Officer's Technical Representative |
|  | Document Imaging Contractor |
|  | Project Manager, Contractor (3) |
| ATF Field Offices | Special Agent (27) |
|  | Industry Operations Investigator (10) |
| Industry Representatives | Board Member, National Firearms Act Trade and Collectors Association (2) |
|  | Representative, National Rifle Association (NRA) |
|  | Federal Firearms Licensee |

<u>Data Analyses and Document Reviews</u>

We reviewed and analyzed data ATF provided that included the number of applications processed, number of record searches, number of inventory reports, processing and response times, number of disapproved applications, NFA weapons prosecutions, and NFA weapons seizures and forfeitures.  The data came from the time period of either fiscal or calendar years 1995 – 2006.

We reviewed ATF policies, budget documents, manuals, reports, memorandums, staff performance plans, and position descriptions. Additionally, we reviewed legislation, congressional testimony, news articles, citizens' concerns, and other reports related to the NFA, NFA weapons, and the NFRTR.

Survey

To obtain information about the effects of NFRTR errors on compliance inspections of federal firearms licensees and ATF field office work, we conducted an internet-based survey of all ATF Industry Operations Investigators (IOI).  We pretested the survey with 10 users and made changes to the questions based on the pretest results.  In December 2006, we sent e-mail invitations to 621 IOIs (the entire IOI population) with passwords, instructions, and a link to the survey.  Three-hundred and fifteen e-mail invitations were returned as "undeliverable."  After reviewing the original list of IOI e-mails, we determined there were various errors with over half of the e-mail addresses ATF provided.  We made corrections where possible and re-sent invitations and reminders to a total of 609 IOIs.  Within the 3 weeks that online access was available, 334 (55 percent) of the IOIs completed the survey, and 299 of those 334 had had experience inspecting federal firearms licensees with NFA weapons.  See Appendix II for a copy of the survey questions.

Demonstration

We observed a demonstration of the NFRTR database that included the functions, processes, and use of the system.

# RESULTS OF THE REVIEW

**The NFA Branch has significantly improved the timeliness of processing NFA weapons applications and responding to customer inquiries since 2004. However, management and technical deficiencies still exist that cause inaccuracies in the NFRTR. NFA Branch staff do not process applications or enter data into the NFRTR in a consistent manner and do not promptly correct record discrepancies. Additionally, the NFRTR database has technical problems, and its software programming is considered by the NFA Branch to be flawed. The lack of consistency in processing procedures, combined with database technical issues, results in errors in records, reports, and queries produced from the NFRTR that affect its reliability as a regulatory tool in inspections of federal firearms licensees. Notwithstanding these concerns, we did not find evidence that individual weapons owners or federal firearms licensees were criminally prosecuted inappropriately because of errors in the NFRTR.**

## The NFA Branch has improved significantly the timeliness of processing NFA applications and responding to customer inquiries.

We found that the NFA Branch has improved significantly its processing time for NFA applications and its process for responding to customer inquiries since 2004. Branch staff attribute these improvements to placing a priority on customer service, hiring additional staff, and working with the NFA weapons industry. Additionally, IOIs and Special Agents in ATF field offices reported satisfaction with the level of service they received from the NFA Branch since the Branch moved to West Virginia.

The NFA Branch has decreased the time it takes to process applications.

Between 2004 and 2006, the average processing time for NFA Forms 1, 3, 4, and 5 combined decreased from approximately 39 days to approximately 10 days.[24] We focused on these four forms because

---

[24] Between 2004 and 2006, the average processing time for all forms decreased from 30 days to 8 days. This number includes the NFA registration and transfer forms not discussed in this section. See Appendix I for a list of all NFA forms.

individual NFA weapons owners and dealers use them.  Table 3 describes the use of each form.

**Table 3:  NFA Weapons Applications Forms**

| Form | Use | Applicant |
|------|-----|-----------|
| Form 1 | Application to Make and Register a Firearm | Individual |
| Form 3 | Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer | Dealer, Manufacturer, Importer |
| Form 4 | Application for Tax-Paid Transfer and Registration of a Firearm | Individual |
| Form 5 | Application for Tax-Exempt Transfer and Registration of a Firearm | Dealer, Manufacturer, Importer |

Source:  ATF

Average processing time for Form 1 decreased from 99 days in 2004 to 28 days in 2006, while processing time for Form 4 decreased from 81 days to 23.6 days.  Forms 1 and 4 typically take longer than other forms to process because NFA Branch staff review additional paperwork with them, such as fingerprint cards, and spend more time answering questions from individual applicants who often have less experience with the application process.

The NFA Branch decreased the average processing time for Form 3 from 30 days in 2004 to 4 days in 2006, while decreasing average processing time for Form 5 from 30 days to 9 days.  Figure 3 shows the improvement in processing times for Forms 1, 3, 4, and 5 since 2004.

**Figure 3:  Average Processing Time for NFA Weapon
Registration and Transfer Forms**



Source:  ATF, NFRTR data

   To facilitate processing of applications, the NFA Branch hired three
contract Data Entry Clerks in 2002 and, by 2005, increased the number of
clerks to seven.  Data Entry Clerks enter information from paper application
forms into the NFRTR, allowing the Examiners who used to enter data to
focus on reviewing the content of applications.

<u>The NFA Branch has improved the process for responding to customer
inquiries</u>.

   The NFA Branch has improved its process for responding to NFA
weapons applicants' inquiries by placing a priority on customer service and
hiring additional staff to answer the telephones.  In a 2003 ATF inspection
report, NFA Branch staff identified handling telephone calls as a challenge
to providing satisfactory customer service.[25]  At the time, the Acting Branch
Chief stated that the Branch had no clerks to handle customer service
issues and the large number of incoming telephone calls.  Staff members
needed to spend most of their time processing forms and working with the
NFRTR, and could not devote the time needed to respond to customer
inquiries.

---

[25]  Bureau of Alcohol, Tobacco, Firearms and Explosives, *Inspection Report:  National
Firearms Act Branch* (2003).

In 2005, the NFA Branch hired three contract Customer Service Representatives (CSR) to answer telephone calls and respond to customer inquiries.  The three CSRs handle the majority of telephone calls that would otherwise divert NFA Branch staff from processing applications or conducting records searches.  CSRs answer questions from individuals, members of the NFA weapons industry, and ATF field staff usually within 1 workday.  If they cannot answer a question themselves, they direct the call to the appropriate NFA Branch staff member.  In addition to their primary duty of answering the telephones, CSRs help with correspondence and filing.

In 2006, ATF noted in another inspection report that the NFA Branch Chief had "provided courteous service" and "displayed a positive image of ATF to industry members."[26]  Members of the National Firearms Act Trade and Collectors Association (NFATCA) – an association that provides guidance and support to the NFA weapons industry and is made up of NFA weapons dealers, manufacturers, importers, and owners – also told us that the quality of the service of the NFA Branch had improved over the past 2 years.  As part of this review, we interviewed a federal firearms licensee, a member of the NFATCA, who stated that he was satisfied with the recent service provided to him by the NFA Branch.

We also reviewed various NFA industry websites and electronic mailing lists used by NFA weapons owners and dealers and found several positive comments about the NFA Branch and the improvement in application processing.  For example, an article in *Small Arms Review* magazine about an NFA weapons-related gun show held in 2006 states:

> There is almost a universal feeling regarding the excellent service the community has been provided with since the move of the NFA Branch from Washington, D.C. to West Virginia. Under the direction of the NFA Branch Chief Ken Houchens, transfer times have been cut to a fragment of their previous lengths and customer service is at an all time high.[27]

Also, in the narrative response to our survey, an IOI related a licensee's comment that NFA Branch staff "are much more customer service oriented and supportive to the industry, and more efficient than they have

---

[26]  Bureau of Alcohol, Tobacco, Firearms and Explosives, *Inspection Report: Firearms and Explosives Services Division* (2006).

[27]  Jeff W. Zimba, "SAR Show 2006 Huge Success!" www.smallarmsreview.com/SARShow2007.htm (April 4, 2007).

ever been in the past." Another IOI who formerly held a federal firearms license (FFL) stated,

> I previously held a Type 01 FFL and Class 3 occupational tax (dealer in NFA). I had contact with the "old" branch then and have had on the job contact with the "new" since working for ATF (August, 2005). The attitudes, professionalism, and procedural knowledge of the employees have improved dramatically. Based on my personal experience and reports I hear or read from people engaged in the industry as dealers or collectors, the turnaround times on transfers have dropped considerably. In my opinion, the NFA Branch has transformed into a very positive representative of our agency.

<u>The NFA Branch is working with the NFA industry to communicate more effectively with weapons owners</u>.

The NFA Branch has created a working relationship with the NFATCA. To increase communication between the NFA weapons industry and the NFA Branch, the Branch hosted a meeting in West Virginia in 2006 with members of the NFATCA executive board to discuss NFA- and NFRTR-related issues. The NFATCA used the NFA Branch's comments in two articles published in the *Small Arms Review* magazine providing tips on completing applications correctly and legibly to lessen the amount of time needed for corrections.[28]

The NFA Branch and the NFATCA also have collaborated to write a handbook on the processing of NFA weapons applications.[29] The first draft of the handbook was completed in December 2006. In March 2007, the ATF Chief Counsel's office was reviewing the draft, and ATF plans to make the handbook publicly available on the ATF website as soon as it is finalized. The NFATCA intends to promote the handbook as a guide for all NFA weapons owners. NFA Branch officials said they plan to annually update the handbook with the NFATCA's assistance.

However, in the course of reviewing the ATF website, we found it very difficult to locate information relevant to NFA weapons owners.

---

[28] John Brown, "NFATCA Report: The NFA and Forms Processing," *The Small Arms Review,* Vol. 10, No. 1 (October 2006), pp. 53 – 55. John Brown, "NFATCA Report: Working with the NFA Branch," *The Small Arms Review,* Vol. 10, No. 2 (November 2006), pp. 22 - 23.

[29] Bureau of Alcohol, Tobacco, Firearms and Explosives, *NFA Handbook Draft* (2006).

Additionally, the site's generally poor navigation may impede the public's access to the NFA handbook.  Neither the site's main page nor its firearms page displays a link to NFA information.  In addition, the site's search engine returns more than 240 "hits" when queried for "NFA," and because meta tags were not used to describe the information on the pages returned by the search feature, it is difficult for users to tell which "hits" will take them to the information they are seeking.  Among the "hits" is a page apparently created expressly for NFA information, but the page lacks direct links to the application forms NFA weapons owners and licensees are required to submit, filing instructions, or a frequently asked questions section.  A direct link to all NFA information (and eventually the NFA handbook) from ATF's homepage would further the NFA Branch's efforts to communicate more effectively with NFA weapons owners and licensees.

The two NFATCA board members we interviewed praised the increased communication between the NFA Branch and the NFA weapons industry and noted significant improvement in the efficiency and responsiveness of the NFA Branch over the past 2 years.  NFATCA board members told us that the process for registering and transferring NFA weapons has "vastly improved."  The NFATCA also stated that the NFA weapons industry speaks highly of the NFA Branch Examiners and Specialists and praises their progress in minimizing the time it takes them to process and approve an application.  According to the NFATCA, the greatest improvement in the NFA Branch is that NFA weapons owners and federal firearms licensees can contact the NFA Branch with questions about the application process.  Additionally, the NFATCA believes that NFA Branch Examiners are more knowledgeable about NFA weapons because applicants have told them that the Examiners are asking more questions about model numbers and weapon characteristics to prevent errors in the information entered into the NFRTR.

<ins>ATF field staff reported satisfaction with NFA Branch customer service</ins>.

Six of the 10 IOIs interviewed and 25 of the 27 Special Agents interviewed stated that they were "satisfied" or "very satisfied" with the information they received from the NFA Branch.  Additionally, we received positive comments about the NFA Branch from IOIs responding to our survey.  Two IOIs commented specifically:

- "The improvement of the NFA Branch under [the current Branch Chief] is nothing short of phenomenal."

- "I have noticed that, as a whole, the NFA Branch has improved significantly over the past months. Many of the [federal firearms licensees] have noticed this as well."

Several other IOI survey respondents stated that the NFA Branch provides helpful information for their work with compliance inspections, including one who said, "I think the NFA Branch does an excellent job of answering questions from the IOIs in the field as to which NFA forms are required and when they are submitted." One Special Agent told us in an interview that he is satisfied with the work of the Branch and that it has improved since the Branch offices were relocated to West Virginia.

Both IOIs and Special Agents reported satisfaction with the timeliness of the NFA Branch's response to their requests. IOIs we interviewed stated that the NFA Branch usually sends them an inventory report 2 to 4 days after they submit their request and rarely takes more than 1 week to respond to a request. One IOI stated, "The staff at the NFA Branch has always been professional and helpful. When additional information is required, forms are always faxed in a short period of time." Another IOI mentioned that he has received increasingly expedited service in the past few years from the Branch.

Our survey results also verified the timeliness of the NFA Branch in providing inventory reports. We asked IOIs in our survey, "Once requested, how many days does it take to receive the inventory report from the NFA Branch?" The responses indicate a median number of 4 days to receive an inventory report, and of the 293 IOIs answering this question, only 3.4 percent (10) indicated that it took over 2 weeks to receive an inventory report.

Although discrepancies in inventory reports are still a problem (discussed later in the report), a few IOIs told us in the survey that they have noticed an improvement in the accuracy of inventory reports. One IOI told us in the OIG survey, "I feel that the NFRTR has improved greatly in the past couple years and [federal firearms licensees] are noticing that when you request [a record] be amended, that it is getting amended." Another IOI said, "In the past, there was no follow through by NFA Branch on recommended corrections. This seems to have changed in the last year."

The Special Agents we interviewed, like the IOIs, were satisfied with the length of time the NFA Branch took to respond to their requests, describing the turnaround time as "fast" and the NFA Branch as "efficient." Of the 27 Special Agents we interviewed, 7 said they received the results of a records check same day of the request, 8 received the results within 2

days, 2 received the results within 3 days, 4 received results within 1 week. Three others said they received responses to urgent requests in a few hours, and two described responses as "prompt."  Only one Special Agent said it took more than a week to receive results of a records check.  An NFA Branch Specialist told us that the Branch attempts to complete Special Agent requests for records checks within 2 to 3 days and urgent requests within 1 day.

ATF internal reports also show that the field offices have been satisfied with the work of the NFA Branch.  In an October 2006 survey of the 31 field offices, conducted as part of an internal review of the NFA Branch, over 90 percent of ATF field offices reported average or higher satisfaction with the quality of the Branch's service.  The review gave the Branch an overall rating of "effective and efficient."[30]

**NFA Branch staff do not process NFA weapons applications or enter data into the NFRTR in a consistent manner.**

We found that NFA Branch staff do not process applications or enter data uniformly into the NFRTR, which results in errors in NFRTR records, reports, and queries as well as inconsistent decisions on NFA weapons registration and transfer applications.  The NFA Branch has not established adequate standard operating procedures for working with the NFRTR and processing NFRTR applications.  Further, there is no structured training for NFA Branch staff members when first hired.  In addition, NFA Branch managers do not have regular communication with staff members, and the Examiners responsible for reviewing and processing application forms receive conflicting direction from their supervisors.

<u>The NFA Branch lacks a comprehensive standard operating procedures manual</u>.

We found that the NFA Branch's memorandums and directives on specific processes related to the NFA and the NFRTR do not cover all day-to-day tasks the staff perform.  When the NFA Branch Chief started in his position in 2005, he inherited an undated manual of standard operating procedures for processing NFA forms.  He told us the manual was under revision but that he has not had enough staff to complete the revision.  None of the staff members we interviewed had ever received a copy of this manual, although some of them had been with the NFA Branch for over 15 years.  Staff members reported that they had developed their own procedures manual by compiling various documents.  For example, an NFA

---

[30]  Bureau of Alcohol, Tobacco, Firearms and Explosives, *Inspection Report: Firearms and Explosives Services Division* (2006).

Branch Specialist who conducts records checks stated, "We have over the years made up our own internal [personal] manual."  An Examiner told us, "I had to start my own document with all the policies and procedures because there is no [standard operating procedures] manual."

We reviewed the various memorandums and directives provided to NFA Branch staff in place of a standard operating procedures manual and determined that they were usually specific to one issue and did not cover the basic information needed to process applications and enter data into the NFRTR.  For example, one memorandum describes how a Native American tribal police department can use a specific application form as long as the department has been designated a law enforcement agency by the Bureau of Indian Affairs.[31]  Another document lists the information about a pending application that NFA Branch staff can give to those transferring and receiving weapons.  The procedures and guidance that NFA Branch staff told us were important, but not covered by the various documents, are outlined below.

1. Data Entry – There are no standards for entering abbreviations and other data in the NFRTR.  For example, staff members use different abbreviations to signify a weapon's caliber.  One NFA Branch staff member may use ".9" to signify a 9-millimeter caliber weapon, while another may use ".9mm," and a third staff member may use ".9m." NFA Branch staff told us this variation could lead to errors when searching or querying the NFRTR and staff may not know to search using other abbreviations.

2. File Maintenance and Contact with Applicants – Each Examiner has a different method of keeping files and contacting applicants with pending applications.  Application forms may contain errors, or a check of the National Crime Information Center (NCIC) may reveal a criminal charge or conviction under the applicant's name.[32]  There are no standards specifying when and how often to contact the applicant other than to send an initial error letter. Applicants are supposed to have 30 days to correct errors on

---

[31]  ATF Memorandum, Processing Transfers to Native American Tribal Police Departments, Kenneth Houchens (August 21, 2006).

[32]  The NCIC is a computerized database that contains information on criminal histories, fugitives, stolen property, and missing persons.  The NCIC is maintained by the Federal Bureau of Investigation and used by federal, state, and local law enforcement agencies.

their applications or provide evidence that a criminal charge was dismissed; but some Examiners allow more time or call the applicant before sending written communication, which leads to inconsistencies in the approval of applications and variations in customer service.

3. <u>Technical "Workarounds"</u> – There is no standard direction on how to handle or overcome NFRTR technical flaws.  For example, the NFRTR automatically splits a weapon's record into two separate records when incorrect information or a change to the weapon's specifications is entered because the NFRTR interprets the new information as a new weapon. Staff members have figured out how to work around the flaws by conducting searches using all variations of a name, address, and weapon serial number and by fixing errors in the NFRTR records when encountered.  However, it is not clear if these trial-and-error methods are the standard or most efficient methods for handling technical issues.  (We discuss the NFRTR's technical flaws in more detail later in the report.)

4. <u>Responsibility for Correcting Errors</u> – There are no standards that assign responsibility for fixing certain errors.  For example, if an Examiner or Specialist finds an error in an NFRTR record while processing a new application for the transfer of a weapon, there is no clear direction as to who is responsible for fixing the error.  Most Examiners and Specialists told us they fix the error if possible, but some may refer it to a Section Chief or to the staff member that worked on the record previously.

Without written procedures, NFA Branch staff members told us that they had to rely on other Branch staff or managers to explain what they believed were the proper procedures for processing applications and navigating the NFRTR database.  One Examiner stated, "I wish there were procedures, guidance, or policy in writing . . . it is all just 'known' and transferred" from staff member to staff member. A Section Chief explained that NFA Branch staff "mainly learn on the job and are expected to ask questions of other Examiners and Section Chiefs."  Staff members said they were not sure whether the information "passed down" represented the acceptable standard for the NFA Branch.  For example, we found that the NFA Branch staff are not handling suspicious applications (such as one where an applicant is attempting to transfer a weapon for which the

applicant is not the current owner in the NFRTR) consistently because there are no standard procedures outlining how to handle these applications.

When NFA Branch staff members identify suspicious applications to transfer or register weapons, according to Branch managers staff members are supposed to go directly to their Section Chiefs.  The Section Chief then may refer it to the Branch Chief and the Branch Program Manager for review.  If they believe there may be criminal intent, the Branch drafts a formal memorandum for referral to an ATF field office for investigation. Because there are no written standard operating procedures for referrals and the Branch does not keep track of referrals or identify suspicious applications in the NFRTR, we did not find evidence that staff were following management's verbal instructions.

<u>Training is inadequate, especially for new employees</u>.

The training provided to NFA Branch staff when first hired is insufficient, ad hoc, and not uniform.  All the staff we interviewed told us that initial training was unstructured and consisted of sitting beside a more experienced staff member and watching that member work on the NFRTR or having the experienced staff member watch the new employee use the NFRTR and process applications.  The length of this ad hoc training ranged from several days to several weeks.  One Examiner described the training as "sloppy" and further stated:

> Someone [a more experienced staff member] would sit with the new Examiners on occasion to go over how to use the NFRTR, but it was not for a long time and was not consistent . . . . Examiners just started working on the computer.

In addition to training on the NFRTR, staff told us that they needed more information on NFA weapons, such as the physical descriptions, to be able to easily identify an NFA weapon, as well as specific and up-to-date information on state laws and regulations that relate to NFA weapons because state laws change periodically and are complicated.  The NFA Branch provides one binder with printouts of all current NFA-related state laws and regulations.  However, staff said that the legislation related to NFA weapons is complex and not written in an easily understandable format, and they were not comfortable interpreting it without assistance.

Staff members told us that as a result of inadequate and unstructured training at the beginning of their employment, they were uncertain how to use the NFRTR, lacked skill in processing the applications or conducting searches, were not familiar with the NFA, and did not have all

the information necessary to accomplish their jobs.  Staff stated that it was difficult to become familiar with the NFRTR and navigate through the database, a vital skill needed to process applications and conduct records checks.  One Examiner told us that because of poor training not all staff members are "on the same page" on how they approach the work and applications may be processed incorrectly.  He cited an instance in which an Examiner needed to know whether a state allowed a certain type of NFA weapon, and rather than researching the current state law or regulation, the Examiner simply queried the NFRTR to view a similar transaction in that state that had been approved in the past.  State laws and regulations may change since a previous transaction, but Examiners are not kept current on these changes and are not trained to research the laws and regulations appropriately instead of copying old transactions.

We also found that inadequate training could affect the direction given to NFA Branch staff as well as information provided to the ATF field offices.  For example, the lack of training on NFA-related state laws and regulations affected the guidance from Section Chiefs to Examiners.  Further, an IOI survey respondent commented, "We can call [the] NFA [Branch] and speak to different people [on the same issue] and get different answers.  This has happened more than a few times in the past."

The Section Chiefs are usually selected from the Examiner pool and do not receive additional training, either supervisory or NFA-related.  They receive the same ad hoc training as other NFA Branch staff, and the quality of the information received during the training is not standard.  Two of the Examiners we interviewed told us that they have received different direction from the same Section Chief on two identical cases, and they have received different direction on identical issues from different Section Chiefs.  For example, an Examiner explained that she had two different applicants with NCIC "hits" (meaning that the applicants had criminal charges against them).  Both applicants had the same criminal charge.  However, the Section Chief advised her to approve one application to register or transfer a weapon but to disapprove the other application.  The Examiner was not certain if there were variables that affected the decision to approve or disapprove an application, and the Section Chief did not communicate the reasoning for each decision.  The Examiner further stated that she had received conflicting direction on other occasions, especially with decisions based on interpretation of NFA-related state laws.

The second Examiner described the incidences of receiving conflicting direction from his Section Chief as directly related to the complex legislation and regulations in each state on NFA weapons.  He told us, "A lot of the circumstances where different direction was given revolved around state

regulations.  A particular type of weapon may be legal one time [in that state] and then later you find out they told someone else that it wasn't."

Because new staff members receive different training from different people who also were not formally trained, the quality of the training in terms of topics covered and accuracy of information is insufficient. Incomplete and inaccurate training leads to errors in the NFRTR and in decisions based on the NFRTR.  Moreover, variations in direction based on inadequate training could produce inconsistent approvals or disapprovals of NFA weapons applications.

Managers' communication with staff is sporadic.

The NFA Branch managers do not communicate regularly with staff. Most staff members told us they are comfortable asking questions of Section Chiefs and the NFA Branch Chief but need more structured and regular forms of communication to stay current on changes that affect the NFA Branch.

All of the NFA Branch staff said that they sporadically receive e-mails and memorandums from management on administrative, procedural, or NFA issues.  An Examiner told us, "Sometimes the Section Chiefs will e-mail us with information about interpretation of state regulations, but communication is not [regular]."  Another NFA Branch Specialist told us that approximately 10 years ago, the Branch held staff meetings to discuss specific issues, but no longer does so.  When a new Examiner asked her Section Chief if they could have staff meetings, the Section Chief responded, "I don't do meetings."  Without coordinated and regular communication, Branch managers cannot update staff on the complex regulations and issues surrounding NFA weapons and ensure that direction is given in a standard manner.  Moreover, when Examiners encounter a technical problem in an NFRTR record and ask Section Chiefs for assistance, the Section Chiefs will often fix the record themselves and fail to communicate with or teach the Examiner how to solve the problem in the future.

NFA Branch Actions to Address Identified Needs

*Training*

To address the needs for specific training expressed by staff, the NFA Branch Chief provided several training opportunities.  In October 2006, the NFA Branch Chief sent all 10 Examiners to a conference in Washington, D.C., that included information on NFA weapons and allowed the staff to interact with the NFA weapons industry members.  Six of the 10 Examiners

attended an additional conference in 2006, which included information and sessions related to the NFA weapons industry.  The NFA Branch Chief told us that all Examiners are encouraged to attend these conferences and he believed that more staff would take advantage of the conferences in 2007.

In 2006, at the request of the NFA Branch Chief, two attorneys from the Chief Counsel's office (on-site in West Virginia since late 2006) held a training session for NFA Branch staff that focused on legal issues related to trusts and transferring ownership of NFA weapons.  The two attorneys are available continuously to answer questions from NFA Branch staff.  Additionally, one attorney offered to assist the NFA Branch in obtaining information from each ATF field office on the most recent NFA-related legislation and regulations for each state.

Lastly, in 2007, in response to the need expressed by NFA Branch staff to have greater familiarity with NFA weapons, the NFA Branch Chief sent 10 staff to training conducted by the ATF's Firearms Technology Branch (FTB).  The FTB, located in the same building as the NFA Branch, maintains a variety of NFA weapons in its library.

We believe these training sessions and opportunities are beneficial for the NFA Branch staff and should continue.  However, staff still need structured technical training on the NFRTR database, processing applications, and conducting searches.  Further, the Section Chiefs need training on supervisory techniques.

*Communication*

In March 2007, the NFA Branch initiated the first monthly meeting for Examiners.  According to the NFA Branch Chief, the meetings are to be used to provide updates on NFA weapons industry issues, office policies, data entry concerns, fingerprint card scanning, training opportunities, and any other issues.  The meeting is led by the Section Chiefs, attended by all Examiners, and includes time for an open forum where any concerns, issues, or questions can be presented by Examiners to management.  A summary of issues and points discussed during the first meeting was distributed to Examiners afterwards.  We believe this is an important step in improving communication in the NFA Branch, and the meetings should continue with staff input.

**The NFA Branch is not promptly correcting a backlog of errors in NFRTR records identified during inspections of federal firearms licensees.**

We found that the NFA Branch does not promptly correct errors IOIs identify in NFRTR records. Errors in NFRTR records can be caused by NFA Branch staff when entering data, by Examiners failing to update the NFRTR to reflect approved NFA weapons applications and by technical flaws in the programming of the NFRTR database. Other discrepancies can be caused by applicants incorrectly listing information on NFA weapon applications, and by licensees transferring or receiving NFA weapons before receiving approval from the NFA Branch.

The NFA Branch is responsible for addressing errors and discrepancies after they are identified by IOIs during compliance inspections.[33] However, the NFA Branch does not have established guidelines for reconciling errors and discrepancies within a certain amount of time after receiving them from IOIs. As of March 2007, the NFA Branch had a backlog of 61 discrepancy reports to reconcile.

In our interviews and survey, IOIs reported that discrepancies between licensees' inventories and the NFRTR record were prevalent. In our survey, 46.5 percent of IOIs (139 of 299) reported that there was a discrepancy between the NFRTR inventory report and the licensee's inventory "always" or "most of the time." Further, 44.4 percent of IOI respondents (133 of 299) said that the discrepancy was due to an error in the NFRTR "always" or "most of the time." In comparison, no IOI

> **Use of Inventory Reports During Compliance Inspections**
>
> As part of compliance inspections of licensees that deal in NFA weapons, IOIs compare the NFRTR inventory report to the actual inventory of the licensee. This comparison is to ensure that all NFA weapons in the inventory are registered to the licensee and that all NFA weapons listed on the NFRTR inventory report are present on the licensee's premises. IOIs also inspect the licensee's NFA weapon transfer and registration paperwork for completeness and accuracy. IOIs note any discrepancies between the licensee's inventory and the NFRTR report on a worksheet, make copies of all related NFA transfer and registration paperwork, and fax the relevant documents to the NFA Branch for resolution of all discrepancies identified. IOIs often work with the licensee and the NFA Branch to determine the origin of discrepancies so that they can be resolved as quickly as possible.

---

[33] Compliance inspections are conducted to ensure federal firearms licensees are complying with the GCA, NFA, and other federal firearms laws. During inspections, licensees must account for all weapons they have bought and sold, and report all multiple sales and firearms thefts to ATF. Violations of federal firearms laws include missing or incomplete sales records, selling a firearm to a minor, or not properly filling out an ATF Form 4473 (a firearms transaction record).

respondent reported that the error was "always" on the part of the licensee, and only 2 percent (6 of 299) reported that the error was on the part of the licensee "most of the time."

In contrast to the IOIs, all of the Special Agents that we interviewed believed that the information they received from the NFRTR records checks was accurate.  The Special Agents request NFRTR records checks to determine whether NFA weapons that they encounter during investigations are registered and to whom.  None of the Special Agents believed that they had ever received incorrect information from the NFA Branch.  One Special Agent noted that it would be very difficult for NFA Branch staff to reach an incorrect conclusion in a records search because he always provides them with so much specific information about the weapon and the suspect that the NFA Branch can always make a definitive conclusion about the weapon's and individual's registration status.

IOIs and Special Agents have different experiences with the accuracy of the information they receive from the NFRTR because the method for producing inventory reports for IOIs is different from the method for conducting records checks for Special Agents.  NFA Branch Specialists produce inventory reports by running standard programs from the NFRTR that generate lists of all the firearms that are supposed to be owned by a specific licensee.[34]  However, because of programming flaws in the NFRTR (discussed later in the report) and delays in correcting previously identified discrepancies, these inventory lists often contain errors.  In contrast, NFA Branch Specialists prepare records checks by performing numerous queries on all available weapon and suspect search terms and individually reviewing the results to see if the NFRTR contains any record that could pertain to the weapon or suspect in question.

Discrepancies between the NFRTR and licensees' inventories delay completion of inspections and erode confidence in the NFRTR.

We found that discrepancies between the NFRTR and licensees' inventories are frustrating and time consuming for IOIs and are disconcerting for licensees who can be referred for criminal investigation for violations of the NFA and GCA discovered in compliance inspections.  According to the NFA Branch Chief, discrepancies between NFRTR inventory reports and licensee inventories make the NFA Branch look incompetent and can be disruptive to licensees' operations.

---

[34]  In 2006, the NFA Branch produced 530 NFRTR inventory reports.  However, some field offices and IOIs have read-only access to the NFRTR and can print out inventory reports themselves.

*Discrepancies are frustrating and time consuming for IOIs.*

Some IOIs noted frustration over the NFA Branch's failure to correct identified discrepancies in the NFRTR before a licensee's next compliance inspection.  Only five of the 10 IOIs that we interviewed said that discrepancies were corrected in the NFRTR by the time of subsequent inspections.[35]  Forty-three IOIs commented in the survey that the NFA Branch should make updates to the NFRTR in a timely fashion.  NFA Branch staff also are supposed to notify the IOIs who submit discrepancy reports after corrections have been made, but IOIs told us that this is not always done.  One IOI we interviewed stated that it would be helpful to know when and how discrepancies were resolved.  In our survey, one IOI commented, "I always have to close the inspection without ever knowing if the problems were resolved."  The NFA Branch staff stated that they attempt to minimize the instances in which discrepancies are not reconciled in the NFRTR by the next inspection by completing the pending reconciliation when notified by an IOI that another inspection has been scheduled.

When we asked IOIs in our survey to tell us how errors and discrepancies in NFRTR inventory reports affect their ability to carry out compliance inspections, almost half of the respondents stated that inspections take more time, and a quarter of respondents said that errors called into question the accuracy of the information from the NFRTR.  One IOI noted in a survey response, "If an Investigator [IOI] cannot obtain an accurate list of NFA weapons in an inventory, we cannot complete a proper inspection and reconcile that inventory."  ATF managers, NFA Branch staff, and field IOIs stated that the majority of discrepancies can be resolved quickly if the licensees can prove ownership of NFA weapons in their possession by producing the approved transfer and registration paperwork.  One former NFA Branch Specialist noted that while most discrepancies can be resolved quickly, about one out of four may take an entire day to address because staff must locate and review paper records to analyze a weapon's registration and transfer history.

Many IOIs commented in the survey about the discrepancies between the NFRTR reports and licensees' inventories.  For example,

---

[35]  Under the Firearm Owners Protection Act, part of the Gun Control Act of 1986, Congress mandated that ATF compliance inspections be done no more than once a year and, at a minimum, must be done once every 3 years.  An exception to the "once a year" rule exists if multiple record-keeping violations are recorded in an inspection, in which case the ATF may do a follow-up inspection within the next 12 months.  However, a previous OIG report (I-2004-005) found that most licensees are inspected infrequently or not at all.  While ATF's goal is to inspect each licensee at least once every 3 years to ensure that they are complying with federal firearms laws, ATF is currently unable to achieve that goal, partly because of resource shortfalls.

one survey respondent stated, "I feel that immediate action should be taken to correct any discrepancies noted during inspection."  Several IOIs suggested that having an NFA Branch staff member dedicated to serving as a contact for IOIs and resolving discrepancies would improve the process.  Other comments included:

- "We should have a standard procedure to report inconsistencies and to follow to find a remedy to those discrepancies.  The procedure should require timelines for responses to IOI inventory requests and for the action taken regarding a discrepancy report."

- "Implement a process where information that is obtained in the field and is forwarded to the NFA Branch, to correct discrepancies, is acted upon.  Which should reduce the amount of time spent re-addressing previously identified discrepancies."

- "Have NFA Branch report the resolution of discrepancies, that are found during inspections, back to the inspector/area office.  I feel that a lot of investigators will just move on to the next assignment once NFA inventory discrepancies are reported and never consider if the discrepancies are resolved."

- "More or new quality control procedures need to be in place to make sure that corrections to the NFRTR are made."

IOIs also expressed concern with the accuracy of the NFRTR in general and want ATF to improve the quality of the data.  An IOI survey respondent stated, "I believe NFA items are the most important area of regulation and we should strive for complete accuracy in this realm."  When asked what suggestions they had for improving the NFRTR inventory reports or the work of the NFA Branch, many IOIs stated that the existing data in the NFRTR should be "cleaned up" and the Branch should establish a system to double-check new data as it is entered into the database.  One of the IOIs we interviewed even suggested that IOIs be assigned to "perform comprehensive inspections of all licensees' inventories that include NFA weapons to ensure that all records in the database are accurate."

*Discrepancies are disconcerting for federal firearms licensees.*

The two NFATCA representatives and one federal firearms licensee we interviewed were very concerned with the accuracy of the NFRTR.  Our survey found that the IOIs were aware of licensees' concerns.

One of the NFATCA representatives who maintains a federal license for NFA weapons estimated that during his compliance inspections the NFRTR inventory reports were 25 to 30 percent inaccurate.  This NFATCA representative explained that NFA weapons dealers fear compliance inspections because the NFRTR is inaccurate, not because their inventory records are inaccurate.  The NFATCA representatives stated that NFA weapons dealers are concerned about NFRTR discrepancies being used by ATF to seize weapons or issue violations against the dealer.  One NFATCA representative said that licensees that deal in NFA weapons "should not be afraid of compliance inspections because their records are probably better than ATF's."

IOIs were aware of federal firearms licensees concerns about the accuracy of the NFRTR.  In responding to the survey question, "How do errors and discrepancies in the NFRTR inventory reports affect the licensees you inspect?," IOIs stated that licensees are frustrated that the NFRTR is inaccurate and the inspections difficult to complete, worried about being investigated or cited with violations, and frustrated that their own records are held to higher standards of accuracy and completeness than NFRTR records.  Some specific comments by the IOIs included:

- "When repetitive errors are found in the NFRTR, the licensees lose their confidence in the integrity of the system."

- "While the burden of proof is generally placed upon the licensees to demonstrate that the firearms were properly transferred, incorrect information from the NFRTR can cause an undue burden for those licensees who have properly transferred the firearms yet must spend days or weeks searching for documentation to prove these transfers."

- "The licensees get frustrated and assume that inspectors are inept just because of an error in the NFRTR inventory report.  The licensees then tend to tune out any suggestions or advice we give to them to help them in remaining or becoming compliant."

- "Licensees are upset, become very concerned, and fear any possible liability or action that might be erroneously taken against them as a result."

<u>Errors or discrepancies in the NFRTR have not resulted in inappropriate criminal prosecutions of NFA weapons owners and licensees.</u>

Although letters from several citizens expressed concern that errors and discrepancies in the NFRTR leave them vulnerable to unwarranted administrative sanctions or criminal charges, we found this has not occurred.  While ATF can include NFA violations discovered during compliance inspections on the Report of Violations, it cannot suspend or revoke a federal firearms license or issue administrative sanctions based on NFA violations alone.[36]  According to the Deputy Chief, Field Management Staff, Field Operations,

> ATF may revoke a federal firearms license for willful violation of the Gun Control Act (GCA).  Further, the GCA specifies a suspension and fine authority for violation of certain violations of the permanent Brady [law] provisions.  Although ATF IOIs commonly cite NFA dealers for violations of the regulations at 27 CFR Part 479 [NFA], there is no revocation, suspension, or "administrative" fining authority for violations of the NFA.[37]

In 2006, ATF conducted 7,292 compliance inspections from which it issued 12,176 violations.  Of these, less than 1 percent (53) was issued for NFA violations.  In 2006, ATF issued an average of 1.7 violations per inspection, but only 0.007 NFA violations per inspection.[38]

We also found that IOIs are referring cases to Special Agents infrequently.  When IOIs discover NFA weapons not registered to a licensee (and the licensee's paperwork does not satisfactorily resolve the

---

[36] ATF told us that violations of the NFA may be included in the Report of Violations issued to an FFL without further action being taken.  The specific circumstances of the case and the discretion of the ATF field office and the U.S. Attorney's office determines whether further criminal action is taken.

[37] The Brady Handgun Violence Prevention Act of 1993 (Brady Act) (Public Law 103-159) established the National Instant Criminal Background Check System that federal firearms dealers are required to contact before the transfer of any firearm to ensure that a person receiving a firearm is not prohibited under the GCA from possessing firearms.

[38] ATF could not tell us exactly how many of the total number of federal firearms licensees inspected actually have NFA weapons in their inventories, but estimates the number as low.

discrepancy) or other apparent deliberate violations of the NFA during compliance inspections, they can refer the case to Special Agents in the corresponding ATF field office.  In our survey we asked IOIs how many times in the past year they had referred a federal firearms licensee to an ATF Special Agent based on a discrepancy between the NFRTR inventory report and the licensee's inventory.  Of the 298 IOIs who responded to this question, 91 percent (272) said they had made 0 referrals, 7 percent (20) had made 1 referral, 1.6 percent (5) had made 2, and less than 1 percent (1) had made 3.  IOIs we interviewed emphasized that they refer cases only when an NFA weapons registration in the NFRTR cannot be established after discussions with the licensee, the NFA Branch, and extensive searches of the NFRTR or when they suspect deliberate criminal activity involving NFA weapons.

We did not find evidence that errors in NFRTR records caused inappropriate seizures or criminal charges against NFA weapons owners or federal firearms licensees.  In fact, we found that few federal firearms licensees were criminally charged with NFA violations.  Between 2000 and 2006, only 15 licensees were charged with violating 26 U.S.C. Chapter 53, the chapter of the Internal Revenue Code that includes the NFA.  This represents only 6.5 percent of the total number of licensees (230) criminally charged with any violation.

We asked both ATF and the NFATCA (the representative organization of the NFA weapons industry), to provide us with examples or cases in which an NFRTR error resulted in a seizure of an NFA weapon or criminal consequences.  Neither ATF nor the NFATCA could provide any examples.  We reviewed ATF processes related to requesting records checks from the NFRTR and determined that when an error is detected, the NFA Branch staff thoroughly research the NFRTR and the imaging database to find out if a weapon is actually registered.  Additionally, the NFA requires owners to retain the approved NFA weapons application form as proof of a weapon's registration and make it available to ATF upon request.  If the NFA weapons owner can produce the registration paperwork, ATF assumes the error is in the NFRTR and fixes it in the database.

However, NFA Branch staff's errors in processing NFA weapon applications have resulted in financial loss to individuals and licensees.  The NFATCA and ATF each provided an example:

1. The NFA Branch incorrectly approved the sale (transfer) of a machine gun from a law enforcement agency to a federal firearms licensee.  The licensee subsequently tried to sell (transfer) the weapon to another licensee.  However, the NFA Branch discovered

its original error and subsequently disapproved both the first and second transactions. The licensee was not allowed to retain possession of the machine gun, and the law enforcement agency did not have the funds to return the $10,000 paid by the licensee for the weapon.

2. An NFA Branch Examiner processed an application to transfer an NFA weapon from a federal firearms licensee to another licensee. The licensee selling the weapon had purchased the weapon from a police department that had, in turn, purchased the weapon 10 years ago from an importer. The Examiner who handled the original transaction should have stamped the approved application form "restricted" because only holders of certain federal firearms licenses can possess and transfer the weapon. Because the first application form was never stamped, the licensee did not know that he could only resell the weapon to certain license holders. The NFA Branch had to disapprove the licensee's application to sell (transfer) the weapon.

NFA Branch Action to Address Backlog of Discrepancy Reports

The NFA Branch was working to reduce the backlog of discrepancy reports to be resolved. In October 2006, the backlog was 112 reports, and by March 2007 had been reduced to 61 reports. In early 2007, the NFA Branch Chief had assigned one NFA Branch Examiner to work part-time on the backlog. This Examiner spends 50 percent of her time reconciling discrepancies, and two other staff members (a Specialist and the NFA Program Manager) reconcile inventory reports sporadically as their time permits.

**The NFRTR database has technical problems, and the NFA Branch considers the programming to be flawed.**

We found that ATF has not updated the programming of the NFRTR database platform, and the NFA Branch considers it to be flawed. The NFRTR's technical flaws introduce errors in records and make it more difficult for NFA Branch staff to ensure that decisions based on NFRTR reports and queries are correct.

In 1983, ATF first created a database to track NFA weapons applications and entered information into the database from hardcopy applications received both prior to and after implementation of the database. ATF converted the first database to an Oracle platform in 1997 and has not modified it since. NFA Branch staff stated that the Oracle

database is more accurate and easier to search than the old database; however, several other Branch staff described it as obsolete or becoming obsolete.  For example, one Examiner described the NFRTR as "old, antiquated, and not set up well."  Another NFA Branch Examiner recommended giving the NFRTR "an IT upgrade."

Some IOIs also expressed concern and frustration about the NFRTR in their responses to our survey.  IOI comments about the NFRTR included:

- "Update the computer program to a 21st century capability . . . . [ATF should] stop operating like a third world Department of Motor Vehicles office."

- "Hire more people and/or invest in new technology which will enable the NFA Branch to maintain accurate and up-to-date records."

- "Revamp [the NFRTR] making it easier to verify its integrity, and spend more money on people to ensure it is maintained properly."

The NFA Branch Program Manager said that ATF suspended making any database changes or enhancements to the NFRTR for the last 5 years because ATF had initiated the Firearms Integrated Technology (FIT) project that would encompass the NFRTR.[39]  FIT was intended to integrate the databases of the National Tracing Center, Firearms and Explosives Imports Branch, and NFA Branch.  FIT would ensure that the data from each database was compatible for interoperability, but would not fix the underlying software programming flaws in the NFRTR.  ATF ceased significant work on FIT because the funding had been reallocated and exhausted by 2004 on implementing the Safe Explosives Act.[40]  Any

---

[39] During the times when work was actively going on with the integration project, any other maintenance or development work was halted because ATF's information technology security will not allow two different contractors to work on one application at the same time.

[40] The Safe Explosives Act, enacted on November 25, 2002, expanded the ATF's licensing authority to include the intrastate manufacture, purchase, and use of explosives. The act required ATF to inspect licensees' manufacturing and storage facilities at least once every three years and to conduct background checks on all licensees, as well as all employees who have access to explosives as part of their work.

continued work on FIT was dependent on additional funding.[41]  Subsequent funding requests for FIT were not successful.  ATF requested additional funding for FY 2008 to enhance the NFRTR, but the funding request was not included in the President's budget.[42]

While several NFA Branch staff described the database as "user friendly," they identified flaws that make it more difficult for Specialists and Examiners to ensure that decisions based on NFRTR reports and queries are correct.  Flaws that impede the maintenance of accurate records and the accuracy of searches include:  (1) older NFRTR records have empty data fields that can improperly exclude records from search results, (2) the NFRTR allows separate records to be generated for a single weapon, (3) the NFRTR does not have system controls over data entry, so consistent data entry is not ensured, (4) the NFRTR does not always indicate the correct owner of NFA weapons on queries and reports, and (5) when multiple NFA weapons are registered on the same application form, changes in ownership made to one of the weapon's NFRTR record can affect the records of all of the weapons registered on that form (a problem that recurs until the weapon has been transferred from the manufacturer to two successive owners).

<u>Older NFRTR records have empty data fields.</u>

When the NFRTR was converted to an Oracle platform in 1997, several new fields were added, including the applicant's date of birth, Social Security Number, Special Occupational Tax (SOT) status, business trade name, and address.  Records for NFA weapons registered before 1997 do not contain data in any of the fields that were added in the 1997 conversion.  In addition, the pre-1997 NFRTR database had one field for "Name," and if the applicant had a trade name, NFA Branch staff entered only the trade name (or the name of the company) in the "Name" field and not the applicant's name.  As a result of empty fields, it is more difficult for Examiners to compile complete weapon registration histories for weapons that were registered before 1997 because there are fewer fields with data to search on; thus, NFRTR searches may not locate some relevant records.

---

[41]   At the point when congressionally earmarked funds where exhausted during 2005, ATF had completed the Functional Requirements Analysis and developed a prototype for converting three hard copy forms to electronic forms for the NFRTR.

[42]   ATF funded the development of FIT through congressional appropriations in FY 2001 and FY 2002.  In FY 2001, Congress appropriated $2 million for NFA Branch, National Licensing Center, and Imports Branch IT improvements.  ATF apportioned this money to three initiatives within the FIT Project that were intended to standardize and integrate data from the NFA Branch, Imports, and the National Licensing Center.  In FY 2002, Congress allocated another $2 million for the FIT Project.

<u>Some NFA weapons have multiple records in the NFRTR</u>.

NFA Branch staff stated that the NFRTR will split the record for a weapon into two separate records if any specifications of the weapon, such as the caliber or barrel length, differ in subsequent transfer applications from that weapon's existing record in the NFRTR.  When this split happens, Examiners see only part of the transfer history unless they find both parts of the record that have been stored in the NFRTR database as the records of two weapons.  One Examiner described this problem by saying that "it's easy for data to hide" in the NFRTR and "you have to be very thorough." Another Examiner told us that sometimes when a record splits into two staff members cannot search for the second record using the weapon's serial number, but must use the NFRTR-generated control number originally assigned to the weapon.  Examiners and Specialists must be aware that more than one record could exist for the same weapon and search the NFRTR for additional records that are "hiding" under slightly different serial numbers or other characteristics.  Examiners also must ensure that when they add data to the record of an NFA weapon, the record does not split into separate records for the same weapon.

<u>The NFRTR does not have system controls over data entry, so consistency is not ensured</u>.

The NFRTR is not programmed to control for incorrect or inconsistent data entry.  Several NFA staff noted the lack of automated edits as a problem, reporting that the database allows wide variations in how data in certain fields are entered.  One IOI survey respondent commented, "The NFRTR inventory [reports contain] codes or abbreviated manufacturer codes, which do not seem to resemble the actual manufacturer of the firearm."  One Examiner said that having drop-down lists for manufacturers and corresponding model numbers would reduce the chance for mistakes. For example, if an Examiner selected the Remington manufacturer code from a list, then the NFRTR should be programmed to give the Examiner only the model number choices that correspond to Remington.  The NFRTR also accepts special punctuation, which makes it more difficult to query the database.  For example, the NFRTR will accept the word "and" as well as the ampersand symbol.  As with split records, inconsistent data entry due to the lack of built-in controls requires NFA Branch staff to perform many searches using all possible permutations of the search terms to ensure they have located the correct record.

<u>The NFRTR does not always indicate the correct owner of weapons on queries and reports</u>.

Many NFA Branch staff noted that the NFRTR does not always indicate the correct owner of weapons on queries and reports. The NFA Branch Program Manager stated that this problem was identified almost immediately after the new NFRTR system was deployed in 1997, but the IT staff was unable to correct the problem and ATF did not pursue resolution.

The NFRTR was designed to automatically place the most recently approved transaction at the top of a weapon's record and to shade the information about that transaction purple to clearly identify the current owner when viewed on the computer screen. However, if a transfer of an NFA weapon is canceled after the application has been entered into the NFRTR and approved, the NFRTR will incorrectly list the transferee in the most recently approved transaction as the current owner on printouts. NFA Branch staff viewing the weapon's record in the NFRTR can see all recent transactions associated with the weapon and easily identify the true current owner because the "status" field will indicate "void" for the transaction that was canceled, even though the incorrect owner is shaded in purple. (Staff members are trained to review the "status" field for all the transactions listed on the screen.)

Because the printed reports or queries only include the transaction shaded in purple at the top of the record, the printouts will incorrectly identify the current owner. Figure 4 shows an example of an NFRTR record of a weapon for which the most recent transfer was canceled by the applicant. Because the transfer from Robert Smith to John Doe was canceled, the true current owner is still Robert Smith; however, the purple shading indicates that John Doe is the current owner. John Doe also will be listed as the current owner on NFRTR printed queries and reports.

**Figure 4:   Screen View of an NFA Weapon's Record in the NFRTR**



Ensuring the accuracy of the NFRTR record is the responsibility of the Examiner, who must manipulate the system to change the current ownership back to the actual owner, which will then move the correct transaction to the top of the weapon's record and shade it purple.  If the Examiner does not take these steps, the true current owner will not be reflected in reports printed from the NFRTR.

When multiple NFA weapons are registered on the same application form, modifications to one weapon's record affect all of the weapons registered on that form.

Often firearms manufacturers will use the same application form to register multiple NFA weapons (sometimes hundreds), and weapons owners sometimes use the same form to register or transfer multiple NFA weapons. Even though each weapon has its own record in the NFRTR, weapons registered or transferred on the same form are initially linked by their NFRTR-generated control number.  This control number is based on the form and not the weapon and applies to the records of all weapons registered on that form.  The link between weapons registered on the same NFA weapon application is broken only after weapons have been transferred

to new owners two subsequent times.  The weapons would then have their own NFRTR-generated control numbers.

This programming flaw is most evident when a transfer of a weapon is canceled by the applicant and that weapon's preceding transaction involved multiple weapons registered or transferred on the same form.  If no action is taken to correct the record to show the true current owner, all NFRTR queries and reports will incorrectly list the transferee from the canceled transaction as the current owner.  However, when an NFA Branch staff member manually fixes the record to show the correct owner of the weapon, the NFRTR will apply that change to all the weapons on the form, which are still linked by the same control number.  Because it takes a significant amount of time and effort to ensure that only the relevant weapon on that record is changed, Examiners often do not fix such records.

The existence of these flaws requires NFA Branch staff to be attentive to likely errors in the NFRTR and knowledgeable about how to identify and correct them.  Maintaining NFRTR accuracy depends on staff carefully and thoroughly entering data, conducting searches, and correctly interpreting search results.  Examiners and Specialists do not necessarily reach the correct conclusion about a weapon's history or registration when their searches of the NFRTR database do not take into account all possible permutations of the name or search variable.  This level of inquiry requires Examiners and Specialists to conduct many NFRTR searches using different search terms and variables in an attempt to discover all of the information relevant to a registration or transfer of a particular weapon.  Failure of Examiners and Specialists to thoroughly search the NFRTR in this manner can result in their forming incorrect conclusions about whether a registration or transfer should be approved or how a NFA weapon's record should be updated.

<u>NFA Branch Action to Address Technical Issues</u>

The NFA Branch is beginning to address some of the errors caused by NFRTR programming flaws by creating an IT Specialist position.  The NFA Branch Chief told us he wants the IT Specialist to:

- Track branch productivity, application processing times by each type of form, the number of applications with pending status, and SOT reports;

- Review the NFRTR database to determine its full capability, including developing additional queries; and

- Determine the best approach to correcting errors in the NFRTR records.

The Chief filled the IT Specialist position in February 2007 with an NFA Branch Examiner who had information technology experience. Because of a shortage of staff, as of March 2007 the IT Specialist was still performing Examiner duties and was only conducting his IT Specialist duties part-time.

**ATF has not completed two vital projects to improve the NFRTR, which limits the NFA Branch's capability to correct or prevent discrepancies.**

Because of budget constraints, ATF has not completed two projects that would improve the accuracy of the NFRTR's records and increase the efficiency of the NFA Branch. The projects are 1) scanning all NFA transfer and registration documents into digital files, and 2) establishing an electronic filing (e-Forms) system so that applicants with access to computers can submit certain NFA transfer and registration applications online.

In its FY 2002 congressional appropriations, ATF received $500,000 specifically "to assist in such efforts as linkage technology, electronic filing, and the use of contract employees with the aim of reducing processing times and ensuring the completeness and accuracy of the NFRTR." ATF used the funds to supplement the contract for staff to image and index the NFA applications. ATF also used the funds to develop the requirements document for the development of an electronic filing system for NFA Forms 2, 3, and 5 and a prototype system and to modify the prototype based on feedback received from the NFA weapons industry.

<u>ATF has a backlog of NFA weapons applications to be imaged and indexed</u>.

We found that as of October 2006, ATF had a 1-year's backlog worth of application forms to be imaged and indexed. The imaging database is an important parallel system to the NFRTR with the goal of ensuring that all NFA registration and transfer applications received by ATF since 1934 are searchable and retrievable. NFA Branch staff use the imaging database to easily locate specific forms when needed to process new NFA weapons applications, verify the ownership and the complete transfer history of NFA weapons, and verify whether certain weapons are or are not registered in the NFRTR. As of October 2006, all NFA documents received from 1934 through November 2005 were imaged, and two contractors were assigned to image NFA records received since then. In 2005, the NFA Branch had four contractors working on imaging and indexing and a 6-month backlog.

Budget cuts forced ATF to reduce the number of contractors from four to two in June 2005, and as of October 2006 the Branch was falling increasingly farther behind in indexing and imaging NFA weapons application forms.  The NFA Branch Chief told us that the Branch needs additional imaging staff to eliminate the backlog.[43]  ATF did not allot additional funding for imaging NFRTR records for FY 2006 or FY 2007 because of budget constraints and competing priorities.  Further, when ATF had four contractors assigned to image NFA forms, they were able to check that the information from the forms had been entered into the NFRTR correctly as they indexed each form.  The contractors have not been able to perform this step since the number of contractors was reduced from four to two.

ATF has not completed the e-Forms project.

We found that since 2005, ATF has not had the funds to continue the e-Forms project it initiated in 2004.  ATF anticipated that this project would reduce human errors in processing and entering NFA transfer and registration applications, detect errors on applications so that incorrect information was never entered into the NFRTR, improve communication with importers and manufacturers by providing an online method for checking the status of applications submitted electronically, and ultimately reduce the NFA Branch's data entry burden and require less Examiner time for processing routine NFA applications.[44]

ATF began the e-Forms project in October 2004 (with congressionally earmarked funds as part of FIT) to allow for electronic submission of NFA Form 2 (Notice of Firearms Manufactured or Imported) and Form 3 (Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer).  In June 2005, ATF added Form 5 (Application for Tax-Exempt Transfer and Registration of Firearm) to the project.[45]  Eighty-two percent of all NFA weapons applications the NFA Branch receives are on

---

[43]  The contract covering imaging and indexing is managed by the National Tracing Center.  In 2005, 47 imaging contractors were laid off and were not replaced, and as a result the number of contractors assigned to the NFA Branch was reduced.

[44]  Bureau of Alcohol, Tobacco, Firearms and Explosives, *NFA and e-Forms Functional Requirements Document* (December 19, 2005).

[45]  The Functional Requirements Document for the e-Forms project explained that the electronic submission for Form 5 applications would only apply to federal firearms licensee-to-government transactions because transactions to non-licensees require the applicants to submit photographs and fingerprint cards.  Creating a secure way for those documents to be submitted electronically was beyond the scope of the project, so paper forms were to continue to be used for such transactions.

Form 2s, 3s, and 5s, and very few of them are disapproved.[46]  If a significant portion of Form 2s, 3s, and 5s was submitted electronically, Examiners would be able to spend more of their time resolving technical questions and processing complicated NFA weapon applications rather than routinely processing these less complex forms.

In our interviews with NFA Branch staff, several staff members mentioned that establishment of an e-Forms system would enhance the NFRTR and help ensure its reliability.  One Specialist explained that "e-Forms would make things easier for the ATF and the external customer" because it would force applicants to provide standardized information and applicants would no longer have to risk forms getting lost in the mail.  ATF's Deputy Assistant Director of the Office of Enforcement Programs and Services expected that an e-Forms system would reduce human error in entering the data from the paper forms into the NFRTR.

In February 2006, ATF demonstrated the prototype of the e-Forms system at the Shooting, Hunting, and Outdoor Trade (SHOT) show, where NFA weapon buyers and sellers expressed eagerness to see it implemented.[47]  In our interview, a representative of the NFATCA commented on the e-Forms project saying, "I cannot emphasize enough the need for funding."  He believed that e-Forms would speed the NFA weapon application processing and approval process.

According to the Assistant Director, Office of Enforcement Programs and Services, ATF could not continue funding the project while it was still in the prototype phase because of budget constraints.  ATF estimates that $13,964,870 will be needed to establish the e-Forms system and to operate it for the first 2 years and that $200,000 will be needed to operate it each year thereafter.  The Assistant Director stated that ATF is working closely with the NFA weapons industry to develop alternatives for accomplishing the e-Forms project.  He did not know when the project will resume but he believes it will get done because of its importance to streamlining the application process.

---

[46]  In 2006, 45.7 percent (183,932) of the forms the NFA Branch received were Form 2s, 12.7 percent (50,971) were Form 3s, and 23.47 percent (94,367) were Form 5s.  Of these, the NFA Branch disapproved 8 Form 2s, 95 Form 3s, and 94 Form 5s.

[47]  The SHOT Show, sponsored by the National Shooting Sports Foundation, is one of the largest trade shows for the shooting sports and hunting industries.  It includes expositions of firearms, ammunition, archery, outdoor apparel, optics, camping and related products and services.

# CONCLUSIONS AND RECOMMENDATIONS

We concluded that since 2004 the NFA Branch has reduced the overall average processing time by more than two thirds for forms used most by individual weapons owners and federal firearms dealers. According to members of the NFA weapons industry and ATF IOIs and Special Agents, the NFA Branch also has improved its responsiveness to customer service inquiries and requests for information from the NFRTR. In general, comments from individuals we interviewed external and internal to ATF were favorable about the NFA Branch's service and efforts to maintain the NFRTR. However, we found that the ATF website is generally difficult to navigate and finding NFA information is challenging for NFA Branch customers.

Despite the significant improvements, management deficiencies and technical software flaws contribute to errors in the NFRTR database and affect its reliability as a regulatory tool for ATF IOIs. For example, the NFA Branch staff do not process applications or enter data into the NFRTR in a consistent manner. The NFA Branch also has a backlog of record discrepancies that it is not able to resolve in a timely manner. Further, the NFRTR database has software programming flaws that can cause errors in records and reports.

Despite these problems, we found no evidence that individual weapons owners and federal firearms licensees had been charged inappropriately with criminal violations because of errors in the NFRTR.

We concluded that the NFA Branch has not fully established an adequate management infrastructure for ensuring the integrity of the NFRTR and the integrity of the decisions based on NFRTR data. The NFA Branch does not have sufficient standard operating procedures for working with the NFRTR and processing applications. The Branch also lacks uniform training on procedures for NFA Branch staff members and systematic communications methods for managers to keep staff members continuously informed of procedures and NFA issues. As a result, staff members learned about procedures in an ad hoc manner, were not fully familiar with the NFRTR and the NFA, and did not have all the information necessary to accomplish their duties. The NFA Branch Chief recognized these problems and was working to update and expand written procedures as well as to improve communication with staff and to provide training about NFA weapons and NFA-related issues.

Further, we concluded that the NFA Branch and ATF headquarters have not taken sufficient action to address other longstanding management and technical issues affecting the NFRTR – a backlog in correcting errors identified during compliance inspections of federal firearms licensees, technical programming flaws that create errors, and slow or no progress on important projects that could improve application processing.

The NFA Branch does not promptly correct errors in NFRTR records identified by IOIs when conducting compliance inspections of federal firearms licensees.  Discrepancies between the NFRTR data and licensees' actual inventories slow completion of inspections and are disconcerting for licensees because they fear sanctions for violations of the NFA.

ATF also has not updated the programming of the NFRTR database platform.  While NFA Branch personnel described the database as "user friendly," the NFRTR has incomplete data and logic flaws that produce inaccurate results in reports and queries.

Moreover, ATF has not completed two projects funded initially in FY 2002 that would improve the accuracy of the NFRTR and increase the efficiency of the NFA Branch.  ATF has a backlog of NFA weapons transfer and registration documents to scan into digital files and index in a database (called the "imaging" database).  With the imaging database, NFA Branch staff can electronically search for information not available in the NFRTR and needed for the complete transaction history of registered NFA weapons.  ATF also has not implemented e-Forms, a system that would allow applicants to submit NFA transfer and registration forms online.  The e-Forms project would streamline the application process, reduce application errors, and reduce NFRTR data entry errors.  With these improvements, the NFA Branch could devote more resources to fixing the backlog of existing errors in the NFRTR.  However, funding constraints have slowed or stopped progress on the projects.

Although many of the letters from citizens that prompted our review of the NFRTR, as well as comments that we received from representatives of the NFATCA, indicate concern that errors in the NFRTR can lead to unjust sanctions and criminal charges, we concluded, based on ATF records and interviews, that this has not occurred.  Further, NFATCA representatives did not provide us with any examples of instances in which inaccuracies in the NFRTR resulted in weapons being inappropriately seized from NFATCA members.

To assist in the improvement of the NFRTR, we recommend that ATF:

1. Improve the ATF website by making it easier for the public to find NFA information, such as frequently asked questions, application forms and instructions, NFA Branch contact information, and the NFA handbook.

2. Develop and disseminate to all NFA Branch staff a comprehensive standard operating procedures manual that includes all NFA weapons application processes, NFRTR processes, and data entry codes and abbreviations.

3. Develop uniform and structured training for new staff members that includes standard operating procedures and hands-on experience with the NFRTR.  Ensure that all NFA Branch staff members attend the training and that the staff trainers are themselves properly trained.  Provide training for the Section Chiefs on supervisory techniques.

4. Establish regular and recurring methods of communication to NFA Branch staff.

5. Resolve discrepancies between the NFRTR and inventories of federal firearms licensees in a timely manner.

6. Develop and implement an action plan to fix technical programming flaws and errors in the NFRTR.

7. Develop and implement an action plan for eliminating the backlog of imaging and indexing forms for the imaging database.

8. Develop and implement an action plan for completing the e-Forms project.

# APPENDIX I:  NFA APPLICATION FORMS AND TRANSACTION PROCESSES

This appendix outlines all the application forms and processes needed by manufacturers, makers, dealers, importers, and individuals for registering and transferring NFA weapons.

### Table 4:  NFA Weapon Application Forms

| Form | Use | Fee | Requirements | Applicant |
|---|---|---|---|---|
| Form 5320.20 | Application to Transport Interstate or to Temporarily Export Certain NFA Firearms | None | | Individual |
| Form 1 | Application to Make and Register a Firearm | $200 | • Applicant Photograph<br>• Fingerprint Cards<br>• Signed Certification | Individual |
| Form 2 | Notice of Firearms Manufactured or Imported | $200 or $5 | | Dealer, Manufacturer, Importer |
| Form 3 | Application for Tax-Exempt Transfer of Firearm and Registration to Special (Occupational) Taxpayer | Tax Exempt | | Dealer, Manufacturer, Importer |
| Form 4 | Application for Tax Paid Transfer and Registration of a Firearm | $200 or $5 | • Applicant Photograph<br>• Fingerprint Cards<br>• Signed Certification | Individual |
| Form 5 | Application for Tax-Exempt Transfer and Registration of a Firearm | Tax Exempt | | Individual, Dealer, Manufacturer, Importer |
| Form 9 | Application and Permit for Permanent Exportation of a Firearm | None if proof of exportation is provided | Proof of exportation provided to ATF within 6 months | Individual, Dealer, Manufacturer, Importer |
| Form 10 | Application for Registration of Firearms Acquired by Certain Government Entities | None | | Federal, Local, or State Department or Agency |

**Manufacture/Making**

Individuals may apply to make and register an NFA weapon using Form 1.  An individual applicant must pay a $200 "making" tax and submit a photograph, two fingerprint cards, and a certification by the applicant's local Chief of Police stating that the applicant is in compliance with state and local law.  Individual applicants undergo a background check before the application is approved.  Licensed manufacturers may register a new NFA weapon using Form 2.  Manufacturers, dealers, and importers must have a background check to obtain their licenses and do not need to repeat a background check for each application.  A newly made NFA weapon must be registered within 24 hours of its manufacture.

**Transfers**

Individual weapons owners may apply to transfer an NFA weapon using Form 4.  A licensed manufacturer may apply to transfer an NFA weapon using Form 3 or Form 5.  Licensed manufacturers, dealers and importers use Form 3 to transfer weapons to other manufacturers in a tax-exempt transaction.  Form 5 can be used for several reasons:  to transfer a registered NFA weapon to a government agency, to transfer an unserviceable NFA weapon, to temporarily transfer an NFA weapon for repair, and to distribute an NFA weapon to a lawful heir as part of an estate.  A weapon transfer to an individual requires additional information to be submitted:  a local law enforcement certification, a current photograph of the applicant, and two fingerprint cards.  All transferred NFA weapons are subject to a transfer tax of $200 except for those classified as "any other weapon," which are subject to a $5 transfer tax.  Once the transfer application has been submitted, approved, and returned to the transferor by the NFA Branch, the weapon must be transferred immediately to the transferee.

**Sales Samples**

The sale or transfer of machine guns is restricted by the NFA and Section 922 (o) of the GCA.  Machine guns that were lawfully registered before 1986 (known as pre-86 guns) are transferable to any person in compliance with NFA regulations.  Machine guns that were manufactured after May 19, 1986, or were not registered prior to this date, are known as post-86 guns and may only be manufactured and registered for official use within law enforcement agencies or as sales samples by dealers.

## Imports/Exports

NFA weapons may be imported for use by the U.S. government or any state law enforcement agency.  They also may be imported for scientific or research purposes, or for testing or use as a model by manufacturers, importers, or dealers who are qualified to possess these weapons.  Post-86 machine guns are subject to Section 922 (o) of the GCA and cannot be imported for scientific, research, testing or model purposes.

Weapons imported by a manufacturer, dealer, or importer are released from Customs using Form 6 and must be registered on Form 2 no later than 15 days after the weapons are released.  Weapons imported by the U.S. government for official use are registered on Form 10.

Exported weapons must be filed on Form 9.  Their NFRTR records are updated to reflect their exported status.  The transferor must provide the NFA Branch with documentation that the firearm has been exported within 6 months of exportation.  Examples of this documentation include a certificate of exportation or mailing, or a certificate of landing signed by a Customs official of the country to which the firearm has been sent.  The exportation of an NFA weapon is tax-exempt unless the exporter fails to provide proof of exportation to the NFA Branch.

## Registration by Law Enforcement Agency

State and local law enforcement offices may register NFA weapons on Form 10 for official use by an entity of the U.S. government.  These agencies may register previously unregistered weapons obtained by seizure, forfeiture, or abandonment.  Once they are registered on Form 10, they may only be transferred between U.S. government agencies.

## Temporary Transport

Individual weapons owners may apply to transport an NFA weapon in interstate or foreign commerce using a Form 5320.20.  This form must be approved by the NFA Branch before the weapon is transported and may be approved for continual transport of the same weapon to the same location for up to one year.

# APPENDIX II:  OIG SURVEY QUESTIONS TO INDUSTRY OPERATIONS INVESTIGATORS

* 1. Do any of the compliance inspections you conduct involve NFA weapons?

○ Yes    ○ No

* 2. What is your Field Division?
Please choose from the list below.

[Select ▾]

* 3. How many years have you worked as an IOI?
○ Less than a year
○ 1 year to 5 years
○ 6 years to 10 years
○ 11 years to 15 years
○ More than 15 years

* 4. What percentage of your compliance inspections involve NFA weapons?
Please enter a number without decimal points in the box provided.
[          ]

* 5. When in the inspection process do you request an inventory report from the NFA Branch?
○ At least 2 weeks prior to conducting compliance inspection
○ 1 to 2 weeks prior to conducting compliance inspection
○ Less than a week prior to conducting compliance inspection
○ At the time of the compliance inspection
○ Other (Please type your answer in the box provided.)
[          ]

* 5A. Once requested, how many days does it take to receive the inventory report from the NFA Branch?
Please enter the number of days in the box provided.
[          ]

* 6. How often would you say there is a discrepancy between the NFRTR inventory report and the FFL inventory?

○ Always    ○ Most of the time    ○ Sometimes    ○ Never    ○ Don't Know

\* 7. How often is a discrepancy between the NFRTR inventory report and the FFL inventory due to an error in the NFRTR?

○ Always    ○ Most of the time    ○ Sometimes    ○ Never    ○ Don't Know

---

\* 8. How often is the discrepancy between the NFRTR inventory report and the FFL inventory due to an error by the FFL?

○ Always    ○ Most of the time    ○ Sometimes    ○ Never    ○ Don't Know

---

\* 9. What do you do when there is a discrepancy between the NFRTR inventory report and the FFL inventory? Please describe the process and the actions you take.
Please type your answer in the box provided.

---

\* 10. How many times in the past year have you referred an FFL to an ATF Special Agent based on a discrepancy between the NFRTR inventory report and the FFL inventory?
Please type a number in the box provided. If you have not made any referrals, please type "0" in the box provided.

---

10A. What resulted from these referrals?
Please type your answer in the box provided.

---

\* 11. How satisfied are you with the accuracy of the NFRTR inventory reports?

○ Very Satisfied    ○ Satisfied    ○ Neither Satisfied Nor Dissatisfied    ○ Dissatisfied    ○ Very Dissatisfied    ○ Don't Know

* 12. How do errors and discrepancies in NFRTR inventory reports affect your ability to carry out compliance inspections?
Please type your answer in the box provided.

* 13. How do errors and discrepancies in the NFRTR inventory reports affect the FFLs you inspect?
Please type your answer in the box provided.

14. Do you have any suggestions for improving the NFRTR inventory reports or the work of the NFA Branch?
Please type your answer in the box provided.

# APPENDIX III:  THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES' RESPONSE



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

JUN 13 2007    Washington, DC 20226

MEMORANDUM TO: Assistant Inspector General for Evaluation and Inspections

FROM: Acting Director

SUBJECT: Response to the Draft Report – Review of the Bureau of
Alcohol, Tobacco, Firearms and Explosives' National
Firearms Registration and Transfer Record,
Assignment Number A-2006-002

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has reviewed the Department of Justice, Office of the Inspector General's draft report on the above-cited subject. We appreciate the opportunity to provide comments on the report and its recommendations.

## EXECUTIVE DIGEST

Page i

In the first paragraph, line 9, the word "ownership" should be changed to "possession." Ownership of firearms registered in the National Firearms Registration and Transfer Record (NFRTR) is irrelevant. The registry reflects the person or persons legally entitled to possess the weapon—that person may or may not have an ownership interest in the registered weapon.

In the second paragraph, line 4, the words "single shot" should be replaced with the word "semiautomatic." In the fifth line, we recommend that the word "press" be changed to "function," as this more closely tracks the statutory definition of a machinegun.

Also in the second paragraph, line 6, the phrase "smooth bore, short-barreled handguns" should be replaced with the phrase "other concealable weapons." The drafter is correct that certain smooth bore shot pistols are included in the definition of "any other weapon," but there are many other firearms that fit within this category of "firearm." In the next sentence, beginning, "The GCA restricts…," we recommend that the word "new" be deleted. Registrations of all weapons, whether they are new or old, are restricted to makers, manufacturers, and importers.

- 2 -

Assistant Inspector General for Evaluation and Inspections

Page ii

In the second full paragraph, line 2, the word "ownership" should be changed to "possession," and the parenthetical should be revised to read "(through sale, rental, gift, or bequest)."

**BACKGROUND**

Page 1

The last sentence in the first full paragraph in this section suggests that the central registry of all NFA weapons is an electronic database called the National Firearms Registration and Transfer Record (NFRTR). First, the reference to "ownership" records in this sentence should be changed to "possession." In addition, it is inaccurate to state that the electronic database is the NFRTR. The NFRTR consists of the database AND all the registration documents and attachments associated with those documents. The electronic database is merely an automated means of searching the entire NFRTR. We recommend that the last sentence be revised to read as follows:

> "The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) collects
> the taxes and maintains NFA firearm registration records in a central registry.
> The central registry consists of all the registration documents and attachments
> to those documents, as well as an electronic database that incorporates many of
> the documents and that enables computerized searches of the registry."

The second paragraph makes reference to the 1968 amendments to the NFA and refers to "frames and receivers that can convert a single shot weapon into an automatic weapon." Frames and receivers cannot convert any weapon into a machinegun, and the drafters apparently misunderstand the amendments made in 1968. The amendments added machinegun frames or receivers and machinegun conversion kits to the definition of "machinegun." In addition, this sentence indicates that certain smooth bore, short-barreled handguns were added to the NFA in 1968. These weapons, regulated as "any other weapons," were regulated under the NFA beginning in 1934. Accordingly, the first sentence of the second paragraph should be revised to read as follows:

> "Congress expanded the scope of the NFA through the Gun Control Act of 1968
> (GCA) to include destructive devices (explosive and incendiary bombs, grenades,
> missiles, rockets, mines, and weapons with a bore of more than ½" in diameter),
> machinegun frames or receivers, and conversion kits for machineguns."

In footnote 13 at the bottom of the page 1, the word "reclassified" should be changed to "defined." The word "reclassified" makes it sound as if Congress or ATF changed its mind

- 3 -

Assistant Inspector General for Evaluation and Inspections

about how the term "firearm" should be defined. Antique firearms were excluded from the definition from the date of enactment of the GCA – there was no "reclassification."

Page 2

The first full paragraph on page 2 refers to registration of NFA weapons and their owners. Only weapons must be registered—neither owners nor possessors are registered per se. We recommend that the first sentence be revised to read as follows:

> "NFA weapons must be registered in the NFRTR and whenever the weapon is transferred (through sale, gift, rental, or bequest), the transfer must be approved in advance by ATF."

In the second sentence of the first full paragraph, "An owner" should be changed to "A registrant."

Pages 3 and 4

The second paragraph on page 3 refers to the penalties imposed for violations of the NFA and states that they are punishable by a $10,000 fine and 10 years imprisonment. Footnote 18 cites 26 U.S.C. § 5871 as authority for these penalties. The reference to a fine of $10,000 should be changed to $250,000, and the footnote should refer to 18 U.S.C. § 3571, in addition to 26 U.S.C. § 5871. Terms of imprisonment for all Federal offenses are governed by Chapter 227, Title 18 U.S.C. Section 3571 provides that the fine for Federal felonies committed by an individual is not more than $250,000.

The second sentence in the second paragraph on page 3 correctly refers to asset forfeiture for weapons involved in violations of the NFA, then goes on to refer to the fact that a person convicted of a felony loses the right to receive and possess firearms. We assume this is a reference to the prohibited persons' provisions of the GCA and recommend that this sentence be revised to read as follows:

> "The NFA firearm is subject to forfeiture, and if the possessor is convicted of a criminal violation of the NFA, he or she will be prohibited from receiving or possessing firearms."

Page 4

Footnote 19 at the bottom of the page 4, should be revised to cite "18 U.S.C. § 922(g) (1)," in addition to "26 U.S.C. § 5872."

- 4 -

Assistant Inspector General for Evaluation and Inspections

On page 4, the sentence at the top beginning "In addition," should be deleted.  This sentence refers to the general tax evasion statute of the Internal Revenue Code, but then refers to the fine provision of Title 18.  As the fine applicable to NFA violations was explained previously, there is no need to mention it again, and we do not understand the reference to the general tax evasion statute.

Page 6

The first full paragraph, second sentence, beginning "Only licensed manufacturers," should be revised to read as follows:

> "Only licensed manufacturers, licensed importers, and makers of NFA weapons may register NFA weapons."

The reference to "applying" to register NFA weapons is not correct as to licensed manufacturers and licensed importers, as they do not "apply" to register—they notify ATF of firearms they have manufactured or imported within a specified period after manufacturing or importing the firearm, as the case may be.  27 C.F.R §§ 479.103, 479.112.

Page 31

The first full paragraph on page 31, beginning "We did not find evidence…" has an incorrect citation to the National Firearms Act.  The third sentence of this paragraph should be revised to read as follows:

> "Between 2000 and 2006, only 15 licensees were charged with violating 26 U.S.C. Chapter 53, the Chapter of the Internal Revenue Code that includes the NFA."

**Concurrence or Nonconcurrence on the Eight Recommendations**

Page 44

1. Improve the ATF website by making it easier for the public to find NFA information, such as frequently asked questions, application forms and instructions, NFA Branch contact information, and the NFA handbook.  **We concur.**

- 5 -

Assistant Inspector General for Evaluation and Inspections

2. Develop and disseminate to all NFA Branch staff a comprehensive standard operating procedures manual that includes all NFA weapons application processes, NFRTR processes, and data entry codes and abbreviations.  **We concur.**

3. Develop uniform and structured training for new staff members that includes standard operating procedures and hands-on experience with the NFRTR.  Ensure that all NFA Branch staff members attend the training and that the staff trainers are themselves properly trained.  Provide training for the Section Chiefs on supervisory techniques.  **We concur.**

4. Establish regular and recurring methods of communication to NFA Branch staff.  **We concur.**

5. Resolve discrepancies between the NFRTR and inventories of federal firearms licensees in a timely manner.  **We concur.**

6. Develop and implement an action plan to fix technical programming flaws and errors in the NFRTR.  **We concur.**

7. Develop and implement an action plan for eliminating the backlog of imaging and indexing forms for the imaging database.  **We concur.**

8. Develop and implement an action plan for completing the e-Forms project.  **We concur.**

Should you have any questions regarding this response, please contact Richard E. Chase, Assistant Director, Office of Professional Responsibility and Security Operations/(CSO), at (202) 927-7800.

Michael J. Sullivan

# APPENDIX IV:  OIG'S ANALYSIS OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES' RESPONSE

On May 8, 2007, the OIG sent a copy of the draft report to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) with a request for written comments.  In a memorandum dated June 13, 2007, ATF agreed with the report's eight recommendations but did not describe the actions it had taken or planned to take to implement the recommendations.  As a result of ATF's response, the recommendations are resolved and remain open.  The ATF response also discussed technical and factual matters, and we made revisions to the report to address them where appropriate.

**Recommendation 1.**  ATF should improve the ATF website by making it easier for the public to find National Firearms Act (NFA) information, such as frequently asked questions, application forms and instructions, NFA Branch contact information, and the NFA handbook.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  To close this recommendation, please provide the OIG with documentation that the ATF website has been changed to make it easier to find NFA information by September 30, 2007.

**Recommendation 2.**  ATF should develop and disseminate to all NFA Branch staff a comprehensive standard operating procedures manual that includes all NFA weapons application processes, NFRTR processes, and data entry codes and abbreviations.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  To close this recommendation, please provide the OIG with a copy of the standard operating procedures manual by September 30, 2007.

**Recommendation 3.**  ATF should develop uniform and structured training for new staff members that includes standard operating procedures and hands-on experience with the NFRTR.  ATF should ensure that all NFA Branch staff members attend the training and that the staff trainers are themselves properly trained.  ATF should provide training for the Section Chiefs on supervisory techniques.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  As mentioned in the report, ATF began offering training opportunities to NFA Branch staff members during our review, which was a positive development.  To close this recommendation, please provide the OIG with a copy of the NFA Branch training plan by September 30, 2007.

**Recommendation 4.**  ATF should establish regular and recurring methods of communication to NFA Branch staff.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  The NFA Branch began holding monthly staff meetings with Section Chiefs and Examiners during our review, which was a positive development.  To close this recommendation, please provide the OIG with copies of subsequent meeting minutes or agendas and the plan for establishing other regular forms of communication by September 30, 2007.

**Recommendation 5.**  ATF should resolve discrepancies between the NFRTR and inventories of federal firearms licensees in a timely manner.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  To close this recommendation, please provide the OIG with the status of the backlog of discrepancies between the NFRTR and the federal firearms licensees' inventories as well as ATF's plan for resolving the backlog in a timely manner by September 30, 2007.

**Recommendation 6.**  ATF should develop and implement an action plan to fix technical programming flaws and errors in the NFRTR.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  To close this recommendation, please provide the OIG with the action plan and the status of actions for fixing technical programming flaws and errors in the NFRTR by September 30, 2007.

**Recommendation 7.**  ATF should develop and implement an action plan for eliminating the backlog of imaging and indexing forms for the imaging database.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  To close this recommendation, please provide the OIG with the action plan and the status of actions for eliminating the backlog of imaging and indexing forms for the imaging database by September 30, 2007.

**Recommendation 8.**  ATF should develop and implement an action plan for completing the e-Forms project.

**Status.**  Resolved – open.

**Summary of the ATF Response.**  ATF concurred with this recommendation.

**OIG Analysis.**  To close this recommendation, please provide the OIG with the action plan and the status of actions for completing the e-Forms project by September 30, 2007.