IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| MOREHOUSE ENTERPRISES, LLC | ) | |
| d/b/a BRIDGE CITY ORDNANCE, GUN | ) | |
| OWNERS OF AMERICA, INC., | ) | |
| and GUN OWNERS FOUNDATION, | ) | |
| | ) | Case No. 3:23-cv-00129-PDW-ARS |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES; UNITED | ) | |
| STATES DEPARTMENT OF JUSTICE; | ) | |
| STEVEN M. DETTELBACH in his official | ) | |
| capacity as THE DIRECTOR OF ATF, and HANS | ) | |
| HUMMEL, in his official capacity as | ) | |
| THE DIRECTOR OF INDUSTRY OPERATIONS | ) | |
| FOR THE SAINT PAUL FIELD DIVISION OF | ) | |
| THE ATF, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
PRELIMINARY AND/OR PERMANENT INJUNCTION**

## INTRODUCTION

The market for firearms, ammunition, and related items is constitutionally protected. Under the guise of overseeing that highly regulated marketplace, federal bureaucrats may not lawfully or constitutionally implement the President's political agenda to drive thousands of licensed gun dealers out of business, reducing the options to acquire firearms, and thereby bottlenecking and atrophying Americans' constitutionally guaranteed access to arms.

Pursuant to Fed. R. Civ. P. 65(a), Plaintiffs submit this memorandum of law in support of their motion for a preliminary and/or permanent injunction. Plaintiffs ask this Court to enjoin Defendants from further implementing or enforcing a Department of Justice ("DOJ") "zero tolerance" policy that was first promulgated in 2021 and, since then, has been wielded as a political weapon by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to revoke the Federal Firearms Licenses ("FFL") of numerous gun dealers across the nation (or intimidate them into "voluntary" surrender). Unless enjoined, this "zero tolerance" policy will continue to have widespread and deleterious effects on the firearms community, including causing significant and irreparable harm to Plaintiff Morehouse Enterprises, LLC d/b/a Bridge City Ordnance ("BCO") and its customers, along with countless of the members and supporters of the organizational Plaintiffs (both FFLs and the gun owners who do business with them).

### A.    ATF's New "Zero-Tolerance" Policy

On June 23, 2021, the "Biden-Harris Administration" announced a purported "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety."[1] Part of that "strategy" was "establishing zero tolerance for rogue gun dealers that 'willfully' violate the law" and "put public safety at risk," listing five "zero tolerance" violations that now result in

---

[1] *See* https://tinyurl.com/54rbhu5m.

automatic revocation, "[a]bsent extraordinary circumstances...." Compl. ¶45. An ATF memorandum[2] soon followed, instructing ATF personnel to begin revoking licenses based on the Administration's new "zero tolerance" agenda, and promising to update ATF Order 5370.1D, the "Federal Firearms Administrative Policy and Procedures," to incorporate that new standard. *Id.* ¶46. Then, on January 28, 2022, ATF promulgated a heavily revised ATF Order 5370.1E[3] (Compl. Ex. 3), replacing its prior 2019 version 5370.1D (Compl. Ex. 4).[4]

The Administrative Action Policy ("AAP") is the internal ATF document that purports to "provide[] fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearm licensees (FFLs)." In other words, the AAP is an "if this, then that" set of guidelines for use by ATF personnel to impose adverse action on gun dealers for recordkeeping and other errors.[5] Historically, and with certain exceptions,[6] the ATF AAP lays out three possible scenarios (other than taking no action) for various types of violations found during an inspection of an FFL: (i) a Warning Letter, (ii) a Warning Conference, and (iii) Revocation pursuant to 18 U.S.C. § 923(e).

The 2022 AAP made a series of significant changes compared to prior versions that have existed for years. Importantly, the ATF's AAP changes in 2021 and 2022 did not result from statutory changes enacted by Congress, but rather they were implemented solely to implement the President's political agenda.

---

[2] https://tinyurl.com/2jx48zk6.
[3] https://tinyurl.com/4env6sf9.
[4] https://tinyurl.com/zb7asnj8.
[5] Although ATF issued a new 2023 AAP earlier this year, that recent version does not appear to effect any meaningful changes, as compared to the 2022 AAP, that substantively affect Plaintiffs' claims. *See* Compl. ¶¶82-87. Plaintiffs thus use the term "AAP" or "2022 AAP" interchangeably to refer to the current version of that document.
[6] In certain situations not relevant here, ATF can issue civil fines or temporarily suspend a license. *See* Compl. Ex. 3 at 8.

First, whereas the 2019 AAP stated that ATF "**may** revoke" an FFL based on "appropriate circumstances," the 2022 AAP removes that discretion and mandates that ATF "**will** revoke" absent "extraordinary circumstances."  Compl. Ex. 3 at 6 and Ex. 4 at 6 (emphasis added).  Second, the 2022 AAP specifically deletes language from the 2019 AAP which previously had stated that "not every repeat violation is per se a willful violation.  A single, or even a few inadvertent errors in failing to complete forms may not amount to 'willful' failures, even when the FFL knew of the legal requirement to complete the forms."  Compl. Ex. 4 at 7.3.1.  Third, the 2022 AAP now states that, with respect to certain categories of violations, "[o]ne instance of a violation … does not constitute extraordinary circumstances and will not be an acceptable reason for an alternate recommendation" other than revocation.  Compl. Ex. 3 at 9, 11.  Fourth, parroting the Administration's June 2021 announcement, the 2022 AAP states that, pursuant to the "zero tolerance" policy, "*revocation is the assumed action*, unless extraordinary circumstances exist...."  Compl. Ex. 3 at 7.a.4 (emphasis added).  Fifth, the 2022 AAP makes numerous specific changes, generally ratcheting up the severity of penalties for various offenses, as compared to the 2019 AAP.[7]

Sixth and importantly, the 2022 AAP removes virtually all discretion from ATF field personnel.  *See* Compl. ¶¶59-73.  Previously, ATF personnel exercised significant discretion when weighing the facts and circumstances of each case, and crafting an appropriate remedial action to ensure an FFL's compliance with its recordkeeping requirements.  However, under the 2022 AAP, even where ATF field personnel believe revocation is inappropriate, they are left with *no discretion*

---

[7] For example, under the 2019 AAP, "failure to conduct a [National Instant Background Check ("NICS")] check or obtain an alternate permit" merited a Warning Conference (Compl. Ex. 4 at 5), but under the 2022 AAP, the same offense results in an automatic revocation (Compl. Ex. 3 at 7).

to take alternative action, and *must initiate* revocation proceedings.[8]  Indeed, ATF inspectors readily admit that they now have *no role at all to play* in the determination that an FFL has "willfully" violated the law, but instead merely perform an administrative, data entry function, simply cataloging violations and entering them into ATF's computer system, the "Spartan"[9] database, which determines the punishment.  *See* Compl. ¶¶65-71.  In other words, willfulness is no longer *found* by an individual based on facts, circumstances, and the exercise of human judgment.  Rather, it is *presumed*[10] by computer software, based on nothing more than the category of recordkeeping violations that are discovered and fed into the computer system.  To put it simply, a computer program now controls Americans' constitutionally guaranteed access to arms.

---

[8] In order to deviate from revocation, ATF inspectors first must create a detailed report substantiating their recommendation of alternate action, then have it approved by the "Director of Industry Operations" within their local ATF Field Division.  Then, if approved, it is "submitted to the [Monitored Case Program] for [Deputy Assistant Director for Industry Operations] approval" at ATF headquarters in Washington, D.C.  *See* Compl. Ex. 3 at 7.h; *see also* ATF July 14, 2021 Letter at 2.  Very few of these requests for alternate action have been granted by ATF headquarters.

[9] "Spartan is a system for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), that serves as the case management system and database for creating, tracking, and collecting investigative information and inspections in support of ATF's regulatory, strategic, law enforcement mission, program initiatives, and tactical field activities."  *See* https://www.justice.gov/d9/2023-02/atf_spartan_pia_-_final.pdf.

[10] In stark contrast to the AAP's presumption that BCO acted willfully here, a federal district court in Idaho found that, "on the record before this Court, *it is unclear* whether [the FFL's] actions and/or omissions raise to the level of indifference to the regulations [*i.e.*, willfulness]" – even though that court was faced with (i) *far more serious* violations than BCO's, (ii) *far more numerous* violations than BCO's, and (iii) *repeated* violations that continued to occur after repeated ATF warnings.  *See Red's Trading Post, Inc. v. Van Loan*, 2007 U.S. Dist. LEXIS 31786, at *11 (D. Idaho Apr. 30, 2007); *see also* 07-cv-90, ECF #68 (ATF pretrial memorandum summarizing "*hundreds*" of violations, including sales to *illegal aliens* and persons *under indictment*, which had continued to occur despite *three* prior inspections and warnings).  After the court granted Red's a preliminary injunction, and after the court denied ATF's motion to dismiss (*Red's Trading Post, Inc. v. Van Loan*, 2008 U.S. Dist. LEXIS 5421 (D. Idaho Jan. 24, 2008)), ATF apparently had a change of heart, entering a Stipulation of Dismissal with Prejudice (07-cv-90, ECF #98) allowing Red's to keep its license, which Red's still holds to this day (https://redstradingpost.com/store/about-porto-4).

B.      ATF Compliance Inspection of Plaintiff BCO

Plaintiff BCO is a retail gun store located in Valley City, North Dakota, that offers a wide variety of products and services including firearms, accessories, ammunition, along with providing firearm repair, gunsmithing, and customization services.  *See* Compl. Ex. 12.  BCO is the only such gun store in the vicinity.  *See* Compl. Ex. 2, ¶¶13-18.  BCO holds two FFLs, a Type 01 dealer's license acquired in June of 2019 and a Type 07 manufacturer's license acquired in 2022.  Compl. ¶147.  Although federal law permits ATF to conduct an annual warrantless administrative compliance inspection (18 U.S.C. § 923(g)(1)(B)) as to each license, ATF never inspected or audited either of BCO's FFLs prior to the inspection below.

In July of 2022, BCO brought suit in this Court against ATF in *Morehouse, et al. v. ATF, et al.*, 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022) ("*Morehouse I*"), currently on appeal in the Eighth Circuit (Docket 22-2812), challenging an ATF rulemaking promulgated in April of 2022, entitled "Definition of 'Frame or Receiver' and Identification of Firearms."  ATF then took an interest in BCO.

In February of 2023, ATF Industry Operations Investigator ("IOI") Jacob Temp arrived at BCO to conduct ATF's first-ever compliance inspection of BCO.  *See* Compl. Ex. 12 at ¶8.  IOI Temp stated to BCO that, although ATF had initially planned to defer any inspection of BCO pending litigation in this Court, apparently priorities had changed.  *Id.* at ¶10.  IOI Temp joked to BCO that ATF personnel within his office had discussed how the inspection of BCO would seem retaliatory for BCO having sued ATF in federal court.  *Id.* at ¶9.  A three-day inspection of BCO's records followed, including a complete audit of BCO's Acquisition and Disposition ("A&D") records.  *Id.* at ¶12.  At the culmination of his inspection, IOI Temp seemed generally pleased with BCO's overall level of compliance, noting that every single firearm (out of thousands) that had

come across BCO's counter was properly accounted for.  *Id.* at ¶11-15.  Several days later, in early March of 2023, IOI Temp issued an official "Report of Violations" based on his inspection of BCO.  Compl. Ex. 13.  Although BCO had conducted thousands of firearm transactions over several years (each of which requires the buyer and seller to properly complete and record more than one hundred pieces of information), IOI Temp identified only **five violations** that allegedly had occurred.  Compl. Ex. 13 at 2.[11]  For two of these violations, IOI Temp specifically noted that they clearly were based on human error, and that there was "no evidence" that the mistakes were intentional.  Compl. ¶211.

However, on May 23, 2023, IOI Temp's boss, ATF Saint Paul Director of Industry Operations Hans Hummel, issued a Notice of his intent to revoke *both* of BCO's licenses, even though only one license had been inspected.  Compl. Ex. 1.  Whereas IOI Temp's March 6, 2023 Report of Violations had identified five errors, DIO Hummel based his Notice of Revocation on only three.  These three alleged violations involved only two transactions.  First, DIO Hummel alleged that, on August 25, 2022, BCO "willfully sold or delivered a firearm other than a rifle or a shotgun to a person not licensed by the GCA and who Licensee knows or has reasonable cause to believe does not reside in the state in which Licensee's place of business or activity is located...." *Id.* at 2.  Second, and with respect to that same August 25, 2022 transaction, DIO Hummel alleged that BCO "willfully transferred a firearm to an unlicensed person without first contacting the National Instant Criminal Background Check System ("NICS") and obtaining a unique identification number before allowing the transfer...." *Id.*  Third, DIO Hummel alleged that BCO

---

[11] Of these five violations, three were transcription errors.  *Id.* at 5.  The other two violations found by IOI Temp involved a single transaction on August 25, 2022, where BCO was alleged to have sold a handgun to an out-of-state resident, and had used the buyer's valid Georgia "Weapons Carry License" in lieu of an FBI background check.  *Id.*

"willfully made a false entry in, failed to make appropriate entry in, or failed to properly maintain any record of importation, production shipment, receipt sale or other disposition as required by the GCA...." *Id.* at 2-3.[12]  In stark contrast to IOI Temp's explanation that there was "no evidence the NTN was falsified," but rather was merely "recorded on the form incorrectly," DIO Hummel accused BCO of having acted "willfully" on all counts.

## ARGUMENT

## I.     PRELIMINARY INJUNCTION STANDARD.

Consideration of a motion for a preliminary injunction requires a court to "weigh[] four factors," including "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (*en banc*).  The "irreparable harm analysis turns on the nature of the injury likely to result from the challenged action, not the number of people who would be injured … an irreparable injury [is] an injury 'of such a nature that money damages alone do not provide adequate relief.'"  *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region v. Parson*, 1 F.4th 552, 562 (8th Cir. 2021).  As is pertinent here, "money damages" are not available under the APA.  *See Dep't of the Army v. Blue Fox*, 525 U.S. 255 (1999).  In this Circuit, the "likelihood of success on the merits is [the] most significant" factor. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995).  Finally, "[t]he balance of harms and public interest factors merge when the government is the opposing party."

---

[12] This violation allegedly includes three errors (only one of which was listed in the Report of Violations): (i) a mistranscribed NTN number, (ii) a failure to document a denied NICS transaction at 2:54 pm, and (iii) another failure to document a denied NICS transaction at 3:22 pm.  All three violations were on the same day, for the same person, and on the same Form 4473.  Compl. ¶¶190-197.

*Walen v. Burgum*, 2022 U.S. Dist. LEXIS 94978, at *6 (D.N.D. May 26, 2022).  Each factor weighs heavily in Plaintiffs' favor here.

## II.        PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR APA CLAIMS.

The AAP challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.[13]  Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A).  A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.  Certainly, agency action is unlawful when it facially conflicts not only with the text of, but also with the intent behind, the statute it purportedly is designed to implement.[14]

### A. ATF's Zero Tolerance Policy Violates the APA (and the Gun Control Act).

Under 18 U.S.C. § 923(e), ATF has no authority to revoke a license unless it can prove that the licensee has (i) "violated any provision of" the GCA or its regulations and (ii) that such violation was done "willfully."  Congress did not define the term "willfully" in Section 923(e).  In

---

[13] *See Cargill v. BATFE*, 2023 U.S. Dist. LEXIS 123249, at *13-14 (W.D. Tex. July 18, 2023) (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)) ("ATF-O-5370.1E marks the consummation of the agency's decision-making process, and … it 'is not … of a merely tentative or interlocutory nature.'").

[14] This action is *not* brought pursuant to Section 923(f), which grants courts the authority to review ATF revocations of licenses.  *See* Compl. ¶¶213-222, 250-334.  Even so, it is worth nothing that, unlike judicial review of other types of administrative actions, Congress required *de novo* reviews in § 923(f)(3):  "the ATF's decision is entitled to no presumption of correctness."  *Wilborn v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 2014 WL 5502495, at *3 (N.D. Ala. Oct. 30, 2014); *Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 348 F.Supp.2d 1299, 1306 (S.D. Ala. 2004), *aff'd*, 415 F.3d 1274 (11th Cir. 2005) (*per curiam*) (citing *Stein's, Inc. v. Blumenthal*, 649 F.2d 463, 467 (7th Cir. 1980)); *3 Bridges, Inc. v. United States*, 216 F.Supp.2d 655, 657 (E.D. Ky. 2002) (ATF's "administrative decision is not clothed in this Court with any presumption of correctness.").

that void, however, courts have held that a licensee willfully violates the GCA when it intentionally, knowingly, or recklessly violates known legal requirements.[15]   This "willful" language in Section 923(e) was no accident, but rather a deliberate addition to the statute by Congress as part of the 1986 Firearms Owners' Protection Act ("FOPA"), which was intended by Congress to protect gun dealers from the very sort of abuses to which ATF has recently returned. *See Bryan v. Harris*, 524 U.S. 184, 195 (1998) ("[FOPA] was enacted to protect law-abiding citizens who might inadvertently violate the law."); *see also* Compl. ¶¶ 90-99 (detailing the history of ATF abuses that led to FOPA's enactment).   Indeed, licensee errors that are accidental, inadvertent, unintentional, or perhaps even negligent simply do not rise to the level of willfulness under the GCA, and thus cannot support a license revocation.  Compl. ¶99 (a prior ATF director agreeing that "inadvertent violations" should not be used to target licensees); *see also RSM, Inc. v. Herbert*, 466 F.3d 316, 320-22 (4th Cir. 2006) ("To be sure, a single, or even a few, inadvertent errors in failing to complete forms may not amount to 'willful' failures, even when the legal requirement to complete the forms was known."); *Willingham Sports, Inc. v. BATF*, 415 F.3d 1274, 1277 (11th Cir. 2005); *Prino v. Simon*, 606 F.2d 449, 451 (4th Cir. 1979).

Unfortunately, the ATF is not an agency that seeks faithfully to enforce the laws that Congress actually enacted.  Rather, ATF has a lengthy history of using expansive regulatory enactments, non-public classification letters, and even implicit threats and intimation to expand the scope of its authority and to target, harm, and even destroy the very industry that it regulates.

---

[15] *See Sturdy v. Bentsen*, 1997 U.S. App. LEXIS 27671, at *4 (8th Cir. Oct. 6, 1997) (unpublished) ("To show a willful violation, the BATF had to prove [the FFL] knew of the legal record-keeping requirements and 'purposefully disregarded' or was 'indifferent to' them."); *see also Armalite, Inc. v. Lambert*, 544 F.3d 644, 649 (6th Cir. 2008) (citation omitted) ("Just as [the U.S. Supreme Court in] *Safeco* construed the phrase 'willfully fails to comply' to reach only deliberate, knowing or reckless statutory violations, so we interpret the phrase 'willfully violated' to do the same."); *Weaver v. Harris*, 486 F. App'x 503, 505 (5th Cir. 2012).

Thus, when faced with Congress' decision to add a "willfulness" requirement to the statute to stop the ATF's abuses, ATF was forced to get creative about how to demonstrate that an FFL had acted "willfully" when making unintentional and inadvertent technical, recordkeeping, or paperwork violations.

For example, the current AAP doubles the number of ways in which ATF presumes "willfulness," now to include "publications and information [previously] provided to the FFL which explain the FFL's legal responsibilities." Compl. ¶¶101-104. Indeed, when an FFL is first licensed, ATF provides a copy (or now simply a website link) of a 237-page manual of rules and regulations for dealers, requiring the FFL to sign an acknowledgement form that it received the manual. *Id.* ¶106. That form has only one purpose – to later be used as evidence that the FFL knew of its obligations when it inevitably commits an inadvertent error (as all humans do, when engaging in thousands of sales and manually entering tens of thousands of unique data points). But this is like revoking the driver's license of a person who fails to use his turn signal, on the theory that he was given a driver's manual by the DMV when he was 15 years old, and thus he must have acted in "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation" years later when forgetting to follow one of those rules.

Likewise, the AAP paradoxically takes the position that an FFL that _either_ has "a history of prior violations" _or_ "a history of past compliance" and "substantial experience as an FFL" must have acted "willfully." Compl. Ex. 3 at 7.e.4.d-f. In other words, ATF has created the sort of "heads I win, tails you lose" scenario that "has a necrotizing effect on the rule of law." *Saunders v. Thies*, 2022 U.S. App. LEXIS 25527, at *4 (8th Cir. Sept. 12, 2022) (Grasz, J., and Smith, C.J., dissenting from denial of rehearing). But ATF is not permitted to regulate the firearms industry –

which facilitates the exercise of a constitutionally enumerated right – such that "the only winning move is not to play" (War Games, 1983).

DIO Hummel (who almost certainly will be the hearing officer in BCO's administrative hearing) confirms this no-win situation for FFLs, having opined in a recent 2022 revocation letter that "[a]rguing that errors were the result of human mistakes or harmless misunderstandings … ___is irrelevant___ to the standard of willfulness."  Compl. Ex. 10 at 6 (emphasis added).  According to DIO Hummel, then, "willfulness" and "strict liability" are synonyms.  In other words, *res ipsa loquitur.*

Indeed, as noted above, no longer do ATF personnel use judgment to decide, based on unique facts and circumstances, whether an FFL's violations are willful.  *See Cargill*, 2023 U.S. Dist. LEXIS 123249, at *14 ("the [AAP] language regarding enforcement changed from 'may' to 'shall,' negating any discretion as to certain willful violations.").  Rather, ATF computer software – the "Spartan" system – decides "willfulness" based on its algorithmic programming.  But this is ___precisely___ what Congress intended to prevent by enactment of FOPA and Section 923(g)'s willfulness mandate.  Representative Harold Volkmer (FOPA's sponsor) stated that his bill was necessary to avoid "the strict liability provided by the act," where "even the most trivial and unintentional misstep would do."  *See* 132 Cong. Rec. 6841.  "Human mistakes" and "harmless misunderstandings" simply do not, as a matter of law, amount to a "purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation."  In other words, the AAP and DIO Hummel's statements directly conflict with both the statutory text and the explicit Congressional purpose of FOPA.[16]

---

[16]  Luckily for ATF, the agency has not itself been required to live up to these same unrealistic expectations.  Yet by his own words, DIO Hummel would have no sympathy for the sorts of errors ATF's own personnel commit on a daily basis, many of which are orders of magnitude more

Although this case does not involve a Section 923(f) *de novo* review of any eventual (if not inevitable) revocation of BCO's licenses, it nevertheless is important to discuss the patent absurdity of the "violations" that ATF has leveled against BCO. First, ATF accuses BCO of transferring a handgun to an out-of-state resident who was in fact *eligible* to possess firearms under state and federal law. *See* Compl. ¶¶170, 182. Yet BCO's alleged transfer implicated none of the concerns Congress had in mind when enacting the GCA; the transferee was not a prohibited person, posed no danger to public safety, and the firearm would be easily traceable in the event of future investigation. *See id.* ¶175 n.30. And yet, what was once grounds for a mere "Warning Conference" is suddenly now a revocable offense – but apparently only if you are BCO, as even the revised 2022 AAP does not call for such extreme action. *Id.* ¶175.

BCO's second alleged sin was recording the Georgia-issued firearm carry license of that same transferee, rather than conducting a NICS background check. *See* Compl. ¶176. Yet under federal law, FFLs *may accept* certain permits in lieu of requiring a NICS check, provided those permits qualify to show that the permit holder is not a prohibited person. *See id.* ¶177. Ironically, both North Dakota and Georgia permits qualify under that NICS exemption, leading to an illogical

---

egregious than any mistake an FFL could ever make. *See* Compl. ¶134. For example, unbeknownst to ATF until the firearms were already long gone, a former ATF contractor managed to steal *thousands* of firearms from ATF custody, for illicit resale. *Id.* ¶120. Making matters worse, ATF personnel had falsified reports stating that many of the very same firearms had been destroyed. *Id.* ¶121. Similarly, ATF's spectacular failure in Operation Fast and Furious permitted deliberately trafficked firearms to be used in the murder of a U.S. Border Patrol agent, with ATF lacking the ability to trace those firearms. *Id.* ¶136. But ATF's records are rife with errors even when there is nothing to cover up. Data contained in the National Firearms Registration and Transfer Record is notoriously unreliable; the OIG has reported that FFL data is *almost always* more accurate than ATF's. *Id.* ¶125. Finally, ATF personnel admit to making the same clerical errors as FFLs – *including when documenting FFL revocations* – errors that would be "willful" violations under the new policy if the tables were turned. *Id.* ¶138. The fact that ATF cannot live up to its own unrealistic recordkeeping standards shows those standards for what they are – arbitrary and capricious.

predicament where BCO may NICS-exempt transfer to a North Dakota permit holder, a Georgia FFL may NICS-exempt transfer to a Georgia permit holder, but crossing wires is utterly verboten. *Id.* ¶179.  But again, literally none of the public safety considerations Congress had in mind come into play here.  To make matters worse, the 2022 AAP silently and capriciously increased the penalty for such a mistake from a Warning Conference – which does not require a finding of willfulness – to an instant revocation. *Id.* ¶¶183-84.

Finally, ATF drummed up *three separate* violations from just *one* firearm transaction, in which the government's own failure to maintain accurate NICS records resulted in repeated, erroneous NICS denials for a BCO customer. *See* Compl. ¶¶189-97.  Only after the transferee supplied an entirely optional Social Security number did the FBI finally determine its error, and the transferee finally received a NICS approval. *Id.* ¶196.  ATF now dings BCO for failing to record on the transferee's Form 4473 all the different times the *government's own records* were erroneous (nowhere does the Form 4473 indicate that this is required). *Id.* ¶197.  Indeed, the ATF Industry Operations Manual[17] provides quite a different rule, stating that "[t]he IOI may also encounter situations where a NICS check was done incorrectly by the NICS call center and the FFL, who was not at fault, should not be cited for a violation." *Id.* at 39-40.  In other words, ATF's faulting BCO for the FBI's errors violates ATF's own policy.  To add insult to injury, DIO Hummel unilaterally elevated a mere typo from that same Form 4473 to a "willful" (and therefore revocable) offense, in stark contrast to IOI Temp's assessment that it was simply an honest mistake.  Compl. ¶199-202.

Importantly, none of BCO's alleged violations involved a firearm transfer to a prohibited person.  None placed a transferee in violation of state or federal law.  None hampered ATF's ability

---

[17] https://www.scribd.com/document/575603256/ATF-2019-IOM.

to trace any firearm.  None *in any way* endangered public safety.  In other words, the allegations against BCO are, at best, for technical, paperwork, and recordkeeping violations.

Interestingly enough, Defendant Dettelbach was recently a guest on MSNBC's "Morning Joe" show,[18] where he was asked about this very case.  At first, the Director stated that "it's pending litigation, so I'm limited in what I can say," but then proceeded to opine about the priorities of ATF in regulating FFLs.

First, Director Dettelbach stated that, while the "vast majority of firearms dealers … are actually following the rules … there are always some that either can't or are unintentionally not following the rules.  Those we try to help and get into compliance."  *Id.*  On the contrary, ATF has never sought to "help" BCO achieve and maintain compliance with federal requirements.

Second, Defendant Dettelbach claimed that there is "a smaller group, who are willfully violating the law," but *only* when an FFL is "willfully violating the law *and* endangering public safety," ATF's response "*can* include revocation.  It can include other things as well."  *Id.*  On the contrary, ATF has sought to revoke BCO's (and many others') licenses without any consideration of possible alternative penalties.  Further, ATF has sought to revoke BCO's licenses with absolutely no indication that the alleged violations have any impact on "public safety."

In other words, the revocation of BCO's licenses *checks literally none of the boxes* the Director identified as ATF's mission and priorities.  Thus, the Director's claim that ATF seeks to "help" and "get into compliance" licensees who "unintentionally" make recordkeeping mistakes – like BCO's accidentally mistranscribing numbers on a form – is nothing more than talk show pablum, belied by the facts of this case.  Instead of actually "help[ing]" BCO comply with its recordkeeping obligations, ATF seeks to eliminate BCO and destroy livelihoods in the process.

---

[18] *See* https://www.youtube.com/watch?v=4-bniPK5yK0.

Allowing ATF to proceed on that basis, resuming revocations based on nothing more than occasional and unintentional errors or mistakes, even if repeated over time, would read the word "willfully" out of the statute and would allow ATF to return to the very practices Congress deliberately acted in 1986 to stop – "strict liability[, where] even the most trivial and unintentional misstep would do."[19]  Expectedly, ATF will claim that the AAP changes nothing – that ATF has always been free revoke licenses for willful violations, and that this is all the AAP does.  But the court in *Cargill* rejected those arguments as "without merit," finding instead that "the array of consequences of 'willful' conduct has narrowed with the implementation" of the AAP.  *Cargill*, 2023 U.S. Dist. LEXIS 123249, at *15.  Significantly, the AAP's severe revision in ATF's interpretation of "willfulness" reflects a material policy change impacting constitutionally protected rights, implementing an agenda that was not enacted by Congress, but rather was the result of a political edict from the Executive branch.

Contrary to the treatment provided to BCO and others under the AAP, the totality of the circumstances and all mitigating factors must be taken into consideration in determining whether a licensee's violation of the GCA is "willful."  Willfulness cannot be presumed by computer algorithm.  Yet instead of considering BCO's long history of compliance with the statutory scheme and regulatory requirements across thousands of transactions, ATF seeks to use past compliance against BCO.  Likewise, ATF has (i) failed to consider the mitigating factors discussed in the AAP, which weigh heavily in favor of Plaintiff BCO, (ii) failed to consider that BCO's alleged violations have no nexus to public safety, prohibited persons, or impaired tracing, (iii) failed to consider BCO's ability to correct its unintentional mistakes and to avoid making similar errors in the future,

---

[19]  *See* https://armsandthelaw.com/gunlaw/FOPA/house_floor_debates.html (by Representative Volkmer).

(iv) failed to have an actual human being consider the merits of BCO's case, instead assigning the initial determination of "willfulness" to a computer program, and (v) failed to consider that IOI Temp found that BCO had *not* acted willfully.

Tellingly, ATF's intended punishment of BCO does not even meet the stated purpose of the Biden-Harris "zero tolerance" policy, at least as presented to the public, to target only FFLs who "put public safety at risk."  Rather, the revised AAP is a weapon that ATF is wielding against the firearm industry (a constitutionally protected community), creating a situation where most (if not all) well-intentioned dealers at some point will commit an inadvertent slipup, inevitably subjecting their license to revocation, cabined only by the good graces of ATF field personnel (if any) who choose to exercise their discretion not to report certain violations.

## B.  ATF's "Zero Tolerance" Policy Violates the Second Amendment

Ratified in 1791, the Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  These rights exist independent of, and existed prior to, their recognition in the United States Constitution, and are protected by the rigid mandate "shall not be infringed."

In order to "keep and bear" firearms, Americans who are part of "the people" necessarily have the right to acquire, purchase, own, and possess firearms.  This includes the members and supporters of the organizational Plaintiffs who, in turn, include customers of BCO.  BCO has a corresponding right to manufacture, acquire, and sell firearms to those persons.[20]  These rights

---

[20] As a vendor, BCO is able to bring claims on behalf of its customers.  *Craig v. Boren*, 429 U.S. 190, 195 (1976).  Even so, at least one member represented by GOA wishes to purchase firearms from BCO, but will be deprived of doing so by the AAP and BCO's revocation thereunder.  One of GOA's members in Valley City advised that BCO was the only "real" gun store in Valley City and that the other gun stores in the vicinity are small, usually maintain only part-time hours, or have a primary business other than firearms.  This person will be required to travel long distances,

are two sides of the same coin.  Indeed, the right to acquire arms to "keep and bear" becomes meaningless if ATF is able to control Americans' access to arms, first by heavily regulating the Second Amendment supply chain, and second by deliberately and intentionally driving gun stores out of business (whether through revocation or "voluntary" surrender), thereby reducing the total supply of available arms.

Indeed, under the GCA, there can be no commercial manufacture of firearms without ATF licensure.  And for those firearms that are manufactured commercially (*i.e.*, probably 99.9% of them[21]), they cannot be distributed to the American public other than through federally licensed dealers.  (As noted above, BCO has both a manufacturing and dealer license.)  Thus, ATF almost entirely controls Americans' access to firearms through the GCA's licensure scheme.  The AAP is deliberately and intentionally designed to bottleneck that constitutionally guaranteed pipeline.

Numerous courts have found that the text of the Second Amendment covers the manufacture, purchase, and/or sale of firearms and ammunition.  *See Lynchburg Range & Training, LLC v. Northam*, 2020 Va. Cir. LEXIS 57, at *6 (Lynchburg Cir. Ct. Apr. 27, 2020) ("the right to keep and bear arms 'inclu[des] the otherwise lawful possession, carrying, transportation, sale, or transfer of firearms....'"); *Tony Kole & Ghost Indus., LLC v. Village of*

_____

at increased difficulty and cost, in order to acquire constitutionally protected arms, if BCO's doors are closed by ATF.  *See* Compl. Ex. 2 ¶17.

[21] The other small percentage of newly manufactured firearms are what ATF calls "privately made firearms," which are lawfully manufactured by non-licensed individuals for their own personal use.  Of course, ATF has also attempted to destroy that supply chain as well, seeking to virtually eliminate the market for homemade firearms, and requiring licensed dealers to serialize and register any "privately made firearms" that come into their possession.  *See Morehouse I.*  That ATF rule was vacated by a district court in Texas, and a Fifth Circuit motions panel declined to stay the vacatur as to the provisions that were challenged by the parties.  The U.S. Supreme Court has since administratively stayed the vacatur, pending briefing, until August 4, 2023.  *Garland v. VanDerStok*, 2023 U.S. LEXIS 2861 (July 28, 2023).

*Norridge*, 2017 U.S. Dist. LEXIS 178248, at *29 (N.D. Ill. Oct. 27, 2017) ("The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas Jefferson … 'Our citizens have always been free to make, vend, and export arms.'"). The rights protected under the Second Amendment include the right to engage in the commerce and/or business of being a gun dealer, gun manufacturer and/or operating a gun range (businesses that invariably also possess FFLs as part of their operations). *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *see also Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them … and to purchase and provide ammunition suitable for such arms....").[22]

---

[22] *But see United States v. Kazmende*, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (plain text of Second Amendment does not cover commercial sales); *United States v. Flores*, 2023 WL 361868, at *2-6 (S.D. Tex. Jan. 23, 2023) (the Second Amendment does not protect the right to commercially deal firearms). But these cases, each decided in the criminal context, are simply wrong, for numerous reasons that Plaintiffs will detail in their reply brief, after the government expectedly relies on this line of unpersuasive authority. Simply, if there uniformly is no right to sell a firearm, and/or no right to buy one, then there can be no right to keep and bear arms (since there can be no arms to keep and bear in the first place). In other words, the government cannot demur that a person still has a right to post a Tweet, but Twitter has no right to provide the forum in which to do so. *See United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5-6 (W.D. Tex. Jan. 9, 2023) ("what the Government is suggesting is absurd in practice. If receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right. And if buying (receiving) a gun is not covered by the Second Amendment's plain text, neither would selling one. So according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!").

Reducing the number of federally licensed firearm dealers, and thereby reducing the availability of firearms and thus imposing additional hurdles to lawful gun ownership, infringes Second Amendment rights including the individual right of self-defense. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2133 (2022). As the Supreme Court explained in *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important governmental interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Under *Bruen*, that inquiry is generally limited to the historical precedent at the time of the Second Amendment's adoption. *Id.* at 2136 (citation omitted) ("'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.").

As of 1791, there was no broad and enduring historical tradition of the government regulation or even licensing of firearms manufacturers, wholesalers, or dealers. As of 1791, there was no historical tradition of government regulation of the commercial sales of firearms at all. Certainly, there is no historical tradition of government bureaucrats revoking licenses, limiting the ability of persons to offer "arms" for sale, and thereby restricting Americans' access to arms based on nothing more than unintentional, technical, or paperwork violations like those at issue here. Likewise, as of 1868 (even though that is not a relevant time period here),[23] there was no

---

[23] Although *Bruen* references 1868 in *dicta*, it does so only because that is the date of ratification of the Fourteenth Amendment. This case, however, involves the federal government, and thus 1791

historical tradition of government regulation or even licensing of firearms manufacturers, wholesalers, or dealers.

Yet absent clear evidence that firearms licensing schemes for manufacturers and dealers are part of a broad and enduring historical tradition of firearms regulation as of 1791, ATF is not authorized to prohibit, deny, or revoke the ability of anyone to engage in commerce, manufacturing, retail sales, or other commercial activities that are protected by the Second Amendment. At a minimum, the historical tradition certainly does not support the government ending the livelihood of a firearm dealer for simple bookkeeping errors or unintentional technical violations in the course of business. For that simple reason – that there is no broad and enduring historical tradition supporting the challenged agency action – the AAP is constitutionally invalid.

Quite to the contrary of the AAP's attempt to shut down gun stores and reduce the overall availability of firearms, during the Founding Era, manufacturers and dealers in firearms (usually called "gunsmiths") were ubiquitous. In fact, gunsmiths were practically as widespread in the decades following the Founding as FFLs are today, evincing a widespread early (and now modern) American tradition of domestic production and sale with "vast numbers of gunsmiths in

---

is unequivocally the correct date of focus. But even so, with respect to whether post-Founding historical sources have any role at all to play in the analysis, the Supreme Court technically left the question open, finding it unnecessary to its decision in *Bruen*. 142 S.Ct. at 2138. Nevertheless, as the Court has repeatedly made clear, even prior to *Bruen*, Reconstruction-era historical sources are to be used (at most) only as *confirmation* of a historical tradition that was *already* in existence during the Founding. For example, in *Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246 (2020), the Court rejected the fact that "more than 30 States" had enacted a certain type of legislation in the mid-to-late 19th century, explaining that even such a pattern "cannot by itself establish an early American tradition." *Id.* at 2258-59; *see also Bruen*, 142 S.Ct. at 2137 (using 1800s sources only "as mere confirmation of what the Court thought already had been established"); *id.* at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'"); *Ramos v. Louisiana*, 140 S.Ct. 1390, 1396 (2020).

this country's first three centuries."  Frank M. Sellers, <u>American Gunsmiths</u> 4 (2d ed. 2008).  In

the year 1850, the first official industrial census of its kind recorded over 3,800 active gunsmiths

across the country, relative to a free population of just shy of 20 million,[24] yielding a per capita

rate of approximately 5,260.  *See id.* at 6.  In comparison, ATF reported 66,853 dealer and

manufacturer FFLs as of 2020,[25] relative to a population of about 334 million,[26] yielding a

remarkably similar proportion of 5,007 people per the modern equivalent of "gunsmith."[27]

In other words, widespread closures of today's FFLs would offend our Founders'

expectations of citizens' ready access to arms.  Rather, this nation's Founders especially

recognized the necessity of the domestic manufacture and supply of arms, as they had just fought

a Revolution where military operations had been hamstrung by the constant shortage of

---

[24] *See* https://tinyurl.com/44vz97kf (reporting 19,553,068 "Whites" and 434,495 freed slaves who
ostensibly could access firearms in 1850).

[25] *See* https://tinyurl.com/22fv63u3 at 21 (reporting 52,799 dealers and 14,054 manufacturers in
2020).

[26] *See* https://tinyurl.com/2rvpcycx (reporting a total resident population of 334,735,155 in 2020).

[27] It is likely that, during the Founding Era, the per capita rate of "gunsmiths" was even greater
than in 1850 as, prior to the Industrial Revolution, the production of firearms was a laborious and
time-consuming process.  *See, e.g.*, Jeremiah Knupp, *Making the American Rifle at Colonial
Williamsburg*, <u>Am. Rifleman</u> (Dec. 17, 2018),  https://tinyurl.com/ycyaxx5w (describing the
painstaking process of forging rifle barrels by hand and the individual fitment of other
components).  One source contains a list of many thousands of such gunsmiths during that era, in
a time that the population numbered fewer than 4 million.  *See generally* Sellers, back
cover, *infra* (containing "[o]ver 20,000 listings of individual manufacturers, trademarks,
gunsmiths, and other trade names" from early American history and onwards); *see
also* https://tinyurl.com/4zwxnxy4 (reporting a population of 3.9 million in 1790).

gunpowder,[28] and firearms as well.[29]  In fact, the early battles of the Revolutionary War had been precipitated not by "taxation without representation," but by the Crown's <u>efforts to control and restrict the colonists' access to arms</u>.[30]  In that sense, then, perhaps there is a historical tradition for ATF's actions here, but definitively ***not*** the sort of which our Founders would have approved. Rather, should ATF have attempted to shut down famed colonial gunsmith William Henry for recordkeeping violations, it is likely that the colonists would have reacted quite differently.

### III.    Plaintiffs Will Suffer Irreparable Harm if the AAP Is Not Enjoined.

As stated throughout the Complaint, if enforcement and implementation of the AAP is not enjoined, Plaintiffs (including not only BCO but also the members and supporters of the organizational Plaintiffs) will suffer irreparable harm in a variety of specified ways.  *See* Compl. ¶238 (unable to manufacture or sell firearms and forced to go out of business); ¶239 (other member and supporter FFLs will be driven out of business by "zero tolerance" policy); ¶243 (customers will be forced to travel further to exercise Second Amendment rights when FFL licenses are revoked); ¶244 (as licenses of more gun stores are revoked, diminished number of firearms stores will lead to diminished supply of firearms); ¶32 (loss of employment, livelihoods lost, criminal

---

[28]  *See*  https://revolutionarywarjournal.com/gunpowder/  ("The supply of gunpowder haunted George Washington and the Continental Congress throughout the entire Revolutionary War.  The vast quantity of powder came from sources overseas, around 90% from French Colonies in the West Indies.  The other 10% was produced domestically.  With dwindling powder supplies and only three powder mills in operation in all of the colonies, Washington's army around Cambridge was i[n] [sic] serious danger at the start of the war.").

[29]  During the Founding Era, civilians as well as domestic and foreign armies relied extensively, if not almost entirely, on commercial manufacturing and distribution of firearms, ammunition, and most other items.  Washington's forces certainly did not set about with each soldier making from scratch his own musket, any more than they made their own field artillery, tents, saddles, canteens or battle flags.  *See* https://tinyurl.com/mryjswws.

[30]  *See* Brief Amicus Curiae of Gun Owners of America, Inc., et al. in *District of Columbia v. Heller*, https://tinyurl.com/mvdwnpsz (at 22-27).

liability).  Each of these is a serious and irreparable harm, involving not only unrecoverable[31] and permanent business, reputational, and monetary losses, but also the loss of constitutional rights.

This Circuit recognizes that the "loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury...."  *Smith v. Starr*, 2022 U.S. Dist. LEXIS 85760, at *18 (D. Minn. Mar. 7, 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). And, because GOA and GOF's members and supporters have a constitutional right to purchase and otherwise acquire firearms, and their FFL members have a right to engage in constitutionally protected commerce, these parties' ability to engage in commerce in arms is infringed by the AAP.

The AAP callously turns unavoidable, non-willful, human errors into revocation of the licenses on which tens of millions of Americans rely – not only for a livelihood, but also for their exercise of the constitutional right to acquire protected "arms."  As Defendant Dettelbach stated on Morning Joe, the "vast majority of firearms dealers … are following the rules."  However, rather than educating the industry in order to help well-intentioned dealers like BCO achieve and maintain compliance, the AAP seeks to punish and destroy FFLs on the theory that every minor technical and recordkeeping violation is willful.

In a recent, similar case in this Circuit, Judge Magnuson found that an FFL "established that it will suffer irreparable harm without" an injunction because, among other things, if the FFL lost its license, it would be put out of business and "will cause its 40 employees to lose their jobs." *Streicher's, Inc. v. Hummel*, 2023 U.S. Dist. LEXIS 68898, at *15 (D. Minn. Apr. 20, 2023); *see*

---

[31] BCO, like other FFLs represented by GOA and GOF, has no adequate remedy at law, as "money damages" are not available under the APA.  *See Dep't of the Army v. Blue Fox*, 525 U.S. 255 (1999); *see also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020). Likewise, Plaintiffs cannot obtain damages for their constitutional claims because "Congress has not waived sovereign immunity for constitutional claims against the United States."  *Manos v. Fed. Bureau of Prisons*, 2020 U.S. Dist. LEXIS 21370, at *8 (D. Minn. Jan. 14, 2020); *see also Laswell v. Brown*, 683 F.2d 261, 268 (8th Cir. 1982).

Compl. Ex. 12, Declaration of Tanner Morehouse ¶19 (BCO will shut down and not be able to employ staff); ¶20 (will have to lay off employees, lose goodwill with customers); ¶21 (if shut down, BCO will not likely recover even if ATF is eventually reversed). *Cf.* Compl. Ex. 12, *with Streicher's*, at 2023 U.S. Dist. LEXIS 68898, at *15 ("Harm to a company's good will, or the loss of customers and business, may, if corroborated, constitute irreparable harm sufficient to support the 'extraordinary remedy' of injunctive relief.").

## IV.     The Balance of Equites and the Public Interest Factors Favor Plaintiffs.

The question here is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir. 1981). When the "government is the opposing party," the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Moreover, "the public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F.Supp.2d 7, 21 (D.D.C. 2009). Indeed, "[t]here is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58-59 (D.C. Cir. 1997). Finally, "[i]t is in the public interest for … an agency to implement properly the statute it administers." *Mylan Pharms., Inc. v. Shalala*, 81 F.Supp.2d 30, 45 (D.D.C. 2000).

As Judge Magnuson found in a similar case, "[t]he balance of harms clearly favors [Plaintiffs], as there is no harm to ATF in maintaining the status quo." *Streicher's*, 2023 U.S. Dist. LEXIS 68898, at *17. Indeed, as noted above, none of the violations alleged against BCO involve transfer of a firearm to a prohibited person, impede ATF's ability to trace any firearm, or otherwise cause any negative effect on public safety. Rather, ATF's only interest here is <u>*enforcing rules for*</u>

*the sake of rules*, a slender reed when balanced against the certainty of continued substantial irreparable harm to the firearms industry and Second Amendment community if the 2022 AAP is not enjoined.  Indeed, revocations of FFLs will result in less access to firearms for members and supporters of the organizational Plaintiffs, who (even if at the margin) will find it more expensive and difficult to acquire firearms, thereby infringing the Second Amendment by limiting access to protected "arms."  For example, FFLs including BCO are under threat of being revoked and shut down for human errors and mistakes that did not, prior to the 2022 AAP, merit revocation, but rather merited either warning letters, warning conferences, or no action at all.  ATF cannot seriously contend that these very same violations – which would have merited only a warning conference for BCO – suddenly are so severe that an injunction should not issue to prevent ATF from revoking BCO's licenses and implementing the AAP.  Temporarily maintaining the status quo, and deferring the AAP's substantial and radical changes until the Court can properly consider the merits of Plaintiffs' claims, will cause no risk to the public (or to the agency).

## III.     Conclusion.

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin the current ATF Administrative Action Policy, and ATF's pending revocation of BCO's Federal Firearms Licenses, until such time as a decision on the merits can be reached.

Respectfully submitted,

August 4, 2023

*/s/ Robert J. Olson*
Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
rob@wjopc.com

Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be mailed by United States Postal Service first-class mail, postage pre-paid, and by electronic mail, to the following non-ECF participants who have confirmed that they represent the above-named Defendants in this action:

> Michael Drezner
> Taylor Pitz
> Trial Attorney
> Federal Programs Branch, Civil Division
> U.S. Department of Justice
> Work: 202.514.4505
> Michael.L.Drezner@usdoj.gov
> Taylor.n.pitz@usdoj.gov

Dated: August 4, 2023.

> */s/ Stephen D. Stamboulieh*
> Stephen D. Stamboulieh