**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

MOREHOUSE ENTERPRISES, LLC )
d/b/a BRIDGE CITY ORDNANCE, GUN )
OWNERS OF AMERICA, INC., )
and GUN OWNERS FOUNDATION, )
 )
     Plaintiffs, )
 )
v. )  Civil Action No. 3:23-cv-00129-PDW-ARS
 )
BUREAU OF ALCOHOL, TOBACCO, )
FIREARMS AND EXPLOSIVES; UNITED )
STATES DEPARTMENT OF JUSTICE; )
STEVEN M. DETTELBACH, in his official )
Capacity as THE DIRECTOR OF ATF, and )
HANS HUMMEL, in his official capacity )
as THE DIRECTOR OF INDUSTRY )
OPERATIONS FOR THE SAINT PAUL )
FIELD DIVISION OF THE ATF, )
 )
     Defendants. )
 )

**AMICUS CURIAE BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE,
EVERYTOWN, MARCH FOR OUR LIVES, AND GIFFORDS
IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Margaux Poueymirou
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel: (415) 365-7243
Fax: (415) 986-2827
mpoueymirou@crowell.com

Maria T. Vanikiotis
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Tel: (212) 803-4063
Fax: (212) 223-4134
mvanikiotis@crowell.com

Scott L. Winkelman
Tiana Russell
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 688-2500
Fax: (202) 628-5116
swinkelman@crowell.com
trussell@crowell.com

*Counsel for Amici*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ...........................................................................1

INTEREST OF THE AMICI CURIAE ............................................................2

INTRODUCTION .............................................................................................3

ARGUMENT .....................................................................................................6

I.      ATF's Compliance Inspection Program Is Integral To Public Safety ...........6

      A.     The Importance of Background Checks to Public Safety. ...................8

      B.     The Importance of Record-Keeping to Public Safety.........................9

II.     ATF's Enhanced Regulatory Enforcement Policy Aligns With The GCA And Applies Only To The Most Serious And Willful Betrayals Of Law .....10

III.    The Data Demonstrate The Zero Tolerance Policy's Modest Yet Important Nature..............................................................................................................12

IV.    Special Due Process Protections Favoring Firearm Licensees Apply Throughout The Revocation Process ...........................................................14

CONCLUSION................................................................................................16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. U.S.*,
    573 U.S. 169 (2014) ............................................................................ *passim*

*Barrett v. U.S.*,
    423 U.S. 212 (1976) .................................................................................. 8

*Dick's Sport Ctr., Inc. v. Alexander*,
    No. 2:04-CV-74482, 2006 WL 799178 (E.D. Mich. Mar. 29, 2006) ...................................... 10

*Dist. of Columbia v. Heller*,
    554 U.S. 570 (2008) .................................................................................. 8

*Fin & Feather Sport Shop, Inc. v. U.S. Treasury Dep't.*,
    481 F. Supp. 800 (D. Neb. 1979) ....................................................................... 10

*Huddleston v. United States*,
    415 U.S. 814 (1974) ........................................................................ 7, 8, 10, 12

*Lewin v. Blumenthal*,
    590 F.2d 268 (8th Cir. 1979) .......................................................................... 15

*Morehouse Enterprises, LLC v. ATF*,
    Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022) ............................................................ 2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ............................................................................. 6, 8

*On Target Sporting Goods, Inc. v. Att'y Gen. of U.S.*,
    472 F.3d 572 (8th Cir. 2007) .......................................................................... 15

*U.S. v. Harris*,
    720 F.3d 499 (4th Cir. 2013) ........................................................................... 9

*U.S. v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ............................................................................. 9

*U.S. v. Mobley*,
    956 F.2d 450 (3d Cir. 1992) ............................................................................ 9

*Willingham Sports, Inc. v. ATF*,
    348 F. Supp. 2d 1299 (S.D. Ala. 2004) ................................................................... 9

DCACTIVE-73627770.3

**Statutes**

18 U.S.C. § 922 ................................................................................................4, 7

18 U.S.C. § 922(a)(1)(A) ......................................................................................7

18 U.S.C. § 922(a)(6) ...........................................................................................8

18 U.S.C. § 922(b) ................................................................................................7

18 U.S.C. § 922(d) ................................................................................................7

18 U.S.C. § 922(g)(1)(A) ......................................................................................9

18 U.S.C. § 922(m) ...............................................................................................8

18 U.S.C. § 922(t) .................................................................................................8

18 U.S.C. § 922(t)(1) .......................................................................................8, 11

18 U.S.C. § 923(a) ................................................................................................7

18 U.S.C. § 923(e) ..............................................................................................14

18 U.S.C. § 923(f)(2) ..........................................................................................14

18 U.S.C. § 923(f)(3) .....................................................................................14, 15

18 U.S.C. § 923(g) ...........................................................................................4, 15

18 U.S.C. § 923(g)(1)(B) ......................................................................................9

18 U.S.C. § 923(g)(3) ...........................................................................................7

18 U.S.C. § 924 ....................................................................................................7

18 U.S.C. § 924(a)(3) ...........................................................................................8

**Regulations**

17 C.F.R. 478.73-74 ...........................................................................................14

27 C.F.R. § 478.73 ..........................................................................................7, 14

27 C.F.R. § 478.74 ..........................................................................................6, 14

27 C.F.R. § 478.78 ..............................................................................................15

27 C.F.R. § 478.99 ................................................................................................7

DCACTIVE-73627770.3

27 C.F.R. §§ 478.101 ........................................................................................7

27 C.F.R. § 478.102(a) ......................................................................................8

27 C.F.R. §§ 478.121–134 .................................................................................9

27 C.F.R. § 478.121(b) ......................................................................................9

27 C.F.R. § 478.124 ...........................................................................................4

28 C.F.R. § 0.130(a) ..........................................................................................6

**U.S. Constitution**

U.S. Const., amend. 2 ....................................................................................3, 8

U.S. Const., amend. 14 ......................................................................................8

U.S. Const. art. III, § 3 ......................................................................................6

U.S. Const. pmbl. ..............................................................................................3

**Rules**

Fed. R. App. P. 29(a) .........................................................................................2

**Other Authorities**

Annette Choi, *Children and teens are more likely to die by guns than anything else*, CNN (Mar. 29, 2023).............................................................................4

ATF: BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Jan. 2023) .....................12, 13

ATF BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (July 21, 2022) .......................13

ATF Order 5370.1E (Jan. 28, 2022) ................................................................10

*Attorney General Merrick B. Garland Delivers Remarks on the Biden Administration's Gun Crime Prevention Strategy*, U.S. DEP'T. OF JUST. (June 23, 2021) ....................................................................................................10

*Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Risk-Based Inspection Selection Processes and Administrative Actions Issued to Federal Firearms Licensees,* U.S. DEP'T OF JUST. OFFICE OF INSPECTOR GEN. (Apr. 2023) ......................................................................................................12

Connor Brooks, *Background Checks for Firearm Transfers*, 2016-2017, U.S. BUREAU OF JUST. STATISTICS (Feb. 2021) ................................................4

DCACTIVE-73627770.3

*Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, THE WHITE HOUSE (June 23, 2021) .................................................................................5, 10

THE FEDERALIST No. 15 (Hamilton) .....................................................................6

Gun Store Transparency Project, BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, https://gunstoretransparency.org/?zip%5Bdistance%5D%5Bfrom%5D=10 (last visited Sept, 12, 2023).........................................................................12

*Gun Violence Archive 2023*, https://www.gunviolencearchive.org/ (last visited Aug. 15, 2023) .................................................................................4

H. Rep. No. 90-1577 (1968) ...............................................................................6

*Issues: Children and Teens*, EVERYTOWN RESEARCH & POLICY (https://everytownresearch.org/issue/child-and-teens (last updated Feb. 28, 2023) .................................................................................4

*Licensee Blue Valley Sales, Inc. d/b/a Blue Valley Firearms,* ATF (Feb. 3, 2022).......................13

*Licensee Gary William Gibbs d/b/a The Gun Shop,* ATF (May 20, 2022) ...................................14

*Licensee Harrison's Inc. d/b/a LaVergne Pawn and Jewelry*, ATF (July 21, 2022) ...................14

*Part III: Crime Guns Recovered and Traced Within the United States and Its Territories*, ATF: BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (Jan. 11, 2023).................................................................................9

*Revocation of Firearms Licenses*, ATF: BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/firearms/revocation-firearms-licenses (last visited Sept. 8, 2023) ...............................................................15

S. Rep. No. 90-1501 (1968)........................................................................6, 12

Siladitya Ray, *More Than 300 U.S. Mass Shootings Recorded Halfway Into 2023- This Year Is On Pace To Be Deadliest Ever*, FORBES (June 19, 2023).......................3

v

## DISCLOSURE STATEMENT

*Amici curiae* submit that Brady Center to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Action Fund ("Everytown"), March For Our Lives Foundation ("MFOL"), and Giffords Law Center to Prevent Gun Violence ("Giffords") are nonprofit corporations with no parent corporations. No publicly held company owns 10% or more of the stock of Brady, Everytown, MFOL, or Giffords.

1

## INTEREST OF THE AMICI CURIAE

*Amici curiae* Brady, Everytown, Giffords, and MFOL submit this brief in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction.

Brady Center to Prevent Gun Violence is the nation's oldest nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to take action to prevent gun violence. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady has filed *amicus* briefs in many cases involving the regulation of firearms, including in this Court.[1]

Everytown for Gun Safety Action Fund is the largest gun violence prevention organization in the country. Everytown was founded in 2014 as the combined efforts of Mayors Against Illegal Guns, a national, bipartisan, coalition of mayors combatting illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the Sandy Hook massacre. Everytown regularly advocates on behalf of common-sense gun regulations that save lives, and has submitted numerous *amicus* briefs in cases involving challenges to federal firearms laws and regulations. *See, e.g.*, Amicus Br., *Morehouse Enterprises, LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022) (amicus brief in support of ATF rulemaking).

Giffords Law Center to Prevent Gun Violence is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded thirty

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *amici* certify that (1) all parties consented to the filing of this brief, (2) no party's counsel authored the brief in whole or in part, (3) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (4) no person other than *amici* contributed money that was intended to fund preparing or submitting this brief.

2

years ago following a massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.  Through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.  Together with its partner organization, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

March For Our Lives Foundation ("MFOL") is a youth-led non-profit organization seeking to promote civic engagement, education, and direct action in support of sensible gun regulations that protect communities and save lives.  MFOL arose in the wake of the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida.  It immediately organized the largest single day of protest against gun violence in the nation's history.  Five years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy to prevent gun violence.

## INTRODUCTION

For over 50 years, federal law has "regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands." *Abramski v. U.S.*, 573 U.S. 169, 172 (2014). These laws serve the vital purpose of "insur[ing] domestic Tranquility" and "[p]romot[ing] the general welfare," as enshrined in the U.S. Constitution. U.S. CONST. pmbl.  While firearms have lawful uses, they also cause enormous individual and societal harm.  This year alone, there have been over 300 mass shootings in the United States.[2]  And firearms have tragically become *the*

---

[2] Siladitya Ray, *More Than 300 U.S. Mass Shootings Recorded Halfway Into 2023—This Year Is*

DCACTIVE-73627770.3

leading cause of death for children and teens nationally.[3]  Without the Gun Control Act of 1968 ("GCA")—the enforcement of which the Attorney General has vested in the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF")—these facts would be grimmer still.[4]

The GCA, as Plaintiffs in this case observe, "is Congress's primary means of regulating the interstate commerce in firearms." Complaint ¶ 19.  To protect the public welfare, the GCA "establishes a detailed scheme to enable the [licensed firearms] dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.  It does so by requiring federal firearms licensees ("FFLs") "to check and make use of certain identifying information received from the buyer" and, before completing any sale, to submit the prospective buyer's identifying information to the National Instant Background Check System "to determine whether the potential purchaser is for any reason disqualified from owning a firearm." *Id.* at 172– 73 (citing 18 U.S.C.A. § 922 (West)).  In tandem, FFLs are to memorialize these critical requirements and their firearm transactions in certain records and forms. 18 U.S.C. § 923(g); 27 C.F.R. § 478.124.

These conduct and record-keeping requirements are no mere bureaucratic red tape. Congress looks to FFLs as the first line of defense when it comes to gun safety, and these regulatory measures secure that line by helping to ensure that guns get in proper hands only.  They

---

*On Pace To Be Deadliest Ever*, FORBES (June 19, 2023, 8:06 AM), https://www.forbes.com/sites/siladityaray/2023/06/19/more-than-300-us-mass-shootings-recorded-halfway-into-2023-this-year-is-on-pace-to-be-deadliest-ever/?sh=5c2bf13674ee.

[3] *Issues: Children and Teens*, EVERYTOWN RESEARCH & POLICY (https://everytownresearch.org/issue/child-and-teens (last updated Feb. 28, 2023);*Gun Violence Archive 2023*, https://www.gunviolencearchive.org/ (last visited Aug. 15, 2023); Annette Choi, *Children and teens are more likely to die by guns than anything else*, CNN (Mar. 29, 2023, 8:41 AM), https://www.cnn.com/2023/03/29/health/us-children-gun-deaths-dg/index.html.

[4] Connor Brooks, *Background Checks for Firearm Transfers*, 2016-2017, U.S. BUREAU OF JUST. STATISTICS (Feb. 2021);  https://bjs.ojp.gov/content/pub/pdf/bcft1617 (Between 1994 to 2017, over 3.5 applications for gun sales were legally blocked due to failed background checks).

are also crucial to helping solve crimes.  Law enforcement will often trace guns used in crimes back to their first retail sale to develop investigative leads; dealers who fail to accurately record their firearm transactions eliminate this essential tool.  The GCA's conduct and record-keeping requirements are thus linchpins in "keep[ing] guns out of the hands of criminals and others who should not have them, and . . . assist[ing] law enforcement authorities in investigating serious crimes." *Abramski,* 573 U.S. at 180.

In June 2021, President Biden announced a "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety"[5] which, among other things, sought to correct historically less than stringent enforcement of five of the most egregious violations of FFLs by implementing a zero tolerance policy when FFLs willfully violate these provisions absent extraordinary mitigating circumstances.  In January 2022, the DOJ issued an order ("Order") memorializing this strategy so as to provide "fair and consistent guidelines for administrative remedies for violations." Doc 1-3 to Compl. at 1.  The Order singles out five types of misconduct for "assumed" license revocation when done willfully: 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records such as a firearms transaction form, 4) failing to respond to an ATF tracing request, and 5) refusing to permit ATF to conduct an inspection in violation of the law.  *Id.*

Even where revocation is assumed, ATF officials still exercise discretion, and the Order leaves unmistakable that various circumstances can obviate this sanction.  Affected parties may

---

[5] *Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, THE WHITE HOUSE (June 23, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/.

DCACTIVE-73627770.3

also contest revocation pursuant to 27 C.F.R. § 478.74.  Indeed, FFLs enjoy unusually robust due process protections regarding their licensing and any attempts to revoke their licenses.

The President of the United States "shall take Care that the Laws be faithfully executed…." U.S. CONST. art. III, § 3.  Laws without commensurate sanctions are not only toothless but undermine the public good. "Government implies the power of making laws. It is essential to the idea of a law, that it be attended with a sanction; or, in other words, a penalty or punishment for disobedience." THE FEDERALIST No. 15 (Hamilton). The President "took care" when issuing the Order.  ATF "takes care" when it enforces the Order.

No party in this case condones the five categories of mischief at issue.  No one asserts that this misbehavior promotes public safety, or is beneficial to the nation's welfare.  This, then, is a case of the duly authorized branch of our federal government incrementally adjusting its enforcement practice to redress undeniably egregious misbehavior that is dangerous to our nation and its "law-abiding citizens." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 n.46 (2022).

## ARGUMENT

## I.    ATF's Compliance Inspection Program Is Integral To Public Safety

The Attorney General has delegated authority to enforce the GCA to ATF.  *See* 28 C.F.R. § 0.130(a).  The GCA has two principal goals: to promote public safety by keeping guns out of the hands of persons prohibited from owning them, and to assist law enforcement in fighting crime. S. Rep. No. 90-1501, at 22 (1968) ("Senate Report") ("The principal purposes of this act are to make it possible to keep firearms out of the hands of those not legally entitled to possess them . . . and to assist law enforcement . . . in combating . . . crime."); H. Rep. No. 90-1577, at 4412 (1968) (explaining the "need" to combat "the growing use of firearms in violent crime").

6

The GCA furthers these goals by regulating who may buy or sell firearms and how firearm transactions are documented and tracked.

The GCA designates FFLs—those who manufacture, sell, or import firearms—the "principal agent of [law] enforcement" in "restricting . . . access to firearms." *Huddleston v. United States*, 415 U.S. 814, 824 (1974).  Under the GCA, FFLs—and only FFLs—may "engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A); *see id.* § 923(a). In exchange, FFLs serve as the GCA's frontline mechanism for implementation:

- FFLs may not "sell or deliver" firearms to individuals who, *inter alia*, are underage, reside out of state (with limited exceptions), or have a criminal history. 18 U.S.C. §§ 922(b), 922(d); *see* 27 C.F.R. § 478.99.

- FFLs must keep inventory and transaction records and report suspicious purchasing patterns. 27 C.F.R. §§ 478.101 (record-keeping), 478.121–134 (same); 18 U.S.C. § 923(g)(3) (FFLs must report when an individual buys multiple guns within a short timeframe).

- FFLs must make their records accessible to law enforcement officials, who may access them to monitor, investigate, and combat firearm-related crimes. *See id.*

FFLs who fail to meet these or other duties may lose their license, per 27 C.F.R. § 478.73, and become subject to civil and criminal liability, per 18 U.S.C. §§ 922, 924.  These sanctions are commensurate with the seriousness of the infractions, as failure to properly conduct background checks, falsifying records, or selling across state lines allows dangerous and prohibited persons to obtain firearms, makes it difficult if not impossible to trace firearms recovered in crimes, and undermines public safety.

The centrality of the GCA's focus on the point of sale cannot be overestimated.  In essence, the GCA and its implementing regulations anoint FFLs as gatekeepers—"principal agents" in the Supreme Court's parlance—who facilitate the law-abiding use of firearms, and the Act reinforces

DCACTIVE-73627770.3

the importance of their front-line role by specifying sanctions for noncompliance.  *Huddleston*, 415 U.S. at 824.

A.    **The Importance of Background Checks to Public Safety.**

Background checks are foundational to keeping firearms out of the hands of dangerous individuals who should not have them.  To that end, the GCA requires that individuals who purchase a firearm from an FFL submit to a background check. 18 U.S.C. § 922(t)(1); 27 C.F.R. § 478.102(a).  If this provision is not taken seriously, firearms could be acquired by prohibited persons: criminals, domestic abusers, minors, and persons determined to suffer from severe mental illness, to name a few.

Allowing prohibited persons to have unfettered access to dangerous weapons is the opposite of what Congress envisioned.  In prescribing who may purchase a firearm under the GCA, "Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. U.S.*, 423 U.S. 212, 218 (1976).  This adheres to a "longstanding" historical tradition of "prohibitions on the possession of firearms," such as limiting possession by "felons and the mentally ill." *Dist. of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see Bruen*, 142 S. Ct. at 2122, 2162 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding* citizen . . . ." (emphasis added)).  The GCA honors this tradition by "establish[ing] a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.

So important is the identity of the purchaser that it is a crime for an FFL to sell a firearm without running a background check on the transferee, 18 U.S.C. § 922(t); a crime for a buyer to "make any false or fictitious oral or written statement" concerning their identity, *id*. § 922(a)(6); and a crime for FFLs to make false statements in records regarding licensing or a buyer's identity, *id*. §§ 922(m), 924(a)(3).

DCACTIVE-73627770.3

### B.      The Importance of Record-Keeping to Public Safety.

To further aid law enforcement, the GCA also requires FFLs to engage in record-keeping central to tracking firearm transactions and inventory. *See* 18 U.S.C. § 922(g)(1)(A); 27 C.F.R. §§ 478.121–134. These provisions go far in helping law enforcement fight crime. *See, e.g.*, *U.S. v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010); *U.S. v. Harris*, 720 F.3d 499, 502 (4th Cir. 2013) (same). Law enforcement personnel are empowered to "inspect or examine the inventory and records of [FFLs] . . . without such . . . reasonable cause or warrant," "in the course of a reasonable inquiry during the course of a criminal investigation." 18 U.S.C. § 923(g)(1)(B); *see* 27 C.F.R. § 478.121(b).

FFL records enable law enforcement to trace a firearm and identify the last bona fide purchaser of that firearm, as well as its path through the distribution chain. The ATF Form 4473, for instance, includes a firearm purchaser's address.  Notably, over 60 percent of crime guns are purchased by individuals living within a ten-mile radius of the FFL where the firearm was acquired.[6]  Without accurate records, which include important personal information about purchasers, law enforcement mechanisms are crippled. *U.S. v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (it is "no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes."); *Marzzarella*, 614 F.3d at 98; *cf. Willingham Sports, Inc. v. ATF*, 348 F. Supp. 2d 1299, 1309 n.14 (S.D. Ala. 2004) ([T]he "gravity of the policy objectives of the Gun Control Act, from both a law enforcement standpoint and a safety standpoint, strongly militates in favor of allowing the ATF to insist on total compliance as a condition of retaining" one's gun license).

---

[6]*Part III: Crime Guns Recovered and Traced Within the United States and Its Territories*, ATF: Bureau of Alcohol, Tobacco, Firearms & Explosives (Jan. 11, 2023), https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.

9

Consequently, courts routinely recognize that "'[i]mproper recordkeeping is a serious violation.'" *Fin & Feather Sport Shop, Inc. v. U.S. Treasury Dep't.*, 481 F. Supp. 800, 806 (D. Neb. 1979) (quoting *Huddleston.*, 415 U.S. at 824). By failing to properly maintain required records, FFLs can "seriously undermine[] the effectiveness and purpose of the Act and ultimately endanger[] society." *Fin & Feather*, 482 F. Supp at 806; *Dick's Sport Ctr., Inc. v. Alexander*, No. 2:04-CV-74482, 2006 WL 799178, at *5 (E.D. Mich. Mar. 29, 2006) (noting licensee's "failure to comply with exacting book keeping regulations may hinder the ATF's ability to perform its mandated function").

## II.   ATF's Enhanced Regulatory Enforcement Policy Aligns With The GCA And Applies Only To The Most Serious And Willful Betrayals Of Law

The President's zero tolerance policy at issue in this case takes aim at select willful violations of law by FFLs that directly imperil public safety.[7] ATF's consequent guidance assists ATF personnel when conducting compliance inspections. *See* ATF Order 5370.1E ("Order") (Compl. Ex. 3).

As noted, the Order singles out a narrow subset of licensing violations for which revocation should be the "assumed" recourse, albeit only upon a finding of willfulness. They are: "1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3)

---

[7] *See Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, THE WHITE HOUSE (June 23, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/; *Attorney General Merrick B. Garland Delivers Remarks on the Biden Administration's Gun Crime Prevention Strategy*, U.S. DEP'T. OF JUST. (June 23, 2021), https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-biden-administration-s-gun-crime?utm_medium=email&utm_source=govdelivery. *See also* Federal Firearms Administrative Action Policy Procedures, ATF Order 5370.1E (Jan. 28, 2022), https://www.gunowners.org/wp-content/uploads/2022-ATF-O.5370.1E-Federal-Firearms-Administrative-Action-Policy-Procedures-1.pdf.

DCACTIVE-73627770.3

falsifying records, such as a firearms transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to permit ATF to conduct an inspection in violation of the law." Exhibit A to DOJ Mem. Opp PI [ECF# 34]. These infractions take center stage precisely because they so evidently undermine public safety and ATF's ability to trace firearms recovered in crime.

To call this suite of violations "good-faith, clerical, and ultimately harmless errors in FFL recordkeeping" (Compl. ¶ 40) is to not read them.  Four of the five are not even squarely about record-keeping: they are about conduct.  Furnishing a gun to a "prohibited person" (18 U.S.C. § 922(t)(1)); deciding not to complete a background check; disregarding a tracing request; denying an ATF inspector's entry—these are actions: not paperwork mistakes, and not clerical errors. When the Order finally turns to record-keeping, it hones in on a profoundly serious form of record-related abuse— falsifying records required by a federal agency—that no law-abiding citizen would condone.

Plaintiffs contend that the Order has radically departed from previous 2019 guidance, which had vested considerable discretion in ATF officers when determining whether FFLs were observing licensing rules.  Mem. ISO Mot. Prelim. Inj. [ECF# 15-1] at 2.  Not so.  The Order continues to recognize that "every inspection is unique and requires individual analysis" and, as before, provides a rubric for determining whether violations of the GCA are "willful."  Exhibit 3 to Compl. at 2 (outlining five questions "the field should consider . . . when recommending administrative action").  Contrary to Plaintiff's further contention, the Order provides that ATF field officers, and not a "computer system" (Compl. ¶ 73), do the assessing of whether an FFL is abiding by the GCA's background check and record-keeping requirements.

Trivializing these violations ignores their potency in maintaining public safety and fighting crime.  The willful doing of any of these five misdeeds undermines the essential purposes and

11

public safety directive of the GCA to "curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'" *Huddleston,* 415 U.S. at 824 (quoting S. Rep. No. 90-1501 (1968)).

## III.   The Data Demonstrate The Zero Tolerance Policy's Modest Yet Important Nature

Claims that the Order dramatically transforms ATF revocation practice are belied by the facts. Since the establishment of the zero tolerance policy, revocations of licenses remain extraordinarily rare. From October 1, 2010 through February 1, 2022, ATF reported 111,077 inspections.[8] While 23,124 of those inspections revealed revocable violations, only 589 were subject to revocation proceedings.[9] Of those, all were afforded due process rights to challenge the revocation. And recall that these proceedings were not for innocent mistakes or accidents but for alleged willful defiance of law.

To provide some context: In FY 2022, ATF issued a revocation order to less than seven-hundredths of one percent of all FFLs.[10] In FY 2022, ATF conducted 6,979 compliance inspections, but only recommended revocations in 90 of these inspections. *See Fact Sheet – Facts and Figures for Fiscal Year 2022*, ATF: Bureau of Alcohol, Tobacco, Firearms & Explosives (Jan. 2023), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-

---

[8] *Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Risk-Based Inspection Selection Processes and Administrative Actions Issued to Federal Firearms Licensees,* U.S. Dep't of Just. Office of Inspector Gen. (Apr. 2023), https://oig.justice.gov/sites/default/files/reports/23-062_0.pdf.

[9] *Id.*

[10] Gun Store Transparency Project, Brady Campaign to Prevent Gun Violence, https://gunstoretransparency.org/?zip%5Bdistance%5D%5Bfrom%5D=10 (last visited Sept, 12, 2023).

DCACTIVE-73627770.3

figures-fiscal-year-2022.   Indeed, ATF revoked 39% fewer licenses in 2022 than it did almost twenty years ago in 2004 (90 in 2022 vs. 125 in 2004).   *See id*.

At the same time, the number of alternative actions has risen: warning conferences went up by 80%, warning letters by 1121%, and reports of violations by 276%. A 2023 OIG Report found that of 23,124 FFLs for which an investigator identified a revocable violation between October 1, 2010 and February 1, 2022, only 529, or 2.3%, resulted in a recommendation of revocation.  The 2023 OIG Report further found 214 FFLs with repeat violations of having sold a firearm to a prohibited person, resulting in a recommendation for revocation in only 15 of those instances.  *See* Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Risk-Based Inspection Selection Processes and Administrative Actions Issued to Federal Firearms Licensees (April 2023).

Ultimately, when revocation actually ensues the fact patterns are sobering and dire. Typical is the case of Charles Brown (d/b/a Uncle Sam's Loan Office in Bristol, Tennessee).  The ATF revoked the license of Charles Brown in July 2022 after a full hearing, only upon finding that the FFL willfully violated the law *even after* the ATF tried, and tried, to educate the FFL holder, to impress upon him the importance of compliance, and to instruct him on the need for accurate record-keeping. *Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Charles G. Brown*, ATF BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (July 21, 2022), https://www.atf.gov/docs/undefined/charlesgbrowninc62fci-8343508pdf/download.  Other revocations are to similar effect, bespeaking flagrant defiance of safety measures. *See also Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Blue Valley Sales, Inc. d/b/a Blue Valley Firearms,* ATF, (Feb. 3, 2022),

13

*https://www.atf.gov/docs/undefined/bluevalleysalesinc14fci-21646r1508pdf/download* (revoking where FFL willfully falsified firearms records); *Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Gary William Gibbs d/b/a The Gun Shop*, ATF (May 20, 2022), https://www.atf.gov/docs/undefined/garywilliamgibbs84fci-24948508pdf/download (revoking where FFL failed to perform background check before transferring firearm to an unlicensed person on twelve occasions); *Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Harrison's Inc. d/b/a LaVergne Pawn and Jewelry*, ATF (July 21, 2022), https://www.atf.gov/docs/undefined/harrisonsinc82fci-24993508pdf/download (same).

## IV.   Special Due Process Protections Favoring Firearm Licensees Apply Throughout The Revocation Process

Generally, and with certain exceptions, the Order lays out three possible scenarios (other than taking no action) for violations found during inspection of an FFL: (i) a warning letter, (ii) a warning conference, and (iii) revocation pursuant to 18 U.S.C. § 923(e).

In the exceedingly rare instance when ATF does pursue license revocation, it is hardly done trivially. A robust set of due process protections instantly attaches. *See* 17 C.F.R. 478.73–74. First comes notice: ATF sends the FFL a notice of revocation that specifies the violations forming the bases for the pursued revocation and notifies the licensee of its right to request a hearing prior to suspension or revocation. *Id.*; *see also* 18 U.S.C. § 923(f)(2). The FFL may then request a hearing with the Director of Industry Operations (DIO). At that hearing, the FFL is provided full opportunity to challenge the asserted violations by submitting facts and arguments for review and cross-examining witnesses, and the FFL can be represented by an attorney. The FFL may also bring employees and documentation to address the violations cited. *See* 18 U.S.C. §§ 923(e) and (f)(3); 27 C.F.R. §§ 478.73 and 478.74.

14

Then, of course, the government must prove not just any violation of federal firearms law but a willful violation.  Not negligence, not clerical error, not accident, not innocent mishap: a *willful* violation.  To do so, it must establish that a licensee "knew of his legal obligation and purposefully disregarded or was plainly indifferent" to it. *Lewin v. Blumenthal*, 590 F.2d 268, 269 (8th Cir. 1979) (referencing the record-keeping requirements of Section 923(g)); *see also On Target Sporting Goods, Inc. v. Att'y Gen. of U.S.*, 472 F.3d 572, 575 (8th Cir. 2007) ("For the government to prove a willful violation of the federal firearms statutes, it need [  ] establish that a licensee knew of its legal obligation and purposefully disregarded or was plainly indifferent to the record-keeping requirements." (internal quotations omitted)).

If, after all this process, the DIO ultimately determines that the cited violations were willful and revocation is justified, or if the FFL does not request a hearing, still more process ensues. ATF next sends a final notice of revocation to the licensee featuring a summary of the findings and legal conclusions that warrant revocation. *See Revocation of Firearms Licenses*, ATF: Bureau of Alcohol, Tobacco, Firearms & Explosives, https://www.atf.gov/firearms/revocation-firearms-licenses (last visited Sept. 8, 2023).  The FFL may then appeal an adverse decision by filing a petition for judicial review, which review is *de novo*.  The FFL may even introduce new evidence in support of its revocation appeal.  *See* 18 U.S.C. § 923(f)(3).  Notably, as an FFL challenges their revocation at an administrative hearing, the license remains in effect and the FFL can continue operating pending the outcome of the hearing.  27 C.F.R. § 478.78.

These stout protections, rippling throughout the revocation process, amply protect the interests of FFLs in those rare instances when revocation is even in play.

15

**CONCLUSION**

Congress's animating concern in enacting the GCA was "the practical realities . . . of firearm transactions." *Abramski*, 573 U.S. at 183. The practical realities are that practical measures—background checks, inspections, gun tracing procedures, and common-sense record-keeping—keep guns out of the wrong hands and help save lives. Willful defiance of these mechanisms should enjoy no tolerance. The President's zero tolerance policy is just, is well within the ATF's enforcement authority, and is promoting of its duty to faithfully execute the laws for the nation's well-being.

For these reasons, and those set forth in the government's submission, Plaintiffs' challenge to the policy should fail.

September 12, 2023

Respectfully submitted,

*s/Maria T. Vanikiotis*
Maria T. Vanikiotis

Margaux Poueymirou
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel: (415) 365-7243
Fax: (415) 986-2827
mpoueymirou@crowell.com

Maria T. Vanikiotis
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Tel: (212) 803-4063
Fax: (212) 223-4134
mvanikiotis@crowell.com

Scott L. Winkelman
Tiana Russell
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 688-2500
Fax: (202) 628-5116
swinkelman@crowell.com
trussell@crowell.com

*Counsel for Amici*

16

<u>CERTIFICATE OF SERVICE</u>

       I, Maria Vanikiotis, hereby certify that I have on this day, caused the foregoing document to be filed with this Court's CM/ECF system, which caused a notice of the filing and a true and correct copy of the same to be delivered to all counsel of record.

       Dated: September 15, 2023

                        */s/ Maria T. Vanikiotis*
                        Maria T. Vanikiotis