IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

MOREHOUSE ENTERPRISES, LLC )
d/b/a BRIDGE CITY ORDNANCE, GUN )
OWNERS OF AMERICA, INC., )
and GUN OWNERS FOUNDATION, )
                       )      Case No. 3:23-cv-00129-PDW-ARS
Plaintiffs, )
                       )
v. )
                       )
BUREAU OF ALCOHOL, TOBACCO, )
FIREARMS AND EXPLOSIVES; UNITED )
STATES DEPARTMENT OF JUSTICE; )
STEVEN M. DETTELBACH in his official )
capacity as THE DIRECTOR OF ATF, and HANS )
HUMMEL, in his official capacity as )
THE DIRECTOR OF INDUSTRY OPERATIONS )
FOR THE SAINT PAUL FIELD DIVISION OF )
THE ATF, )
                       )
Defendants. )
_____)

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY AND/OR PERMANENT INJUNCTION

## ARGUMENT

**I.     The AAP Is a Clear and Present Threat of Irreparable Harm to FFLs Nationwide.**

ATF obfuscates what ought to be a straightforward analysis under the irreparable harm factor.  *See* Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp."), ECF #34 at 6-7, (emphases added) (quoting operative language like "**likely** to suffer" and "**threat** of irreparable harm" but then demanding Plaintiffs demonstrate harm that is "**certain** and great"[1] and "**will** imminently occur").  On the contrary, such "harm must be '*likely* in the absence of an injunction,' 'great[,] and of such imminence that there is a clear and present need for equitable relief.'"  *Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, 486 F.Supp.3d 1300, 1310 (D. Minn. 2020) (alteration in original) (citation omitted).  Plaintiffs meet this standard.

ATF's "zero-tolerance" policy unilaterally transforms inadvertent and largely unavoidable clerical errors into revocable, "willful" violations.  That policy change is not just *likely* to cause Plaintiffs harm – it is inevitable, subject only to the frequency of compliance inspections themselves.  *See* Compl. ¶ 40 ("Good-faith, clerical, and ultimately harmless errors in FFL recordkeeping are a statistical inevitability … in 2020 [ATF] conducted 5,823 and found and reported errors in 43.7% of those inspections.").  ATF cannot hide behind the statutory limitation of (at most) annual compliance inspections to claim that Plaintiffs' irreparable harm is too conjectural to warrant equitable relief (Opp. at 8 n.2), when ATF's own policy clearly describes what *will happen* (and what *did happen* to BCO) when inspections occur.

---

[1] Defendants' authority suggesting a "certain and great" requirement is unavailing. *See Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (merely noting the plaintiff's lack of urgency in failing to enforce its contractual rights for 17 months as evidence of no irreparable harm); *see also Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) (finding irreparable harm to grant a stay against FCC rules that *contravened congressional intent*, bearing a striking resemblance to ATF's contravention of FOPA's intent here).

Next, ATF posits that its decision not to revoke Plaintiff BCO's license (*after BCO filed this suit*) dispenses with any claim of irreparable harm because Plaintiffs have not "identified" (i.e., named[2]) the scores of other FFLs also harmed by the AAP.  *See* Opp. at 7-8.  By arguing Plaintiffs must name all the FFLs they represent, ATF asks this Court to abolish the settled doctrine of representational standing and require the individualized participation that representational standing definitively does not require.[3]  *See Nat'l Fed'n of the Blind v. Cross*, 184 F.3d 973, 981 (8th Cir. 1999); *see also Marszalek v. Kelly*, 2021 U.S. Dist. LEXIS 107613, at \*12 (N.D. Ill. June 9, 2021) (declarations describing membership are sufficient and "explicitly naming the affected member [is] a step that associational standing does not require").  On the contrary, Plaintiffs have described a discrete category of FFLs currently subject to ATF's draconian AAP and on whose behalf Plaintiffs seek relief.  Compl. ¶ 11 (discussing the Caliber Club, "comprised of more than five thousand gun stores and shooting ranges" and noting that "GOA has Caliber Club members who hold federal firearms licenses in every state … all of whom are subject to and affected by Defendants' 'zero tolerance' enactments"); *id.* ¶ 274 ("the AAP is being used to target many other FFLs, some of which are members and supporters of GOA and GOF, or members of the Caliber Club.").  By representing at least 5,000 FFL members in its Caliber Club, Plaintiff GOA represents about 7% of **all** dealers and manufacturers, not to mention those who are members and supporters of GOA proper.  *See* Opp. at 4 (citing "71,969 dealer and manufacturer licensees").[4]

---

[2] This issue is discussed in more detail, *infra*, regarding Plaintiff GOA's standing.

[3] Nor can ATF deny that a broadly inflicted harm can still be concrete and particularized as to each person or entity harmed. *See Massachusetts v. EPA*, 549 U.S. 497, 517, 522 (2007) (cleaned up) ("it does not matter how many [other] persons have [also] been injured.... where a harm is concrete, though widely shared, the Court has found 'injury in fact.'").

[4] ATF then attacks the seeming axiom that 'fewer gun stores means less access to firearms' by claiming that "only 90 FFLs were revoked in 2022, out of over 130,000 FFLs," as if to represent that ATF's 2022 revocation rate was a mere fraction of a percent.  Opp. at 9.  But ATF admitted that dealers and manufacturers only numbered 71,969.  *Id.* at 4.  Apparently, ATF believes the

Next, ATF claims Plaintiffs "delay[ed] in seeking preliminary relief."  Opp. at 9.  This is categorically false.  In fact, it was ATF counsel who, by letter sent July 27, 2023 (prior to Plaintiffs' motion filed August 4), urged Plaintiffs *not to rush* this litigation, pending resolution of BCO's administrative hearing.  In other words, ATF previously took issue with Plaintiffs' urgency, only to fault Plaintiffs for allegedly having been *too leisurely* now.  Upon learning of BCO's revocation notice, Plaintiffs' counsel in fact took less than one month to draft a 66-page complaint and file it on July 11, before promptly seeking preliminary relief.

Finally, ATF questions why "Plaintiffs waited well over two years to challenge" the AAP.  Opp. at 10.  But Plaintiff BCO did not face a retaliatory inspection and revocation until just recently.  Seeing as how ATF objects to BCO's harm *even after* it was inspected and issued a revocation letter, presumably ATF would have objected even more strongly had BCO challenged the AAP *prior to* being inspected and issued  a notice of revocation.  Indeed, the AAP's new policy necessarily took some time to implement.  *See* Compl. ¶¶ 45, 47 (noting a June 23, 2021 announcement followed by a January 28, 2022 promulgation of ATF Order 5370.1E).  Moreover, ATF often imposes significant delays between inspections and revocations.  *See, e.g.*, Complaint for Declaratory and Injunctive Relief ¶ 7, *Kiloton Tactical, LLC v. BATFE*, No. 3:23-cv-23985-MCR-ZCB (N.D. Fla. Aug. 29, 2023) (emphasis added) (noting that ATF issued a July 2023

---

effects of the AAP are not as bad when grouped with nearly 53,000 unaffected private collectors. https://tinyurl.com/4kee888c (listing 52,814 Type 03 FFLs representing curios and relics FFLs). On the contrary, ATF's revocation rate continues to accelerate.  *See* https://tinyurl.com/2y69k8ns (reporting 72 revocations for the *first half* of 2023, an increase of 60% even over 2022).  ATF fails to grapple with the over 1,000 FFLs who "voluntarily" surrendered their licenses in 2022 after compliance inspections, up from just 96 in 2020, caused by the AAP's zero-tolerance policy. Compl. ¶ 80; *See Kiloton Tactical, LLC*, ECF #13-1, pp. 56-59. Revocation is not the only harm FFLs face; the mere accusation of a "zero tolerance" violation in one's records constitutes irreparable harm when "mom and pop" shops cannot afford the legal costs of fighting ATF's new "zero-tolerance" policy at an administrative hearing or in federal court.  In the grand scheme of things, 1 out of every 72 FFLs out of business is a significant number, one that is sure to increase.

revocation based on a "May 24, 2022 inspection … *more than a year earlier*"). And ATF does not publicly release the content of the AAP. It appears nowhere on the ATF's website or in published regulations. Claiming that Plaintiffs delayed in challenging ATF's secret policy is inappropriate.

## II.   Plaintiffs Have Demonstrated a Strong Likelihood of Success on the Merits.

### A.   Plaintiffs Have Standing to Challenge ATF's Atextual and Unconstitutional Mass-Revocation Policy.

ATF's suggestion that Plaintiffs lack standing already has been rejected by a court within the Fifth Circuit. *See Cargill v. BATFE*, 2023 U.S. Dist. LEXIS 123249 (W.D. Tex. July 18, 2023) (allowing a case against Defendants' "zero-tolerance" policy to proceed despite the plaintiffs not facing, or having ever faced, any revocation proceeding), adopted by *Cargill v. BATFE*, 2023 U.S. Dist. LEXIS 166989 (W.D. Tex. Sept. 20, 2023). In *Cargill*, the fact that inadvertent violations, discovered during the plaintiffs' prior 2018 compliance inspection, would now constitute "willful," revocable offenses under the challenged AAP was found sufficient to confer standing. *See id.* at *14; *cf.* Compl. ¶¶ 155-62 (discussing BCO's receipt of a "Report of Violations" following a 2023 inspection and a subsequent revocation notice, thereby exceeding the facts in *Cargill*).

Plaintiffs need not wait for irreparable harm to continue to befall them for this Court to hear their case. Rather, "[w]hen an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (observing that "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (same).

ATF cites *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), for the proposition that the "threatened injury must be

*certainly impending* to constitute injury in fact." Opp. at 11. But *Clapper* noted that "imminence is concededly a somewhat elastic concept." 568 U.S. at 409. Only in cases where "the acts necessary to make the injury happen are at least partly *within the plaintiff's own control*" has the Supreme Court "insisted that the injury proceed with a high degree of immediacy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (emphasis added). In cases where the *government* retains all discretion on when, where, and how to inflict legal harm, the Court's standing doctrine accommodates pre-enforcement review without the need for ATF's preferred degree of stringency. Here, Plaintiffs have no control over when ATF will come searching for clerical errors that ATF has *already announced will warrant revocation* under the new AAP. When the question of harm is not a matter of "if" but "when," Plaintiffs need not wait until license revocations actually bankrupt and destroy their businesses to incur the requisite "harm" to challenge Defendants' novel policy. As the Supreme Court explains, "[w]hen the suit is one challenging the legality of government action or inaction … [if] the plaintiff is himself an object of the action … at issue … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-562.

Arguing next that Plaintiffs GOA and GOF do not have standing (Opp. at 13-15), ATF appears to acknowledge that GOA is a traditional membership organization, yet gloms onto a recent Eighth Circuit decision that states an organization must "identify members who have suffered the requisite harm." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). From this requirement to sufficiently "***identify***" affected members, ATF believes that GOA must "***name*** the members on behalf of whom it brings suit…." Opp. at 15. But that is *not* what the Eighth Circuit said, or what representational standing requires (indeed, if each affected person and entity was named, there would be no need for GOA to represent them, as each would *already*

be litigating "in their own right").  Rather, the Eighth Circuit (and each of the cases on which it relied) faulted the litigants for failing to identify *by failing to describe* their affected membership with sufficient specificity that a court could identify the class of persons on whose behalf they sought to litigate, and thereby determine standing existed.  55 F.4th at 602 (collecting cases).  GOA has more than met this requirement to "identify" its affected members, having described with specificity the Caliber Club,[5] a discrete GOA program made up entirely of Federal Firearms Licensees, each of whom is, by definition, directly affected by the AAP.[6]  ATF offers no Eighth Circuit law that these persons and entities must be *named*.  Instead, this Circuit already has implicitly concluded that individual members and supporters *need not be named – with respect to these very Plaintiffs*.  *See Morehouse Enters., LLC v. BATFE*, 2023 U.S. App. LEXIS 22075, at *11 n.5 (addressing the irreparable harms alleged by GOA and GOF, but finding it unnecessary to address the harms alleged by 17 states "as we find the states lack standing," and thus implicitly finding that the organizations had standing without having "named" their members).  Finally, the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2158 (2023) granted relief to a "501(c)(3) nonprofit with forty-seven

---

[5] Defendants liken the harms suffered by GOA's Caliber Club members to "a statistical probability."  Opp. at 15 n.6.  But Plaintiffs have alleged these members "**have been**" and "**are being**" subjected to the "zero-tolerance" policy.  Compl. ¶ 13 (emphases added).  This is language of currency, not mere possibility.

[6] To the extent that ATF relies on a single contrary decision from an Oklahoma district court (pending appeal in the Tenth Circuit, 23-6054) concluding that an organization's members must be expressly named (Opp. at 15), that court acknowledged the overwhelming weight of authority against its conclusion, but decided to chart its own path in light of "the Tenth Circuit's silence on the issue…."  *Speech First, Inc. v. Shrum*, 2023 U.S. Dist. LEXIS 66250, at *5 (W.D. Okla. Apr. 10, 2023) (referencing contrary decisions by the Second, Fifth, Ninth, and Eleventh Circuits); *see also Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (*Hunt* "allows for the member on whose behalf the suit is filed to remain unnamed by the organization.").  ATF thus asks this Court to reject the conclusions of no fewer than six circuits (including the Eighth Circuit) and adopt the logically flawed reasoning of a single district court.

members," although each was not named in the case, thus foreclosing ATF's spurious claim that Plaintiffs must "name" their members.

**B.  The AAP Is Clearly Subject to Legal Challenge.**

**1.  The AAP Is Final Agency Action, Not the Mere Exercise of Enforcement Discretion.**

Arguing that the AAP does not violate the APA, ATF first claims that the AAP is nothing more than "ATF's internal enforcement guidelines on FFL revocation," which ATF contends are "committed to agency discretion and thus not reviewable under the APA." Opp. at 16.  ATF argues that it is entitled to prosecutorial discretion when it decides to prosecute or not to prosecute. *Id.*  On the contrary, the AAP constitutes final agency action which "mark[s] the 'consummation' of the agency's decisionmaking process," "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

First, the current AAP ("zero-tolerance" versions 1.E and thereafter 1.F) is not merely a draft, or currently under consideration, but instead by its very terms (and at the explicit direction of the President) formally repeals, replaces, and supersedes ATF's prior existing Order 5370.1D. Compl. Ex. 3 at 1.  It is a "final" order to agency personnel that directs the actions they *must* take.[7]

Second, the AAP explicitly restricts the exercise of prior prosecutorial discretion by ATF, stating in absolute terms that certain revocations "shall" occur (changed from "may") if certain conditions are met.  *See Cohen v. United States*, 578 F.3d 1, 7 (D.C. Cir. 2009) ("We have given decisive weight to agencies' use of mandatory words like 'will' instead of permissive words like 'may,'" finding that certain agency actions represent a "bind[ing] … legal position" when they

---

[7]  *See also Cargill* at *13 ("ATF-O-5370.1E marks the consummation of the agency's decision-making process").  *See* Declaration of Curtis Gilbert, ECF #34-3, ¶ 4 (the AAP is "intended to provide … guidance to assist ATF field personnel and other officials as they conduct compliance inspections and take appropriate administrative actions," and ATF considers "portions of the AAP privileged and law enforcement sensitive").

"do[] not include the classic 'weasel words' through which agencies try—with variable success—to reserve discretion for themselves.").[8]  Indeed, ATF personnel have testified that, under the AAP, they no longer have any discretion to determine whether a violation was "willful," but instead that they merely catalog violations into the Spartan system.  Compl. ¶¶ 65-73; Exhibit A Morehouse transcript at 82 ll.9-23 ("does your scope of duties … including making any findings, conclusions, or recommendations concerning whether the violations were … willful?" … "It doesn't.  My disclosure of violations … really has nothing to do with my opinion on whether they're willful or whether they're inadvertent"); at 89 ll.7-10 (ATF lawyer stating "[w]e're here because he conducted an inspection, found they committed these violations, and now the DIO just needs to [hear] why they were willful"); *see also Cargill*, ECF #41 at 12 ("ATF-O-5370.1F is a final agency action because it withdraws the agency's previously held discretion").  Like the agency guidance in *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), the AAP "binds [ATF] staff to an analytical method in conducting [FFL] investigations and directs their decisions about which [FFLs] to refer for enforcement actions."  *Id*. at 443 (the EEOC guidance "limits discretion respecting the use of certain evidence," just like the AAP *requires* both past violations and past compliance be used against an FFL, and "leaves no room for [agency] staff not to issue [revocations] when a" regulated entity commits a certain type of violation).

Third, the AAP "alters the legal regime" of obligations for FFLs, because it materially alters the statutory scheme and creates a strict liability rule where any inadvertent slipup of a certain type

---

[8] This case is definitively *not* one where an agency has exercised its enforcement discretion to *decline* to bring certain enforcement actions, decisions that courts traditionally have been leery to second-guess.  *See Heckler v. Chaney*, 470 U.S. 821 (1985); *see also United States v. Texas*, 143 S. Ct. 1964, 1974-75 (2023) ("our … decision today should in no way be read to suggest or imply that the Executive possesses some … authority to disregard statutes … prohibiting executive action," which "the Federal Judiciary of course routinely and appropriately decides").

*will result in* a notice of revocation, altering and adding to the existing statutory obligation that FFLs not "willfully" violate the law. *See Cargill* at *15, *see also Cargill*, ECF #41 at 10 ("certainly, legal consequences will flow from this wording change"); *Scenic Am., Inc. v. United States DOT*, 836 F.3d 42, 56 (D.C. Cir. 2016); Compl. ¶¶ 108, 348, 358; *cf.* Opp. 18.

ATF relies on the Eighth Circuit's opinion in *Ngure v. Ashcroft*, 367 F.3d 975 (2004), but this is not a case regarding an agency decision "whether to institute an enforcement action" which "'involves a complicated balancing of a number of factors that are peculiarly within [the agency's] expertise.'" *Id*. at 982.  Rather, "the crucial question is whether the statute supplies any 'meaningful standard against which to judge the agency's exercise of discretion.'" *Du Lac v. Wheeler*, 519 F. Supp. 3d 549, 565 (D. Minn. 2021) (citation omitted).  Here, Section 923(e)'s requirement that an FFL act "willfully" before ATF is authorized to revoke its license clearly provides the "meaningful standard against which to judge the" AAP.   ATF is forced to admit as much. *See* Opp. 17.  *See Friends of the Norbeck v. United States Forest Serv*., 661 F.3d 969, 975 (8th Cir. 2011); *see also Sokol v. Kennedy*, 210 F.3d 876, 879 (8th Cir. 2000).

Certainly, ATF has the discretion to prioritize certain "willful" offenses that it deems more serious than others, such as the AAP's list of five offenses of heightened priority.  Nor are Plaintiffs' challenging ATF's ability to choose to revoke one FFL but not another, based on a balancing of numerous factors that the agency says it might consider pursuant to its inherent enforcement discretion.  On the contrary, this case involves ATF's *promulgation of an unyielding rule* for its personnel, establishing a strict liability regime governing, controlling, restricting, and eliminating the exercise of any discretion by agency personnel – in no uncertain terms "order[ing]" them to initiate revocations (such as BCO's) that, on their face, do not meet the statutory standard of "willfulness."

2.     **The AAP Eliminates the GCA's Willfulness Requirement.**   Next, disputing

Plaintiffs' claim that the AAP "displace[s] the willfulness requirement," ATF's primary argument

is that the word "willful" appears in the AAP – as if the mere presence of the word is some saving

grace to the strict liability system the AAP clearly imposes.  Opp. at 19 and n.7 ("the document is

otherwise replete with references to the willfulness requirement").  On the contrary, as Plaintiffs

already discussed at length, the AAP inverts the Congressional mandate by imposing *de facto* strict

liability on all FFLs nationwide, which FFLs must then incur significant costs to rebut.  *See* Compl.

¶ 263; Compl. Ex. 3 at 3 (emphasis added) (AAP providing that now, "revocation is the ***assumed***

***action***").    Indeed,  the  AAP  blatantly  claims  that  certain  violations  "***inherently*** demonstrate

willfulness."  Compl. Ex. 3 at 6 (emphasis added).

ATF's observation that a DIO must still find willfulness *at some later point after the notice*

*of revocation is issued* does not help its case.  Opp. at 22.  Again, Plaintiffs are not challenging any

*subsequent* revocation  proceeding  or  any  ultimate  decision  by  a  DIO  *after* an  administrative

hearing.  Rather, Plaintiffs challenge the AAP, and its elimination of the willfulness requirement

necessary to initiate revocation proceedings in the first place.  Compl. ¶ 216.  Indeed, ATF's Notice

of Revocation to BCO expressly asserted ATF's *pre-hearing* claim that the alleged violations were

willful.  Comp. Ex. 1-1 at 2.   The fact that ATF eventually may correct its errors *on the back end*

does not rectify the policy that leads to tens of thousands of dollars of legal expenses for a licensee.

Much like the saying, "[y]ou can beat the rap, but you can't beat the ride.  It's usually taken to

mean that the police can subject you to the criminal process even when they know the charges

won't stick." *Wagner v. Hyra*, 518 F. Supp. 3d 613, 619 (N.D.N.Y. 2021).  Of course, those who

cannot afford the costs of an administrative hearing or subsequent judicial review will never enjoy

such eleventh-hour vindication, as even the mere accusation of willfulness will lead to irreparable

harm through loss of their licenses.  *See* Compl. ¶ 80 ("ATF has coerced and intimidated an ever increasing number of FFLs into 'voluntarily' ceasing operations...."); *Kiloton Tactical, LLC,* ECF #13-1, pp. 56-59.

In essence, the AAP flips the presumption of guilt – absolving ATF of having to establish that an FFL's actions *were willful* in order to begin the revocation process, and placing the burden on the FFL to rebut the presumption at an administrative hearing (or in court) and show that its actions *were not willful*.  Adding insult to injury, a licensee is required to prove it *did not* act willfully to the same official (DIO) who *already* signed the Notice of Revocation claiming that the licensee *did* act willfully.  Plaintiffs should not need to emphasize the absurdity of such a presumption of culpability: "If the defendants were innocent, then why had they been arrested? And once they had been arrested, that meant they were guilty!"  Aleksandr I. Solzhenitsyn, <u>The Gulag Archipelago</u>, vol. I, at 394 (1st ed. 1973).  The AAP is thus contrary to the statutory text.

But this Court need not take Plaintiffs' word for it.  ATF's lawyers' claims that "the inspecting IOI, not Spartan, makes the ultimate recommendation as to further action" and "an IOI recommends sending an initial notice of revocation" (Opp. 22) is belied not only by the language of the AAP but also by the repeated testimony by ATF's own IOIs, not to mention an OIG Report. First, ATF's new policy *most certainly does not* leave it up to the IOI to determine whether to revoke, instead demanding that certain violations "shall result in a revocation recommendation…." Compl. ¶ 46.  The fact that the IOI does what he or she is *ordered to do* does not make the revocation the IOI's decision.  Second, ATF's IOI's have confirmed in testimony that no longer do they have any control over the revocation decision.  *See* Compl. ¶ 66 ("I input data, and Spartan does the figuring."); at ¶ 66 ("[d]id you have any role in the decision …  regarding your compliance inspection?" … "No. … Spartan does. … It assesses the errors and – and after the

adverse action policy apparently that is input into Spartan, it … makes a recommendation."). *See also* Exhibit A Morehouse transcript at 74 ll. 3-7 (ATF lawyer stating that "as the IOI testified, he just writes the report … his … opinion as to willfulness, that's not relevant because the DIO determines willfulness based on the information that's presented here at this hearing today."). Third, the OIG Report cited in Plaintiffs' Complaint confirms that, "when an IOI enters inspection results into Spartan, the system prompts the IOI with a recommendation consistent with the Administrative Action Policy." Compl. ¶ 71. The unsupported contrary claims by ATF's lawyers and ATF's Declarant must be rejected.

Finally, there is an inherent logical problem with ATF's false claim that IOIs make the decisions to revoke licenses. If it is true that the IOI makes the initial revocation determination, then it would follow that this could occur *only* after the IOI established that the FFL had acted willfully. But as ATF IOIs have testified, they no longer find facts or make conclusions as to willfulness. *See* Compl. ¶ 67 ("in this report of violations … are you … commenting on the question of whether or not the violation … was done willfully?" … "No, sir. Not my job.").

**3. ATF's Cases Do Not Lead to the Conclusion ATF Draws.** Finally, ATF cobbles together several district and circuit court decisions to suggest a judicial consensus that the AAP's novel presumption of willfulness enjoys broad support. Opp. at 19-20. This is not the case. While each decision might have concluded that certain types of evidence – signed acknowledgements, prior compliance, or prior noncompliance – may help demonstrate *knowledge of a legal obligation* under the facts peculiar to each case, a one-size-fits-all formula presuming willfulness contravenes one of the very elements that ATF acknowledges in its opposition: "a finding of willfulness requires two elements: (1) knowledge of a legal obligation, and **(2) 'purposeful disregard of, or a plain indifference to, or a reckless disregard' of that obligation**." Opp. at 19-20 (emphasis added).

Even assuming, *arguendo*, that all of ATF's cited cases evince a consensus as to what constitutes knowledge of a legal obligation, ATF utterly fails to cite any cases to support a similar judicial consensus as to the second element.  In other words, ATF's citations to cases *finding* willfulness to justify its new policy of *presuming* willfulness ring hollow.

## 2.    ATF's Facial/As-Applied Hair-Splitting Is a Distinction without a Difference and Does not Change the Analysis.

ATF reads into Plaintiffs' complaint distinct facial and as-applied challenges,[9] and claims that BCO cannot bring an as-applied challenge to the AAP because of (i) supposed mootness, (ii) the purported presence of alternative remedies, and (iii) an alleged absence of final agency action. Opp. at 23-25.  None of these theories bars this suit or precludes injunctive relief.  First, Defendants cannot seriously claim mootness when Plaintiffs represent other FFLs who "are being" subjected to the "zero-tolerance" policy.  Compl. ¶ 13.  But even for BCO, ATF backed down on the BCO revocation only after this litigation was filed, and "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  If it did, the courts would be compelled to leave the defendant ... free to return to his old ways."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (punctuation and citations omitted); *see also Northland Baptist Church of St. Paul v. Walz*, 37 F.4th 1365, 1372 (8th Cir. 2022) (actions "capable of repetition yet evading review" remain reviewable "when there is a reasonable expectation that the alleged actions of the defendant[] will recur").  Although targeted for revocation, BCO's Type 07 FFL was not part of ATF's February 2023 inspection, meaning ATF could visit BCO tomorrow and conduct a different

---

[9] *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect …[it] goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.").

compliance inspection for *that* license (or a new annual inspection five months from now on BCO's Type 01 license). Either way, "BCO … like all FFLs, remains subject to ATF compliance inspections and potential administrative action" (Opp. at 23), and thus this case is far from moot.

Second, ATF claims that the "revocation hearings" and "revocation decisions" under 18 U.S.C. § 923(f) are not subject to APA review. Opp. 24. But Plaintiffs were *explicit* that they are not challenging any such hearing or decision. Compl. ¶ 216. Rather, this case challenges *final agency action* in the form of an official ATF Order promulgated to *eliminate* the exercise of agency discretion and *require* revocations where they were not required before. That is quintessential APA territory subject to this Court's review, independent of any enforcement action brought pursuant to the AAP. Third, ATF thus claims (again) that the AAP is not final agency action within the meaning of the APA, until applied to revoke a particular license. Opp. at 24-25. But as already noted, *supra*, there is no question that the AAP produces "legal consequences," as the entire premise of the AAP's "zero tolerance" mandate is to increase the number of revocations for certain offenses without any finding of "willfulness." *See Bennett*, 520 U.S. at 177-78.

### C. The AAP Violates Second Amendment Rights.

Rather than attempt to downplay the "marvelous[] Second Amendment loophole" identified tongue-in-cheek by Judge Albright in *United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5-6 (W.D. Tex. Jan. 9, 2023), ATF instead embraces the "absurd[ity]" wholesale, arguing broadly that "the Second Amendment does not protect the ability of corporations, such as BCO, to sell firearms for the purpose of making a profit." Opp. at 25. Of course, aside from the few Americans who undertake the laborious, highly skilled, and time-intensive process to manufacture their own personal firearms at home, ***all*** firearms manufactured and transferred in the United States are created by "corporations" who engage in that business "for the purpose of making

a profit."  As Judge Albright noted, "if buying (receiving) a gun is not covered by the Second Amendment's plain text, neither would selling one."  2023 U.S. Dist. LEXIS 35485, at *5.  So too must the obvious corollary also be true – if there is no guarantee to manufacture and sell firearms, then there is no guaranteed supply of "arms" to "keep and bear."  Otherwise, as Judge Albright concluded, "Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms."  *Id.* at *6.  It is thus evident that Second Amendment rights are implicated (and indeed infringed), by an ahistorical government program designed from the ground up to bottleneck the Second Amendment supply chain.

By ATF's unyielding logic, should Congress choose to entirely ban the manufacture or transfer of firearms, then only previously existing firearms could continue to be "kept," while new ones could not be "acquired."  A new firearm could not be manufactured.  A young person who came of age could not purchase or otherwise newly acquire a firearm to "keep and bear." Unsurprisingly, the Supreme Court has already dispelled this notion as "bordering on the frivolous," explaining in *District of Columbia v. Heller* that not "only those arms in existence in the 18th century are protected by the Second Amendment. … Just as the First Amendment protects modern forms of communications … the Second Amendment extends, prima facie, to ***all instruments*** that constitute bearable arms, even those that were not in existence at the time of the founding."  554 U.S. 570, 582 (2008).  Likewise, the Second Amendment applies to "***all members*** of the political community, not an unspecified subset."  *Id.* at 580.  Since the Second Amendment protects modern persons and modern firearms, then it must protect current commerce and current firearm manufacturers and dealers.  Otherwise, Congress could eliminate Second Amendment rights in a single generation, simply by grinding commerce in arms to a halt.

### 1.   The AAP Infringes Licensees' Rights to Engage in Commerce in Firearms.

ATF first notes that a few courts agree with the position it takes here.  Opp. at 26.  For example, the Ninth Circuit's pre-*Bruen* decision in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017), distinguished a Second Amendment "acquisition right," which the court concluded does not include "an independent right to sell or trade weapons."  *Id.* at 678, 683, 686 (finding that the Second Amendment might be implicated only "if the right of the people to obtain and bear arms was [] compromised"); *see also Gazzola v. Hochul*, 2022 U.S. Dist. LEXIS 220168, at *35 (N.D.N.Y. Dec. 7, 2022) (the Second Amendment "makes no mention of buying, selling, storing, shipping, or otherwise engaging in the business of firearms.").  But as Plaintiffs explained (Mot. at 18 n.22), these cases are wrongly decided, as they fail to explain how Congress could not eliminate Second Amendment rights entirely by simply banning commerce in arms.[10]

Dissenting in *Teixeira*, Judge Tallman rejected the notion that an attempt by government "to restrict firearm acquisition and possession as much as [] government can get away with" could be rubber stamped by resort to *Heller*'s "longstanding regulatory measures" language.  873 F.3d at 692; *cf.* Opp. at 27 (citing those statements made in *dicta*).  Rather, Judge Tallman concluded that "[h]istory supports the view that the Second Amendment must contemplate the right to sell firearms if citizens are to enjoy the core, fundamental right to own and possess them in their homes."  873 F.3d at 693; *see also id.* at 693-94 (explaining that, "[i]n light of the British embargo

---

[10] Nor, post *Bruen*, are courts free to reach some middle ground, such as *Teixeira*'s implicit conclusion that firearm commerce might be throttled to some purportedly *reasonable* extent, so long as it does not *significantly* burden a *core* Second Amendment right to acquire arms.  Such a conclusion would require the very same sort of interest balancing that *Bruen* explicitly prohibited, permitting judges to decide "whether the right is really worth insisting on."  142 S. Ct. 2111, 2131 (2022); *Heller* at 634.  Rather, the choice is a binary one.  Either commerce in arms is within the scope of the Second Amendment, or there is no Second Amendment right to manufacture or sell a firearm.  If Plaintiffs are correct, ATF must demonstrate a broad and enduring tradition of similar regulation to justify its actions.  If ATF is correct, then the rights to "keep and bear arms" would be left entirely to the good graces of Congress to *permit* firearms to be manufactured and sold.

on the sale of arms in 1774 to prevent the Colonists from resisting the tyranny of King George III, it is understandable that the Framers would want to protect not only the right to bear arms, but correspondingly, the right to sell and acquire them. … Throughout history and to this day the sale of arms is ancillary to the right to bear arms."); *see also* Mot. at 21-22 (making the same argument).

Siding with Judge Tallman, Judge Bea's separate *en banc* dissent referenced the *Teixeira* panel's reliance on "historical evidence demonstrating that the right to sell firearms is 'part and parcel of the historically recognized right to keep and to bear arms.'" *Id.* at 698 (Bea, J., dissenting) (referencing various historical sources including a "colonial Virginia [law] providing for the 'liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony'"); *see also Teixeira v. County of Alameda*, 822 F.3d 1047, 1054-56 (9th Cir. 2016) (vacated by grant of *en banc* review) (laying out a variety of historical sources, and explaining that "[o]ne cannot truly enjoy a constitutionally protected right when the State is permitted to snuff out the means by which he exercises it").

Next, ATF attempts to minimize the cases which have reached conclusions that favor Plaintiffs. First, ATF claims that *Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159 (2020), merely quoted language from a state statute, and did not reach a constitutional conclusion. Opp. at 26 n.9. On the contrary, the court there framed the issue as "whether indoor gun ranges are within the scope of 'bear arms,'" *Id.* at 161, which the court had no trouble answering in the affirmative. *Id.* at 162. Implicitly rejecting the majority's reasoning in *Teixeira*, the Virginia court disagreed that the right to bear arms might not be violated by a closure of shooting ranges so long as people still could visit gun ranges elsewhere, finding instead that "the right to keep and bear arms is not relegated to the outskirts of the city." *Id.* at 164. Second, ATF attempts to limit *Tony Kole & Ghost Indus., LLC v. Village of Norridge*, 2017 U.S. Dist. LEXIS 178248 (N.D. Ill. Oct.

27, 2017), to the issue of third-party standing.  On the contrary, that court clearly explained that the government's evidence "'fall[s] far short' of establishing that gun sales and transfers were historically unprotected by the Second Amendment."  *Id.* at *29.  Third, ATF claims without analysis that the holding of *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), was "similar" to *Kole*.  But although *Ezell* involved the now-prohibited application of judicial interest balancing, the court was clear that a government may not ban commercial shooting ranges without violating the Second Amendment.  *Id.* at 710.  Finally, ATF claims that *Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5-6, involved only firearm receipt, which is "distinct from the right of corporations to engage in firearm commerce."  Opp. at 26.  But *Hicks* clear language referencing both "buying and selling of firearms" shows that the court considered these activities the same.

Next, ATF mischaracterizes what is at issue in this case, claiming that "Plaintiffs argue that *any substantive regulation* of gun stores, such as that outlined in the AAP, infringes the Second Amendment," and thus that ATF's *entire* "inspection and enforcement procedures governing commercial firearm sales" is being litigated here.  Opp. at 27 (citing Mot. at 20) (emphasis added).  On the contrary, that portion of Plaintiffs' brief discussed what sort of historical tradition of firearm regulation exists (or *does not* exist), not the scope of what is challenged in this case.  Although not conceding that any federal gun law is constitutional, in this litigation Plaintiffs are not challenging the *general* statutory power of ATF to regulate dealers, to require licensure, or to revoke licenses when FFLs actually "willfully" violate their recordkeeping requirements.  Rather, Plaintiffs here challenge *specifically* the AAP and its facial conflict with the statutory *mens rea* requirement, which also violates Second Amendment rights by revoking licenses and restricting access to arms for inadvertent human errors.  Nor does ATF's repeated attempt to create a facial/as-applied distinction hold water.  Opp. at 27 and n.10.  Plaintiffs are not required to show that *every* license

revocation by ATF is unlawful, as Plaintiffs are not challenging every revocation, but rather those made pursuant to the AAP and its "zero-tolerance" elimination of "willfulness" from the statute. *See* Complaint, Prayer for Relief (item 5, asking for the *current versions* of the AAP to be enjoined, which would merely preserve the revocation process as it has existed for many years prior to implementation of the "zero-tolerance" policy and the current versions of the AAP).

Finally, the Supreme Court's dicta from *Heller* and *Bruen* about "longstanding regulatory measures" and "conditions and qualifications on the commercial sale of arms" does not save the AAP from constitutional challenge pursuant to *Bruen*.  First, "not every regulation on the commercial sale of arms is presumptively lawful."  *Rigby v. Jennings*, 630 F.Supp.3d 602, 613 (D. Del. 2022); *see also United States v. Price*, 635 F.Supp.3d 455, 459 (S.D. W. Va. 2022).  But even so, "presumptively lawful" does not mean "conclusively lawful"[11] and, contrary to ATF's apparent belief,[12] neither *Heller* nor *Bruen* identified any protected class of firearm restriction that is immune from analysis under the historical framework that *Bruen* requires *in every case*.

## 2.   The AAP Violates the Second Amendment Rights of Gun Owners.

Arguing next that individual gun owners cannot assert a Second Amendment right to purchase firearms at gun stores, ATF misses the mark, essentially rehashing its argument from elsewhere that there is no foul here because Plaintiffs have not provided evidence that the AAP's increasing number of revocations will have a meaningful impact on their right to acquire arms. Opp. at 28-29.  Relying entirely on two pre-*Bruen*, interest-balancing decisions, ATF argues that

---

[11] For example, a federal law that provided that no gun store could keep more than five firearms in inventory would be a "condition[] … on the commercial sale of arms," but not constitutional.

[12]   *See* Opp. at 28 (emphasis added) ("the AAP provides guidance as to agency inspection and enforcement procedures governing the commercial sale of firearms.  Plaintiffs ***accordingly*** cannot show that the AAP – a presumptively lawful commercial regulation – facially violates the Second Amendment.").

no constitutional infringement occurs unless there is a significant interference with Plaintiffs' ability to acquire arms – something more than what ATF characterizes as a "minimal inconvenience affecting the purchase of guns…." *Id.* at 29.

But that is not how the law works after *Bruen*. Rather, once Plaintiffs have shown that "the Second Amendment's plain text covers [their] conduct" – members of "the people" acquiring "arms" from gun stores in order to "keep and bear" them – this Court must assume that "the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). Thus, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* In fact, the Supreme Court explicitly rejected the approach ATF advances here, refusing to look at "the severity of the law's burden on that right." *Id.* Plaintiffs are no more required to show precisely how closure of a particular gun store will infringe their right to acquire arms than Dick Heller was required to show how his inability to possess a handgun in his home would meaningfully impact his ability to defend himself, since "the possession of other firearms (i.e., long guns) [wa]s allowed." *Heller*, 554 U.S. at 629. Nor does BCO (or another FFL) have to justify its existence as a popular gun store in the Valley City area – rather, "it is enough to note" for "whatever the reason," North Dakotans have chosen BCO for their Second Amendment needs. *See id.*

But even so, Plaintiffs have made a factual showing as to how the AAP infringes their right to acquire firearms. As BCO has explained, it is the only licensed firearm manufacturer and the only full-service retail firearm store in the area. Compl. Ex. 12 ¶ 4. As GOA's declaration explains, there are only six other license holders (of any sort) in the vicinity, two of them primarily run other businesses (auto supply and shoe store), and none is a traditional "gun store" like BCO. Compl. Ex. 2 ¶¶ 14-15. Because of that reality, BCO has explained that its customers would have to travel

"much farther" and spend "significant[ly]" more "time and resources[] to buy firearms at far more distant locations," were BCO to close.[13]   Compl. Ex. 12 ¶ 27.   GOA explained that one such customer reported that the customer would have to expend "significant additional resources in the form of time and travel" in order to acquire constitutionally protected arms, should BCO be shut down.   Compl. Ex. 2 ¶ 18.   GOA explained that this person's experience is representative of that being reported by other GOA and GOF members and supporters (¶ 12), that these sorts of harms will continue to accrue as ATF's zero-tolerance policy continues to be implemented (¶ 21), and that the harm to Americans' ability to acquire arms will increase in severity as ATF shutters more and more gun stores (¶ 22).   But again, as the Supreme Court has made clear, a plaintiff is not required to wait for impending irreparable harm to actually occur before challenging governmental action.   *See Sackett v. EPA*, 566 U.S. 120, 127 (2012).

Finally, ATF claims that "only 90 FFLs were revoked in 2022, out of over 130,000 FFLs." Opp. at 9.   But both of those numbers are highly misleading for a number of reasons.   First, while it is true that, in 2022, there were over 136,000 total licensees, a significant proportion (39%) of those were *private collectors* with Curio and Relic ("C&R") licenses.[14]   Second, as Plaintiffs' Complaint explains, ATF's rate of license revocation has more than tripled from its historic average (Compl. ¶ 79), and will continue to increase as revocations lag inspections by a significant period of time (¶ 81).   Indeed, ATF is on track to revoke 60% more licenses in 2023 than it did even in 2022 (meaning ATF's 2023 **revocation rate is up more than 530%** since 2021[15]).   Third, the

---

[13] ATF demurs that a person may simply order a firearm online and pick it up from any FFL.   Opp. at 29 n.12.   But not all FFLs offer this sort of transfer service, and those that do charge a not-insignificant fee, adding to the cost of a firearm.   Moreover, "online" is not the way all people shop, with many persons (especially new gun owners) preferring to visit local retailers, and put "hands on" a product (that is meant to be held in the hands) before purchasing it.

[14] https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2022.

[15] https://tinyurl.com/4vdayyfk.

number of FFLs who are not "revoked" but who "voluntarily" surrender their license and go out of business has increased astronomically since "zero tolerance" was established – rising from 96 in 2020, to 789 in 2021, to 1,037 in 2022.  The AAP's "zero-tolerance" policy is the proximate cause of at least some of this increase in surrenders.  *See Kiloton Tactical, LLC,* ECF #13-1, pages 56-59.  Appropriately considering both revocations and surrenders, the total is far from an insignificant percentage of the nation's total supply of FFLs.  If OSHA forced the closure of 1.5 percent of the nation's grocery stores in a single year, no one would call that *de minimis*.

### 3. ATF Has Not Shown a Broad and Enduring Historical Tradition of Similar Regulation.

Attempting finally to meet its burden to show a broad and enduring historical tradition of similar types of firearm regulation, ATF falls far short, stretching the word "analogous" past its breaking point.[16]  First, ATF points to a single statute that it claims "existed for a limited period,"[17] which restricted the export of arms shortly after the Revolutionary War, which in no way "demonstrate[es] a clear understanding that the Constitution permitted strict regulation of firearm sellers," as ATF claims.  Opp. at 30.  To the contrary, Congress restricting access to arms by foreigners by its very nature *does not implicate* persons, arms, or activities protected by the Second Amendment, because foreigners are not part of "the people," and arming them does not contribute to "the security of a free state."  Such restrictions on arms sent abroad in no way demonstrate an *American* tradition of restricting domestic access to arms by "the people."  When considering this

---

[16] As an initial matter, ATF demurs that it "does not purport to offer an exhaustive analysis of the relevant history."  Opp. at 29.  But there is no authority for ATF to promise the Court "just trust us" in the hopes of developing a sufficient historical record at a later stage in litigation.  Rather, to the extent that ATF has not presented a sufficient historical tradition *now*, the appropriate remedy is to grant Plaintiffs preliminary injunction and perhaps ATF can do better at the merits stage.

[17] The *Bruen* Court refused to consider laws of a "transitory nature" which were "short lived" and did not represent "an enduring American tradition…."  142 S. Ct. at 2156.

purported analogue ATF offers, one court concluded that "the statute was aimed at *ensuring* the overall stock of weapons available *in this country* not be depleted, perhaps out of a concern that the country be sufficiently armed in the case of invasion or insurrection." *United States v. Perez*, No. 22-cr-644, ECF #52 at 18 (S.D.N.Y. July 7, 2023) (emphasis added).  As Plaintiffs alleged, the AAP has a quite different purpose – *to reduce* the firearm supply in this country.

Second, ATF points to a series of early statutes limiting *to whom* arms could be sold – namely, to Indian tribes.  Opp. at 30.  But this racist history at best draws parallels to the "why" such early laws existed – to keep firearms out of disfavored hands.  But it did so with an entirely different "how" – it prohibited certain sales, but did not require licensure and recordkeeping by gunsmiths, traders, or others who did business in arms.  Nor did these enactments end anyone's livelihood, or prevent anyone from selling firearms to law-abiding members of "the people," as ATF sought to do against BCO.  Yet *Bruen* requires analysis of *both the "how" and the "why,"* in order for an analogue to be considered historically relevant.  142 S. Ct. at 2133.

Third, ATF relies on a series of proofing laws from the early 1800s imposed on those who manufactured firearm barrels, requiring their products be of adequate quality.  Opp. at 31.  But these examples fail *Bruen*'s "why" factor – as their ostensible motivation was to ensure proper functioning of arms – not their acquisition by prohibited persons.  Moreover, under *Bruen*, "19th-century evidence [i]s 'treated as mere confirmation of what ... had already been established.'" 142 S. Ct. at 2137.  Without evidence of similar regulation dating back contemporaneously with the time of ratification, these laws are unhelpful, and they certainly do not establish a broad and enduring tradition of revoking the licenses of firearm dealers.

Fourth, ATF presents various restrictions on the storage of gunpowder, arguing that is "akin to modern ammunition."  Opp. at 31.   Not so.  Colonial-era gunpowder (today classified by ATF

as an "explosive"[18]) is entirely unlike smokeless powder (an accelerant or "propellant"[19]) used in modern firearm ammunition.   Colonial-era gunpowder was greatly unstable, volatile, extremely hazardous, and often resulted in terrible accidents and explosions.   In contrast, even large quantities of "modern ammunition" have been shown not to create such hazards during testing.   *See* https://tinyurl.com/j23e3h3c.   During the colonial era, there were various urban restrictions on powder ownership and storage (how much could be possessed, how it could be transported, requiring it to be stored in a community magazine, etc.), such as an 1801 Massachusetts statute[20] entitled "An Act to Provide for the Storing and Safe Keeping of Gun Powder … and to Prevent Damage from the Same."   But these laws had an entirely different "why" (to prevent cataclysmic explosions) than does the AAP, and do not establish a historical tradition of anything relevant here.

Finally, ATF claims that this non-analogous history is confirmed by "similar" laws "enacted through the antebellum and reconstruction eras."   Opp. at 32.   Apparently cognizant that such late-coming history cannot be used *to create* a historical record but rather only *to confirm* one that existed during the Founding era, ATF confines these sources to a footnote.   *Id.* at n.16.   While these 1874 and 1879 Alabama statutes did indeed appear to impose licensing requirements on certain firearm dealers (primarily requiring payment of a fee), they arose nearly a century after ratification of the Second Amendment, and thus do not illuminate its meaning.   Nor is there any evidence that such licensing schemes were ever used to *revoke* the ability of gun dealers to sell arms, like the AAP does.   As such, "a few late-19[th]-century outlier jurisdictions … cannot provide much insight into the meaning of the Second Amendment."   *Bruen*, 142 S. Ct. at 2154, 2156.   Quite the opposite.

---

[18]   https://www.atf.gov/explosives/black-powder.
[19]   https://tinyurl.com/2p9dsxsh (explaining that modern ammunition powder is exempt from federal explosive requirements).
[20]   https://tinyurl.com/bdhf2d44.

The fact that ATF is unable to muster a single historical record requiring licensure of firearm dealers *prior to* 1874 demonstrates that no such broad and enduring historical tradition exists. Indeed, prior to 1968, Americans regularly bought firearms through the mail.

## III.   The Balance of the Equities Favors Plaintiffs.

As Plaintiffs argued in their Motion, if this Court agrees that the AAP violates either statutory language or constitutional rights, the equitable factors weigh in favor of requiring ATF to comply with the law and Constitution. Mot. at 24. In response, ATF claims that "the public interest is best served by preserving policies that advance public safety and prevent crime," Opp. at 32, spilling much ink as to how the AAP purportedly furthers those policies. *Id.* at 32-33. Of course, neither of those policy goals authorizes ATF to rewrite the statutes Congress enacted or the enumerated rights the People ratified. Nor would a ruling for Plaintiffs threaten ATF's ability to find "willfulness" or "curb the agency's ability to monitor and deter FFL violations…." *Id.* at 33. Rather, ATF merely would be required to *actually* determine that an FFL had willfully violated its obligations before revoking its license, as opposed to relying on the AAP's declaration of "zero tolerance" for certain violations *regardless of whether* they were committed willfully. ATF again posits that the harm is past, since for now it has permitted BCO to keep its license. But the fact that ATF began license revocation in the first place evidences that the AAP is endemically off base, punishing inadvertent and accidental paperwork violations and innocent misunderstandings of highly technical requirements by licensees across the country who every day do their very best to comply with the requirements of federal law.

## CONCLUSION

For the reasons stated, this Court should grant Plaintiffs' Motion.

Respectfully submitted, this the 22nd of September 2023.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

<u>**CERTIFICATE OF SERVICE**</u>

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be filed with this Court's CM/ECF system which generated a notice and delivered a copy to all counsel of record.

Dated: September 22, 2023.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh