**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
**Hearing on 08/16/2023**

```
 1              U.S. DEPARTMENT OF JUSTICE
      BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
 2            FARGO FIELD OFFICE, NORTH DAKOTA

 3  -------------------------------------------------------
    UNITED STATES OF AMERICA        )
 4  IN THE MATTER OF THE NOTICE     )
    TO REVOKE OR SUSPEND LICENSE    )
 5  AND/OR IMPOSE A CIVIL FINE      )
    ISSUED TO:                      )
 6                                  )
    MOREHOUSE ENTERPRISES, LLC      )
 7  1021 14TH STREET SW             )
    VALLEY CITY, ND 58702           )
 8  -------------------------------------------------------

 9

10                          HEARING

11          REPORT OF PROCEEDINGS on the hearing of the

12  Notice to Revoke or Suspend License and/or impose a

13  Civil Fine, ATF Form 4500, issued under the provisions

14  of Title 27, Code of Federal Regulations, Part 478(e),

15  by DIRECTOR DIO HANS HUMMEL on the 16th of August, 2023,

16  at 657 2nd Avenue North, Fargo, North Dakota.

17

18

19

20

21

22

23

24      REPORTED BY:  Matthew Hanneman, Notary Public

25
```

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
**Hearing on 08/16/2023**                                    Page 2

```
 1    APPEARANCES:

 2         MS. MICHELE THIELHORN
           One Galleria Blvd Suite 1700
 3         Metairie, Louisiana  70001
           (504) 841-7000 (Phone)
 4         Michele.Thielhorn@atf.gov,
               For ATF;
 5
           SCHULMAN, LeROY & BENNETT, P.C. by
 6         JOHN I. HARRIS, III
           310 West End Avenue, Suite 460
 7         Nashville, Tennessee 37203
           (615) 244-6670
 8         jharris@slblaaawfirm.com,
               For Morehouse Enterprises.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
**Hearing on 08/16/2023**                                    **Page 3**

```
 1                    I N D E X
         WITNESS                              PAGE
 2   IOI JACOB TEMP
         Examination by Ms. Thielhorn         11,139
 3       Examination by Mr. Harris            37,139
     TANNER MOREHOUSE
 4       Examination by Mr. Harris            151
         Examination by Ms. Thielhorn         168
 5   TORREY MOREHOUSE
         Examination by Mr. Harris        183,209,217
 6       Examination by Ms. Thielhorn         195,215

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
**Hearing on 08/16/2023**                                    Page 4

```
 1                      ATF EXHIBIT LIST

 2     NO.   DESCRIPTION                        PAGE

 3     1   NOTICE OF REVOCATION 4500           10,90
           FULL PACKET
 4
       2   MOREHOUSE HEARING REQUEST           10
 5
       3   NOTICE OF HEARING                   10
 6
       3A  NOTICE OF RESCHEDULED HEARING       10
 7         8/16/23

 8     4   AMENDED REPORT OF VIOLATIONS,       10,24,32,66-7,109
           SIGNED                              110-11,116,118
 9
       5   ACKNOWLEDGMENT OF REGULATIONS       10,14,39,41-3,143,
10         Signed and Dated 4/3/2019           169

11     6   ACKNOWLEDGMENT OF REGULATIONS       10,17,18,39,143
           SIGNED/TORREY MOREHOUSE, 8/26/22
12
       6A  ACKNOWLEDGMENT OF REGULATIONS       10,17,18,143
13         SIGNED/TANNER MOREHOUSE, 8/26/22

14     7   ACKNOWLEDGMENT OF REGULATIONS       11,137
           Signed and Dated 3/10/2023
15
       8   FORM 4473 - FLUKER [Viol #1&2       11,24,26-8,62,197
16         Re:    478.99(a) & 478.102(a)]

17     9   FORM 4473 - NELSON                  11,29,30-1,33,109,
           [Viol 3 re:    478.121 ]            199,201,203,213
18
       10  NICS Audit Log - NELSON             11,20,23,33-4,36-7
19         [Viol 3 re:    478.121 ]            55,108,112-4,135,
                                               141,207
20     11  BLANK FORM 4473 (2020)              22,53,162,164
           With Instructions
21

22

23

24

25
```

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
**Hearing on 08/16/2023**                                                    **Page 5**

```
 1                    LICENSEE HEARING EXHIBITS

 2    NO.         DESCRIPTION                        PAGE

 3    1           ATF FEDERAL FIREARMS REG           42-4,126-7,
                  REFERENCE GUIDE 9/2014             142,160,176
 4
      2           ATF INDUSTRY OPERATIONS            74
 5                MANUAL  10/2019

 6    3           NICS FIREARMS LICENSEE MANUAL      126,128,130,
                  8/2011                             132, 172,173
 7
      4           ATF FIREARMS COMPLIANCE
 8                INSPECTIONS PROCESS 7/14/2023

 9    5           ATF REVOCATION OF FIREARMS LIC
                  6/23/2021
10
      6           ATF ENHANCED REGULATORY
11                ENFORCEMENT POLICY 3/29/2023

12    7           ATF NOTICE 36N - HEARING PROC
                  RELATED TO FEDERAL FIREARMS LIC
13
      8           ATF 36N HEARING PROCEDURES 8/10/2023
14
      9           ATF FFL REVOCATION PROCESS  5/2014
15
      10          ATF ADVERSE ACTION
16                POLICY ATF 0 5370.1C  02/21/2017

17    11          ATF ADVERSE ACTION POLICY
                  ATF 0 5370.1D  10/2/2019
18
      12          USDOJ MEMORANDUM ON
19                ATF 0 5370.1D  7/14/2021

20    13          ATF ADVERSE ACTION POLICY
                  ATF 0 5370.1E  1/28/2022
21
      14          MOREHOUSE ENTERPRISES, LLC
22                POWER OF ATTORNEY  6/26/2023

23    15          JOHN I. HARRIS, III LTR TO
                  HANS HUMMEL    7/13/2023
24
      16          MICHAEL J. DREZNER LTR TO
25                HANS C. HUMMEL rec'd 7/27/2023
```

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
**Hearing on 08/16/2023**                                    Page 6

```
 1   NO.            DESCRIPTION                    PAGE

 2   17         HARRIS LTR TO DREZNER,
                HUMMEL AND THIELHORN 7/28/2023
 3
     18         MOREHOUSE FIREARMS COMPLIANCE          67,118
 4              INSPECTION FC1-38752    3/6/2023

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2             Whereupon, the transcript of proceedings was

 3  commenced at 8:48 a.m. as follows:

 4             DIO HUMMEL:  All right.  The hearing has

 5  officially begun.  It's 8:48 a.m.  The date is August 16th,

 6  2023.  We're located at 657 2nd Avenue North, Fargo, North

 7  Dakota.  My name is Hans Hummel.  I'm the Director of

 8  Industry Operations for the Saint Paul Field Division, and

 9  will be the officer presiding over this hearing by the

10  direction and under the authority of the Bureau of Alcohol,

11  Tobacco, Firearms and Explosives, United States Department

12  of Justice.

13             This hearing is administrative proceeding as

14  informal in nature.  The hearing is to review the Notice to

15  Revoke or Suspend License and/or impose a civil fine, ATF

16  Form 4500, issued under the provisions of Title 27, Code of

17  Federal Regulations, Part 478, Subpart E.

18             As a result of the issuance of ATF Form 4500, you

19  requested in writing that a hearing be granted.  The focus

20  of this hearing will be on the evidence regarding whether

21  the license should be revoked or suspended or if a fine

22  should be issued.  There are a couple procedural issues I'll

23  address before we get started.

24             A transcript is being made of these proceedings

25  for the record.  Because of this, I ask that you speak one
```

1  at a time, so that a clear and accurate record can be made.

2  Answers must be audible.  Please do not nod or shake your

3  head in response to a question.

4          At this time, I'll ask the licensee and those

5  present on its behalf to introduce themselves.  And please

6  give me your full name and spell your last name for the

7  record.

8          MR. HARRIS:  I'm John Harris.  I'm an attorney

9  representing the licensee, H-A-R-R-I-S.

10          MR. MOREHOUSE:  Tanner Morehouse.  I am a co-owner

11  of Bridge City Ordinance.  M-O-R-E-H-O-U-S-E.

12          MR. TORREY MOREHOUSE:  I'm Torrey Morehouse,

13  co-owner of Bridge City Ordinance.  M-O-R-E-H-O-U-S-E.

14          DIO HUMMEL:  All right.  Division Counsel

15  Thielhorn, will you and anyone producing evidence on behalf

16  of ATF introduce yourselves?  Please give me your full name

17  and spell your last name for the record.

18          MS. THIELHORN:  I'm Michele Thielhorn, Acting

19  Division Counsel for the St. Paul Field Division.  My last

20  name is spelled T-H-I-E-L-H-O-R-N.  And we will be asking,

21  IOI Jacob Temp to testify on behalf of ATF.

22          DIO HUMMEL:  Just a little bit louder in the

23  future, counsel.

24          MS. THIELHORN:  Sure.

25          DIO HUMMEL:  Thank you.

1            MR. TEMP:  My name is Jacob Temp, last name

2 spelled T-E-M-P.  I'm an industry operations investigator

3 here in the Fargo office.

4            DIO HUMMEL:  Okay.  And then before we

5 proceed with the presentations, I believe there's a

6 consensus that we'll accept all the exhibits provided in

7 advance to the record.  That's ATF Exhibits 1 through 11 and

8 then Licensee Exhibits 1 through 18.

9            So it's still active, right?  Yeah.

10            MS. THIELHORN:  Yes, I agree.  But I would note

11 for the record, I do have some questions when we get to it,

12 at the time, regarding a good number of the Licensee's

13 Exhibits about how they are relevant to the willfulness

14 determination, which is what we're here to talk about today.

15 And I would also note that some of licensee's exhibits, and

16 I think that's Exhibits No. 7 through 11, are outdated.

17            DIO HUMMEL:  All right.  And with that,

18 Division Counsel, you can proceed with your presentation.

19            MS. THIELHORN:  I am an attorney for the

20 government and representative for the DIO, pursuant to Title

21 27 CFR   478.76.  To be clear, I'm not a prosecutor --

22            THE COURT REPORTER:  A little bit louder, please.

23            MS. THIELHORN:  I don't know if I can talk louder.

24 So to be clear, I'm not a prosecutor and the DIO

25 is not a judge.  My role here today is to present evidence

1   on behalf of ATF regarding the three violations in the

2   Notice of Revocation, specifically, to tell you what

3   evidence ATF has to believe that the violations were

4   willful, and you'll hear that term a lot

5   willful.

6          The 8th Circuit has stated that for ATF to prove

7   that a willful violation of the federal statutes occurred,

8   it need only establish that the licensee knew of its legal

9   obligation and then you were either purposefully disregarded

10  that legal obligation or you were plainly indifferent to it.

11  And that's the On Target Sporting Goods Case 472 Fed 3rd

12  572, 8th Circuit, 2007.

13         So to begin, I will introduce the following

14  exhibits for the purpose of today's hearing.  Exhibit No. 1

15  is the Notice of Revocation from 4500, the full packet that

16  was mailed to the licensee.  Exhibit No. 2 is Morehouse's

17  request for a hearing.  Exhibit No. 3 is the Notice of

18  Hearing, scheduling the hearing originally, for July 13th.

19  Exhibit 3A is the notice, then rescheduling it for today,

20  August 16th.

21         Exhibit No. 4 is the amended report of violations

22  signed by Mr. Tanner Morehouse.  Exhibit No. 5 is the

23  Acknowledgment of Federal Regulations form, signed by Mr.

24  Tanner Morehouse in 2019.  Exhibit No. 6 is the

25  Acknowledgment of Federal Regulations form signed by Mr.

1  Morehouse in 2022.  And Exhibit 6A is the Acknowledgment of

2  Federal Regulations form signed by Mr. Tanner Morehouse in

3  2022.

4             Exhibit No. 7 is the Acknowledgment of federal

5  regulations signed by Mr. Tanner Morehouse in 2023.  Exhibit

6  No. 8 is the Form 4473 for the Fluker gun sale transaction

7  that is referenced in Violations 1 and 2 in the Notice to

8  Revoke.  Exhibit No. 9 is the Form 4473 for the Nelson gun

9  sale transaction that is referenced in Violation No. 3.  And

10 Exhibit No. 10 is a NICS audit log regarding the violations

11 discussed in Violation No. 3.

12            All of these exhibits were previously provided in

13 advance to Mr. Harris.  And I believe Morehouse Enterprises

14 would already have all of these documents in their records

15 with the exception of the NICS Audit Log, Exhibit No. 10.

16 And so I would submit these for the record as evidence in

17 support of the Notice of Revocation.

18            DIO HUMMEL:  Well, as discussed, I think

19 these are all accepted for the record.

20            MS. THIELHORN:  So at this time, we'll hear

21 testimony from IOI Jacob Temp.

22                 DIRECT EXAMINATION

23                 BY MS. THIELHORN:

24      Q.  Please, for the record, introduce yourself and

25 tell us where you work.

 1      A.   My name is Jacob Temp.  I'm an industry operations

 2 investigator, commonly known as an IOI for ATF, located here

 3 at the Fargo satellite office.

 4      **Q.   And how many years have you worked for ATF?**

 5      A.   Since April 2016, so over seven years.

 6      **Q.   And what training have you received?**

 7      A.   I received 9 to 10 weeks of IOI basic training

 8 located down in Glencoe, Georgia.  Two weeks of advance

 9 explosives, a week of firearms trafficking, and I am a OJT

10 or on-the-job trainer for a trainee for the last year or so.

11      **Q.   Do you receive ongoing trainings to keep up-to-**

12 **date?**

13      A.   I do.

14      **Q.   Now, how many inspections have you conducted while**

15 **working for ATF as an IOI, or Industry Operations**

16 **Investigator?**

17      A.   Approximately 300.

18      **Q.   And did you conduct a qualification inspection of**

19 **Morehouse Enterprises doing business as Bridge City**

20 **Ordinance on August 26th, 2022?**

21      A.   I did.

22      **Q.   Just tell us what is a qualification inspection?**

23      A.   A qualification inspection is where an applicant

24 submits a application for an FFL.  It goes to the licensing

25 center, area supervisor, then get given to me, as the IOI.

1  I review that application.  I check to see if they have any

2  prior FFLs or any type of relationship with ATF.

3           I do some preliminary work, which I verify about

4  the ownership of the premises, making sure the business is

5  properly registered.  For instance, like the Secretary of

6  State, North Dakota, if it's an LLC incorporation.  I verify

7  zoning, compliance with zoning law or ordinances, and then I

8  call the applicant.  We set up a time to meet.  We go

9  through the application and then do a regulation review of

10 the Federal Firearms License.

11      **Q.   Okay.  And before your qualification inspection in**

12 **2022, did you notice that Morehouse had had a previous**

13 **qualification inspection in 2019, when they applied for**

14 **their first license, their dealer's license?**

15      A.   Yes.

16      **Q.   And as part of an inspection, either a compliance**

17 **inspection or a qualification inspection, is it standard**

18 **operating procedure for an IOI, an investigator such as**

19 **yourself, to review the federal regulations with the Federal**

20 **Firearms Licensee?**

21      A.   It is.

22      **Q.   The FFL?  And just tell us, what is an**

23 **Acknowledgment of Regulations form?**

24      A.   It's a form that lists all the Federal Firearm

25 regulations that we are to review.  There's boxes on the

1  left side where the applicant or licensee records their

2  initials.  And then we go through each regulation and then

3  we sign, both the applicant or the licensee and IOI, sign

4  the back of the form stating that we reviewed the

5  regulations and that's what an Acknowledgment of Federal

6  Firearm regulations is or the form.

7      Q.   Okay.  So it is standard operating procedure to

8  have the licensee sign the Acknowledgment of Regulations

9  form?

10     A.   Yes.

11     Q.   And does the licensee get a copy of this

12 Acknowledgment of Federal Firearms Regulations form?

13     A.   They do.

14     Q.   Let me show you Government's Exhibit No. 5.  Is

15 this the acknowledgment form like you've just described?

16     A.   Yes, it is.

17     Q.   And as for Government's Exhibit No. 5, who

18 reviewed the regulations with Mr. Morehouse in 2019?

19     A.   IOI Joann Symington.

20     Q.   And what does it say, right there, above Mr.

21 Morehouse's signature on Exhibit 5?

22     A.   It says:  "Investigator Joann Symington, IOI,

23              explained this information to me on April

24              3rd, 2019 and answered my questions regarding

25              this information.  I have received a copy of

1                    this for my records as a reference.  I

2                    understand that this is only a general

3                    overview of the regulations and that I will

4                    be responsible for familiarizing myself with

5                    all the laws and regulations governing my

6                    licensed firearms business."

7        Q.   And as a result of that qualification inspection

8   in 2019, Morehouse Enterprises was issued a Federal Firearms

9   License -- Dealer's License; correct?

10       A.   Correct.

11       Q.   Now let's talk about -- that was in 2019 -- let's

12  talk about in 2020.  When the pandemic started in 2020, how

13  did that impact your inspections?

14       A.   There is a period of time where we did not go

15  onsite to conduct inspections pertaining to qualifications,

16  it was done by phone.  So everything was done first.  We

17  call the applicant and then do the application review and

18  the acknowledgment over the phone.

19       Q.   What about compliance inspections?  Did you do a

20  lot of compliance inspections during the pandemic?

21       A.   No.

22       Q.   And then, the pandemic lasted well into 2021;

23  correct?

24       A.   Correct.

25       Q.   And what of the inspections you did in 2021?  What

1  did the majority of those consist of?

2      A.   They were SCA explosive inspections and then

3  follow-up with Federal Firearms licensees who had received a

4  qualification by phone the year prior, in 2020.

5      Q.   And you had to --

6           DIO HUMMEL:  Date, 2020?

7           THE WITNESS:  Yes.

8  BY MS. THIELHORN:

9      Q.   And you had to do those explosives inspections in

10  2021 because those are mandated, by the statute, to be

11  conducted every three years or so; correct?

12      A.   Correct.

13      Q.   So that takes us then to 2022.  Let me show you

14  Government's Exhibits No. 6 and 6A.  Who reviewed the

15  regulations on August 26th, 2022, with both Mr. Tanner

16  Morehouse and Mr. Torrey Morehouse?

17      A.   I did.

18      Q.   And that was part of the second qualification

19  inspection; correct?

20      A.   Correct.

21      Q.   And so when you reviewed those regulations with

22  them in 2022, that would have been the second time an ATF

23  investigator had gone through the federal regulations and

24  the legal requirements for gun sales with Morehouse

25  Enterprises; correct?

1      A.    That's correct.

2      Q.    Now during that qualification inspection in August

3  of 2022, do you specifically recall going over the National

4  Instant Criminal Background Check System, the NICS system,

5  for the requirement with the Morehouses in August of 2022?

6      A.    Yes.

7      Q.    And does that, Government's Exhibit 6 and 6A,

8  specifically indicate that you reviewed the NICS background

9  check requirements with both Mr. Tanner and Mr. Torrey

10  Morehouse?

11      A.    That's correct.

12      Q.    And do you specifically recall going over sales to

13  out-of-state residents with the Morehouses on August 26th,

14  2022?

15      A.    Yes.

16      Q.    And do those documents, Government's Exhibit 6 and

17  6A, specifically indicate that you reviewed prohibited sales

18  with both Mr. Tanner and Mr. Torrey Morehouse?

19      A.    Yes.

20      Q.    And that would include sales to out-of-state

21  residents.

22      A.    That's correct.

23      Q.    Do you specifically recall going over the

24  requirement for proper record-keeping, particularly

25  recording information received from the FBI NICS background

1  check system?

2       A.   Yes.

3       Q.   Specifically, did you discuss, with both Mr.

4  Torrey and Mr. Tanner Morehouse, what to do in the case of a

5  NICS denial?

6       A.   Yes.

7       Q.   They could give the transferee that NICS

8  transaction number, the NTN, so that the buyer could appeal

9  the decision to the FBI if they chose to do so.

10      A.   That's correct.

11      Q.   And do those documents, Government's Exhibit 6 and

12  6A, specifically indicate that you reviewed record keeping

13  requirements with Mr. Torrey and Mr. Tanner Morehouse?

14      A.   Yes.

15      Q.   Now, regarding Exhibit 6 and 6A, did both Mr.

16  Tanner Morehouse and Mr. Torrey Morehouse, initial beside

17  those boxes and then sign the forms on August 26th, 2022,

18  indicating and acknowledging that you had gone over those

19  topics with them?

20      A.   Yes.

21      Q.   And were you present when they signed those forms?

22      A.   I was.

23      Q.   Is that your signature on those two forms?

24      A.   That is.

25      Q.   Now, at the end of your qualification inspection

1  in August of 2022, did you provide contact information or

2  reference materials to the Morehouses if they had any

3  questions for you?

4      A.   Yes.

5      Q.   And could you just tell us briefly, what type of

6  things you provided?

7      A.   Yep, I always provide my business card, which

8  includes my phone number, my name, and my email.  And then

9  the reference materials that we went over, saw the

10  regulation, there's a packet that I provide that we go

11  through.  And so that's standard operating procedure that I

12  leave all those documents behind of the regulations we

13  covered.

14      Q.   Did either Mr. Tanner or Mr. Torrey Morehouse ask

15  any questions about NICS requirements or out-of-state or

16  sales to out-of-state residents at that time, on August

17  26th, 2022?

18      A.   Yes, I specifically recall a discussion regarding

19  concealed carry permits regarding like reciprocity with, you

20  know, for instance, like an example, like Utah and North

21  Dakota.  And I always make it clear that to use a concealed

22  carry in lieu of NICS, it must be issued from the -- it must

23  be North Dakota concealed carry permit for North Dakota

24  residents.

25      Q.   Okay.  And so that conversation would have been

1  the day after the violation that was listed in the notice to

2  revoke; correct?  Look, that's the --

3      A.    Fluker transaction?

4      Q.    Yes.

5      A.    Yes, that would have been.  That, yeah, that was

6  my recollection.  The Fluker transaction was 8/25 and the

7  application -- qualification inspection done was on 8/26,

8  according to my computer.

9      Q.    So they had concern about it at that time and they

10 asked you to so that they would know to clarify for them;

11 correct?

12     A.    That would be my view, yes.

13     Q.    Now, ultimately, as a result of the qualification

14 inspection on August 26th, 2022, ATF issued Morehouse

15 Enterprises their second license; correct?

16     A.    Yes.

17     Q.    That's a manufacturing license.

18     A.    That's correct.

19     Q.    Now, following the qualification inspection in

20 August of 2022, at some time after that, were you ask to

21 conduct a compliance inspection of Morehouse Enterprises?

22     A.    I was.

23     Q.    Why did you conduct the inspection at that

24 particular time, in February of 2023?

25     A.    Due to a referral that was given to us with

1  concerns of suspicious NICS activity.

2      Q.   Okay, now let me show you ATF Exhibit No. 10.

3  Does this document show the suspicious NICS transactions?

4  Namely, that Morehouse Enterprises was running the same

5  person more than once after they received the denial?

6      A.   Yes.

7      Q.   Okay.  Now, the compliance inspection that you

8  conducted in February of 2023, that was then actually the

9  third time that an ATF investigator had done some sort of

10  inspection with Morehouse Enterprises; correct?

11      A.   That's correct.

12      Q.   So two previous qualification inspections and then

13  this compliance inspection; correct?

14      A.   Yes.

15      Q.   So just tell us briefly, what is a compliance

16  inspection?

17      A.   A compliance inspection is an inspection that's

18  done to assure that Federal Firearm regulations and laws are

19  abided by.  So once issued, I do preliminary work, again

20  verifying that the business entity is registered with the

21  appropriate state, that the premises ownership.  I verify

22  with zoning.  We look at prior interactions with ATF, their

23  file.

24          I run different logs like that audit log that we

25  discussed, review those things and then we conduct the

1  compliance inspection and then I always do an inventory of

2  the firearms first.  I then reconcile to the acquisition

3  disposition record and then review 4473s for the inspection

4  period, which was a year from that date prior.

5      Q.   Now, you mentioned a 4473.  Let me show you

6  Government's Exhibit 11.  What is that?

7      A.   That's an ATF Form 4473 Firearms Transaction

8  record.

9      Q.   And you know, briefly, what is exactly a 4473?

10     A.   It's a form that records the transfer between

11  transferor to transferee of the firearms that are being

12  transferred.  Section A is filled out by the licensee.

13  Section B is then filled out by the transferee, which

14  includes their name, their personal identification.  There's

15  a series of questions beginning in Item 21 of prohibited

16  factors or categories, then the transferee then signs and

17  dates, assuring that everything on that Section B is filled

18  out correctly.

19         Section C is filled out by the licensee, which

20  includes identification, the NICS information.  And then

21  Section D is, when applicable, signed and dated by the

22  transferee if the firearm was transferred after the original

23  data certification.  And then Section E is filled out by the

24  licensee.

25     Q.   Okay.  And I believe that you also mentioned that

1  you review the NICS audit log as part of the compliance

2  inspection; correct?

3       A.   Yes.

4       Q.   Let me show you Exhibit No. 10.  Just to tell us,

5  what exactly is a NICS audit log?

6       A.   The log provides information of NICS checks that

7  were initiated by the licensee to the FBI NICS.  All

8  proceeds for the little, you know, 90 days prior to when

9  this is run, is recorded.  And then all denials associated

10 with NICS, with this licensee, are recorded on this log.

11      Q.   And you reviewed that audit log, Exhibit No. 10,

12 prior to conducting the compliance inspection?

13      A.   I did.

14      Q.   Correct?

15      A.   Yes.

16      Q.   Now tell me about the compliance inspection.  When

17 you got there, what did you do exactly?

18      A.   I first introduced myself to the licensee, so I

19 spoke with Tanner and Torrey Morehouse.  There was another

20 employee there.  I don't recall his name at this time.  They

21 spoke with -- I requested, you know, their A&D record or

22 notified them what I was doing there and then first

23 conducted 100% inventory of their firearms.

24           I reconciled that to their acquisition disposition

25 record.  I reviewed the 4473s and then disclosed the

1  violations to them.

2      Q.   So were were any violations found as a result of

3  the compliance inspection?

4      A.   Yes.

5      Q.   Okay.  And let me show you Government's Exhibit

6  No. 4.  That's the amended report.

7           Did you amend the original report to add the 121

8  violations regarding the failures to appropriately record

9  the two NICS denials on a 4473 and the failure to

10  appropriately record the NTN number associated with the

11  proceed?

12     A.   Yes.

13     Q.   So, and that's your report that you issued as a

14  result of your inspection; correct?

15     A.   Yes.

16     Q.   Now let's talk about the actual Notice to Revoke

17  that was sent.  Violation No. 1 states that:  "The licensee

18                    willfully sold or delivered a firearm other

19                    than a rifle or a shotgun to a person not

20                    licensed by the Gun Control Act and who the

21                    licensee knew or had reasonable cause to

22                    believe, did not reside in the state in which

23                    the licensee's place of business or activity

24                    is located."

25           And then it references the Fluker transaction on

 1  August 25th, 2022.  So let's talk about that transaction.

 2  Let me show you Government's Exhibit 8.

 3          What is Government's Exhibit No. 8?

 4     A.   It's a ATF Form 4473 Firearms transaction record

 5  pertaining to the transferee of Andrew Fluker.

 6     Q.   And for that form, the gun purchaser or the buyer

 7  is Andrew Fluker; correct?

 8     A.   That's correct.

 9     Q.   Is Mr. Andrew Fluker a person licensed by the Gun

10  Control Act?

11     A.   No.

12     Q.   And per that form, what type of firearm did Mr.

13  Fluker purchase for Morehouse Enterprises?

14     A.   A pistol.

15     Q.   In what state of residence did Mr. Fluker indicate

16  in Box No. 10, on that Form 4473?

17     A.   Georgia.

18     Q.   And what identification did Mr. Fluker provide as

19  indicated in Box 26 on that Form 4473?

20     A.   Georgia is his driver's license.

21     Q.   So would a person indicating their current state

22  of residence is Georgia and giving the FFL, a Georgia

23  driver's license, give that FFL reason to know or believe

24  the person does not reside in the State of North Dakota?

25     A.   That's correct.

1      Q.   And that North Dakota is in fact where the

2  Morehouse Enterprise business is located; correct?

3      A.   Correct.

4      Q.   Now, despite Mr. Fluker clearly indicating he was

5  a current resident of Georgia, was the pistol transferred to

6  him, anyway?

7      A.   Yes.

8      Q.   And this is evidenced by the FFL signature in Box

9  35; correct?

10      A.   That's correct.

11      Q.   And who signed that form?

12      A.   Mr. Torrey Morehouse.

13      Q.   And does Federal Law, specifically 18 United

14  States Code 922(b)(3) and 27 CFR 478.99(a) prohibit a

15  licensee from selling a pistol to a person, such as Mr.

16  Fluker, who is not licensed by the Gun Control Act and who

17  lives in another state?

18      A.   It prevents the transfer of a pistol to an

19  out-of-state residence.

20      Q.   Now, did you show this document, Government's

21  Exhibit No. 8, to Mr. Tanner Morehouse and discuss the

22  residency requirement?

23      A.   Yes.

24      Q.   And did he have a response to the violation?

25      A.   No, I just recall him acknowledging the violation

1  that was stated.

2      Q.   Okay.  Now Violation No. 2, that's set forth in

3  the Notice of Revocation, states that Morehouse Enterprises,

4  the licensee, willfully transferred a firearm to an

5  unlicensed person without first contacting NICS and

6  obtaining the unique identification number before

7  proceeding.

8           And again, this references the Fluker transaction

9  on August 25th, 2022.  So just briefly, tell us what is a

10  NICS check?

11      A.   It's a National Instant Criminal Background Check

12  System, NICS.  It is licensee's responsibility to contact

13  NICS prior to a transfer of a firearm to a non-licensee.

14  And the NICS check is to assure that the transferee is not

15  prohibited from possessing firearms.

16      Q.   And so that's a public safety aspect, to make sure

17  that prohibited people aren't getting guns; correct?

18      A.   Correct.  Correct.

19      Q.   Now is the NICS system run by the FBI?

20      A.   It is.

21      Q.   And does Federal Law, specifically Title 18,

22  United States Code, Section 922(t) and 27 CFR 478.102(a)

23  require a Federal Firearms Licensee, such as Morehouse

24  Enterprises, to conduct a NICS check on each unlicensed

25  person wanting to buy a firearm?

```
 1      A.   Correct.

 2      Q.   Now, back to Government's Exhibit No. 8, on that

 3 form up there in Box 29, what does it say?

 4      A.    It says no NICS check is required because the

 5 transferee buyer has a valid permit from the states where

 6 the transfers take place, which qualifies as an exemption to

 7 NICS.

 8      Q.   And tell us, briefly, what is a valid permit?

 9      A.   A North Dakota concealed carry permit issued by

10 the North Dakota BCI for North Dakota residents.

11      Q.   And according to that, Government's Exhibit No. 8,

12 what state issued the permit to Mr. Fluker?

13      A.   Georgia.

14      Q.   And what state was the gun transfer conducted in?

15      A.   State of North Dakota.

16      Q.   So despite the form clearly stating the permit had

17 to be issued by North Dakota, the gun was transferred to Mr.

18 Fluker anyway; correct?

19      A.   That's correct.

20      Q.   And we know that based on the FFL signature on the

21 form; correct?

22      A.   Yes.

23      Q.   Now, did you discuss this NICS violation with Mr.

24 Tanner Morehouse?

25      A.   I did.
```

1    Q.   And did he have any response about the violation?

2    A.   No.  But just recall a acknowledgment of the

3    violation I've stated.

4    Q.   Okay, now let's talk about Violation No. 3 set

5    forth in the Notice of Revocation.  It states that:

6              "Morehouse Enterprises, the licensee,

7              willfully made a false entry in, or failed to

8              make appropriately interest in, or failed to

9              properly maintain any record of importation,

10             production, shipment, receipt, sale or other

11             disposition as required by the Gun Control

12             Act."

13         And it says, for three instances, where this

14   occurred:  "The failure to properly record the NICS

15   transaction number, the NTN, the failure to record the NICS

16   deny responses in two instances."

17         And this is in regards to the Robert Nelson

18   transfer on March 28th, 2022.  Does Federal Law,

19   specifically 18 United States Code 922M and 27 CFR

20   478.121(c) require a Federal Firearms Licensee to make these

21   entries, an NTN entry and a NICS denial response entry, into

22   its records for gun sales?

23   A.   Yes.

24   Q.   And specifically, where is the licensee required

25   to record this information?

```
 1      A.   In Section 27 of the 4473.
 2      Q.   Okay, now let's talk here about Government's
 3 Exhibit 9.  What is Governments Exhibit 9?
 4      A.   It's the ATF Form 4473 Firearm Transaction Record.
 5           DIO HUMMEL:  Just a little bit slower,
 6 please, sir.
 7           THE WITNESS:  Ah, well.
 8           DIO HUMMEL:  I know you're just reading off
 9 of it.
10           THE WITNESS:  It's 4473 Firearms Transaction
11 Record for Mr. Robert Nelson.
12 BY MS. THIELHORN:
13      Q.   Now regarding this transaction, the transaction
14 for Mr. Robert Nelson, did that transaction appear in the
15 NICS audit log, which is Government's Exhibit 10?
16      A.   Can you please repeat the question?
17      Q.   Did the Nelson transaction, which is referenced in
18 Government's Exhibit 9, did that appear on the NICS audit
19 log, which is Government's Exhibit 10?
20      A.   Not the specific transaction on this form, but I
21 was familiar with Robert Nelson on the audit log in Exhibit
22 10, yes.
23      Q.   So this form, Government's Exhibit 9, represents
24 the proceed that was purportedly received for Mr. Nelson;
25 correct?
```

1      A.    That's correct.

2      Q.    And the NICS audit log, Exhibit No. 10, talks

3  about the two denials on the same day as the proceed for Mr.

4  Nelson; correct?

5      A.    That's correct.

6      Q.    And those two NICS denials, according to this

7  audit log, were approximately one hour apart; correct?

8      A.    Correct.

9      Q.    Okay.  Now, look over at Government's Exhibit No.

10  9, there in Box 27.b.

11           What is the purpose of Box 27.b on the 4473?

12      A.    It's the NICS transaction number that the licensee

13  receives from NICS on a NICS check and it's to show and

14  provide that they contacted NICS, and it's a unique number

15  for that specific NICS transaction.

16      Q.    So the NTN number is required to be recorded there

17  in Box 27.b; correct?

18      A.    That's correct.

19      Q.    And the NTN, that's the NICS transaction number,

20  and that's the number the FBI gives to a licensee to

21  document that they did in fact contact the NICS system and

22  run a background check; correct?

23      A.    That's correct.

24      Q.    Now, was the NTN information in Box 27.b

25  appropriately or accurately entered?

1     A.    No, it was not.

2     Q.    And how do you know it was not?

3     A.    Because there is 8 digits and NICS numbers are 9

4 digits.

5     Q.    Now, are NTN numbers information that is required,

6 by Federal Law, to be recorded in the FFL's records?

7     A.    Yes.

8     Q.    Now, when you amended the Report of Violations,

9 Government's Exhibit 4, was it your concern that you

10 basically had no way of validating that NTN number --

11    A.    No.

12    Q.    -- meaning you didn't have anything to show at

13 that point in time that they'd ever gotten a proceed;

14 correct?

15    A.    That's correct.

16    Q.    And that's because the number is only 8 digits, so

17 you couldn't call up, you know, NICS and say, is this the

18 proceed that they reported because you only had 8 digits;

19 correct?

20    A.    Correct.

21    Q.    And then that proceed didn't appear on the audit

22 log; correct?

23    A.    That's correct.  It was not on the audit log.

24    Q.    So when a licensee calls the NICS system, what are

25 the four possible responses that they can get from the NICS

1  system?

2       A.   Proceed, denied, cancelled, and delayed.

3       Q.   **And just briefly tell us what's the significance**

4  **of each of those responses?**

5       A.   Proceed is that there's no identifiable for

6  contributing information for that transferee, so they can

7  proceed with the firearm sale transfer.  Denied, the

8  transaction needs to stop as there's prohibitng factors.

9            Canceled is -- personally, I've never seen a

10 cancelled, but I'm assuming the whole NICS transaction is

11 canceled.  And then delayed, there needs to be further

12 review by the FBI, and so there needs to be so often provide

13 the licensee when the date of the firearm that can be

14 transferred.  It needs to be three business days after,

15 where they could legally transfer that firearm.

16      Q.   **Back there to Governments Exhibit No. 9.  What**

17 **does it say in Box 27.c, Government's Exhibit 9?**

18      A.   This is response initially provided by NICS, or

19 the appropriate state agency was, and then they checked

20 proceed.

21      Q.   **And was that information correct?**

22      A.   No, it was not correct.

23      Q.   **And how do you know that information is not**

24 **correct?**

25      A.   Because of the denials that were recorded on the

 1  audit log in Exhibit 10, and there's no way for me to

 2  confirm due to the missing digit of NTN in Box 27b.

 3      Q.   Right.  But you know that the initial response

 4  given by the NICS system was not a proceed because they had

 5  two previous denies on the same day; correct?

 6      A.   That's correct.

 7      Q.   Now let's go to the Government's Exhibit No. 10,

 8  the audit log that you just mentioned.  So the initial

 9  response that the NICS system gave to the licensee, that

10  should have been recorded in Box 27.c on the Form 4473, was

11  a denial; correct?

12      A.   That's correct.

13      Q.   And was that response accurately recorded by the

14  FFL?

15      A.   No, it was not.

16      Q.   Was that response recorded anywhere?

17      A.   No.

18      Q.   Again, is a NICS response information the licensee

19  is required by Federal Law to accurately record and maintain

20  in its records?

21      A.   Yes.

22      Q.   Now, and the second response that the licensee

23  received from the NICS system was also a denial; correct?

24      A.   That's correct.

25      Q.   And was that response recorded anywhere?

1    A.    No, it was not.

2    Q.    And how should this have been recorded?

3    A.    They should have recorded the first initial or the

4  response of denial on the form, and at that point, provide

5  the transferee the NTN number of that denial where they

6  could then proceed to appeal NICS if they so choose.

7    Q.    Okay.  So to be clear, instead of writing down a

8   proceed , which was the third response, they were supposed

9  to write down the initial response per the instructions on

10  the form; correct?

11    A.    That's correct.

12    Q.    And the initial response for Mr. Nelson was

13  denied; correct?

14    A.    Correct.

15    Q.    And then, according to the procedure, they were

16  supposed to give Mr. Nelson the NTN number and information

17  on how to appeal that FBI NICS decision; correct?

18    A.    That's correct.

19    Q.    Now, did you discuss this violation, 4473

20  violation, with Mr. Tanner Morehouse?

21    A.    I did.

22    Q.    And did he have any explanation about the

23  violation?

24    A.    Yes, we talked about this a few different times

25  and I just recall different -- you know, the responses as

1  that Tanner said that he wasn't the transferor, you know,

2  the transferor of the firearm, but speculated a few

3  different things that could have happened.

4          I do recall remarks saying that they would never

5  run multiple NICS checks on one person on the same day,

6  especially if it was denied.  And then the other responses

7  was that when talking about the multiple NICS denials, that

8  the transferee would come in, get a denial and then sometime

9  after, they would tell the FFL that they got it cleared up

10  or they fixed the problem or issue, and so then they would

11  run them again.

12      **Q.   Was Mr. Tanner Morehouse's statements about not**

13  **doing multiple NICS checks on the same day accurate?**

14      A.   No.

15      **Q.   And how do you know they were not?**

16      A.   Because according to Exhibit 10, the audit log

17  date, they did indeed run multiple NICS checks on one

18  individual on the same day.

19      **Q.   And only one of those 3 responses was recorded;**

20  **correct?**

21      A.   That's correct.

22      **Q.   Now, in reviewing -- you said you reviewed all the**

23  **4473s for the inspection period.  Did you find evidence that**

24  **Morehouse Enterprise does, in fact, know how to record**

25  **multiple NICS responses?**

1      A.   Yes.

2      Q.   And particularly, do you recall what 4473 showed

3  that?

4      A.   Yep, pertaining to a transferee by the last name

5  of Rykowski?

6      Q.   And was that also reflected on Government's

7  Exhibit No. 10?

8      A.   Yes.

9      Q.   Now, at the end of the compliance inspection, did

10 you again go over the regulations with Mr. Tanner Morehouse?

11     A.   I did.

12     Q.   And let me show you Government's Exhibit No. 7.

13          Is that your signature on the form?

14     A.   It is.

15     Q.   And were you present when Mr. Tanner Morehouse

16 signed that form?

17     A.   I was.

18     Q.   That is all the questions that I have for you.

19 I'm sure Mr. Harris may have some questions for you, but

20 that's all I have.

21          DIO HUMMEL:  All right, Mr. Harris.

22             CROSS EXAMINATION

23             BY MR. HARRIS:

24     Q.   Thank you.  Good morning, IOI Temp.

25     A.   Good morning, sir.

1      Q.    This is the first time we've met.

2            Is that correct?

3      A.    Yes.

4      Q.    And actually, I think it's the first time I've met

5  any of you.  So I've got some questions about this

6  transaction, and it may take us a while to get through them,

7  but bear with me, please.  Can you tell me, in preparing for

8  your testimony today, did you review any documents

9  concerning the Morehouse FFL or the history of it, other

10 than what you've seen today?

11     A.    No.  I mean, as far as -- I reviewed the file of

12 Morehouse, which included the qualifications and a change of

13 address within the file.

14     Q.    And when you say you reviewed the file, is that a

15 paper file or is that something else, a computerized record,

16 for example?

17     A.    It's a computerized record.

18     Q.    And is that computerized record maintained in a

19 system called Spartan?

20     A.    It is.

21     Q.    Okay.  Do their records go back far enough that

22 they're in the inspect system or just the Spartan system?

23           MS. THIELHORN:  Excuse me, Mr. Harris, but how is

24 this relevant to the willfulness determination?

25           MR. HARRIS:  It'll get there in a minute.  Is some

1  of the records that are maintained in Spartan that are not

2  here this morning are relevant I think to the wilfulness in

3  its determination because it goes to issues like, for

4  example, the volume of sales that the IOI's required to

5  document.

6        MS. THIELHORN:  Okay.  Okay.  Sure.

7  BY MR. HARRIS:

8        Q.   Go ahead.

9        A.   I believe that the qualifications were all in and

10 the change of just, there, I did review them in the Spartan

11 system.  I don't recall seeing anything in the inspect

12 system.

13       Q.   Very good.  If you would look, again, at the

14 Government's Exhibit 6.  Let me back up.  Let's start with 5

15 before I get to 6.  Government's Exhibit 5 is the

16 Acknowledgment of Federal Firearms Regulations dated in

17 April of 2019.  Is that correct?

18       A.   That's correct.

19       Q.   And that qualification inspection was performed by

20 which IOI?

21       A.   For Exhibit 5, dated April of '19, Joann

22 Symington.

23       Q.   And is IOI Symington still with this office?

24       A.   Yes.

25       Q.   Okay.  And she's not testifying today, as far as

1  you know?

2      A.    No.

3      Q.    And were you present at the time that Exhibit 5

4  was signed and acknowledged?

5      A.    I was not present at that business premises, no.

6  Or I had nothing to do with that qualification, sir.

7      Q.    Okay.  And so as far as your testimony today, you

8  can't tell us to what level of detail IOI Symington covered

9  these individual issues at the qualification inspection in

10  2019.

11      A.    Sir, all I have is the signed acknowledgment that

12  they went through and that those regulations were covered

13  with the licensing.

14      Q.    Right.  But in terms of the amount of detail or

15  specific questions or topics other than what's checked here,

16  for example, you don't know specifically what was discussed

17  by IOI Symington on, for example, prohibited sales or how to

18  conduct the NICS check?  You don't know the detail.

19      A.    No, I was not present at that qualification

20  inspection, sir.

21      Q.    And you don't know, because you weren't there,

22  what questions either of the Mr. Morehouses, let me say it

23  that way, may have had at that time.  Is that correct?

24      A.    Correct.

25      Q.    And you would have no testimony concerning the

1  specifics of that conversation as it applies to the three

2  counts that we're talking about today, the Fluker incident

3  or the Nelson incident.  Is that correct?

4     A.   No, I was not there, present.  I don't know how

5  much detail was spoken specifically to either.  All I have

6  to go off is that an acknowledgment was provided and gone

7  through.  I don't know the specific, you know,

8  communications.  What was discussed, questions asked, I

9  would not be able to speak to anything like that other than

10 the acknowledgment here in the exhibit.

11    Q.   Okay, and looking at Exhibit 5, you've got on the

12 left-hand side, your topics, and then there's a middle

13 column that's US code and CFR references.  And in the

14 right-hand column is a page number column.  Can you tell me

15 what that column refers to?

16    A.   The page number column?

17    Q.   Yes, sir.

18    A.   That's to provide the page reference in the

19 Federal Firearm Regulations Guide where the regulations are,

20 the specific topic is located.

21    Q.   Okay, and is a full copy of that Federal Firearms

22 Regulations Reference Guide provided to the licensee or the

23 applicant at the time of the qualification inspection?

24    A.   I'm not sure with Joann's.  I, individually, do

25 not print out a copy of the regulations other than the

1  pamphlets provided in the packet that I give to licensees or

2  applicants at the inspection.

3      Q.   And when you review that, a licensee's file, like

4  you did in this case, is there a document in there,

5  anywhere, that specifically shows an itemization or

6  checklist of what IOI Symington would have provided in 2019?

7      A.   I don't recall any specific items other than the

8  review of the acknowledgment or the Acknowledgment of

9  Federal Primary Regulations that we have here.

10     Q.   Okay.  And you would have no way to know or

11 testify, today, as to how long, how many hours, for example,

12 IOI Symington spent with the Morehouses, explaining to them

13 all of these topics that are checked off on these two pages

14 of Exhibit 5.

15     A.   No, I don't know how long she was present with

16 them.

17     Q.   Now, if you would look at Licensee Exhibit 1,

18 which is in this stack of documents, that's Exhibit 1 right

19 there.  Do you recognize that document?

20     A.   Yes.

21     Q.   And what is it for the record?

22     A.   It is the 2014 ATF Federal Firearms Regulations

23 Reference Guide.

24     Q.   And is this the same Federal Firearms Regulations

25 Reference Guide that is referred to on the Acknowledgment of

1  Federal Firearms Regulations?  That's Government Exhibit 5.

2       A.   All I have to go off of, sir, is that on the top

3  it says:   Page references are in the Federal Firearm

4  Regulations Reference Guide ATF 5300.4, December 2014.

5       Q.   Right.  And do you have an opinion, one way or the

6  other, is Licensee Exhibit 1 the document that's being

7  referenced in that form, Exhibit 5 from the government?

8       A.   I couldn't say yes or no with all assurance that

9  that's the exact page number into this regulation guide.

10       Q.   Well, have you ever seen Licensee Exhibit 1 in a

11  bound book form as opposed to the PDF printed out?

12       A.   Yes.

13       Q.   And it's a white book.  Is that correct?

14       A.   That's correct.

15       Q.   Prior to that, there was a green book.

16            Do you remember it?

17       A.   I'm sure I've seen it before, but I came on with

18  --

19            MS. THIELHORN:  You're going to date yourself now.

20            THE WITNESS:  Yeah.  I came on in 2016, so I've

21  always just referenced to the 2014 white book.

22  BY MR. HARRIS:

23       Q.   Yeah.  Do you know if the 2014 white book was ever

24  updated, or is this the current version?

25       A.   This is the current version, the 2014.  I'm not

1  sure if they've made updates.  I've never been in possession

2  if there has been updates.  This is the last known version

3  of the regulation guide.

4       Q.   You may or may not know, but can you explain, at

5  least for this record, why Licensee Exhibit 1, and if you go

6  to the website and pull it up or print it off, because I

7  think that's where this one came from, is dated September of

8  2014.  But the acknowledgment form references a December

9  2014 edition?

10      A.   Are you asking me why I think that?

11      Q.   Mm-hmm.

12      A.   I couldn't possibly answer that.  I have no idea.

13      Q.   So if you were doing an qualification inspection

14 or compliance inspection and you had someone sign an

15 acknowledgment and they said, Hey, where's December 2014?  I

16 can't find it.

17           What would you tell them?

18      A.   I would tell them that I'm only aware of the

19 September 2014 guidebook in reference, the one that I know

20 of.

21      Q.   Okay.  Now, just so for the questions I've got

22 coming up, the Fluker incident occurred August the 25th of

23 2022.  Is that correct?

24      A.   That's correct.

25      Q.   And the Nelson incident occurred in March of 2022.

1    A.   I haven't reviewed that, but I believe you're

2  right.  That's correct.

3    Q.   **Okay.**

4    A.   Yes, March of 2022.  That's right.

5    Q.   **And your qualification inspection was done for the**

6  **manufacturing license August the 26th of 2022.**

7    A.   That's correct.  Yes, sir.

8    Q.   **So both of the incidents that we're talking about**

9  **today -- that's charged as a basis of this revocation --**

10  **both of those occurred before the 2nd qualification**

11  **inspection.**

12    A.   That's accurate.

13    Q.   **And certainly prior to your compliance inspection.**

14    A.   Yes, sir.

15    Q.   **So the only training that they had from the ATF,**

16  **at the time that those two incidences occurred, were the**

17  **qualification inspection performed by IOI Symington, and**

18  **she's not here today; correct?**

19    A.   That's correct.

20    Q.   **When you went in to do the 2022 qualification**

21  **inspection, at that time, that was just to get an additional**

22  **category of license.  Is that correct?  The 07 manufacturing**

23  **license.**

24    A.   That's applying, yeah, for a Type 07 manufacturing

25  license.

1      Q.   Correct.

2      A.   Yes.

3      Q.   And since they already have a license, would the

4  qualification inspection that was just adding the 07

5  manufacturing, would you have spent as much time going over

6  the materials on the Acknowledgment of Federal Firearms

7  Regulations as IOI Symington should have done back in 2019?

8      A.   Would have I spent more time or less time on --

9      Q.   More, the same, less; yeah.

10     A.   It really often depends on how long the

11 discussions had with the applicants of how long it goes.  I

12 couldn't -- I don't let the more interaction I have with an

13 FFL I know -- well, for instance, like that moment in August

14 or the application inspection in August, I spent more time

15 than the regulation review done in March, during the

16 compliance inspection.

17     Q.   Okay.

18     A.   So I believe what I'm responding to is my

19 qualification.  First time interacting with any licensee, I

20 spend a lot more detailed going through the qualification

21 inspection than I do if I know I just did a qualification

22 with them less than a year prior.

23     Q.   And when you went in and did the qualification

24 inspection in August of 2022, were they keeping -- their A&D

25 records, for example, were they paper records or were they

1  computerized records?

2      A.   I don't review any recordkeeping other than the

3  application that they submitted for that application.  I did

4  not review any of their current compliance inspection.  Or

5  excuse me, I didn't review any of their records at that time,

6  at that qualification inspection in August.

7      **Q.   Right.  But and I'm not asking did you perform a**

8  **qualification inspection, but did you have a discussion with**

9  **them at the time you did the QI for the 07 as to, you know,**

10 **"How you do your record-keeping?".  Did you have the how-to**

11 **discussion as opposed to the compliance inspection?**

12     A.   Yeah.  We definitely go through -- I often do as,

13 hey, if you have -- are already an FFL, you know, what kind

14 of records they maintain.  Now, do I remember specifically

15 Tanner and Torrey saying they have computerized records?

16          I wouldn't be able to regard, you know, that

17 specific response.  But it's definitely possible that we had

18 a discussion about computerized records and whether it --

19 what kind of records that they hold.

20     **Q.   Were you aware, when you did the qualification**

21 **inspection in 2022, that they were using a product called**

22 **FastBound?**

23     A.   I don't recall any specific.  We could have had

24 that discussion, I just don't recall any specific

25 conversation I had with them --

1      Q.   And for the record, can you tell me, if you know,

2   what is FastBound?

3      A.   I do know it's a computerized program for A&D

4   records.  It could and I know that for -- yes, I understand

5   that.

6      Q.   And does it also computerize the 4473 process?

7      A.   I am aware -- well, I guess I knew for sure for

8   the A&D, I wasn't 100 percent sure.  I don't recall if they

9   did well, 4473s or computerized records or not.

10     Q.   When you do a qualification inspection or in this

11  particular instance, when you did the one in 07 -- I mean,

12  in 2022, for the 07, did you talk with him about the NICS

13  process?

14     A.   I did.

15     Q.   And as part of that discussion, do you talk about,

16  with the licensee, whether they're going to call in the NICS

17  checks or whether they're using the electronic, computerized

18  NICS check?

19     A.   That is usually a discussion had.  Well, you know,

20  I'll say that both options are an available component or you

21  can do it with E-check.

22     Q.   Okay.  Do you recall if they indicated if they

23  were using one versus the other at that time?

24     A.   I'm not specifically -- no, I don't recall that

25  specific.

1      Q.   And if a licensee is using the electronic NICS

2  check, they don't actually talk to a human do they?

3      A.   For the E-check, did you say?

4      Q.   Yes.

5      A.   I've never personally done an E-check, but I

6  wouldn't imagine they would be communicating with the human,

7  no.

8           THE COURT REPORTER:  You wouldn't imagine?

9           THE WITNESS:  Them communicating with a human on

10 an E-check.

11          THE COURT REPORTER:  Thank you.

12 BY MR. HARRIS:

13     Q.   Now, when you went in to do the qualification

14 inspection in August of 2023, were you aware as to whether

15 or not there had been any --

16          MS. THIELHORN:  Mr. Harris, I believe you mean

17 February.

18          MR. HARRIS:  2022.

19          MS. THIELHORN:  Okay.  Sorry.  I thought you said

20 August '23.

21          MR. HARRIS:  I did.  I got it wrong.

22          Because I was sitting here

23 thinking wow that's today.

24

25 BY MR. HARRIS:

1      Q.    At the time you did the qualification inspection

2  in August of 2022, were you aware as to whether or not there

3  had been any report, of any kind, of suspicious activity

4  regarding this FFL?

5      A.    I was not aware.

6      Q.    I want to move forward now to the compliance

7  inspection.  I think you testified it started in February of

8  2023?

9      A.    That's correct.

10     Q.    And I think you indicated on your direct

11  testimony, that that would have been the third inspection of

12  this licensee.

13     A.    That's correct.  Between the two qualifications

14  done by my, or the qualifications done in August, Joann

15  Symington's done in 2019, and this would have been a -- so

16  those were two qualifications, and this would been the third

17  inspection; that it was a compliance inspection done in

18  February of 2023.

19     Q.    Okay, and actually, before I get to the compliance

20  inspection, when you went in August of 2022 for the

21  qualification inspection, did either of the Morehouses have

22  any questions, in particular, about the process of

23  transferring a gun, a handgun, specifically, to an

24  out-of-state resident?

25     A.    The only specific conversation I recall was

1  regarding concealed carries and what concealed carries were

2  accepted or not acceptable for, you know, for in lieu of the

3  NICS check.

4       Q.   Right.

5       A.   That's how I recall that conversation that we had.

6       **Q.   What is your general recollection of what they, at**

7  **the time, understood to be the law with respect to whether,**

8  **for example, a handgun could be transferred to an**

9  **out-of-state resident?**

10      A.   I couldn't provide like the level of their

11  knowledge exactly.  I just recall, you know, specifically

12  like I just said, like they're asking about specifically,

13  concealed carries.  And so whatever that -- that's all I

14  recall specifically regarding the conversation we had in

15  response to that.  Like I don't recall them saying Hey, we

16  never knew that we could could or couldn't transfer

17  handguns.

18           I don't remember having things or to out-of-state

19  residents, I never remember having that specific

20  conversation with them outside of the realm of concealed

21  carries.

22      **Q.   Okay.  So with respect to the concealed carries,**

23  **ATF maintains a list of all the states that have handgun**

24  **permits that are NICS exempt.  Is that correct?**

25      A.   I don't have, like at least me, individually, I

1  don't have a list of states of what is allowable or not.

2      Q.   Okay.  You know North Dakota's allowable.

3      A.   Yes.

4      Q.   Are you aware of any other states around North

5  Dakota that are allowable?

6      A.   South Dakota.  I mean, I know that South Dakota

7  allows a specific permit in lieu of NICS for South Dakota

8  residents, yes.

9      Q.   Do you have an opinion as to whether or not, as of

10 August of 2022, when you did the QI inspection, whether or

11 not the Morehouses accurately understood whether a Georgia

12 permit would be NICS exempt?

13     A.   I wouldn't be able to comment or give an opinion

14 on whether -- their level of understanding.  But I do

15 believe they asked questions regarding that concealed carry

16 discussion we had for a reason, like they think they were

17 generally wanted -- I think they wanted to know the right

18 answer; how to conduct those transfers properly, which is

19 why they would ask that question.

20     Q.   Do you recall if there was any discussion at that

21 time about wait a minute, if we did one wrong, how do we fix

22 it?

23     A.   I do.  I guess not specifically to a transfer of a

24 handgun, but I wouldn't be able to say specific discussions

25 regarding that, but I do know we go through, during the

1 regulation review, how to properly fix 4473s with mistakes,

2 yes.

3      Q.   And it's accurate to the 4473, the form itself,

4 which is, I think, Exhibit 11, it has specific instructions

5 on how to edit a 4473 and correct it.  Is that correct?

6      A.   That's correct.

7      Q.   Did anywhere in those instructions, is there an

8 indication of if you have made a mistake, like selling a

9 pistol to an out-of-state resident, do the instructions

10 address how to correct that?

11      A.   I would have to read verbatim of what the

12 instructions are on the form, but I do know that the

13 properly correct 4473, the licensee can only make

14 corrections to their portion of the form and the transferee

15 can only make corrections to their portion of the form.  And

16 if the firearm's already been transferred, they have to make

17 copies of the original 4473 to make corrections to the

18 copies.

19      Q.   And that conversation about selling to an

20 out-of-state person, the conversation took place the day

21 after the Fluker transfer.  Is that correct?

22      A.   Yes, sir.

23      Q.   And the part of the form that involve the Fluker

24 information, that would have been a part of the form that

25 the transferor could edit.  Am I correct?  Is that --

1    A.   One second, let me reference the book, here.

2              (Book is referred to.)

3         Correct.  Well, if the firearm has already been

4    transferred, they could make a copy and then make the

5    corrections because Item 29 is in Section C, so that would

6    be the portion of the form.

7    Q.   Okay, very good.  So let's move forward again,

8    where I was a moment ago, to the compliance inspection, I

9    think, in February of 2023.  Is that correct?

10   A.   Yes, sir.

11   Q.   And you indicated that this came about as a result

12   of a suspicious activity report concerning NICS activities.

13   A.   That's correct.

14   Q.   And you got the referral to do the inspection from

15   who?

16        DIO HUMMEL:  Before we -- I guess I'm

17   wondering how far -- what the -- how this has to do the

18   violations and the willfulness as to why we are going into

19   where --

20        MR. HARRIS:  One reason --

21        DIO HUMMEL:  Whoever issued the inspection.

22        MR. HARRIS:  And I can appreciate that.

23        DIO HUMMEL:  Yeah.

24        MR. HARRIS:  The inspection took place in March

25   2023.  I'm assuming, based on the testimony, but I can

1 clarify it, if needed, that the suspicious activity on NICS

2 was the Nelson transaction.  Is that correct?

3          DIO HUMMEL:  Right.  And I don't think we're

4 going to get into the -- because we're here to talk about

5 these violations, and I guess for clarification because I

6 don't want to go too far down into the referral path because

7 that's not the subject we're talking about.  But I will say

8 it was not the Nelson transaction, just for your

9 information.

10          MR. HARRIS:  Okay.  If it wasn't the Nelson

11 transaction --

12          DIO HUMMEL:  Right.  It wasn't and I'm just

13 -- just to cut it off because I don't know exactly where

14 you're going with regards to willfulness, but it didn't have

15 anything -- it was not the Nelson transaction.

16          MR. HARRIS:  Okay, very good.

17          MS. THIELHORN:  Would you like us to tell him

18 which transaction it was, but we --

19          DIO HUMMEL:  No, I think I would get the

20 potential line of questioning or the relevance if it had to

21 do with the transaction that was part of the -- that recited

22 in the notice, but it it wasn't.

23          MR. HARRIS:  Okay, and that is where I was going

24 because it, to me, it looked like based on the records that

25 were exhibited so far, that it was a year later because

1  Nelson was March of 2022.

2          MS. THIELHORN:  It's on Government's Exhibit 10,

3  but it's not any of the information cited in the Notice of

4  Revocation.  So I believe that's what the DIO was referring

5  to.

6          We're here today to just talk about whether the

7  violations cited in the Notice of Revocation were committed

8  willfully, not to talk about other suspicious NICS

9  transactions that are outside the inspection we did.

10         MR. HARRIS:  Okay.

11         MS. THIELHORN:  So does that make sense?

12         MR. HARRIS:  I got you there.  So, when --

13         THE COURT REPORTER:  I heard outside the

14  inspection.

15         MS. THIELHORN:  Period.  Outside the inspection.

16  Period.

17  BY MR. HARRIS:

18     Q.  Can you tell me what you -- when you showed up, in

19  March of '23, to perform the compliance inspection, were the

20  Morehouses cooperative with your --

21     A.  Very much.  Yes, sir.

22     Q.  And at that time, you reviewed, I think based on

23  your direct testimony, you reviewed the inventory.

24         Is that correct?

25     A.  Correct.

1     Q.   Did you find any errors or problems with the

2  inventory?

3     A.   Well, upon reconciling with the A&D record, there

4  was one firearm that was not disposed or in the disposition

5  portion of the book, but we reconciled that.  We reconciled

6  that, sir.  But, you know, it went to, I think a -- correct

7  me if I'm wrong -- I believe it was a gunsmith firearm.

8          We identified who that firearm was transferred to.

9  So we knew that it wasn't missing, but it was not properly

10 disposed in their books.

11    Q.   Okay, and they corrected that to your

12 satisfaction.

13    A.   Yes, sir.

14    Q.   And other than -- do you have -- did you, as part

15 of your compliance inspection document the volume of

16 records?  For example, for the 12-month period that you

17 examined the 4473s, did you document the number of

18 transfers, the number of acquisitions, the number of

19 dispositions, the total volume?

20    A.   Yes, sir.

21    Q.   And that's information's maintained in Spartan.

22         Is that correct?

23    A.   Yes.  Well, yeah, I recorded that in Spartan.

24    Q.   And do you have a recollection, as we're sitting

25 here today, of roughly what their volume of acquisitions and

1  dispositions for that prior 12-month period had been?

2      A.   If I recall correctly, it was over a thousand

3  acquisitions and over a thousand dispositions of firearms

4  within that 12-month period.

5      Q.   And if you had any questions of the Morehouses

6  concerning your review of records, whether it was inventory,

7  A&D, 4473s or multiple sales or anything else, were they

8  responsive to your request for clarification or information?

9      A.   Yes.

10     Q.   And when you did your inspection, do you recall,

11 with respect to the compliance inspection, were they using

12 computerized records at that time?

13     A.   Yes.

14     Q.   And does that make your job easier, as an IOI?

15     A.   Yes.

16     A.   Well, it's a lot cleaner.  We can -- yes, rather

17 than going through the hardbound books looking for guns, it

18 is cleaner.  It is easier for an IOI, yes, to do

19 inspections.

20     Q.   And is it you're understanding that Morehouse,

21 practically since the time they started in 2019, had been

22 using computerized records?

23     A.   I guess that could be my assumption, but I

24 wouldn't be able to tell you.  I knew for a fact in 2019,

25 they were using computerized records.  I mean, that's all

1  they provided me at the compliance which went back 2019.  So

2  that would be a safe -- yes, they were using records --

3       Q.   And in general, your experience as an IOI doing

4  compliance inspections on FFLs, do licensees that use these

5  computerized systems, do they typically have better

6  organized records?

7       A.   I couldn't give you, I mean, it depends on the

8  operator of behind those records.  I'll answer it that way.

9  So, no, not always, and I couldn't give you a ballpark

10 usually or not usually.  It is dependent on who is operating

11 those records of whether they're good records or not.  It's

12 not the actual system itself. In my view.

13      Q.   And then, based on that then, do you have an

14 opinion as to whether or not the Morehouse records were

15 average, above average, below average?  How would you

16 classify them in terms of the state of their records?

17      A.   There was -- I'll respond this way, that they had

18 -- well, one.  I believe I cited on for one error of the

19 late disposition.  That speaks for itself.  I believe that's

20 how I respond like that, that yeah, I didn't spend much time

21 having to reconcile.  The inventory was there, the records

22 reflected there's one violation I cited for a late

23 disposition.

24      Q.   Okay.

25      A.   I don't want to get into other inspections that I

1  did, whether they're better or worse or whatever, but it was

2  a smooth inventory and reconciliation with the A&D record.

3      Q.  Okay.  And did you perceive any aspect of the

4  status of the records that led you to believe or conclude

5  that their operations, at least in terms of record keeping,

6  created a risk to the public?

7      A.  I wouldn't say, based off their A&D record.  No, I

8  couldn't say that there was a -- regarding the A&D record,

9  no risk to the public, sir.

10     Q.  What about the status of their 4473s?  Did they

11 have those organized and maintained in such a fashion that

12 they were at least average or better than average?

13     A.  Well, I don't want to compare them to other FFLs

14 and inspections I've done.  But the errors I cited are --

15 the errors that I found or that was relayed here around the

16 ROV report, and I cited the forms that were not made

17 available or weren't done or, you know, with regarding the

18 two denials.  Otherwise, I have no reason to believe that

19 they hid any records or anything like that.  They provided

20 everything that I asked for.

21     Q.  And were the records that they provided in good

22 order?

23     A.  Yes, sir.

24     Q.  And were you able to efficiently go through and do

25 your review?

1    A.    Yes.

2    Q.    And they were generally typed up and easy to read.

3 You didn't have to wonder if they spelled someone's name

4 wrong.  I mean, everything looked in good shape.

5    A.    Yes, sir.

6    Q.    Okay.  Did you observe anything regarding the

7 4473s or the A&D records that would have negatively impacted

8 the ability of the licensee to respond to a trace request?

9    A.    I guess, off the top of my head, I wouldn't be

10 able to recount how many traces done, but I don't recall any

11 negative traces, so they were able to provide traces

12 successfully to the --

13   Q.    Okay.

14   A.    Or I shouldn't say negative; I mean unsuccessful

15 traces.

16   Q.    And in your review of the actual 4473s, did you

17 identify or see any patterns or indicators it would have

18 made actually performing a trace request difficult?

19   A.    No, sir.  I mean, again, the violations I cited

20 are the rule violations I found, and they didn't have any

21 unsuccessful traces.  So that's all I can respond to you.

22   Q.    Okay.  Okay.  In doing the compliance inspection,

23 did you talk with or observe how they actually used the

24 electronic 4473 or the electronic NICS system, how that

25 process worked or you were just reviewing records?

1     A.   I remember having a discussion with them about how

2   they -- yes, yeah, I remember having discussion with them

3   how they use or how they -- if I recall correctly, sir, I

4   recall them copying and pasting out the E-check system and

5   then transferring it over to Item 27.b of the form where

6   they record the NTN.

7     Q.   Okay.

8          THE COURT REPORTER:  Or if they -- just, can you

9   restate that, please?

10         THE WITNESS:  Yes, I recall having a conversation

11  with them that they would copy the NTN number on the NICS

12  E-check system and then paste that onto the 4473 and Item

13  27.b.

14  BY MR. HARRIS:

15    Q.   And so that the record is clear, when they run the

16  E-check system for the 4473, that's a computerized process,

17  isn't it?

18    A.   That's my understanding, sir.  Yes.

19    Q.   And so the information that's on the 4473, what we

20  see, for example, as exhibits, the Government's Exhibits 8

21  and 9, over -- no, the government -- no.

22    A.   Yeah.  I know what you're --

23    Q.   So this information off of the 4473, let's just

24  use Exhibit 8.  That information is, by the licensee, keyed

25  into the E-check system.  Is that correct?

 1     A.   The whole 44 -- like, can you please repeat the
 2  question?  Actually, I didn't understand it.
 3     Q.   **The E-check system, you've got to still enter the**
 4  **information into the computer screen so that it can be --**
 5     A.   Processed.
 6     Q.   **-- processed.  So, the way you observed the**
 7  **system working, were they having to cut and paste, copy and**
 8  **paste the information from the 4473 into the eTrace system?**
 9     A.   I don't recall that being conducted in front of
10  me.  I just recall a conversation that they would copy the
11  information from the E-check system and paste it onto the
12  4473.  I don't recall them exemplifying that to me on a form
13  or anything like that.  So I don't, I can't answer that at
14  all.
15     Q.   **Okay.**
16     A.   I don't think I can confidently answer your
17  question about that.
18     Q.   **And as an IOI, and either doing a qualification**
19  **inspection or a compliance inspection, if you come across**
20  **information that they're copying and pasting the information**
21  **from the E-check system to the 4473, is that something that**
22  **you would tell them, Wait a minute, that's not the right**
23  **way to do it.  You need to do it some other way .?**
24     A.   I guess I couldn't say that.  I would say that
25  that's wrong.  I don't understand, I guess, basically.  I

1  don't remember, you know, reviewing their electronic system.

2  I just remember having a conversation of how they

3  transcribed from E-check to the 4473.  I don't know how to

4  further expound on that question.

5       Q.    Okay, well, then let me follow-up with this:

6  Based upon what you observed as to how they were conducting,

7  just in general, the E-check system for purposes of doing

8  the background checks, did you feel like or did you conclude

9  that they were making a good faith effort to comply with

10  their obligations to run background checks?

11       A.    Yeah.  I found the violations I said were the only

12  one, you know, were the only, I guess, issues that, within

13  the inspection period, that I disclosed as having problems

14  with the NICS checks system.

15       Q.    And even though there are, I think, five

16  violations or five instances charged, we're really talking

17  about two 4473s.  Is that correct?

18       A.    Regarding the Fluker and Nelson transactions, yes.

19       Q.    Yeah.  And that's two out of about a thousand.  I

20  think that's what you told me, early on.

21       A.    I believe I reviewed, like, seven hundred 4473s

22  during the inspection period, but there were over a thousand

23  dispositions of firearms.

24       Q.    And that's because some 4473s will have multiple

25  firearms.  Is that correct?

1    A.   Yes, sir.

2    Q.   And sometimes if it's a dealer transfer, you're

3 not even going to have a 4473.  Is that correct?

4    A.   That's correct.

5    Q.   So, but in terms of the ratio, let's just assume

6 it's seven hundred 4473s; we're talking about two that have

7 some errors on them.  Is that correct?

8    A.   Yep.  Regarding the Nelon and Fluker transactions,

9 yes.

10    Q.   And does that indicate to you, as the individual

11 that did the compliance inspection, that Morehouse was

12 making a genuine effort to try to comply with their

13 obligations under the law?

14    A.   Again, I disclosed the violations I found, and

15 they provided me with the information I asked for and then,

16 that's all.  I mean, I guess trying to compare to other

17 inspections or whatever, I wouldn't say that they were

18 making a foul-based effort or they were trying to deceive me

19 in any way.  They they gave me what I asked for.  I cited

20 them with the violations I found, and yep, there was a

21 thousand dispositions, approximately seven hundred, I

22 reviewed, and I cited them with the violations I disclosed.

23    Q.   So you performed your compliance inspection in

24 March of '23 of this year; February and March?

25    A.   Yes, sir.

1      Q.   Okay.  And you finished the compliance inspection
2  by some point in March, and then you had the final meeting
3  in April.  Is that correct?

4      A.   Yes, sir.

5      Q.   And if you would look at Government's Exhibit 4.
6  Again, that's your report of violations dated April the 6th
7  of 2023.

8      A.   Yes, sir.

9      Q.   Okay.  And if you would look at also, for me, Tab
10  18 in that file.

11             (Exhibit found.)

12             That is a report of violations dated March the 6th
13  of 2023.  Is that correct?

14      A.   There is no date on here, but I believe that is
15  the ballpark of when I issued the -- I'm sorry.

16      Q.   That might be a little easier.

17             (Exhibits gone through.)

18      A.   No, yeah.  Date generated was March 6th.

19      Q.   Okay.  So, but let me ask, between March the 6th,
20  when you did the first report of violations, in April the
21  6th, when you did the amended report of violations, were you
22  back out there onsite looking at or examining any other
23  records?

24      A.   I recall when I initiated the inspection and was
25  there, onsite, three days.  And then, perhaps the following

1  week, I was back out there reviewing 4473s, out of concern

2  of the Nelson transaction and then did the closing or did

3  issue the ROV, at that point, with Mr. Tanner.  And then

4  came back, about, on April of 6th to do the amended ROV,

5  sir.

6      Q.  Okay.

7          THE COURT REPORTERS:  R-O-B, as in Boy?

8          THE WITNESS:  Report of Violations, V as in

9  Victor.

10 BY MR. HARRIS:

11     Q.  And if you'll look at the Exhibit 18, which is the

12 March 6th, 2023 Report, Category 4 includes the Nelson

13 incident.  Is that correct?

14     A.  Yes, sir.

15     Q.  And it includes the reference specifically to the

16 error with respect to Box 27 and the NTN number that was

17 entered.  Is that correct?

18     A.  Yeah, well, it says:   In instance, details at

19 4473 omission 27.b; incorrect, Nelson, Robert,  and then,

20  March 20, 2022.

21     Q.  Right.  And if you look at that next column, it's

22 specifically, at that point, talking about the Nelson

23 incident and the missing NTN.

24     A.  Correct.

25     Q.  Okay.  And then if you look at Government's

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023

1  Exhibit 4, the amended report of violations, the item that

2  got added on the April report of violations was the incident

3  involving the two Nelson NICS inquiries that generated the

4  denials.  Is that accurate?

5      A.   That's correct.

6      Q.   So that's really the only thing that was added

7  between the March and the April reports of violations.

8      A.   That's correct.

9      Q.   Okay.  So when you finished up your compliance

10 inspection, you then meet with the licensee and you're going

11 through the closing interview and you review the report of

12 violations with him.  Is that correct?

13     A.   That's correct.

14     Q.   Okay.  Did you instruct them, at that time, that

15 any of the errors that are cited in the April 6th, 2023

16 Report of Violations that they needed to take specific

17 actions to go back and edit or correct any of those?

18     A.   I don't recall giving specific instructions to

19 correct them.

20     Q.   Okay.  But for example, the instructions to the

21 4473 say that they can be edited at any time.

22          Is that correct?

23     A.   Correct.

24     Q.   And so, for example, with respect to Nelson, did

25 you explain to them that, Hey, we've got these two denials

1  and they really needed to be on the form?  You probably

2  ought to think about amending the form pursuant to the

3  instructions to reflect those two denials, just in case a

4  trace request or something comes up in the future?

5      A.   I did not instruct them to make corrections to the

6  form, sir.

7      Q.   Okay.  For purposes of a trace request that might

8  be conducted in the future, would it be important to have

9  those two denials documented on the form?

10     A.   Yes, sir.

11     Q.   Any particular reason why you didn't instruct them

12  that, Hey, maybe you need to go back and edit it, put those

13  on there, now that we know they existed?

14     A.   I don't have a good reason of why I didn't

15  instruct them.

16     Q.   Okay.

17     A.   I don't know if it -- I just can't give a good

18  reason why I didn't instruct them.  It wasn't purposeful or

19  unpurposeful.  I just didn't have them correct the form,

20  sir.

21     Q.   So, in this process, you prepared this report of

22  violations, and is this something that you sat down at a

23  computer or typewriter and you filled in on a spreadsheet,

24  or is this somehow generated out of some other software

25  package, the reported violations?

1      A.   I use my input information or I record the

2   violation I cited, like I'll take pictures of the exhibits

3   of like the Nelson form, and then I record it onto my laptop

4   or my computer.

5      Q.   Okay.  But --

6           DIO HUMMEL:  Can I just ask how, that, again,

7   I'm not is this heading towards talking to the violation

8   themselves?

9           MR. HARRIS:  Yes.

10          DIO HUMMEL:  And the willful nature?

11          MR. HARRIS:  It gets to the basis for the

12  determination of willfulness and the recommendation.  That's

13  where I'm headed.

14          DIO HUMMEL:  Okay.

15          MR. HARRIS:  I'll get there quickly because, well

16  --

17          DIO HUMMEL:  I just, I don't want to spend

18  too much time on our case management system because that's

19  not relevant to willfulness determination.  I'm familiar

20  with the system, and this is to help me make a decision as

21  to whether or not the willfulness occurred.

22          MR. HARRIS:  Right.

23          DIO HUMMEL:  So, but go ahead, I ---

24          MR. HARRIS:  I'll get there quickly.

25  BY MR. HARRIS:

1     Q.   Just so the record's clear and some future judge

2  reading this knows what we're talking about, when you say

3  you put it in your computer, did you enter the data

4  concerning the violations that you found into a product

5  called Spartan?

6     A.   Yes, sir.

7     Q.   Okay.  And as part of that process, you're the

8  only person from the ATF that's out there looking at the

9  records and reviewing the records and talking with the

10  licensee.  Is that correct; for this compliance inspection?

11    A.   Yes, sir.  I mean Seth Bowman, an IOI, was there

12  for the amended ROV, report of violations.  He was there.

13  But as far as review of records during the client

14  inspection, I was the only IOI out there.

15    Q.   Was IOI Bowman, was he participating as an IOI, or

16  was he sort of in the training?

17    A.   He was strictly there for the amended report of

18  violations that was issued to Morehouse and Tanner.  There

19  was Tanner, and then there was another employee, I believe,

20  that was in the room.  That was the extent of IOI Bowman's

21  involvement with the inspection.

22    Q.   But my question on Bowman is, so that I'm clear,

23  was -- he is there because of on-the-job training, so to

24  speak, as opposed to taking part actively in the process?

25    A.   He was there for training.  Yes, sir.

1      Q.   So you're the only one that's there observing

2  everything and reviewing the records.  Am I correct?

3      A.   Yes, sir.

4      Q.   As part of that process, are you evaluating the

5  issue of the extent of the licensee's knowledge about how

6  these obligations, A&D records, keeping good inventory,

7  keeping 4473s, keeping their multiple sales and making them,

8  are you the only one observing how they're doing in terms of

9  honoring their legal duties in those regards?

10     A.   Yes, I was the only one doing the compliance

11  inspection.

12     Q.   And did you form an opinion as to whether or not

13  they understood their legal responsibilities with respect to

14  all of those activities?

15     A.   I mean, I want to be careful about my opinion.

16  Like my job is to go and disclose the violations, cite it,

17  and go over with the licensee of what I cited and like,

18  that's what I do.

19     Q.   And in light of Director Hummel's question or

20  comments a moment ago, I want to make sure I'm clear but I

21  want the record to reflect what you're doing, okay?

22     A.   Yep.

23     Q.   Is part of your job, when you go out and do the

24  compliance inspection, to assess and report on the licensees

25  level of understanding of the law?

1     A.   I mean, I don't have some metric of like, hey,

2  this is their understanding like, but I mean I'm relatively

3  pretty clear, at times of -- based off their record keeping,

4  if they are are, pardon me, keeping the laws and regulations

5  or if they're not.  I mean, there's inspections that go

6  smoothly, there's inspections that don't go smoothly.  But

7  like I don't have, you know, I want to be careful on like

8  some kind of like assessment of I mean they're not -- I mean

9  I believe that they had a good knowledge of the laws and

10 based off the inspection and the violations.

11          Of the violations that -- I've cited the

12 violations I found so pertaining to the volume, my opinions

13 or whatever, it's what I found is on the report of

14 violations, sir.

15     **Q.   Okay.  And as Counsel Thielhorn said at the very**

16 **beginning this morning, and part of why we're here today is**

17 **to talk about the question of willfulness, okay?  My**

18 **question directly to you is:  In your job as an IOI doing**

19 **the compliance inspection is do you draw any conclusions as**

20 **to the issue of whether or not the violations that you**

21 **identified were made willfully?**

22          MS. THIELHORN:  Mr. Harris, I'll just interject

23 there, if I may.  The willfulness determination, as you

24 know, is made by the DIO, DIO Hummel.  So what his opinions

25 are regarding willfulness really don't impact this procedure

1  here today because it's up to the DIO to determine whether

2  it's willful.

3          So as the IOI testified, he just writes the

4  report, you know his, I guess, opinion as to willfulness,

5  that's not relevant because the DIO determines willfulness

6  based on the information that's presented here at this

7  hearing today.

8          MR. HARRIS:  I understand.

9  BY MR. HARRIS:

10     Q.    IOI Temp, could you look at Licensee's Exhibit 2

11  for me?  It's the next big book probably.  That's it.

12     A.    Messed up the whole order on that, but all right,

13  I'm on Exhibit 2.  What?

14     Q.    Are you familiar with that document?

15     A.    Yes, I am, sir.

16     Q.    Is it currently in effect?

17     A.    Yes.  It's an industry operations manual.  I mean, I

18  don't know if I -- quite frankly, I don't know if it's the

19  latest edition or what, but I'm familiar with this document.

20     Q.    Okay.

21          MS. THIELHORN:  Mr. Harris, again, we're here to

22  determine whether your client's committed these violations

23  willfully.  So getting into an ATF manual, a training

24  manual, a  go by , again, I don't understand the relevance

25  of whether your clients, you know, acted with deliberate

1  indifference or purposely disregarded the law.  That's the

2  only thing that we're here to talk about today.

3           So regardless of what, I know you proposed this or

4  submitted as part of the record.  But again, this is an

5  internal manual that the IOIs use for training and you know,

6  as guidance.  And again, he wrote the report, set forth

7  violations.

8           It's my understanding they're not contesting that

9  the violations occurred, they're just wanting to talk about

10 whether or not they were willful.  So again, how is this

11 relevant to the DIO's determination?

12          MR. HARRIS:  Well, and I'll be glad to answer.

13 The IOM, Inter Operations Manual, contains policies and

14 procedures that that talk about how the compliance

15 inspection is being conducted.  And part of that goes to the

16 documentation of evidence relative to the issue of

17 willfulness.  That's specifically the question I'm asking.

18          All I'm trying to clarify for the record and for

19 the court is that IOI Temp's job, as he saw it in this

20 particular instance, was to go out and make a report based

21 upon what he found to be violations, but he made no report

22 or recommendation as to the issue of willfulness.

23          MS. THIELHORN:  Well, again, the evidence that we

24 are submitting in support of the numbers of violations are

25 presented in Government's Exhibits 1 through 11.  That's the

1  evidence we're relying on.  And that's the evidence that the

2  Court will review in determining whether, you know, the

3  violations were committed willfully and, you know, whether

4  or not the DIO, you know, could act the way that he chooses

5  to act regarding the outcome of his hearing.

6          So DIO Hummel, is this helpful to you?

7          DIO HUMMEL:  Well, no.  And that's the --

8  ultimately, what we're talking about and what this is all

9  about is, is a legal standard of willfulness that we've been

10 talking about all along.

11         MR. HARRIS:  Right.

12         DIO HUMMEL:  The process by which he found

13 these violations and has presented them.  And this is the

14 opportunity to talk about how those violations occurred and

15 what may have been known or not known, which was clearly the

16 point of certainly, the questions that are being asked.  But

17 as the our, you know, internal case management system and

18 our internal processes and procedures for purposes of

19 conducting inspections, I don't get how that affects what

20 was issued in this notice and whether or not they meet the

21 legal standard of willfulness.

22         MR. HARRIS:  Right.

23         DIO HUMMEL:  The legal standard, not anything

24 other than that.

25         MR. HARRIS:  Well, it's a factual component to it,

1  and I don't want to get into a debate about it.  I've got

2  about four questions that I'd just like to get on the record

3  that I think go to the issue of willfulness.  And I think

4  courts have found, in other cases I've had, go to the issue

5  of wolflessness.  And if I'll be permitted, I don't want to

6  spend a lot of time asking questions about ATF standards and

7  procedures.

8          But I do have about four specific questions that

9  whenever I do an IOI cross-examination, that I typically

10  asked and that I have found courts are interested in.

11          DIO HUMMEL:  But again, for purposes of this

12  hearing, this may not go to a court, right?  Because that's

13  what this is for.  This is my opportunity to gather the

14  information.

15          MR. HARRIS:  Right.

16          DIO HUMMEL:  So I can make a final decision

17  then, then, and as my prologue will walk through, then

18  there's an opportunity to appeal a decision in de novo

19  review, and that's when the courts are involved to your

20  point.  But for purposes of the presentation, in this

21  presentation, I'd really like to just stick to "not go down

22  the path" of again, a case management system because it

23  isn't relevant to the violations and whether or not they are

24  done willfully or not.  And, again this is the opportunity

25  to voice that.  This is the opportunity for the FFL to

1  present the arguments that they weren't willful, presumably.

2          MR. HARRIS:  Right, and I get that, but part of

3  the proof and part of the testimony is that the person who

4  did the inspection draw a conclusion.  I mean, if his answer

5  is I draw no conclusions, I'm fine with that.  But I think

6  it is relevant.  And I've had the testimony in plenty of

7  other cases where the IOIs testify that based upon what they

8  saw and observed, they didn't see anything that indicated to

9  them that it was willful.  And that the report that they

10 made, when they went through the Spartan process, that

11 specifically commented on the concept and the facts

12 regarding the issue of willfulness.

13          So my experience has been, and I'd like to just

14 ask about four questions and whatever his answers are, they

15 are, but I think it is important because as counsel knows,

16 if this goes to a 923(f)(3) hearing, frequently, the ATF

17 argues that the only thing that's relevant ought to be the

18 transcript that we're preparing today.  And frequently,

19 that's all the Court reads once we get in those hearings.

20          So I would ask the indulge.  I don't mean to get

21 into the SOPs, but there's a specific part of the IOM that

22 says this is what's supposed to be done by an IOI at the

23 time the final report is made.  And I'd like to discover

24 those, about four questions.

25          MS. THIELHORN:  Well, I guess my concern with your

1  questions about Spartan and what information is put into

2  Spartan and various opinions that he may have had or anyone

3  else at ATF, is that it doesn't pertain to this hearing.

4  It's not relevant to this hearing as we sit here now.

5           The only issue we're here to talk about is whether

6  your clients committed these violations willfully.  And

7  again, it doesn't seem that they're here to challenge the,

8  you know, well, hey, we didn't know we needed to do the NICS

9  check.  So it doesn't seem like they're contesting that they

10  didn't understand the law or know the law.  They're just

11  probably here to talk about, hey, we didn't commit these

12  violations willfully.

13           However, the questions that it appears your

14  inquiry, where you're going with this, it seems that this

15  line of inquiry is more in tune with the lawsuit that you

16  have filed in federal court against ATF.  And as you know,

17  the IOI and the DIO and other ATF employees are represented

18  by attorneys from the Civil Division, DOJ Civil Division.

19  One of the main attorneys is Michael Drezner, and he's not

20  here today.

21           So I just don't feel comfortable having you ask

22  his client questions that go to that lawsuit because you've

23  made various allegations about Spartan and the way Spartan

24  works and the way recommendations come out of Spartan and

25  that sort of thing.  And it appears that this inquiry goes

1  directly to that, as opposed to going to did your clients

2  commit the violations willfully?

3          So with him not being here today, I don't think

4  it's appropriate to get into this.  And so DIO Hummel,

5  again, it's just if this information will be helpful to you,

6  is this information helpful to you?  I think your answer to

7  that question, you know, determines whether we move on or

8  not.

9          DIO HUMMEL:  Well, and again, I really don't

10 see how, again, a policy that I'm familiar with and a line

11 of questioning on the policy I'm familiar with and a system

12 that I'm familiar with really adds to the willfulness

13 argument.  And you know, I've noted, for the record, that

14 you wanted to bring up the topic of our IOI manual.  And I

15 don't know if there's anything else that you're going to

16 point to in this line of questioning, but I don't think it's

17 going to be productive for purposes of understanding whether

18 or not the circumstances surrounding these violations was

19 willful.

20          MR. HARRIS:  Okay, well, let me let me wrap it up

21 then with a few questions that leaves Spartan out of it for

22 the time being.

23          DIO HUMMEL:  One caveat is that I guess

24 you're welcome to to add, and I'm sure you will, add to the

25 record some of the stuff that, for, from your perspective,

1 what might be missing.  And again, you're welcome to do that

2 and whether or not we're in closing arguments, you know,

3 this is a theory or, you know, whatever you want to add to

4 the record for purposes of potential anything down this

5 path, I'll open the floor to you at the end to do that.

6          MR. HARRIS:  Okay.

7          DIO HUMMEL:  But for purposes of this, I

8 don't see that the benefit of going through ATF internal

9 guidance documents when it comes to these three violations

10 that are noted in the ROV and that's not the ROV, the

11 notice.

12          MR. HARRIS:  The notice.  Okay, let me proceed

13 this way, then.  And their objections, I guess we'll deal

14 with.

15 BY MR. HARRIS:

16     **Q.   IOI Temp, as the person performing the**

17 **compliance inspection, did you see your job as limited to**

18 **the data-gathering process of what violations, if any,**

19 **occurred?**

20     A.   Are you asking like -- what I'm there to do is

21 just simply gathering evidence to like issue and I mean, I

22 don't understand any of the question.

23     **Q.   Okay, let me rephrase it.  Did you view your job**

24 **as an IOI, doing a compliance inspection, as inspecting the**

25 **records and then documenting any violations that you**

1  observed?

2      A.   Yes.  I go as I testified to or I stated, I review

3  A&D records, 4473s, reconcile inventory to the A&D, review

4  the audit log, and I disclose the violations that I found

5  and cited them in the ROV and then dislose them to the

6  licensee.

7      Q.   Okay.

8      A.   That was my duty.

9      **Q.   And do you understand your duty to include whether**

10 **it's reported to the licensee or not, for example, on the**

11 **reported violations, does your scope of duties, as an IOI,**

12 **in a compliance inspection include making any findings,**

13 **conclusions, or recommendations concerning whether the**

14 **violations were inadvertent, accidental, or willful?**

15     A.   It doesn't.  My disclosure of violations have --

16 there's nothing I read, like E-check or whatever.  I mean,

17 it really has nothing to do with my opinion on whether

18 they're willful or whether they're inadvertent or anything

19 like that.  I disclose the violations that I found and I

20 cite the licensee, like in this case what I did, I don't

21 have like there -- I don't have an opinion box on there that

22 record my opinions like I, you know.  Like I said, my duty

23 is to disclose the violations that I cited.

24     A.   Okay.

25          THE COURT REPORTER:  That I see?

1          THE WITNESS:  That I cited.

2          THE COURT REPORTER:  That I cited.  Thank you.

3  //

4  BY MR. HARRIS:

5      Q.  And as to that next element that brings us here

6  today, do you have, as an IOI, any involvement in reaching

7  the conclusion, at any point, as to whether or not any

8  violation that you've identified was either willful or

9  knowing or inadvertent or accidental or just human error?

10          Does your job, as an IOI, include any of that

11  analysis at anytime, not just on the ROV?

12          MS. THIELHORN:  Again, Mr. Harris, I don't

13  understand how internal processes at ATF have anything to do

14  with whether your clients committed the three violations

15  cited in the notice to revoke, whether they committed those

16  willfully.  He's explained to you, as an IOI, his duty is to

17  go out to do the compliance inspection, to review the A&D,

18  to do the inventory, to reconcile things, to review the

19  4473s , and then to write up a report of the, you know,

20  violations that he finds.

21          He presents that to your clients and he goes over

22  that with your clients and they have a discussion about it.

23  He tries to educate them on it and that's his job and that's

24  the exhibits that we presented here in support of this.

25          So your questions are all outside the scope of the

1  determination that we have here today for the violations

2  willfully.  What he may or may not do after he closes out

3  this inspection with your clients, after he presented it to

4  them and talks to them; that's all internal ATF processes.

5  And again, you filed this lawsuit in federal court

6  challenging some of these internal ATF processes.

7         So I don't think it's appropriate for you to

8  specifically ask him questions that's beyond the scope of

9  this hearing today, but more in line with the lawsuit you

10 filed when his attorney for that lawsuit is not here.  I

11 mean, when the time comes, that litigation, I'm sure, you

12 know, court's about discovery and that will be your time,

13 you know, to talk about this when he has his attorney and

14 you all get into this.

15         But again, as the DIO has already said a couple of

16 times, internal ATF processes that happen or may or may not

17 happen after this report is generated and signed by your

18 client and discussed with your client, it has nothing to do

19 with the conversation here today of how did these violations

20 occur?

21         That you know, let's hear what happened.  This is

22 their chance to explain to the DIO, hey, it happened and

23 here's how it happened.  We made a mistake or this happened.

24 We were confused or you know, various explanations.  But all

25 of this stuff about what he does after the fact, the IOI,

1 his process is after the fact.  It's irrelevant to this

2 determination.

3          MR. HARRIS:  My point is, and what I'm trying to

4 document for the record on which an ultimate decision here

5 is going to be made, regardless of the now two Federal

6 lawsuits that are out there, is from the government's

7 witness, I want to elicit testimony on specifically what

8 factors were considered or evaluated, not on the question of

9 was there technically an error which is not really being

10 disputed.

11          You've cited things.  There's two exhibits.

12 There's errors, okay?  This hearing is about willfulness.

13 Some government witness, somewhere, needs to testify as to

14 the factors that constituted willfulness, as distinguished

15 from accident, inadvertence, human error.  Some government

16 witness has to testify as to whether or not the errors that

17 we're talking about were plain indifference or reckless

18 disregard.

19          I'm trying to establish that this witness did not

20 make any of those determinations.  It's all I'm trying to

21 do.  Now, if the government wants to concede that this

22 witness wasn't involved in any of that, without any more

23 questions on those topics, I'm willing to entertain that

24 stipulation.

25          MS. THIELHORN:  Well, again, Mr. Harris,

1 willfulness, as you pointed out or as the DIO pointed out,

2 if you choose to appeal the outcome of today's hearing, you

3 get a de novo review in federal court in front of a federal

4 judge.  And as you know, the federal judge will then review

5  were these violations committed willfully? .

6          And part of that review, the judge will consult

7 various case law.  And we both know that there's case law

8 out there that says a single mistake is not willful.  And

9 there's also case law out there that says, well, clearly

10 they knew this, and they didn't do it.

11          And so, you know, it's up to the judge what case

12 law they give particular weight to and basically, how the

13 judge is going to review this, that's up to the Court.  But

14 the purpose of the hearing here today is not to go through

15 internal ATF processes because the facts are we're here

16 today because the DIO sent out a notice to revoke.  And I'm

17 here, as an attorney for ATF, to present evidence in support

18 of that, to explain, hey, this is why ATF thinks that these

19 violations are willful.

20          And I've presented 11 exhibits in support of that.

21 And so the only thing that's left here is for you, if you

22 choose, if your clients choose, to tell the DIO why this

23 wasn't willful.  Again, all of this ATF internal process

24 stuff has nothing to do with these three violations, and did

25 they commit them willfully?

1         That's the only issue here before us.  And I
2  understand you're wanting to create a record to make it
3  easier for the judge.  But again, when you get into court,
4  most judges allow discovery.  So that's when you get to say,
5  hey, I want to hear from this government witness or I want
6  to hear from this government witness.  And it's up to the
7  Court how much discovery, as you know, they'll allow,
8  whether it's depositions or interrogatories or that sort of
9  thing.  That's all to be decided later on down the road.
10 And that's assuming you even get to that point.
11        Again, the DIO hasn't made a decision, to my
12 knowledge, that there will even be a revocation.  So we're
13 not there yet.  So you're asking to do things that are so
14 far beyond the scope of this hearing but may help you out
15 way down the road.  It's just totally irrelevant to what
16 we're doing here today.
17        DIO HUMMEL:  And in the event that -- I mean,
18 in the event, which is I understand is what you're planning
19 for, but in the event that I were to decide to revoke, you
20 get the findings of fact and conclusion, which is what you
21 are presenting there, which is, you know, your expectations
22 and presumably, is that somebody from the government or that
23 the government didn't make that case at this hearing.
24        That would be your case, presumably.  Again, but
25 for purposes of my decision and the decision on whether or

1  not to revoke or not revoke.  And again, the purpose of this

2  hearing, the internal document, guidance documents and

3  discussion isn't pertinent.

4          MR. HARRIS:  Well, let me say this because I do

5  understand the sensitivity, unlike most hearings that I do

6  at this level.  And I'm very familiar with the 923(f)(3)

7  proceedings and what courts allow and don't allow.  I'm

8  equally familiar with cases like Harris News out of the 8th

9  Circuit, as well as James Paul that go into the issues

10  about, you know, evidence of what constitutes willfulness.

11          I can short circuit, particularly, with these

12  flight issues, a lot of questions if the government would

13  stipulate that IOI Temp doesn't play a role in the ATF's

14  determination, other than documenting the errors.

15          MS. THIELHORN:  Well, Mr. Harris, I'm not an

16  attorney on the lawsuit you filed in federal court.  So it's

17  not my place to make any kind of stipulation like that

18  because I have reviewed the complaint you filed in federal

19  court where you allege that the Spartan system used by ATF,

20  that apparently uses some type of purported computer

21  algorithm, I think that's your theory, and somehow just

22  spits out revoke and that there's no human interaction.

23  But certainly we're all here today.

24          We're humans and we're interacting, but again, I'm

25  not the attorney of record for that, and so it's not

1 appropriate for you to ask this witness questions about how

2 these recommendations, you know, come about when you're

3 suing ATF and the attorney representing the DIO and the IO

4 and others in that is not here.

5          It's just not appropriate.  And besides not being

6 appropriate to question him without his attorney present is

7 the issue, is not relevant to why we're here.  We're here

8 because he conducted an inspection, found they committed

9 these violations, and now the DIO just needs to here why

10 they were willful.  And I've presented 11 exhibits that

11 suggests they were because the form clearly says a permit

12 has to be in the state where the transfer occurs.  And the

13 instructions, you know, say you've got to report a NTN.  And

14 it says report the initial response, which, you know, the

15 initial response was a denial.

16          So the forms speak for themselves.  So this is

17 again, your chance, your client's chance, if they choose, to

18 tell the DIO why these violations weren't willful.  And all

19 of these questions about who from the government is going to

20 say, you know, the recommendation comes from or how that

21 recommendation comes about, you can get into all of that at

22 the appropriate time, which will be more than likely during

23 the discovery phase of your lawsuit where you're making

24 those allegations.

25          MR. HARRIS:  Well --

1          MS. THIELHORN:  Again, it's up to the DIO.  If he

2    wants to hear about it, you know, I've, you know, noted how

3    I'm uncomfortable with this line of inquiry.  His attorney's

4    not here.  I mean, it doesn't go to our hearing it goes to

5    the lawsuit that you filed.  So, again, the DIO is the

6    hearing officer.  DIO Hummel, is this in any way helpful to

7    you?

8          DIO HUMMEL:  And that's a circle back to I

9    really don't see the relevance to this with regards to the

10   three violations included in the notice that I issued, and

11   in making my final decision as to whether or not it was

12   willful, so.

13   BY MR. HARRIS:

14        Q.   Okay.  So IOI Temp, let's talk specifically about

15   the two instances that are on the on the notice of

16   revocation, okay?  If you'll look at Government's Exhibit 1.

17   That's the 4473 and the transaction involving Fluker.

18             Is that correct?

19        A.   Violation 1 regarding Fluker?  Yes, sir.

20        Q.   And Violation 2 is the exact same transaction;

21   correct?

22        A.   Yes, sir.

23        Q.   So we've got one transaction involving one 4473,

24   involving one sale that resulted in two separate charges.

25             Is that correct?

1      A.   Yes.  Regarding 1 and 2, yes.

2      **Q.   Okay.**

3            THE COURT REPORTER:  One or two?  I just heard

4   that regarding --

5            THE WITNESS:  The notice of revocation, there's

6   three regarding the Fluker transaction.  It's regarding the

7   1 and 2 by like Violation 1 and Violation 2.

8            THE COURT REPORTER:  Thank you.

9   BY MR. HARRIS:

10     **Q.   Now with respect to Fluker, this is the gentleman**

11  **from Georgia.  Is that correct?**

12     A.   Yes, sir.

13     **Q.   Did you, as the IOI doing the report, investigate**

14  **whether or not Georgia's handgun permit is a NICS exempt**

15  **permit?**

16     A.   I did not.

17     **Q.   Did you, as part of the investigation of the facts**

18  **concerning this incident, do any type of background check on**

19  **Fluker to determine if he was a prohibited person?**

20     A.   I did.

21     **Q.   And what was your finding as to prohibited status?**

22     A.   I can't comment on background checks of

23  individuals.  I guess I don't feel comfortable commenting on

24  the background check of Mr. Fluker.

25     **Q.   Okay.  If you, as part of your investigation,**

1  determined, factually, that the FFL sold a gun or

2  transferred a gun to a prohibited person, would that be a

3  chargeable violation on the report of violations?

4       A.   Yes.

5       Q.   Did you charge them with selling to any prohibited

6  person?

7       A.   I did not.

8       Q.   Okay.  Did you conclude that this licensee, with

9  respect to any of the thousand or so transfers that they did

10  in the scope of your inspection, make any transfer at all to

11  any prohibited person?

12      A.   I did not disclose any transfer to a prohibited

13  person.

14           THE COURT REPORTER:  I did not disclose any...?

15           THE WITNESS:  Any transfer to a prohibited person.

16           THE COURT REPORTER:  Thank you.

17  BY MR. HARRIS:

18      Q.   Did you, as part of your factual investigation

19  concerning Fluker, determine whether the licensee did that

20  background check, that transfer using the electronic 4473

21  system, the electronic background checks?

22      A.   Did they use the electronic background check

23  system on Fluker?

24      Q.   Yes.

25      A.   Not to my knowledge because they accepted that

1  Georgia concealed carry permit as noted.

2         THE COURT REPORTER:  I'm sorry.  I'm having

3  trouble hearing you.  Just your last answer.

4         THE WITNESS:  All the information I have is what's

5  on the form and I don't have any information about the NICS

6  background check being utilized, only the Georgia concealed

7  carry permit that was recorded.

8  BY MR. HARRIS:

9     Q.   And you came in the day after Fluker, on August

10 the 26th, and were performing that second qualification

11 inspection, from our earlier testimony.  Is that correct?

12    A.   Yes, sir.

13    Q.   And you had a discussion with them on August the

14 26th of 2022, specifically about the Fluker transaction?

15    A.   On August 26th, did we have a discussion about the

16 Fluker transactions?

17    Q.   Yes.

18    A.   No, no, sir.  We talked about to my -- sorry, go

19 ahead with your question.

20    Q.   Yeah.  Then to clarify, what you talked about, on

21 August the 26th, was their understanding of the law on

22 making a sale of a handgun to a nonresident based upon a

23 permit exemption.

24    A.   That's my recollection as we discussed what

25 concealed carry permits were allowed or are not allowed, or

1 if reciprocity was involved in that.  I remember having a

2 discussion along those -- to the best I can recall on August

3 26th, during the qualification inspection.

4      Q.   Based on that conversation that you had, do you

5 have an opinion as of August the 26th, 2022, as to whether

6 or not they correctly understood what the law was with

7 respect to sales of handguns to non-residents?

8      A.   Yes, after August 26th, 2022, I think they

9 correctly understood what the law was.

10     Q.   Do you think they understood that before you had

11 that discussion with them on August the 26th, 2022?

12     A.   I believe that that question or that discussion --

13 have this thing come out of the blue.  I believe that they

14 generally had concerns about the concealed carry permit and

15 that's why they asked and that's why we had the discussion.

16     Q.   And how lengthy was that discussion, was it?

17     A.   I don't recall.  I mean, I know I'm there kind of

18 average between an hour and two hours for these things.  It

19 could have been 5 minutes.  I couldn't tell you the length

20 of that specific discussion in that qualification.

21     Q.   And based on that discussion that you had with him

22 on August the 26th, 2022, do you believe that you corrected

23 their misunderstanding of what the law was in that regard?

24     A.   Yes, sir.

25     Q.   Now, the two counts involving Fluker, one is they

1  sold a handgun across state lines to Fluker.  And is it

2  correct that if they sold a rifle or a shotgun that that

3  would have been a sale across state lines where a rifle or a

4  shotgun is permissible?

5      A.   As long as it's complying with state law, yes,

6  sir.

7      Q.   So handguns are unique.  They're an outlier, so to

8  speak, as to what's allowed and what isn't.

9      A.   There's handguns, yes, are not treated the same as

10 long guns in that regard.

11          THE COURT REPORTER:  In that regard?

12          THE WITNESS:  Yes.

13 BY MR. HARRIS:

14     Q.   And the process that they used for checking Box 29

15 that they relied upon a handgun permit, had this been a

16 North Dakota resident, that would have been the right way to

17 do this for?

18     A.   Yes, they would have accepted in North Dakota

19 concealed carry permit.  As a North Dakota resident, they

20 could record that in Item 29 in lieu of contacting NICS.

21     Q.   And based upon the conversations and jumping

22 forward to when you did the compliance inspection in

23 February and March of 2023, did you have a further

24 conversation with him at that time about the Fluker

25 incident?

1      A.   Yes.

2      Q.   And I believe, at least I wrote down in my notes,

3 that you spoke with Tanner Morehouse about the Fluker

4 incident?

5      A.   Yes.

6      Q.   Did you talk to Torrey Morehouse about it?

7      A.   I believe when we did the original report of

8 violations review, it was only Tanner.  Yeah, Tanner.  And

9 then also the second one, I don't recall specifically

10 discussing that transaction with Torrey.

11      Q.   And you would agree with me, based on the

12 Government's exhibit, that Torrey Morehouse is the one that

13 signed the Fluker 4473.

14      A.   That's correct.

15      Q.   And you were there over a span of days.  It wasn't

16 just the date, April the 6th, when you came back for the ROV

17 meeting.  You had several days during which you were there.

18      A.   Yes, sir.

19      Q.   During any of those days, did you talk with Torrey

20 Morehouse about the Fluker incident?

21      A.   I cannot specifically remember if I did or didn't.

22 All I recall specifically regarding this, the violation of

23 Fluker, is I discussed it with Tanner during the report of

24 violation closing conference.  I can't remember specifically

25 who I'm talking to.

1      Q.   And it is it correct, I think in summary, rather,

2 you spoke with them on August the 26th, 2022, about

3 clarifying this nonresident handgun sale issue.

4           Is that correct?

5      A.   On August 20?  Yes, sir.

6      Q.   2022.

7      A.   Yes, sir.

8      Q.   And then about, let's say, six, maybe seven months

9 later, you come back and do a compliance inspection.

10          Is that correct?

11     A.   Yes, sir.

12     Q.   And based upon the conversation that you had with

13 him in August of 2022, did you find any repeat violations of

14 this nonresident sale error between August and when you came

15 back in February of '23 to do the compliance inspection?

16     A.   No, sir.  I did not.

17     Q.   Do you feel like as a result of the training and

18 discussions you had with him in August of 2022, that they,

19 at least by that point in time, they clearly understood how

20 the law applied with respect to nonresident sales of

21 handguns?

22     A.   Yes, sir.

23     Q.   And based upon your inspection in March of '23,

24 they were fully compliant with that understanding of the law

25 by that point in time.  Is that correct?

1      A.   I cited no violations to regarding -- after

2  8/26/22, I saw no violations pertaining to out-of-state

3  transferring handguns to out-of-state residents.

4      Q.   Did they discuss with you either, at any point,

5  between August of 2022, and when you came back to do the

6  compliance inspection that they had somehow changed their

7  policies, changed their procedures, gone through new

8  training with their employees on these out-of-state sale

9  issues?

10     A.   I don't specifically remember.  I'm not denying

11  that we didn't.  I can't specifically remember --

12          THE COURT REPORTER:   I'm not denying that we

13  didn't?

14          THE WITNESS:  That we didn't have a conversation.

15  I just don't remember the conversation of their updated

16  education to their employees.

17  BY MR. HARRIS:

18     Q.   And when you met with him in August of 2022, you

19  gave them your business card.

20     A.   Yes, sir.

21     Q.   Correct?  And that's got an email address for you

22  on it?

23     A.   Yes, sir.

24     Q.   And an office number?

25     A.   Yes.  By all --

1      Q.   Does it have --

2      A.   I'm sorry, it's just my email and my cell phone

3  number.  It does have an office number; I strike it out

4  saying it's not active.  As you can see there, it's just my

5  cell phone and my email.

6      Q.   And did they contact you, at any point, between

7  August of 2022 and when you came back for the compliance

8  inspection and say, hey, we got another out-of-state sale,

9  we're a little confused, can you remind us?

10     A.   I don't recall a conversation like that.

11     Q.   Is it your opinion that, at least as a result of

12 the August 2022 incident, that they accurately understood

13 the out-of-state sale issue?

14     A.   I found no other violations pertaining to that,

15 those specific transactions.  I didn't find any other

16 violations after that date of any issues of out-of-state

17 handgun transfers.  So I trust that they understood exactly

18 the education that was given.

19     Q.   Right.  And so that we're clear in this portion of

20 the record, you did have the concern, as a good way to put

21 it, maybe, as of August of 26th, 2022, that maybe they

22 didn't really accurately understand the out-of-state sale

23 issue prior to that point in time.

24     A.   I believe there's a reason why they asked that

25 question.  We addressed that question.  And so I think it's

1 safe to believe that they were concerned about that practice

2 or out-of-state sales or concealed carries.

3      Q.   And when you say "concerned", I want to make sure

4 the record's clear.  Are you indicating that they were

5 concerned that they had done something wrong and they were

6 trying to hide it or?

7      A.   No, when I say concern, I think they legitimately

8 had a question about how to handle these concealed carries

9 in lieu of NICS, and so they asked the question.  I didn't

10 draw any conclusion of any question asked, saying, oh, they

11 definitely broke this law and we need to -- I think they

12 were legitimately concerned.

13         They asked the question, I answered to the best of

14 my ability of my understanding of the law, gave the answer,

15 and that's all I can recall or say.

16      Q.   Okay.  And you testified earlier, about COVID

17 really shutting down onsite inspections.  Y'all were doing

18 QIs, for example, remotely.  Is that correct?

19      A.   Yes, sir.

20      Q.   And so from sometime in, what, early 2020, when

21 COVID started until late '21, '22, really COVID was

22 impacting the industry, wasn't it?

23      A.   Yes, sir.

24      Q.   And was ATF offering onsite training where they

25 could come in and hear a seminar during that period of time?

1      A.   I can't say whether they were or not.  I was not

2  involved in a seminar in 2020 that I recall.

3      Q.   And in part of your involvement in the August of

4  '22 qualification inspection and then following up with the

5  compliance inspection in '23 and this issue of out-of-state

6  sales, did you ever go back and talk with IOI Symington

7  about, you know, hey, did you really go into detail with the

8  Morehouse licensee about how this out-of-state sale works?

9      A.   I don't recall a discussion between them.

10     Q.   She never came and told you that hey, I explained

11  that to him in detail.  There's no reason why they should

12  have got that wrong.

13     A.   I don't recall any discussion about with IOI

14  Symington regarding --

15     Q.   Okay.

16     A.   -- the Morehouses.

17     Q.   Okay.  And when you reviewed the Morehouses --

18          THE COURT REPORTER:  Regarding the?

19          THE WITNESS:  The Morehouses.

20  BY MR. HARRIS:

21     Q.   And when you reviewed the ATF's records, did you

22  see any kind of notation or documentation in the FFL's

23  records with the ATF, that there had been prior communicate,

24  and when I say prior, prior to August 25th, 2022, prior

25  communications between an IOI or any ATF official in the

1  Morehouses, specifically about out-of-state handgun

2  transfers?

3     A.   All I have is the acknowledgment that was signed

4  in 2019 between Joann and Tanner.

5     Q.   And just so that I'm clear, if you have, for

6  example, if Morehouse were to contact you and say, hey, I

7  got a question and also they texted you, okay, on your

8  phone, do you document that in their file or is that just on

9  your phone?

10    A.   I don't document that on my phone, sir.

11    Q.   Okay.

12    A.   I don't --

13    Q.   There's no report of communications or report of

14  conversations that's --

15    A.   Regarding the Morehouses, I don't recall seeing

16  any -- I don't recall any discussion with Joann Symington

17  about any of the specifics regarding the acknowledgment

18  other than me reviewing the acknowledgment.  I don't recall

19  that.  I don't recall anything else, sir, regarding Joann or

20  that, no.  Tanner texted me.  You know, it's on my phone.  I

21  don't have a system that inputs it, sir.

22    Q.   Okay.  And based upon your investigation of the

23  facts concerning the Fluker transactions, the first two

24  counts, does it appear to you that that occurred because

25  they just didn't clearly understand what the law required in

1  that regard?

2      A.   I don't think I can really answer what I think.

3  All I know is that they asked that question on August 26th,

4  2022.  The violation of that form was cited a day before.

5  I'm sure there's a reason why they asked that, they were

6  concerned about that.  We addressed it.  I did all that.

7  That's all I can respond to.  That's all I can say.

8      Q.   When you had the conversation on August the 26th

9  of 2022, did any component of the conversation address,

10 well, if this has happened, here's how you need to correct

11 it?

12     A.   I don't recall that conversation piece.

13     Q.   When this issue came up as part of the compliance

14 inspection in February and March of 2023 or the closing

15 conference in April, did you have any conversation with the

16 Morehouses about, okay, now we got to talk about Fluker

17 because I'm going to charge you for this one.  Here's what

18 you need to do to correct it and make it right, so to speak.

19          Did you have any conversation with them along

20 those lines at that time?

21     A.   No, I don't recall having them make any

22 corrections to the form.

23     Q.   Okay.  Is there anything that they could have done

24 at that time to go back and correct the Fluker transaction?

25     A.   Nothing that comes to mind that they could have

1 done to correct that form unless -- you can't pack data.

2 You can't run a NICS check after the firearm's been

3 transferred, so I don't believe there's anything you can do

4 to correct that form.

5     **Q.   Would it have been productive, at all, to tell**

6 **them, hey, you got to go find Fluker and recover the gun and**

7 **put it back on your records?**

8     A.   Would that have been productive?  I would say no,

9 I didn't give such instruction to do it, or I don't know.

10 In my view, the violation was disclosed; it was cited.

11 Again, provided information of North Dakota concealed

12 carries for North Dakota residents.  At that point or

13 moment, there was nothing more further that I could have

14 done to fix the transaction that occurred six months ago

15 with Mr. Fluker.

16     **Q.   Okay.  And with respect to Fluker, would it have**

17 **been, I mean, to your knowledge, is there anything they**

18 **could have done to try to fix that situation other than ask**

19 **for information on how to not repeat this mistake?**

20     A.   No, I don't know.  Like I said in my prior

21 statement, I don't know if after it occurred, if there's

22 that point, customer's out the door, there's nothing you can

23 do.  They asked me a question to address the issue a day

24 later on August 26th, and it occurred on August 25th.  Like,

25 they asked the question a day later, like there's nothing --

1  I don't -- my view or understanding, there's nothing you

2  could have done to correct the Fluker transaction.

3      **Q.  Did you, at any point, have the concern or belief**

4  **that they were trying to hide or conceal the Fluker**

5  **transaction from you when you did your compliance**

6  **inspection?**

7      A.  No, sir.

8      **Q.  They owned up to it?**

9      A.  They gave me all the 4473s in the allotted period

10  that I asked for and I reviewed the form and a discussion

11  with Tanner about it, specifically.  I don't recall, you

12  know, which -- right when I found it, if we discussed it or

13  if it was only during the report of violations that when I

14  cited it, we had a discussion.

15          I know we had a discussion then, but I don't think

16  they would try to hide that transaction or transfer at all.

17      **Q.  Very good.  Let's talk a little bit about the**

18  **Nelson --**

19          THE COURT REPORTER:  Can we take a quick break?

20          DIO HUMMEL:  Yeah, let's --

21          THE COURT REPORTER:  Five minutes?

22          DIO HUMMEL:  Is this a good time? I don't

23  know how close you were.

24          MR. HARRIS:  No, it's fine.

25          DIO HUMMEL:  You've got significant more

1  time?  All right, let's take off the record.  The time is

2  11:14.

3                    (Recess taken.)

4            DIO HUMMEL:  Okay, we're back on the record

5  at 11:25.

6                 CROSS EXAMINATION RESUMED

7                 BY MR. HARRIS:

8       Q.   IOI Temp, let's talk about the third count, so to

9  speak, which is the Nelson incident.

10           Are you familiar with it?

11      A.   Yes, sir.

12      Q.   Okay.  And Nelson is a 4473 violation.

13           Is that correct?

14      A.   That's correct.

15      Q.   And there are really two issues on the Nelson

16  incident.  One is the NICS confirmation number, the NTN is

17  -- there's an NTN there, but it's 1 digit short.

18           Is that correct?

19      A.   That's correct.

20      Q.   And did you discuss that factual circumstance with

21  either of the Morehouses, as to how that occurred or might

22  have occurred?

23      A.   Yes.

24      Q.   And can you tell me what that conversation was?

25      A.   I just recall discussion of why -- the question is

1 why the NTN number was missing a digit or off by one.

2       Q.   Right.

3       A.   I recall Tanner stating they copy the NTN off the

4 E-check system and then they paste it to the 4473.  And so

5 it could have been copied wrong or, you know, all the

6 possibilities of it not transcribing from the E-check to the

7 4473 system.

8       Q.   Okay.  Did you believe them when they told you

9 that that's how they populated that data field?

10      A.   Did I believe that that's how they -- yeah, I

11 believe that that's how they do it.

12      Q.   Would that be an appropriate way to try to copy

13 the NTN data from the E-check system to the 4473?

14      A.   I don't have any objections to that.  I don't get

15 -- as long as they didn't -- all that to me, in my view, all

16 that matters is that the NTN number is correct to be able to

17 verify that the NICS check was done.

18      Q.    And when you realized that there was a problem

19 with the NTN number -- well, first let me back up.  You

20 looked at about seven hundred 4473s for this error?

21      A.   That's correct.

22      Q.   Okay.  And did you count the number of digits on

23 all the NTNs?

24      A.   Not every NTN.  No, I mean.  No, I don't go

25 through and count digits on every one.  I specifically will

1  focus in when it's not on the audit log or if I have

2  concerns over transferring.

3        Q.   And so what was it, specifically, about Nelson

4  that made you look at it closer to figure out there's only 8

5  digits as opposed to nine?

6        A.   There was 2 denials for Mr. Nelson.

7        Q.   And so that's what brought onto the Nelson 4473?

8        A.   Yeah, because I recall there's two on my audit

9  log, there's two deny forms.  I remember asking for the deny

10 forms.  There wasn't deny forms and then on that same day,

11 there was a proceed for Nelson and that drew my concern over

12 the whole transfer transaction.

13       Q.   Okay.  When did you become aware that there were

14 the two denials on Nelson?

15       A.   I would say, well, prior to the onsite inspection.

16       Q.   Okay.

17       A.   I couldn't tell you at what date or what, I mean,

18 I don't know.  Review the audit log, when I requested the

19 audit log, I reviewed the audit log, see if there's any

20 concerns when I go conduct the inspection.

21       Q.   And when you're talking about the audit log,

22 you're talking about Government's Exhibit 10, which is the

23 NICS printout?

24       A.   It's on Exhibit 10, yes, sir.

25            THE COURT REPORTER:  Are you saying audit log?

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                                    Page 109

1            THE WITNESS:  A-U-D-I-T.

2            THE COURT REPORTER:  Thank you.

3            MR. HARRIS:  That's what I was trying to say, but

4  I'm from Nashville, so make adjustments on your notes.

5            MS. THIELHORN:  I'm also from the South and

6  probably have a thicker accent than Mr. Harris, so feel free

7  if you can't understand me either.  I'm sure everyone here

8  from Fargo is probably having real trouble with our

9  southern accents, so.

10  BY MR. HARRIS:

11       Q.   Okay, so I'm clear, you knew about the duplicate

12  or the two instances where there had been denials, but those

13  were not on the 4473 by the time you were doing the

14  compliance inspection, initially.

15       A.   I was clear that there was multiple denials for

16  one person like Nelson.

17       Q.   And so were you looking specifically for the

18  Nelson 4473 when you did your compliance inspection?

19       A.   Yeah, while conducting -- yeah, the compliance

20  inspection, I review a year's worth of records and I needed

21  to verify that Nelson had 4473s because I know he was on

22  this audit log.

23       Q.   Okay, did you find more than one 4473 for Mr.

24  Nelson?

25       A.   No, sir.  I only recall the 4473 exhibit.  Is it

1  9?  Exhibit 9.

2      Q.   Okay, now let's look back at Government's Exhibit

3  4, which is your April 6th, 2023 report of violations.

4      A.   Yes, sir.

5      Q.   Okay, and if you look at the way mine's printed

6  out, 5 of 5, there's a column on it that has Nature of

7  Discrepancy.  Do you have that page?

8      A.   Yes, sir.

9      Q.   So look at at Category 4 and then over on the

10  Nature of Discrepancy, we're talking about Mr. Nelson's

11  4473, dated March the 28th of 2022.  Is that correct?

12      A.   Mr. Nelson dated March 28, 2022.  It's 2022,

13  right.

14      Q.   And that's the actual 4473 is Government's Exhibit

15  9.

16      A.   Correct.

17      Q.   So you've got them both.

18      A.   Yes.

19      Q.   Now on Category No. 4, under Nature of

20  Discrepancy, the second item is the NTN issue; correct?

21      A.   Yes sir.

22      Q.   Okay.  So what is the source of the nature of

23  discrepancy?  Where do those statements come from?

24      A.   So regarding Nelson, which is titled No. 2 on 4,

25  Nature of Discrepancy, regarding the Nelson form, I said,

1  Licensee recorded incorrect NTN.   And Item 27.b, IOI Temp

2  conducted a query -- "

3           THE COURT REPORTER:  I can't hear you very well.

4           THE WITNESS: " -- inquiry, the -- the

5                results of NTN doesn't exist.  I made contact

6                with NICS, state the NTN number is missing a

7                digit.  I went back over the firearms to see

8                if the NTN is duplicating.  I found nothing

9                that would demonstrate that the NTN was

10               duplicated --

11          THE COURT REPORTER:  Slower, please, sir.

12          THE WITNESS:   IOI Temp went back to that file to

13               review all forms to see if the NTN was

14               duplicated.  Found nothing that would then

15               demonstrate the NTN is duplicated, and no

16               evidence the NTN was falsified but recorded

17               on the form incorrectly.

18 BY MR. HARRIS:

19     Q.   Okay.  So that narrative that's on Exhibit 4,

20 under Nature of Discrepancy, is that a narrative describing

21 your activities and your factual investigation?

22     A.   It is describing my activities or my yes, what I

23 found regarding Mr. Nelson and the NTN that was transcribed.

24     Q.   And by the time that you were investigating the

25 Nelson incident, it's almost a year later.  Is that correct?

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                                    Page 112

1      A.   Yes, sir.

2      Q.   Okay.  Was there a way, at that point in time, a

3  year later, that you could run any kind of report from the

4  NICS liaison or the NICS system to find out what proceeds

5  have been issued to this licensee in March of 2022?

6      A.   I'm sorry, can you can you repeat the last

7  question?

8      Q.   Yeah.  And I'll tell you why I'm asking.  I noted

9  and maybe I wrote it down wrong that on your direct

10 testimony you made the comment that when you run this audit

11 log that for proceeds, it only goes back 90 days.

12          Is that correct?

13     A.   That's correct.

14     Q.   Okay.  So if a proceed was more than 90 days old,

15 it won't show up on the audit log?

16     A.   That's accurate.

17     Q.   So by the time you were investigating Nelson in

18 March, February - March of '23, the audit logs from ATF or

19 the FBI, they would not have shown you which proceeds were

20 issued to Morehouse in March of 2022.  Is that correct?

21     A.   That's correct.

22     Q.   And that's because all the proceeds roll off the

23 system after 90 days?

24     A.   That's my understanding.

25     Q.   Okay.  Look at Exhibit 10 for me.

1     A.   Is this Government's Exhibit 10 or?

2     **Q.   Government's Exhibit 10.**

3     A.   Okay.

4     **Q.   And this sort of looks like an Excel spreadsheet**

5  **to me.  Is that what this is?**

6     A.   Yes, sir.

7     **Q.   Okay.  And is this a report that you generated or**

8  **did someone generate it and give it to you?**

9     A.   It's information I received from NICS, sir.

10    **Q.   And is this report truncated or is this the full**

11 **report?**

12    A.   Specifically here in Exhibit 10?

13    **Q.   Yes.**

14    A.   It is not the complete report I received.

15    **Q.   Okay, and did the complete report, would it have**

16 **showed all the denials for the preceding year?**

17    A.   It would have shown all the denials, to my

18 understanding of the -- since the NICS was registered with

19 Morehouse Enterprises since 2019.

20         **Q.   And so, for example, if you look at Line 26,**

21 **there's a denial on a transaction that was initially created**

22 **on November the 23rd of 2020.  Is that correct?**

23    A.   Yes, sir.

24    **Q.   And at least, if we start with November of 2020,**

25 **is it your understanding that this exhibit reflects all the**

1  denials from that period of time forward, for this licensee?

2      A.   I wouldn't be able to comfortably say that it

3  included all the denials.

4      Q.   Okay.  And that's my question.  Can you tell me is

5  this report somehow filtered, so that it only shows

6  selective ranges of denials for that prior year?  Or

7  actually, that goes back a little over 2 years, if it's

8  2020.

9      A.   As I stated before, this isn't the complete report

10 and so the 90 days window proceeds.  As an example, if a

11 denial happened within those 90 days, it would record by the

12 dates.  So it would, rather than it all just stacked back at

13 the end page, it would have been a denial and the first --

14 so, for instance, if there was a denial of February of 2023,

15 it wouldn't be in the back of this report.  It would have

16 been in February of 2023, year of the NICS audit log.

17     Q.   Okay.

18     A.   So this would include, to my understanding, all

19 the denials set forth.  There would have been -- it didn't

20 include any of the early 2020 -- if that.  It's not a

21 perfect, ordered system of what's portrayed here in Exhibit

22 10.

23     Q.   So it's not chronological and it's not complete.

24     A.   This was just meant to show regarding the Robert

25 Nelson transfer and denial, sir.

1      Q.   And the two Robert Nelson denials are on lines 20

2  and 21, dated March the 28th of 2022.  Is that correct?

3      A.   That's correct.

4      Q.   Okay.  And did you specifically look for the

5  Robert Nelson proceed or a proceed that would have been in

6  say, March of 2022, that might have matched up with that

7  partial NTN?

8      A.   Well, originally, if I recall correctly, I was

9  looking for the denials of Mr. Nelson.  And then I asked for

10  the denials, the denial forms weren't provided, and then I

11  saw Nelson made with the proceed on the same day and that's,

12  if I recall accurately, that's what kicked off like, oh,

13  there's I have concerns about this this transaction because

14  of the denials and --

15      Q.   Okay.

16      A.   And then I went back to see, I recall going back

17  to the premises the following week to see if -- to do as

18  much homework as I could to see if this NICS transaction

19  number was duplicated.  You know, yeah, duplicated or like

20  to find whatever information I had regarding the NTN,

21  especially.

22      Q.   And specifically, did you try to run any kind of

23  report that would have showed you all the proceeds on this

24  licensee for the month of March of 2022?

25      A.   That report, to my knowledge, doesn't exist.  I

1  didn't try to run it because I know the proceeds are only

2  good for --

3      Q.   90 days.

4      A.   90 days.

5      Q.   And if you look, then at Line 23 or toward Line

6  22, you see the transaction date of 2/25/22?

7      A.   Yes, sir.

8      Q.   And that's a month before the March of '22 Robert

9  Nelson window, isn't it?

10     A.   Yes, it's 2/25/2022.

11     Q.   And do you know why that would show a proceed more

12 than 90 days old?

13     A.   I have no idea, sir.

14     Q.   Okay.  So going back to Exhibit 4, where you wrote

15 the narrative about the nature of discrepancy on Nelson's

16 NTN, you were trying to figure out, as I take it from your

17 testimony, how this occurred, and was it a duplicate?  And

18 you ruled out it being a duplicate.  Is that correct?

19     A.   Yes.  It was not a duplicate, sir.

20     Q.   And you found -- I'm just reading what you wrote

21 -- you found no evidence the NTN was falsified.

22          Is that correct?

23     A.   That's correct.

24     Q.   And your conclusion was:  But it was reported or

25 but reported on the form incorrectly.  And that's

1 self-evident isn't it?  It's eight digits instead of nine;

2 correct?

3        A.   That's accurate.

4        Q.   Okay, but you didn't draw any conclusions as to

5 why or how that happened.

6        A.   As I stated, I recall a conversation between me

7 and Tanner about them --

8        Q.   Cut and paste.

9        A.   Yes.

10       Q.   And what you do, you know, either for a living or

11 recreationally, you're used to using a computer and cutting

12 and pasting things.

13       A.   Yes, sir.

14       Q.   And it sometimes happens that when you cut and

15 paste, you leave off something, usually, on the beginning or

16 on the back end.

17       A.   Yes, sir.

18       Q.   Is that, to you, a plausible reason how this

19 number got down to eight digits instead of nine?

20       A.   It is possible.  Yes, sir.

21       Q.   Did you rule out that that was likely?

22       A.   I can't.  I just find -- hearing the explanation,

23 I could understand all that could -- that was possible, that

24 could happen, yes.

25       Q.   And when they gave you that explanation that they

1  they cut and paste and it just must have missed a digit.

2  Did you think they were being truthful with you?

3       A.   I couldn't find, as my report said, I couldn't

4  find any evidence that it was falsified or duplicated or

5  anything like that.

6       Q.   It's just an error.  Would that be correct?

7       A.   I couldn't find any evidence that it was falsified

8  or duplicated.

9       Q.   Okay.  Now if you look at Category 5 on

10 Government's Exhibit 4, this is the violation regarding

11 Robert Nelson concerning writing down or failing to write

12 down the two denials.  Is that correct?

13      A.   Yes, sir.

14      Q.   And if you look at Licensee Exhibit 18, if you

15 still have it.  Here, let me just hand it to you because in

16 my book, it's sideways, there you go.  Licensee Exhibit 18

17 is your original draft report of violations that was done on

18 March the 6th of 2023.  Is that correct?

19      A.   Yes, sir.

20      Q.   And is that, Pages 5 of 5, is that the complete

21 draft of the March 6th version of the report of violations?

22      A.   Make sure I got one.  Yes, this appears to be,

23 there will be -- that was issued on that date.

24      Q.   Okay.  And this is your report, Exhibit 18.

25           Is that correct?

1     A.   Yes, sir.

2     Q.   Okay.  I want to know why there's no Category 5.

3  Why the two denials, if you knew about them at the time you

4  prepared this, why they don't show up on this report.

5     A.   On the original?

6     Q.   Yeah, the March 6th version.  Why are the two

7  denials that are Category 5 on the April the 6th, 2023

8  report, why did those not exist on the March the 6th one, if

9  you knew about them when you prepared it?

10    A.   Because I failed to cite them.  I failed to, you

11 know, cite them, at that time, for not recording the denials

12 of Mr. Nelson in that case.

13    Q.   Was that just an oversight on your part?

14    A.   I failed to cite the first time of Nelson's

15 denials.

16    Q.   But what what I'm getting at is, and did you know

17 about it and choose not to cite it, or was it just an

18 oversight?

19    A.   I would say it was an oversight, as in I

20 completely was -- I was focused in on trying to figure this

21 out, and I failed to put the denials on the form.  Or to

22 cite, excuse me, the review of the denials that were not

23 recorded on the 4473.

24    Q.   Now, if you look at --

25         THE COURT REPORTER:  On the 4473?

1        THE WITNESS:  Yes, sir.

2   BY MR. HARRIS:

3        Q.   If you look at the narrative, Nature of

4   Discrepancy, regarding the NTN, you went back and tried to

5   figure out how this occurred and you addressed that in your

6   narrative.  Is that correct?

7        A.   Yes, sir.

8        Q.   Did you make a similar effort with respect to the

9   two denials in Category 5?  Did you try to figure out and

10  document whether those were, for example,  no evidence that

11  it was falsified , as you did with respect to Category 4?

12       A.   So as far as finding the denials?

13       Q.   Yes.

14       A.   Yeah, I recall going back and doing on the for

15  4473s, looking for the duplicate.  I guess looking for the

16  denials, I looked for other Nelson paperwork of the 4473s

17  provided to me.  I recall asking Tanner, you know, if

18  there's any denial forms or including Nelson.  There was

19  none or it wasn't provided to me, and so that was the extent

20  of my, I guess, investigation on the denials regarding Mr.

21  Nelson.

22       Q.   And what I'm contrasting is, or trying to figure

23  out is on the NTN, for example, you specifically said you

24  found nothing that would demonstrate that it was duplicated

25  and no evidence that it was falsified.  But you don't make

1 the same kind of statements or findings with respect to the

2 denials.  Is there a reason why you treated those

3 differently?

4     A.   I didn't have enough evidence that the intent was

5 falsified on that.  Regarding the denials, it was -- I don't

6 want to say I put in, I made every effort I can as far as

7 documenting they omitted entry or failed to properly record

8 the entry of the denials.  I think that was accurate based

9 off not recording the denials, like --

10     Q.   Right.

11     A.   -- there was an omission of entry, or they didn't

12 properly maintain that record.

13     Q.   What I'm really asking is with respect to the NTN,

14 you didn't just document it, but you went further and you

15 looked at the question of how did it happen; was it

16 intentional; was it falsified; was it just an error?

17          You looked at the issue of to some extent,

18 willfulness.  You know, were they trying to avoid accurate

19 information on the form?  Is that correct you did that on

20 the NTN issue?

21     A.   I did as much investigative work on that NTN

22 numbers I had thought to do in that time.

23     Q.   And you, to some extent, you did the same thing

24 with respect to the two denials.  You asked them where their

25 denial 4473 is.  Am I understanding you correctly?

```
 1      A.   Yes, sir.
 2      Q.   But you didn't note that in the Nature of
 3  Discrepancy, like you did with the NTN.  Is that accurate?
 4      A.   I did not put that in the Nature of Discrepancy.
 5      Q.   Now, you testified on Direct, that when you run a
 6  NICS check, if I wrote my notes down right, there's four
 7  possible responses.  Can you tell me, again, what those
 8  possible responses are to a NICS check?
 9      A.   It's proceed, denied, canceled, and delayed.
10      Q.   And when they run an E-check, are you familiar
11  with a possible fifth response?
12      A.   I don't do E-check; I'm not sure.  I couldn't
13  think of another -- according to the form, you've got
14  proceed, denied, cancelled, delayed.
15      Q.   Right.  On the E-checks, which is what they were
16  running, have you heard of a response from NICS called
17  research?
18      A.   I'm not familiar with it.
19      Q.   You're not familiar with that one?  So, on a
20  delay, when does NICS use a delay?
21      A.   When the initial information is provided and there
22  may be something in the background that could be a
23  prohibiting factor, from what I understand.
24           THE COURT REPORTER:  That could be?
25           THE WITNESS:  A prohibiting factor.
```

```
1              THE COURT REPORTER:  Thank you.

2  BY MR. HARRIS:

3       Q.   And in your experience, could a delay also be used

4  if there's potential confusion as to two people with the

5  same name or same dates of birth?  It's just an identity

6  issue that results in a delay.

7       A.   That's possible.

8       Q.   Okay.  And in your conversations with the

9  Morehouses, did you have any discussion about why they ran

10 the NICS check more than once?

11      A.   Yes.  I remember having a conversation with them

12 --

13      Q.   And what do you recall about that conversation?

14      A.   I recall that they would have a transferee or

15 someone buying a gun would come in, they'd get denied.

16 Shortly thereafter, they would come back saying they got

17 their information cleared up and so, then they would run

18 them again.

19             I remember them saying that they don't believe

20 they would ever run multiple NICS checks on the same day,

21 especially if it was denial over a piece like.  That, off

22 the top of my head right now is, as I'm answering, that's

23 all I can recall regarding multiple NICS checks done.

24      Q.   Okay.  And my notes are that that conversation

25 about  we wouldn't typically run multiples on the same day ,
```

1  that was a conversation you had with Tanner Morehouse.

2          Is that correct?

3      A.   That's correct.

4      Q.   And if you look at the Nelson 4473, it was

5  actually run by Torrey Morehouse.  Is that correct?

6      A.   That's true.  That's correct.

7      Q.   Did Torrey Morehouse tell you the same thing about

8   we won't run multiples on the same day ?

9      A.   I don't recall ever having a specific conversation

10  about the Nelson Form 4473.

11     Q.   Do you recall any part of the conversation about

12  the Nelson 4473 that included information that they reran it

13  because he then decided to provide a serial number -- not

14  serial, Social Security number.

15     A.   I recall a conversation of that as a possibility

16  that he made.  I remember having a conversation with Tanner

17  of like, hey, because he didn't do the transfer, these are

18  possible possibilities of what could have occurred.

19     Q.   Okay, okay.  When you did the qualification

20  inspection back in August of 2022, and you talked with them

21  about how to run NICS checks and document NICS checks, did

22  you discuss that?  I guess is the first question.

23     A.   Yes, sir.

24     Q.   Okay.  Did you have, specifically, any

25  conversation that you can recall about, hey, if the

1  transferee says wait a minute, I shouldn't have a problem

2  let me give you my social and run it again.

3         Can that be done?

4     A.   I know that there's the appeals process upon a

5  denial that the FFL needs give that NTN number, associate

6  that denial to that individual to appeal that NICS decision.

7     Q.   But is the appeals process the only option?  Is

8  there something where the licensing is told in the

9  qualification inspection that once there's a denial, you

10 can't resubmit it with a Social Security number or you can't

11 resubmit it with a UPIN?  Are they expressly told you can't

12 resubmit with additional information on the NICS check?

13    A.   Part of my presentation is going through those

14 things, and then I provide the documentation from the

15 regulation NICS packet.

16    Q.   Yeah.

17    A.   Do I recall it specifically say you cannot do a

18 NICS check if you include these things?  I don't recall that

19 specific conversation related with the licensee.

20    Q.   Are you aware of anything in the statute or in the

21 CFRs or the regulations that specifically says if there's a

22 denial in the lot and the and the guy wants to rerun it

23 because he says wait a minute, I've got a social or wait a

24 minute, I've got a UPIN, run it again.

25        Is that prohibited by the regulations?

1      A.    I don't recall.  As I said before, the only thing

2  I know on the denial is the NICS appeal process and provide

3  the NTN to the transferee of how to appeal NICS.  I am not

4  aware of a regulation under 478 of running multiple NICS.

5            THE COURT REPORTER:  Of?

6            THE WITNESS:  Running multiple NICS.

7  BY MR. HARRIS:

8      Q.    So if you look at Licensee Exhibit 3, which is the

9  Federal Firearms Licensee Manual, and you can have my copy.

10           Are you familiar with that manual?

11     A.    Yes, sir.

12     Q.    Is that part of the materials that you would give

13  a licensee when you do a qualification inspection?

14     A.    I don't give the complete Federal Firearms License

15  Manual, no.

16     Q.    Why not?  That's for the licensees, isn't it?

17     A.    I provide, you know, resources regarding the NICS,

18  but I don't hand out this.  That's all I -- why don't I?

19  It's probably I just never have.  It's not part of the

20  packet I provide the FFL folks.

21     Q.    All right.  Let me ask this about the packet.  The

22  packet that you give the licensee, you've told me it doesn't

23  include Licensee Exhibit 1, which is the full Federal

24  Firearms Reference Manual; correct?

25     A.    It's not complete.  There is like a highlight,

1  what I believe to be key points from the actual regulation,

2  but do I hand out a bound book of the 2014 regulation guide?

3  I don't provide that to the FFLs.

4       **Q.   And you don't tell them, hey, before you start**

5  **doing business, you've got to read that whole thing, 233**

6  **pages.**

7       A.   I don't tell them that they have to read the whole

8  thing, no.

9       **Q.   And you certainly don't tell them that they've got**

10  **to be aware of everything in that manual, do you?**

11            MS. THIELHORN:  I'm sorry.  Are you still talking

12  about the NICS manual?

13            MR. HARRIS:  No, I'm talking about the Exhibit 1,

14  the Federal Firearms Regulation.

15            THE WITNESS:  I don't use that specific language,

16  say hey, I see -- I mean, specific conversation, you know,

17  do I say, hey, you got to read back-to-back this whole -- I

18  don't give them homework.  But I provide them with a general

19  overview of the regulations the best I can, ranging from

20  what could be an hour of time to six hours of time depending

21  on their questions.

22            I do the best I can over the acknowledgment and

23  the regulations I have with the resources and that's the

24  education that I provide.  And if you have any further

25  questions to give me a call or email me and I'm not -- I try

1  to do the best I can with the with in respect to everyone's

2  time, right?   Like give as much information I can.  But no,

3  I don't give them, you know, the bound book of 2014.

4           I don't provide the complete Federal Firearms

5  License Manual from the National Instant Criminal or

6  National Instant Criminal Background Check System.  We do

7  not do that.

8       **Q.   And that's because as a practical matter, you're**

9  **going to spend a couple hours with them with this training.**

10 **So you're giving them an overview of what they need to know,**

11 **primarily, on how to be an FFL.  Is that correct?**

12      A.   Yes, I try to spend as much time with them on

13 4473, A&D records.  I'd say NICS checks, but I didn't hand

14 them this pamphlet like on what I believe to be key points

15 to be as successful as possible as an FFL.

16      **Q.   And the NICS Pamphlet exhibit, Licensee Exhibit 3,**

17 **are you familiar with it?**

18      A.   Yes, I am familiar with that, right through it,

19 yeah.

20      **Q.   And can you tell me does it specifically address**

21 **in there, anywhere, and say that if a licensee is running a**

22 **NICS check and the transferee says wait a minute, I don't**

23 **have a problem.  Can you run it again?  Here's my social.**

24           **Is there anything in that manual that says they**

25 **cannot resubmit, at that point?**

1    A.   It's my understanding that it does provide the

2 process if someone is denied and that is to provide them the

3 NTN number associated with that denial, so that they can

4 appeal that NICS decision.

5    Q.   Right.

6    A.   I mean, and that's what I can recall from getting

7 a denial.  As far as repeat, I don't know if that's

8 specifically in there or not in there.  I just remember,

9 hey, the process of a denial is that you provide the NTN to

10 appeal the NICS issue.

11    **Q.   And that's like we talked a minute ago.  You know,**

12 **I'm sitting on the airplane at 20,000 feet and this is the**

13 **two-hour talk on how to be an FFL; correct?  Or the**

14 **three-hour talk or whatever.**

15    A.   Right.  Yeah, I mean, we go through everything on

16 the acknowledgment of regulations the best I can, and that's

17 my time during the qualification that I spend at the FFL, is

18 going over as much information as I can.

19    **Q.   But as we're here today, looking back on all of**

20 **this, you're not aware that there's a specific statute,**

21 **regulation or manual that says if the transferee wants to**

22 **resubmit with their social, right then and there, that**

23 **that's prohibited?**

24         DIO HUMMEL:  Just a clarification, transferee

25 or transferor?

1              MR. HARRIS:  It's the transferee.  The buyer wants

2  to resubmit the background check with their social.

3              DIO HUMMEL:  Oh, the transferor wants to

4  resubmit their submission.

5              MR. HARRIS:  Right.  Correct.

6              DIO HUMMEL:  All right.  I'm just looking at

7  the customer coming in.

8              MR. HARRIS:  Yeah, customer comes in and I'm

9  trying to sell -- you're my customer and you say, wait a

10  minute, I'm a DIO.  That shouldn't be blackmail to me, but,

11  you know, it does.  And could you say, well, run it with my

12  social and --

13              DIO HUMMEL:  After you've been denied.

14  BY MR. HARRIS:

15      **Q.   My point is none of the documents that they're**

16  **given and none of the training at the QI tells them they**

17  **can't resubmit that if the customer says here's my social,**

18  **run it again.  Is that correct?**

19      A.   The only information I know or process that's

20  provided and it is providing him with the NTN number

21  associated with that denial to appeal.  That's all I can

22  respond to that question with.

23      **Q.   Okay.**

24              MS. THIELHORN:  Actually Mr. Harris, I'll get into

25  this on redirect, but to help you, if you want the

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                                    Page 131

1  information, it actually does say that in your Licensees

2  Exhibit No. 3, the NICS FFL's user manual says on Page 24:

3  "Note:  FFLs are not authorized to conduct additional checks for

4  denied individuals until the appeal process is successfully completed."

5          And ATF does not give a copy of the NICS FFL

6  user's manual.  However, according to NICS, in the

7  information in this, they give a copy of it when the

8  licensee enrolls to be a part of the NICS process.

9          MR. HARRIS:  Right.  But my point was it's not

10  given to them in the qualification inspection.

11          MS. THIELHORN:  Right.  But I just wanted to

12  clarify for the record, you said  in none of this stuff .

13  And it actually, it is in it because you introduced the FBI

14  manual and he's talking about the ATF stuff that he gives.

15          So I just wanted to clarify for the record, it's

16  two different agencies.  The FBI gives out the NICS system.

17  The FBI runs the NICS system, so they give out the

18  information about the NICS system.  And he's the ATF

19  investigator.  He provides information regarding to the ATF

20  Regulations of 478.  You asked about federal regulation

21  about this, and that's 28 CFR 25.11.

22          DIO HUMMEL:  And again, that isn't relevant

23  to this because we're talking about GCA violations as

24  opposed to the FBI regulations that they're responsible in

25  the use of the NICS system, which, you know, again, that's a

1  different --

2          MS. THIELHORN:  Exactly and I wasn't wanting to

3  get into it.

4          DIO HUMMEL:  Right.

5          MS. THIELHORN:  I just wanted to clarify for the

6  record because he was introducing different exhibits, and I

7  just wanted to make sure the record was clear Exhibit 3 is

8  an FBI document, whereas, you know, some of the other

9  exhibits are ATF documents.

10 BY MR. HARRIS:

11     Q.  And so my follow-up on this, with respect to

12 Nelson, is because the only training that they officially

13 had from the ATF on how to run or document the e-NICS [sic]

14 on the 4473, as of March of 2022, when Nelson occurred, was

15 the initial qualification inspection that was done in 2019.

16         Is that correct?

17     A.  That's correct.

18     Q.  And when you discussed the Nelson incident with

19 them and either between February and April of 2023, did they

20 indicate to you, in any way, that they knew that it was

21 wrong or inappropriate to rerun the e-NICS check with the

22 social?

23     A.  Did they ever say it was wrong for them to do

24 that?

25     Q.  Yeah, we all were discussing it and you said --

1      A.   Right.  I don't recall.

2      **Q.   Did they indicate to you that they even knew there**

3 **was a problem with rerunning it, at the time they did it?**

4      A.   I remember a conversation like that occurring.  I

5 don't really -- all I remember is -- yeah, I remember them

6 saying say, hey, they were unaware that rerunning NICS was,

7 I didn't think -- if I remember correctly -- I recall them

8 -- they were unaware that they couldn't do that or they

9 weren't able to do that.

10          That was new, you know, that's the first time

11 they've heard about it.  I can't remember exact specifics,

12 but I remember them saying that, hey, this is, I don't know,

13 the first time.  I don't want to put words in the mouth, so

14 I don't want to comment but on specifics.  But I do remember

15 the conversation of not going over that.

16      **Q.   Okay, okay.**

17          THE COURT REPORTER:  You remember the

18 conversation...?

19          THE WITNESS:  Of them being aware of not being

20 able to run a person more than once in NICS or twice or

21 something.

22 BY MR. HARRIS:

23      **Q.   And I think we talked about this a little bit with**

24 **respect to the first individual, Fluker, but did you**

25 **determine that the sale to Nelson was a sale to a prohibited**

1  person, at any point?

2      A.   The person was not prohibited.

3      Q.   Okay.  Did you discover any information as part of

4  your compliance inspection or investigation that indicated

5  that either of the two individuals involved, Fluker or

6  Nelson, were related to straw purchases?

7      A.   I don't recall any evidence that they were

8  involved with straw purchases.

9      Q.   Did you see any evidence that there was a pattern

10 of these kind of errors that were repeat or recurring?

11     A.   No, it was just the instances that I found that

12 was recorded in our audit log.

13     Q.   Okay.  Just two isolated instances out of hundreds

14 of transactions.  Is that correct?

15     A.   Yes.  But the violations I did -- are in ROV, are

16 the violations I found and disclosed.

17     Q.   And when you discussed the rules and how these

18 things should be handled, do you feel like they were willing

19 to comply with those instructions going forward?

20     A.   Yes.  I don't recall any objection to any

21 discussion we had.

22     Q.   With respect to Nelson, is there any way, as of

23 the time you did the compliance inspection, that they could

24 have gone back and edited the Nelson form to put in a

25 complete NTN number?

1    A.   I don't know of a way because on the proceed NTNs,

2   they, to my understanding, I know you raised an issue with

3   the one example of whatever.  But like, to my knowledge,

4   they fall off after 90 days.  I tried looking for that

5   number; I just couldn't verify with it being eight digits or

6   not complete.  But there -- I just made a short story long,

7   but I don't believe they could have fixed that form.

8       Q.   And to your knowledge, a licensee doesn't have the

9   ability to pull up prior proceed approvals that are older

10  than the ones that you have access to, do they?

11      A.   I have no idea honestly, what they have access to

12  in the E-check system.  I don't know.

13      Q.   But you didn't instruct them to, hey guys, if you

14  can, go back and edit this and fix it.

15      A.   I did not instruct them to do that at all.

16      Q.   And does the Nelson 4473 form, as far as you know,

17  today, still have these two pieces of information incorrect?

18      A.   I'm not sure if I understand your question.

19      Q.   So for example, we talked about the NTN just then

20  and you didn't tell them to go back and fix it.

21      A.   Right.

22      Q.   But you're sitting there with them at the

23  compliance inspection, in the final meeting in April, and at

24  that point, you do have Exhibit 10 which shows the dates and

25  the prior denial NTNs.  Is that correct?

1      A.   Yes, sir.

2      Q.   Did you say, hey guys, here's the information, you

3  need to edit it, and let's update this?

4      A.   I did hand them -- I gave them directions to the

5  form.

6      Q.   And does that omission, failure to correct the

7  form, does that somehow negatively impact the ability to run

8  a trace on that gun?

9      A.   Well, as it stands, with the one NTN being

10  incomplete, yes it does.  It could run the -- it could

11  potentially cause problems with the traceability.

12      Q.   How does, if when you run a trace, I mean do you,

13  as an IOI, ever run a trace?

14      A.   I don't.  No, sir.

15      Q.   Do you know how the trace --

16      A.   Yes, sir.

17      Q.   -- function operates?

18      A.   Oh, I understand what you're saying, like because

19  you got the name, serial number and, you know, individual.

20  So, no, as far as the traceability.  To my understanding,

21  other than not being able to validate that NTN number of

22  whether it was a proceed or denied.  But as far as the

23  traceability, there is the information there:  Robert Nelson

24  got this specific firearm.

25      Q.   It's traceable.

1      A.   Traceable, yes.

2      Q.   Yeah, so does does the error, the fact that it's

3 eight digits instead of nine, does it, in any way, impact

4 the ATF's ability to regulate the firearms industry if that

5 digit's off by one, at this point?

6      A.   I guess.  I cited the violation, it was recorded.

7 Now, I mean the overall, I don't regulate.  I don't -- I

8 mean, I agree it doesn't affect the traceability in that

9 case, but did dry issue because we can't validate that NTN

10 number.  And we don't know if there was ever a proceed.

11        It's possible that there was, you know, regarding

12 that and that's why I cited it.

13     Q.   Well, and my question is really -- getting to this

14 point -- is if you know, if the ATF knows there's an error

15 on, for example, the Nelson 4473, that's correctable because

16 you still got the data concerning the two denials.  And you

17 don't ask the FFL to edit the form and update it.  And you

18 know, there's a procedure to do that; correct?

19     A.   Yes, sir.

20     Q.   Then that information being incorrect on the form

21 really doesn't impact public safety at all, does it?  You

22 can still do the trace.

23     A.   It's my understanding, you can still do the trace.

24     Q.   And it doesn't really impact public safety at all,

25 because if it did, part of your job, as an IOI, is to

1 protect public safety, right?

2      A.   Yes, sir.

3      Q.   And so if it was really a public safety issue, you

4 would be telling them, hey, guys this is really critical,

5 you need to edit the form and update it.

6      A.   As far as correcting the form, that, you know, as

7 you articulate, hey, I understand that that would -- that I

8 should have done that.  It was completely -- that was my

9 oversight.  I should have given this information I have.

10 That would have been a good correction to the form.  That

11 would have been appropriate.  Yeah, I didn't do that.

12      Q.   But I'm not picking on you, IOI Temp.  It's just

13 the way you're trained is an IOI, in general, you're not

14 trained to tell them, hey, this is correctable, this is

15 fixable.

16           It's critical that these forms be accurate so

17 whenever we find a problem, you've got to edit it and fix

18 it.  You're not trying to tell them that, are you?

19      A.   It's practiced by me that if we can correct the

20 forms in an appropriate manner, we do it as procedure

21 regulations state.  Again, on this specific instance, I

22 didn't do that.

23      Q.   And as you can tell, I've got lots of pages of

24 additional notes that we've not talked about.  And I think I

25 can just eliminate all of them because I think between what

1  you've told me and what everybody else has talked about,

2  your job, as an IOI, doesn't get into the area of what

3  response the ATF should have based upon your compliance

4  inspection.  Your job is just document and report on the

5  errors that you find.  Is that correct?

6      A.   That's correct.

7      Q.   I'll pass the witness back.

8               REDIRECT EXAMINATION

9               BY MS. THIELHORN:

10     Q.   Just briefly, I just have a few follow-up

11  questions that I'll go through.  Just a moment ago, Mr.

12  Harris asked you about correcting the 4473 for the Nelson

13  transaction and then talked about you know, well, you know,

14  you didn't tell them to correct it.  And I believe your

15  answer was is that it was oversight, on your part, that, you

16  know, you didn't tell them to correct it.  But my question

17  to you is how could you tell them to correct the NTN error?

18          They couldn't tell you what that number was.  So

19  how could you possibly have said correct that?  Because

20  isn't it true you testified they didn't know what the number

21  was.  It was only eight digits, so it wasn't oversight, you

22  couldn't have possibly corrected that.  True?

23     A.   That's accurate.  You couldn't correct the NTN

24  number.  It is my understanding is it would be pertaining to

25  the denial and the NTN is pertaining to the denials on that

1  form.

2      Q.   So the only way to possibly have corrected that

3  would be to have asked them to get Mr. Nelson back in and

4  fill out the forms because it's not super hard to complete

5  the top portion and then they would document the two

6  denials.  Is that what we're talking about here?  And did

7  you see a need for that to even happen?  Because they said

8  he got a proceed, and you documented that he was not

9  prohibited.

10          So was there a need to have them call Mr. Nelson

11 to come back in to issue those two denials when they will

12 appear in the NICS audit log, so we do have a record of them

13 somewhere.  So was there a need for you to tell them to

14 correct those two denial forms?

15     A.   No.

16     Q.   Yeah, that was my whole point.  It was we've got

17 the information; NICS keeps the denied information so it

18 wasn't as imperative as the proceed information.  And in

19 regards to that, isn't it true that the FBI is required by

20 Federal Law to dispose of the proceed information after 90

21 days?

22     A.   That's my --

23     Q.   They can't keep a database.

24     A.   That's my understanding, yes.

25     Q.   And then so regarding the Nelson transaction, that

1  transaction occurred March 28th, 2022; correct?

2      A.   Yes.

3      Q.   And so as of June 28th, 2022, that information

4  would have been purged 90 days later.

5      A.   Correct.

6      Q.   And you didn't print off the NICS audit log back

7  in June 28th, 2022, did you?

8      A.   No.

9      Q.   So, as you sit here today, you have no way of

10 knowing that there was ever a proceed generated because we

11 don't have a full NTN number to look up regarding that

12 proceed; correct?

13     A.   That's correct.

14     Q.   And that was your concern all along is there was

15 no way to know if they ever actually got a proceed because

16 the number was invalid; correct?

17     A.   That's correct.

18     Q.   Now Mr. Harris did note on the Government's

19 Exhibit 10 that there is an instance in there where there is

20 a proceed that's past 90 days old.  Isn't it true that the

21 NICS FBI, the NICS system, if they can maintain proceed

22 information more than 90 days, if the customer requests

23 what's called a UPIN number, a unique personal

24 identification number, that then gives the FBI permission to

25 maintain their information in the system longer.

1           Is that correct?

2      A.   I'm familiar with the UPIN.  Now, regarding all

3  the  how  that allows the proceeds, I'm not familiar with if

4  that makes sense.  But I'm familiar with the UPIN.  Either

5  --

6      Q.   I just offer that as one possible explanation why

7  a proceed older than 90 days would appear on an audit log.

8           Is that possible?

9      A.   Yes.

10     Q.   And then also regarding Mr. Fluker, the Fluker

11 transaction, if he had been prohibited, you would have

12 instructed Morehouse to contact Mr. Fluker and have him

13 bring that gun back; correct?

14     A.   I would have contacted criminal enforcement to go

15 after that firearm.

16          THE COURT REPORTER:  I would have contacted?

17          THE WITNESS:  Criminal enforcement.

18 BY MS. THIELHORN:

19     Q.   But because he wasn't prohibited, there was no

20 need to contact Mr. Fluker after the transaction because you

21 did not see any prohibitions to him having that gun.

22     A.   That's correct.

23     Q.   And then Mr. Harris also asked you about his

24 exhibit, Licensee's Exhibit No. 1, the ATF Federal Firearms

25 Regulations Reference Guide, and that is several hundred

1  pages long.  And I believe he asked you if you told them

2  they have to read that.

3           And if you would, please -- and you said no, that

4  you, you know, don't tell them you know you don't give them

5  homework I think was your answer.  Would you, please, read

6  the highlighted portion of Governments Exhibit 6, please?

7      A.    I understand this is only a general overview of

8  the regulations and that I'll be responsible for

9  familiarizing myself with all laws and regulations governing

10  my licensed firearms business."

11     Q.   And both Mr. Torrey and Mr. Morehouse signed

12  Government's Exhibit 6 and 6A, which specifically said that

13  they understood that your review was only a general overview

14  and they were responsible for familiarizing themselves with

15  all of the laws and regulations governing their use of the

16  license; correct?

17     A.   That's correct.

18     Q.   I think that's all I have.

19               RECROSS EXAMINATION

20               BY MR. HARRIS:

21     Q.   A couple of just follow-ups.  One, the Document 6A

22  that you were just speaking with counsel about.  Or let's

23  let's look at 5 because 6A occurred after, well, 6 and 6A,

24  both, occurred after the two incidences that are the subject

25  of this hearing.  Exhibit 5 has that same language in it

1 that the acknowledgment that they sign-off on says it's a

2 general overview of the laws.  Is that correct?

3     A.   Yes.  I understand this is only a general review

4 of the regulations.

5     Q.   Yeah.  And there's no way you're going to cover

6 the full ambit in detail of all the regs in a two- or three-

7 or four-hour session, is there?

8     A.   No, you can't.

9     Q.   Yeah.  And it also says that their responsible for

10 familiarizing themselves with the laws and regs.

11          Is that correct?

12     A.   Yes.

13     Q.   And you've been -- you're an IOI, you've been

14 doing it, again, for how many years?

15     A.   Over 7 years.

16     Q.   Yeah.  Okay, and you're far more familiar with the

17 laws because you live it as a job every day than most FFL's.

18 Is that correct?

19     A.   I do interact with these laws every single day as

20 part of my job.

21     Q.   Yeah, but when it says they're responsible for

22 being familiar with the laws, do you read that to mean

23 they're responsible for 100% accurately knowing what every

24 one of them requires?

25     A.   I can just resort to what the form says, sir.

1       Q.   Yeah.

2       A.   I don't know what I think is an overview or I

3   mean, I'm not going to shoot from the hip of what I think an

4   overview is --

5       Q.   Well, let me ask this question.  Do you ever get a

6   question from an FFL in your capacity, as an IOI, where you

7   go, I'm not sure.  Let me go check and get back with you.

8       A.   Yes, that's happened

9       Q.   Okay.  And that's typically an FFL calling in and

10  saying, hey, what's the law on this?  And your response is,

11  I'm not sure.  Let me check and find out.  That's correct?

12      A.   That's correct.

13      Q.   And you're comfortable that that response is

14  appropriate even though you, as an IOI, are responsible for

15  being familiar like they are with what the law requires.

16      A.   Yes, I don't have an immediate response to any FFL

17  calls.  I review the regulations and try to get the best and

18  given the -- as correct or accurate of the stand, or what

19  the regulation states pertaining to the question.

20      Q.   When you went out there in February of '23 to do

21  the compliance inspection, did you sense or perceive any

22  tension in showing up at Morehouse to do a compliance

23  inspection?

24      A.   Perceived any tension?

25      Q.   Yeah.  Did you perceive that there might be any

1  tension or awkwardness in just showing up to do the

2  compliance inspection?

3      A.   Like on their behalf or on my behalf, like --

4      Q.   Either way.

5           DIO HUMMEL:  I'm curious where we're going

6  with it.  What's the feeling in the room, is that what

7  you're going for?

8           MR. HARRIS:  No, it's just, you know, for example,

9  he mentioned earlier on, that he found an A&D open on a

10 gunsmithing gun.  Is that correct?

11          THE WITNESS:  Yes, sir.

12          MR. HARRIS:  And it wasn't charged.  It was just a

13 guise needed.  It's a gunsmithing gun.  We need to fix this

14 disposition, and it was reconciled during the inspection;

15 correct?

16          THE WITNESS:  Yes.  And it's my understanding I

17 did cite them for that 478.125(e), failure to maintain an

18 accurate, complete timely acquisition.

19          DIO HUMMEL:  Excuse me.  Sorry.  Slow down.

20 Speak up.

21          THE COURT REPORTER:  Can you just repeat it,

22 please?

23          THE WITNESS:  Yeah, and I did cite that specific

24 instance of a late disposition record based on the original

25 Report of Violations.  It's No. 3.

1  BY MR. HARRIS:

2      Q.   Okay.  So, and my question gets back to when you

3  came out in February of 2023, to do the compliance

4  inspection, they were fully cooperative with you; correct?

5      A.   Yes.

6      Q.   They weren't standoffish?

7      A.   No.  They were very cooperative.

8      Q.   They were -- whatever questions you had, they

9  tried to get you answers, they were accommodating?

10     A.   Yes.

11     Q.   Was there any awkwardness at all to the situation

12  because Morehouse had sued the ATF prior to that point in

13  time?  Did you feel like, for example, that they were being

14  guarded in their responses to you?

15     A.   No, they provided me what I asked them for.  There

16  was discussions about what I just, you know, what I, you

17  know, what we found.  We'd be like I don't think they're

18  hiding anything or I didn't, but like why I wouldn't walk

19  out -- I didn't think I walked out of there and say all that

20  like this is this is a inappropriate or improper or like,

21  they provided everything I asked for.  Like I don't --

22     Q.   Okay.  And they obviously knew, but did you know

23  when you walked in, in February of 2023, that there was a

24  lawsuit pending in federal court?

25          DIO HUMMEL:  Before we go any further, are we

1  -- I guess I fail to see the relevance with regards to these

2  three findings as to -- I'm trying to understand where

3  you're even -- where you're going.  And you know, as Michele

4  pointed out, he's represented in that case --

5              MR. HARRIS:  Right.

6              DIO HUMMEL:  -- by the other attorney who's

7  not here.  I don't know if that speaks to these three

8  violations and their willfulness; correct?

9              MR. HARRIS:  I think only to the extent of I'm

10  trying to just get on the record, were you in any way

11  guarded or hesitant in asking them to answer your questions

12  or produce records?  And if you didn't know about the

13  lawsuit at all, it's irrelevant.

14              I'm just asking if you did know, did it impact you

15  in any way and your willingness to ask them questions about

16  how these things occurred or were they willful?  Did it have

17  any impact at all on your compliance inspection?

18              MS. THIELHORN:  You can answer that; yes or no.

19              THE WITNESS:  Yeah.  Did that impact my request?

20  BY MR. HARRIS:

21       Q.   Well, I guess the first question is --

22       A.   No, I conducted compliance inspection

23  appropriately and as professionally as I could.

24       Q.   And I think built in your answer was yes, you

25  knew, but it had no impact.

1          MS. THIELHORN:  He actually didn't say that.

2          MR. HARRIS:  That's what I'm trying to get the

3   answer to.

4          MS. THIELHORN:  Right, but again, that goes to

5   your lawsuit in federal court and he has an attorney on

6   that.  So what he knew and when will be appropriate for you

7   to ask when his attorney on that case is here.  We're here

8   just to talk about violations, and he's already said they

9   were nice to him, he was nice to them, and it didn't impact

10  his inspection.

11         So beyond that, your line of inquiry goes to this

12  lawsuit you have in federal court, and his attorney is not

13  here.  So it's not appropriate for you to ask him questions

14  when his attorney, Michael Drezner, the DOJ Civil Division,

15  is not here.  So you would need to take that up with Mr.

16  Drezner and the Court as to when you will be allowed, you

17  know, depositions or interrogatories or discovery motions,

18  that sort of thing.  But this hearing is just about the

19  violations, whether they were willful.

20         MR. HARRIS:  And so you're telling him not to

21  answer the question --

22         DIO HUMMEL:  I'll say I don't think it's

23  relevant with regards to --

24         MS. THIELHORN:  I take it, I'm not comfortable --

25         THE COURT REPORTER:  One at a time, please.

1          DIO HUMMEL:  I don't find it relevant with

2   regards to, I think, an established line of questioning

3   already that established the fact that I mean, truly that

4   the FFLs were very cooperative throughout and that the

5   compliance inspection was done and violations were cited and

6   that's what we're here to to to talk about.

7          I mean, I'm just going to leave it at that.

8          MR. HARRIS:  Okay.  No further questions of this

9   witness.

10          MS. THIELHORN:  That's it on behalf of ATF.

11          DIO HUMMEL:  Do we want to take another quick

12   break before proceeding with yours?  It's 12:30.

13          MR. HARRIS:  I can get through these two witnesses

14   pretty quick unless you think you're going to have a long

15   time with them.

16          MS. THIELHORN:  I guess it depends on what they

17   say.

18          DIO HUMMEL:  I'll tell you what.  Let's go

19   off the record just for 5 minutes.  We're off the record.

20              (Recess taken.)

21          DIO HUMMEL:  It's 12:40.  We're back on the

22   record and for your FFL's presentation.

23          MR. HARRIS:  Sure, call Tanner Morehouse, and Mr.

24   Morehouse, would you state your full name for the reporter,

25   please?

```
 1              THE WITNESS:  Tanner Morehouse.

 2  //

 3  //

 4              DIRECT EXAMINATION

 5              BY MR. HARRIS:

 6      Q.   And just as a brief introduction, the licensee is

 7  a corporate entity.  Is that correct?

 8      A.   Yes, sir.

 9      Q.   And who owns the corporation?

10      A.   Torrey and I do.

11      Q.   Okay.  You're brothers?

12      A.   Yes.

13      Q.   Did either of you have a history, prior to 2019,

14  of either owning an interest in an FFL or working for an

15  FFL?

16      A.   No.

17      Q.   What was what was you and your brother's business

18  activities before pursuing an FFL?

19      A.   We run a watch-making company where we restore

20  wrist watches from pretty much all over the world, and we do

21  metal fabrication.

22      Q.   And what came about or what caused you and your

23  brother to decide to pursue obtaining an FFL in 2019?

24      A.   My brother, Torrey, kind of foresee, I guess, the

25  political seas, tides, if you will, and had a hunch that gun
```

1  sales would be really good in 2020.  So we got an FFL.

2      Q.   Okay, and were you involved in the qualification

3  inspection that took place in 2019 with IOI Symington?

4      A.   Yes.

5      Q.   Okay, and can you tell me what you recall about

6  and let's focus on, for time purposes, the part of the law

7  that has to do with Fluker and/or the Nelson incidences?

8      A.   Sure.

9      Q.   So can you tell me if you recall how much time IOI

10 Symington spent specifically talking about the issues that

11 are relevant to either Fluker or Nelson?

12     A.   I mean, she wasn't there for very long, not even

13 half a day, and most of it was going to the 4473.  I mean,

14 you know, it wasn't super clear to me how I needed to

15 operate the business after after she left.

16     Q.   Did she specifically spend time discussing the

17 issue of the NICS exemption for handgun permit holders?

18     A.   I mean, it was four years ago, so it's hard to

19 think back four years.  It's possible she did, but it's

20 possible she didn't.

21          THE COURT REPORTER:  Did you say income permit

22 holders handgun?

23          THE WITNESS:  Handgun.

24          THE COURT REPORTER:  Thank you.  That's much more

25 -- makes much more sense.

1          MS. THIELHORN:  Are you sure that you don't want

2    that air conditioner turned off?

3    //

4    BY MR. HARRIS:

5          Q.   So I will articulate louder, but not necessarily

6    without the Southern accent.

7               So do you recall specifically her having any

8    discussion that you could accept North Dakota handgun

9    permits, but not permits from other states?

10         A.   I don't recall that from that far, the permits.

11   I don't remember having that discussion.

12         Q.   And with respect to the issue of selling a handgun

13   to a nonresident, did she discuss specifically that area of

14   the law?

15         A.   Again, not to my knowledge, but she may have.  She

16   may have not.  I don't think so.  I don't believe so.

17         Q.   Did you have or did you and/or your brother have

18   follow-up contact with IOI Symington after she did your

19   qualification inspection?

20         A.   Not at all, no.

21         Q.   During your initial qualification inspection, did

22   you all have any conversations with IOI Symington about

23   record keeping?

24         A.   I mean, yes.  I mean, she recommended that we use

25   FastBound.  She said it's way simpler to use than the

1  paperwork copies and me and Torrey are busy guys and we're

2  kind of all about making it as simple as possible.

3      Q.   Did you have any conversations with IOI Symington

4  about the FastBound system and whether or not it would help

5  achieve compliance with your obligations as an FFL?

6      A.   She did not give us any advice on FastBound, just

7  told us that it was it was approved by ATF and that it's

8  simpler than the paperwork, than writing it in a handbook

9      Q.   Did you and your brother follow her recommendation

10 about FastBound?

11     A.   Instantly, yep.

12     Q.   And just for introductory purposes, does the

13 FastBound system, does it maintain your acquisition and

14 disposition records?

15     A.   Yes.

16     Q.   Does it handle your 4473 forms?

17     A.   Yes.

18     Q.   And does it fully integrate with the electronic

19 NICS system?

20     A.   No, no.  Totally separate websites.

21     Q.   Okay.  And so when you have a completed 4473 and

22 you're going to run a NICS check on an individual, how does

23 the information go from, if at all, the FastBound system to

24 the NICS system?

25     A.   We copy and paste the NICS number or I mean, I

1 guess nowadays, I type -- I pull up the one page which has

2 all their information that they input into to the tablet,

3 which is filling out the 4473 and I type it into the NICS

4 check by hand on the keyboard.  And then when we get the

5 answer, the response from NICS, I copy and paste the NTN

6 number over to the FastBound system.

7     Q.   Does the FastBound system also handle your

8 multiple cell reports?

9     A.   Yes, it does.

10     Q.   Does it handle any other reports that you're

11 required to keep or maintained for the ATF?

12     A.   I don't believe there's any other types of reports

13 that they are required.

14     Q.   Now --

15     A.   Besides suppressor sales, I guess.  I mean, if

16 you're talking about manufacturing, also, it generates all

17 that stuff.

18     Q.   And when you initially applied for a license in

19 2019, it was a Type 1 retail license.  Is that correct?

20     A.   Correct.

21     Q.   When did you apply for your Special Occupational

22 Tax status?

23     A.   It was in our new shop, probably at least 2 1/2

24 years ago, two years ago?  I'd say probably 2 1/2 years ago.

25     Q.   Now, your under your FFL, you heard, earlier --

1  IOI Temp testify that there were according to his memory,

2  about a thousand dispositions, about a thousand

3  acquisitions, and about seven hundred or so 4473s in the one

4  year that he inspected.

5      A.   Correct.

6      Q.   Is that all that --

7      A.   Yep.

8      Q.   Is that, are those numbers consistent with your --

9      A.   FastBound?

10     Q.   -- opinion of the volume of activity during the

11 one year period?

12     A.   Yes, yep.

13     Q.   And of the categories of firearms, and what I mean

14 by that is rifles, shotguns, handguns, lower receivers, and

15 things that are classified potentially as a firearm, but not

16 necessarily one of the three typical categories.

17          Primarily, what does Morehouse sell?

18     A.   We sell a lot of rifles, a lot of shotguns and we

19 used to, during the pandemic, sold a lot of AR-15 parts

20 which includes receivers and some handguns.  I would say

21 handguns mostly, to people of Valley City or the surrounding

22 area, but yeah, I would say mostly rifles.  A lot of the

23 AR-15s back then, too.  Mostly rifle shotguns, some

24 handguns.  Not a lot out-of-state.

25     Q.   And in the Valley City area, you're about an hour

```
 1  west of Fargo.  Is that correct?
 2      A.   Correct.
 3      Q.   Okay.  Are there other -- well, let me first ask,
 4  is Morehouse -- how would you describe Morehouse?  Are you a
 5  full-service FFL?
 6      A.   Yes.
 7      Q.   Do you provide --
 8      A.   Yep.
 9      Q.   Okay.  Are there other full-service FFLs in the
10  Valley City area?
11      A.   No.  No, there are not.
12      Q.   Okay, and following the 2019 licensure, the
13  initial licensure, were you and your brother aware that you
14  could accept North Dakota handgun permits?
15      A.   Yes.
16      Q.   Okay.  Were you aware as to whether or not you
17  could accept permits from residents of adjoining states?
18      A.   No, we, I mean, we don't, like I said, we don't
19  really get a lot of out-of-state transfers.  I mean, we knew
20  we could sell rifles and shotguns, but we don't really get a
21  lot of handguns and stuff out-of-state.  And I guess we
22  know, for a fact, that Minnesota has a permit to purchase --
23  needed to buy a handgun in Minnesota.
24          So I guess we we never dealt handguns to
25  Minnesotans, but nobody really comes from Montana, I guess
```

1  to buy guns from our shop or South Dakota.

2     Q.   Now, were you present when Morehouse applied for

3  its manufacturing license in 2022?

4     A.   Yes, I did the application.

5     Q.   And why, what was changing that you decided to

6  pursue a manufacturing license?

7     A.   I wanted to start building handguns and the R-15s,

8  too, I guess.

9     Q.   And was it IOI Temp that came in and did your

10  initial inspection for the manufacturing license?

11     A.   Yes, he did.

12     Q.   And he talked something about that this morning.

13  That was on August the 26th of 2022, do you recall that?

14     A.   Yes.

15     Q.   Do you recall having a conversation with IOI Temp

16  about the Fluker transaction?

17     A.   Not the Fluker exactly, but I do remember asking

18  him if we can do handgun sales with concealed carry permits

19  to other states.

20     Q.   Okay.  And just for Director Hummel, just sort of

21  explain how that conversation went.  This was after Fluker

22  had already happened; correct?

23     A.   Yes.  Well, Mr. Hummel, me and Jacob actually had

24  a lot of conversations about because, you know, we had been

25  operating for four years kind of what we thought was the

1  right thing.  And so I had a lot of questions that I haven't

2  really been able to pin down.  And so I guess we kind of had

3  an ATF agent at the shop, so you might as well get a handle

4  on what's right and wrong.  And that's all it was.

5          You know, I mean, we operate for businesses.

6  We're not, you know, we're known around the country for

7  being the highest watch restoration place around.  I mean,

8  we're not trying to do wrong, you know.

9      Q.    So in addition to the question of selling to non

10  -- selling handguns to non-residents, you had other

11  questions that you asked IOI Temp when he came in?

12      A.    Many questions, yeah.

13      Q.    Okay.  And as a result of those conversations, did

14  you and/or your brother determine that you had not

15  accurately understood the law, at least as IOI Temp

16  explained it on August the 26th of 2022?

17      A.    Absolutely.

18      Q.    Did y'all make any changes to your practices and

19  procedures at that time?

20      A.    Well, I guess, not after August.  I mean, it was

21  still only really me and Torrey and Dan.  So I guess we

22  explained -- Dan was sitting there, too, I believe, the

23  first day.  But yeah, I mean we basically went through, you

24  know, what we can and can't do.  But, it like I said, it was

25  only me and Torrey.  And I believe after he came in August,

1  it was only me, Torrey, and Dan doing 4476s period.

2      Q.   And my question is, so that it's clear, is after

3  you talked with IOI Temp on August the 26th of 2022, about,

4  for example, sales of handguns to non-residents, did

5  Morehouse make any changes to its practices or procedures to

6  try to match the instruction that you received from IOI

7  Temp?

8      A.   I mean, yeah, it was all known to our employees

9  that we can't sell handguns out of the state period.  It's a

10 pretty simple question, and it's a pretty simple answer.

11     Q.   Now, did you have any conversations with IOI Temp

12 in August of 2022 about the issues that came up concerning

13 the Nelson 4473?

14     A.   I don't believe that we asked him if we could do

15 multiple -- I think I asked him if I could do multiple

16 background checks and he said no.  But I don't think -- I

17 didn't know about the Nelson ordeal.  You know, I mean, I'm

18 up in the watch shop a lot, so I don't know everything that

19 goes on.

20     Q.   Now, after the initial qualification inspection

21 with IOI Symington, did she provide you and your brother

22 with the Federal Firearms Regulations Reference Guide that

23 we've marked as Licensee Exhibit 1?

24     A.   I believe a partial or maybe --

25     Q.   Can you tell me if this is it?

1      A.   Yeah, that's what she gave us.  She gave us a

2  quick reference guide, theft, and I believe that's

3  everything.

4      Q.   Okay.  And did you and your brother read through

5  the materials that she left with you?

6      A.   Yeah, I'm assuming we skimmed over it; didn't read

7  it word-for-word.

8      Q.   And based upon that familiarization with the

9  materials that she provided you, were you aware, in any way,

10  that the sale to Fluker was inappropriate?

11     A.   No, because I think I looked it up just casually

12  on Google and it said, you know, it said I think it was

13  probably misread when I misread it.  So hence, why I thought

14  it was okay.  But it probably was saying yes, if they have a

15  concealed carry, you can transfer a gun, not out-of-state.

16  So I mean, it obviously got misread at some point back then.

17     Q.   Let me go back to the FastBound system that we

18  talked about a little bit ago.  If you've got a sale going

19  on that requires a 4473.  I think you testified that the

20  buyer fills out the 4473 on an iPad?

21     A.   Correct.

22     Q.   And does FastBound have built into it, to your

23  understanding, logic or protections to make sure that all

24  the boxes are filled in when they complete the 4473?

25     A.   It changes all the time, like it's been an ongoing

1  update, so I don't know about that then.

2       Q.   What so far --

3       A.   It does help you though, yes.  Determine whether

4  or not.  It does a good job, I should say.  I wouldn't say

5  it's perfect.

6       Q.   But the FastBound system, and let's just take a

7  look at a blank 4473, which is ATF Exhibit 11.  If a buyer

8  comes in and doesn't fill in, for example, their street

9  address or their city, or their state or their zip code,

10 does FastBound pop up and give you any warning that you got

11 to have this information in order to proceed?

12      A.   I don't believe so.

13           MR. TORREY MOREHOUSE:  Yeah, if you don't fill in

14 a blank.

15           THE WITNESS:  Yeah, yeah, yes.

16           MR. TORREY MOREHOUSE:  It doesn't let you proceed

17 on the 4473.

18           THE WITNESS:  Right.  If you don't fill in

19 something, it will warn you that you didn't fill something

20 in.  But it doesn't know, like for instance --

21           MR. TORREY MOREHOUSE:  It doesn't know how many

22 characters there are.

23           THE WITNESS:  For an NTN number, it doesn't know

24 how many characters there are.  It just knows that there's

25 something there.  You could put a period there and it would

 1  think that you wrote something down.

 2  BY MR. HARRIS:

 3      Q.   And you're not the one that did the 4473s for

 4  either Fluker or --

 5      A.   No.

 6      Q.   That's correct, right?  But just in general, using

 7  the FastBound system, is it your understanding that one of

 8  the reasons that you invest in this system is to try to

 9  maintain compliance and make sure these 4473s are filled out

10  accurately?

11      A.   Of course.  I mean, I don't have the time to

12  devote my entire day to filling out paper work.

13      Q.   And typically, now with the interaction between

14  the FastBound system where the 4473s are completed by the

15  buyer and then how that information is put into the

16  electronic NICS system, explain just a little bit for the

17  record, not a lot of detail, but explain a little about how

18  that process works.

19      A.   Well, I mean, basically, we go on FastBound.  We

20  type, we find the gun, serial number, make, model, all that

21  stuff, enter that in.  Then you press submit and it gives

22  you a number to type in on the iPad.  That brings up a 4473,

23  you hand that to the customer, they fill the whole thing out

24  and press submit.  And then it says you may return, you

25  know, the seller will fill out the rest of the paperwork;

1  like you're done.

2          So then we take their driver's license, type in

3  the information and then go to the background check.  It

4  opens up the FBI background check.  It also opens up a

5  window of what they filled out, on their end, on the iPad.

6  And then I type in everything manually onto FBI NICS, and

7  then it gives you a response.

8      Q.  Okay.

9      A.  Then you go back to the 4473 on FastBound or it's

10 not a 4473, it's a window where you continue filling out the

11 response, the day, the proceed, delay, denied, canceled, you

12 know, and then you sign your name, date it.  And then when

13 it's all -- when you get a proceed, you put proceed and then

14 you print out the 4473, file it.  You know, look it over,

15 file it, and then the transaction's closed.

16     Q.  So Exhibit 11 of the Government's exhibits is a

17 blank Form 4473 from May of 2020.  And that's probably the

18 earliest or close to the earliest that y'all were using

19 since you just got your license in 2019.  I asked a

20 question, earlier, of IOI Temp about the responses that you

21 get from the electronic NICS system.  And he's testified

22 that he's familiar with the four that show up on the form:

23 Proceed, denied, canceled, delayed.

24         And have you ever seen a response other than those

25 four come back from the electronic NICS system?

1      A.    I mean, it says research, yes.

2      Q.    **Is there a place on the form for that initial**

3  **response to be entered?**

4      A.    No.

5      Q.    **What's your understanding of what researching**

6  **means?**

7      A.    I've been trying to figure out why people get

8  researching or not.  I mean, it's not really -- it doesn't

9  matter to me.  It's just I have to tell the customer, hey,

10  you can't take the gun right now.  And it might be an hour,

11  it might be 3 days, but you know you were you were delayed

12  because FBI's researching.

13      Q.    **When you get a researching response back from the**

14  **FBI initially, is there any place on the 4473 to mark that**

15  **response?**

16      A.    The researching?

17      Q.    **Yes.**

18      A.    No.

19      Q.    **Do you get an NTN number when you get a**

20  **researching?**

21      A.    Yes, that's generated instantly.

22      Q.    **Have you had any instructions about where you're**

23  **supposed to write or document that the initial response was**

24  **research as opposed to one of the four check boxes that's on**

25  **the form?**

1    A.   No.

2    Q.   Prior to Nelson, have you ever had a situation

3  that you were involved in where a customer got a denial and

4  the customer's responsible was well, wait a minute, I've

5  never had a denial before.  Can you run it again?

6    A.   I have not.

7    Q.   Okay.  Now, after going through and having the

8  discussion with IOI Temp in August of '22, about all the

9  questions you had, did Morehouse make any changes to how it

10  processes either FastBound or the 4473 forms --

11    A.   After August?

12    Q.   After August of 2022.

13    A.   No.  Well --

14         MR. TORREY MOREHOUSE:  Denial forms.

15         THE WITNESS:  No, that was after.  I don't believe

16  we asked him that then.  I could be wrong, though.  I can't

17  exactly recall, but we do have a separate folder for denials

18  now that we make copies of.

19  BY MR. HARRIS:

20    Q.   So from your involvement, the Fluker instance, had

21  it ever occurred, in your experience as an FFL, prior to

22  when Fluker came in?

23    A.   Not to my knowledge, no, we don't do very many

24  out-of-state transfers.

25    Q.   To your knowledge, did it occur -- had that same

1  pattern occurred at any point after Fluker came in?

2      A.   No.

3      Q.   And is it correct that at the time the Fluker

4  transaction occurred, your understanding was that if they

5  had a handgun permit from another jurisdiction that you

6  could sell to them?

7      A.   Correct.

8      Q.   Now with respect to Nelson, after you went through

9  the compliance inspection in February through say, March,

10 early April of 2023, did you get information from IOI Temp

11 about what's the right way to handle a situation such as

12 Nelson?

13     A.   After it was discovered, yes, but not before that.

14     Q.   And based upon what you discussed with IOI Temp in

15 2023, what's your understanding of the right way now to

16 handle a situation such as Nelson?

17     A.   If you get a denial, give them the NTN number and

18 they can appeal.

19     Q.   Are you of the understanding that even if the

20 customer says run it again with my social, that you should

21 not do that?

22     A.   Right.  Correct.

23     Q.   Could you, for example, on a 4473 such as Nelson,

24 write down the NTN for the denial, check denied as the

25 initial response, and then run it again and fill that

1  information out in 27.d?

2      A.   I don't know if that's correct or not.  Yeah, I

3  mean, and the new forms make it even more wish-washy.

4  They've updated the forms in the last few months, and now it

5  seems like there's two boxes where you've got denied or

6  delayed or it's more unclear now than it used to be.

7      **Q.   Do you think at this point that Morehouse, the**

8  **FFL, has put procedures in place and provided training to**

9  **all the employees that would allow you to preclude problems**

10 **like Fluker or Nelson recurring in the future?**

11     A.   A hundred percent.  I mean, how are you supposed

12 to know everything you're doing right or wrong until

13 somebody tells you you're doing something wrong?  That's, I

14 mean, that's like getting a speeding ticket and saying, hey,

15 you lose your license because you should have known better.

16         Well, that's, I mean, we're human.  It's easy to

17 make mistakes and especially if you don't know the mistakes

18 you're making are wrong.

19     **Q.   Pass the witness.**

20         CROSS EXAMINATION

21         BY MS. THIELHORN:

22     **Q.   I just have a few questions.  Is it okay if I call**

23 **you Mr. Tanner?  Because if I call you Mr. Morehouse, the**

24 **record isn't going to know which person I'm talking to.**

25     A.   No problem.

1       Q.   Mr. Tanner, you received your license in 2019;

2   correct?

3       A.   Yes.

4       Q.   That's your dealer's license.  And then IOI

5   Symington came out to do the qualification inspection;

6   correct?

7       A.   Correct.

8       Q.   And she reviewed this regulations form with you,

9   ATF Exhibit No. 5; correct?

10      A.   Correct.

11      Q.   And you signed that acknowledgment form; correct?

12      A.   Yep.

13      Q.   And did you read the part there on the form where

14  it says:   I understand that this is only a general overview

15  of the regulations and I,  meaning you,  will be responsible

16  for familiarizing myself with all of the laws and

17  regulations governing my licensed firearm business.

18      A.   Yes.

19      Q.   All right.  And admittedly, there are a lot of

20  them.  But at the same time, you told Mr. Harris that at

21  that time you don't recall IOI Symington telling you that

22  you couldn't accept a permit from North Dakota or that you

23  could accept a permit from North Dakota, but not other

24  states.  She didn't talk about that with you; correct?

25      A.   I don't remember.

1       Q.   And then you got the license.  Then in 2019, do

2   you remember about how many sales you did that year?

3       A.   It wasn't a terrible amount of them.  Probably, we

4   got the license in March, did you say?  February?

5       Q.   This is 2019.  I don't know the date.

6       A.   No date, though or no month?

7            MR. TORREY MOREHOUSE:  Are you saying a full year

8   or are you saying --

9            MS. THIELHORN:  Right.  Just, you know, from the

10  time it was in April of 2019.  I'm just trying to get an

11  overview of like, you got the business, you're new in town.

12  Was there an influx of business or is it just kind of --

13           THE WITNESS:  When we first got it --

14           DIO HUMMEL:  One at a time, please.

15           MR. TORREY MOREHOUSE:  All right.

16           THE WITNESS:  -- it was very slow going.  It was

17  very slow going right away.

18  BY MS. THIELHORN:

19      Q.   And then you said in 2020, I believe you said once

20  the pandemic started, you got more business at that time.

21      A.   I would say when we moved into our new shop, we

22  started getting more business.  Our old shop was very small

23  and we were doing three businesses out of a very small

24  rental business.

25      Q.   So then, let's move to 2021.  How many sales would

1  you say you did in 2021?

2     A.   I mean, probablly more than 2022.

3     Q.   Oh, okay, so --

4     A.   I would think 2021 was probably the best year.

5     Q.   So I believe Jake has stated that in 2022 of the

6  period that he reviewed for the '23 inspection, that he

7  reviewed approximately seven hundred 4473s.

8          Does that sound about right?

9     A.   Yes.

10    Q.   And you said in 2021, you think you did more

11 business than 2022?

12    A.   As much or more, yeah, I would say.

13    Q.   So the point I'm trying to make is by the time of

14 this transaction here with Mr. Fluker, which I believe was

15 --

16         MR. HARRIS:  August 25?

17         MS. THIELHORN:  Yes.

18 BY MS. THIELHORN:

19    Q.   August 25th of 2022.  At that point in time,

20 you've probably completed what, a thousand 4473s, give or

21 take?

22    A.   Yep.

23    Q.   And so my question is even if, as you say, she

24 didn't specifically say you can't accept a permit from

25 someone with a Georgia permit, how is it that you never

 1  actually read Box 29 on the 4473 which clearly says the

 2  permit has to be issued by the state where the transfer

 3  occurs?

 4      A.   Yep.  And like I told you, we don't do a lot of

 5  out-of-state transfer.  So if you don't come across the

 6  situation ever, I mean, it's a new instance, you know.

 7      Q.   So even though it's on the form and you've looked

 8  at the form for a thousand times, I mean --

 9      A.   Correct.

10      Q.   The point I'm trying to make is can you see ATF's

11  point of view on this?

12      A.   Absolutely.  Absolutely.

13      Q.   You completed a thousand forms and it's on there.

14      A.   Absolutely.

15      Q.   Okay, fair enough.

16      A.   But I also didn't do this transfer.  I wasn't even

17  around.

18      Q.   No, true, true, that's true.  And we'll talk to

19  Mr. Torrey in a moment.  So it's my understanding then that

20  you acknowledge that you know you have to conduct the NICS

21  check that someone wants to buy gun and they're not licensed

22  by the Gun Control Act and there's no exception to doing

23  that.  You understand that.  So you're basically only saying

24  it wasn't willful, we didn't purposely disregard the law.

25      A.   No.

1       Q.    Okay.  And then let me just ask you this, you have

2  here, I think this is marked Licensee's Exhibit No. 3, which

3  is the NICS Federal Firearms Licensee's User Manual.

4            Have you read this Exhibit No. 3?

5       A.    A long time ago, probably.

6       Q.    Well, the reason I asked is because there was some

7  confusion about whether you knew or didn't know that you

8  couldn't run multiple NICS checks once you get it denied.

9       A.    I did not know that.

10      Q.    All right.  So if I told you it's on Page 24, that

11 may be something in the future you would want to review

12 again because you know, again, we're not here to, you know,

13 get into your NICS privileges.  But at the same point, do

14 you understand that when you log into that NICS E-check

15 system, isn't there a page that pops up that says terms and

16 conditions and there's like a little yellow warning banner?

17      A.    Yep.

18      Q.    And then you have to click I agree before you can

19 even proceed to enter the information.

20      A.    Correct.

21      Q.    And do you understand what you're agreeing to

22 every time you click on that?

23      A.    I do, yes.

24      Q.    And which says you've read this manual and they're

25 going to charge you with knowledge of everything that's in

1 here.

2      A.   Right.

3      Q.   So it's important that you actually understand

4 everything that's in here.

5      A.   Correct.

6      Q.   Which then brings me to my next point.  So you

7 said that sometimes and again, I'm not putting words into

8 your mouth, I'm just trying to remember what you stated

9 before.  You said that occasionally, you'll get a response

10 from NICS that says research.

11     A.   Yep.

12     Q.   Apparently, you're a little confused about that.

13     A.   Not confused, but the way they reformatted the new

14 4473s, they made it more complicated than they used.

15     Q.   Okay.  Isn't it true that the term "research"

16 actually comes in with a delayed response?

17     A.   Sometimes, but no, not always.

18     Q.   Okay.  So let me just show you then, what I'm

19 talking about here.  And again, when you click on that terms

20 and conditions it says that you kind of understand all of

21 this.

22          On Page 17 here it says:  When the NICS response

23 is delayed, the FFL, meaning you, will receive the

24 following instructions from NICS.

25          Quote:  NTN, that's transaction number, they

 1  give you that.  And then it will say,  is delayed while NICS

 2  continues its research.

 3      A.   Yep.

 4      Q.   And then it will say,  If you do not receive a

 5  response from us, the Brady law does not prohibit you from

 6  transferring the firearm on,  and then they'll give you that

 7  three business days to date; correct?

 8      A.   Yep.  Correct.  Except if they're 18 and 21.

 9      Q.   Correct.  So the point I'm trying to make is this

10  term, research, actually is explained in this manual, if you

11  read this, that it's associated with delayed responses.  So

12  my point is there is a place on the 4473 if you get a

13  research response because it's associated there.

14      A.   Okay.

15      Q.   Do you understand that?

16      A.   Yes.

17      Q.   And you also understand that NICS gives you

18  contact information if you have questions and it says

19  they're open 24/7 and you can call them.  So would it be

20  fair to say in the future, if you receive a response from

21  NICS, and you don't know how to record it or write it down

22  on the 4473, you know you can call them; correct?

23      A.   Correct.

24      Q.   Is that fair?  So, as we sit here today, you

25  understand you cannot transfer a firearm to a person in

1  Georgia that indicates they're a resident of Georgia.

2       A.   Correct.

3       Q.   Now, there is a way that you could sell a firearm

4  to a person in Georgia, do you understand that?

5       A.   Yeah, of course.  Of course.

6       Q.   So you know that?  And that's here in your

7  Licensee's Exhibit No. 1, it talks about that.

8       A.   Yeah, right.

9       Q.   Have you reviewed this, the Federal Firearms

10 Regulations Reference Manual from ATF?

11      A.   I mean, not recently, no.

12      Q.   So the reason I ask again, just a future reference

13 just so you know, back over here on Page 197, there is a

14 very lengthy question and answer section, and questions such

15 as can I sell to an out-of-state resident?

16      A.   Right.

17      Q.   Is covered in here.

18      A.   Okay.

19      Q.   So, again, there are resources and certainly, you

20 can call if you know you're confused about it because I

21 believe Mr. Harris had asked IOI Temp, well, if that

22 licensee calls you up and you don't know the answer, you'll

23 say I'll check and get back with you.

24           So isn't it fair to say that you, as the licensee,

25 could give the buyer that same answer?  Let me check on this

1  and we'll see, you know, if I can do it or not; correct?

2      A.    Right.

3      Q.    Okay.  So as for the February 2023rd, the

4  compliance inspection, I know that IOI Temp said that he had

5  the closing conference with you meaning he went over the

6  violations.

7      A.    Yep.

8      Q.    Was Mr. Torrey present for that?  Or was he just

9  not there that day?

10     A.    I think he was for after our inspection or audit,

11 you're talking?

12     Q.    No, at the very end when he comes back and goes

13 over the report with you.

14     A.    I don't remember.  I think Torrey was around, but

15 I don't -- I can't exactly recall.

16     Q.    And were you present on the day of the violations

17 regarding Mr. Fluker and Mr. Nelson?

18     A.    I was, but like I said, I was probably watching

19 upstairs.

20     Q.    So you just learned about them after.

21     A.    Mm-hmm.

22     Q.    You aren't there, like actually helping with the

23 transactions?

24     A.    No.

25     Q.    Okay.  And then --

```
1              THE COURT REPORTER:  You said no?

2              THE WITNESS:  No, yes.  I mean --

3              THE COURT REPORTER:  I understand.

4              THE WITNESS:  I should say when you had 2500

5    transactions in your career, it's hard to know where you

6    were at during each huge transaction.

7    MS. THIELHORN:

8         Q.   Fair, fair, fair.

9         A.   I mean that's impossible to know.

10        Q.   Well, in terms of the Nelson transaction, you

11   know, at the time, I understand there was a confusion about

12   whether you could run him again or couldn't run him again

13   and then how to record the deny, the deny in the proceed;

14   correct?

15        A.   Right.  It was the first time that, to my

16   knowledge, that something like that happened.

17        Q.   But you weren't present for that so you don't know

18   like what Mr. Nelson was actually there telling --

19        A.   I know Mr. Nelson.  I know him.

20        Q.   Oh, okay.  So, well, let's talk about that then.

21   Because, you know, we don't have the complete NTN number, we

22   can't actually look back in time to see whether that was an

23   actual proceed.  So is there anything or any way that you

24   would have known he would not have been prohibited like?

25        A.   He just applied for a suppressor.
```

 1    Q.   So had he shown you any of that paperwork?

 2    A.   We did the paperwork.

 3    Q.   And to your knowledge, was that approved?

 4    A.   It was after the inspection, yes.

 5    Q.   Okay.  But before the --

 6    A.   No.

 7    Q.   -- gun sale?

 8    A.   No.

 9    Q.   So, at the time, you knew he was going through the

10 process, but you didn't know whether that would be approved

11 or not.

12    A.   Right.  Correct.

13    Q.   Because the point I was making is if you had known

14 that, that would have probably told you --

15    A.   Yep.

16    Q.   -- not for him.

17    A.   I mean, you know, Valley City is a very small

18 town.  You kind of just know people and you know, there's

19 not a whole lot of felons in Valley City.  We've probably

20 only had like two or three people being denied total.

21    Q.   Right.  But you understand there is seven, eight

22 other prohibiting categories other than just being a felon.

23    A.   Yeah, no, I realize that.

24    Q.   All right.  Sure.

25    A.   I'm just saying when we run background checks,

 1  there hasn't been a terrible amount of people that got

 2  denied.

 3      Q.   Okay, okay.

 4      A.   And I guess I should also mention that Robert was

 5  willing to bring the gun back afterwards.  You know, I

 6  called him and he said, "Oh, yeah, I can bring it back if

 7  you need me to."

 8      Q.   And I believe Mr. Harris touched on this briefly,

 9  but regarding these transactions, what have you done since

10  to make sure that it doesn't happen again?  Specifically,

11  let's talk about the first one, the sale to an out-of-state

12  resident.  So if a person comes in and shows you a permit

13  from say, Florida, do you understand you can't, you know --

14      A.   Right.

15      Q.   You know, sell them to the gun face-to-face;

16  correct?

17      A.   Yes, correct.  And as we get more employees, we

18  will have training in place for them.

19      Q.   So currently, it's you and Mr. Torrey and another

20  employee --

21      A.   Yes.

22      Q.   And so do all three of you, are you now fully

23  aware that you can't do that?

24      A.   Yes, yes.

25      Q.   And then in terms of the Nelson violations, I know

 1  that IOI Temp went through that with you in terms of

 2  properly documenting that.  And do you understand that the

 3  4473 uses the term initial response; correct?

 4      A.   Yep.

 5      Q.   And do you understand that initial means first,

 6  first response they give you.

 7      A.   Yes.

 8      Q.   So do you understand how it was incorrect to put

 9  down the third response?

10      A.   Yes.

11      Q.   And what have you done since to make sure that

12  things like that don't happen?

13      A.   Well, like I said, we made a folder in our file

14  for already denied, so and I guess so that should take care

15  of that problem.

16      Q.   And then with regards to the NTN number, I

17  understand that you cut and paste and so now, do you

18  understand the need to go back and double-check the

19  accuracy.

20      A.   And I, personally, only me and only me since we

21  started, have went through every single 4473 until I file

22  it.  And do I count the number of numbers on the NTN?  No.

23  But I suppose I will now.

24      Q.   Right.  Because you understand the importance of

25  that.

1    A.   Yes.  And that's the thing, you don't know what

2   you're missing or not doing correct until somebody tells me

3   I'm doing something wrong.

4    Q.   And again, just so you know, all of that

5   information is covered in the NICS FFL manual --

6    A.   Right.

7    Q.   -- and it actually discusses the NTN number, what

8   it means, and why it's important.  So other than the fact

9   that other regulation requires you to report that

10  information, it also explains to you how it's important in

11  other aspects.

12   A.   I understand.

13   Q.   I understand that you didn't complete the 4473 for

14  Mr. Nelson, but we did find evidence that you all do know

15  how to properly document denials and that was in the

16  Rykowski, the review of the Rykowski 4473, where you had

17  according to the NICS audit log, you had run him one day and

18  got a deny.  And then the next day, you ran him and so got

19  the full response and I believe when Jacob testified and

20  testified that those were properly recorded.

21        So I guess my question is, if you knew how to do

22  it, are you just saying that your brother didn't know how to

23  do it?

24   A.   It's possible.  It's possible.

25   Q.   Because my question is, well, why didn't you

1  properly record the Nelson denies?

2      A.   Right.

3      Q.   Right, and have you all talked about that since

4  now, does everybody know?

5      A.   Many, many times.  You know, I mean this is our

6  business for almost five years.  We're not trying to go out

7  of business, you know.

8      Q.   I believe that's all of the questions I have

9  because I understand you didn't do the transactions, so

10  okay.

11          MR. HARRIS:  No redirect.  I'll call Torrey

12  Morehouse.

13              DIRECT EXAMINATION

14              BY MR. HARRIS:

15      Q.   Mr. Torrey, since we're using that convention,

16  spell your first name.

17      A.   T-O-R-R-E-Y.

18      Q.   And Mr. Torrey, were you present in 2019 for the

19  Application Qualification Inspection with IOI Symington?

20      A.   Yes, sir.

21      Q.   And I asked your brother some questions, but did

22  she go into detail at that time about the issues, the

23  specific issues, that we're talking about today involving

24  Fluker or Nelson?

25      A.   From what I recall, it was very brief, the whole

1  thing.  I can't say whether it was specifically those two

2  things as it was four years ago, but I remember it being

3  brief and being overwhelmed with what information was in

4  front of us.  Like Tanner said, she spent a lot of time

5  talking about the 4473, which was new to me.  Like, I had

6  never filled one out, even in my life.

7       **Q.   So it it is correct that prior to applying for**

8  **this license, you've never worked as an FFL?**

9       A.   Not even around.  Like I said, I've never even

10 purchased a gun until I had an FFL.

11      **Q.   And you've never then obviously worked as a**

12 **responsible party on someone else's FFL?**

13      A.   Absolutely not.

14      **Q.   Never worked in a gun store?**

15      A.   No.

16      **Q.   And were you, even though you're not filling out a**

17 **4473, were you even a gun owner prior to 2019?**

18      A.   Yeah, I had my deer rifle, and that was about it.

19      **Q.   Okay.**

20      A.   I was relatively young, actually.  I barely --

21      **Q.   Were still young.**

22      A.   Yeah, yeah.

23      **Q.   And your brother's explained that that he's in the**

24 **watch business and just for the record, briefly tell us what**

25 **your background was as of 2019.  Like what work were you in?**

1    A.    I had been a welder my whole life.  I went to

2  machining school so it really fit in when me and Tanner got

3  together on the watch business, that that's how I was going

4  to make money for the company.  And machining and welding

5  fabrication is what we do in the in the shop portion.  So

6  the watches are upstairs, got the shop floor and the

7  storefront, it's pretty small up front, he can attest to

8  that.  And it was just an addition to our original business.

9    Q.    Now let's talk just briefly about the Fluker

10 transaction.  You're the one that processed the Fluker 4473?

11   A.    That is correct.

12   Q.    And do you recall Mr. Fluker coming in to make

13 that purchase?

14   A.    Yeah, we see a lot of people every day.  But yeah,

15 I remember bits and pieces of it, yes.

16   Q.    And he's clearly from Georgia.  That's the

17 information he put on this form.  Is that correct?

18   A.    Yeah, he was from Georgia.

19   Q.    Do you know, had he ever been in the store before?

20   A.    I had never seen him, no.

21   Q.    Did he give you any indication of why he was there

22 that day?

23   A.    Not that I recall.

24   Q.    Now, y'all were using the FastBound system at that

25 time.  Is that correct?

1      A.   Yeah.

2      Q.   Did he, in fact, fill out, on the iPad, the

3  buyer's portion of the 4473?

4      A.   Yeah.  You bet.

5      Q.   Did FastBound kick up and show when it was time

6  for him to hit the submit button, did it kick up any error

7  messages or warnings that he had not filled out the form

8  correctly?

9      A.   No, and I find that quite odd.  You know, this is

10  compliance software that was told to us by the ATF to

11  utilize and it's not catching stuff that's, in my head, it

12  should be catching.  You know, we've even talked about

13  trying to email, reach out to them that, you know, these

14  things, we're getting -- we're sitting here today because

15  your software isn't doing what it's supposed to be doing, in

16  my head.

17      Q.   There was a question to your brother about, you

18  know, the FFL had done, by the time of Fluker, maybe a

19  thousand, maybe two thousand 4473 transfers.  And in

20  general, do you have an opinion as to, of the sales that

21  y'all do, how many of them are processed involving handguns?

22           What percentage, roughly?

23      A.   Let me see, and this is a guess, but I would say

24  10 percent, maybe.

25      Q.   Okay, and of that number on an annualized basis,

1  what percentage of your total 4473s involve people making a

2  purchase based upon a handgun permit?

3      A.   Sorry, repeat the --

4      Q.   Yeah.  Of the total number of sales y'all do, say

5  that year that IOI Temp was looking at.

6      A.   Mm-hmm.

7      Q.   About seven hundred 4473s.

8      A.   Yeah.

9      Q.   Approximately how many of those would you say were

10  processed based upon the fact that the buyer had a handgun

11  permit?

12      A.   Like concealed carry?

13      Q.   Yes.

14      A.   I would say close to that same thing as the

15  handgun.  I would say around 10 percent.

16      Q.   And would that include people buying rifles,

17  shotguns and handguns?

18      A.   Yeah.

19      Q.   Now, when you processed the Fluker transaction

20  into the NICS system, were you the one that took the

21  information from the 4473 and put it into the --

22          MR. MOREHOUSE:  There was no NICS.

23  BY MR. HARRIS:

24      Q.   That's right.  There's was no NICS because --

25      A.   Yeah.  He had his concealed weapon license for

1  that.

2      Q.   He just checked the box and went.

3      A.   Yeah, yeah.

4      Q.   Did FastBound pop up any error messages or any
5  warnings that said, wait a minute, make sure that the buyer
6  is from the same state.

7      A.   No, I -- nothing.  That's kind of what I was
8  getting at before.  I believe FastBound should.  It should
9  be able to differentiate that because we are in North
10 Dakota, like we we should be logging in as a North Dakota,
11 our FastBound code, you know?

12     Q.   But FastBound didn't give you any warning wait a
13 minute, this --

14     A.   Not, no.

15     Q.   -- this looks suspicious.

16     A.   Right.

17     Q.   And in your conversations with Mr. Fluker, were
18 you concerned or suspicious in any way that he was or might
19 have been a prohibitive person?

20     A.   Not at all.  I would say if anything, it was the
21 opposite.  He seemed very knowledgeable from what I can
22 remember.  And I'm not going to risk my entire livelihood,
23 how I feed my family, over a $250 revolver.  It was an
24 honest mistake.  It was lack of knowledge.

25     Q.   Now Fluker occurred on August the 25th, 2022.

```
 1              Is that correct?
 2      A.   Yeah, sounds right.
 3      Q.   And the next day, you have your qualification
 4  inspection with IOI Temp.  Had that been scheduled in
 5  advance?
 6      A.   Yeah.  I would assume, yeah, for sure it would
 7  have been.
 8      Q.   And do you recall the conversation that took place
 9  during the qualification inspection about selling to
10  non-residents?
11      A.   Yeah, I recall.
12      Q.   What do you recall about that conversation?
13      A.   I agree with what both of them have been saying.
14  I can't say it was more than a 5-minute conversation, but I
15  remember us asking, it was probably me who asked, I'm
16  guessing, because I had that situation.
17      Q.   Did that discussion that took place with IOI Temp,
18  on August the 26th, change your understanding of what the
19  law was concerning selling to someone with a handgun permit?
20      A.   Absolutely.
21      Q.   And how did it change your understanding?
22      A.   Why I can't use anything, but a North Dakota
23  concealed carry weapon license.  I mean, I've known that for
24  a long time now, but we're talking about something that
25  happened a year ago.
```

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023

Page 190

1    Q.   And there's two issues with Fluker, but they're

2  related.  One is you used a non-resident concealed weapon

3  permit and checked the Box 29.  And so as a result of that,

4  you did not run the NICS check.

5    A.   Correct.

6    Q.   And you checked Box 29 and took the permit because

7  you thought at the time that it was lawful to do so.  Am I

8  understanding your testimony correctly?

9    A.   Correct.

10    Q.   So let's talk a little bit about Nelson.  Nelson

11  is the 4473, it's the transaction where there were two

12  denials and then a proceed was issued.  And you did the

13  background check on Nelson.  Is that correct?

14    A.   Yeah.

15    Q.   Did you know Mr. Nelson before he came in, in

16  March of 2022, to purchase that firearm?

17    A.   I don't know that.  I believe I had seen him in

18  there before, but it's hard to say I know and by heart now,

19  especially after his name is came up 30 times in the last

20  three hours.  But no, I know the guy, but I don't know him

21  that well.

22    Q.   Yeah.

23    A.   And I mean, I remember it to a point.  I mean, it

24  was very simple.  He was like disgruntled that I would deny

25  his background check or more so disgruntled that you guys

1  are FBI.  And so he asked well, can't you just run it again?

2  I'm like, well, I don't don't see why not.  I didn't know

3  that at the time, so.

4       **Q.   Did he make any statements about -- other than**

5  **being disgruntled, did he make any specific statements like,**

6  **well, I've bought guns before or bought guns recently?**

7       A.   100 percent, yeah, that would have been the

8  conversation.  Yeah.  Like, you know, just kind of annoyed

9  at the situation he was in.  And I don't know that we'd

10  still have him as a customer if you would have just said, oh

11  here's your number, appeal this.  He probably would have

12  said no, I'm not going to buy the gun, and that's just what

13  it would had to end with.

14       But it just doesn't seem quite -- I was using my

15  discretion of what I knew, but I probably should have went

16  and asked Tanner because he knew that.

17       **Q.   How did it come to be that it was run -- Nelson's**

18  **background check was run a third time, but the third time it**

19  **was run with a Social Security number?**

20       A.   Because he didn't provide that on his 4473.

21       **Q.   Where did the idea come from to run it with the**

22  **Social Security number?**

23       A.   I'm not 100 percent sure.  I would say it's

24  probably because we had situations in the past that the

25  Social Security number is a lot of times essential just even

 1  to not get a delayed response, you know.  But I don't know

 2  exactly.

 3      Q.   Do you recall running it with the Social Security

 4  number?

 5      A.   Yeah, I do.  That sound -- yeah, that is right.

 6      Q.   And --

 7      A.   The third time.

 8      Q.   The third time, do you recall specifically getting

 9  a proceed on the third time when you ran the social?

10      A.   Correct, yes.

11      Q.   How did the number for the NTN, for the proceed,

12  get onto the 4473?

13      A.   Copy and paste.  I always copy and paste.

14      Q.   And did you realize at the time that it only got

15  the -- copy process only got 8 of the 9 digits?

16      A.   No, I did not notice that.  I didn't know it until

17  Jake found it.

18      Q.   And as a result of what happened with Nelson and

19  this issue of getting the denials and documenting the

20  denials, what, if anything, has changed in how you process

21  Form 4473s at this point?

22      A.   Are you talking about that -- which one are you

23  talking about?

24      Q.   Well, like Nelson.

25      A.   Nelson.

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                                    Page 193

1      Q.    Yeah, so --

2      A.    The denial --

3      Q.    Correct.

4      A.    -- part.  We have a folder for denials.  Now just

5  for denials because I was looking -- I was analyzing the way

6  Jake was going through everything and well, that's going to

7  make their life a lot easier the next time they come around

8  because all the denials are right there.

9      Q.    Is it your understanding if there's a denial, that

10 if you are provided a Social Security number at this point,

11 can you run it again?

12     A.    No.

13     Q.    What's your understanding of the right process

14 now?

15     A.    I give them the NTN number to appeal to FBI NICS.

16     Q.    And then what happens?

17     A.    Well, it's on them, I mean, and then they can come

18 in with their UPIN.

19     Q.    Do y'all at this point, and we're only, you know,

20 five months basically after your compliance inspection.  In

21 the last five months, have you had many 4473s denied where

22 you just had to give them the paperwork and say here you

23 need to go appeal this?

24     A.    No, I don't think that we've had any denials at

25 all recently, but not that I know of.  But also I'm in the

1  busiest summer I've ever had in my life and honestly, I

2  haven't been in the storefront as much as Tanner and Dan

3  have.

4          You know, the five months window that we're in,

5  that's kind of been where my busy season has been in the

6  shop.  I've been on service calls and machining.

7      Q.   And is it your experience over the last -- since

8  2019, in general, does Morehouse, as an FFL, does it get

9  many denials at all?

10     A.   Not many at all.  Very few.

11     Q.   And do you think, at this point, that sufficient

12  changes have been made and how Morehouse handles instances

13  like Fluker or Nelson; that these two isolated incidences

14  are unlikely to recur in the future?

15     A.   100 percent.  Yeah.

16     Q.   And on Fluker, out of the four years y'all been in

17  business, to your memory, is that the only time that a

18  non-resident has shown up and tried to make an in-store

19  purchase of a handgun?

20     A.   Yeah, because I think there's a lot of gun guys

21  that know that.  That's something that I didn't even know,

22  you know, that they can't just -- for sure, Minnesota

23  residents and that's  typically what our out-of-state people

24  are and they have they have to get permit to purchase like

25  we we know that for sure, you know?

1          And they know that, you know, that we and now, we
2   especially know it after going through all of this.
3      Q.   In the last four years, since you've had your
4   license, have you had any, that you can remember,
5   non-residents come in and go, hey, I want to purchase this
6   handgun.  I'm standing right here, but I know you've got to
7   ship it to a dealer in my home state.
8          Does that happen very often?
9      A.   Not very often, but I believe it's probably
10  happened in our shop, but not me specifically.
11     Q.   You've not run into it?
12     A.   No.
13     Q.   Now, what about on Nelson?  Have you run into the
14  issue where Nelson was irritated that he'd been denied and
15  he wanted you to do something about it right then?  Have you
16  run into that pattern other than with Nelson?
17     A.   No, no.  And to be totally honest, the gun
18  business has slowed down a lot from what it was even during
19  our audit period.  Or with Tanner saying 2021.  We don't --
20  we're not seeing as much traffic through our shop.
21     Q.   Pass the witness.
22          CROSS EXAMINATION
23          BY MS. THIELHORN:
24     Q.   Mr. Torrey, I just have a few questions.  Just to
25  clarify some of your responses.  You're an RP, a responsible

1  person on the licenses; correct?

2      A.   I don't believe so.  I'm not listed on that.  I

3  don't know for sure.

4      Q.   So if I told you that you were listed as an RP on

5  the license, that you both are listed, would you have any

6  reason to doubt the accuracy of that, that when you applied

7  as an application?

8      A.   No.

9      Q.   Okay.

10     A.   Yeah.  No.  Right.

11     Q.   So then, you know, that the responsible person

12 on the license means that you're responsible for conducting

13 the business in compliance with the regulations; you

14 understand that?

15     A.   Yeah.  Yes, ma'am.

16     Q.   Okay.  And then I know you said that sometimes you

17 work in the welding shop and in the machine shop and that's

18 where you were, but in terms of the times that you've worked

19 in the firearms store, how many NICS background checks would

20 you say you've run since you got the license?

21     A.   Hundreds.

22     Q.   Maybe a thousand; definitely hundreds?

23     A.   Hundreds.

24     Q.   And at the same time, then would you say that you

25 also completed hundreds of 4473s?

1      A.    Filled out, yeah, on the dealer end.  Yes.

2      Q.    Right.  On the part that you're supposed to

3  include.

4      A.    Yeah.

5      Q.    So if you did hundreds of background checks, this

6  stands to reason you've used this hundreds of times.

7      A.    Fair.

8      Q.    Now we're referring to the first violation that's

9  listed in the Notice of Revocation.  Let me show you

10  Government's Exhibit 8.  In fact, you can just keep that

11  packet with you.  And then that's the 4473 for the Fluker

12  transaction; correct?

13      A.    Mm-hmm.

14      Q.    And that goes to the two first two violations.

15  Now, regarding the first violation, the transfer of the

16  firearm to the person who does not reside in the state where

17  your business is located.  You're not contesting the fact

18  that Mr. Fluker told you he was a resident of Georgia;

19  correct?

20      A.    I never said that he verbally told me necessarily

21  that, but his driver's license would insinuate that.

22  Correct.

23      Q.    Well, let's look at Box No. 10 on that form.  Did

24  he indicate there, on Box No. 10, three over, that his

25  current state of residence is Georgia?

1      A.   Yeah, that's correct.

2      Q.   Right.  And then also there, in Box 26.a, on the

3 next page, did he present to you a Georgia driver's license?

4      A.   Right.  Correct.

5      Q.   And then, so despite him indicating on the form

6 that he was a current resident of the state of Georgia and

7 giving you that driver's license from Georgia, you sold the

8 gun to him, anyway; correct?

9      A.   Yeah.  Because of lack of knowledge, yeah.

10     Q.   But my point is, can you understand ATF's point of

11 view on this?  How, you know, the form, you know, here he

12 clearly said I'm a state resident of the state of Georgia,

13 and you sold the gun to him, anyway.  You can kind of

14 understand how it looks.

15     A.   Yeah, yeah.

16     Q.   Okay.  Fair enough.  So regarding the Violation

17 No. 2, the transfer of the firearm to an unlicensed person

18 without conducting the NICS check.  Look at there, at Box

19 No. 29.  You've done hundreds of NICS checks.  And how is it

20 you've never actually read Box 29?  Do you see Box 29 there?

21     A.   No, I'm not --

22     Q.   It's up here at the top.

23     A.   Top of the third page?

24     Q.   Yeah.  And for the record, it states:  No NICS

25 check is required because the transferee buyer has a valid

1 permit from the state where the transfer is to take place.

2          So I believe before, you testified that about 10

3 percent of your sales are, you know, for people with the

4 permit.  So clearly you've utilized this box before;

5 correct?

6     A.   Yeah, and they're always North Dakota concealed

7 carries.

8     Q.   Right.  But if you've checked that box before,

9 then obviously you've read where it says the permit has to

10 be from the state where the transfer's going to happen.

11    A.   That is correct.

12    Q.   So. Again, you can kind of see how this looks from

13 ATF's point of view, that you indicated here in the box that

14 his permit is from Georgia and completed that information;

15 correct?

16    A.   Correct.

17    Q.   But yet the instruction on the form says it's got

18 to be from the state where your business is.

19    A.   It was overlooked.

20    Q.   Okay, fair enough.  And then now, let's talk about

21 the guns sold to Mr. Nelson and that's the next page,

22 Exhibit 9, that's in the packet.  If you could take a look

23 at that.  Is that your signature there in Box 35 for the

24 Nelson transaction?

25    A.   Appears to be.

1      Q.   Now look at Box 27.b.  That's where you're

2   supposed to record the NTN number; correct?

3      A.   27.  Yes.  Correct.

4      Q.   And there's only 8 digits recorded, correct, in

5   that box?

6      A.   Yes.

7      Q.   And you now know that there's supposed to be nine;

8   correct?

9      A.   Yeah.

10     Q.   Can you explain why you recorded an incomplete

11  number?

12     A.   As we've talked about, the copy and paste

13  function, it was human error.  It wasn't the computer's

14  fault.  It's human error.

15     Q.   Well, I mean, you understand they've talked about

16  it, but you're the one that did that --

17     A.   Yeah, I --

18     Q.   -- and so now I've got to ask you --

19     A.   Yes, ma'am.

20     Q.   -- about it, so sure.

21     A.   Yeah.

22     Q.   And just for point of clarification, do you also

23  understand that that NTN number is also important to you, as

24  the licensee, because that's your way to document that you

25  actually did the NICS check?

1    A.    Uh-huh.

2    Q.    So not only do you understand the importance now

3 that it's legally required to be accurately recorded, but

4 you also understand the benefit to you, as the licensee, is

5 then you've got proof you did the NICS check.

6          Do you understand that?

7    A.    Yes, ma'am.

8    Q.    Now, let me have you look at Box 27.c,

9 Government's Exhibit No. 9.  Now, isn't it true that that

10 box states the response initially provided by NICS was and

11 you checked proceed.  Is that correct?

12    A.    Right.

13    Q.    And do you understand that the word "initially"

14 means first?

15    A.    I do.

16    Q.    But in that case, that was not correct, was it?

17    A.    It was the going off of what I knew.  I didn't

18 know, at that time, that you cannot run a background check

19 without attaching it to a 4473.

20    Q.    Right.  So my question though is you contacted

21 NICS for Mr. Nelson; correct?

22    A.    Yeah.

23    Q.    And the first response they gave you was denied,

24 true?  Because that's when he became agitated.

25    A.    But it wasn't attached to a 4473 in my head at the

1  time.

2      Q.   So you're not disputing that the first response

3  was a deny, you're just saying that you didn't associate it

4  with the 4473?

5      A.   That's correct.

6      Q.   Well, do you understand that in order to initiate

7  a NICS check, the customer has to first complete a 4473.

8      A.   I do now.

9      Q.   So, at the time, are you saying you did the NICS

10 check before he ever filled out the 4473?

11     A.   No, that's not what I'm insinuating; no.

12     Q.   I'm just trying to, you know, I'm not trying to

13 upset you --

14     A.   In my head --

15     Q.   I'm just trying to ask what happened.

16     A.   -- I was filling out that NICS check.  The 4473 is

17 open, yes.  But I had done those two denials and then I was

18 treating it as a whole new NICS check.  That's how it made

19 sense to me at the time, but now I know that that is

20 incorrect.

21     Q.   So where are the 4473s for the two denials?

22     A.   Like I said, I did not know that at the time.

23     Q.   So you couldn't have checked out without a 44 --

24     A.   So I should have made.  I should have made three

25 different 4473s.  Sorry.

```
 1              DIO HUMMEL:  One at a time, please.

 2              THE WITNESS:  But I should have three separate

 3  4473s for that with the two denials.  Actually, you know,

 4  but I didn't know at the time that you can't just run a

 5  background check willy-nilly.  And I do know that now.

 6  BY MS. THIELHORN:

 7      Q.   So if I understand correctly, Government's Exhibit

 8  No. 9, this is the 4473 that you had Mr. Nelson complete for

 9  the third check.

10      A.   Yeah, it --

11      Q.   He did not complete a 4473 for the first two

12  checks, the first two denies; correct?

13      A.   It --

14      Q.   He either did or he didn't.

15              MR. MOREHOUSE:  We just didn't file them.

16              THE WITNESS:  Right.

17              MR. MOREHOUSE:  We probably didn't keep them.

18              MS. THIELHORN:  So you're throwing 4473s away?

19              MR. MOREHOUSE:  Well, we didn't know we were

20  supposed to keep the denials.  Yeah, we don't get a lot of

21  denials.  We didn't know how to approach the situation.

22              MS. THIELHORN:  Do you not understand that the

23  instructions, themselves, say you have to keep a 4473 for 20

24  years?

25              MR. MOREHOUSE:  I hear you, yes.
```

1           MS. THIELHORN:  But yet you threw them away?

2           MR. MOREHOUSE:  We didn't know we were doing

3  anything wrong.  I wish you knew how busy me and Torrey are.

4  We don't sit in the gun shop and study the ATF book all day.

5           MS. THIELHORN:  Right.  But do you understand what

6  a serious business this is?

7           MR. MOREHOUSE:  Absolutely.

8           MS. THIELHORN:  And you can't say, well, I'm too

9  busy to understand the law.

10          MR. MOREHOUSE:  I agree.

11          MS. THIELHORN:  Do you understand that giving guns

12  to prohibited people is a huge public safety concern?

13          THE WITNESS:  Well, we got a --

14          MR. MOREHOUSE:  We're not giving guns to a

15  prohibited person.

16          MS. THIELHORN:  But you didn't know it at the

17  time.

18          MR. MOREHOUSE:  Well, I know, we're like.  I know

19  Robert, yeah.  I know I didn't.  You're right.  I can't

20  control -- I can't watch everybody who sits in front of

21  computer all day long, every day.

22          MS. THIELHORN:  Right.  But do you understand it's

23  your responsibility, if you want to be in the gun business,

24  to follow these regulations, whether you like them or not?

25          MR. MOREHOUSE:  Yes.

1         MS. THIELHORN:  And to complete these forms as

2   instructed on this form.  And now to keep these forms, you

3   don't --

4         MR. MOREHOUSE:  If you can give me an example of a

5   gun shop that has never made a mistake, let me know.

6         MS. THIELHORN:  Okay.  I'm not talking about other

7   people.  We're here to talk about you.  And certainly,

8   everyone makes mistakes.  I'm not trying to upset anyone

9   here.  I'm just pointing out you can't come in and say,

10  "Oh, I'm too busy or oh, we -- "

11        MR. MOREHOUSE:  I don't.

12  BY MS. THIELHORN:

13      **Q.   And I understand if you didn't know -- at the**

14  **time, you didn't know.  But at the same time, I'm just here**

15  **trying to understand how this occurred so it doesn't happen**

16  **again in the future.  It's important that you guys explain**

17  **your side of the story to the DIO so we can understand**

18  **exactly what happened and what you've done to fix it.**

19      A.   Right.  And that's my whole and now that something

20  is known, there's no way it can happen again.  But I mean,

21  we've just sat and talked about it all day long, so it won't

22  happen again.  Those two things that are about it, I've been

23  staying awake every night thinking about those two things.

24  So it won't happen again.

25      **Q.   Okay.  Well, let me just ask this question:  Do**

1  you, as you sit here, today, knowing what you have since

2  learned and you know, today, do you understand that every

3  time you sign this 4473 form, that you're certifying that

4  the information in here is true, accurate, and correct?

5      A.   Correct.

6      Q.   And you understand obviously, if you're putting

7  information in here that is not correct, certifying is the

8  problem with that.  So do you understand that?

9      A.   Yeah, right.  But there's no margin of error

10  there?  I mean, when you're talking about less than 2% of

11  our audit, would it have errors less than that?  Yeah.

12      Q.   Well, and certainly your error rate and those

13  sorts of things, those are mitigating circumstances that

14  your attorney is here, on your behalf, presenting to the

15  DIO, and he's talked about that.  And certainly, you guys,

16  you know, can point that out and talk about that.  And you

17  know, that will you know be part of the DIO's consideration

18  of all of this.  But I'm just again, trying to go through

19  the violations, understand how it occurred, what you knew,

20  what you didn't know --

21      A.   Fair enough.

22      Q.   -- sort go through that.  So I guess the point I'm

23  making is you can understand ATF's point of view on this.

24  The form says one thing, you do another.  If you certify

25  it's true, but you know it's not true.

 1      A.   Correct.

 2      **Q.   Eight digits, you needed nine.  You didn't record**

 3   **the denials, you can see where we're coming from.**

 4      A.   Yes.

 5      **Q.   Fair enough.**

 6           THE COURT REPORTER:  Sir, I just need another 5

 7   minutes.

 8           DIO HUMMEL:  1:52, we're off the record.

 9               (Break taken.)

10           DIO HUMMEL:  Are we back on the record?

11           THE COURT REPORTER:  Yes.

12           DIO HUMMEL:  Okay.

13               CROSS EXAMINATION RESUMED

14               BY MS. THIELHORN:

15      A.   I believe we were talking about the Nelson

16   transaction and let me just have you take a look at

17   Government's Exhibit No. 10.  It's in that packet in front

18   of you.  This was introduced by IOI Temp as the NICS audit

19   log.  Have you ever seen this audit log before?  It would be

20   --

21      A.   I'm on -- did you say Exhibit 10?

22      **Q.   Yes.  That's the NICS audit log.**

23      A.   No, I --

24      **Q.   Well, as IOI Temp testified, this audit log**

25   **captures when you run the same person through the NICS**

 1  system multiple times after you get a denial for them.  And

 2  you clearly, you can see from Government's Exhibit 10, that

 3  Morehouse has run the same person in there after being

 4  denied.

 5          And in terms of Mr. Nelson, those denies were not,

 6  you know, recorded.  So you understand how that looks.  You

 7  see, this audit log and it goes out there and you don't have

 8  the 4473, you didn t -- denials.  You can understand how

 9  that looks in ATF s point of view; correct?

10      A.  Yes.

11      Q.  And now do you understand you have to record each

12  response you get from NICS?

13      A.  Yeah.  Totally.

14      Q.  And you now understand, if I understand it, as you

15  said previously, that you now know when you get a denied

16  response, you have to stop immediately; correct?

17      A.  Mm-hmm.

18      Q.  And even if the customer was agitated:  I can't

19  believe this.  What's going on?  Do it again.

20          You have to explain to them, sir, I can t.

21  Here's the NTN number you can talk to NICS about.

22          Do you understand that?

23      A.  I do.

24      Q.  So you had talked before about the -- with Mr.

25  Nelson.  He was upset, he was agitated, and you thought you

1  would have lost him as a customer if you said you can't do

2  it.  But as you sit here today, you understand, even if it

3  means losing a customer, you have to follow the rules and

4  regulations.

5      A.   No doubt.

6      Q.   And then the other question I had, I believe

7  before, you talked about the software system that you use,

8  and you were upset because the software hadn't caught any of

9  this.  But you understand you can't just blame the software.

10 You, yourself, are responsible for following the

11 instructions on the forms.

12     A.   For sure.

13     Q.   Okay.  That's all I have.

14          REDIRECT EXAMINATION

15          BY MR. HARRIS:

16     Q.   Just a couple of redirects.  Mr. Torrey, you were

17 asked, on cross, how many 4473s you've done, and you said

18 hundreds.  Is that correct?

19     A.   Yeah.

20     Q.   And of those, though, a very small percentage

21 involved, as I understand your direct and then your

22 response, but I want to make sure it's clear, but a very

23 small percentage of those hundreds actually involve people

24 who are buying firearms based upon a concealed weapons

25 permit.  Is that correct?

1      A.    Yes.

2      Q.    And that small percentage, I think you testified

3   earlier, is maybe 10 percent.

4      A.    Uh-huh.

5      Q.    So out of four years worth of transactions, we're

6   talking about a small number that actually involved a

7   situation where you'd actually be reading the box that says,

8    This is exempt based on NICS.

9            Is that correct?

10     A.    Right.

11     Q.    And of the ones where you do check that, almost

12  all of them are people who have North Dakota concealed

13  weapons permits.

14     A.    Right.  It'd be redundant, with that, yeah.

15     Q.    And other than Fluker, can you think of any

16  situations where you've checked Box 29, that you're selling

17  based on concealed weapons permit, where they were a

18  non-resident purchasing a handgun for in-state transfer?

19     A.    No.  Repeat the question, please.

20     Q.    Other than Fluker, can you think of any instance

21  where someone shows up, wants to buy a handgun, wants to

22  walk out the door with it, and they are a non-resident

23  presenting an out-of-state concealed weapons permit?

24     A.    No.  No other circumstance.

25     Q.    And in the ones where they present the North

 1  Dakota permit, were you in the habit of action -- prior to

 2  the time that this came up and you had the conversation with

 3  Iowa Temp, were you actually in the habit of reading the

 4  text of the question on those Box 29 every time you fill it

 5  out?

 6      A.  I would say not.

 7      Q.  Okay.  You've gotten used to enough of the

 8  process?

 9      A.  I got used to when the concealed carry permit is

10  the box, yeah.

11      Q.  So I want to ask a couple more questions to make

12  sure I'm clear on Nelson.  Nelson's the individual who had

13  the two denials and then the proceed in March of 2022.

14      A.  Yes, sir.

15      Q.  And you did that sale, okay.  So Nelson fills the

16  form out on an iPad, is that correct?

17      A.  Yeah.

18      Q.  And then you transfer information from the iPad to

19  the electronic 4473.

20      A.  Right.

21      Q.  My question is at what point --

22          DIO HUMMEL:  For point of clarification, he

23  transfers into the E-check.

24          MR. HARRIS:  E-check.

25          DIO HUMMEL:  Yeah, not under the 4473.  The

1  4473 is the iPad.

2          THE WITNESS:  Yeah, the 4473 --

3          MR. HARRIS:  The E-check is what I am asking

4  about.

5          THE WITNESS:  Yeah.

6          DIO HUMMEL:  Sorry.

7          MR. HARRIS:  It s okay.

8  BY MR. HARRIS:

9      Q.   So, at what point does the hard copy of the 4473

10  -- the documents that were discussed with you by ATF council

11  -- for Nelson, for example, at what point does that hard

12  copy get printed out?

13     A.   Well, every time.

14     Q.   No, no, no, no.  It s, for example, does it get

15  printed out before you run the NICS check?

16     A.   No, it would be the NICS check and then you attach

17  that NTN and print it.

18     Q.   Oky, so my question is, the first time you ran

19  Nelson, as I understand it, Nelson takes the iPad and he

20  fills out the information.  Is that correct?

21     A.   Yeah, yep.

22     Q.   And then you took the information out of the

23  FastBound electronic screen --

24     A.   Yeah, yep.

25     Q.   -- because there's no printed-out 4473.

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                                    Page 213

1      A.   No.  Right, right.

2      Q.   And you run the E-check.

3      A.   Yep.

4      Q.   And you got a denial.

5      A.   Right.

6      Q.   Did you then fill that denial data in on the

7   electronic, into the FastBound system and then print it out

8   and throw it away?

9      A.   No.  I mean, I don't recall.  I don't know if I --

10  if it would have been those three that went to the one 4473,

11  or if it would have copy and pasted that.  We wouldn't have

12  thrown away a 4473.  That doesn't make any sense.

13     Q.   And my question is -- what I'm trying to make sure

14  I understand, given that you were using FastBound in the

15  electronic NICS and then at some point, a 4473 gets printed

16  out and put in your records.

17          Did Mr. Nelson go through the iPad and fill out

18  the 4473, three separate times for three different checks?

19     A.   No, I don't believe so.  No, I don't think so.

20     Q.   It it your testimony then that you ran the check

21  the first time and got a denial and then, roughly, 30

22  minutes later, just ran it again?

23     A.   I mean, if it was 30 minutes later or unless he

24  was on the phone, you know, trying to get it sorted out and

25  it's -- I don't recall.

1      Q.   Well, what I want to make sure that I'm clear on

2  and that the record's clear on is following-up on counsel's

3  question.  Are there two 4473s, that were printed out, that

4  had denials on them that just got thrown away or destroyed?

5      A.   No, I'm thinking we ran three checks for the one.

6  So she's correct in saying that the initial one should have

7  been denied regardless of that.

8      Q.   And instead, what happened was before a 4473 was

9  ever printed out, he fills out the first one.  You run the

10  first check.

11     A.   Right.

12     Q.   So there's a 4473 there.

13     A.   Yep.

14     Q.   But it's not finished at that point.

15          Is that correct?

16     A.   Right, right.

17     Q.   You get a denial.

18     A.   And then another denial and then add that Social

19  Security number in and then I put proceed.

20     Q.   And a couple of cousel s questions were, you know,

21  do you understand now your obligations under the law?  So,

22  for example, if there's a 4473 and the NICS check is run and

23  it's a denial, what is your current process at that point?

24     A.   Well, it s denied and still put the NTN number in

25  and then it goes in the denial folder.

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                                    Page 215

1      Q.   And when did you get the instruction or the
2  understanding that that's the right process?
3      A.   It would have been during our compliance check.
4      Q.   Was that your understanding of that's the right
5  way to do it, back in March of 2022, when Nelson was there?
6      A.   It was not, no.
7      Q.   And then also with respect to Fluker, you now know
8  that you can't check Box 29 if they're a non-resident.
9      A.   Correct, correct.
10     Q.   So even if they're buying a rifle or a shotgun and
11 you can make the transfer, they've got to have a NICS check.
12     A.   Right.
13     Q.   When did you attain that understanding?
14     A.   It would have been the same time.
15     Q.   The March?
16     A.   Yeah, the last compliant check.
17     Q.   In  23.
18     A.   In  23.
19     Q.   Okay.  No further questions.
20          RECROSS EXAMINATION
21          BY MS. THIELHORN:
22     Q.   I just had one follow-up question, just so I
23 understand the current process.  The customer comes in and
24 you have an iPad that they complete the 4473, their portion
25 of, and then you completing your portion, is that correct?

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                                          Page 216

1      A.   Yeah, that s correct.

2      Q.   And then you do the NICS check; correct?

3      A.   Yeah, the NICS check would be -- well, it would be

4  you fill out the driver's license, then the NICS check, then

5  you finish the 4473.

6      Q.   Fair.  But my question to you is, do you review

7  the information the customer puts into the form before you

8  do that NICS check?

9      A.   Currently, yeah.

10     Q.   Well, then and now.

11     A.   Yeah, we do.  I do now, yeah.

12     Q.   So I guess my question is as, at the time, if Mr.

13  Fluker have put in onto that iPad that he's a resident of

14  Georgia, is it possible that you didn't even pick up on that

15  because you just did the NICS check or --

16          MR. MOREHOUSE:  He didn t do the NICS check.

17          MS. THIELHORN:  Or Fluker with Nelson --

18          MR. MOREHOUSE:  Correct.

19  BY MS. THIELHORN:

20     Q.   -- that, you know, you did the NICS check and you

21  weren't necessarily reviewing the information?

22     A.   Correct.

23     Q.   Because you understand if you have a customer that

24  comes in and indicates they're a felon and/or they're

25  somehow prohibited, it's important for you to read that

1  information before you do the NICS check.

2       A.   Correct.

3       Q.   Because at that point, you just need to stop.

4            You understand that; correct?

5       A.   Yes.

6       Q.   That s all I have.

7                 REDIRECT EXAMINATION

8                 BY MR. HARRIS:

9       Q.   I ve got one follow up on that and this has to do

10  with FastBound.  So look at Exhibit 9, for example, which is

11  the Nelson 4473.  In FastBound, you've told us -- one of the

12  two of you did -- that if required boxes are missing, that

13  it'll pop up a warning.  Is that correct?

14            MR. MOREHOUSE:  Correct.

15            THE WITNESS:  Right.

16  BY MR. HARRIS:

17       Q.   Under Section 21, where there are these columns of

18  yes and no answers, like are you a felon; have you ever been

19  dishonorably discharged?  If a buyer answers the wrong way,

20  one of those yes or no questions, does FastBound pop-up a

21  warning?

22       A.   Yeah, it will, like it'll automatically deny them.

23  FastBound, before you even get to the point of filling out

24  the background check.  Am I saying that correct?

25            MR. MOREHOUSE:  It will flag them as a contact

1  until you go in there and unflag them, like if they may --
2  you obviously can't transfer the gun that day.  But if they
3  were flagged, it will put a flag in their contact and
4  FastBound will say, hey, this is a prohibited person.
5           THE COURT REPORTER:  This is a ?
6           MR. MOREHOUSE:  Prohibited person.
7           MR. HARRIS:  Nothing further.
8           DIO HUMMEL:  You all set, Michele?
9           MS. THIELHORN:  Yes, I am.
10          DIO HUMMEL:  And so I guess I offer it up and
11  I'll leave it to each of you, an opportunity starting -- I
12  don't know if you have any closing remarks or anything, you
13  want to have an opportunity to summarize anything before I
14  close the hearing.  I'll give you an opportunity to, if you
15  want to.
16          MS. THIELHORN:  I do not.  I think we've discussed
17  it and you have an understanding of what happened and why it
18  happened.  You know, that they didn't particularly know or
19  didn't understand and so, but then they have indicated, both
20  of them, that they understand ATF s point of view in terms
21  of how it was willful, in terms of the forms, clearly
22  indicating that, you know, can't accept the permit if it's
23  from the state other than where the transfer takes place.
24  And have a form indicates you have to put in the initial
25  response and beside that there's a place where you put

1 subsequent responses.

2          I believe the forms speak for themselves and they

3 explain what happens.  So I would just close, basically,

4 resting on that.

5          DIO HUMMEL:  Your opportunity to have a last

6 word before my last word.

7          MR. HARRIS:  I think frankly, that given the fact

8 we've been here -- if this is like what I typically hear

9 from Jenny in Nashville, longer than normal -- that you're

10 probably heard enough about our theory of this case that

11 there are some errors, they're very minuscule.  That almost

12 all of the mitigating factors that are addressed in the

13 adverse action policy, which we've not really discussed, but

14 something that you obviously work with.

15          That the mitigating factors that are in this case,

16 the fact that they've never had a prior compliance

17 inspection, they never had any other inspection after the

18 initial qualifying inspection before these two errors

19 occurred, are all mitigating factors, including the fact

20 that none of these are prohibited.

21          None of these directly impact tracing.  None of

22 these are tied to or connected with any kind of indication

23 of trafficking.  And they've accepted responsibility that

24 these are errors and that they have implemented systems and

25 policies to make sure that these errors are not likely to

1  repeat or recur.

2         That these are all indicators that they are human

3  errors or misunderstandings of the law and so relatively, at

4  least in the scope of their business, rare occurrences.  And

5  that based on that we feel like, with respect to Nelson, I

6  think even the current, well, I'll say it this way.  The

7  most recent version of the adverse action policy that I've

8  got access to indicates that Nelson, most likely, would have

9  been a matter of calling for a warning letter.  And that up

10 until release 1(d), even the Fluker matter is something that

11 would have called, at most, for a warning conference.

12        So the question there even might be under the

13 later versions, 1(e) and 1(f), is are these matters, which

14 are so clearly compelling, a willful violation, an

15 intentional or annoying violation, or even evidence of

16 reckless disregard or plain indifference to their

17 obligations?

18        We don't think that level of evidence exists.  I

19 mean, it's clear that there's some errors and they've taken

20 steps to make sure that those don't recur.  And knowing that

21 typically, you don't consider compliance plans, I think

22 they've implemented already everything that they can do in

23 their capacity to already make sure that these kind of

24 things don't recur.  And with that, I'll close.

25        DIO HUMMEL:  All right, thank you, everyone.

1  I believe I have all the information that I need.  I'll make

2  my final decision based on the information provided at the

3  hearing today and the record before me.  If the decision is

4  that the license is not to be revoked, you will receive a

5  written notice of that decision.

6           In the event that it is determined that the

7  licenses will be revoked, you will receive a Final Notice of

8  Revocation, Suspension and/or fine of the Firearms License.

9  You will also receive a copy of my findings and conclusions.

10  If you receive a final notice, you may file a request in

11  Federal District Court in the district where you conduct

12  business under the provisions of Section 923(f)(3), Title

13  18, United States Code, for a de novo hearing.

14           The request must be submitted within 60 days at

15  the receipt of the final notice.  Is there anything else for

16  the record?

17           MS. THIELHORN:  Not on behalf of ATF.

18           DIO HUMMEL:  All right, if there's nothing

19  further that anyone would like to add --

20           MR. HARRIS:  Just so, before you click me out.  So

21  that I'm clear, all of the documents that were tendered in

22  the two notebooks, are they in the record at this point?

23           DIO HUMMEL:  Yeah, just as a -- that was a

24  preliminary matter.  Just put them all in the record.

25           MR. HARRIS:  I'm fine with that, then.

1          DIO HUMMEL:  Okay.  The time is 2:15 p.m.,

2  and the hearing is closed.

3               (Whereupon, the transcript of proceedings was

4               concluded at 2:15 p.m.)

5                         ***

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF NORTH DAKOTA      :
                                :              CERTIFICATE
 2   COUNTY OF CASS             :

 3
          I, Matthew Hanneman, Shorthand Reporter and Notary
 4   Public duly qualified in and for the state of North Dakota
     do hereby certify there came before me the deponent herein,
 5   who was by me duly sworn to testify to the truth and nothing
     but the truth concerning the matters in this cause.
 6
          I further certify that the foregoing transcript is a
 7   true and correct transcript of my original stenographic
     notes.
 8
          I further certify that I am neither attorney or
 9   counsel for, nor related to or employed by, any of the
     parties to the action in which this deposition is taken;
10   and, furthermore, that I am not a relative or employee of
     any attorney or counsel employed by the parties hereto or
11   financially interested in the action.

12        IN WITNESS WHEREOF, I have hereunto set my hand and
     affixed my Notarial Seal this 23rd day of August, 2023.
13

14

15
                           _____
16                         Matthew Hanneman, Notary Public

17

18

19

20   THIS OFFICIAL TRANSCRIPT MAY NOT BE ALTERED OR REPRODUCED
     WITHOUT THE EXPRESS CONSENT OF THE CERTIFYING COURT
21   REPORTER.

22

23

24

25
```

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023                    Index: $250..2019

**$**

**$250**    188:23

**0**

**07**    45:22,24
46:4 47:9
48:11,12

**1**

**1**    9:7,8
10:14 11:7
24:17
42:17,18
43:6,10
44:5 75:25
90:16,19
91:1,7
106:17
126:23
127:13
142:24
155:19
160:23
176:7

**1(d)**    220:10

**1(e)**    220:13

**1(f)**    220:13

**1/2**    155:23,
24

**10**    11:10,15
12:7 21:2
23:4,11
25:16

30:15,19,
22 31:2
34:1,7
36:16 37:7
56:2
108:22,24
112:25
113:1,2,12
114:22
135:24
141:19
186:24
187:15
197:23,24
199:2
207:17,21
208:2
210:3

**100**    48:8
191:7,23
194:15

**100%**    23:23
144:23

**11**    9:7,16
22:6 53:4
75:25
86:20
89:10
162:7
164:16

**11:14**    106:2

**11:25**    106:5

**12-month**
57:16
58:1,4

**121**    24:7

**12:30**    150:12

**12:40**    150:21

**13th**    10:18

**16th**    7:5
10:20

**17**    174:22

**18**    9:8
26:13
27:21
29:19
66:10
67:11
118:14,16,
24 175:8
221:13

**19**    39:21

**197**    176:13

**1:52**    207:8

**2**

**2**    10:16
11:7 27:2
74:10,13
90:20
91:1,7
108:6
110:24
114:7
155:23,24
198:17

**2%**    206:10

**2/25/2022**

116:10

**2/25/22**
116:6

**20**    67:20
97:5 115:1
203:23

**20,000**
129:12

**2007**    10:12

**2014**    42:22
43:4,21,
23,25
44:8,9,15,
19 127:2
128:3

**2016**    12:5
43:20

**2019**    10:24
13:13
14:18,24
15:8,11
39:17
40:10 42:6
46:7 50:15
58:21,24
59:1 102:4
113:19
132:15
151:13,23
152:3
155:19
157:12
164:19
169:1
170:1,5,10

183:18
184:17,25
194:8

**2020**  15:12
16:4,6
100:20
101:2
113:22,24
114:8,20
152:1
164:17
170:19

**2021**  15:22,
25 16:10
170:25
171:1,4,10
195:19

**2022**  11:1,3
12:20
13:12
16:13,15,
22 17:3,5,
14 18:17
19:1,17
20:14,20
25:1 27:9
29:18
44:23,25
45:4,6,20
46:24
47:21
48:12
49:18
50:2,20
52:10 56:1
67:20
93:14

94:5,8,11,
22 97:2,6,
13,18
98:5,18
99:7,12,21
101:24
103:4,9
110:11,12
112:5,20
115:2,6,24
124:20
132:14
141:1,3,7
158:3,13
159:16
160:3,12
166:12
171:2,5,
11,19
188:25
190:16
211:13
215:5

**2023**  7:6
11:5 20:24
21:8 49:14
50:8,18
54:9,25
66:7,13
67:12
68:15
95:23
103:14
110:3
114:14,16
118:18
119:7
132:19

147:3,23
167:10,15

**2023rd**  177:3

**21**  22:15
100:21
115:2
175:8
217:17

**22**  100:21
101:4
116:6,8
166:8

**23**  49:20
56:19
65:24
97:15,23
101:5
112:18
116:5
145:20
171:6
215:17,18

**233**  127:5

**23rd**  113:22

**24**  131:2
173:10

**24/7**  175:19

**25**  171:16

**25.11**  131:21

**2500**  178:4

**25th**  25:1
27:9 44:22
101:24
104:24

171:19
188:25

**26**  25:19
113:20

**26.a**  198:2

**26th**  12:20
16:15
17:13
18:17
19:17
20:14 45:6
93:10,14,
15,21
94:3,5,8,
11,22 97:2
99:21
103:3,8
104:24
158:13
159:16
160:3
189:18

**27**  7:16
9:21 26:14
27:22
29:19 30:1
67:16
200:3

**27.b**  31:10,
11,17,24
62:5,13
67:19
111:1
200:1

**27.c**  33:17
34:10

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC

201:8

**27.d** 168:1

**27b** 34:2

**28** 110:12
131:21

**28th** 29:18
110:11
115:2
141:1,3,7

**29** 28:3
54:5
95:14,20
172:1
190:3,6
198:19,20
210:16
211:4
215:8

**2:15** 222:1,
4

**2nd** 7:6
45:10

---

**3**

---

**3** 10:17
11:9,11
29:4 36:19
126:8
128:16
131:2
132:7
146:25
165:11
173:2,4

**30** 190:19
213:21,23

**300** 12:17

**35** 26:9
199:23

**3A** 10:19

**3rd** 10:11
14:24

---

**4**

---

**4** 10:21
24:6 32:9
66:5 67:12
68:1
110:3,9,
19,24
111:19
116:14
118:10
120:11

**44** 63:1
202:23

**4473** 11:6,8
22:5,7,9
24:9 25:4,
16,19
30:1,4,10
31:11
34:10
35:19 37:2
48:6 53:3,
5,13,17
61:24
62:12,16,
19,23

63:8,12,21
64:3 65:3
67:19
68:21
90:17,23
92:20
96:13
106:12
107:4,7,13
108:7
109:13,18,
23,25
110:11,14
119:23,25
121:25
124:4,10,
12 128:13
132:14
135:16
137:15
139:12
152:13
154:16,21
155:3
160:13
161:19,20,
24 162:7,
17 163:22
164:9,10,
14,17
165:14
166:10
167:23
172:1
175:12,22
181:3,21
182:13,16
184:5,17

185:10
186:3,19
187:21
190:11
191:20
192:12
197:11
201:19,25
202:4,7,
10,16
203:8,11,
23 206:3
208:8
211:19,25
212:1,2,9,
25 213:10,
12,15,18
214:8,12,
22 215:24
216:5
217:11

**4473s** 22:3
23:25
36:23 48:9
53:1 57:17
58:7 60:10
61:7,16
64:17,21,
24 65:6
67:1 72:7
82:3 83:19
105:9
107:20
109:21
120:15,16
156:3
163:3,9,14
171:7,20

Case 3:23-cv-00129-PDW-ARS    Document 41    Filed 09/26/23    Page 227 of 299

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                 Index: 4476s..a.m.

174:14
187:1,7
192:21
193:21
196:25
202:21,25
203:3,18
209:17
214:3

**4476s** 160:1

**4500** 7:16,
18 10:15

**472** 10:11

**478** 7:17
126:4
131:20

**478.102(a)**
27:22

**478.121(c)**
29:20

**478.125(e)**
146:17

**478.76** 9:21

**478.99(a)**
26:14

─────────────
**5**
─────────────

**5** 10:22
14:14,17,
21 39:14,
15,21 40:3
41:11
42:14
43:1,7

94:19
110:6
118:9,20
119:2,7
120:9
143:23,25
150:19
169:9
207:6

**5-minute**
189:14

**5300.4** 43:4

**572** 10:12

─────────────
**6**
─────────────

**6** 10:24
16:14
17:7,16
18:11,15
39:14,15
143:6,12,
23

**60** 221:14

**657** 7:6

**6A** 11:1
16:14
17:7,17
18:12,15
143:12,21,
23

**6th** 66:6,
12,18,19,
21 67:4,12
68:15
96:16

110:3
118:18,21
119:6,7,8

─────────────
**7**
─────────────

**7** 9:16 11:4
37:12
144:15

─────────────
**8**
─────────────

**8** 11:6
25:2,3
26:21
28:2,11
32:3,16,18
62:20,24
108:4
192:15
197:10
200:4

**8/25** 20:6

**8/26** 20:7

**8/26/22** 98:2

**8:48** 7:3,5

**8th** 10:6,12
88:8

─────────────
**9**
─────────────

**9** 11:8 12:7
30:3,18,23
31:10 32:3
33:16,17
62:21
110:1,15

192:15
199:22
201:9
203:8
217:10

**90** 23:8
112:11,14,
23 114:10,
11 116:3,
4,12 135:4
140:20
141:4,20,
22 142:7

**922(b)(3)**
26:14

**922(t)** 27:22

**922M** 29:19

**923(f)(3)**
78:16 88:6
221:12

─────────────
**A**
─────────────

**A&d** 23:21
46:24
48:3,8
57:3 58:7
60:2,7,8
61:7 72:6
82:3 83:17
128:13
146:9

**A-U-D-I-T**
109:1

**a.m.** 7:3,5

**abided** 21:19

**ability** 61:8
  100:14
  135:9
  136:7
  137:4

**Absolutely**
  159:17
  172:12,14
  184:13
  189:20
  204:7

**accent** 109:6
  153:6

**accents**
  109:9

**accept** 9:6
  153:8
  157:14,17
  169:22,23
  171:24
  218:22

**acceptable**
  51:2

**accepted**
  11:19 51:2
  92:25
  95:18
  219:23

**access**
  135:10,11
  220:8

**accident**
  85:15

**accidental**
  82:14 83:9

**accommodating**
  147:9

**accuracy**
  181:19
  196:6

**accurate** 8:1
  36:13
  45:12 53:3
  68:4
  112:16
  117:3
  121:8,18
  122:3
  138:16
  139:23
  145:18
  146:18
  206:4

**accurately**
  31:25
  34:13,19
  52:11
  99:12,22
  115:12
  144:23
  159:15
  163:10
  201:3

**achieve**
  154:5

**acknowledge**
  172:20

**acknowledged**
  40:4

**acknowledging**
  18:18
  26:25

**acknowledgment**
  10:23,25
  11:1,4
  13:23
  14:5,8,12,
  15 15:18
  29:2 39:16
  40:11
  41:6,10
  42:8,25
  44:8,15
  46:6
  102:3,17,
  18 127:22
  129:16
  144:1
  169:11

**acquisition**
  22:2 23:24
  146:18
  154:13

**acquisitions**
  57:18,25
  58:3 156:3

**act** 24:20
  25:10
  26:16
  29:12
  76:4,5
  172:22

**acted** 74:25

**Acting** 8:18

**action** 211:1
  219:13
  220:7

**actions**
  68:17

**active** 9:9
  99:4

**actively**
  71:24

**activities**
  54:12
  72:14
  111:21,22
  151:18

**activity**
  21:1 24:23
  50:3 54:12
  55:1
  156:10

**actual** 24:16
  59:12
  61:16
  110:14
  127:1
  178:23

**add** 24:7
  80:24 81:3
  214:18
  221:19

**added** 68:2,6

**adding** 46:4

**addition**
  159:9
  185:8

additional
  45:21
  125:12
  131:3
  138:24

address   7:23
  38:13
  53:10
  98:21
  103:9
  104:23
  128:20
  162:9

addressed
  99:25
  103:6
  120:5
  219:12

adds   80:12

adjoining
  157:17

adjustments
  109:4

administrative
  7:13

admittedly
  169:19

advance   9:7
  11:13  12:8
  189:5

adverse
  219:13
  220:7

advice   154:6

affect   137:8

affects
  76:19

agencies
  131:16

agency   33:19

agent   159:3

agitated
  201:24
  208:18,25

agree   9:10
  96:11
  137:8
  173:18
  189:13
  204:10

agreeing
  173:21

ahead   39:8
  70:23
  93:19

air   153:2

airplane
  129:12

Alcohol   7:10

algorithm
  88:21

allegations
  79:23
  89:24

allege   88:19

allotted
  105:9

allowable
  52:1,2,5

allowed
  93:25  95:8
  149:16

ambit   144:6

amend   24:7

amended
  10:21  24:6
  32:8  66:21
  67:4  68:1
  71:12,17

amending
  69:2

amount   40:14
  170:3
  180:1

analysis
  83:11

analyzing
  193:5

and/or   7:15
  152:7
  153:17
  159:14
  216:24
  221:8

Andrew   25:5,
  7,9

annoyed
  191:8

annoying
  220:15

annualized
  186:25

answering
  123:22

answers   8:2
  78:14
  147:9
  217:18,19

anytime
  83:11

apparently
  88:20
  174:12

appeal   18:8
  35:6,17
  77:18  86:2
  125:6
  126:2,3
  129:4,10
  130:21
  131:4
  167:18
  191:11
  193:15,23

appeals
  125:4,7

appears
  79:13,25
  118:22
  199:25

applicable
  22:21

applicant
  12:23  13:8
  14:1,3

15:17
41:23

applicants
42:2 46:11

application
12:24
13:1,9
15:17 20:7
46:14 47:3
158:4
183:19
196:7

applied
13:13
97:20
155:18
158:2
178:25
196:6

applies 41:1

apply 155:21

applying
45:24
184:7

approach
203:21

appropriately
24:8,10
29:8 31:25
148:23

approvals
135:9

approved
154:7

179:3,10

approximately
12:17 31:7
65:21
171:7
187:9

April 12:5
14:23
39:17,21
66:3,6,20
67:4 68:2,
7,15 96:16
103:15
110:3
119:7
132:19
135:23
167:10
170:10

AR-15 156:19

AR-15S
156:23

area 12:25
139:2
153:13
156:22,25
157:10

argues 78:17

argument
80:13

arguments
78:1 81:2

articulate
138:7
153:5

aspect 27:16
60:3

aspects
182:11

assess 72:24

assessment
73:8

associate
125:5
202:3

assume 65:5
189:6

assuming
33:10
54:25
87:10
161:6

assumption
58:23

assurance
43:8

assure 21:18
27:14

assuring
22:17

ATF 7:15,18
8:16,21
9:7 10:1,
3,6 12:2,
4,15 13:2
16:22
20:14
21:2,9,22
22:7 25:4

30:4 42:22
43:4 45:15
51:23 71:8
74:23 77:6
78:16
79:3,16,17
81:8 83:13
84:4,6,16
86:15,17,
18,23
88:19 89:3
100:24
101:23,25
112:18
131:5,14,
18,19
132:9,13
137:14
139:3
142:24
147:12
150:10
154:7
155:11
159:3
162:7
169:9
176:10
186:10
204:4
208:9
212:10
218:20
221:17

ATF's 88:13
101:21
137:4
172:10

198:10
199:13
206:23

attach
  212:16

attached
  201:25

attaching
  201:19

attain
  215:13

attest  185:7

attorney  8:8
  9:19
  84:10,13
  86:17
  88:16,25
  89:3,6
  148:6
  149:5,7,
  12,14
  206:14

attorney's
  90:3

attorneys
  79:18,19

audible  8:2

audit  11:10,
  15 21:24
  23:1,5,11
  30:15,18,
  21 31:2,7
  32:21,23
  34:1,8

36:16 82:4
108:1,8,
18,19,21,
25 109:22
112:10,15,
18 114:16
134:12
140:12
141:6
142:7
177:10
182:17
195:19
206:11
207:18,19,
22,24
208:7

August  7:5
  10:20
  12:20
  16:15
  17:2,5,13
  18:17
  19:1,16
  20:14,20
  25:1 27:9
  44:22 45:6
  46:13,14,
  24 47:6
  49:14,20
  50:2,14,20
  52:10
  93:9,13,
  15,21
  94:2,5,8,
  11,22
  97:2,5,13,
  14,18

98:5,18
99:7,12,21
101:3,24
103:3,8
104:24
124:20
158:13
159:16,20,
25 160:3,
12 166:8,
11,12
171:16,19
188:25
189:18

authority
  7:10

authorized
  131:3

automatically
  217:22

Avenue  7:6

average
  59:15
  60:12
  94:18

avoid  121:18

awake  205:23

aware  44:18
  47:20 48:7
  49:14
  50:2,5
  52:4
  108:13
  125:20
  126:4

127:10
129:20
133:19
157:13,16
161:9
180:23

awkwardness
  146:1
  147:11

_____

B
_____

back  14:4
  28:2 33:16
  38:21
  39:14 46:7
  59:1 66:22
  67:1,4
  68:17
  69:12 90:8
  96:16
  97:9,15
  98:5 99:7
  101:6
  103:24
  104:7
  106:4
  107:19
  110:2
  111:7,12
  112:11
  114:7,12,
  15 115:16
  116:14
  117:16
  120:4,14
  123:16
  124:20

129:19
134:24
135:14,20
139:7
140:3,11
141:6
142:13
145:7
147:2
150:21
152:19
156:23
161:16,17
164:9,25
165:13
176:13,23
177:12
178:22
180:5,6
181:18
207:10
215:5

back-to-back
127:17

background
17:4,8,25
27:11
31:22
64:8,10
91:18,22,
24 92:20,
21,22 93:6
122:22
128:6
130:2
160:16
164:3,4

179:25
184:25
190:13,25
191:18
196:19
197:5
201:18
203:5
217:24

ballpark
59:9 66:15

banner
173:16

barely
184:20

based  28:20
54:25
55:24
56:22
59:13 60:7
64:6 73:3,
10 74:6
75:20 78:7
93:22
94:4,21
95:21
96:11
97:12,23
102:22
121:8
139:3
146:24
161:8
167:14
187:2,10
209:24
210:8,17

220:5
221:2

basic  12:7

basically
32:10
63:25
86:12
159:23
163:19
172:23
193:20
219:3

basis  45:9
70:11
186:25

BCI  28:10

bear  38:7

begin  10:13

beginning
22:15
73:16
117:15

begun  7:5

behalf  8:5,
15,21 10:1
146:3
150:10
206:14
221:17

belief  105:3

benefit  81:8
201:4

bet  186:4

big  74:11

birth  123:5

bit  8:22
9:22 30:5
105:17
133:23
161:18
163:16
190:10

bits  185:15

blackmail
130:10

blame  209:9

blank  162:7,
14 164:17

blue  94:13

book  43:11,
13,15,21,
23 54:1,2
57:5 74:11
118:16
127:2
128:3
204:4

books  57:10
58:17

bought  191:6

bound  43:11
127:2
128:3

Bowman
71:11,15,
22

Bowman's
 71:20

box  25:16,
 19 26:8
 28:3
 31:10,11,
 17,24
 33:17
 34:2,10
 67:16
 82:21
 95:14
 172:1
 188:2
 190:3,6
 197:23,24
 198:2,18,
 20 199:4,
 8,13,23
 200:1,5
 201:8,10
 210:7,16
 211:4,10
 215:8

boxes  13:25
 18:17
 161:24
 165:24
 168:5
 217:12

Boy  67:7

Brady  175:5

break  105:19
 150:12
 207:9

Bridge  8:11,

13 12:19

briefly  19:5
 21:15 22:9
 27:9 28:8
 33:3
 139:10
 180:8
 184:24
 185:9

bring  80:14
 142:13
 180:5,6

brings  83:5
 163:22
 174:6

broke  100:11

brother
 151:23,24
 153:17
 154:9
 157:13
 159:14
 160:21
 161:4
 182:22
 183:21
 186:17

brother's
 151:17
 184:23

brothers
 151:11

brought
 108:7

building

158:7

built  148:24
 161:22

Bureau  7:10

busiest
 194:1

business
 12:19 13:4
 15:6 19:7
 21:20
 24:23 26:2
 33:14 40:5
 98:19
 127:5
 143:10
 151:17
 152:15
 169:17
 170:11,12,
 20,22,24
 171:11
 175:7
 183:6,7
 184:24
 185:3,8
 194:17
 195:18
 196:13
 197:17
 199:18
 204:6,23
 220:4
 221:12

businesses
 159:5
 170:23

busy  154:1
 194:5
 204:3,9
 205:10

button  186:6

buy  27:25
 157:23
 158:1
 172:21
 191:12
 210:21

buyer  18:8
 25:6 28:5
 130:1
 161:20
 162:7
 163:15
 176:25
 187:10
 188:5
 198:25
 217:19

buyer's
 186:3

buying
 123:15
 187:16
 209:24
 215:10

─────────
C
─────────

call  13:8
 15:17
 32:17
 48:16

127:25
140:10
150:23
168:22,23
175:19,22
176:20
183:11

called 38:19
47:21 71:5
122:16
141:23
180:6
220:11

calling
145:9
220:9

calls 32:24
145:17
176:22
194:6

canceled
33:9,11
122:9
164:11,23

cancelled
33:2,10
122:14

capacity
145:6
220:23

captures
207:25

card 19:7
98:19

care 181:14

career 178:5

careful
72:15 73:7

carries
51:1,13,
21,22
100:2,8
104:12
199:7

carry 19:19,
22,23 28:9
52:15
93:1,7,25
94:14
95:19
158:18
161:15
187:12
189:23
211:9

case 10:11
18:4 42:4
69:3 70:18
76:17
77:22
82:20
86:7,9,11
87:23,24
119:12
137:9
148:4
149:7
201:16
219:10,15

cases 77:4
78:7 88:8

casually
161:11

catching
186:11,12

categories
22:16
156:13,16
179:22

category
45:22
67:12
110:9,19
118:9
119:2,7
120:9,11

caught 209:8

caused
151:22

caveat 80:23

cell 99:2,5
155:8

center 12:25

certification
22:23

certify
206:24

certifying
206:3,7

CFR 9:21
26:14
27:22
29:19
41:13
131:21

CFRS 125:21

challenge
79:7

challenging
84:6

chance 84:22
89:17

change 38:12
39:10
189:18,21

changed
98:6,7
192:20

changing
158:5

characters
162:22,24

charge 92:5
103:17
173:25

chargeable
92:3

charged 45:9
64:16
146:12

charges
90:24

check 13:1
17:4,9
18:1
27:10,11,
14,24 28:4
31:13,22
40:18

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**

48:18 49:2
51:3 79:9
91:18,24
92:20,22
93:6 104:2
107:17
122:6,8
123:10
125:12,18
128:6,22
130:2
132:21
145:7,11
154:22
155:4
164:3,4
165:24
167:24
172:21
176:23,25
190:4,13,
25 191:18
198:18,25
200:25
201:5,18
202:7,10,
16,18
203:5,9
210:11
212:15,16
213:20
214:10,22
215:3,8,
11,16
216:2,3,4,
8,15,16,20
217:1,24

checked
33:19
40:15
42:13
188:2
190:3,6
199:8
201:11
202:23
210:16

checking
95:14

checklist
42:6

checks    23:6
36:5,13,17
48:17
64:8,10,14
91:22
92:21
123:20,23
124:21
128:13
131:3
160:16
173:8
179:25
196:19
197:5
198:19
203:12
213:18
214:5

choose    35:6
86:2,22
89:17
119:17

chooses    76:4

chose    18:9

chronological
114:23

circle    90:8

circuit
10:6,12
88:9,11

circumstance
106:20
210:24

circumstances
80:18
206:13

cite    72:16
82:20
119:10,11,
14,17,22
146:17,23

cited    56:3,7
59:18,22
60:14,16
61:19
65:19,22
68:15 70:2
72:17
73:11
82:5,23
83:1,2,15
85:11 98:1
103:4
104:10
105:14
137:6,12
150:5

city    8:11,
13 12:19
156:21,25
157:10
162:9
179:17,19

civil    7:15
79:18
149:14

clarification
55:5 58:8
129:24
200:22
211:22

clarify
20:10 55:1
75:18
93:20
131:12,15
132:5
195:25

clarifying
97:3

classified
156:15

classify
59:16

cleaner
58:16,18

clear    8:1
9:21,24
19:21 35:7
62:15
71:1,22
72:20 73:3

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023          Index: cleared..completing

99:19
100:4
102:5
109:11,15
132:7
152:14
160:2
209:22
211:12
214:1,2
220:19
221:21

**cleared**  36:9
123:17

**click**
173:18,22
174:19
221:20

**client**  71:13
79:22
84:18

**client's**
74:22
89:17

**clients**
74:25 79:6
80:1
83:14,21,
22 84:3
86:22

**close**  105:23
164:18
187:14
218:14
219:3
220:24

**closed**
164:15
222:2

**closer**  108:4

**closes**  84:2

**closing**  67:2
68:11 81:2
96:24
103:14
177:5
218:12

**co-owner**
8:10,13

**code**  7:16
26:14
27:22
29:19
41:13
162:9
188:11
221:13

**column**
41:13,14,
15,16
67:21
110:6

**columns**
217:17

**comfortable**
79:21
91:23
145:13
149:24

**comfortably**
114:2

**commenced**
7:3

**comment**
52:13
91:22
112:10
133:14

**commented**
78:11

**commenting**
91:23

**comments**
72:20

**commit**  79:11
80:2 86:25

**committed**
56:7 74:22
76:3 79:6
83:14,15
86:5 89:8

**commonly**
12:2

**communicate**
101:23

**communicating**
49:6,9

**communications**
41:8
101:25
102:13

**company**
151:19
185:4

**compare**
60:13
65:16

**compelling**
220:14

**complaint**
88:18

**complete**
113:14,15
114:9,23
118:20
126:14,25
128:4
134:25
135:6
140:4
146:18
161:24
178:21
182:13
202:7
203:8,11
205:1
215:24

**completed**
131:4
154:21
163:14
171:20
172:13
196:25
199:14

**completely**
119:20
138:8

**completing**

215:25

**compliance**
13:7,16
15:19,20
20:21
21:7,13,
15,17 22:1
23:1,12,16
24:3 37:9
44:14
45:13
46:16
47:4,11
50:6,17,19
54:8 56:19
57:15
58:11
59:1,4
61:22
63:19
65:11,23
66:1 68:9
71:10
72:10,24
73:19
75:14
81:17,24
82:12
83:17
95:22
97:9,15
98:6 99:7
101:5
103:13
105:5
109:14,18,
19 134:4,
23 135:23

139:3
145:21,22
146:2
147:3
148:17,22
150:5
154:5
163:9
167:9
177:4
186:10
193:20
196:13
215:3
219:16
220:21

**compliant**
97:24
215:16

**complicated**
174:14

**comply**  64:9
65:12
134:19

**complying**
95:5

**component**
48:20
76:25
103:9

**computer**
20:8 63:4
69:23 70:4
71:3 88:20
117:11
204:21

**computer's**
200:13

**computerize**
48:6

**computerized**
38:15,17,
18 47:1,
15,18
48:3,9,17
58:12,22,
25 59:5
62:16

**conceal**
105:4

**concealed**
19:19,21,
23 28:9
51:1,13,
20,22
52:15
93:1,6,25
94:14
95:19
100:2,8
104:11
158:18
161:15
187:12,25
189:23
190:2
199:6
209:24
210:12,17,
23 211:9

**concede**
85:21

**concept**
78:11

**concern**  20:9
32:9 67:1
78:25
99:20
100:7
105:3
108:11
141:14
204:12

**concerned**
100:1,3,5,
12 103:6
188:18

**concerns**
21:1 94:14
108:2,20
115:13

**conclude**
60:4 64:8
92:8

**concluded**
222:4

**conclusion**
78:4 83:7
87:20
100:10
116:24

**conclusions**
73:19 78:5
82:13
117:4
221:9

**conditioner**

153:2

**conditions**
173:16
174:20

**conduct**
12:18
15:15
20:21,23
21:25
27:24
40:18
52:18
108:20
131:3
172:20
221:11

**conducted**
12:14
16:11 21:8
23:23
28:14 63:9
69:8 75:15
89:8 111:2
148:22

**conducting**
23:12 64:6
76:19
109:19
196:12
198:18

**conference**
96:24
103:15
177:5
220:11

**confidently**

63:16

**confirm** 34:2

**confirmation**
106:16

**confused**
84:24 99:9
174:12,13
176:20

**confusion**
123:4
173:7
178:11

**connected**
219:22

**consensus**
9:6

**consideration**
206:17

**considered**
85:8

**consist** 16:1

**consistent**
156:8

**constituted**
85:14

**constitutes**
88:10

**consult** 86:6

**contact** 19:1
27:12
31:21 99:6
102:6
111:5

142:12,20
153:18
175:18
217:25
218:3

**contacted**
31:14
142:14,16
201:20

**contacting**
27:5 95:20

**contesting**
75:8 79:9
197:17

**continue**
164:10

**continues**
175:2

**contrasting**
120:22

**contributing**
33:6

**control**
24:20
25:10
26:16
29:11
172:22
204:20

**convention**
183:15

**conversation**
19:25 41:1
47:25

50:25
51:5,14,20
53:19,20
62:10
63:10 64:2
84:19 94:4
95:24
97:12
98:14,15
99:10
103:8,9,
12,15,19
106:24
117:6
123:11,13,
24 124:1,
9,11,15,
16,25
125:19
127:16
133:4,15,
18 158:15,
21 189:8,
12,14
191:8
211:2

**conversations**
95:21
102:14
123:8
153:22
154:3
158:24
159:13
160:11
188:17

**cooperative**

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                    Index: copied..correct

| | | | |
|---|---|---|---|
| 56:20 | 20:2,11, | 57:6,22 | 128:11 |
| 147:4,7 | 15,18 | 62:25 | 129:13 |
| 150:4 | 21:10,11, | 64:17,25 | 130:5,18 |
| copied 107:5 | 13 23:2,14 | 65:3,4,7 | 132:16,17 |
| | 24:14 | 66:3,13 | 134:14 |
| copies | 25:7,8,25 | 67:13,17, | 135:25 |
| 53:17,18 | 26:2,3,9, | 24 68:5,8, | 136:6 |
| 154:1 | 10 27:17, | 12,13,17, | 137:18 |
| 166:18 | 18 28:1, | 19,22,23 | 138:19 |
| copy 14:11, | 18,19,21 | 69:19 | 139:5,6, |
| 25 41:21, | 30:25 | 71:10 72:2 | 14,16,17, |
| 25 54:4 | 31:1,4,5, | 90:18,21, | 19,23 |
| 62:11 | 7,8,17,18, | 25 91:11 | 140:14 |
| 63:7,10 | 22,23 | 93:11 95:2 | 141:1,5, |
| 107:3,12 | 32:14,15, | 96:14 | 12,13,16, |
| 126:9 | 19,20,22, | 97:1,4,10, | 17 142:1, |
| 131:5,7 | 23 33:21, | 25 98:21 | 13,22 |
| 154:25 | 22,24 | 100:18 | 143:16,17 |
| 155:5 | 34:5,6,11, | 103:10,18, | 144:2,11, |
| 192:13,15 | 12,23,24 | 24 104:1,4 | 18 145:11, |
| 200:12 | 35:10,11, | 105:2 | 12,18 |
| 212:9,12 | 13,14,17, | 106:13,14, | 146:10,15 |
| 213:11 | 18 36:20, | 18,19 | 147:4 |
| 221:9 | 21 38:2 | 107:16,21 | 148:8 |
| copying 62:4 | 39:17,18 | 110:11,16, | 151:7 |
| 63:20 | 40:23,24 | 20 111:25 | 155:19,20 |
| | 41:3 | 112:12,13, | 156:5 |
| corporate | 43:13,14 | 20,21 | 157:1,2 |
| 151:7 | 44:23,24 | 113:22 | 158:22 |
| corporation | 45:2,7,18, | 115:2,3 | 161:21 |
| 151:9 | 19,22 46:1 | 116:18,22, | 163:6 |
| | 50:9,13 | 23 117:2 | 167:3,7,22 |
| correct | 51:24 | 118:6,12, | 168:2 |
| 15:9,10, | 53:5,6,10, | 18,25 | 169:2,6,7, |
| 23,24 | 13,21,25 | 120:6 | 9,10,11,24 |
| 16:11,12, | 54:3,9,13 | 121:19 | 172:9 |
| 19,20,25 | 55:2 | 124:2,3,5, | 173:20 |
| 17:1,11,22 | 56:24,25 | 6 126:24 | 174:5 |
| 18:10 | | | |

175:7,8,9, 22,23 176:2 177:1 178:14 179:12 180:16,17 181:3 182:2 184:7 185:11,17, 25 189:1 190:5,9,13 192:10 193:3 196:1 197:12,19, 22 198:1, 4,8 199:5, 11,15,16 200:2,3,4, 8 201:11, 16,21 202:5 203:12 206:4,5,7 207:1 208:9,16 209:18,25 210:9 211:16 212:20 214:6,15 215:9,25 216:1,2, 18,22 217:2,4, 13,14,24

**correctable**
137:15
138:14

**corrected**
57:11
94:22
139:22
140:2

**correcting**
138:6
139:12

**correction**
138:10

**corrections**
53:14,15,
17 54:5
69:5
103:22

**correctly**
22:18 58:2
62:3 94:6,
9 115:8
121:25
133:7
186:8
190:8
203:7

**council**
212:10

**counsel**
8:14,19,23
9:18 73:15
78:15
143:22

**counsel's**

214:2

**count**  106:8
107:22,25
181:22

**country**
159:6

**counts**  41:2
94:25
102:24

**couple**  7:22
84:15
128:9
143:21
209:16
211:11
214:20

**court**  9:22
49:8,11
56:13 62:8
67:7 75:19
76:2 77:12
78:19
79:16
82:25 83:2
84:5 86:3,
13 87:3,7
88:16,19
91:3,8
92:14,16
93:2 95:11
98:12
101:18
105:19,21
108:25
109:2
111:3,11

119:25
122:24
123:1
126:5
133:17
142:16
146:21
147:24
149:5,12,
16,25
152:21,24
178:1,3
207:6,11
218:5
221:11

**court's**
84:12

**courts**  77:4,
10,19 88:7

**cousel**
214:20

**cover**  144:5

**covered**
19:13
40:8,12
176:17
182:5

**COVID**
100:16,21

**create**  87:2

**created**  60:6
113:21

**criminal**
17:4 27:11
128:5,6

142:14,17

**critical**
138:4,16

**cross** 37:22
106:6
168:20
195:22
207:13
209:17

**cross-examination**
77:9

**curious**
146:5

**current**
25:21 26:5
43:24,25
47:4
197:25
198:6
214:23
215:23
220:6

**customer**
130:7,8,9,
17 141:22
163:23
165:9
166:3
167:20
191:10
202:7
208:18
209:1,3
215:23
216:7,23

**customer's**
104:22
166:4

**cut** 55:13
63:7
117:8,14
118:1
181:17

**cutting**
117:11

──────────

D

**Dakota** 7:7
13:6
19:21,23
25:24 26:1
28:9,10,
15,17
52:5,6,7
95:16,18,
19 104:11,
12 153:8
157:14
158:1
169:22,23
188:10
189:22
199:6
210:12
211:1

**Dakota's**
52:2

**Dan** 159:21,
22 160:1
194:2

**data** 22:23
71:3 104:1
107:9,13
137:16
213:6

**data-gathering**
81:18

**database**
140:23

**date** 7:5
12:12 16:6
22:4 33:13
36:17
43:19
66:14,18
96:16
99:16
108:17
116:6
118:23
164:12
170:5,6
175:7

**dated** 22:21
39:16,21
44:7 66:6,
12 110:11,
12 115:2

**dates** 22:17
114:12
123:5
135:24

**day** 20:1
31:3 34:5
36:5,13,18
53:20 93:9

103:4
104:23,25
108:10
115:11
123:20,25
124:8
144:17,19
152:13
159:23
163:12
164:11
177:9,16
182:17,18
185:14,22
189:3
204:4,21
205:21
218:2

**days** 23:8
33:14
66:25
96:15,17,
19 112:11,
14,23
114:10,11
116:3,4,12
135:4
140:21
141:4,20,
22 142:7
165:11
175:7
221:14

**de** 77:18
86:3
221:13

**deal** 81:13

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023          Index: dealer..Department

dealer  65:2
  195:7
  197:1

dealer's
  13:14 15:9
  169:4

dealt  157:24

debate  77:1

deceive
  65:18

December
  43:4 44:8,
  15

decide  87:19
  151:23

decided  87:9
  124:13
  158:5

decision
  18:9 35:17
  70:20
  77:16,18
  85:4
  87:11,25
  90:11
  125:6
  129:4
  221:2,3,5

deer  184:18

delay  122:20
  123:3,6
  164:11

delayed
  33:2,11

122:9,14
164:23
165:11
168:6
174:16,23
175:1,11
192:1

deliberate
  74:25

delivered
  24:18

demonstrate
  111:9,15
  120:24

denial  18:5
  21:5 29:21
  34:11,23
  35:4,5
  36:8 89:15
  113:21
  114:11,13,
  14,25
  115:10
  120:18
  121:25
  123:21
  125:5,6,9,
  22 126:2
  129:3,7,9
  130:21
  135:25
  139:25
  140:14
  166:3,5,14
  167:17,24
  193:2,9
  208:1

213:4,6,21
214:17,18,
23,25

denials  23:9
  24:9 31:3,
  6 33:25
  36:7 60:18
  68:4,25
  69:3,9
  108:6,14
  109:12,15
  113:16,17
  114:1,3,6,
  19 115:1,
  9,10,14
  118:12
  119:3,7,
  11,15,21,
  22 120:9,
  12,16,20
  121:2,5,8,
  9,24
  137:16
  139:25
  140:6,11
  166:17
  182:15
  190:12
  192:19,20
  193:4,5,8,
  24 194:9
  202:17,21
  203:3,20,
  21 207:3
  208:8
  211:13
  214:4

denied  33:2,
  7 35:13
  36:6
  122:9,14
  123:15
  129:2
  130:13
  131:4
  136:22
  140:17
  164:11,23
  167:24
  168:5
  173:8
  179:20
  180:2
  181:14
  193:21
  195:14
  201:23
  208:4,15
  214:7,24

denies  34:5
  183:1
  203:12
  208:5

deny  29:16
  108:9,10
  178:13
  182:18
  190:24
  202:3
  217:22

denying
  98:10,12

Department
  7:11

dependent
 59:10

depending
 127:20

depends
 46:10 59:7
 150:16

depositions
 87:8
 149:17

describe
 157:4

describing
 111:20,22

destroyed
 214:4

detail  40:8,
 14,18 41:5
 101:7,11
 144:6
 163:17
 183:22

detailed
 46:20

details
 67:18

determination
 9:14 38:24
 39:3
 70:12,19
 73:23
 75:11 84:1
 85:2 88:14

determinations

 85:20

determine
 74:1,22
 91:19
 92:19
 133:25
 159:14
 162:3

determined
 92:1 221:6

determines
 74:5 80:7

determining
 76:2

devote
 163:12

didn  208:8
 216:16

differentiate
 188:9

differently
 121:3

difficult
 61:18

digit  34:2
 106:17
 107:1
 111:7
 118:1

digit's
 137:5

digits  32:3,
 4,16,18
 107:22,25

108:5
117:1,19
135:5
137:3
139:21
192:15
200:4
207:2

DIO  7:4
 8:14,22,25
 9:4,17,20,
 24 11:18
 16:6 30:5,
 8 37:21
 54:16,21,
 23 55:3,
 12,19 56:4
 70:6,10,
 14,17,23
 73:24
 74:1,5
 76:4,6,7,
 12,23
 77:11,16
 79:17
 80:4,9,23
 81:7
 84:15,22
 86:1,16,22
 87:11,17
 89:3,9,18
 90:1,5,6,8
 105:20,22,
 25 106:4
 129:24
 130:3,6,
 10,13
 131:22

132:4
146:5,19
147:25
148:6
149:22
150:1,11,
18,21
170:14
203:1
205:17
206:15
207:8,10,
12 211:22,
25 212:6
218:8,10
219:5
220:25
221:18,23
222:1

DIO's  75:11
 206:17

direct  11:22
 50:10
 56:23
 112:9
 122:5
 151:4
 183:13
 209:21

direction
 7:10

directions
 136:4

directly
 73:18 80:1
 219:21

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC

Director    7:7
  72:19
  158:20

discharged
  217:19

disclose
  72:16
  82:4,19,23
  92:12,14

disclosed
  23:25
  64:13
  65:14,22
  104:10
  134:16

disclosure
  82:15

discover
  78:23
  134:3

discovered
  167:13

discovery
  84:12
  87:4,7
  89:23
  149:17

discrepancy
  110:7,10,
  20,23,25
  111:20
  116:15
  120:4
  122:3,4

discretion

191:15

discuss    18:3
  26:21
  28:23
  35:19  98:4
  106:20
  124:22
  153:13

discussed
  11:11,18
  21:25
  40:16  41:8
  84:18
  93:24
  96:23
  105:12
  132:18
  134:17
  167:14
  212:10
  218:16
  219:13

discusses
  182:7

discussing
  96:10
  132:25
  152:16

discussion
  19:18
  47:8,11,
  18,24
  48:15,19
  52:16,20
  62:1,2
  83:22  88:3

93:13,15
  94:2,11,
  12,15,16,
  20,21
  101:9,13
  102:16
  105:10,14,
  15  106:25
  123:9
  134:21
  153:8,11
  166:8
  189:17

discussions
  46:11
  52:24
  97:18
  147:16

disgruntled
  190:24,25
  191:5

dishonorably
  217:19

dislose   82:5

dispose
  140:20

disposed
  57:4,10

disposition
  22:3  23:24
  29:11  57:4
  59:19,23
  146:14,24
  154:14

dispositions

57:19
  58:1,3
  64:23
  65:21
  156:2

disputed
  85:10

disputing
  202:2

disregard
  85:18
  172:24
  220:16

disregarded
  10:9  75:1

distinguished
  85:14

district
  221:11

Division    7:8
  8:14,19
  9:18  79:18
  149:14

document
  21:3  26:20
  31:21  39:5
  42:4,19
  43:6
  57:15,17
  74:14,19
  85:4  88:2
  102:8,10
  120:10
  121:14
  124:21

132:8,13
139:4
140:5
143:21
165:23
182:15
200:24

**documentation**
75:16
101:22
125:14

**documented**
69:9 140:8

**documenting**
81:25
88:14
121:7
181:2
192:19

**documents**
11:14
17:16
18:11
19:12 38:8
42:18 81:9
88:2
130:15
132:9
212:10
221:21

**DOJ** 79:18
149:14

**door** 104:22
210:22

**double-check**

181:18

**doubt** 196:6
209:5

**draft**
118:17,21

**draw** 73:19
78:4,5
100:10
117:4

**drew** 108:11

**Drezner**
79:19
149:14,16

**driver's**
25:20,23
164:2
197:21
198:3,7
216:4

**dry** 137:9

**due** 20:25
34:2

**duplicate**
109:11
116:17,18,
19 120:15

**duplicated**
111:10,14,
15 115:19
118:4,8
120:24

**duplicating**
111:8

**duties** 72:9
82:11

**duty** 82:8,
9,22 83:16

─────────────
         E
─────────────

**E-CHECK**
48:21
49:3,5,10
62:4,12,
16,25
63:3,11,21
64:3,7
82:16
107:4,6,13
122:10,12
135:12
173:14
211:23,24
212:3
213:2

**E-CHECKS**
122:15

**e-nics**
132:13,21

**earlier**
93:11
100:16
146:9
155:25
164:20
210:3

**earliest**
164:18

**early** 64:20

100:20
114:20
167:10

**easier**
58:14,18
66:16 87:3
193:7

**easy** 61:2
168:16

**edit** 53:5,
25 68:17
69:12
135:14
136:3
137:17
138:5,17

**edited** 68:21
134:24

**edition** 44:9
74:19

**educate**
83:23

**education**
98:16
99:18
127:24

**effect** 74:16

**efficiently**
60:24

**effort** 64:9
65:12,18
120:8
121:6

**electronic**

48:17 49:1
61:24 64:1
92:20,21,
22 154:18
163:16
164:21,25
211:19
212:23
213:7,15

element  83:5

elicit  85:7

eliminate
138:25

else's
184:12

email  19:8
98:21
99:2,5
127:25
186:13

employee
23:20
71:19
180:20

employees
79:17
98:8,16
160:8
168:9
180:17

end  18:25
37:9 81:5
114:13
117:16
164:5

177:12
191:13
197:1

enforcement
142:14,17

enrolls
131:8

enter  63:3
71:3
163:21
173:19

entered
31:25
67:17
165:3

Enterprise
26:2 36:24

Enterprises
11:13
12:19 15:8
16:25
20:15,21
21:4,10
25:13
27:3,24
29:6
113:19

entertain
85:23

entire
163:12
188:22

entity  21:20
151:7

entries
29:21

entry  29:7,
21 121:7,
8,11

equally  88:8

error  59:18
67:16 83:9
85:9,15
97:14
107:20
118:6
121:16
137:2,14
139:17
186:6
188:4
200:13,14
206:9,12

errors  57:1
60:14,15
65:7 68:15
85:12,16
88:14
134:10
139:5
206:11
219:11,18,
24,25
220:3,19

essential
191:25

establish
10:8 85:19

established
150:2,3

etrace  63:8

evaluated
85:8

evaluating
72:4

event  87:17,
18,19
221:6

everyone's
128:1

evidence
7:20 8:15
9:25 10:3
11:16
36:23
75:16,23
76:1 81:21
86:17
88:10
111:16
116:21
118:4,7
120:10,25
121:4
134:7,9
182:14
220:15,18

evidenced
26:8

exact  43:9
90:20
133:11

EXAMINATION
11:22
37:22

106:6
139:8
143:19
151:4
168:20
183:13
195:22
207:13
209:14
215:20
217:7

examined
57:17

examining
66:22

Excel  113:4

exception
11:15
172:22

excuse  38:23
47:5
119:22
146:19

exemplifying
63:12

exempt  51:24
52:12
91:14
210:8

exemption
28:6 93:23
152:17

exhibit
10:14,16,
17,19,21,

22,24
11:1,4,5,
8,10,15
14:14,17,
21 17:7,16
18:11,15
21:2 22:6
23:4,11
24:5 25:2,
3 26:21
28:2,11
30:3,15,
18,19,21,
23 31:2,9
32:9
33:16,17
34:1,7
36:16
37:7,12
39:14,15,
21 40:3
41:10,11
42:14,17,
18 43:1,6,
7,10 44:5
53:4 56:2
62:24
66:5,11
67:11 68:1
74:10,13
90:16
96:12
108:22,24
109:25
110:1,2,14
111:19
112:25
113:1,2,

12,25
114:21
116:14
118:10,14,
16,24
126:8,23
127:13
128:16
131:2
132:7
135:24
141:19
142:24
143:6,12,
25 160:23
162:7
164:16
169:9
173:2,4
176:7
197:10
199:22
201:9
203:7
207:17,21
208:2
217:10

exhibited
55:25

exhibits
9:6,7,8,
13,15,16
10:14
11:12
16:14
62:20
66:17 70:2

75:25
83:24
85:11
86:20
89:10
132:6,9
164:16

exist  111:5
115:25
119:8

existed
69:13

exists
220:18

expectations
87:21

experience
59:3 78:13
123:3
166:21
194:7

explain  44:4
68:25
84:22
86:18
158:21
163:16,17
200:10
205:16
208:20
219:3

explained
14:23
83:16
101:10

159:16,22
175:10
184:23

explaining
42:12

explains
182:10

explanation
35:22
117:22,25
142:6

explanations
84:24

explosive
16:2

explosives
7:11 12:9
16:9

expound   64:4

expressly
125:11

extent   71:20
72:5
120:19
121:17,23
148:9

─────────────

F

─────────────

fabrication
151:21
185:5

face-to-face
180:15

fact   26:1
31:21
36:24
58:24
84:25 85:1
87:20
137:2
150:3
157:22
182:8
186:2
187:10
197:10,17
219:7,16,
19

factor
122:23,25

factors
22:16 33:8
85:8,14
219:12,15,
19

facts   78:11
86:15
91:17
102:23

factual
76:25
92:18
106:20
111:21

factually
92:1

fail   148:1

failed   29:7,
8 119:10,

14,21
121:7

failing
118:11

failure   24:9
29:14,15
136:6
146:17

failures
24:8

fair   172:15
175:20,24
176:24
178:8
197:7
198:16
199:20
206:21
207:5
216:6

faith   64:9

fall   135:4

false   29:7

falsified
111:16
116:21
118:4,7
120:11,25
121:5,16

familiar
30:21
70:19
74:14,19
80:10,11,
12 88:6,8

106:10
122:10,18,
19 126:10
128:17,18
142:2,3,4
144:16,22
145:15
164:22

familiarizatio
n   161:8

familiarizing
15:4
143:9,14
144:10
169:16

family
188:23

Fargo   7:6
9:3 12:3
109:8
157:1

fashion
60:11

Fastbound
47:22 48:2
153:25
154:4,6,
10,13,23
155:6,7
156:9
161:17,22
162:6,10
163:7,14,
19 164:9
166:10
185:24

186:5
188:4,8,
11,12
212:23
213:7,14
217:10,11,
20,23
218:4

fault  200:14

FBI  17:25
18:9 23:7
27:19
31:20
33:12
35:17
112:19
131:13,16,
17,24
132:8
140:19
141:21,24
164:4,6
165:14
191:1
193:15

FBI's  165:12

February
20:24 21:8
49:17
50:7,18
54:9 65:24
95:23
97:15
103:14
112:18
114:14,16
132:19

145:20
147:3,23
167:9
170:4
177:3

Fed  10:11

federal  7:17
10:7,23,25
11:2,4
13:10,19,
24 14:5,12
15:8 16:3,
23 21:18
26:13
27:21,23
29:18,20
32:6 34:19
39:16
41:19,21
42:9,22,24
43:1,3
46:6 79:16
84:5 85:5
86:3,4
88:16,18
126:9,14,
23 127:14
128:4
131:20
140:20
142:24
147:24
149:5,12
160:22
173:3
176:9
221:11

feed  188:23

feel  64:8
79:21
91:23
97:17
109:6
134:18
147:13
220:5

feeling
146:6

feet  129:12

felon  179:22
216:24
217:18

felons
179:19

FFL  12:24
13:22
25:22,23
26:8 28:20
34:14 36:9
38:9 46:13
47:13 50:4
77:25 92:1
125:5
126:20
128:11,15
129:13,17
131:5
137:17
145:6,9,16
151:14,15,
18,23
152:1
154:5

155:25
157:5
166:21
168:8
174:23
182:5
184:8,10,
12 186:18
194:8

FFL's  32:6
101:22
131:2
144:17
150:22

FFLS  13:2
59:4 60:13
127:3
131:3
150:4
157:9

field  7:8
8:19 107:9

figure  108:4
116:16
119:20
120:5,9,22
165:7

file  21:23
38:11,13,
14,15 42:3
66:10
102:8
111:12
164:14,15
181:13,21
203:15

221:10

**filed** 79:16
84:5,10
88:16,18
90:5

**fill** 140:4
162:8,13,
18,19
163:23,25
167:25
186:2
211:4
213:6,17
216:4

**filled**
22:12,13,
17,19,23
69:23
161:24
163:9
164:5
184:6
186:7
197:1
202:10

**filling**
155:3
163:12
164:10
184:16
202:16
217:23

**fills** 161:20
211:15
212:20
214:9

**filtered**
114:5

**final** 66:2
77:16
78:23
90:11
135:23
221:2,7,
10,15

**find** 36:23
44:16 57:1
97:13
99:15
104:6
109:23
112:4
115:20
117:22
118:3,4,7
138:17
139:5
145:11
150:1
163:20
182:14
186:9

**finding**
91:21
120:12

**findings**
82:12
87:20
121:1
148:2
221:9

**finds** 83:20

**fine** 7:15,
21 78:5
105:24
221:8,25

**finish** 216:5

**finished**
66:1 68:9
214:14

**firearm**
13:24 14:6
21:18
22:22
24:18
25:12
27:4,13,25
30:4 33:7,
13,15 36:2
41:19 43:3
54:3 57:4,
7,8 136:24
142:15
156:15
169:17
175:6,25
176:3
190:16
197:16
198:17

**firearm's**
53:16
104:2

**firearms**
7:11 12:9
13:10,20
14:12
15:6,8

16:3 22:2,
7,11 23:23
25:4
27:15,23
29:20
30:10
39:16
41:21
42:22,24
43:1 46:6
58:3
64:23,25
111:7
126:9,14,
24 127:14
128:4
137:4
142:24
143:10
156:13
160:22
173:3
176:9
196:19
209:24
221:8

**fit** 185:2

**fix** 52:21
53:1
104:14,18
135:14,20
138:17
146:13
205:18

**fixable**
138:15

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023                              Index: fixed..forms

**fixed** 36:10
135:7

**flag** 217:25
218:3

**flagged**
218:3

**flight** 88:12

**floor** 81:5
185:6

**Florida**
180:13

**Fluker** 11:6
20:3,6
24:25
25:5,7,9,
13,15,18
26:4,16
27:8
28:12,18
41:2 44:22
53:21,23
64:18 65:8
90:17,19
91:6,10,
19,24
92:19,23
93:9,14,16
94:25
95:1,24
96:3,13,
20,23
102:23
103:16,24
104:6,15,
16 105:2,4
133:24

134:5
142:10,12,
20 152:7,
11 158:16,
17,21
161:10
163:4
166:20,22
167:1,3
168:10
171:14
177:17
183:24
185:9,10,
12 186:18
187:19
188:17,25
190:1
194:13,16
197:11,18
210:15,20
215:7
216:13,17
220:10

**focus** 7:19
108:1
152:6

**focused**
119:20

**folder**
166:17
181:13
193:4
214:25

**folks** 126:20

**follow** 154:9

204:24
209:3
217:9

**follow-up**
16:3 64:5
132:11
139:10
153:18
215:22

**follow-ups**
143:21

**following-up**
214:2

**foresee**
151:24

**form** 7:16,
18 10:23,
25 11:2,6,
8 13:23,24
14:4,6,9,
12,15
22:7,10
25:4,6,12,
16,19
26:11
28:3,16,21
30:4,20,23
34:10
35:4,10
37:13,16
43:7,11
44:8 53:3,
12,14,15,
23,24 54:6
62:5 63:12
69:1,2,6,

9,19 70:3
72:12
89:11 93:5
103:4,22
104:1,4
105:10
110:25
111:17
116:25
119:21
121:19
122:13
124:10
134:24
135:7,16
136:5,7
137:17,20
138:5,6,10
140:1
144:25
164:17,22
165:2,25
169:8,11,
13 172:7,8
185:17
186:7
192:21
197:23
198:5,11
199:17
205:2
206:3,24
211:16
216:7
218:24

**forms** 18:17,
21,23
60:16

89:16
108:9,10
111:13
115:10
120:18
138:16,20
140:4,14
154:16
166:10,14
168:3,4
172:13
205:1,2
209:11
218:21
219:2

forward  50:6
54:7 95:22
114:1
134:19

foul-based
65:18

found  24:2
60:15
61:20
64:11
65:14,20
66:11 71:4
73:12,13
75:21
76:12
77:4,10
82:4,19
89:8 99:14
105:12
111:8,14,
23 116:20,
21 120:24

134:11,16
146:9
147:17
192:17

four-hour
144:7

frankly
74:18
219:7

free  109:6

frequently
78:16,18

front  63:9
86:3 184:4
185:7
204:20
207:17

full  8:6,16
10:15
41:21
113:10
126:23
141:11
144:6
150:24
170:7
182:19

full-service
157:5,9

fully  97:24
147:4
154:18
180:22

function
136:17

200:13

future  8:23
69:4,8
71:1
168:10
173:11
175:20
176:12
194:14
205:16

_____

G
_____

gather  77:13

gathering
81:21

gave  34:9
65:19
98:19
100:14
105:9
117:25
136:4
161:1
201:23

GCA  131:23

general  15:2
51:6 59:3
64:7
127:18
138:13
143:7,13
144:2,3
163:6
169:14
186:20

194:8

generally
52:17 61:2
94:14

generate
113:8

generated
66:18 68:3
69:24
84:17
113:7
141:10
165:21

generates
155:16

gentleman
91:10

genuine
65:12

Georgia  12:8
25:17,20,
22 26:5
28:13
52:11
91:11
93:1,6
171:25
176:1,4
185:16,18
197:18,25
198:3,6,7,
12 199:14
216:14

Georgia's
91:14

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023                    Index: give..guidebook

give  8:6,16
18:7 25:23
35:16 42:1
52:13
59:7,9
69:17
86:12
104:9
113:8
125:2,5
126:12,14,
22 127:18,
25 128:2,3
131:5,7,17
143:4
154:6
162:10
167:17
171:20
175:1,6
176:25
181:6
185:21
188:12
193:15,22
205:4
218:14

giving  25:22
68:18
128:10
198:7
204:11,14

glad  75:12

Glencoe  12:8

good  9:12
37:24,25
39:13 54:7

55:16
59:11
60:21 61:4
64:9
69:14,17
72:6 73:9
99:20
105:17,22
116:2
138:10
152:1
162:4

Goods  10:11

Google
161:12

governing
15:5
143:9,15
169:17

government
9:20 43:1,
7 62:21
85:13,15,
21 87:5,6,
22,23
88:12
89:19

government's
14:14,17
16:14
17:7,16
18:11 22:6
24:5 25:2,
3 26:20
28:2,11
30:2,15,

18,19,23
31:9 32:9
33:17 34:7
37:6,12
39:14,15
56:2 62:20
66:5 67:25
75:25 85:6
90:16
96:12
108:22
110:2,14
113:1,2
118:10
141:18
143:12
164:16
197:10
201:9
203:7
207:17
208:2

Governments
30:3 33:16
143:6

granted  7:19

green  43:15

guarded
147:14
148:11

guess  48:7
52:23
54:16 55:5
58:23 61:9
63:24,25
64:12

65:16 74:4
78:25
80:23
81:13
91:23
120:15,20
124:22
137:6
148:1,21
150:16
151:24
155:1,15
157:21,24,
25 158:8
159:2,20,
21 180:4
181:14
182:21
186:23
206:22
216:12
218:10

guessing
189:16

guidance
75:6 81:9
88:2

guide  41:19,
22 42:23,
25 43:4,9
44:3 127:2
142:25
160:22
161:2

guidebook
44:19

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023          Index: guise..Harris

guise  146:13

gun  11:6,8
 16:24
 24:20
 25:6,9
 26:16
 28:14,17
 29:11,22
 50:23
 92:1,2
 104:6
 123:15
 136:8
 142:13,21
 146:10,13
 151:25
 161:15
 163:20
 165:10
 172:21,22
 179:7
 180:5,15
 184:10,14,
 17 191:12
 194:20
 195:17
 198:8,13
 204:4,23
 205:5
 218:2

guns  27:17
 58:17
 95:10
 158:1
 191:6
 199:21
 204:11,14

gunsmith
 57:7

gunsmithing
 146:10,13

guy  125:22
 190:20

guys  135:13
 136:2
 138:4
 154:1
 190:25
 194:20
 205:16
 206:15

——————————

          H

——————————

H-A-R-R-I-S
 8:9

habit  211:1,
 3

half  152:13

hand  118:15
 126:18
 127:2
 128:13
 136:4
 155:4
 163:23

handbook
 154:8

handgun
 50:23
 51:8,23
 52:24

91:14
93:22
95:1,15
97:3 99:17
102:1
152:17,22,
 23 153:8,
 12 157:14,
 23 158:18
167:5
187:2,10,
 15 189:19
194:19
195:6
210:18,21

handguns
 51:17 94:7
 95:7,9
 97:21 98:3
 156:14,20,
 21,24
 157:21,24
 158:7
 159:10
 160:4,9
 186:21
 187:17

handle  100:8
 154:16
 155:7,10
 159:3
 167:11,16

handled
 134:18

handles
 194:12

Hans  7:7

happen
 84:16,17
 117:24
 121:15
 140:7
 180:10
 181:12
 195:8
 199:10
 205:15,20,
 22,24

happened
 36:3
 84:21,22,
 23 103:10
 114:11
 117:5
 145:8
 158:22
 178:16
 189:25
 192:18
 195:10
 202:15
 205:18
 214:8
 218:17,18

hard  140:4
 152:18
 178:5
 190:18
 212:9,11

hardbound
 58:17

Harris  8:8

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023          Index: head..Hhere's

| | | | |
|---|---|---|---|
| 11:13 | 127:13 | **headed** 70:13 | **hearings** |
| 37:19,21, | 130:1,5,8, | | 78:19 88:5 |
| 23 38:23, | 14,24 | **heading** 70:7 | |
| 25 39:7 | 131:9 | **hear** 10:4 | **heart** 190:18 |
| 43:22 | 132:10 | 11:20 | **helpful** 76:6 |
| 49:12,16, | 133:22 | 84:21 | 80:5,6 |
| 18,21,25 | 139:12 | 87:5,6 | 90:6 |
| 54:20,22, | 141:18 | 90:2 | **helping** |
| 24 55:10, | 142:23 | 100:25 | 177:22 |
| 16,23 | 143:20 | 111:3 | |
| 56:10,12, | 146:8,12 | 203:25 | **hesitant** |
| 17 62:14 | 147:1 | 219:8 | 148:11 |
| 67:10 | 148:5,9,20 | **heard** 56:13 | **hey** 44:15 |
| 70:9,11, | 149:2,20 | 91:3 | 47:13 |
| 15,22,24, | 150:8,13, | 122:16 | 51:15 |
| 25 73:22 | 23 151:5 | 133:11 | 68:25 |
| 74:8,9,21 | 153:4 | 155:25 | 69:12 73:1 |
| 75:12 | 163:2 | 219:10 | 79:8,11 |
| 76:11,22, | 166:19 | | 84:22 |
| 25 77:15 | 169:20 | **hearing** 7:4, | 86:18 87:5 |
| 78:2 80:20 | 171:16 | 9,13,14, | 99:8 |
| 81:6,12,15 | 176:21 | 19,20 | 101:7,10 |
| 83:4,12 | 180:8 | 10:14,17, | 102:6 |
| 85:3,25 | 183:11,14 | 18 74:7 | 104:6 |
| 88:4,8,15 | 187:23 | 76:5 77:12 | 124:17,25 |
| 89:25 | 209:15 | 78:16 | 127:4,16, |
| 90:13 91:9 | 211:24 | 79:3,4 | 17 129:9 |
| 92:17 93:8 | 212:3,7,8 | 84:9 85:12 | 133:6,12 |
| 95:13 | 217:8,16 | 86:2,14 | 135:13 |
| 98:17 | 218:7 | 87:14,23 | 136:2 |
| 101:20 | 219:7 | 88:2 90:4, | 138:4,7,14 |
| 105:24 | 221:20,25 | 6 93:3 | 145:10 |
| 106:7 | | 117:22 | 165:9 |
| 109:3,6,10 | **head** 8:3 | 143:25 | 168:14 |
| 111:18 | 61:9 | 149:18 | 195:5 |
| 120:2 | 123:22 | 218:14 | 218:4 |
| 123:2 | 186:11,16 | 221:3,13 | **Hhere's** |
| 126:7 | 201:25 | 222:2 | 208:21 |
| | 202:14 | | |

hid   60:19

hide   100:6
  105:4,16

hiding
  147:18

highest
  159:7

highlight
  126:25

highlighted
  143:6

hip   145:3

history   38:9
  151:13

hit   186:6

hold   47:19

holders
  152:17,22

home   195:7

homework
  115:18
  127:18
  143:5

honest
  188:24
  195:17

honestly
  135:11
  194:1

honoring
  72:9

hour   31:7

94:18
127:20
156:25
165:10

hours   42:11
  94:18
  127:20
  128:9
  190:20

how-to   47:10

huge   178:6
  204:12

human   49:2,
  6,9 83:9
  85:15
  88:22
  168:16
  200:13,14
  220:2

humans   88:24

Hummel   7:4,7
  8:14,22,25
  9:4,17
  11:18 16:6
  30:5,8
  37:21
  54:16,21,
  23 55:3,
  12,19
  70:6,10,
  14,17,23
  73:24
  76:6,7,12,
  23 77:11,
  16 80:4,9,
  23 81:7

87:17
90:6,8
105:20,22,
25 106:4
129:24
130:3,6,13
131:22
132:4
146:5,19
147:25
148:6
149:22
150:1,11,
18,21
158:20,23
170:14
203:1
207:8,10,
12 211:22,
25 212:6
218:8,10
219:5
220:25
221:18,23
222:1

Hummel's
  72:19

hunch   151:25

hundred
  64:21
  65:6,21
  107:20
  142:25
  156:3
  168:11
  171:7
  187:7

hundreds
  134:13
  196:21,22,
  23,25
  197:5,6
  198:19
  209:18,23

_____

          I

_____

idea   44:12
  116:13
  135:11
  191:21

identifiable
  33:5

identification
  22:14,20
  25:18 27:6
  141:24

identified
  57:8 73:21
  83:8

identify
  61:17

identity
  123:5

imagine
  49:6,8

immediately
  208:16

impact   15:13
  73:25
  136:7
  137:3,21,

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**

24 148:14,
17,19,25
149:9
219:21

impacted
61:7

impacting
100:22

imperative
140:18

implemented
219:24
220:22

importance
181:24
201:2

important
69:8 78:15
174:3
182:8,10
200:23
205:16
216:25

importation
29:9

impose  7:15

impossible
178:9

improper
147:20

in-state
210:18

in-store
194:18

inadvertence
85:15

inadvertent
82:14,18
83:9

inappropriate
132:21
147:20
161:10

incidences
45:16
143:24
152:7
194:13

incident
41:2,3
44:22,25
67:13,23
68:2 91:18
95:25
96:4,20
99:12
106:9,16
111:25
132:18

incidents
45:8

include
17:20
82:9,12
83:10
114:18,20
125:18
126:23
187:16
197:3

included
38:12
90:10
114:3
124:12

includes
19:8
22:14,20
67:12,15
156:20

including
120:18
219:19

income
152:21

incomplete
136:10
200:10

incorporation
13:6

incorrect
67:19
111:1
135:17
137:20
181:8
202:20

incorrectly
111:17
116:25

indicating
18:18
25:21 26:4
100:4
198:5

218:22

indication
53:8
185:21
219:22

indicators
61:17
220:2

indifference
75:1 85:17
220:16

indifferent
10:10

individual
36:18 40:9
65:10
125:6
133:24
136:19
154:22
211:12

individually
41:24
51:25

individuals
91:23
131:4
134:5

indulge
78:20

industry  7:8
9:2 12:1,
15 74:17
100:22
137:4

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC

influx
  170:12

informal
  7:14

information
  14:23,25
  17:25 19:1
  22:20 23:6
  29:25
  31:24 32:5
  33:6,21,23
  34:18
  35:16
  53:24 55:9
  56:3 58:8
  62:19,23,
  24 63:4,8,
  11,20
  65:15 70:1
  74:6 77:14
  79:1 80:5,
  6 93:4,5
  104:11,19
  113:9
  115:20
  121:19
  122:21
  123:17
  124:12
  125:12
  128:2
  129:18
  130:19
  131:1,7,
  18,19
  134:3
  135:17

136:2,23
137:20
138:9
140:17,18,
20 141:3,
22,25
154:23
155:2
162:11
163:15
164:3
167:10
168:1
173:19
175:18
182:5,10
184:3
185:17
187:21
199:14
206:4,7
211:18
212:20,22
216:7,21
217:1
221:1,2

information's
  57:21

initial
  18:16
  34:3,8
  35:3,9,12
  89:14,15
  122:21
  132:15
  153:21
  157:13

158:10
160:20
165:2,23
167:25
181:3,5
214:6
218:24
219:18

initially
  33:18
  109:14
  113:21
  155:18
  165:14
  201:10,13

initials
  14:2

initiate
  202:6

initiated
  23:7 66:24

input   70:1
  155:2

inputs
  102:21

inquiries
  68:3

inquiry
  79:14,15,
  25 90:3
  111:4
  149:11

insinuate
  197:21

insinuating
  202:11

inspect
  38:22
  39:11

inspected
  156:4

inspecting
  81:24

inspection
  12:18,22,
  23 13:11,
  13,16,17
  15:7 16:19
  17:2 18:25
  20:7,14,
  19,21,23
  21:7,10,
  13,16,17
  22:1,3
  23:2,12,16
  24:3,14
  36:23 37:9
  39:19
  40:9,20
  41:23 42:2
  44:13,14
  45:5,11,
  13,17,21
  46:4,14,
  16,21,24
  47:4,6,8,
  11,21
  48:10
  49:14
  50:1,7,11,
  17,20,21

52:10
54:8,14,
21,24
56:9,14,
15,19
57:15
58:10,11
61:22
63:19
64:13,22
65:11,23
66:1,24
68:10
71:10,14,
21 72:11,
24 73:10,
19 75:15
78:4
81:17,24
82:12
83:17 84:3
89:8 92:10
93:11 94:3
95:22
97:9,15,23
98:6 99:8
101:4,5
103:14
105:6
108:15,20
109:14,18,
20 124:20
125:9
126:13
131:10
132:15
134:4,23
135:23

139:4
145:21,23
146:2,14
147:4
148:17,22
149:10
150:5
152:3
153:19,21
158:10
160:20
167:9
169:5
171:6
177:4,10
179:4
183:19
189:4,9
193:20
219:17,18

**inspections**
12:14
15:13,15,
19,20,25
16:2,9
21:12
58:19
59:4,25
60:14
65:17
73:5,6
76:19
100:17

**instance**
13:5 19:20
46:13
48:11

67:18
75:20
114:14
138:21
141:19
146:24
162:20
166:20
172:6
210:20

**instances**
29:13,16
64:16
90:15
109:12
134:11,13
194:12

**Instant** 17:4
27:11
128:5,6

**instantly**
154:11
165:21

**instruct**
68:14
69:5,11,
15,18
135:13,15

**instructed**
142:12
205:2

**instruction**
104:9
160:6
199:17
215:1

**instructions**
35:9 53:4,
7,9,12
68:18,20
69:3 89:13
134:19
165:22
174:24
203:23
209:11

**integrate**
154:18

**intent** 121:4

**intentional**
121:16
220:15

**Inter** 75:13

**interact**
144:19

**interacting**
46:19
88:24

**interaction**
46:12
88:22
163:13

**interactions**
21:22

**interest**
29:8
151:14

**interested**
77:10

**interject**

73:22

**internal**
75:5
76:17,18
81:8 83:13
84:4,6,16
86:15,23
88:2

**interrogatorie
s** 87:8
149:17

**interview**
68:11

**introduce**
8:5,16
10:13
11:24

**introduced**
23:18
131:13
207:18

**introducing**
132:6

**introduction**
151:6

**introductory**
154:12

**invalid**
141:16

**inventory**
22:1 23:23
56:23 57:2
58:6 59:21
60:2 72:6
82:3 83:18

**invest** 163:8

**investigate**
91:13

**investigating**
111:24
112:17

**investigation**
91:17,25
92:18
102:22
111:21
120:20
134:4

**investigative**
121:21

**investigator**
9:2 12:2,
16 13:18
14:22
16:23 21:9
131:19

**involve**
53:23
187:1
209:23

**involved**
77:19
85:22 94:1
101:2
134:5,8
152:2
166:3
209:21
210:6

**involvement**

71:21 83:6
101:3
166:20

**involving**
68:3
90:17,23,
24 94:25
183:23
186:21

**IO** 89:3

**IOI** 8:21
11:21
12:2,7,15,
25 13:18
14:3,19,22
37:24
39:20,23
40:8,17
42:6,12
45:17 46:7
58:14,18
59:3 63:18
71:11,14,
15,20
73:18
74:3,10
75:19 77:9
78:22
79:17
80:14
81:16,24
82:11
83:6,10,16
84:25
88:13
90:14
91:13

101:6,13,
25 106:8
111:1,12
136:13
137:25
138:12,13
139:2
144:13
145:6,14
152:3,9
153:18,22
154:3
156:1
158:9,15
159:11,15
160:3,6,
11,21
164:20
166:8
167:10,14
169:4,21
176:21
177:4
181:1
183:19
187:5
189:4,17
207:18,24

**IOI's** 39:4

**IOIS** 75:5
78:7

**IOM** 75:13
78:21

**Iowa** 211:3

**ipad** 161:20
163:22

164:5
186:2
211:16,18
212:1,19
213:17
215:24
216:13

**irrelevant**
85:1 87:15
148:13

**irritated**
195:14

**isolated**
134:13
194:13

**issuance**
7:18

**issue** 36:10
67:3 72:5
73:20
75:16,22
77:3,4
78:12 79:5
81:21 87:1
89:7 97:3
99:13,23
101:5
103:13
104:23
110:20
121:17,20
123:6
129:10
135:2
137:9
138:3

140:11
152:17
153:12
192:19
195:14

**issued** 7:16,
22 15:8
19:22
20:14
21:19
24:13
28:9,12,17
54:21
66:15
71:18
76:20
90:10
112:5,20
118:23
172:2
190:12

**issues** 7:22
39:3 40:9
64:12
88:9,12
98:9 99:16
106:15
152:10
160:12
183:22,23
190:1

**item** 22:15
54:5 62:5,
12 68:1
95:20
110:20
111:1

**itemization**
42:5

**items** 42:7

------

**J**

**Jacob** 8:21
9:1 11:21
12:1
158:23
182:19

**Jake** 171:5
192:17
193:6

**James** 88:9

**Jenny** 219:9

**Joann** 14:19,
22 39:21
50:14
102:4,16,
19

**Joann's**
41:24

**job** 58:14
72:16,23
73:18
75:19
81:17,23
83:10,23
137:25
139:2,4
144:17,20
162:4

**John** 8:8

**judge** 9:25

71:1 86:4,
6,11,13
87:3

**judges** 87:4

**July** 10:18

**jumping**
95:21

**June** 141:3,
7

**jurisdiction**
167:5

**Justice** 7:12

------

**K**

**keeping**
18:12
46:24 60:5
72:6,7
73:3,4
153:23

**key** 127:1
128:14

**keyboard**
155:4

**keyed** 62:24

**kick** 186:5,
6

**kicked**
115:12

**kind** 47:13,
19 50:3
73:8 88:17
94:17

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023                    Index: knew..length

101:22
112:3
115:22
121:1
134:10
151:24
154:2
158:25
159:2
170:12
174:20
179:18
188:7
191:8
194:5
198:13
199:12
219:22
220:23

knew  10:8
24:21 48:7
51:16 57:9
58:24
86:10
109:11
119:3,9
132:20
133:2
147:22
148:25
149:6
157:19
173:7
179:9
182:21
191:15,16
201:17
204:3

206:19

knowing  83:9
141:10
144:23
206:1
220:20

knowledge
51:11 72:5
73:9 87:12
92:25
104:17
115:25
135:3,8
153:15
166:23,25
173:25
178:16
179:3
188:24
198:9

knowledgeable
188:21

────────────
        L
────────────

lack  188:24
198:9

language
127:15
143:25

laptop  70:3

lasted  15:22

late  59:19,
22 100:21
146:24

latest  74:19

law  13:7
26:13
27:21
29:18 32:6
34:19 51:7
65:13
72:25 75:1
79:10
86:7,9,12
93:21
94:6,9,23
95:5
97:20,24
100:11,14
102:25
140:20
145:10,15
152:6
153:14
159:15
172:24
175:5
189:19
204:9
214:21
220:3

lawful  190:7

laws  15:5
21:18
73:4,9
143:9,15
144:2,10,
17,19,22
169:16

lawsuit
79:15,22

84:5,9,10
88:16
89:23 90:5
147:24
148:13
149:5,12

lawsuits
85:6

learned
177:20
206:2

leave  19:12
117:15
150:7
218:11

leaves  80:21

led  60:4

left  14:1
86:21
152:15
161:5

left-hand
41:12

legal  10:8,
10 16:24
72:9,13
76:9,21,23

legally
33:15
201:3

legitimately
100:7,12

length  94:19

lengthy
  94:16
  176:14

letter  220:9

level  40:8
  51:10
  52:14
  72:25  88:6
  220:18

liaison
  112:4

license
  7:15,21
  13:10,14
  15:9
  20:15,17
  25:20,23
  45:6,22,
  23,25  46:3
  126:14
  128:5
  143:16
  155:18,19
  158:3,6,10
  164:2,19
  168:15
  169:1,4
  170:1,4
  184:8
  187:25
  189:23
  195:4
  196:5,12,
  20  197:21
  198:3,7
  216:4
  221:4,8

licensed
  15:6  24:20
  25:9  26:16
  143:10
  169:17
  172:21

licensee
  8:4,9  9:8
  10:8,16
  13:20
  14:1,3,8,
  11  22:12,
  19,24
  23:7,10,18
  24:17,21
  26:15
  27:4,23
  29:6,20,24
  31:12,20
  32:24
  33:13
  34:9,18,22
  41:22
  42:17
  43:6,10
  44:5  46:19
  48:16  49:1
  50:12
  53:13  61:8
  62:24
  68:10
  71:10
  72:17
  82:6,10,20
  92:8,19
  101:8
  111:1
  112:5

114:1
115:24
118:14,16
125:19
126:8,9,
13,22,23
128:16,21
131:8
135:8
151:6
160:23
176:22,24
200:24
201:4

licensee's
  9:12,15
  24:23
  27:12  42:3
  72:5  74:10
  142:24
  173:2,3
  176:7

licensees
  16:3  42:1
  59:4  72:24
  126:16
  131:1

licenses
  196:1
  221:7

licensing
  12:24
  40:13
  125:8

licensure
  157:12,13

lieu  19:22
  51:2  52:7
  95:20
  100:9

life  184:6
  185:1
  193:7
  194:1

light  72:19

limited
  81:17

lines  95:1,3
  103:20
  115:1

list  51:23
  52:1

listed  20:1
  196:2,4,5
  197:9

lists  13:24

litigation
  84:11

live  144:17

livelihood
  188:22

lives  26:17

living
  117:10

LLC  13:6

located  7:6
  12:2,8
  24:24  26:2
  41:20

197:17

log  11:10,
  15 21:24
  23:1,5,6,
  10,11
  30:15,19,
  21 31:2,7
  32:22,23
  34:1,8
  36:16 82:4
  108:1,9,
  18,19,21,
  25 109:22
  112:11,15
  114:16
  134:12
  140:12
  141:6
  142:7
  173:14
  182:17
  207:19,22,
  24 208:7

logging
  188:10

logic  161:23

logs  21:24
  112:18

long  42:11,
  15 46:10,
  11 95:5,10
  107:15
  135:6
  143:1
  150:14
  152:12

173:5
189:24
204:21
205:21

longer
  141:25
  219:9

looked  55:24
  61:4
  107:20
  120:16
  121:15,17
  161:11
  172:7

lose  168:15

losing  209:3

lost  209:1

lot  10:4
  15:20
  46:20
  58:16 77:6
  88:12
  125:22
  156:18,19,
  22,24
  157:19,21
  158:24
  159:1
  160:18
  163:17
  169:19
  172:4
  179:19
  184:4
  185:14
  191:25

193:7
194:20
195:18
203:20

lots  138:23

louder  8:22
  9:22,23
  153:5

lower  156:14

────────────

────────────
            M
────────────

M-O-R-E-H-O-U-
S-E  8:11,13

machine
  196:17

machining
  185:2,4
  194:6

made  7:24
  8:1 29:7
  44:1 53:8
  60:16
  61:18
  73:21,24
  75:21
  78:10,23
  79:23
  84:23 85:5
  87:11
  108:4
  111:5
  112:10
  115:11
  121:6
  124:16

135:6
174:14
181:13
194:12
202:18,24
205:5

mailed  10:16

main  79:19

maintain
  29:9 34:19
  47:14
  121:12
  141:21,25
  146:17
  154:13
  163:9

maintained
  38:18 39:1
  57:21
  60:11
  155:11

maintains
  51:23

majority
  16:1

make  19:21
  27:16
  29:8,20
  53:13,15,
  16,17 54:4
  56:11
  58:14 69:5
  70:20
  72:20
  75:20

77:16
85:20
87:2,23
88:17
92:10
100:3
103:18,21
109:4
118:22
120:8,25
132:7
159:18
160:5
161:23
163:9,20
166:9,18
168:3,17
171:13
172:10
175:9
180:10
181:11
185:4,12
188:5
191:4,5
193:7
194:18
209:22
211:11
213:12,13
214:1
215:11
219:25
220:20,23
221:1

makes    142:4
152:25
205:8

making    13:4
64:9
65:12,18
72:7  82:12
89:23
90:11
93:22
154:2
168:18
179:13
187:1
206:23

management
70:18
76:17
77:22

mandated
16:10

manner
138:20

manual
74:17,23,
24  75:5,13
80:14
126:9,10,
15,24
127:10,12
128:5,24
129:21
131:2,6,14
173:3,24
175:10
176:10
182:5

manually
164:6

manufacturing
20:17
45:6,22,24
46:5
155:16
158:3,6,10

March    29:18
44:25  45:4
46:15
54:24
56:1,19
65:24
66:2,12,
18,19
67:12,20
68:7  95:23
97:23
103:14
110:11,12
112:5,18,
20  115:2,
6,24  116:8
118:18,21
119:6,8
132:14
141:1
167:9
170:4
190:16
211:13
215:5,15

margin    206:9

mark    165:14

marked
160:23
173:2

match    160:6

matched
115:6

materials
19:2,9
46:6
126:12
161:5,9

matter    128:8
165:9
220:9,10
221:24

matters
107:16
220:13

meaning
32:12
169:15
174:23
177:5

means    165:6
181:5
182:8
196:12
201:14
209:3

meant    114:24

meet    13:8
68:10
76:20

meeting    66:2
96:17
135:23

memory    156:1

194:17

mention
 180:4

mentioned
 22:5,25
 34:8 146:9

messages
 186:7
 188:4

Messed  74:12

met  38:1,4
 98:18

metal  151:21

metric  73:1

Michael
 79:19
 149:14

Michele  8:18
 148:3
 218:8

middle  41:12

mind  103:25

mine's  110:5

Minnesota
 157:22,23
 194:22

Minnesotans
 157:25

minuscule
 219:11

minute  38:25
 52:21

63:22
125:1,23,
24 128:22
129:11
130:10
166:4
188:5,13

minutes
 94:19
 105:21
 150:19
 207:7
 213:22,23

misread
 161:13,16

missed  118:1

missing  34:2
 57:9 67:23
 81:1 107:1
 111:6
 182:2
 217:12

mistake  53:8
 84:23 86:8
 104:19
 188:24
 205:5

mistakes
 53:1
 168:17
 205:8

misunderstandi
ng  94:23

misunderstandi
ngs  220:3

mitigating
 206:13
 219:12,15,
19

Mm-hmm  44:11
 177:21
 187:6
 197:13
 208:17

model  163:20

moment  46:13
 54:8 72:20
 104:13
 139:11
 172:19

money  185:4

Montana
 157:25

month  115:24
 116:8
 170:6

months  97:8
 104:14
 168:4
 193:20,21
 194:4

Morehouse
 8:10,12
 10:22,24
 11:1,2,5,
 13 12:19
 13:12
 14:18 15:8
 16:16,24
 17:10,18

18:4,13,16
19:14
20:14,21
21:4,10
23:19
25:13
26:2,12,21
27:3,23
28:24 29:6
35:20
36:24
37:10,15
38:9,12
58:20
59:14
65:11
71:18
96:3,6,12,
20 101:8
102:6
112:20
113:19
124:1,5,7
142:12
143:11
145:22
147:12
150:23,24
151:1
156:17
157:4
158:2
160:5
162:13,16,
21 166:9,
14 168:7,
23 170:7,
15 183:12

187:22
194:8,12
203:15,17,
19,25
204:2,7,
10,14,18,
25 205:4,
11 208:3
216:16,18
217:14,25
218:6

**Morehouse's**
10:16
14:21
36:12

**Morehouses**
17:5,13
19:2 40:22
42:12
50:21
52:11
56:20 58:5
101:16,17,
19 102:1,
15 103:16
106:21
123:9

**morning**
37:24,25
39:2 73:16
158:12

**motions**
149:17

**mouth**  133:13
174:8

**move**  50:6

54:7 80:7
170:25

**moved**  170:21

**multiple**
36:5,7,13,
17,25 58:7
64:24 72:7
109:15
123:20,23
126:4,6
155:8
160:15
173:8
208:1

**multiples**
123:25
124:8

_____
         **N**
_____

**narrative**
111:19,20
116:15
120:3,6

**Nashville**
109:4
219:9

**National**
17:3 27:11
128:5,6

**nature**  7:14
70:10
110:6,10,
19,22,25
111:20
116:15

120:3
122:2,4

**necessarily**
153:5
156:16
197:20
216:21

**needed**  55:1
68:16 69:1
79:8
109:20
146:13
152:14
157:23
207:2

**negative**
61:11,14

**negatively**
61:7 136:7

**Nelon**  65:8

**Nelson**  11:8
29:17
30:11,14,
17,21,24
31:4
35:12,16
41:3 44:25
55:2,8,10,
15 56:1
64:18
67:2,12,
19,22
68:3,24
70:3
105:18
106:9,12,

15 108:3,
6,7,11,14
109:16,18,
21,24
110:12,24,
25 111:23
25 112:17
114:25
115:1,5,9,
11 116:9
118:11
119:12
120:16,18,
21 124:4,
10,12
132:12,14,
18 133:25
134:6,22,
24 135:16
136:23
137:15
139:12
140:3,10,
25 152:7,
11 160:13,
17 166:2
167:8,12,
16,23
168:10
177:17
178:10,18,
19 180:25
182:14
183:1,24
190:10,13,
15 192:18,
24,25
194:13

195:13,14,
16 199:21,
24 201:21
203:8
207:15
208:5,25
211:12,15
212:11,19
213:17
215:5
216:17
217:11
220:5,8

**Nelson's**
110:10
116:15
119:14
191:17
211:12

**News**  88:8

**nice**  149:9

**NICS**  11:10,
15 17:4,8,
25 18:5,7
19:15,22
21:1,3
22:20
23:1,5,6,
7,10 24:9
27:5,10,
12,13,14,
19,24
28:4,7,23
29:14,15,
21 30:15,
18 31:2,6,
12,13,14,

15,19,21
32:3,17,
24,25
33:10,18
34:4,9,18,
23 35:6,17
36:5,7,13,
17,25
40:18
48:12,16,
18 49:1
51:3,24
52:7,12
54:12 55:1
56:8 61:24
62:11
64:14 68:3
79:8 91:14
93:5 95:20
100:9
104:2
106:16
107:17
108:23
111:6
112:4
113:9,18
114:16
115:18
122:6,8,
16,20
123:10,20,
23 124:21
125:6,12,
15,18
126:2,3,4,
6,17
127:12

128:13,16,
22 129:4,
10 131:2,
5,6,8,16,
17,18,25
133:6,20
140:12,17
141:6,21
152:17
154:19,22,
24,25
155:3,5
163:16
164:6,21,
25 172:20
173:3,8,
13,14
174:10,22,
24 175:1,
17,21
182:5,17
187:20,22,
24 190:4
193:15
196:19
198:18,19,
24 200:25
201:5,10,
21 202:7,
9,16,18
207:18,22,
25 208:12,
21 210:8
212:15,16
213:15
214:22
215:11
216:2,3,4,

8,15,16,20
217:1

**night**  205:23

**nod**  8:2

**non-licensee**
27:13

**non-resident**
190:2
194:18
210:18,22
215:8

**non-residents**
94:7
159:10
160:4
189:10
195:5

**nonresident**
93:22
97:3,14,20
153:13

**normal**  219:9

**North**  7:6
13:6
19:20,23
25:24 26:1
28:9,10,
15,17
52:2,4
95:16,18,
19 104:11,
12 153:8
157:14
169:22,23
188:9,10

189:22
199:6
210:12,25

**notation**
101:22

**note**  9:10,
15 122:2
131:3
141:18

**notebooks**
221:22

**noted**  80:13
81:10 90:2
93:1 112:8

**notes**  96:2
109:4
122:6
123:24
138:24

**notice**  7:14
10:2,15,
17,19
11:7,17
13:12 20:1
24:16 27:3
29:5 55:22
56:3,7
76:20
81:11,12
83:15
86:16
90:10,15
91:5
192:16
197:9
221:5,7,

10,15

**notified**
23:22

**November**
113:22,24

**novo**  77:18
86:3
221:13

**nowadays**
155:1

**NTN**  18:8
24:10
29:15,21
31:16,19,
24 32:5,10
34:2 35:5,
16 62:6,11
67:16,23
89:13
106:16,17
107:1,3,
13,16,19,
24 110:20
111:1,5,6,
8,9,13,15,
16,23
115:7,20
116:16,21
120:4,23
121:13,20,
21 122:3
125:5
126:3
129:3,9
130:20
134:25

135:19
136:9,21
137:9
139:17,23,
25 141:11
155:5
162:23
165:19
167:17,24
174:25
178:21
181:16,22
182:7
192:11
193:15
200:2,23
208:21
212:17
214:24

**NTNS**  107:23
135:1,25

**number**  9:12
18:8 19:8
24:10 27:6
29:15
31:12,14,
16,19,20
32:10,16
35:5,16
41:14,16
43:9
57:17,18
62:11
67:16
98:24 99:3
106:16
107:1,16,

19,22
111:6
115:19
117:19
124:13,14
125:5,10
129:3
130:20
134:25
135:5
136:19,21
137:10
139:18,20,
24 141:11,
16,23,24
154:25
155:6
162:23
163:20,22
165:19
167:17
174:25
178:21
181:16,22
182:7
186:25
187:4
191:11,19,
22,25
192:4,11
193:10,15
200:2,11,
23 208:21
210:6
214:19,24

**numbers**
32:3,5
75:24

121:22
156:8
181:22

————————
O
————————

objection
134:20

objections
81:13
107:14

obligation
10:9,10

obligations
64:10
65:13 72:6
154:5
214:21
220:17

observe
61:6,23

observed
63:6 64:6
78:8 82:1

observing
72:1,8

obtaining
27:6
151:23

occasionally
174:9

Occupational
155:21

occur  84:20
166:25

occurred
10:7 29:14
44:22,25
45:10,16
70:21 75:9
76:14
81:19
102:24
104:14,21,
24 106:21,
22 116:17
120:5
124:18
132:14
141:1
143:23,24
148:16
166:21
167:1,4
188:25
205:15
206:19
219:19

occurrences
220:4

occurring
133:4

occurs  89:12
172:3

odd  186:9

offer  142:6
218:10

offering
100:24

office  9:3
12:3 39:23

98:24 99:3

officer  7:9
90:6

official
101:25

officially
7:5 132:12

OJT  12:9

Oky  212:18

older  135:9
142:7

omission
67:19
121:11
136:6

omitted
121:7

on-the-job
12:10
71:23

ongoing
12:11
161:25

onsite  15:15
66:22,25
100:17,24
108:15

open  81:5
146:9
175:19
202:17

opens  164:4

operate

152:15
159:5

operates
136:17

operating
13:18 14:7
19:11
59:10
158:25

operations
7:8 9:2
12:1,15
60:5 74:17
75:13

operator
59:8

opinion  43:5
52:9,13
59:14
72:12,15
74:4
82:17,21
94:5 99:11
156:10
186:20

opinions
73:12,24
79:2 82:22

opportunity
76:14
77:13,18,
24,25
218:11,13,
14 219:5

opposed

43:11
47:11
71:24  80:1
108:5
131:24
165:24

opposite
188:21

option  125:7

options
48:20

ordeal
160:17

order  60:22
74:12
162:11
202:6

ordered
114:21

Ordinance
8:11,13
12:20

ordinances
13:7

organized
59:6  60:11

original
22:22  24:7
53:17  96:7
118:17
119:5
146:24
185:8

originally

10:18
115:8

out-of-state
17:13,20
19:15,16
26:19
50:24
51:9,18
53:9,20
98:2,3,8
99:8,13,
16,22
100:2
101:5,8
102:1
156:24
157:19,21
161:15
166:24
172:5
176:15
180:11
194:23
210:23

outcome  76:5
86:2

outdated
9:16

outlier  95:7

overlooked
199:19

oversight
119:13,18,
19  138:9
139:15,21

overview
15:3
127:19
128:10
143:7,13
144:2
145:2,4
169:14
170:11

overwhelmed
184:3

owned  105:8

owner  184:17

ownership
13:4  21:21

owning
151:14

owns  151:9

―――――――
P
―――――――

p.m.  222:1,
4

pack  104:1

package
69:25

packet  10:15
19:10  42:1
125:15
126:20,21,
22  197:11
199:22
207:17

pages  42:13
118:20

127:6
138:23
143:1

pamphlet
128:14,16

pamphlets
42:1

pandemic
15:12,20,
22  156:19
170:20

paper  38:15
46:25
163:12

paperwork
120:16
154:1,8
163:25
179:1,2
193:22

pardon  73:4

part  7:17
13:16
16:18  23:1
48:15
53:23,24
55:21
57:14
71:7,24
72:4,23
73:16
75:4,15
78:2,3,21
86:6
91:17,25

92:18
101:3
103:13
119:13
124:11
125:13
126:12,19
131:8
134:3
137:25
139:15
144:20
152:6
169:13
193:4
197:2
206:17

**partial**
115:7
160:24

**participating**
71:15

**parts** 156:19

**party** 184:12

**pass** 139:7
168:19
195:21

**past** 141:20
191:24

**paste** 62:12
63:7,8,11
107:4
117:8,15
118:1
154:25
155:5

181:17
192:13
200:12

**pasted**
213:11

**pasting** 62:4
63:20
117:12

**path** 55:6
77:22 81:5

**pattern**
134:9
167:1
195:16

**patterns**
61:17

**Paul** 7:8
8:19 88:9

**PDF** 43:11

**pending**
147:24

**people** 27:17
123:4
156:21
165:7
179:18,20
180:1
185:14
187:1,16
194:23
199:3
204:12
205:7
209:23
210:12

**perceive**
60:3
145:21,25

**Perceived**
145:24

**percent** 48:8
168:11
186:24
187:15
191:7,23
194:15
199:3
210:3

**percentage**
186:22
187:1
209:20,23
210:2

**perfect**
114:21
162:5

**perform** 47:7
56:19

**performed**
39:19
45:17
65:23

**performing**
61:18
81:16
93:10

**period** 15:14
22:4 36:23
56:15,16
57:16

58:1,4
64:13,22
100:25
105:9
114:1
156:11
160:1,9
162:25
171:6
195:19

**permissible**
95:4

**permission**
141:24

**permit** 19:23
28:5,8,9,
12,16
52:7,12
89:11
91:14,15
93:1,7,23
94:14
95:15,19
152:17,21
157:22
167:5
169:22,23
171:24,25
172:2
180:12
187:2,11
189:19
190:3,6
194:24
199:1,4,9,
14 209:25
210:17,23

211:1,9
218:22

**permits**
19:19
51:24
93:25
153:9,10
157:14,17
158:18
210:13

**permitted**
77:5

**person** 21:5
24:19
25:9,21,24
26:15
27:5,25
36:5 53:20
71:8 78:3
81:16
91:19
92:2,6,11,
13,15
109:16
133:20
134:1,2
168:24
175:25
176:4
180:12
188:19
196:1,11
197:16
198:17
204:15
207:25
208:3

218:4,6

**personal**
22:14
141:23

**personally**
33:9 49:5
181:20

**perspective**
80:25

**pertain** 79:3

**pertaining**
15:15 25:5
37:4 73:12
98:2 99:14
139:24,25
145:19

**pertinent**
88:3

**phase** 89:23

**phone** 15:16,
18 16:4
19:8 99:2,
5 102:8,9,
10,20
213:24

**pick** 216:14

**picking**
138:12

**pictures**
70:2

**piece** 103:12
123:21

**pieces**

135:17
185:15

**pin** 159:2

**pistol** 25:14
26:5,15,18
53:9

**place** 24:23
28:6 53:20
54:24
88:17
152:3
159:7
165:2,14
168:8
175:12
180:18
189:8,17
199:1
218:23,25

**plain** 85:17
220:16

**plainly**
10:10

**planning**
87:18

**plans** 220:21

**plausible**
117:18

**play** 88:13

**plenty** 78:6

**point** 32:13
35:4 66:2
67:3,22
76:16

77:20
80:16 83:7
85:3 87:10
97:19,25
98:4 99:6,
23 104:12,
22 105:3
112:2
128:25
130:15
131:9
134:1
135:24
137:5,14
140:16
147:12
161:16
167:1
168:7
171:13,19
172:10,11
173:13
174:6
175:9,12
179:13
190:23
192:21
193:10,19
194:11
198:10
199:13
200:22
206:16,22,
23 208:9
211:21,22
212:9,11
213:15
214:14,23

217:3,23
218:20
221:22

pointed  86:1
148:4

pointing
205:9

points  127:1
128:14

policies
75:13 98:7
219:25

policy
80:10,11
219:13
220:7

political
151:25

pop  162:10
188:4
217:13

pop-up
217:20

pops  173:15

populated
107:9

portion
53:14,15
54:6 57:5
99:19
140:5
143:6
185:5
186:3

215:24,25

portrayed
114:21

possessing
27:15

possession
44:1

possibilities
107:6
124:18

possibility
124:15

possibly
44:12
139:19,22
140:2

potential
55:20 81:4
123:4

potentially
136:11
156:15

practical
128:8

practically
58:21

practice
100:1

practiced
138:19

practices
159:18
160:5

preceding
113:16

preclude
168:9

preliminary
13:3 21:19
221:24

premises
13:4 21:21
40:5
115:17

prepared
69:21
119:4,9

preparing
38:7 78:18

present  8:5
9:25 18:21
37:15
40:3,5,19
41:4 42:15
78:1 86:17
89:6 158:2
177:8,16
178:17
183:18
198:3
210:25

presentation
9:18
77:20,21
125:13
150:22

presentations
9:5

presented
74:6 75:25
76:13
83:24 84:3
86:20
89:10

presenting
87:21
206:14
210:23

presents
83:21

presiding
7:9

press
163:21,24

pretty  73:3
150:14
151:20
160:10
185:7

prevents
26:18

previous
13:12
21:12 34:5

previously
11:12
208:15

primarily
128:11
156:17

Primary  42:9

print  41:25

44:6 141:6
164:14
212:17
213:7

**printed**
43:11
110:5
212:12,15
213:15
214:3,9

**printed-out**
212:25

**printout**
108:23

**prior** 13:2
16:4 21:22
22:4 23:8,
12 27:13
43:15
45:13
46:22 58:1
99:23
101:23,24
104:20
108:15
114:6
135:9,25
147:12
151:13
166:2,21
184:7,17
211:1
219:16

**privileges**
173:13

**probablly**

171:2

**problem**
36:10
107:18
125:1
128:23
133:3
138:17
168:25
181:15
206:8

**problems**
57:1 64:13
136:11
168:9

**procedural**
7:22

**procedure**
13:18 14:7
19:11
35:15
73:25
137:18
138:20

**procedures**
75:14
76:18 77:7
98:7
159:19
160:5
168:8

**proceed** 9:5,
18 24:11
30:24 31:3
32:13,18,
21 33:2,5,

7,20 34:4
35:6,8
81:12
108:11
112:14
115:5,11
116:11
122:9,14
135:1,9
136:22
137:10
140:8,18,
20 141:10,
12,15,20,
21 142:7
162:11,16
164:11,13,
23 173:19
178:13,23
190:12
192:9,11
201:11
211:13
214:19

**proceeding**
7:13 27:7
150:12

**proceedings**
7:2,24
88:7 222:3

**proceeds**
23:8
112:4,11,
19,22
114:10
115:23
116:1

142:3

**process**
48:6,13
50:22
61:25
62:16
69:21
71:7,24
72:4 76:12
78:10
81:18 85:1
86:23
95:14
125:4,7
126:2
129:2,9
130:19
131:4,8
163:18
179:10
192:15,20
193:13
211:8
214:23
215:2,23

**processed**
63:5,6
185:10
186:21
187:10,19

**processes**
76:18
83:13
84:4,6,16
86:15
166:10

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC
Hearing on 08/16/2023          Index: produce..purportedly

produce
  148:12

producing
  8:15

product
  47:21  71:4

production
  29:10

productive
  80:17
  104:5,8

professionally
  148:23

program   48:3

prohibit
  26:14
  175:5

prohibited
  17:17
  22:15
  27:15,17
  40:17
  91:19,21
  92:2,5,11,
  12,15
  125:25
  129:23
  133:25
  134:2
  140:9
  142:11,19
  178:24
  204:12,15
  216:25
  218:4,6

  219:20

prohibiting
  122:23,25
  179:22

prohibitions
  142:21

prohibitive
  188:19

prohibitng
  33:8

prologue
  77:17

proof   78:3
  201:5

proper   17:24

properly
  13:5  29:9,
  14  52:18
  53:1,13
  57:9
  121:7,12
  181:2
  182:15,20
  183:1

proposed
  75:3

prosecutor
  9:21,24

protect
  138:1

protections
  161:23

prove   10:6

provide
  19:1,7,10
  25:18
  31:14
  33:12  35:4
  41:18
  51:10
  61:11
  124:13
  125:14
  126:2,17,
  20  127:3,
  18,24
  128:4
  129:1,2,9
  157:7
  160:21
  191:20

provided   9:6
  11:12  19:6
  33:18
  41:6,22
  42:1,6
  59:1
  60:19,21
  65:15
  104:11
  115:10
  120:17,19
  122:21
  130:20
  147:15,21
  161:9
  168:8
  193:10
  201:10
  221:2

providing
  130:20

provisions
  7:16
  221:12

public   27:16
  60:6,9
  137:21,24
  138:1,3
  204:12

pull   44:6
  135:9
  155:1

purchase
  25:13
  157:22
  185:13
  187:2
  190:16
  194:19,24
  195:5

purchased
  184:10

purchaser
  25:6

purchases
  134:6,8

purchasing
  210:18

purged   141:4

purported
  88:20

purportedly
  30:24

purpose
  10:14
  31:11
  86:14 88:1

purposeful
  69:18

purposefully
  10:9

purposely
  75:1
  172:24

purposes
  64:7 69:7
  76:18
  77:11,20
  80:17
  81:4,7
  87:25
  152:6
  154:12

pursuant
  9:20 69:2

pursue
  151:23
  158:6

pursuing
  151:18

put  69:12
  71:3 79:1
  99:20
  104:7
  119:21
  121:6
  122:4
  133:13

134:24
162:25
163:15
164:13
168:8
181:8
185:17
187:21
213:16
214:19,24
216:13
218:3,24,
25 221:24

puts  216:7

putting
  174:7
  206:6

────────────
      Q
────────────

QI  47:9
  52:10
  130:16

QIS  100:18

qualification
  12:18,22,
  23 13:11,
  13,17 15:7
  16:4,18
  17:2 18:25
  20:7,13,19
  21:12
  39:19
  40:6,9,19
  41:23
  44:13
  45:5,10,

17,20
46:4,19,
20,21,23
47:6,8,20
48:10
49:13
50:1,21
63:18
93:10
94:3,20
101:4
124:19
125:9
126:13
129:17
131:10
132:15
152:2
153:19,21
160:20
169:5
183:19
189:3,9

qualifications
  15:15
  38:12 39:9
  50:13,14,
  16

qualifies
  28:6

qualifying
  219:18

query  111:2

question  8:3
  30:16
  52:19

63:2,17
64:4 71:22
72:19
73:17,18
75:17 80:7
81:22 85:8
89:6 93:19
94:12
99:25
100:8,9,
10,13
102:7
103:3
104:23,25
106:25
112:7
114:4
121:15
124:22
130:22
135:18
137:13
139:16
145:5,6,19
147:2
148:21
149:21
159:9
160:2,10
164:20
171:23
176:14
182:21,25
186:17
201:20
205:25
209:6
210:19

211:4,21
212:18
213:13
214:3
215:22
216:6,12
220:12

**questioning**
55:20
80:11,16
150:2

**questions**
9:11 14:24
19:3,15
22:15
37:18,19
38:5
40:15,22
41:8 44:21
50:22
52:15 58:5
76:16
77:2,6,8
78:14,24
79:1,13,22
80:21
83:25 84:8
85:23
88:12
89:1,19
127:21,25
139:11
147:8
148:11,15
149:13
150:8
159:1,11,

12 166:9
168:22
175:18
176:14
183:8,21
195:24
211:11
214:20
215:19
217:20

**quick** 105:19
150:11,14
161:2

**quickly**
70:15,24

**Quote** 174:25

---

**R**

---

**R-15S** 158:7

**R-O-B** 67:7

**raised** 135:2

**ran** 123:9
182:18
192:9
212:18
213:20,22
214:5

**ranges** 114:6

**ranging**
127:19

**rare** 220:4

**rate** 206:12

**ratio** 65:5

**reach** 186:13

**reaching**
83:6

**read** 53:11
61:2 82:16
127:5,7,17
143:2,5
144:22
161:4,6
169:13
172:1
173:4,24
175:11
198:20
199:9
216:25

**reading** 30:8
71:2
116:20
210:7
211:3

**reads** 78:19

**real** 109:8

**realize**
179:23
192:14

**realized**
107:18

**realm** 51:20

**reason** 25:23
52:16
54:20
60:18
69:11,14,
18 99:24

101:11
103:5
117:18
121:2
173:6
176:12
196:6
197:6

**reasonable**
24:21

**reasons**
163:8

**recall** 17:3,
12,23
19:18
23:20
26:25 29:2
35:25 36:4
37:2 39:11
42:7
47:23,24
48:8,22,24
50:25
51:5,11,
14,15
52:20
58:2,10
61:10
62:3,4,10
63:9,10,12
66:24
68:18
94:2,17
96:9,22
99:10
100:15
101:2,9,13

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023                    Index: receipt..record

102:15,16,
18,19
103:12,21
105:11
106:25
107:3
108:8
109:25
115:8,12,
16 117:6
120:14,17
123:13,14,
23 124:9,
11,15,25
125:17,18
126:1
129:6
133:1,7
134:7,20
152:5,9
153:7,10
158:13,15
166:17
169:21
177:15
183:25
185:12,23
189:8,11,
12 192:3,8
213:9,25

**receipt**
29:10
221:15

**receive**
12:11
174:23
175:4,20

221:4,7,9,
10

**received**
12:6,7
14:25 16:3
17:25 21:5
30:24
34:23
113:9,14
160:6
169:1

**receivers**
156:14,20

**receives**
31:13

**recent**    220:7

**recently**
176:11
191:6
193:25

**recess**    106:3
150:20

**reciprocity**
19:19 94:1

**recited**
55:21

**reckless**
85:17
220:16

**recognize**
42:19

**recollection**
20:6 51:6
57:24

93:24

**recommendation**
70:12
75:22
89:20,21
154:9

**recommendation
s**  79:24
82:13 89:2

**recommended**
153:24

**reconcile**
22:2 59:21
82:3 83:18

**reconciled**
23:24 57:5
146:14

**reconciliation**
60:2

**reconciling**
57:3

**record**    7:25
8:1,7,17
9:7,11
11:16,19,
24 18:12
22:3,8
23:21,25
24:8,10
25:4 29:9,
14,15,25
30:4,11
34:19
36:24
38:15,17,

18 42:21
44:5 48:1
57:3 60:2,
5,7,8
62:6,15
70:1,3
72:21 73:3
75:4,18
77:2
80:13,25
81:4 82:22
85:4 87:2
88:25
95:20
99:20
106:1,4
114:11
121:7,12
131:12,15
132:6,7
140:12
146:24
148:10
150:19,22
153:23
163:17
168:24
175:21
178:13
183:1
184:24
198:24
200:2
207:2,8,10
208:11
221:3,16,
22,24

record's
  71:1 100:4
  214:2

record-keeping
  17:24
  47:10

recorded
  23:9,10
  31:16 32:6
  33:25
  34:10,13,
  16,25
  35:2,3
  36:19
  57:23 93:7
  111:1,16
  119:23
  134:12
  137:6
  182:20
  200:4,10
  201:3
  208:6

recording
  17:25
  119:11
  121:9

recordkeeping
  47:2

records
  11:14 14:1
  15:1 22:10
  29:22 32:6
  34:20
  38:21 39:1
  46:25

47:1,5,14,
15,18,19
48:4,9
55:24
57:16
58:6,12,
22,25
59:2,6,8,
11,14,16,
21 60:4,
19,21
61:7,25
66:23
71:9,13
72:2,6
81:25 82:3
101:21,23
104:7
109:20
128:13
148:12
154:14
213:16

recount
  61:10

recover
  104:6

recreationally
  117:11

RECROSS
  143:19
  215:20

recur   194:14
  220:1,20,
  24

recurring

134:10
168:10

redirect
  130:25
  139:8
  183:11
  209:14
  217:7

redirects
  209:16

redundant
  210:14

reference
  15:1 19:2,
  9 41:18,22
  42:23,25
  43:4 44:19
  54:1 67:15
  126:24
  142:25
  160:22
  161:2
  176:10,12

referenced
  11:7,9
  30:17
  43:7,21

references
  24:25 27:8
  41:13 43:3
  44:8

referral
  20:25
  54:14 55:6

referred

42:25 54:2

referring
  56:4 197:8

refers   41:15

reflect   69:3
  72:21

reflected
  37:6 59:22

reflects
  113:25

reformatted
  174:13

regard   47:16
  94:23
  95:10,11
  103:1

registered
  13:5 21:20
  113:18

regs   144:6,
  10

regulate
  137:4,7

regulation
  13:9 14:2
  19:10 43:9
  44:3 46:15
  53:1
  125:15
  126:4
  127:1,2,14
  129:21
  131:20
  145:19

182:9

**regulations**
7:17
10:23,25
11:2,5
13:19,23,
25 14:5,6,
8,12,18
15:3,5
16:15,21,
23 19:12
21:18
37:10
39:16
40:12
41:19,22,
25 42:9,
22,24
43:1,4
46:7 73:4
125:21,25
127:19,23
129:16
131:20,24
138:21
142:25
143:8,9,15
144:4
145:17
160:22
169:8,15,
17 176:10
196:13
204:24
209:4

**related**
125:19

134:6
190:2

**relationship**
13:2

**relative**
75:16

**relayed**
60:15

**release**
220:10

**relevance**
55:20
74:24 90:9
148:1

**relevant**
9:13 38:24
39:2 70:19
74:5 75:11
77:23
78:6,17
79:4 89:7
131:22
149:23
150:1
152:11

**relied** 95:15

**relying** 76:1

**remarks** 36:4
218:12

**remember**
43:16
47:14
51:18,19
62:1,2

64:1,2
94:1
96:21,24
98:10,11,
15 108:9
123:11,19
124:16
129:8
133:4,5,7,
11,12,14,
17 153:11
158:17
169:25
170:2
174:8
177:14
184:2
185:15
188:22
189:15
190:23
195:4

**remind** 99:9

**remotely**
100:18

**rental**
170:24

**repeat** 30:16
63:1 97:13
104:19
112:6
129:7
134:10
146:21
187:3
210:19
220:1

**rephrase**
81:23

**report** 10:21
24:6,7,13
32:8 50:3
54:12
60:16
66:6,12,
20,21
67:8,12
68:1,2,11,
16 69:21
71:12,17
72:24
73:13 74:4
75:6,20,21
78:9,23
83:19
84:17
89:13,14
91:13 92:3
96:7,23
102:13
105:13
110:3
112:3
113:7,10,
11,14,15
114:5,9,15
115:23,25
118:3,17,
21,24
119:4,8
139:4
146:25
177:13
182:9

reported
 32:18
 69:25
 82:10,11
 116:24,25

reporter
 9:22 49:8,
 11 56:13
 62:8 82:25
 83:2 91:3,
 8 92:14,16
 93:2 95:11
 98:12
 101:18
 105:19,21
 108:25
 109:2
 111:3,11
 119:25
 122:24
 123:1
 126:5
 133:17
 142:16
 146:21
 149:25
 150:24
 152:21,24
 178:1,3
 207:6,11
 218:5

REPORTERS
 67:7

reports  68:7
 155:8,10,
 12

representative
 9:20

represented
 79:17
 148:4

representing
 8:9 89:3

represents
 30:23

request
 10:17 58:8
 61:8,18
 69:4,7
 148:19
 221:10,14

requested
 7:19 23:21
 108:18

requests
 141:22

require
 27:23
 29:20

required
 28:4
 29:11,24
 31:16 32:5
 34:19 39:4
 102:25
 140:19
 155:11,13
 198:25
 201:3
 217:12

requirement

17:5,24
 26:22

requirements
 16:24 17:9
 18:13
 19:15

requires
 144:24
 145:15
 161:19
 182:9

reran  124:12

rerun  125:22
 132:21

rerunning
 133:3,6

rescheduling
 10:19

research
 122:17
 165:1,24
 174:10,15
 175:2,10,
 13

researching
 165:5,8,
 12,13,16,
 20

reside  24:22
 25:24
 197:16

residence
 25:15,22
 26:19

197:25

residency
 26:22

resident
 26:5 50:24
 51:9 53:9
 95:16,19
 176:1,15
 180:12
 197:18
 198:6,12
 216:13

residents
 17:13,21
 19:16,24
 28:10
 51:19 52:8
 98:3
 104:12
 157:17
 194:23

resort
 144:25

resources
 126:17
 127:23
 176:19

respect
 51:7,22
 58:11
 67:16
 68:24
 72:13
 91:10 92:9
 94:7 97:20
 104:16

120:8,11
121:1,13,
24 128:1
132:11
133:24
134:22
153:12
167:8
215:7
220:5

**respond**
59:17,20
61:8,21
103:7
130:22

**responding**
46:18

**responible**
144:9

**response**  8:3
26:24
29:1,21
33:18
34:3,9,13,
16,18,22,
25 35:4,8,
9,12 47:17
51:15
89:14,15
122:11,16
139:3
145:10,13,
16 155:5
164:7,11,
24 165:3,
13,15,23
167:25

174:9,16,
22 175:5,
13,20
181:3,6,9
182:19
192:1
201:10,23
202:2
208:12,16
209:22
218:25

**responses**
29:16
32:25 33:4
35:25
36:6,19,25
122:7,8
147:14
164:20
175:11
195:25
219:1

**responsibiliti
es**  72:13

**responsibility**
27:12
204:23
219:23

**responsible**
15:4
131:24
143:8,14
144:21,23
145:14
166:4
169:15
184:12

195:25
196:11,12
209:10

**responsive**
58:8

**rest**  163:25

**restate**  62:9

**resting**
219:4

**restoration**
159:7

**restore**
151:19

**resubmit**
125:10,11,
12 128:25
129:22
130:2,4,17

**result**  7:18
15:7 20:13
24:2,14
54:11
97:17
99:11
159:13
190:3
192:18

**resulted**
90:24

**results**
111:5
123:6

**RESUMED**
106:6

207:13

**retail**
155:19

**return**
163:24

**review**  7:14
13:1,9,19,
25 15:17
21:25 22:3
23:1 33:12
38:8 39:10
42:3,8
46:15
47:2,4,5
53:1 58:6
60:25
61:16
68:11
71:13 76:2
77:19
82:2,3
83:17,18
86:3,4,6,
13 96:8
108:18
109:20
111:13
119:22
143:13
144:3
145:17
173:11
182:16
216:6

**reviewed**
14:4,18
16:14,21

17:8,17
18:12
23:11,25
36:22
38:11,14
45:1
56:22,23
64:21
65:22
88:18
101:17,21
105:10
108:19
169:8
171:6,7
176:9

reviewing
36:22
61:25 64:1
67:1 71:9
72:2
102:18
216:21

revocation
10:2,15
11:17 27:3
29:5 45:9
56:4,7
87:12
90:16 91:5
197:9
221:8

revoke  7:15
11:8 20:2
24:16
83:15
86:16

87:19
88:1,22

revoked  7:21
221:4,7

revolver
188:23

rifle  24:19
95:2,3
156:23
184:18
215:10

rifles
156:14,18,
22 157:20
187:16

right-hand
41:14

risk  60:6,9
188:22

road  87:9,
15

Robert  29:17
30:11,14,
21 67:19
114:24
115:1,5
116:8
118:11
136:23
180:4
204:19

role  9:25
88:13

roll  112:22

room  71:20
146:6

roughly
57:25
186:22
213:21

ROV  60:16
67:3,4
71:12
81:10 82:5
83:11
96:16
134:15

RP  195:25
196:4

rule  61:20
117:21

ruled  116:18

rules  134:17
209:3

run  21:24
23:9 27:19
31:22
36:5,11,17
62:15
64:10
104:2
112:3,10
115:22
116:1
122:5,10
123:17,20,
25 124:5,
8,21
125:2,24

128:23
130:11,18
132:13
133:20
136:7,10,
12,13
151:19
154:22
166:5
167:20,25
173:8
178:12
179:25
182:17
190:4
191:1,17,
18,19,21
193:11
195:11,13,
16 196:20
201:18
203:4
207:25
208:3
212:15
213:2
214:9,22

running  21:4
122:16
126:4,6
128:21
192:3

runs  131:17

Rykowski
37:5
182:16

**S**

**safe**  59:2
  100:1

**safety**  27:16
  137:21,24
  138:1,3
  204:12

**Saint**  7:8

**sale**  11:6,9
  29:10 33:7
  90:24
  93:22 95:3
  97:3,14
  98:8 99:8,
  13,22
  101:8
  133:25
  161:10,18
  179:7
  180:11
  211:15

**sales**  16:24
  17:12,17,
  20 19:16
  29:22 39:4
  40:17 58:7
  72:7 94:7
  97:20
  100:2
  101:6
  152:1
  155:15
  158:18
  160:4
  170:2,25

186:20
187:4
199:3

**sat**  69:22
  205:21

**satellite**
  12:3

**satisfaction**
  57:12

**SCA**  16:2

**scheduled**
  189:4

**scheduling**
  10:18

**school**  185:2

**scope**  82:11
  83:25 84:8
  87:14
  92:10
  220:4

**screen**  63:4
  212:23

**seas**  151:25

**season**  194:5

**Secretary**
  13:5

**section**
  22:12,13,
  17,19,21,
  23 27:22
  30:1 54:5
  176:14
  217:17

221:12

**Security**
  124:14
  125:10
  191:19,22,
  25 192:3
  193:10
  214:19

**selective**
  114:6

**self-evident**
  117:1

**sell**  130:9
  156:17,18
  157:20
  160:9
  167:6
  176:3,15
  180:15

**seller**
  163:25

**selling**
  26:15
  53:8,19
  92:5
  153:12
  159:9,10
  189:9,19
  210:16

**seminar**
  100:25
  101:2

**sense**  56:11
  142:4
  145:21

152:25
202:19
213:12

**sensitivity**
  88:5

**separate**
  90:24
  154:20
  166:17
  203:2
  213:18

**September**
  44:7,19

**serial**
  124:13,14
  136:19
  163:20

**series**  22:15

**service**
  194:6

**session**
  144:7

**set**  13:8
  27:2 29:4
  75:6
  114:19
  218:8

**Seth**  71:11

**shake**  8:2

**shape**  61:4

**ship**  195:7

**shipment**
  29:10

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**

shoot  145:3

shop  155:23
 158:1
 159:3
 160:18
 170:21,22
 185:5,6
 194:6
 195:10,20
 196:17
 204:4
 205:5

short  88:11
 106:17
 135:6

Shortly
 123:16

shotgun
 24:19
 95:2,4
 215:10

shotguns
 156:14,18,
 23 157:20
 187:17

show  14:14
 16:13
 21:2,3
 22:5 23:4
 24:5 25:2
 26:20
 31:13
 32:12
 37:12
 112:15
 114:24

 116:11
 119:4
 164:22
 174:18
 186:5
 197:9

showed  37:2
 56:18
 113:16
 115:23

showing
 145:22
 146:1

shown  112:19
 113:17
 179:1
 194:18

shows  42:5
 114:5
 135:24
 180:12
 210:21

shutting
 100:17

sic  132:13

side  14:1
 41:12
 205:17

sideways
 118:16

sign  14:3,8
 18:17
 44:14
 164:12
 206:3

sign-off
 144:1

signature
 14:21
 18:23 26:8
 28:20
 37:13
 199:23

signed
 10:22,23,
 25 11:2,5
 18:21
 22:21
 26:11
 37:16
 40:4,11
 84:17
 96:13
 102:3
 143:11
 169:11

significance
 33:3

significant
 105:25

signs  22:16

similar
 120:8

simple  154:2
 160:10
 190:24

simpler
 153:25
 154:8

simply  81:21

single  86:8
 144:19
 181:21

sir  30:6
 37:25
 40:6,11,20
 41:17 43:2
 45:7,14
 53:22
 54:10
 56:21
 57:6,13,20
 60:9,23
 61:5,19
 62:3,18
 65:1,25
 66:4,8
 67:5,14
 69:6,10,20
 71:6,11,25
 72:3 73:14
 74:15
 90:19,22
 91:12
 93:12,18
 94:24 95:6
 96:18
 97:5,7,11,
 16,22
 98:20,23
 100:19,23
 102:10,19,
 21 105:7
 106:11
 108:24
 109:25
 110:4,8,21
 111:11

112:1
113:6,9,23
114:25
116:7,13,
19 117:13,
17,20
118:13,19
119:1
120:1,7
122:1
124:23
126:11
136:1,14,
16 137:19
138:2
144:25
146:11
151:8
183:20
207:6
208:20
211:14

**sit** 79:4
141:9
175:24
204:4
206:1
209:2

**sits** 204:20

**sitting**
49:22
57:24
129:12
135:22
159:22
186:14

**situation**
104:18
147:11
166:2
167:11,16
172:6
189:16
191:9
203:21
210:7

**situations**
191:24
210:16

**skimmed**
161:6

**slow** 146:19
170:16,17

**slowed**
195:18

**slower** 30:5
111:11

**small**
170:22,23
179:17
185:7
209:20,23
210:2,6

**smooth** 60:2

**smoothly**
73:6

**social**
124:14
125:2,10,
23 128:23
129:22

130:2,12,
17 132:22
167:20
191:19,22,
25 192:3,9
193:10
214:18

**software**
69:24
186:10,15
209:7,8,9

**sold** 24:18
92:1 95:1,
2 156:19
198:7,13
199:21

**someone's**
61:3

**SOPS** 78:21

**sort** 21:9
71:16
79:25 87:8
113:4
149:18
158:20
206:22

**sorted**
213:24

**sorts** 206:13

**sound** 171:8
192:5

**sounds** 189:2

**source**
110:22

**South** 52:6,7
109:5
158:1

**southern**
109:9
153:6

**span** 96:15

**Spartan**
38:19,22
39:1,10
57:21,23
71:5 78:10
79:1,2,23,
24 80:21
88:19

**speak** 7:25
41:9 71:24
89:16 95:8
103:18
106:9
146:20
219:2

**speaking**
143:22

**speaks** 59:19
148:7

**Special**
155:21

**specific**
30:20
31:15
40:15
41:7,20
42:7
47:17,23,

24 48:25
50:25
51:19
52:7,24
53:4
68:16,18
77:8 78:21
94:20
99:15
124:9
125:19
127:15,16
129:20
136:24
138:21
146:23
183:23
191:5

**specifically**
10:2 17:3,
8,12,17,23
18:3,12
19:18
26:13
27:21
29:19,24
40:16 41:5
42:5 47:14
48:24
50:23
51:11,12,
14 52:23
67:15,22
75:17
78:11 84:8
85:7 90:14
93:14
96:9,21,

22,24
98:10,11
102:1
105:11
107:25
108:3
109:17
113:12
115:4,22
120:23
124:24
125:17,21
128:20
129:8
143:12
152:10,16
153:7,13
171:24
180:10
184:1
192:8
195:10

**specifics**
41:1
102:17
133:11,14

**speculated**
36:2

**speeding**
168:14

**spell** 8:6,17
183:16

**spelled** 8:20
9:2 61:3

**spend** 46:20
59:20

70:17 77:6
128:9,12
129:17
152:16

**spent** 42:12
46:5,8,14
152:10
184:4

**spits** 88:22

**spoke** 23:19,
21 96:3
97:2

**spoken** 41:5

**Sporting**
10:11

**spreadsheet**
69:23
113:4

**St** 8:19

**stack** 42:18

**stacked**
114:12

**stand** 145:18

**standard**
13:17 14:7
19:11
76:9,21,23

**standards**
77:6

**standing**
195:6

**standoffish**
147:6

**stands** 136:9
197:6

**start** 39:14
113:24
127:4
158:7

**started** 7:23
15:12 50:7
58:21
100:21
170:20,22
181:21

**starting**
218:11

**state** 13:6
21:21
24:22
25:15,21,
24 26:17
28:12,14,
15 33:19
59:16
89:12
95:1,3,5
111:6
138:21
150:24
160:9
162:9
172:2
188:6
195:7
197:16,25
198:6,12
199:1,10,
18 218:23

stated  10:6
27:1 29:3
82:2 114:9
117:6
171:5
174:8

statement
104:21

statements
36:12
110:23
121:1
191:4,5

states  7:11
24:17
26:14
27:3,22
28:5 29:5,
19 51:23
52:1,4
145:19
153:9
157:17
158:19
169:24
198:24
201:10
221:13

stating  14:4
28:16
107:3

status  60:4,
10 91:21
155:22

statute
16:10

125:20
129:20

statutes
10:7

staying
205:23

steps  220:20

stick  77:21

stipulate
88:13

stipulation
85:24
88:17

stop  33:8
208:16
217:3

store  184:14
185:19
196:19

storefront
185:7
194:2

story  135:6
205:17

straw  134:6,
8

street  162:8

strictly
71:17

strike  99:3

study  204:4

stuff  80:25

84:25
86:24
131:12,14
155:17
157:21
163:21
186:11

subject  55:7
143:24

submission
130:4

submit  11:16
163:21,24
186:6

submits
12:24

submitted
47:3 75:4
221:14

submitting
75:24

Subpart  7:17

subsequent
219:1

successful
128:15

successfully
61:12
131:4

sued  147:12

sufficient
194:11

suggests

89:11

suing  89:3

summarize
218:13

summary  97:1

summer  194:1

super  140:4
152:14

supervisor
12:25

support
11:17
75:24
83:24
86:17,20

suppose
181:23

supposed
35:8,16
78:22
165:23
168:11
186:15
197:2
200:2,7
203:20

suppressor
155:15
178:25

surrounding
80:18
156:21

Suspend  7:15

IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC

suspended
 7:21

Suspension
 221:8

suspicious
 21:1,3
 50:3 54:12
 55:1 56:8
 188:15,18

Symington
 14:19,22
 39:22,23
 40:8,17
 42:6,12
 45:17 46:7
 101:6,14
 102:16
 152:3,10
 153:18,22
 154:3
 160:21
 169:5,21
 183:19

Symington's
 50:15

system  17:4
 18:1
 27:12,19
 31:21
 32:24 33:1
 34:4,9,23
 38:19,22
 39:11,12
 59:12
 61:24
 62:4,12,

16,25
63:3,7,8,
11,21
64:1,7,14
70:18,20
76:17
77:22
80:11
88:19
92:21,23
102:21
107:4,7,13
112:4,23
114:21
128:6
131:16,17,
18,25
135:12
141:21,25
154:4,13,
19,23,24
155:6,7
161:17
162:6
163:7,8,
14,16
164:21,25
173:15
185:24
187:20
208:1
209:7
213:7

systems  59:5
 219:24

———————————
      T
———————————

T-E-M-P   9:2

T-H-I-E-L-H-O-
R-N  8:20

T-O-R-R-E-Y
 183:17

Tab  66:9

tablet  155:2

takes  16:13
 212:19
 218:23

taking  71:24

talk  9:14,
 23 15:11,
 12 24:16
 25:1 29:4
 30:2
 48:12,15
 49:2 55:4
 56:6,8
 61:23
 73:17
 75:2,9,14
 76:14
 79:5,11
 84:13
 90:14
 96:6,19
 101:6
 103:16
 105:17
 106:8
 129:13,14
 149:8

150:6
169:24
172:18
178:20
180:11
185:9
190:10
199:20
205:7
206:16
208:21

talked  35:24
 93:18,20
 124:20
 129:11
 133:23
 135:19
 138:24
 139:1,13
 158:12
 160:3
 161:18
 183:3
 186:12
 200:12,15
 205:21
 206:15
 208:24
 209:7

talking  36:7
 41:2 45:8
 55:7 64:16
 65:6 67:22
 70:7 71:2,
 9 76:8,10
 85:17
 96:25

108:21,22
110:10
127:11,13
131:14,23
140:6
152:10
155:16
168:24
174:19
177:11
183:23
184:5
189:24
192:22,23
205:6
206:10
207:15
210:6

talks  31:2
84:4 176:7

Tanner  8:10
10:22,24
11:2,5
16:15
17:9,18
18:4,13,16
19:14
23:19
26:21
28:24
35:20
36:1,12
37:10,15
47:15 67:3
71:18,19
96:3,8,23
102:4,20

105:11
107:3
117:7
120:17
124:1,16
150:23
151:1
168:23
169:1
184:4
185:2
191:16
194:2
195:19

Target  10:11

Tax  155:22

technically
85:9

telling
138:4
149:20
169:21
178:18

tells  130:16
168:13
182:2

Temp  8:21
9:1 11:21
12:1 37:24
74:10
81:16
88:13
90:14
106:8
111:1,12
138:12

156:1
158:9,15
159:11,15
160:3,7,11
164:20
166:8
167:10,14
176:21
177:4
181:1
187:5
189:4,17
207:18,24
211:3

Temp's  75:19

tendered
221:21

tension
145:22,24
146:1

term  10:4
174:15
175:10
181:3

terms  40:14
59:16 60:5
65:5 72:8
173:15
174:19
178:10
180:25
181:1
196:18
208:5
218:20,21

terrible

170:3
180:1

testified
50:7 74:3
82:2
100:16
122:5
139:20
161:19
164:21
182:19,20
199:2
207:24
210:2

testify  8:21
42:11 78:7
85:13,16
156:1

testifying
39:25

testimony
11:21 38:8
40:7,25
50:11
54:25
56:23
78:3,6
85:7 93:11
112:10
116:17
190:8
213:20

text  211:4

texted
102:7,20

theft  161:2

theory  81:3
 88:21
 219:10

thicker
 109:6

Thielhorn
 8:15,18,24
 9:10,19,23
 11:20,23
 16:8 30:12
 38:23 39:6
 43:19
 49:16,19
 55:17
 56:2,11,15
 73:15,22
 74:21
 75:23
 78:25
 83:12
 85:25
 88:15 90:1
 109:5
 127:11
 130:24
 131:11
 132:2,5
 139:9
 142:18
 148:18
 149:1,4,24
 150:10,16
 153:1
 168:21
 170:9,18
 171:17,18

 178:7
 195:23
 203:6,18,
 22 204:1,
 5,8,11,16,
 22 205:1,
 6,12
 207:14
 215:21
 216:17,19
 218:9,16
 221:17

thing  68:6
 75:2 78:17
 79:25
 86:21 87:9
 94:13
 121:23
 124:7
 126:1
 127:5,8
 149:18
 159:1
 163:23
 182:1
 184:1
 187:14
 206:24

things  19:6
 21:25 36:3
 51:18
 83:18
 85:11
 87:13
 94:18
 117:12
 125:14,18

 134:18
 148:16
 156:15
 181:12
 184:2
 186:14
 205:22,23
 206:13
 220:24

thinking
 49:23
 205:23
 214:5

thinks  86:18

thought
 49:19
 121:22
 158:25
 161:13
 190:7
 208:25

thousand
 58:2,3
 64:19,22
 65:21 92:9
 156:2
 171:20
 172:8,13
 186:19
 196:22

three-  144:6

three-hour
 129:14

threw  204:1

throw  213:8

throwing
 203:18

thrown
 213:12
 214:4

ticket
 168:14

tides  151:25

tied  219:22

time  8:1,4
 9:12 11:20
 13:8 15:14
 16:22
 19:16
 20:9,20,24
 21:9 23:20
 32:13
 38:1,4
 40:3,23
 41:23
 45:16,21
 46:5,8,14,
 19 47:5,9
 48:23 50:1
 51:7 52:21
 56:22
 58:12,21
 59:20
 68:14,21
 70:18 77:6
 78:23
 80:22
 84:11,12
 89:22
 95:24
 97:19,25

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023                    Index: timely..Torrey

99:23
100:25
103:20,24
105:22
106:1
109:13
111:24
112:2,17
114:1
119:3,11,
14 121:22
127:20
128:2,12
129:17
133:3,10,
13 134:23
147:13
149:25
150:15
152:6,9,16
159:19
161:25
163:11
167:3
169:20,21
170:10,14,
20 171:13,
19 173:5,
22 178:11,
15,22
179:9
183:22
184:4
185:25
186:5,18
189:24
190:7
191:3,18

192:7,8,9,
14 193:7
194:17
196:24
201:18
202:1,9,
19,22
203:1,4
204:17
205:14
206:3
211:2,4
212:13,18
213:21
215:14
216:12
222:1

**timely**
146:18

**times** 35:24
73:3 84:16
172:8
183:5
190:19
191:25
196:18
197:6
208:1
213:18

**Title** 7:16
9:20 27:21
221:12

**titled**
110:24

**Tobacco** 7:11

**today** 9:14,

25 10:19
38:8,10
39:25 40:7
41:2 42:11
45:9,18
49:23 56:6
57:25
73:16
74:1,7
75:2 78:18
79:20 80:3
83:6 84:1,
9,19
86:14,16
87:16
88:23
129:19
135:17
141:9
175:24
183:23
186:14
206:1,2
209:2
221:3

**today's**
10:14 86:2

**told** 64:20
101:10
107:8
125:8,11
126:22
139:1
143:1
154:7
169:20
172:4

173:10
179:14
186:10
196:4
197:18,20
217:11

**top** 43:2
61:9
123:22
140:5
198:22,23

**topic** 41:20
80:14

**topics** 18:19
40:15
41:12
42:13
85:23

**Torrey** 8:12
16:16
17:9,18
18:4,13,16
19:14
23:19
26:12
47:15
96:6,10,
12,19
124:5,7
143:11
151:10,24
154:1
159:21,25
160:1
162:13,16,
21 166:14
170:7,15

172:19
177:8,14
180:19
183:11,15,
18 195:24
204:3
209:16

total   57:19
179:20
187:1,4

totally
87:15
154:20
195:17
208:13

touched
180:8

town   170:11
179:18

trace   61:8,
18 69:4,7
136:8,12,
13,15
137:22,23

traceability
136:11,20,
23 137:8

traceable
136:25
137:1

traces
61:10,11,
15,21

tracing
219:21

traffic
195:20

trafficking
12:9
219:23

trained
138:13,14

trainee
12:10

trainer
12:10

training
12:6,7
45:15
71:16,23,
25 74:23
75:5 97:17
98:8
100:24
128:9
130:16
132:12
168:8
180:18

trainings
12:11

transaction
11:6,9
18:8 20:3,
6 22:7
24:25
25:1,4
27:8 29:15
30:4,10,
13,14,17,
20 31:12,

15,19
33:8,10
38:6 55:2,
8,11,15,
18,21 67:2
90:17,20,
23 91:6
93:14
96:10
103:24
104:14
105:2,5,16
108:12
113:21
115:13,18
116:6
139:13
140:25
141:1
142:11,20
158:16
167:4
171:14
174:25
178:6,10
185:10
187:19
190:11
197:12
199:24
207:16

transaction's
164:15

transactions
21:3 56:9
64:18 65:8
93:16

99:15
102:23
134:14
177:23
178:5
180:9
183:9
210:5

transcribed
64:3
111:23

transcribing
107:6

transcript
7:2,24
78:18
222:3

transfer
22:10
26:18
27:13
28:14
29:18
33:7,15
51:16
52:23
53:21 65:2
89:12
92:10,12,
15,20
105:16
108:12
114:25
124:17
161:15
172:2,5,16
175:25

197:15
198:17
199:1
210:18
211:18
215:11
218:2,23

transfer's
199:10

transferee
18:7
22:11,13,
16,22 25:5
27:14 28:5
33:6 35:5
36:8 37:4
53:14
123:14
125:1
126:3
128:22
129:21,24
130:1
198:25

transferor
22:11
36:1,2
53:25
129:25
130:3

transferred
22:12,22
26:5 27:4
28:17
33:14 51:8
53:16 54:4
57:8 92:2

104:3

transferring
50:23 62:5
98:3 108:2
175:6

transfers
28:6 52:18
57:18 92:9
99:17
102:2
157:19
166:24
186:19
211:23

treated    95:9
121:2

treating
202:18

trouble    93:3
109:8

true    124:6
139:20,22
140:19
141:20
172:18
174:15
201:9,24
206:4,25

truncated
113:10

trust    99:17

truthful
118:2

tune    79:15

turned    153:2

two-    144:6

two-hour
129:13

type    13:2
19:5 25:12
45:24
88:20
91:18
155:1,3,19
163:20,22
164:2,6

typed    61:2

types    155:12

typewriter
69:23

typical
156:16

typically
59:5 77:9
123:25
145:9
163:13
194:23
219:8
220:21

————————

U

————————

Uh-huh    201:1
210:4

ultimate
85:4

ultimately
20:13 76:8

unaware
133:6,8

unclear
168:6

uncomfortable
90:3

understand
15:2 48:4
63:2,25
74:8,24
79:10
81:22 82:9
83:13
87:2,18
88:5 99:22
102:25
109:7
117:23
122:23
135:18
136:18
138:7
143:7
144:3
148:2
169:14
172:23
173:14,21
174:3,20
175:15,17,
25 176:4
178:3,11
179:21
180:13
181:2,5,8,
17,18,24
182:12,13

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023    Index: understanding..version

183:9
196:14
198:10,14
200:15,23
201:2,4,6,
13 202:6
203:7,22
204:5,9,
11,22
205:13,15,
17 206:2,
6,8,19,23
208:6,8,
11,14,22
209:2,9,21
212:19
213:14
214:21
215:23
216:23
217:4
218:19,20

**understanding**
52:14
58:20
62:18
72:25 73:2
75:8 80:17
93:21
97:24
100:14
105:1
112:24
113:18,25
114:18
121:25
129:1
135:2

136:20
137:23
139:24
140:24
146:16
161:23
163:7
165:5
167:4,15,
19 172:19
189:18,21
190:8
193:9,13
215:2,4,13
218:17

**understood**
51:7 52:11
72:13
94:6,9,10
97:19
99:12,17
143:13
159:15

**unflag**  218:1

**unique**  27:6
31:14 95:7
141:23

**United**  7:11
26:13
27:22
29:19
221:13

**unlicensed**
27:5,24
198:17

**unlike**  88:5

**unpurposeful**
69:19

**unsuccessful**
61:14,21

**up-to-**  12:11

**update**  136:3
137:17
138:5
162:1

**updated**
43:24
98:15
168:4

**updates**
44:1,2

**UPIN**
125:11,24
141:23
142:2,4
193:18

**upset**  202:13
205:8
208:25
209:8

**upstairs**
177:19
185:6

**user**  131:2
173:3

**user's**  131:6

**Utah**  19:20

**utilize**
186:11

**utilized**
93:6 199:4

---

**V**

---

**valid**  28:5,8
198:25

**validate**
136:21
137:9

**validating**
32:10

**Valley**
156:21,25
157:10
179:17,19

**ve**  217:9

**verbally**
197:20

**verbatim**
53:11

**verify**  13:3,
6 21:21
107:17
109:21
135:5

**verifying**
21:20

**version**
43:24,25
44:2
118:21
119:6
220:7

versions
  220:13

versus   48:23

Victor   67:9

view   20:12
  59:12
  81:23
  104:10
  105:1
  107:15
  172:11
  198:11
  199:13
  206:23
  208:9
  218:20

violation
  10:7 11:9,
  11 20:1
  24:17
  26:24,25
  27:2 28:23
  29:1,3,4
  35:19,20,
  23 59:22
  70:2,7
  83:8
  90:19,20
  91:7 92:3
  96:22,24
  103:4
  104:10
  106:12
  118:10
  137:6
  197:8,15
  198:16

220:14,15

violations
  10:1,3,21
  11:7,10
  24:1,2,8
  32:8 54:18
  55:5 56:7
  61:19,20
  64:11,16
  65:14,20,
  22 66:6,
  12,20,21
  67:8 68:1,
  2,7,12,16
  69:22,25
  71:4,12,18
  72:16
  73:10,11,
  12,14,20
  74:22
  75:7,9,21,
  24 76:3,
  13,14
  77:23
  79:6,12
  80:2,18
  81:9,18,25
  82:4,11,
  14,15,19,
  23 83:14,
  20 84:1,19
  86:5,19,24
  89:9,18
  90:10 92:3
  96:8 97:13
  98:1,2
  99:14,16
  105:13

110:3
118:17,21
131:23
134:15,16
146:25
148:8
149:8,19
150:5
177:6,16
180:25
197:14
206:19

voice   77:25

volume   39:4
  57:15,19,
  25 73:12
  156:10

---

### W

wait   52:21
  63:22
  125:1,23
  128:22
  130:9
  166:4
  188:5,12

walk   77:17
  147:18
  210:22

walked
  147:19,23

wanted   52:17
  80:14
  131:11,15
  132:5,7

158:7
195:15

wanting
  27:25 75:9
  87:2 132:2

warn   162:19

warning
  162:10
  173:16
  188:12
  217:13,21
  220:9,11

warnings
  186:7
  188:5

watch   159:7
  160:18
  184:24
  185:3
  204:20

watch-making
  151:19

watches
  151:20
  185:6

watching
  177:18

weapon
  187:25
  189:23
  190:2

weapons
  209:24
  210:13,17,

23

website  44:6

websites
 154:20

week  12:9
 67:1
 115:17

weeks  12:7,8

weight  86:12

welder  185:1

welding
 185:4
 196:17

west  157:1

white  43:13,
 21,23

wilfulness
 39:2

willful
 10:4,5,7
 70:10 74:2
 75:10
 78:1,9
 80:19
 82:14,18
 83:8 86:8,
 19,23
 89:10,18
 90:12
 148:16
 149:19
 172:24
 218:21
 220:14

willfully
 24:18 27:4
 29:7 56:8
 73:21
 74:23 76:3
 77:24
 79:6,12
 80:2 83:16
 84:2 86:5,
 25

willfulness
 9:13 38:24
 54:18
 55:14
 70:12,19,
 21 73:17,
 23,25
 74:4,5
 75:17,22
 76:9,21
 77:3 78:12
 80:12
 85:12,14
 86:1 88:10
 121:18
 148:8

willingness
 148:15

willy-nilly
 203:5

window
 114:10
 116:9
 164:5,10
 194:4

wish-washy

168:3

witnesses
 150:13

wolflessness
 77:5

wondering
 54:17

word  201:13
 219:6

word-for-word
 161:7

words  133:13
 174:7

work  11:25
 13:3 21:19
 121:21
 163:12
 184:25
 196:17
 219:14

worked  12:4
 61:25
 184:8,11,
 14 196:18

working
 12:15 63:7
 151:14

works  79:24
 101:8
 163:18

world  151:20

worse  60:1

worth  109:20

210:5

wow  49:23

wrap  80:20

wrist  151:20

write  35:9
 83:19
 118:11
 165:23
 167:24
 175:21

writes  74:3

writing  7:19
 35:7
 118:11
 154:8

written
 221:5

wrong  49:21
 52:21 57:7
 61:4 63:25
 100:5
 101:12
 107:5
 112:9
 132:21,23
 159:4,8
 166:16
 168:12,13,
 18 182:3
 204:3
 217:19

wrote  75:6
 96:2 112:9
 116:14,20
 122:6

**IN THE MATTER OF: MOREHOUSE ENTERPRISES, LLC**
Hearing on 08/16/2023                    Index: y'all..zoning

163:1

---

**Y**

---

**y'all** 100:17
159:18
164:18
185:24
186:21
187:4
193:19
194:16

**year** 12:10
16:4 22:4
46:22
55:25
65:24
111:25
112:3
113:16
114:6,16
156:4,11
170:2,7
171:4
187:5
189:25

**year's**
109:20

**years** 12:4,5
16:11
114:7
144:14,15
152:18,19
155:24
158:25
183:6
184:2

194:16
195:3
203:24
210:5

**yellow**
173:16

**young**
184:20,21

---

**Z**

---

**zip** 162:9

**zoning** 13:7
21:22