IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

MOREHOUSE ENTERPRISES, LLC            )
d/b/a BRIDGE CITY ORDNANCE, GUN       )
OWNERS OF AMERICA, INC.,              )
and GUN OWNERS FOUNDATION,            )
                                      )        Case No. 3:23-cv-00129-PDW-ARS
Plaintiffs,                           )
                                      )
v.                                    )
                                      )
BUREAU OF ALCOHOL, TOBACCO,           )
FIREARMS AND EXPLOSIVES; UNITED       )
STATES DEPARTMENT OF JUSTICE;         )
STEVEN M. DETTELBACH in his official  )
capacity as THE DIRECTOR OF ATF, and HANS )
HUMMEL, in his official capacity as   )
THE DIRECTOR OF INDUSTRY OPERATIONS   )
FOR THE SAINT PAUL FIELD DIVISION OF  )
THE ATF,                              )
                                      )
Defendants.                           )
_____)

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs write to notify the Court of a recent decision from the United States District Court

for the Northern District of Texas.  In *William T. Mock, et al., v. Merrick Garland, et al.*, Civil

Action No. 4:23-cv-00095-O (attached), Judge O'Connor preliminarily enjoined the Bureau of

Alcohol, Tobacco, Firearms and Explosives' from enforcing its Final Rule entitled "Factoring

Criteria for Firearms with Attached 'Stabilizing Braces,'" 88 Fed. Reg. 6,478 (Jan. 31, 2023).  This

Rule applied the National Firearms Act's registration and taxation requirement of short barreled

rifles to pistols with stabilizing braces attached.

Of importance, Judge O'Connor found that the "history interwoven with the 'right of the

people to keep and bear Arms, U.S. CONST. AMEND. II, indicates that the Second Amendment's

text has long incorporated the right of personal gunsmithing, i.e., the right of private individuals to modify or acquire modifications to lawfully bearable firearms so as to increase their accuracy and safety for a more effective exercise of self-defense.'" Slip Op. at 21.  In support of that conclusion, Judge O'Connor cited to a historical analysis for the proposition that, "in order '[t]o sustain themselves against a large and well-supplied British military throughout the [Revolutionary] war, the Americans relied on gunsmiths, individuals with knowhow from working on their own arms, and Americans who were willing to learn the art of arms manufacturing.' Joseph G.S. Greenlee, The American Tradition of Self-Made Arms, 54 ST. MARY'S L.J. 35, 51 (Apr. 11, 2022) (emphasis added)." *Id.*

These conclusions support Plaintiffs' arguments in their Memorandum in Support for their motion for Preliminary and/or Permanent Injunction (ECF #15-1) that the Second Amendment protects a right to "manufacture, acquire, and sell firearms…"  (Memorandum at p.16); that the text of the Second Amendment covers manufacturing firearms (Memorandum at pp. 17-18); and that our Founders' "especially recognized the necessity of the domestic manufacture and supply of arms…" *Id.* at p. 21.

Respectfully submitted, this the 4th of October, 2023.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh (MS # 102784)
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

John I. Harris III (TN # 12099)
Schulman, LeRoy & Bennett PC
3310 West End Avenue, Suite 460
Nashville, Tennessee 37203
(615) 244 6670 Ext. 111
Fax (615) 254-5407
jharris@slblawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be filed with the Court's CM/ECF system, which generated a notice of electronic filing and delivered a true and correct copy of the foregoing to all counsel of record.

Dated: October 4, 2023.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **WILLIAM T. MOCK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00095-O |
| | § | |
| **MERRICK GARLAND, et el.,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**OPINION & ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

Before the Court are Firearms Policy Coalition, Inc., William T. Mock, Christopher Lewis, and Maxim Defense Industries, LLC's ("Plaintiffs") Motion for Preliminary Injunction (ECF Nos. 36, 75), filed February 21, 2023 and August 18, 2023; the Attorney General of the United States, the United States Department of Justice, the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Bureau of Alcohol, Tobacco, Firearms and Explosives' (the "Government Defendants") Response in Opposition to Plaintiffs' Motion (ECF Nos. 37, 84), filed March 10, 2023 and September 1, 2023; and Plaintiffs' Replies (ECF Nos. 38, 85), filed March 17, 2023 and September 8, 2023. Having considered the parties' briefing and applicable law, the Court **GRANTS** Plaintiffs' motion for preliminary injunction against the Government Defendants.

## I.    BACKGROUND

### A.  Statutory and Regulatory Background

In the first major federal attempt to regulate firearms, Congress enacted the National Firearms Act of 1934 ("NFA"), 26. U.S.C. §§ 5801–5872, which focused particularly on dangerous and concealable weapons used in organized crime. *See Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002) (internal citations omitted). To that end, the Act identifies eight specific

categories of "firearms" that are subject to certain registration and use requirements and associated taxes. 26 U.S.C. §§ 5801–02, 5811–12, 5821–22, 5841, 5845(a). Relevant to this dispute is the category of a short-barreled rifle ("SBR"), *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4). The Act defines a "rifle" as:

> [A] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id.* § 5845(c). Given its focus on particular weapon categories, the NFA does not define every type of firearm, *e.g.*, handguns, and specifically exempts "a pistol or a revolver having a rifled bore" from its statutory purview. *Id.* § 5845(e).

Thirty years later, Congress enacted the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921–931, which expanded federal firearms regulation in an effort to address the "widespread traffic in firearms and . . . their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 825–26 (1974) (statutory references omitted). The GCA amended the NFA in some respects, defined additional terms, and reinforced the NFA in others. *See e.g.*, 18 U.S.C. §§ 921–22. Among other terms, the GCA defined "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." *Id.* § 921(a)(30). The GCA's definition of "rifle" is identical to that of the NFA. *Id.* § 921(a)(7).

Authority to administer and enforce the Acts is vested in the Attorney General, 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a), who delegated that responsibility to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). 28 C.F.R. § 0.130. The ATF has subsequently promulgated rules and regulations in keeping with that delegation of authority, including by classifying particular weapons and devices as subject to or exempt from federal regulation. 27 C.F.R. parts 478, 479; *e.g.*, U.S. ATF, Open Letter on the Redesign of "Stabilizing Braces" (Jan. 6, 2015) (indicating that using a stabilizing brace "as a shoulder stock" transforms a pistol or handgun into "a NFA firearm"); U.S. ATF, Reversal of ATF Open Letter on the Redesign of "Stabilizing Braces" (Mar. 21, 2017) (clarifying that purely "incidental, sporadic, or situational 'use'" of a stabilizing brace would not transform a pistol into an NFA-covered firearm).

Since 2012, the ATF has seen a proliferation of "stabilizing brace" devices, which were originally designed "to assist people with disabilities or limited strength or mobility" to safely and single-handedly fire heavy pistols.[1] With time, the devices began to include characteristics resembling shoulder stocks and the ATF soon learned that manufacturers were widely marketing these "braces" to consumers as a means of creating functional SBRs that avoid NFA requirements.[2]

In response to this trend, the ATF published a notice of proposed rulemaking ("NPRM") in June 2021, which proposed amendments to 27 C.F.R. §§ 478.11 and 479.11 and identified criteria by which the ATF would determine whether a weapon was a "rifle" for purposes of the NFA and GCA. 86 Fed. Red. 30,826. After receiving more than 230,000 public comments on the NPRM, the ATF published the Final Rule on January 31, 2023. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023). Consequentially, the Final Rule modified the ATF's earlier regulations addressing how the agency would determine whether

---

[1] Pls.' Br. 6, ECF No. 36; Defs.' Opp. 4–6, ECF No. 37.
[2] Defs.' Opp 7–8, ECF No. 37.

a weapon is a "rifle" for purposes of the NFA and GCA. *Id.* at 6,480. Specifically, the Final Rule

indicates that ATF interprets the phrase "designed or redesigned, made or remade, and intended to

be fired from the shoulder" to include:

> [A] weapon that is equipped with an accessory, component, or other rearward
> attachment (e.g., a "stabilizing brace") that provides surface area that allows the
> weapon to be fired from the shoulder, provided other factors . . . indicate that the
> weapon is designed, made, and intended to be fired from the shoulder.

*Id.* (interpreting the identical definition of "rifle," which is defined similarly in both the
NFA and GCA, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7)). The other factors relevant to
ATF's determination are:

> (1) Whether the weapon has a weight or length consistent with the weight or length
> of similarly designed rifles;
>
> (2) Whether the weapon has a length of pull, measured from the center of the trigger
> to the center of the shoulder stock or other rearward accessory, component or
> attachment (including an adjustable or telescoping attachment with the ability
> to lock into various positions along a buffer tube, receiver extension, or other
> attachment method), that is consistent with similarly designed rifles;
>
> (3) Whether the weapon is equipped with sights or a scope with eye relief that
> require the weapon to be fired from the shoulder in order to be used as designed;
>
> (4) Whether the surface area that allows the weapon to be fired from the shoulder
> is created by a buffer tube, receiver extension, or any other accessory,
> component, or other rearward attachment that is necessary for the cycle of
> operations;
>
> (5) The manufacturer's direct and indirect marketing and promotional materials
> indicating the intended use of the weapon; and
>
> (6) Information demonstrating the likely use of the weapon in the general
> community.

*Id.* While the NPRM had proposed a table (Worksheet 49999) allotting points for specific criteria,

the Final Rule did not implement the weighted point system. *Id.* at 6,479–80. The Final Rule took

effect immediately for newly made or transferred firearms, while individuals already in possession

of subject firearms were given a 120-day registration period (ending May 31, 2023) to come into

compliance with the Final Rule before the ATF began enforcing it. *Id.* at 6,478. For those in previous lawful possession of subject firearms that declined to register them by May 31st, the ATF demanded that before the registration window closed, they must have otherwise: removed the barrels from their firearms and attached 16-inch or longer barrels in their place; permanently altered or disposed of their stabilizing braces so that they could never be reattached to their firearms; divested themselves of their firearms by turning them in to the ATF; or permanently destroyed their firearms. *Id.* at 6,570.

But even despite laying out these alternative directives for firearm owners, the ATF shortly thereafter explained that it is still entirely plausible for none of these measures to suffice for compliance. To illustrate, the Final Rule specifies that a firearm owner can still be criminally charged under the NFA for constructively possessing an unregistered SBR if their pistol could be combined with any number of objects that the ATF believes are demonstrative of a firearm's design for shoulder fire. *Id.* at 6,574-75. The set of subjective criteria the ATF lists for potential constructive possession of an NFA rifle comprises open-ended, broadly articulated standards that are left largely undefined or underdeterminate. *Id.* The ATF has a decades-long history of pressing regulatory enforcement actions based on its own constructive possession theories in other NFA contexts, where the mere ease of creation of a subject firearm has been sufficient to support criminal liability for firearm owners under the NFA. *See, e.g.*, *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421-24 (6th Cir. 2006).

The ATF barred compliance registration any time after May 31st—whereupon anyone still in possession of a braced firearm that did not submit to registration was then deemed, overnight, to have become a felon in possession of an unregistered NFA rifle. Final Rule at 6,481, 6,498. So too, it has since no longer been the case that any of the alternative compliance measures

enumerated by ATF (*i.e.*, barrel replacement, brace disposal or modification, firearm divestiture or destruction, etc.) will suffice for avoiding criminal prosecution under the NFA through the Final Rule's reinterpretaton of it. *Id.* Following the closing of its registration window, the ATF reported that its registration-compliance rate is a mere 8%, according to the higher end of its estimates.[3]

Liability under the federal firearm laws and regulations adopted pursuant thereto carries serious criminal penalties. For example, a violation of the GCA subjects a person to fines and a five-year maximum prison term. 18 U.S.C. § 924(a)(1). A violation of the NFA subjects a person to fines and a statutory maximum sentence of ten years imprisonment. 26 U.S.C. § 5871. On top of that, NFA liability exposes one to seizure and forfeiture of their firearms, *id.* § 5872, an assessment of tax liabilities, 27 C.F.R. § 479.191, hefty fines extending into the hundreds of thousands of dollars, 18 U.S.C. § 3571(b)-(c), and a total ban on the ownership of any and all firearms for life. 18 U.S.C. § 922(g)(1).

### B. The Parties

The Firearms Policy Coalition, Inc. ("FPC") and a group of its dissatisfied members brought forth a challenge to the Final Rule against the Government Defendants: Attorney General Merrick Garland, in his official capacity; the United States Department of Justice; Director of ATF Steven Dettelbach, in his official capacity; and the ATF.[4] FPC is a nonprofit gun-rights organization whose membership encompasses individual gun owners, licensed firearms manufacturers and retailers, gun ranges, firearms trainers and educators, and many others.[5] Plaintiffs William T. Mock and Christopher Lewis are Texas residents who each own at least one

---

[3] *Mock v. Garland*, 75 F.4th 563, 576 (5th Cir. 2023) (citing Stephen Gutowski, *ATF Says a Quarter Million Guns Registered Under Pistol-Brace Ban*, THE RELOAD (Jun. 2, 2023), https://thereload.com/atf-says-a-quarter-million-guns-registered-under-pistol-brace-rule/.).
[4] Am. Comp., ECF No. 13.
[5] *Id.* at 5–6.

pistol with a stabilizing brace attached to it and plan to purchase more braced firearms at the present time but for the Final Rule's added regulatory obstacles.[6] Plaintiff Maxim Defense Industries, LLC ("Maxim Defense") is a firearms and firearms accessories manufacturer and retailer that specializes in stabilizing braces and braced pistols.[7] The majority of Maxim Defense's revenues are attributable to sales of products now subject to the added strictures of the Final Rule.[8] Plaintiffs Mock and Lewis are individual members of FPC, while Plaintiff Maxim Defense is a commercial member of FPC.[9]

### C.  Procedural History

Plaintiffs filed this lawsuit on the day the Final Rule was announced.[10] Three weeks later, on February 21, 2023, Plaintiffs moved the Court for a preliminary injunction against the Government Defendants' enforcement of the Final Rule. *See* 5 U.S.C. § 705.[11] Plaintiffs challenge the validity of the Final Rule on several grounds: (1) that it infringes on individual FPC members' Second Amendment Rights; (2) that it violates the First Amendment by chilling speech; (3) that it runs afoul of the Fifth Amendment's due process guarantee; (4) that it violates structural power-vesting provisions of the Constitution; (5) that it violates the Administrative Procedure Act ("APA") as it was issued in excess of ATF's statutory authority; and (6) that it violates the APA's procedural requirements because it was not a logical outgrowth of the Proposed Rule.[12] On March 30, 2023, the Court denied Plaintiffs' motion for preliminary injunction on grounds that Plaintiffs had failed to demonstrate a substantial likelihood of success on the merits of any of their claims.

---

[6] *Id.* at 3–4.
[7] *Id.* at 4–5.
[8] *See id.*
[9] *Id.*
[10] Compl., ECF No. 1. Plaintiffs filed their Amended Complaint on February 7, 2023. Am. Compl., ECF No. 13.
[11] Mot. for Prelim. Inj., ECF No. 33.
[12] *See generally* Pls.' Br., ECF No. 36.

*See Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 2711630, at *8 (N.D. Tex. Mar. 30, 2023), *rev'd and remanded*, 75 F.4th 563 (5th Cir. 2023).

On August 1, 2023, the United States Court of Appeals for the Fifth Circuit reversed the Court's order denying a preliminary injunction and decided in favor of Plaintiffs' logical outgrowth APA claim, holding that (i) "it is relatively straightforward that the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was prejudicial," and that (ii) "[t]he Final Rule therefore must be set aside as unlawful." *Mock v. Garland*, 75 F.4th 563, 583-586 (5th Cir. 2023) (citing 5 U.S.C. § 553(b)-(c) (providing that a final rule adopted by an agency must be a logical outgrowth of its concomitant proposed rule); *id.* § 706(2)(D) (directing reviewing courts to "hold unlawful and set aside agency [rules]" found to be "without observance of procedure required by law")). The Fifth Circuit remanded the case back to the Court with instructions to assess the remaining preliminary injunction factors and rule on Plaintiffs' motion—in light of the circuit panel's decision—and within 60 days thereof. *See id.* at 586-88. The Fifth Circuit placed "no limitation on the matters that [the Court] may address on remand" and "no indication of what decisions it should reach." *Id.* at 588.

Following the parties' completion of supplemental briefing,[13] and additional briefing from Palmetto State Armory, LLC ("PSA"), the Firearms Regulatory Accountability Coalition, Inc. ("FRAC"), and NST Global, LLC (d/b/a SB Tactical) ("SB Tactical") as *amici curiae*, Plaintiffs' motion is now ripe for the Court's review on remand.[14]

## II.    LEGAL STANDARD

The decision to extend interlocutory relief rests with the sound discretion of the Court. *See*

---

[13] *See* Order, ECF No. 65.
[14] *See generally* Pls.' Supp. Br., ECF No. 75; Defs.' Supp. Opp., ECF No. 84; Pls.' Supp. Reply, ECF No. 85; Br. of *Amici Curiae*, ECF No. 73.

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (laying out the criteria for preliminary injunctive relief); *see also Hecht v. Bowles*, 321 U.S. 321, 329 (1944) ("An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity." (cleaned up)). To establish entitlement to preliminary injunctive relief, the movants must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in their favor; and (4) that the issuance of injunctive relief will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The final two elements merge when the opposing party is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As movant, the parties seeking relief bear the burden of proving all four elements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

Upon determination that a party is entitled to an injunction, a court must make a separate determination regarding the appropriate scope of the prospective relief, which is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Injunctive relief "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702). "[It] should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up). And it must be tailored to "redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted). Under appropriate circumstances, however, the demand for "complete" relief may necessitate that injunctive redress benefit many claimants of a common legal right in order to prevent "more confusion" and "multiplicity of suits" in the courts. *Mock*, 75 F.4th at 587 (quoting *Feds for Med.*

*Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir. 2023)); 2 JOSEPH STORY, COMMENTARIES ON

EQUITY JURISPRUDENCE §§ 853-54, at 147-49 (Boston, 2d ed. 1839) (citations omitted).

### III.   ANALYSIS[15]

#### A.  Substantial Likelihood of Success on the Merits

Plaintiffs were first required to demonstrate that they are substantially likely to succeed on

the merits of one of their claims. *Daniels Health Servs.*, 710 F.3d at 582. "[A]n appellate court's

decision of a legal issue . . . establishes the law of the case and must be followed in all subsequent

proceedings in the same case." *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718-19

(5th Cir. 1995). Following the Fifth Circuit's decision, the controlling law of this case posits that

Plaintiffs have demonstrated, *a fortiori*, an *actual* success on the merits of their APA challenge to

the Final Rule. *See Mock*, 75 F.4th at 578, 586 (holding that "the Final Rule fails the logical-

outgrowth test and violates the APA" and "therefore must be set aside as unlawful"). The Court

wholesale adopts that conclusion as its own as well.

#### B.  Substantial Threat of Irreparable Harm Absent Injunctive Relief

Plaintiffs are further obliged to show a substantial threat of irreparable harm. This exists

where "there is no adequate remedy at law." *Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir.

---

[15] Unless otherwise noted, the facts presented herein are taken from ATF's January 2023 Published Final Rule and Final Regulatory Analysis, Plaintiffs' February 21 Brief in Support of their Motion for Preliminary Injunction (ECF No. 36), Plaintiffs' August 18 Supplemental Brief in Support of their Motion for Preliminary Injunction (ECF No. 75), the Government Defendants' March 10 Response in Opposition to Plaintiffs' Motion (ECF No. 37), the Government Defendants' September 1 Supplemental Brief in Opposition to Plaintiffs' Motion (ECF No. 84), Plaintiffs' March 17 Reply in Support of their Motion (ECF No. 38), Plaintiffs' September 8 Supplemental Reply Brief in Support of their Motion (ECF No. 85), and legislative facts in the August 18 Brief of *Amici Curiae* in Support of Plaintiffs' Motion (ECF No. 73)—as well as all attached or referenced exhibits, sources, and declarations therein.

*See generally* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023); ATF, RIN 1140-AA55, FACTORING CRITERIA FOR FIREARMS WITH ATTACHED "STABILIZING BRACES": FINAL REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS (2023); Pls.' Br., ECF No. 36; Pls.' Supp. Br., ECF No. 75; Defs.' Opp., ECF No. 37; Defs.' Supp. Opp., ECF No. 84; Pls.' Reply, ECF No. 38; Pls.' Supp. Reply, ECF No. 85; Br. of *Amici Curiae*, ECF No. 73.

2022) (cleaned up). Harm is irreparable "if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (cleaned up). Upon a showing that an "alleged" fundamental right is "either threatened or in fact being impaired," a movant is substantially threatened with irreparable injury that "cannot be undone by monetary relief." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–97 (5th Cir. 2012); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also, e.g.*, *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 838-840 (N.D. Tex. 2022) (O'Connor, J.) (holding that "because [Plaintiffs'] injuries are inextricably intertwined with Plaintiffs' loss of constitutional rights, . . . Plaintiffs have suffered irreparable harm") (citations omitted).

A showing of economic injury is ordinarily insufficient to establish irreparable harm when damages are recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). But an "exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). In such a scenario, "substantial financial injury" will be "sufficient to show irreparable injury." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). So too, where financial costs are unrecoverable on account of the government-defendant's sovereign immunity from monetary damages, irreparable harm is generally satisfied. *See Wages & White Lion Invs.*, 16 F.4th at 1142. Under these circumstances, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (cleaned up).

Irreparable harm must also be concrete, non-speculative, and more than merely *de minimis*.

*Daniels Health Servs.*, 710 F.3d at 585; *Dennis Melancon, Inc.*, 703 F.3d at 279. And finally, a movant's "delay in seeking relief is a consideration when analyzing the threat of imminent and irreparable harm." *Anyadike v. Vernon Coll.*, No. 7:15-cv-00157, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015). The Court assesses each set of FPC Plaintiffs in turn.

       1.   Individual FPC Members

The Court finds that Mock, Lewis, and other individual FPC members are threatened with irreparable injuries in the absence of an injunction. The threats to individual FPC members are twofold: (i) sustaining permanent and nonrecoverable costs from their compliance with an unlawfully issued regulation; and (ii) suffering impairment of their fundamental right to keep and bear lawful arms in self-defense. The Court finds that such threats of irreparable harm posed by enforcement of the Final Rule are credible, imminent, and intertwined with one another.

As the record currently stands, Mock and Lewis each lawfully possess at least one pistol with a stabilizing brace attached to it, which was acquired through lawful means prior to the ATF's promulgation of the Final Rule. Mock and Lewis have maintained and used, and continue to maintain and use, each of their braced pistols for the primary purpose of general self-defense and self-defense in the home. Plaintiffs each maintain a stabilizing brace attached to their pistols as an effective tool for improving their capacity to defend their lives, their families' lives, and their homes through safer and more efficient means. The attached braces foster greater stability, control, and precision in the firing of Plaintiffs' pistols so as to enable them to more easily and comfortably accomplish the narrow end goals of self-defense—that is, to deter or neutralize life-threatening perpetrators, preserve innocent life, and as best as possible prevent or mitigate the degree of bodily injury suffered by others. In so enabling a more proficient and exacting performance of self-defense, the attributes provided by the stabilizing braces to Plaintiffs' lawfully owned defense

weapons significantly lessen the cause for lethal and irreversible misfire, friendly fire, or other collateral damage, as well as the probability of being outmatched by or falling victim to dangerous assailants. It is purely for these reasons that Mock and Lewis also plan to purchase additional braced pistols at this immediate point in time—to aid their self- and home-defense capabilities.

The ATF's own regulatory analysis concludes that the Final Rule has effectively reclassified 99% of all pistols with stabilizing braces to NFA rifles. Through seminal Final Rule adjudications, the ATF has already reclassified a whole host of specific weapons platforms and commercially available braced firearms to NFA rifles. Upon review of this record in conjunction with Plaintiffs' declarations, there is no doubt that the Final Rule will subject both FPC members to criminal liability for currently possessing each of their braced pistols. The moment the Fifth Circuit's injunction dissolves, Mock and Lewis will become felons because their braced pistols have become unregistered SBRs under the Final Rule's reinterpretaton of the NFA.

Furthermore, Mock's and Lewis' possession of these specific braced pistol models and platforms—which are newly classified NFA rifles—has been revealed in precise detail to the Government Defendants in this litigation. Thus, the two FPC members are and likely will be prosecutable at any point in time absent the Court's preliminary injunction against the Government Defendants' enforcement of the Final Rule. The evidence also suggests that without such relief, the FPC members are barred from carrying out their concrete plans to acquire additional braced pistols for home- and self-defense at this present point in time—but for complying with the Final Rule's added NFA requirements or facing criminal charges under the NFA through the Final Rule's enforcement.

Neither FPC member wishes to comply with the Final Rule with respect to the braced pistols in their current possession and in their immediate acquisition plans. As of the expiration

date of the Fifth Circuit's injunction, it is certain that both continue to possess and intend to remain in possession of their braced pistols. At the same time, however, Mock and Lewis are strongly dissuaded from continuing *at all* to possess their home- and self-defense pistols, with or without the stabilizing braces, should enforcement of the Final Rule be allowed to resume. They share an inclination toward dispossessing themselves entirely of these home- and self-defense weapons out of fear of criminal prosecution for constructively possessing an unregistered SBR. The ATF's constructive possession criteria is simply too broad and unclear for the FPC members to understand or otherwise decipher through other efforts, with a comfortable degree of certainty, that they are comprehensively abiding by the Final Rule.

The Court finds that this record presents a "credible threat of a potential felony indictment" against each of the FPC members if they proceed with their intent to maintain current possession of their braced (or unbraced) pistols or acquire additional braced pistols for lawful uses in home- and self-defense. *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 855, 857 (N.D. Tex. 2022) (O'Connor, J.).

### i.   *Nonrecoverable Compliance Costs*

At the outset, Mock and Lewis have no trouble establishing a substantial threat of irreparable harm in the form of nonrecoverable compliance costs.

"When determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." *Texas v. EPA*, 829 F.3d at 433–34 (cleaned up). As such, financial harm from regulatory compliance becomes irreparable where a plaintiff cannot recoup money damages from a federal agency on account of its sovereign immunity. *See Wages & White Lion*, 16 F.4th at 1142 (holding that regulatory compliance costs are unrecoverable and therefore amount to irreparable harm "because federal agencies generally enjoy sovereign immunity for any monetary

damages"); *R.J. Reynolds Vapor Co.*, 65 F.4th at 194 (finding that the plaintiff's financial harm was irreparable for in an APA challenge where "[t]here [was] no suggestion . . . that [the plaintiff] could overcome the FDA's sovereign immunity to recover costs"). And the general rule of thumb is that the "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023).

Here, because the ATF-designated registration window has long since passed, Mock and Lewis may only narrowly avoid enforcement of the Final Rule through permanent and costly modification, divestiture, or destruction of their otherwise lawfully owned braced pistols—and only if the Government Defendants do not prosecute them under the Final Rule first.

The FPC members might attempt to immediately remove their braced pistols from the Final Rule's coverage by disassembling the barrels and installing long-rifle barrels in their place. But according to the ATF's own analysis, this will cost an estimated $1,134 for an individual to complete. Should Mock and Lewis instead attempt to permanently dispose of the stabilizing braces or otherwise eliminate their attachability to pistols, they would each sustain a loss of $270 or more based on the ATF's estimated average cost of a stabilizing brace. However, the Government Defendants are now fully informed of Mock's and Lewis' possession of specific braced pistol models and platforms that have been reclassified as NFA rifles under the Final Rule. Mock and Lewis themselves are also disinclined from continuing to possess any unbraced pistols due to the substantial uncertainty behind what the ATF considers to be constructive possession under the Final Rule. It is much more likely therefore that when faced with this "credible threat of criminal prosecution" on the horizon, *VanDerStok*, 633 F. Supp. 3d at 855, the two FPC members will resort to surrendering their braced pistols over to ATF or destroying their braced pistols entirely. The

ATF approximates that an individual will suffer $2,500 or more in losses from the destruction or divestiture of their braced firearms.

Whatever course the FPC members choose, none of these concrete compliance costs are recoupable for them. The Government Defendants retain their sovereign immunity against monetary damages in APA actions. *See* 5 U.S.C. § 702. On top of that, the Fifth Circuit has made clear that the FPC members would be expending these concrete compliance costs on a Final Rule that "violates the APA" and "must be set aside as unlawful." *Mock*, 75 F.4th at 578, 586.

Based on this showing alone, the Court finds that Mock and Lewis satisfy the threat-of-irreparable-harm prong. The FPC members are certain to bear the "nonrecoverable costs of complying with a putatively invalid regulation." *Rest. L. Ctr.*, 66 F.4th at 597.

### ii.   Impairment of Fundamental Right

The situation becomes far more dire for the FPC members in the absence of the Court's intervening protection when one considers the burden the Final Rule threatens to impose on their fundamental right to keep and bear arms in self-defense. *See* U.S. CONST. AMEND. II.[16]

Where a plaintiff's alleged fundamental right is "'either threatened or in fact being impaired,'" that plaintiff is substantially threatened with irreparable injury *per se*. *Deerfield Med. Ctr.*, 661 F.2d at 338 (quoting *Elrod*, 427 U.S. at 373). Such is the case because "once an infringement has occurred it cannot be undone by monetary relief." *Id.* Thus, plaintiffs need only properly make out an "alleged violation" or "deprivation" of a constitutional right to demonstrate that irreparable harm is suffered or threatened. *Opulent Life Church*, 697 F.3d at 295–97 ("'When

---

[16] To be sure, the Court has passed upon the question of whether Plaintiffs are likely to succeed on the merits of their Second Amendment claims, as it is no longer necessary to reach an answer in light of the Fifth Circuit's determination that the Final Rule is already unlawful under the APA. But for purposes of assessing Plaintiffs' overall entitlement to preliminary injunctive relief based on the remaining factors on remand, the Court finds it probative to discern the extent or degree to which the Final Rule threatens irreparable constitutional injury to Plaintiffs' right to armed self-defense.

an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995))); *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 856 (N.D. Tex. 2022) (O'Connor, J.) ("Even alleged deprivations of constitutional or procedural rights may justify injunctive relief.") (cleaned up). Plaintiffs satisfy this irreparable harm showing where their "injuries are inextricably intertwined with [their] loss of constitutional rights." *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 838-840 (O'Connor, J.). The alleged impairment need not be severe or prolonged, for the "loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *VanDerStok*, 633 F. Supp. 3d at 856 (quoting *Elrod*, 427 U.S. at 373) (cleaned up).

In this litigation, Plaintiffs allege that the Government Defendants' promulgation of the Final Rule violates their constitutional rights provided under the Second Amendment. Separate from the merits of this claim, the Court finds that the Government Defendants' implementation and enforcement of the Final Rule substantially threatens to inflict irreparable constitutional harm upon the FPC members. Absent injunctive relief, the Final Rule will impair and threaten to deprive them of their fundamental right to keep and bear commonly used arms as a means of achieving the inherently lawful ends of self-defense. *See* U.S. CONST. AMEND. II (providing that the "right of the people to keep and bear Arms, shall not be infringed.").

***Weapon in Common Use.*** The Second Amendment prohibits government from infringing upon an individual's right to keep and bear arms for self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2125 (2022) (citing *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008)). This protects an individual's "possession and use of weapons that are 'in common use at the [present] time." *Id.* at 2128 (quoting

*Heller*, 554 U.S. at 627). Conversely, protection is not extended to possession or use of "dangerous and unusual weapons." *Heller*, 554 U.S. at 627.

A weapon is in "common use" rather than "dangerous and unusual" if it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment) (emphasis in original); *Heller*, 554 U.S. at 625 (holding that the Second Amendment guarantees the right possess and carry weapons "typically possessed by law-abiding citizens for lawful purposes"). The relevant inquiry under this standard is the current total number of a particular weapon that is in lawful possession, ownership, and circulation throughout the United States. *See, e.g.*, *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment); *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from the denial of certiorari); *see also Hollis v. Lynch*, 827 F.3d 436, 449-450 (5th Cir. 2016) (collecting cases). As a *per se* matter, semiautomatic pistols are commonly used weapons for lawful self-defense purposes across the United States today. *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023); *Caetano*, 577 U.S. at 416-17 (Alito, J., concurring in the judgment).

The Court finds that the braced pistols subject to enforcement of the Final Rule are in common use today. For starters, it is "undisputed" that pistols such as those in the FPC members' possession are, on their own and without the stabilizing braces, already deemed to be among the weapons "most commonly used today for [lawful] self-defense." *Ibid*; *Mock*, 75 F.4th at 578, 588 (Willett, J., concurring) ("ATF agrees that the weapons here are lawfully bearable *pistols* absent a rearward attachment . . . These pistols are therefore lawful." (emphasis in original)). A stabilizing brace does not somehow alter that status and effectively strip these pistols of their Second Amendment protection. The Government Defendants' assertion to the contrary—that pistols *do*

become dangerous and unusual as soon as stabilizing braces are attached to them—does not survive its own administrative record. The ATF's regulatory analysis concludes that there are between 3 and 7 million, with a fifty percentile estimate of 5 million, braced pistols under the ownership of law-abiding individuals for lawful purposes throughout the United States. In the Final Rule publication as well, ATF did not dispute noteworthy public comments pointing out that "millions of 'braces' are in use" and that braced pistols are "commonly used by millions of law-abiding Americans for various reasons." On the other hand, ATF even conceded that since 2012, "the variety of available 'stabilizing braces' or similar 'brace' devices and pistols equipped with 'braces' has grown significantly." Supreme Court guidance and sister circuit precedent postulate that this record is dispositive of the matter. *See Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) (finding stun guns are in common use based on "hundreds of thousands of Tasers and stun guns [that] have been sold to private citizens, who it appears may lawfully possess them in 45 states"); *Friedman*, 577 U.S. 1039 (Thomas, J., dissenting from the denial of certiorari) (finding semiautomatic rifles are in common use based on "[r]oughly five million Americans [that] own AR-style semiautomatic rifles"); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (finding semiautomatic rifles are in common use based on "[a]pproximately 1.6 million AR-15s [that] have been manufactured since 1986") [hereinafter *Heller II*].

Accordingly, the Court finds that braced pistols regulated under the Final Rule are commonly used by law-abiding citizens for lawful purposes. The FPC members' possession and use of brace pistols is therefore within the ambit of Second Amendment protection. *See Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 627.

**Presumptively Protected Conduct.** *"*When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" from the regulation at

issue. *Bruen*, 142 S. Ct. at 2129-2130. Under this inquiry, the Court assesses "whether the plain text of the Second Amendment protects [Mock's] and [Lewis'] proposed course of conduct" with respect to their braced pistols. *Id.* at 2134. An assessment of the Second Amendment's plain text must rely on history to guide and inform its meaning. *Id.* at 2127, 2130; *Heller*, 554 U.S. at 595.

Notwithstanding adverse enforcement action under the Final Rule or the threat thereof, each FPC member's proposed course of conduct is to maintain the possession and use of a pistol with an attached stabilizing brace for purposes of effective self-defense both inside and outside the home.

The Supreme Court has already established that the text and history of the Second Amendment's operative clause, "the right of the people to keep and bear Arms," U.S. CONST. AMEND. II, protect an individual's right to possess, carry, and operate a commonly used handgun in the home and in public for the lawful purpose of immediate self-defense. *See Heller*, 554 U.S. at 579-592, 635-36 (holding that the text and history cover home possession of commonly used handguns for ready use in armed self-defense); *Bruen*, 142 S. Ct. at 2134-35 (holding that the text and history cover public carry of commonly used handguns for ready use in armed self-defense). As such, the Second Amendment "presumptively guarantees" Plaintiffs Mock and Lewis the right to keep and bear braced (and unbraced) pistol arms at home and in public for general self-defense use. *Id.* at 2135.[17]

The Second Amendment also presumptively protects the FPC members' proposed course of conduct insofar as it involves "making common, safety-improving modifications to otherwise lawfully bearable arms" for the purpose of enhancing the performance of self-defense. *Mock*, 75

---

[17] The pistols subject to the Final Rule's restrictions on stabilizing brace firearms, including those in the possession of Mock and Lewis, are a subset type of handgun. *See, e.g.*, *Heller II*, 670 F.3d at 1255; *Renna v. Bonta*, No. 20-CV-2190-DMS-DEB, 2023 WL 2756981, at *1, *7 (S.D. Cal. Mar. 31, 2023).

F.4th at 578, 588 (Willett, J., concurring). The conduct of acquiring, attaching, and maintaining rearward attachments, such as a stabilizing brace, serves to "make the pistol more stable and [thus] the user more accurate." *Id.* And as explained earlier, "[a]ccuracy, in turn, promotes safety" in the real-life exercise of armed self-defense. *Id.* The successful performance of armed self-defense entails not only deterring or neutralizing life-threatening perpetrators, but also preserving innocent life and preventing bodily injury to others as much as possible. Users directly advance these fundamental ends of self-defense when they modify "lawfully bearable *pistols*" with a "rearward attachment—whether as a brace or a stock." *Id.* The increased control and precision to pistol fire materially lowers the probability of potentially lethal misfire and collateral damage, as well as being outmatched by or falling victim to dangerous assailants. Such safety-improving modifications are *especially* critical for "permit[ting] disabled and weaker persons to fire pistols more easily," and "more safely and comfortably," to accomplish a more proficient and exacting self-defense. *Id.* at 566, 571.

The history interwoven with the "right of the people to keep and bear Arms," U.S. CONST. AMEND. II, indicates that the Second Amendment's text has long incorporated the right of personal gunsmithing, *i.e.*, the right of private individuals to modify or acquire modifications to lawfully bearable firearms so as to increase their accuracy and safety for a more effective exercise of self-defense. For example, in order "[t]o sustain themselves against a large and well-supplied British military throughout the [Revolutionary] war, the Americans relied on gunsmiths, individuals with knowhow from working on their *own arms*, and Americans who were willing to *learn the art of arms manufacturing*." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 51 (Apr. 11, 2022) (emphasis added). Analogous to the role that stabilizing braces play for contemporary pistol owners, Founding Era gunsmithing involved modifying lawfully

bearable pistols with extended grips and rearward stocks to facilitate greater stability, control, and accuracy in single-handed self-defense fire.[18] The Court is persuaded upon this record that the Second Amendment's text and history "presumptively guarantees" Plaintiffs Mock and Lewis the right to modify lawfully bearable pistol arms with rearward stabilizing braces for the purpose of improving the performance attributes necessary to successful armed self-defense. *Bruen*, 142 S. Ct. at 2135.

Consequently, the Court finds that the proposed "conduct" of the FPC members—*i.e.*, possessing and using a stabilizing braced pistol for enhanced self-defense capabilities in the home and in public—is "presumptively protect[ed]" by the Second Amendment from the interference of disagreeing restrictions in the Final Rule. *Id.* at 2129-2130.

***Threat of Impairment.*** Ordinarily, the constitutional presumption established by the FPC members would shift the burden to the Government Defendants to "then justify its [Final Rule] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The Plaintiffs' presumption of protection against the Final Rule is so strong that "*[o]nly if [the Final Rule's] firearm regulation is consistent with this Nation's historical tradition may [the] court conclude that [Plaintiffs'] conduct falls outside the Second Amendment's 'unqualified command.'*" *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)) (emphasis added).

However, under this particular posture, the Court need not turn to whether the Government

---

[18] *See, e.g.*, *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionarywar-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738 (last visited Oct. 2, 2023);

*Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silverinlaid-kuchenreiter-flintlock-pistol-with-stock (last visited Oct. 2, 2023).

Defendants surmount this onerous threshold. To reiterate, the Court makes no holding on this motion as to whether the Final Rule violates Plaintiffs' Second Amendment rights on the merits of their claims. Rather, the Court merely determines, based on the record before it, whether Mock and Lewis face a substantial threat of irreparable Second Amendment injury from the Government Defendants' enforcement of the Final Rule.

Under this inquiry, the Court merely answers whether the FPC members' right to keep and bear arms in self-defense is "'threatened or in fact being impaired'" by the Final Rule. *Deerfield Med. Ctr.*, 661 F.2d at 338 (quoting *Elrod*, 427 U.S. at 373). A mere showing that in the absence of the Court's intervening equity, enforcement of the Final Rule would impair or threaten infringement upon the presumptive Second Amendment-protected conduct of the FPC members is dispositive of the inquiry. *Opulent Life Church*, 697 F.3d at 295–97 ("'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995))) *VanDerStok*, 633 F. Supp. 3d at 856  (O'Connor, J.).

This showing is satisfied where Plaintiffs' threatened injuries are "inextricably intertwined with [their] loss of constitutional rights." *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 838-840 (O'Connor, J.). Here, the nonrecoverable compliance costs that the Final Rule threatens against Mock and Lewis are "inextricably intertwined with their loss of [Second Amendment] rights" from the Final Rule. *Id.* Indeed, the record presents a "credible threat of a potential felony indictment" against each of the FPC members if they proceed with their intent to maintain current possession of their braced (or unbraced) pistols or acquire additional braced pistols for lawful uses in home- and self-defense. *VanDerStok*, 633 F. Supp. 3d at 855, 857 (O'Connor, J.). And as just discussed, the Second Amendment "presumptively protects" this intended course of conduct from any

impinging regulation under the Final Rule. *See Bruen*, 142 S. Ct. at 2129-2130. If the FPC members proceed in taking all compliance steps necessary to entirely avoid prosecution, they will be left deprived of their presumptively protected Second Amendment conduct (*i.e.*, divestiture or destruction of otherwise lawfully bearable pistols). If the FPC members proceed in their presumptively protected Second Amendment conduct, they will be left to face criminal prosecution for noncompliance, which will likely deprive them of their presumptively protected Second Amendment conduct anyway (*i.e.*, forfeiture of braced pistols, imprisonment, permanent ban on firearm ownership). But even if the FPC members proceed by taking *some* compliance steps to avoid prosecution, such as permanent modification or disposal of just their stabilizing braces, they will still be deprived of at least *some* presumptively protected Second Amendment conduct (*i.e.,* private gunsmithing). Under this scenario, they may still yet face prosecution anyway (*i.e.,* constructive possession charge), which would threaten deprivation of their remaining presumptive protections (*i.e.*, forfeiture of unbraced pistols, imprisonment, permanent ban on firearm ownership).

Moreover, the Final Rule *itself* flatly "violates the APA" and "must be set aside as unlawful." *Mock*, 75 F.4th at 578, 586. And it is "no answer to say that [Plaintiffs] may avoid the harm by complying with an unlawful agency rule." *VanDerStok*, 633 F.Supp.3d at 861 (O'Connor, J.). Absent injunctive relief, enforcement of the Final Rule evidently threatens the loss of Mock's and Lewis' constitutional rights to possess, maintain, and operate commonly used braced pistols for lawful self-defense purposes. This "unquestionably constitutes irreparable injury." *VanDerStok*, 633 F. Supp. 3d at 856 (quoting *Elrod*, 427 U.S. at 373) (cleaned up). The Court also deems it noteworthy that Plaintiffs' presumptive right to possess, use, and modify lawfully bearable braced pistol-arms for self-defense—of which enforcement of the Final Rule risks serious

infringement—has occupied a fundamental status of the highest order in our legal tradition that both pre-exists and transcends the Constitution itself. *See* 1 SIR WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 144 (Oxford 1768) (citing "the right of having and using arms for self-preservation and defence" as a fundamental right of persons); 3 BLACKSTONE, COMMENTARIES 4 ("Self-defence therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society."); *see also Bruen*, 142 S. Ct. at 2127 ("'[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right.'" (quoting *Heller*, 554 U.S. at 592 (emphasis in original))). To a credible threat of harm of such magnitude, to a right so inherent to mankind that upon which its self-preservation has always depended, the Court's equity cannot be a bystander throughout the interim of this suit.

Once infringement of a fundamental right has occurred, "it cannot be undone." *Deerfield Med. Ctr.*, 661 F.2d at 338. Should enforcement of the Final Rule be allowed to resume, Mock and Lewis will be substantially threatened with irreversible constitutional infringement.

### iii.   *Similarly Situated FPC Members*

Well beyond Mock and Lewis, the Court finds ample support in the attestations of FPC that many of its hundreds of thousands of members, by mere possession or intended acquisition of a single braced pistol, find themselves under similarly situated circumstances—that is, left to suffer the irrecoverable and constitutionally burdensome costs of compliance with the unlawful Final Rule, "or else" face criminal prosecution and imprisonment for exercising the fundamental right to keep and bear commonly used arms in self-defense. *VanDerStok v. Garland*, 633 F.Supp.3d 847, 857 (N.D. Tex. 2022) (O'Connor, J.).

FPC's membership spans into the hundreds of thousands and across the entire United

States. These hundreds of thousands of Americans became members for the sole expectation of accessing and relying upon the fruits of FPC's non-profit assistance with acquiring, constructing, collecting, transporting, carrying, maintaining, and using firearms for self-defense and other lawful purposes. FPC is purely dedicated to providing these members with a wide array of legal, legislative, and regulatory advocacy services, as well as research, education, and outreach programs that assist with accomplishing these ends. The present suit is one such example. The bulk correspondence received by FPC concerning the Final Rule indicates that a broad swath of its hundreds of thousands of firearm-owning members are similarly situated to FPC's participating member-Plaintiffs, Mock and Lewis. They are relying upon FPC to collectively vindicate their ability to maintain current possession of their braced pistols or acquire prospective braced pistols for lawful home- and self-defense applications.

Despite the Government Defendants' contention of mere speculation, the ATF's own administrative record lends additional credence to the sheer volume of affected FPC member-firearm owners. In its publication of the Final Rule, the ATF did not dispute comments from the concerned public noting that "millions of 'braces' are in use" and that braced pistols are "commonly used by millions of law-abiding Americans for various reasons." Of course, the ATF was in no position to do so. According to the agency's most frugal estimates, there are at least 3 million firearms and 1.4 million owners of braced pistols that the Final Rule has now swept under the onerous strictures of the NFA. The higher end of ATF's estimates indicate that the Final Rule has consolidated 7 million braced pistols within the NFA's enforcement thrust. The ATF further anticipates that the Government Defendants' enforcement of the Final Rule will cause the destruction or forfeiture of over 750,000 firearms. And with the reported registration-compliance rate as low as it is (8%), it does not require any attenuated inferences for the Court to posit that

this figure will likely be much greater in the absence of its equitable intervention.

Far from mere speculation, the Court has little trouble finding that there are likely hundreds of thousands of FPC member-firearm owners similarly situated to Mock and Lewis, based on an evaluation of the "whole record" of the ATF's promulgation of the Final Rule. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413 n. 30, 419-20 (1971) (establishing that courts must review the "whole record" of an agency's action, including the "full administrative record," when making findings and determinations in an APA challenge); *see Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597–600 (5th Cir. 2023) (reversing a court's denial of preliminary injunction for failure to incorporate the administrative record into its assessment of plaintiffs' allegations, which together combined to establish irreparable harm). Moreover, FPC cannot be expected to provide the names and declarations of every single one of its similarly situated members to establish collective entitlement to the equally shared benefits of injunctive relief. *See United Food & Commercial Workers Union v Brown Group. Inc.*, 517 U.S. 544, 546 (1996) (holding that "individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members") (cleaned up); *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (holding that where an association seeks an injunction to redress a common injury of equal degree among members, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured").

The Court concludes that Mock, Lewis, and thousands of other FPC member-firearm owners have been relegated to either suffer the irrecoverable and constitutionally burdensome costs of compliance with the unlawful Final Rule, "or else" run the risk of criminal prosecution and imprisonment for engaging in the fundamental right to keep and bear arms for lawful self-defense purposes. *VanDerStok v. Garland*, 633 F.Supp.3d 847, 857 (N.D. Tex. 2022) (O'Connor,

J.). As the Court has held several times over with respect to compliance injuries that are "inextricably intertwined with [the] loss of constitutional rights," this is an unacceptable ultimatum for regulated parties to proceed under without the intervening protection of injunctive relief. *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 838-840 (O'Connor, J.); *VanDerStok*, 633 F.Supp.3d at 855-58, 861 (O'Connor, J.) ("[I]t is no answer to say that [Plaintiffs] may avoid the harm by complying with an unlawful agency rule.") (cleaned up). Accordingly, Mock, Lewis, and other individual FPC members have cleared the threat-of-irreparable-harm hurdle by a safe margin.

2.  Commercial FPC Members

The Court finds that Maxim Defense and other commercial FPC members face substantial threats of irreparable harm absent injunctive relief. Namely, they are threatened with: (i) permanent and nonrecoverable costs of compliance with an unlawfully issued regulation; and (ii) substantial financial injury leading to permanent closure of businesses. The Court finds that these irreparable injuries flow from the threat of enforcement of the Final Rule and are ongoing, vulnerable to intense exacerbation, and interdependent with a vast commercial supply-chain network.

As the record currently stands, the Final Rule has taken and continues to take a toll on the ability of Maxim Defense to conduct its regular business and even survive as a business entity altogether. This commercial member of FPC is the second largest stabilizing brace manufacturer in the United States. In the Year 2022, Roughly 59% of the FPC member-manufacturer's annual non-firearm sales consisted of stabilizing braces covered under the Final Rule, amounting to over $5 million in sales. Braced pistols consisted of approximately 3/4 of Maxim Defense's annual firearm sales for that same year, totaling more than $5 million in sales.

Maxim Defense's business has attained significant reputability within the veteran and Tier 1/special operations community. This is especially the case with community members who are

disabled and rely on the FPC member-manufacturer's stabilizing braces and braced pistols to engage in safe and effective self-defense. Prior to ATF's promulgation of the Final Rule, Maxim Defense vended its stabilizing brace products across all 50 States, complying with all applicable state-law restrictions. Maxim Defense sold its stabilizing braces through a variety of commercial channels: direct-to-consumer from its website; to original equipment manufacturers ("OEMs") of firearms that deploy Maxim Defense braces on their own firearms; and to numerous firearms and firearms equipment dealers, distributors, and retailers across the country. Maxim Defense sold its braced pistols: direct-to-consumer from its website via transactions processed by federal firearms licensees ("FFLs"); and to numerous firearms and firearms equipment dealers, distributors, and other FFL retailers that carried Maxim Defense's product lines for sale in their stores.

Until promulgation of the Final Rule, Maxim Defense sold its stabilizing braces and braced pistols directly to consumers from its website. Because the braces themselves are not regulated as firearms, they can be shipped directly to consumers across every U.S. State. To the contrary, the FPC member-manufacturer's sale of braced pistols requires transfer and shipment to FFL middle-men to execute the transaction. FFLs conduct mandatory background checks before delivering firearms to their end consumers. Maxim Defense's customers now face criminal prosecution, imprisonment, firearm forfeiture, and a lifetime ban on firearm ownership under the NFA for possessing and using stabilizing braces manufactured by Maxim Defense to enhance their self-defense capabilities. Consumers are especially vulnerable to being criminally charged for constructive possession of an unregistered SBR under the Final Rule. By reclassifying 99% of all braced pistols in circulation (including those manufactured and sold by Maxim Defense) as SBRs subject to the NFA's heavy regulatory barriers, the Final Rule has effectively eliminated any remaining consumer market for braced pistols as home- and self-defense weapons.

Maxim Defense sold a considerable proportion of its stabilizing braces to OEMs of firearms. OEM purchasers of Maxim Defense braces installed them onto their firearms to be sold to end markets. FPC member-manufacturer Daniel Defense had equipped its own DDM4 pistol model with Maxim Defense's PDW stabilizing brace. Daniel Defense sold the product to end users as a DDM4 PDW model braced pistol. OEMs had sold firearms equipped with Maxim Defense braces throughout the United States. Since the Final Rule's promulgation, however, every major OEM customer of Maxim Defense discontinued their routine stabilizing brace orders. About a dozen of these OEMs attest that they will only resume their Maxim Defense orders if the Government Defendants are enjoined from any enforcement of the Final Rule against industry players and end consumers.

Maxim Defense vended its stabilizing brace and braced pistol products to seven different distributors. Those distributors subsequently sold their Maxim Defense inventory to firearms retailers and dealers. Those retailers and dealers subsequently sold their Maxim Defense inventory to end consumers across the country. Additionally, Maxim Defense directly sold its brace products to larger retailers. Those larger retailers, such as Modern Warriors located in St. George, Utah, subsequently sold their Maxim Defense inventory through their brick-and-mortar stores and e-commerce websites to end consumers throughout the United States. These streams of commerce have summarily evaporated on account of the ATF's promulgation of the Final Rule.

<em>i.    Nonrecoverable Compliance Costs</em>

Maxim Defense easily demonstrates a substantial threat of irreparable harm in the form of nonrecoverable compliance costs.

"[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. As such, financial harm from regulatory compliance becomes

irreparable where a plaintiff cannot recoup money damages from a federal agency on account of its sovereign immunity. *See Wages & White Lion*, 16 F.4th at 1142 (holding that regulatory compliance costs are unrecoverable and therefore amount to irreparable harm "because federal agencies generally enjoy sovereign immunity for any monetary damages"); *R.J. Reynolds Vapor Co.*, 65 F.4th at 194 (finding that the plaintiff's financial harm was irreparable for in an APA challenge where "[t]here [was] no suggestion . . . that [the plaintiff] could overcome the FDA's sovereign immunity to recover costs"). A general rule of thumb is that the "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr.*, 66 F.4th at 597. Under this theory of irreparable harm, a plaintiff's "lack of a 'guarantee of eventual recovery' is [the] reason that its alleged harm is irreparable." *Wages & White Lion*, 16 F.4th at 1142 (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021)).

The Final Rule has destroyed each of Maxim Defense's primary channels of commerce. Maxim Defense had several outstanding orders that were canceled or held due to the impact of the Final Rule, and the company ceased all sales of its braced pistols on January 31, 2023. Maxim Defense has been unable to fulfill orders for hundreds of thousands of dollars' worth of product that it can no longer transfer to buyers because of the Final Rule. The FPC member-manufacturer had manufacturing orders for thousands of braces that have been canceled and more than $1 million in materials that it purchased in anticipation of its sales in 2023 that it can no longer use for their intended purpose. Absent the Court's intervening relief, Maxim Defense will simply not be able to sustain its business for any longer.

In the past six months, the Final Rule has devastated the financial stability of Maxim Defense. The FPC member-manufacturer's gross revenues for 2022 totaled approximately $15

million. Through August 15, 2023, the company's year-to-date revenue is an anemic $4 million. The company has lost roughly $3 million in year-over-year sales for braced pistol sales, and projects that the total loss for this product category will be over $5 million by the end of 2023.The company has lost approximately $3.4 million in stabilizing brace sales and expects this loss to exceed $4.5 million for the entire year. In a desperate attempt to mitigate these losses, one of the Maxim Defense founders injected $2 million of his capital into the company just to keep it from going under.

Maxim Defense orients its entire business model around the manufacture and sale of stabilizing braces and braced pistols. The ATF's promulgation of the Final Rule effectively destroyed any viable end market for these self-defense products, which previously made up the overwhelming majority of the company's revenue. The Final Rule shut down these end markets for self-defense firearms and equipment by subjecting braced pistols and stabilizing brace attachments to the onerous strictures of the NFA. The impact does not run down a simple linear supply chain, either. The Final Rule has decimated each of the separate channels connected within the complex web of commerce that Maxim Defense relied upon to sell stabilizing braces and braced pistols. The market for the products subject to the Final Rule has evaporated.

None of these exorbitant compliance costs are recoupable for FPC's commercial members, either, since the Government Defendants retain sovereign immunity from money damages in APA actions. *See* 5 U.S.C. § 702. And of course, this FPC member-manufacturer will have shelled out these tens of millions of dollars just to comply with a Final Rule that "violates the APA" and "must be set aside as unlawful." *Mock*, 75 F.4th at 578, 586. Again, it is "no answer" for the Government Defendants to say that Maxim Defense can protect its business by "simply complying" with the unlawful Final Rule during the interim of this suit. *VanDerStok v. Garland*, 625 F. Supp. 3d 570,

583-84 (N.D. Tex. 2022) (O'Connor, J.). The Court is not convinced that there will even be a Maxim Defense left to comply with the Final Rule if that were the case.

In light of the above, Maxim Defense has little difficulty satisfying the irreparable harm threshold. The FPC member-manufacturer is certain to continue enduring the "nonrecoverable costs of complying with a putatively invalid regulation." *Rest. L. Ctr.*, 66 F.4th at 597.

ii.      *Substantial Financial Injury*

Far more calamitous than even nonrecoverable compliance costs, Maxim Defense is threatened with existential financial ruin in the immediate instant without the Court's equity.

A plaintiff's "substantial financial injury" will be "sufficient to show irreparable injury" where financial costs "threaten[] the very existence of [the plaintiff's] business." *Wages & White Lion*, 16 F.4th at 1142 (quoting *Texas v. EPA*, 829 F.3d at 433, 434) (internal quotation marks omitted); *see also Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (recognizing that irreparable exists where potential financial loss "is so great as to threaten the existence of the [plaintiff's] business").

For much the same reason as set forth in the Court's assessment of nonrecoverable compliance costs, Maxim Defense has cleared the irreparable-harm hurdle for substantial financial injury by a wide margin. The FPC member-manufacturer is hanging on by a thread in its ongoing efforts to dodge imminent bankruptcy on the horizon. Any suggestion on the part of the Government Defendants of Maxim Defense's speculation as to the survival of its business is, once again, undermined by a quick glance at the administrative record. *See Citizens to Preserve Overton Park*, 401 U.S. at 413 n. 30, 419-20; *Rest. L. Ctr.*, 66 F.4th at 597–600. The ATF's own regulatory impact analysis expressly forecasts that its promulgation of the Final Rule will bring about the

demise of at least four out of the five major manufacturers of firearm braces in the United States—one of which includes Maxim Defense.

The exorbitant financial losses that the Final Rule continues to inflict upon the FPC member-manufacturer are "so great as to threaten the existence of the [Maxim Defense's] business." *Atwood Turnkey Drilling*, 875 F.2d at 1179. This is well above "sufficient to show irreparable injury." *Wages & White Lion*, 16 F.4th at 1142 (cleaned up).

All in all, the Court concludes that Plaintiffs have each carried their burden of persuasion on a substantial threat of irreparable harm if not for a grant of interlocutory injunction.

### C.  The Balance of Equities and Public Interest Favor Issuing Injunctive Relief

The final two elements necessary to support a grant of injunctive relief—the balance of equities (the difference in harm to the respective parties) and the public interest—merge together when the government is a party. *Nken*, 556 U.S. at 435. In this assessment, the Court weighs "the competing claims of injury" and considers "the effect on each party of the granting or withholding of the requested relief," paying close attention to the public consequences of granting an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations omitted).

The Court has concluded in this Opinion that Plaintiffs have each established credible threats of irreparable injury absent relief from enforcement of the Final Rule. But at the other end of the scale, there can be "*no* public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (emphasis added). As it relates to enforcement of the Final Rule against Plaintiffs, "neither [the Government Defendants] nor the public has *any* interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 5266026, at *28 (5th Cir. Aug. 16, 2023) (emphasis added). In this respect, the government-public-interest equities evaporate upon an adverse decision

touching upon the merits. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43-44 (D.D.C. 2013) (Jackson, J.) (expounding that public interest arguments are "derivative of . . . merits arguments and depend in large part on the vitality of the latter").

The controlling law of this case is that the Government Defendants' promulgation of the Final Rule "fails the logical-outgrowth test and violates the APA" and "therefore must be set aside as unlawful" under the APA. *Mock*, 75 F.4th at 578, 583-586 (citing 5 U.S.C. § 553(b)-(c); *id.* § 706(2)(D)). It follows, then, that there is *no* injury that the Government Defendants or public at-large could possibly suffer from if enforcement of the Final Rule were enjoined. *See Open Communities All. v. Carson*, 286 F.Supp.3d 148, 179 (D.D.C. 2017) ("The [government] defendants . . . cannot suffer harm from an injunction that merely ends an unlawful practice." (cleaned up)).

Having no equities to balance against those of Plaintiffs, the Court concludes that the public interest is entirely undisturbed by a grant of the prayed injunction. To the contrary, it is "of highest public importance that federal agencies follow the law," *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 195 (5th Cir. 2023), which counsels in favor of affording Plaintiffs relief against the Government Defendants' enforcement of the Final Rule here.

\*       \*       \*       \*

Having considered the arguments, evidence, and applicable law, the Court holds that the relevant factors weigh in favor of granting preliminary injunctive relief to Plaintiffs FPC and members Mock, Lewis, and Maxim Defense. The Court proceeds by appropriately tailoring the injunction so as to provide Plaintiffs with the complete relief they are entitled to.

### D.  Scope of Injunctive Relief

The appropriate scope of injunctive relief is "dictated by the extent of the violation

established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock*, 75 F.4th at 587 (quoting *Yamasaki*, 442 U.S. at 702). "[It] should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen*, 512 U.S. at 765 (cleaned up). And it must be tailored to "redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934 (citation omitted). Under appropriate circumstances, however, the demand for "complete" relief may necessitate that injunctive redress benefit many claimants of a common legal right in order to prevent "more confusion" and "multiplicity of suits" in the courts. *Mock*, 75 F.4th at 587 (quoting *Feds for Med. Freedom*, 63 F.4th at 388); 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE §§ 853-54, at 147-49 (Boston, 2d ed. 1839) (citations omitted).

Given the foregoing assessment into the respective irreparable harms for each Plaintiff and the balance of equities, the Court determines that the appropriate scope of the injunction is that which parallels the scope of the preliminary injunction issued by the Fifth Circuit in its May 23, 2023 order and clarified in its May 26, 2023 order. Reflecting the scope of relief previously afforded by the Fifth Circuit, the Court enjoins the Government Defendants' enforcement of the Final Rule against individual Plaintiffs William T. Mock and Christopher Lewis and each of their respective family members. Reflecting the scope of relief previously afforded by the Fifth Circuit as well, the Court's injunction extends to enjoin enforcement of the Final Rule against Maxim Defense Industries, LLC and all of its downstream customers whose interests it has represented since day one of this litigation. Reflecting the same scope of relief afforded by the Fifth Circuit to the Firearms Policy Coalition, Inc., the Court's injunction extends to enjoin enforcement of the Final Rule against the Firearms Policy Coalition, Inc. and all of its members whose interests it has represented since day one of this litigation.

The Court declines Plaintiffs' invitation to extend the scope of the injunctive relief "nationwide." Injunctive relief reflecting that previously afforded by the Fifth Circuit to Plaintiffs is sufficiently limited to "not provide relief beyond the parties to the case," while also affording sufficient relief to meet each Plaintiff's present needs. *Feds for Med. Freedom*, 63 F.4th at 387 (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring)) (internal quotation marks omitted). In affording complete relief to Plaintiffs, the injunction's benefits to non-parties to the suit are "merely incidental." *Id.*

*    *    *    *

## IV.   CONCLUSION

The Court holds that each Plaintiff has demonstrated entitlement to preliminary injunctive relief against the Government Defendants' enforcement of the Final Rule that the United States Court of Appeals for the Fifth Circuit determined to be invalid under the Administrative Procedure Act. For the foregoing reasons, the Court **GRANTS** the Motion for Preliminary Injunction.

Accordingly, the Court **ORDERS** that the Government Defendants—the Attorney General of the United States; the United States Department of Justice; the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the Bureau of Alcohol, Tobacco, Firearms and Explosives—and each of their respective officers, agents, servants, and employees—are hereby:

1) **ENJOINED** from implementing and/or enforcing against the Firearms Policy Coalition, Inc. and all of its members the provisions in 27 C.F.R. §§ 478.11 and 479.11 that the United States Court of Appeals for the Fifth Circuit has determined are unlawful;

2) **ENJOINED** from implementing and/or enforcing against Maxim Defense Industries, LLC and any downstream customers of Maxim Defense Industries, LLC (including all direct consumer purchasers and all intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense products, and any of their respective customers) the provisions in 27 C.F.R. §§ 478.11 and 479.11 that the United States Court of Appeals for the Fifth Circuit has determined are unlawful;

3) **ENJOINED** from implementing and/or enforcing against William T. Mock and any of his family members the provisions in 27 C.F.R. §§ 478.11 and 479.11 that the United States Court of Appeals for the Fifth Circuit has determined are unlawful; and

4) **ENJOINED** from implementing and/or enforcing against Christopher Lewis and any of his family members the provisions in 27 C.F.R. §§ 478.11 and 479.11 that the United States Court of Appeals for the Fifth Circuit has determined are unlawful.

The injunctive relief shall not extend to any individual prohibited from possessing firearms under 18 U.S.C. § 922 (g). The injunctive relief shall take effect immediately and remain in effect pending the conclusion and final disposition of all claims and causes of action before the Court in these review proceedings. 5 U.S.C. § 705.

The Court waives the security requirement of Federal Rule of Civil Procedure 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).[19]

**SO ORDERED** this **2nd day** of **October, 2023**.

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**

---

[19] Because neither party raises the security requirement in Rule 65(c), no security is ordered. *See* FED. R. CIV. P. 65(c).