**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Morehouse Enterprises, LLC, d/b/a/ Bridge City Ordnance, et al.,<br><br>       Plaintiffs,<br><br> vs.<br><br>Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.,<br><br>       Defendants. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 3:23-cv-129 |

   The Gun Control Act of 1968 requires firearm dealers to obtain and maintain a license from the Attorney General. See 18 U.S.C. § 923(a). The Attorney General may, after notice and opportunity for a hearing, revoke a license if its holder "willfully violated" the Gun Control Act. Id. § 923(e). In 2021, the Biden-Harris Administration announced a policy of "zero tolerance" for "rogue gun dealers," and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") circulated an internal document that instructs agency personnel to seek revocation for certain first-time violations of the Gun Control Act.

   Plaintiffs Morehouse Enterprises, LLC, d/b/a/ Bridge City Ordnance ("Morehouse"), a federal firearms license holder in North Dakota, and Gun Owners of America ("GOA") and Gun Owners Foundation ("GOF"), organizations founded to preserve Second Amendment rights, move for a preliminary injunction against further implementation of the zero tolerance policy. They argue the policy misinterprets the Gun Control Act and violates the Second Amendment. But because they failed to show irreparable harm in the absence of an injunction and their claims are clouded by justiciability issues, the motion for a preliminary injunction is denied.

## I.    <u>BACKGROUND</u>

"[T]he focus of the federal scheme" of firearms regulation "is the federally licensed firearms dealer." <u>Huddleston v. United States</u>, 415 U.S. 814, 825 (1974). The Gun Control Act ("GCA") requires no person engage "in the business of . . . dealing in firearms" without first obtaining "a license to do so from the Attorney General." 18 U.S.C. § 923(a). These licenses— referred to as federal firearms licenses—are prerequisites to running a firearms business. A federal firearms license is obtained through an application to the Attorney General. If the application is granted, a federal firearms licensee, or FFL, may deal, manufacture, or import firearms subject to a host of laws and regulations. An FFL may not, for example, sell a firearm to someone under eighteen or to someone under indictment. <u>See e.g.</u>, 18 U.S.C. §§ 922(d)(1)-(11). FFLs must keep detailed records to document their compliance with these rules. <u>See</u> <u>id.</u> § 923(g)(1)(A). And willful violation of these rules can result in the FFL losing its license. <u>Id.</u> § 923(e).

### A.    The GCA's Procedure for Revocation of a Federal Firearms License

The Attorney General, through the ATF, may inspect the inventory and records of an FFL without suspicion to ensure compliance with the GCA "not more than once during any 12-month period." <u>Id.</u> § 923(g)(1)(B)(ii)(I). If the ATF finds an FFL has "willfully violated" the GCA or its implementing regulations, it may revoke a dealer's license after notice and opportunity for a hearing. <u>See</u> <u>id.</u> § 923(e).

The process of revoking a dealer's license occurs in this way—first, the ATF sends the FFL a notice "stating specifically the grounds upon which . . . the license was revoked." <u>Id.</u> § 923(f)(1). This notice must be provided before the effective date of the revocation. <u>Id.</u> Next, the FFL may request a hearing before the ATF to review its alleged willful violation of the GCA and the revocation of its federal firearms license. <u>See</u> <u>id.</u> § 923(f)(2). After the hearing, if the ATF

decides not to reverse its initial decision, the ATF will again issue a notice of revocation. See id. § 923(f)(3). Within sixty days after the hearing, the FFL may petition a United States district court for de novo review of the ATF's decision. Id. No deference is owed to the ATF at this stage, and the FFL may submit evidence that was not before the ATF. Id. The district court then decides whether the FFL willfully violated the GCA and consequently whether the ATF was "authorized" to revoke the license. Id.

This case has followed the same procedure. Plaintiff Morehouse received a "Notice to Revoke or Suspend License" on May 23, 2023. Doc. 1-1. The ATF's notice cited three willful violations of the GCA: one, Morehouse willfully sold a rifle or shotgun to a person it knew or had reason to know did not reside in North Dakota. See id. § 922(b)(3). Two, Morehouse willfully failed to conduct a required background check. See id. § 922(t). And three, Morehouse willfully failed to meet its recordkeeping requirements. See id. The ATF held a hearing on the revocation of Morehouse's federal firearms license on August 16, 2023. Doc. 23. On August 30, the ATF reversed its initial decision and "determined not to issue a Final Notice of Revocation." Id. Morehouse filed suit after receiving its notice of revocation but before the ATF reversed its decision, but, as Plaintiffs emphasize in their brief, their case "is _not_ brought pursuant to Section 923(f)." Doc. 15-1, p. 9.

**B.    The Zero-Tolerance Policy and the Administrative Action Plan**

Plaintiffs instead believe Morehouse's notice of revocation was the result of a new ATF policy. See Doc. 1 ¶ 184. In 2021, the Biden-Harris Administration announced "a new policy" of "zero tolerance for rogue gun dealers that willfully violate the law." White House, Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety,   https://www.whitehouse.gov/briefing-room/statements-

releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/ (last visited Jan 2, 2024). To enforce its zero tolerance policy, the Biden-Harris Administration explained the ATF would seek revocation of federal firearms licenses for certain first-time violations of the Gun Control Act. Id.

After the public announcement, the ATF circulated an internal Administration Action Policy (the "AAP").[1] The AAP is a thirteen page document sent to all ATF industry operations offices. The AAP's stated purpose is to provide "fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of Federal firearms licenses." Doc. 34-1, p. 2. There are two portions of the AAP relevant to this case—a section on ATF's enforcement policy and a section on § 923(e)'s willfulness requirement.

### 1.    The AAP's Enforcement Policy

Section 7 of the AAP pairs an FFL's violation of the GCA with an appropriate administrative action. Id. at 5-6. To start, Sections 7(c) and 7(d) identify violations of the GCA that merit only a warning letter or a warning conference. The AAP notes these administrative actions do "not require a determination of willfulness." Id. For example, an FFL is required to report the theft of a firearm to the ATF and local law enforcement within 48 hours. See 18 U.S.C. § 923(g)(6). Under the AAP, an FFL's failure to timely report the theft to either the ATF or local law enforcement merits a warning letter, but an FFL's failure to report the theft at all merits a warning conference. Id. at 6. Warning letters and conferences are less severe than revocation, but an FFL's violation of the GCA after a warning letter or conference can result in a determination that a later GCA violation was willful. Id. at 9.

---

[1] The AAP is not public, but the ATF attached a copy of the most recent version—ATF-O-5371.1F— to their responsive brief. (Doc. 34-1). The Court's use of "the AAP" refers to the document titled ATF-O-5371.1F.

The ATF will, however, seek revocation for some first-time violations of the GCA, and this is one of Plaintiffs' main concerns. Section 7(e)(2) of the AAP explains the ATF "will" revoke a federal firearms license, absent extraordinary circumstances, for five first-time violations of the GCA. The AAP reiterates the ATF must establish willfulness, and its policy "does not replace or countermand" that requirement. Doc. 34-1, p. 7. As stated in the AAP,

> ATF will revoke a federal firearms license, absent extraordinary circumstances on initial violations, if those violations inherently demonstrate willfulness, such as transferring a firearm to a prohibited person; failing to run a background check prior to transferring a firearm to a non-licensee; falsifying records, or making false statements; failing to respond to an ATF tracing request; refusing to permit ATF to conduct an inspection; or allowing a straw sale of a firearm to occur. ATF may also revoke for any other willful first-time violation as it deems appropriate.

Id. If ATF personnel find one of the five identified GCA violations but believes there are extraordinary circumstances warranting a lesser administrative action, the AAP describes an internal agency process, which includes review by the Director or one of his designees, for approval of that lesser action. Id. at 12. The AAP also lists additional offenses—such as transferring a firearm to an underage person—where revocation is appropriate but not mandated. Id. at 9.

### 2.      The AAP's Willfulness Interpretation

Also of concern to Plaintiffs is the AAP's discussion of § 923(e)'s willfulness requirement. Recall the Attorney General may revoke a federal firearms license only for "willful violations" of the GCA. "Willful" is not defined by statute, but courts have settled on a meaning: A FFL willfully violates the GCA when it "knew of its legal obligation and 'purposefully disregarded or was plainly indifferent to the record-keeping requirements.'" On Target Sporting Goods, Inc. v. Att'y Gen. of U.S., 472 F.3d 572, 575 (8th Cir. 2007) (quoting Lewin v. Blumenthal, 590 F.2d 268, 269 (8th Cir. 1979)).

Important to the AAP's zero tolerance enforcement policy is its position that the "ATF does not have to establish a history of prior violations to demonstrate willfulness." Doc. 34-1, p. 7. Rather, the AAP states some GCA violations can "inherently demonstrate willfulness." <u>Id.</u> Section 7(e)(4) of the AAP also describes several ways "ATF can establish the knowledge element of willfulness." <u>Id.</u> First, the ATF can "[e]stablish the FFL has a history of similar, repeat violations, and documentation that an [Industry Operations Investigator] discussed them with the FFL." <u>Id.</u> Second, the ATF can "[u]se inspection reports to establish willfulness even if the inspection found no violations." <u>Id.</u> at 8. Third, the ATF can point to an FFL's statements, admissions, or actions "during an inspection that demonstrate knowledge of regulations." <u>Id.</u> Fourth, the ATF can show "[p]ublications and information provided to the FFL which explain the FFL's legal responsibilities." <u>Id.</u> Fifth, the ATF can "[d]emonstrate that the FFL has complied with the specific regulation on other occasions." <u>Id.</u> And sixth, the ATF can also "[d]emonstrate that the FFL has substantial experience as an FFL." <u>Id.</u>

### C.     Plaintiffs Move to Enjoin the AAP

Plaintiffs argue the AAP's zero tolerance enforcement policy along with its interpretation of § 923(e)'s willfulness requirement results in the ATF revoking licenses for "honest mistakes, misunderstandings, and human error." Doc. 1 ¶ 264. On July 11, 2023, Plaintiffs filed a complaint bringing statutory and constitutional claims against Defendants ATF, Department of Justice, ATF Director Steven Dettelbach, and St. Paul ATF Field Director Hans Hummel (altogether, the "ATF"). Specifically, Plaintiffs argue the AAP violates the Administrative Procedure Act ("APA") and the Second Amendment and request declaratory and permanent injunctive relief.[2] On August

---

[2] Plaintiffs bring five claims in total, three of which relate to the ATF's alleged retaliatory actions against Morehouse. <u>See</u> Doc. 1 ¶¶ 295-334. Plaintiffs do not rely on these claims to support a preliminary injunction.

4, 2023, Plaintiffs moved for a preliminary injunction enjoining the ATF from "further implementing or enforcing" the "zero tolerance policy implemented in the [AAP]." Doc. 15, p. 1.

## II.   LAW AND DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). When considering a motion for preliminary injunction, the Court weighs the four factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc): "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. at 114. The balance of harms and public interest factors merge when the government is the opposing party. See Nken v. Holder, 556 U.S. 418, 435 (2009). The burden to demonstrate the necessity of a preliminary injunction rests with the movant. See General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).s

### A.   The Threat of Irreparable Harm

The Court begins with the threat of irreparable harm. "A party seeking a preliminary injunction must show he is likely to suffer irreparable harm in the absence of preliminary relief." Padda v. Becerra, 37 F.4th 1376, 1384 (8th Cir. 2022) (internal quotation marks and citation omitted). "To meet this requirement, the movant must show more than the mere possibility that irreparable harm will occur." Id. "[A] party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation marks and citation omitted). "Put another way, any irreparable harm must be actual and immediate, as opposed to a future risk."

<u>Pavek v. Simon</u>, 467 F. Supp. 3d 718, 753 (D. Minn. 2020) (internal quotation marks and brackets omitted).

Plaintiffs allege Morehouse and "many other FFLs across the country" will be driven out of business because the AAP instructs the ATF to seek revocation for unintentional and inadvertent errors. Doc. 1 ¶ 48. As FFLs are driven out of business, Plaintiffs assert gun owners "will be forced to drive additional miles" to visit an FFL and it will become difficult for "law-abiding persons to acquire firearms, as the supply of firearms itself is diminished." <u>Id.</u> ¶¶ 243, 244. Lastly, they allege the loss of constitutional freedoms—here, the right to bear arms—constitutes an automatic irreparable injury. Doc. 15-1, p. 24.

Plaintiffs' alleged irreparable harm is too speculative to warrant preliminary relief. Plaintiffs do not identify an FFL other than Morehouse that is at risk of losing its license. Their complaint asserts "a massive increase in the number of FFLs who are having their licenses revoked." Doc. 1 ¶ 79. But these FFLs go unnamed, and it is unclear when and for what reason their licenses would be revoked. Irreparable harm requires more than an assertion that an unnamed business will be injured on an unknown date. <u>See e.g.</u>, <u>Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives</u>, No. 22-2812, 2023 WL 5356626, at *4 (8th Cir. Aug. 22, 2023) ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time"). Morehouse, to be sure, received a notice of revocation. Doc. 1-1. But that potential revocation is now resolved, the ATF having reversed its initial revocation determination, and the ATF cannot inspect their premises for several months. <u>See</u> 18 U.S.C. §

923(g)(1)(B)(ii)(I).[3] A revocation of Morehouse's license depends not only on the ATF inspecting its records but also on finding additional GCA violations and choosing to initiate revocation proceedings. Morehouse's alleged irreparable harm, then, is not "actual and immediate." Pavek, 467 F. Supp. 3d at 753.

Plaintiffs' constitutional claim does not warrant an automatic finding of irreparable harm either. "[T]he assertion of a possible constitutional violation does not release plaintiffs from their burden of showing that irreparable harm is more than just a mere possibility." Morehouse Enterprises, 2023 WL 5356626, at *3. First, it is questionable whether FFLs possess a constitutional right harmed by the AAP. See D.C. v. Heller, 554 U.S. 570, 626-27 (2008) ("[N]othing in our opinion should be taken to cast doubt on longstanding  . . . laws imposing conditions and qualifications on the commercial sale of arms."). Second, Plaintiffs' claim that individual gun owners will lose their ability to purchase firearms as FFLs go out of business relies on too many undeveloped assumptions at this early stage. In short, the constitutional claims here do not go beyond showing irreparable harm is more than a "mere possibility." Morehouse Enterprises, 2023 WL 5356626, at *3.

Nor is an injunction an FFL's only avenue of relief as this case proceeds. FFLs are entitled to district court review of a revocation of their license, a process familiar to both FFLs and courts. See 18 U.S.C. § 923(f)(3). The district court's review is de novo, which means no deference is owed to the ATF. An FFL may submit evidence that was not before the agency, too. Id. So, even in the absence of a preliminary injunction, FFLs have avenues of relief available to them. See

---

[3] Morehouse suggests the ATF could immediately conduct an inspection of its manufacturing license because the ATF's previous inspection was only of Morehouse's dealing license. Doc. 40, p. 14. Even so, the Court would find Morehouse's threat of irreparable harm too speculative. The ATF could also inspect Morehouse's premises if there were suspicion of criminal wrongdoing, see 18 U.S.C. § 923(g)(1)(A), but there is no indication in the record such an inspection would occur.

Paducah Shooters Supply, Inc. v. Rogers, No. 5:23-CV-88, 2023 WL 5769364, at *1 (W.D. Ky. Aug. 12, 2023) (enjoining the ATF's revocation of an FFL's license). The availability of "other corrective relief . . . weighs heavily against a claim of irreparable harm." Fulton v. Honkamp Krueger Fin. Servs., Inc., No. 20-CV-1063, 2020 WL 7041766, at *8 (D. Minn. Dec. 1, 2020).[4]

"Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." Grasso Enterprises, LLC v. Express Scripts, Inc., 809 F.3d 1033, 1040 (8th Cir. 2016) (internal quotation marks and citation omitted). Plaintiffs' assertion of irreparable harm is too speculative and, if realized, can be remedied by § 923(f)(3)'s review process in the absence of an injunction. For those reasons, Plaintiffs' have failed to show they are sufficiently likely to suffer irreparable harm in the absence of a preliminary injunction.

**B.      Likelihood of Success on the Merits**

The Court now turns to Plaintiffs' likelihood of success on the merits. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007). Rather, likelihood of success on the merits informs the overall balance of equities. See Aventure Commc'ns Tech., L.L.C. v. Iowa Utilities Bd., 734 F. Supp. 2d 636, 654 (N.D. Iowa 2010).

For a claim to be successful it must be "justiciable," meaning one properly suited for resolution by federal courts. See Church v. Biden, 573 F. Supp. 3d 118, 133 (D.D.C. 2021). The

---

[4] A preliminary injunction would also be of questionable efficacy compared to § 923(f)(3)'s review process. An injunction against the AAP—an internal policy guiding the ATF's enforcement discretion of § 923(e)—would not enjoin the ATF from otherwise enforcing § 923(e). The ATF would retain "the same underlying prosecutorial discretion" as before the injunction, and FFLs would remain at risk of revocation for first-time willful violations of the GCA. See United States v. Texas, 143 S. Ct. 1964, 1978 (2023) (Gorsuch, J., concurring). This also weighs against preliminary injunctive relief. See Let Them Play MN v. Walz, 517 F. Supp. 3d 870, 888 (D. Minn. 2021).

ATF asserts Plaintiffs' path towards a successful claim faces several justiciability roadblocks. Specifically, the ATF argues (1) Plaintiffs lack standing, (2) the AAP is not reviewable because it is "committed to agency discretion" under 5 U.S.C. § 701, and (3) Plaintiffs lack a cause of action because the AAP is not a "final agency action" under 5 U.S.C. § 704. See Doc. 34. Plaintiffs must successfully navigate these issues for the Court to consider the merits of their claims.

### 1.    Standing

There are three plaintiffs in this case—Morehouse, GOA, and GOF. The ATF argues no one has Article III standing. Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. This jurisdictional limitation requires every plaintiff to demonstrate it has "standing" when bringing an action in federal court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "The doctrine of standing limits the jurisdiction of federal courts to 'those disputes which are appropriately resolved through the judicial process.'" Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009) (quoting Lujan, 504 U.S. at 560).

Standing requires (1) an injury in fact, (2) causation, and (3) redressability. Hughes v. City of Cedar Rapids, 840 F.3d 987, 992 (8th Cir. 2016). An injury in fact is "the actual or imminent invasion of a concrete and particularized legal interest." Kuehl v. Sellner, 887 F.3d 845, 850 (8th Cir. 2018) (citations omitted). Causation is satisfied when the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Balogh v. Lombardi, 816 F.3d 536, 543 (8th Cir. 2016) (cleaned up). Redressability means "the injury will be redressed by a favorable decision." Kuehl, 887 F.3d at 850 (citations omitted).

GOA and GOF claim to be associations, and an association may assert an injury to itself or as "the representative of its members." See Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 342 (1977). GOA and GOF chose the latter. Doc. 40, p. 3. This is known as "associational standing" and allows an association to "bring suit on behalf of its members"— but only if certain requirements are met. Id. at 343.

"Associational standing is shown when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Northland Parent Ass'n v. Excelsior Springs Sch. Dist. # 40, 571 F. Supp. 3d 1104, 1113 (W.D. Mo. 2021) (quoting Hunt, 432 U.S. at 343). To meet the first requirement, an association must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009); see also Religious Sisters of Mercy v. Becerra, 55 F.4th 583, 601 (8th Cir. 2022).[5]

The ATF argues GOA and GOF "fail [ ] to demonstrate that one of its members would have standing to suit in his or her own right." Doc. 34, p. 24. Plaintiffs point to the "Caliber Club, a discrete GOA program made up entirely of [FFLs], each of whom is, by definition, directly affected by the AAP." Doc. 40, p. 7. GOA and GOF Senior Vice President Erich Pratt also submitted a declaration describing the organizations' function and membership. Doc. 1-2, p. 3. Vice President Pratt stated the organizations "represent the interests of many thousands of FFL

---

[5] The organization invoking associational standing must also show "it qualifies as a membership association." Viasat, Inc. v. Fed. Commc'ns Comm'n, 47 F.4th 769, 781 (D.C. Cir. 2022). GOF faces some difficulty here. It is described in the complaint as "nonprofit legal defense and educational foundation . . . . supported by gun owners across the country." Doc. 1 ¶ 3. Without more, the Court questions whether GOF qualifies as a membership organization simply because gun owners "support" the organization. See id. ("[I]t is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page.").

holders across the country who are affected by [ATF's] 'zero tolerance' enactments." Id. The organizations' members, Vice President Pratt continued, have "had the 'zero tolerance' policy applied against them, or the FFL that they previously used to acquire firearms saw its [license] revoked and can no longer manufacture or transfer firearms." Id.

The Supreme Court has held a court should not accept "the organization's self-description of the activities of its members" to establish "there is a statistical probability that some of those members are threatened with concrete injury." Religious Sisters of Mercy, 55 F.4th at 601 (quoting Summers, 555 U.S. at 497). GOA and GOF's representation of unnamed FFLs relies on a "statistical probability" of injury. Similarly, the Caliber Club is an association within an association, not a member of an association, and Plaintiffs have yet to identify "at least one identified member" that has "suffered or would suffer harm." Id. at 498.

Vice President Pratt's declaration does identify one member of GOA. He states there is "[o]ne GOA member in the Valley City area of North Dakota" that if Morehouse lost its federal firearms license "would lose their local gun store, which is the only 'real' gun store in Valley City." Doc. 1-2, p. 4. This GOA member, according to Vice President Pratt, "advises that the other gun stores in the vicinity are very small, usually only maintain part time hours, or have a primary business other than firearms." Id. Consequently, "the member would have to expend significant additional resources in the form of time and travel to traverse a much further distance in order to acquire constitutionally protected arms." Id.

Vice President Pratt's declaration fails to establish this member would have standing to sue on his own. First, the member is unnamed and the Supreme Court's decision in Summers suggests an association must name the member who would be harmed. See Religious Sisters of Mercy, 55 F.4th at 601; see also Do No Harm v. Pfizer Inc., No. 1:22-CV-07908, 2022 WL 17740157, at *8

(S.D.N.Y. Dec. 16, 2022) (collecting cases on "the <u>Summers</u> naming requirement"). Second, even setting a naming requirement aside, the GOA member's alleged injury is not concrete because Morehouse has not lost its federal firearms license. Nor is it likely that purchasing firearms from a smaller Valley City business is a cognizable injury under Article III. For those reasons, GOA and GOF likely lack associational standing.

Morehouse, in contrast to GOA and GOF, was "the object of the government action" challenged when it received a notice of revocation. <u>See</u> <u>Lujan</u>, 504 U.S. at 562. This is enough to establish standing—which, importantly, is assessed "'at the time the action commences.'" <u>McNaught v. Nolen</u>, 76 F.4th 764, 769 (8th Cir. 2023) (quoting <u>Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.</u>, 528 U.S. 167, 169 (2000)). ATF's later determination to reverse its initial decision and not revoke Morehouse's federal firearms license raises questions of mootness, not standing. <u>See</u> <u>Friends of the Earth</u>, 528 U.S. at 189.

With respect to Morehouse's ability to proceed, mootness contains exceptions that standing does not, <u>see</u> <u>id.</u>, and the Court does not decide here whether Morehouse's case is moot in its entirety. Short of dismissal, a change in circumstances during the course of a lawsuit can moot "particular requests for relief." <u>Council on Am.-Islamic Rels.-Minnesota v. Atlas Aegis, LLC</u>, 497 F. Supp. 3d 371, 376 (D. Minn. 2020). Morehouse originally requested a preliminary injunction against ATF's revocation of its federal firearms licenses, (Doc. 15-1, p. 26), but that request is now moot because there is no pending revocation to enjoin. For now, the Court only notes Morehouse's ability to proceed appears to be in question.

2.        **Committed to Agency Discretion**

In addition to constitutional roadblocks, the ATF argues Plaintiffs' claims are barred by statute. Specifically, § 701(a) of the APA excludes judicial review when the "agency action is committed to agency discretion by law," and the ATF argues the AAP is such an agency action.

There is a presumption of judicial review of agency action but "[o]ver the years, the Supreme Court has held that judicial review is precluded for certain administrative decisions that are 'traditionally left to agency discretion.'" Ngure v. Ashcroft, 367 F.3d 975, 982 (8th Cir. 2004). One area traditionally left to agency discretion is "whether to institute an enforcement action." Id. (citing Heckler v. Chaney, 470 U.S. 821 (1985)). This is because an agency's enforcement policy often involves a "complicated balancing of a number of factors" and an "agency is far better equipped than the courts to deal with the many variables involved." Heckler, 470 U.S. at 831-32; see e.g., United States v. Texas, 143 S. Ct. 1964, 1972 (2023) ("This Court has consistently recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions."). Moreover, statutes are often "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler, 470 U.S. at 830.

Most of the AAP concerns enforcement priorities. So, Section 7 of the AAP—which sets out the circumstances when the ATF will revoke a federal firearms license—appears to be committed to agency discretion. Plaintiffs assert the AAP is not committed to agency discretion because the ATF "promulgat[ed] . . . an unyielding rule." Doc. 40, p. 10. Though the AAP is a policy rather than a discrete act of enforcement or non-enforcement, setting enforcement priorities by policy involves the same "complicated balancing of a number of factors." Heckler, 470 U.S. at 830. What is more, § 923(e) states only that the Attorney General "may" revoke an FFL's license

upon finding a willful violation of the GCA, and this sparse language leaves the Court without a "meaningful standard against which to judge the agency's exercise of discretion." Id. Thus, those portions of the AAP setting the ATF's enforcement policy are likely committed to agency discretion.

### 3.    Final Agency Action

The ATF next argues Plaintiffs do not have a cause of action because the AAP is not a final agency action. Section 704 of the APA provides a cause of action for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In Bennett v. Spear, 520 U.S. 154 (1997), the Supreme Court set out a two-part test to determine if an agency action is "final" for § 704 purposes: first, "the action must mark the consummation of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature." Id. at 1178 (internal quotation marks omitted). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. (internal quotation marks omitted). The parties primarily dispute Bennett's second prong; whether the AAP is an agency action that determines "rights or obligations" or one from which "legal consequences will flow."

By way of background, "[t]he APA divides agency action . . . into three boxes: legislative rules, interpretive rules, and general statements of policy." Nat'l Min. Ass'n v. McCarthy, 758 F.3d 243, 251 (D.C. Cir. 2014). "A lot can turn on which box an agency action falls into." Id. Legislative rules which, through notice and comment rulemaking, impose a new legal obligation on parties are "necessarily final." California Communities Against Toxics v. Env't Prot. Agency, 934 F.3d 627, 635 (D.C. Cir. 2019). Interpretive rules, agency actions that only expound on an existing legal rule, are "sometimes" final. Nat'l Min. Ass'n, 758 F.3d at 251. General statements of policy, which explains how an agency will enforce a statute or regulation, are almost never final.

Id. An agency action's categorization into these three boxes provides a useful heuristic for determining finality, but "[t]he most important factor" remains "the actual legal effect (or lack thereof) of the agency action in question on regulated entities." Id. at 252.

Measuring an agency action's legal effect is, as the Supreme Court reaffirmed in U.S. Army Corps of Engineers v. Hawkes Co., a "pragmatic" exercise. 578 U.S. 590 (2016). In Hawkes, the Supreme Court held an Army Corps of Engineers' "jurisdictional determination" that a private property contained waters covered by the Clean Water Act had "direct and appreciable legal consequences." Hawkes, 578 U.S. at 598. A negative jurisdictional determination—meaning the property contains no covered waters—bound the Corps for five years and represented its position in future litigation, creating "a five-year safe harbor" for a property owner. Id. The negative jurisdictional determination, in other words, "limit[ed] the potential liability a landowner faces for discharging pollutants without a permit." Id. at 599. An affirmative jurisdictional determination had the converse legal consequence; it "represent[ed] the denial of the safe harbor that negative [jurisdictional determinations] afford." Id.

To be a final agency action following Hawkes, the AAP "must determine parties' rights or obligations or compel legal consequences." Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. United States Corps of Engineers, 888 F.3d 906, 915 (8th Cir. 2018). The AAP must "compel affirmative action or prohibit otherwise lawful action" and must "inflict some legal injury upon the party seeking judicial review." Id. But "an agency does not inflict injury merely by expressing its view of the law." Id.

The AAP's enforcement policy, which "explains how the agency will enforce" § 923(e), is similar to a general statement of policy and likely not a final agency action. See Nat'l Min. Ass'n, 758 F.3d at 252. FFLs are obligated to not "willfully violate" the GCA and this obligation remains

unchanged by the AAP. The AAP, unlike the jurisdictional determination in <u>Hawkes</u>, does not expand or contract potential liability; the Attorney General is "authorized" to revoke an FFL's license for a willful violation of the GCA, and an internal decision on when to exercise that authority changes neither the obligations of FFLs nor the power of the Attorney General. <u>See</u> 18 U.S.C. § 923(f)(3) (stating a district court shall review only whether the ATF was "authorized" to revoke an FFL's license); <u>see also</u> <u>In re Taylor</u>, 548 F. App'x 822, 826 (3d Cir. 2013) (finding no basis to "undertake an analysis of ATF's internal policies" in deciding if ATF was authorized to revoke an FFL's license).

Now, as Plaintiffs argue, the ATF's interpretation of "willfully" could "alter [ ] and add [ ] to the existing statutory obligation" of FFLs by expanding what counts as a "willful" violation. Doc. 40, p. 10. The AAP's brief interpretation of "willful" does not do this, however. One way to assess the import of an agency's interpretation of a legal rule is through its potential use. In <u>Hawkes</u>, the Army Corps of Engineers' determination that private property contained no waters covered by the Clean Water Act bound the United States in litigation and carried immense practical consequences—including a safe harbor from criminal penalties. 578 U.S. at 600. In contrast, it is not likely the ATF or an FFL "can rely on" the AAP's interpretation of willful "in any . . . proceeding." <u>California Communities</u>, 934 F.3d at 637; <u>see also</u> <u>Arizona v. Biden</u>, 40 F.4th 375, 389 (6th Cir. 2022) ("Confirming that the Guidance lacks legal effect is the reality that it is difficult to see how. . . any person at all . . . could invoke it to establish legal protection."). "In other words, . . . it has no independent legal authority." <u>California Communities</u>, 934 F.3d at 637. Nor does an agency inflict injury "merely by expressing its view of the law." <u>Sisseton-Wahpeton Oyate of Lake Traverse Rsrv.</u>, 888 F.3d at 915. And the ATF does not characterize the AAP as doing something more. <u>See</u> <u>Nat'l Min. Ass'n</u>, 758 F.3d at 252 (stating another factor of finality is "the agency's

characterization" of the agency action). The AAP was not promulgated to regulated parties and expressly disclaims conferring "any right or benefit" or being "enforceable at law." Doc. 34-1, p. 1.

The Court recognizes the Western District of Texas found the AAP was a final agency action because "the language regarding enforcement changed from 'may' to 'shall,'" and thus withdrew ATF officials' "previously held discretion." Cargill v. Dettelbach, No. 1:22-CV-1063-DAE, 2023 WL 4612548, at *5 (W.D. Tex. July 18, 2023), report and recommendation adopted sub nom. Cargill v. Dettelbach, No. 1:22-CV-1063, 2023 WL 6141595 (W.D. Tex. Sept. 20, 2023). But an agency internally cabining its officials' enforcement discretion differs from an agency publicly binding its "discretion to adopt a different view of the law" because the latter can expand or contract legal liability. See Texas v. Equal Emp. Opportunity Comm'n, 933 F.3d 433, 442 (5th Cir. 2019). An agency's binding adoption of a view of the law can prohibit actions that were lawful under previous interpretations, but an agency's decision to increase enforcement of already unlawful acts does not similarly alter a regulated party's legal obligations. See e.g., id. at 445 ("The Guidance . . . tells EEOC staff and all employers what sort of policy is unlawful."). The AAP does not expand authority the Attorney General's power beyond that already latent in § 923(e), and it offers no safe harbor to FFLs. For purposes of assessing Plaintiffs' likelihood of success on the merits, it does not appear the AAP is a final agency action.

**4.     Administration Procedure Act and Second Amendment Claims**

If Plaintiffs succeed in showing they have standing, the AAP is not committed to agency discretion and is a final agency action, the Court will reach the merits of their claims. Plaintiffs contend the AAP eliminates the requirement that the ATF only revoke an FFL's license for "willful" violations of the GCA. Doc. 15-1, p. 9. Courts have interpreted the GCA's willfulness

requirement to mean an FFL "knew of its legal obligation and 'purposefully disregarded or was plainly indifferent to the record-keeping requirements.'" <u>On Target Sporting Goods, Inc.</u>, 472 F.3d at 575 (citation omitted). The AAP offers six ways the ATF can prove the "knowledge element" of this standard, and those appear to be supported by prior judicial interpretation of the GCA's willfulness requirement. <u>See</u> <u>id.</u> (FFL's repeated failure to follow GCA established knowledge of record-keeping requirements); <u>see also</u> <u>CEW Prop., Inc. v. U.S. Dep't of Just., Bureau of Alcohol, Tobacco, Firearms, & Explosives</u>, 979 F.3d 1271, 1279 (10th Cir. 2020) (acknowledgement of training, magnitude of violations, period of compliance, length of time an individual has been licensed, and an individual's statements to investigators able to establish willfulness). Moreover, "[c]ourts are in agreement that only a single willful violation is sufficient to revoke a federal firearms license." <u>Gun Shop LLC v. U.S. Dep't of Just.</u>, No. 4:10CV01459, 2011 WL 2214671, at *10 (E.D. Mo. June 3, 2011). Thus, at this early stage, the AAP does not appear to violate the GCA.

With respect to Plaintiffs' Second Amendment claims, the Supreme Court recognized in <u>Heller</u> that "nothing in our opinion should be taken to cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27. Plaintiffs also challenge the AAP—not § 923(e) directly. To the extent Plaintiffs' Second Amendment claim relies on the AAP's purported elimination of the GCA's willfulness requirement, it is not likely to succeed for the reasons stated above. Lastly, Plaintiffs' claims that individual gun owners' constitutional right to purchase firearms will be infringed as FFLs go out of business is too speculative to warrant analysis at this stage.

C.      The Public Interest and The Balance of Harms

The balance of harms and public interest factors merge when the Government is the opposing party. See Nken, 556 U.S. at 435. Both an FFL's ability to operate its business and the ATF's ability to enforce the GCA are weighed at this stage, and the Court will not preliminarily upset the balance established by Congress in the GCA's procedure for judicial review. See 18 U.S.C. § 923(f)(3). This factor weighs against a preliminary injunction.

## III.   CONCLUSION

After considering the Dataphase factors, Plaintiffs' assertion of a threat of irreparable harm is too speculative and their likelihood of success on the merits is too precarious. Plaintiffs must traverse through a thicket of justiciability issues on their way to a successful claim. At this early stage, Plaintiffs' path contains too many potential snags to warrant the extraordinary relief requested. For now, FFLs that receive a notice of revocation may go through the statutorily provided relief, including review before the ATF and de novo review before a United States District Court. For those reasons, Plaintiffs' motions for a preliminary injunction (Doc. 15) and for a hearing (Doc. 18) are **DENIED**.

**IT IS SO ORDERED**.

Dated this 2nd day of January, 2024.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

21