**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

MOREHOUSE ENTERPRISES LLC d/b/a
BRIDGE CITY ORDNANCE., *et al.*,

      *Plaintiffs*,

  v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

      *Defendants.*

No. 3:23-cv-00129-PDW-ARS

**<u>DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

I.     Statutory and Regulatory Background ........................................................................ 2

II.    Defendants' Enhanced Regulatory Enforcement Policy ............................................ 4

III.   This Lawsuit ............................................................................................................... 5

STANDARD OF REVIEW .................................................................................................. 6

I.     Rule 12(b)(1), (h)(3) ................................................................................................... 6

II.    Rule 12(b)(6) .............................................................................................................. 6

ARGUMENT ........................................................................................................................ 7

I.     Plaintiffs' claims are not justiciable. ......................................................................... 7

     a.     Plaintiffs lack standing. ................................................................................ 8

     b.    BCO's claims regarding its license revocation are moot. ............................ 12

     c.    This Court lacks jurisdiction over Plaintiffs' APA claims. .......................... 14

          i.    The AAP is committed to agency discretion by law. ....................... 14

          ii.   The AAP is not reviewable final agency action. .............................. 16

II.    Plaintiffs' Complaint fails to state a claim ............................................................... 17

     a.     The Enhanced Regulatory Enforcement Policy and AAP are not contrary to the GCA. ...................................................................................................... 17

     b.    The Enhanced Regulatory Enforcement Policy and AAP do not implicate or infringe the Second Amendment. ................................................................ 19

          i.    Plaintiffs fail to adequately allege that the AAP burdens conduct covered by the Second Amendment's text. ...................................... 20

          ii.   A robust historical tradition supports the regulation of commercial firearms dealers. ....................................................................... 24

          iii.  The AAP is nothing like the licensing scheme invalidated in *Bruen*. .............. 27

     c.    Plaintiffs cannot state a claim for vindictive prosecution. ........................... 28

        d.      Plaintiffs cannot state a claim for selective prosecution. ..................................30

        e.      Plaintiffs cannot state a First Amendment access to courts claim. ..............................31

CONCLUSION ....................................................................................................................32

**TABLE OF AUTHORITIES**

**CASES**

*Ali v. Cangemi,*
419 F.3d 722 (8th Cir. 2005) ...................................................................................................12

*Am. Arms Int'l v. Herbert,*
563 F.3d 78 (4th Cir. 2009) .....................................................................................................18

*Ark. Right to Life State Pol. Action Comm. v. Butler,*
146 F.3d 558 (8th Cir. 1998) ...................................................................................................11

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................................... 7, 11

*Bennett v. Spear,*
520 U.S. 154 (1997) .................................................................................................................16

*Best Loan Co. v. Herbert,*
601 F. Supp. 2d 749 (E.D. Va. 2009) .......................................................................................18

*Bivens v. Six Unknown Fed. Narcotics Agents,*
403 U.S. 388 (1971) .................................................................................................................13

*Bragan v. Poindexter,*
249 F.3d 476 (6th Cir. 2001) ...................................................................................................12

*CEW Props., Inc. v. DOJ,*
979 F.3d 1271 (10th Cir. 2020) ...............................................................................................18

*Christopher v. Harbury,*
536 U.S. 403 (2002) .................................................................................................................31

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) .................................................................................................................15

*Clapper v. Amnesty, Int'l, USA,*
568 U.S. 398 (2013) ...................................................................................................................8

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................................................... 21, 22

*Dittmer Props., LP v. FDIC,*
708 F.3d 1011 (8th Cir. 2013) ............................................................................................ 7, 17

*Dominek v. Equinor Energy, LP,*
No. 1:19-cv-288, 2023 WL 3212544 (D.N.D. May 2, 2023) ....................................................6

iii

*Fairmont Cash Mgmt., LLC v. James,*
    858 F.3d 356 (5th Cir. 2017) .................................................................. 15, 16

*FastTrac Transp., LLC v. Pedigree Techs., LLC,*
    618 F. Supp. 3d 858 (D.N.D. 2022) ............................................................. 7

*Gazzola v. Hochul,*
    645 F. Supp. 3d 37 (N.D.N.Y. 2022) .......................................................... 21

*Green Acres Enters., Inc. v. U.S.,*
    418 F.3d 852 (8th Cir. 2005) ....................................................................... 6

*Greer v. Chao,*
    492 F.3d 962 (8th Cir. 2007) ..................................................................... 14

*Grp. Health Plan, Inc. v. Philip Morris, Inc.,*
    86 F. Supp. 2d 912 (D. Minn. 2000) .......................................................... 10

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................. 14, 15

*Heights Apartments, LLC v. Walz,*
    30 F.4th 720 (8th Cir. 2022) ...................................................................... 31

*Home Depot USA, Inc. v. Jackson,*
    139 S. Ct. 1743 (2019) ................................................................................. 7

*Hughes v. City of Cedar Rapids,*
    840 F.3d 987 (8th Cir. 2016) ....................................................................... 8

*Jarkesy v. SEC,*
    803 F.3d 9 (D.C. Cir. 2015) ....................................................................... 13

*Jones v. Gale,*
    470 F.3d 1261 (8th Cir. 2006) ..................................................................... 6

*Kingdomware Techs., Inc. v. U.S.,*
    579 U.S. 162 (2016) .................................................................................. 13

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ..................................................................................... 6

*Kuehl v. Sellner,*
    887 F.3d 845 (8th Cir. 2018) ....................................................................... 8

*Kuntz v. Dep't of Just.,*
    No. 1:19-cv-70, 2020 WL 6322858 (D.N.D. Mar. 6, 2020) ......................... 6

iv

*Manning v. SA Challenger, Inc.,*
  No. 10-4943, 2011 WL 5520438 (D. Minn. Oct. 17, 2011)..................................................2

*McCarthy v. Ozark Sch. Dist.,*
  359 F.3d 1029 (8th Cir. 2004) ...........................................................................................7

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ...........................................................................................21, 22, 27

*McNaught v. Nolen,*
  76 F.4th 764 (8th Cir. 2023) .............................................................................................11

*Mo. Prot. & Advoc. Servs., Inc. v. Carnahan,*
  499 F.3d 803 (8th Cir. 2007) .............................................................................................9

*Morehouse Enters., LLC v. ATF,*
  No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) ...........................................22

*Morehouse Enters., LLC v. ATF,*
  78 F.4th 1011 (8th Cir. 2023)...........................................................................................21

*Morehouse Enters., LLC v. ATF,*
  No. 3:23-cv-129, 2024 WL 708954 (D.N.D. Jan. 2, 2024) ...........................................*passim*

*Mountaineer Gun Sales, LLC v. ATF,*
  No. 1:11CV200, 2012 WL 194079 (N.D. W.Va. Jan. 23, 2012) .......................................13

*Nat'l Mining Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014)..........................................................................................17

*New York State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022)...........................................................................................................*passim*

*Ngure v. Ashcroft,*
  367 F.3d 975 (8th Cir. 2004) ...........................................................................................14

*On Target Sporting Goods, Inc. v. Att'y Gen. of the U.S.,*
  472 F.3d 572 (8th Cir. 2007) ...........................................................................................18

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ..........................................................................................................8

*Pharm. Rsch. & Mfrs. of Am. v. Williams,*
  64 F.4th 932 (8th Cir. 2023) .............................................................................................9

*Religious Sisters of Mercy v. Becerra,*
  55 F.4th 583 (8th Cir. 2022) .......................................................................................10, 11

*Rocky Mountain Gun Owners v. Polis*,
No. 23-cv-02563, 2023 WL 8446495 (D. Colo. Nov. 13, 2023),
*appeal filed*, No. 23-1380 (10th Cir. Dec. 6, 2023) .......................................................... 23, 26

*Sanzone v. Mercy Health*,
499 F. Supp. 3d 627 (E.D. Mo. 2020) .............................................................................. 8

*Second Amend. Found. v. ATF*,
2023 WL 7490149 (N.D. Tex. Nov. 13, 2023),
*appeal filed*, No. 23-11157 (5th Cir. Nov. 14, 2023) .......................................................... 24

*Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps. of Eng'rs*,
888 F.3d 906 (8th Cir. 2018) ........................................................................................... 16

*Steger v. Franco, Inc.*,
228 F.3d 889 (8th Cir. 2000) ........................................................................................... 8

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........................................................................................................ 10

*Target Training Int'l, Ltd. v. Lee*,
1 F. Supp. 3d 927 (N.D. Iowa 2014) ................................................................................ 15

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) ....................................................................................*passim*

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................................................................ 7

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........................................................................................................ 16

*U.S. v. Fincher*,
538 F.3d 868 (8th Cir. 2008) ........................................................................................... 22

*U.S. v. Hirsch*,
360 F.3d 860 (8th Cir. 2004) ........................................................................................... 28

*U.S. v. Kazmende*,
No. 1:22-cr-236, 2023 WL 3872209 (N.D. Ga. May 17, 2023) ........................................ 21

*U.S. v. Kelley*,
152 F.3d 881 (8th Cir. 1988) ........................................................................................... 28

*U.S. v. King*,
646 F. Supp. 3d 603 (E.D. Pa. 2022) ............................................................................... 21

*U.S. v. Leathers,*
   354 F.3d 955 (8th Cir. 2004) ................................................................28

*U.S. v. Lehman,*
   8 F.4th 754 (8th Cir. 2021) ................................................................22

*U.S. v. Libertad,*
   No. 22-cr-644, 2023 WL 4378863 (S.D.N.Y. July 7, 2023) ................26

*U.S. v. Mumphrey,*
   193 F. Supp. 3d 1040 (N.D. Cal. 2016) ................................................13

*U.S. v. Peterson,*
   652 F.3d 979 (8th Cir. 2011) ................................................................30

*U.S. v. Rodgers,*
   18 F.3d 1425 (8th Cir. 1994) ................................................................29

*U.S. v. Sitladeen,*
   64 F.4th 978 (8th Cir. 2023) ................................................................20

*U.S. v. Texas,*
   599 U.S. 670 (2023) ................................................................15

*U.S. v. Tilotta,*
   No. 3:19-cr-04768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ................20

*Van Bergen v. Minnesota,*
   59 F.3d 1541 (8th Cir. 1993) ................................................................7

*Viasat, Inc. v. FCC,*
   47 F.4th 769 (D.C. Cir. 2022) ................................................................10

*Wayte v. U.S.,*
   470 U.S. 598 (1985) ................................................................30

*Wilson v. Ark. Dep't of Hum. Servs.,*
   850 F.3d 368 (8th Cir. 2017) ................................................................7

*Zorich v. St. Louis Cnty.,*
   No. 4:17-CV-1522 PLC, 2018 WL 6621525 (E.D. Mo. Dec. 18, 2018) ................9

## CONSTITUTION

U.S. Const. art. III, § 2 ................................................................7

**STATUTES**

5 U.S.C. § 701(a) .................................................................................................................................14

5 U.S.C. § 704 ................................................................................................................................ 13, 16

18 U.S.C. § 921 ...................................................................................................................................... 2

18 U.S.C. § 923(a) ................................................................................................................................. 2

18 U.S.C. § 923(e) .........................................................................................................................*passim*

18 U.S.C. § 923(f) ......................................................................................................................... 3, 13, 29

18 U.S.C. § 923(g) .......................................................................................................................... 2, 29

**RULES**

Fed. R. Civ. P 12(b)(1) ......................................................................................................................... 6

Fed. R. Civ. P 12(b)(6) ............................................................................................................. 2, 6, 7, 17

Fed. R. Civ. P 12(h)(3) ..................................................................................................................... 6, 12

**REGULATIONS**

27 C.F.R. § 478.73 ............................................................................................................................ 3, 29

27 C.F.R. § 478.74 ................................................................................................................................. 3

27 C.F.R. § 478.76 ................................................................................................................................. 3

27 C.F.R. § 771.80 ................................................................................................................................. 4

28 C.F.R. § 0.130 ................................................................................................................................... 2

**OTHER AUTHORITIES**

2 General Laws of Massachusetts from the Adoption of the
  Constitution to February 1822 (1823) ............................................................................................26

3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One
  Thousand Seven Hundred (1810) ...................................................................................................26

15 The Public Records of the Colony of Connecticut 191 (1890) ........................................................26

1837 Ala. Acts 7 ...................................................................................................................................25

1837–1838 Tenn. Pub. Acts 200...................................................................................................25

1855–1856 Tenn. Laws 92..........................................................................................................25

1874 Ala. L. 41, ch. 1..................................................................................................................27

1878 Ala. L. 437, ch. 314 ...........................................................................................................27

Act of Feb. 13, 1879, Act No. 314, 1878–1879 Ala. Acts 434................................................27

Act of May 22, 1794, 1 Stat. 369...............................................................................................25

ATF, *Enhanced Regulatory Enforcement Policy*,
    https://perma.cc/G48A-J6ER.......................................................................................... 8, 11

ATF, *Firearms Compliance Inspections*,
    https://perma.cc/AY7F-WUNG ....................................................................................... 2, 3

ATF, *Revocation of Firearms Licenses*,
    https://perma.cc/9FTZ-JG48 ...............................................................................................3

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890) ........................26

Department of Justice, *Justice Department: Violent Crime Reduction Efforts*,
    https://perma.cc/QVN5-JG8D ............................................................................................4

Laws of the Commonwealth of Massachusetts from
    November 28, 1780 to February 28, 1807 (1807)..................................................................26

Laws of the State of Maine 546 (1830). Furthermore, multiple states—including Massachusetts
    (1651 and 1809), Connecticut (1775), New Jersey (1776), and New Hampshire (1820) ................26

Laws of the State of New Hampshire; with the Constitutions of the United States
    and of the State Prefixed 277 (1830)......................................................................................26

Ordinances of the City of Chicago, Ill., ch. 16, § 1 ...................................................................27

Ordinances of the City of St. Paul, Minn., ch. 21, § 1 ..............................................................27

White House, *Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and
    Respond to Gun Violence and Ensure Public Safety*,
    https://perma.cc/ZFK7-8RRN............................................................................................4

## INTRODUCTION

The Gun Control Act of 1968 ("GCA") imposes certain regulatory controls on federal firearms licensees ("FFLs"), a category that includes individuals and entities licensed to manufacture, import, and deal in firearms. Specifically, because of the dangers posed by the sale of weapons to felons and other prohibited persons, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is obligated to periodically inspect the records and firearms inventory of FFLs. If ATF finds that an FFL willfully violated federal laws and regulations, such as by refusing to run background checks or falsifying records, then the agency may notify the FFL of the agency's intent to revoke the license at issue. Following such a notice, the FFL may request an administrative hearing before an ATF official and may present any evidence or testimony they believe is relevant. After such a hearing, ATF may issue a final determination to revoke a license only if the hearing official finds both that the violations alleged took place, and that the violations were willful. Even where a final notice of revocation is issued, FFLs may seek *de novo* review of ATF's decision in federal district court.

Only around five percent of FFLs are subject to inspection each year, and ATF only revokes the licenses of a miniscule fraction of FFLs, all upon a finding of willful violations. Put more concretely, in 2022 ATF recorded a total of 136,563 active FFLs in in the United States; the agency conducted 6,979 inspections that year; and 90 of those inspections eventually resulted in license revocation. The agency's inspection and enforcement processes serve a vital role in preventing gun violence by revoking the licenses of the worst-offending FFLs and deterring violations of the laws and regulations governing the sale of firearms.

Plaintiffs here seek to undermine ATF's established inspection and enforcement processes by broadly enjoining ATF's operative guidance governing FFL inspection and enforcement. But this Court lacks jurisdiction to consider Plaintiffs' claims. Plaintiffs fail to show that they or their members will likely be harmed by ATF's guidance in any way, and indeed, Plaintiffs fail to identify any FFL that

will imminently lose its license due to the challenged policy, originally announced over two years before Plaintiffs brought suit. They accordingly lack standing to sue. To the extent Plaintiffs' claims challenge the FFL-Plaintiff's now-concluded revocation proceedings, those claims are moot. Moreover, the operative guidance Plaintiffs challenge is committed to agency discretion by law and is not final agency action appropriate for judicial review. And, in any event, Plaintiffs have failed to state a claim, as the challenged ATF guidance reasonably implements relevant statutory directives and does not run afoul of the Second Amendment.

Accordingly, the Court should dismiss Plaintiffs' Complaint.

## BACKGROUND

## I.     Statutory and Regulatory Background

The GCA, codified at 18 U.S.C. §§ 921, *et seq.*, gives the Attorney General the authority to approve and revoke federal firearm licenses, and provides that "[n]o person shall engage in the business of importing, manufacturing, or dealing in firearms . . . until he has filed an application with and received a license to do so from the Attorney General." 18 U.S.C. § 923(a). The Attorney General has delegated authority to enforce the GCA to ATF. *See* 28 C.F.R. § 0.130(a).

Pursuant to that authority, ATF periodically inspects FFLs for compliance with the GCA's requirements. 18 U.S.C. § 923(g)(1)(B)(ii)(I). "ATF's industry operations investigators (IOIs) conduct inspections of FFLs to ensure compliance with applicable federal, state and local laws and regulations," and to "educate licensees on the specific requirements of those laws and regulations." ATF, *Firearms Compliance Inspections*, https://perma.cc/AY7F-WUNG.[1] Typically, an inspecting IOI will arrive at the business premises during business hours and will review business operations, evaluate internal

---

[1] Defendants request that for purposes of their Rule 12(b)(6) Motion the Court take judicial notice of the various ATF documents referenced throughout this brief. *See Manning v. SA Challenger, Inc.*, No. 10-4943, 2011 WL 5520438, at *7 (D. Minn. Oct. 17, 2011) ("[P]ublic records and government documents are generally considered not subject to reasonable dispute and the court may take judicial notice of such records without converting a Rule 12(b)(6) motion to a motion for summary judgment." (citation omitted)).

controls, verify the FFL's compliance with state and local laws, review the FFL's records, and inventory the firearms, among other things. *Id.* If the IOI detects violations, they will create a final report of violations and discuss that report with the FFL.

Under the GCA, ATF "may, after notice and opportunity for hearing, revoke any license . . . if the holder of such license has willfully violated any provision of this chapter or any rule or regulation prescribed by the Attorney General." 18 U.S.C. § 923(e). Therefore, following an inspection, "[w]henever the Director has reason to believe that a licensee has willfully violated any provision of the Act . . . a notice of revocation of the license, ATF Form 4500, may be issued." 27 C.F.R. § 478.73(a). This is the first step of the revocation process, and ATF "shall afford the licensee 15 days from the date of receipt of the notice in which to request a hearing prior to suspension or revocation of the license" with the Director of Industry Operations ("DIO") in their ATF field division. *Id.* § 478.73(b); *see also* 18 U.S.C. § 923(f)(2). "During the hearing the licensee will have the opportunity to submit facts and argument for review and consideration[.]" 27 C.F.R. § 478.74; *see also* ATF, *Revocation of Firearms Licenses*, https://perma.cc/9FTZ-JG48 ("At the hearing, the licensee can be represented by an attorney and may bring employees and documentation to address the violations cited in the notice."); 27 C.F.R. § 478.76. "If the DIO decides that the violations were willful and revocation is justified, . . . ATF sends a final notice of revocation (ATF Form 5300.13) to the licensee with a summary of the findings and legal conclusions that warrant revocation." *Revocation of Firearms Licenses*; 27 C.F.R. § 478.74; 18 U.S.C. § 923(f)(3).

If ATF sends a final notice of revocation, the license holder may "file a petition with the United States district court for the district in which he resides or has his principal place of business for de novo judicial review of such . . . revocation." 18 U.S.C. § 923(f)(3). "If the court decides that [ATF] was not authorized to . . . revoke the license, the court shall order [ATF] to take such action as may be necessary to comply with the judgment of the court." *Id.*

## II.        Defendants' Enhanced Regulatory Enforcement Policy

In summer 2021, President Biden and the Department of Justice announced a new policy ("Enhanced Regulatory Enforcement Policy") which would establish "zero tolerance for rogue gun dealers that willfully violate the law." White House, *Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Violence and Ensure Public Safety*, at 2, https://perma.cc/ZFK7-8RRN ("Fact Sheet"); *see also* Department of Justice, *Justice Department: Violent Crime Reduction Efforts*, https://perma.cc/QVN5-JG8D. Pursuant to the Policy, "absent extraordinary circumstances," ATF will seek

> to revoke the licenses of dealers the first time that they violate federal law by willfully 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records, such as a firearms transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to permit ATF to conduct an inspection in violation of the law.

Fact Sheet. Thus, ATF will issue an initial notice of revocation of the federal firearms license of any FFL upon the discovery of any one of these five serious violations, where there is reason to believe such violations were willful. And ATF will issue a final notice of revocation of the license following a hearing where the DIO determines by a preponderance of the evidence that such violations occurred and were willful. 27 C.F.R. § 771.80. ATF employs an internal guidance document to assist ATF personnel as they conduct compliance inspections and take appropriate administrative actions. (For consistency with Plaintiffs' briefing, Defendants will refer to this document as ATF's Administrative Action Policy or "AAP.") ATF amended the AAP first in 2022 and again in 2023 to reflect the agency's implementation of the Enhanced Regulatory Enforcement Policy. The currently operative guidance, ATF-O-5370.1F, is attached as Exhibit A.[2]

---

[2] Portions of the AAP are redacted because those portions are protected by the law enforcement privilege and/or are law enforcement sensitive. *See also* Declaration of Curtis Gilbert ("ATF Decl.") ¶ 4, ECF No. 34-3.

### III.    This Lawsuit

Plaintiffs are Morehouse Enterprises, LLC d/b/a Bridge City Ordnance ("BCO"), a North Dakota limited liability company which holds an active Type 01 federal firearms retail license and a Type 07 federal firearms manufacturing license; Gun Owners of America, Inc. ("GOA"), a non-profit membership organization formed "to preserve and defend [] Second Amendment rights"; and Gun Owners Foundation ("GOF"), a nonprofit corporation. Pls.' Compl. ("Compl.") ¶¶ 4, 8–9, ECF No. 1. BCO alleges that it is a member of GOA. *Id.* ¶ 12. Defendants are the U.S. Department of Justice; ATF; Steven M. Dettelbach, Director of ATF; and Hans Hummel, the Director of Industry Operations for the Saint Paul Field Division of ATF. *Id.* ¶¶ 15–18.

ATF conducted a periodic firearms compliance inspection of BCO in February 2023. The inspection revealed four violations: (1) unlawful sale or delivery of a firearm other than a rifle or shotgun to an out of state resident; (2) failure to complete a National Instant Criminal Background Check System ("NICS") background check; (3) failure to maintain an accurate/complete/timely acquisition and disposition record of firearms; and (4) failure to record NICS contact information on ATF Form 4473 ("Firearms Transaction Record"). Compl. Ex. 13, Report of Violations at 5, ECF No. 1-13. Based on these inspection results, ATF issued BCO a Notice of Revocation stating that its licenses "may be revoked" as ATF "ha[d] reason to believe that [BCO] willfully violated the provisions" of the GCA and its implementing regulations. Compl. Ex. 1, Notice of Revocation at 1–2, ECF No. 1-1. The Notice also stated that BCO "may file a request . . . for a hearing to review the revocation . . . of [its] license," and "[w]here a timely request for a hearing is made, the license shall remain in effect pending the outcome of the hearing." *Id.* at 1.

Plaintiffs filed the present action on July 11, 2023, seeking to "restrain[] Defendants from further implementing or otherwise enforcing" the Enhanced Regulatory Enforcement Policy and to stay or enjoin ATF's proceedings to revoke BCO's licenses. Compl. at 1, 65. Plaintiffs filed a Motion

for Preliminary Injunction, asking the Court to "enjoin the current ATF Administrative Action Policy, and ATF's pending revocation of BCO's Federal Firearms Licenses, until such time as a decision on the merits can be reached." Pls.' Mem. ISO Mot. for a Prelim. Inj. at 25, ECF No. 15-1. On August 16, 2023, ATF held an administrative hearing with BCO, and on August 30, 2023, ATF issued BCO a written notification of the agency's decision not to issue BCO a final notice of revocation. *See* Notice of Admin. Decision at 1, ECF No. 23; *see also* ATF Letter to BCO, ECF No. 34-2. On January 2, 2024, this Court entered an order denying Plaintiffs' Motion for Preliminary Injunction. *Morehouse Enters., LLC v. ATF*, No. 3:23-cv-129, 2024 WL 708954, at *1 (D.N.D. Jan. 2, 2024).

## STANDARD OF REVIEW

### I.     Rule 12(b)(1), (h)(3)

"Federal courts are courts of limited jurisdiction, and it is presumed that jurisdiction is lacking until the party claiming jurisdiction demonstrates otherwise." *Dominek v. Equinor Energy*, LP, No. 1:19-cv-288, 2023 WL 3212544, at *3 (D.N.D. May 2, 2023) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "Jurisdiction is a threshold question that must be decided at the outset of a case," and in considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "the court may look outside the pleadings in order to determine whether subject matter jurisdiction exists." *Kuntz v. Dep't of Just.*, No. 1:19-cv-70, 2020 WL 6322858, at *3–4 (D.N.D. Mar. 6, 2020) (quoting *Green Acres Enters., Inc. v. U.S.*, 418 F.3d 852, 856 (8th Cir. 2005)). "A plaintiff has the burden of establishing subject matter jurisdiction." *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P 12(h)(3).

### II.     Rule 12(b)(6)

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P 12(b)(6). "To survive a Rule 12(b)(6) motion, a complaint must contain 'sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *FastTrac Transp., LLC v. Pedigree Techs., LLC*, 618 F. Supp. 3d 858, 863 (D.N.D. 2022) (Welte, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he Court must accept all factual allegations . . . as true," but "[a] plaintiff must show that success on the merits is more than a sheer possibility," and the "determination of whether a complaint states a claim . . . is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). Accordingly, the complaint must be "read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Id.* (quoting *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 371–72 (8th Cir. 2017)). Further, "while courts primarily consider the allegations [of] the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim." *Dittmer Props., LP v. FDIC*, 708 F.3d 1011 (8th Cir. 2013) (citation omitted).

## ARGUMENT

### I.      Plaintiffs' claims are not justiciable.

As a threshold matter, Plaintiffs' claims are not justiciable. *First*, Article III of the Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). Similarly, "federal courts may adjudicate only *actual, ongoing* cases or controversies." *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1035 (8th Cir. 2004) (emphasis added). And they lack jurisdiction when parties "no longer have a legally cognizable interest in the outcome of the litigation." *Van Bergen v. Minnesota*, 59 F.3d 1541, 1546 (8th Cir. 1993) (citation omitted). *Second*, federal court jurisdiction is "limited to those subjects encompassed within a statutory grant of jurisdiction," and "district courts may not exercise jurisdiction absent a statutory basis," such as the one provided by the Administrative Procedure Act ("APA"). *Home Depot USA, Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019).

### a. **Plaintiffs lack standing.**

The Complaint does not allege that any Plaintiff has standing to sue. Standing requires (1) an injury in fact, (2) causation, and (3) redressability. *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 992 (8th Cir. 2016). An injury in fact is the "actual or imminent invasion of a concrete and particularized legal interest." *Kuehl v. Sellner*, 887 F.3d 845, 850 (8th Cir. 2018) (citations omitted). Additionally, an injury in fact must be "actual or imminent; not conjectural or hypothetical." *Sanzone v. Mercy Health*, 499 F. Supp. 3d 627, 631 (E.D. Mo. 2020) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). "Allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty, Int'l, USA*, 568 U.S. 398, 409 (2013) (emphasis added) (citation omitted).

First, BCO lacks an injury because, at the time the Complaint was filed, *see Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000), it was speculative whether ATF would revoke BCO's licenses following the administrative hearing. Indeed, publicly available data shows that between 2021 and when Plaintiffs filed their Complaint, ATF decided not to revoke licenses in 84 of the 124 administrative hearings that involved at least one of the five violations specified by the Enhanced Regulatory Enforcement Policy. *See* ATF, *Enhanced Regulatory Enforcement Policy*, https://perma.cc/G48A-J6ER (whether a hearing was requested can be determined by examining each final notice of revocation; also showing 58 revocations where the FFL did not request a hearing). That is, in administrative hearings like the one BCO was set to face, "no revocation" was the outcome approximately 68% of the time. Therefore, going into ATF's administrative hearing, it was more likely than not that BCO would retain its license, making its alleged injury too speculative to give rise to standing. *See id.* That BCO ultimately retained its license only demonstrates that its alleged injury was entirely speculative.

To the extent BCO separately intends to claim standing on behalf of its customers, the Complaint falls well short. The Complaint contains the conclusory statement that "BCO is able to

8

bring claims on behalf of its customers," Compl. ¶ 272, but lacks any allegation that BCO actually seeks to claim standing on behalf of such customers. The Complaint then suggests that "an unlawful enforcement policy" would infringe "the rights of BCO's customers," *id.* ¶ 273, without alleging how, exactly, those specific customers would be affected. Presuming that BCO did attempt to bring a third-party claim on behalf of its customers, Plaintiffs fail to plead any of the prudential requirements required to assert third-party standing: (1) an injury to the plaintiff; (2) a "close relation[ship]" between the plaintiff and the third party; and (3) plausible allegations that the third party "was hindered in his ability to protect his own interests." *See Zorich v. St. Louis Cnty.*, No. 4:17-CV-1522 PLC, 2018 WL 6621525, at *23 (E.D. Mo. Dec. 18, 2018) (citation omitted). The Complaint lacks any allegation that BCO's customers are injured, that BCO has a "close relationship" with its customers, or that BCO customers are hindered in some way from bringing their own claims.

As this Court previously determined, the organizational Plaintiffs lack standing. *Morehouse*, 2024 WL 708954, at *6–7. Neither GOA nor GOF alleges harm to itself as an organization, and instead both claim standing solely on behalf of their "members and supporters." Compl. ¶ 13. In order to support such "associational standing," an organizational plaintiff must allege that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 946–47 (8th Cir. 2023) (citation omitted). Both Plaintiff organizations fail this basic test.

First, Plaintiffs do not allege that GOF is a membership organization at all. *See* Compl. ¶ 9 (alleging only that GOF is a "Virginia non-stock corporation" and is "supported by gun owners across the country"). Where an entity has no claimed members, it may assert associational standing only if it possesses the "indicia" of a traditional membership organization, namely, where constituents elect and serve in group leadership and finance its activities. *See Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499

F.3d 803, 810 (8th Cir. 2007); *see also Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 918 (D. Minn. 2000) ("In order to meet this 'indicia of membership' test, the constituents of an organization must exercise a certain measure of control over the organization."). Plaintiffs make no allegations as to the role of GOF "supporters" and whether they are analogous to traditional members, and this deficiency alone precludes a claim of associational standing. *See Grp. Health Plan, Inc.*, 86 F. Supp. 2d at 918 (holding no associational standing in part because "Plaintiffs do not even allege the requisite indicia of membership"). And an organization may not represent individuals in federal court simply because they donate to or otherwise support the group. *See Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) ("[I]t is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page.").

Second, while Plaintiff GOA is alleged to be a membership organization, Compl. ¶ 8, GOA fails to demonstrate that one of its members would have standing to sue in his or her own right. *Morehouse*, 2024 WL 708954, at *6. "[P]laintiffs claiming an organizational standing [must] identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009). While Plaintiffs allege that BCO is a GOA member, this does not provide GOA standing to represent its remaining unnamed members. The Eighth Circuit recently held directly on point, explaining that where an organizational plaintiff fails to identify members with standing "other than the [ ] named plaintiffs," the group "lacks associational standing to sue on behalf of unnamed members." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022).

Plaintiffs do not identify any other member of GOA with standing to sue in his or her own right. At most, Plaintiffs allege that GOA "heard from at least" one purported member who "uses BCO as [their] primary gun store," and "if [BCO's] [licenses] were revoked . . . the member would have to . . . traverse a much further distance" to buy guns. Compl. ¶ 14. As this Court correctly determined when denying Plaintiffs' motion for a preliminary injunction, Plaintiffs' claim that GOA

has "heard from" an anonymous member fails to identify an actual individual with standing to sue. *See*

*See Morehouse*, 2024 WL 708954, at *7 (citing *Religious Sisters of Mercy*, 55 F.4th at 601) ("Vice President

Pratt's declaration fails to establish this member would have standing to sue on his own.").

Moreover, this hearsay statement from an anonymous individual does not demonstrate a

potential injury in fact. For one thing, even if BCO were to close, and even if this person were affected

by the closure, Plaintiffs do not allege how much more travel might be required for him or her to

purchase guns, and Plaintiffs thereby fail to establish that BCO's closure would cause anything more

than a de minimis inconvenience. *See* Compl. ¶ 248 (alleging only that this member would have to

"drive a much further distance" to buy guns); *McNaught v. Nolen*, 76 F.4th 764, 772 (8th Cir. 2023)

(rejecting reliance on "vague, blanket statements of reputational harm" because "[b]reezy declarations

such as these fall well short of establishing" a concrete and particularized injury in fact); *Ark. Right to*

*Life State Pol. Action Comm. v. Butler*, 146 F.3d 558, 560 (8th Cir. 1998) ("Vague and conclusory

allegations of harm are insufficient to create standing.").

At most, any cognizable injury to a Plaintiff would be the (now moot) threat to BCO's license.

Plaintiffs have not alleged that the AAP causes any other harm. Plaintiffs baldly assert that ATF's

enforcement policy has and will continue to cause the revocation of federal firearms licenses held by

other businesses, and thereby result in the closure of other gun stores. *See* Compl. ¶ 239. But the

Complaint contains none of the details—such as the names of these FFLs, where they are located,

what violations they allegedly committed—that are required to put Defendants on notice of Plaintiffs'

claims. *See Iqbal*, 556 U.S. at 662. This failure to plead is even more glaring because the AAP has been

in effect for two years, and this information is publicly available. *See* ATF, *Enhanced Regulatory*

*Enforcement Policy*, https://perma.cc/G48A-J6ER (listing each license revoked under the policy, the

location of the license holder, and including links to the revocation report and documents). The

Complaint thus fails to plausibly allege an injury caused by the AAP.

**b. BCO's claims regarding its license revocation are moot.**

Even if the Complaint alleged an injury at the time of filing, this Court still lacks jurisdiction over claims regarding BCO's revocation, as Plaintiffs' requests for relief from ATF's administrative process are moot. *See* Compl. ¶¶ 250–261, 269–273, 295–334, Prayer for Relief ¶¶ 1–3, 7–8; *see also Morehouse*, 2024 WL 708954, at *7 ("Morehouse's ability to proceed appears to be in question.").

"When, during the course of litigation, the issues presented in a case lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief, the case is considered moot" and must be dismissed. *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005) (citation omitted); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Because ATF ultimately made the determination not to revoke BCO's license, there is no ongoing case or controversy regarding Plaintiffs' claims that ATF acted arbitrarily because it failed to consider certain facts in pursuing revocation. *See* Notice of Admin. Decision; ATF Letter to BCO. For the same reason, any rights BCO has with respect to its ability to manufacture, acquire, and sell firearms are no longer at risk, and BCO's customers and GOA and GOF members will be able to continue to purchase firearms from BCO as usual. And although BCO was never "prosecuted," ATF's administrative process has concluded, and no further administrative action will be taken. There is likewise no barrier to access the courts.

Accordingly, this Court can no longer grant effective relief, as there is no further administrative action or revocation to enjoin, and Plaintiffs have not sought any other remedy with respect to these claims. *See* Compl. Prayer for Relief ¶¶ 1–3 (requesting a stay of enforcement of the proposed revocation, an injunction halting ATF's administrative proceedings, and a declaration that Defendants are not authorized to revoke BCO's license for the cited violations); *see also Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir. 2001) (explaining "remedy for vindictive prosecution claims "is dismissal of

the charges"); *U.S. v. Mumphrey*, 193 F. Supp. 3d 1040, 1055–1059 (N.D. Cal. 2016) (explaining "dismissal . . . is a proper remedy for a selective enforcement claim").[3]

Although there is an exception to the mootness doctrine for cases that are capable of repetition yet evading review, that "exception applies only in exceptional situations," where (1) the challenged action is "in its duration too short to be fully litigated prior to cessation or expiration," and (2) there is a "reasonable expectation" the same party will "be subject to the same action again." *Kingdomware Techs., Inc. v. U.S.*, 579 U.S. 162, 170 (2016). Neither concern is present here. *First*, the challenged action is not too short in duration to be fully litigated. Plaintiffs improperly sought to preempt ATF's administrative process before its conclusion, but even if ATF had made a final determination to revoke BCO's federal firearms license, BCO would have had the opportunity to fully litigate all issues regarding revocation in federal district court pursuant to 18 U.S.C. § 923(f)(3).[4] *Second*, there is no reasonable expectation that ATF would re-initiate revocation proceedings based on BCO's 2023 inspection. The agency already conducted its administrative process, held a hearing, and issued a final decision, and there is no expectation it would change that decision. In the future, pursuant to standard procedures, BCO may be subject to another compliance inspection and could therefore be subject to further administrative action. But that would not constitute the "same action," as it would be based on the discovery of new violations, and thus any arguments against administrative action would be different than those advanced here. Accordingly, the capable of repetition, yet evading review exception does not apply, and the Court should dismiss as moot BCO's license revocation claims.

---

[3] Plaintiffs have not brought a claim for civil liability pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

[4] Judicial review is unavailable before ATF's administrative process concludes. APA review requires the exhaustion of administrative remedies. *See Mountaineer Gun Sales, LLC v. ATF*, No. 1:11CV200, 2012 WL 194079, at *3–4 (N.D. W.Va. Jan. 23, 2012). APA review is further precluded because 18 U.S.C. § 923(f)(3) provides an adequate remedy, and "[i]f a special statutory review scheme exists . . . it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (citation omitted); *see* 5 U.S.C. § 704. An initial notice is also not reviewable final agency action.

### c.   This Court lacks jurisdiction over Plaintiffs' APA claims.

### i.   The AAP is committed to agency discretion by law.

Plaintiffs challenge ATF's AAP as contrary to the GCA and the Second Amendment, but as this Court previously concluded, judicial review of these claims is not available. *See Morehouse*, 2024 WL 708954, at *7–8; *see also* Compl. ¶¶ 262–294. 5 U.S.C. § 701(a) precludes judicial review of agency action when that action "is committed to agency discretion by law." "[W]hether to institute an enforcement action" is one type of agency action that courts have "traditionally left to agency discretion." *Ngure v. Ashcroft*, 367 F.3d 975, 982 (8th Cir. 2004); *see also Heckler v. Chaney*, 470 U.S. 821 (1985); *Greer v. Chao*, 492 F.3d 962, 964 (8th Cir. 2007) ("[W]hen an agency decides to seek enforcement actions (or declines to seek enforcement actions), it is entitled to the same type of discretion that a prosecutor is afforded in bringing (or not bringing) criminal charges."). Agency enforcement policy often involves a "complicated balancing of a number of factors," and an "agency is far better equipped than courts to deal with the many variables involved." *Heckler*, 470 U.S. at 831–32. Additionally, some statutes may be "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830.

The AAP is an internal guidance document setting forth ATF's enforcement priorities and is therefore not subject to judicial review. *See Morehouse*, 2024 WL 708954, at *8 ("Most of the AAP concerns enforcement priorities."); *see, e.g.,* AAP at 1 ("This order provides fair and consistent guidelines for administrative remedies for violations disclosed relative to inspections of [FFLs]."); *id.* ("This order sets forth the general policy guidelines for administrative action recommendations for FFLs."). Although the GCA permits ATF to revoke a firearms license for any willful violation, given the sheer number of FFLs (136,563 as of 2023) and ATF's limited inspection and enforcement resources, ATF cannot and does not seek revocation for every willful violation that occurs. *See* Fact Sheet. Instead, like most agencies charged with the enforcement of a statute, ATF prioritizes the

14

enforcement of certain types of willful violations—namely, those it determines "directly affect public safety and ATF's ability to trace firearms recovered in violent crimes." AAP at 3. To that end, the AAP "establishes a unified plan of action for resolution of violations through administrative action," and "groups . . . violations into categories for which specific administrative actions are recommended." *Id.* at 2. The AAP accordingly identifies willful violations for which revocation is the "assumed" administrative action because such violations directly affect public safety, including the transfer of a firearm to a prohibited person, and the failure to conduct a required background check. *Id.* at 3. But the AAP also specifies violations, both willful and otherwise, for which a warning letter or a warning conference are appropriate actions. *See id.* at 4–6. The AAP is therefore precisely the type of agency policy for which judicial review is precluded, as it reflects ATF's balancing of multiple factors in determining how to enforce the GCA. *See U.S. v. Texas*, 599 U.S. 670, 680 (2023) ("[F]ederal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions.").

Additionally, the GCA provides this Court with no "meaningful standard against which to judge [ATF's] exercise of" such enforcement discretion. *Heckler*, 470 U.S. at 830. The statute simply states that ATF "*may*" revoke a firearms license for any willful violation. *See* 18 U.S.C. § 923(e) (emphasis added); *see also Fairmont Cash Mgmt., LLC v. James*, 858 F.3d 356, 362 (5th Cir. 2017) ("A single willful violation authorizes the ATF to revoke the violator's FFL, regardless how severe."). The GCA does not specify willful violations for which revocation is definitely appropriate, nor does it identify willful violations for which revocation is not appropriate. This is simply an instance in which the statute is "drawn in such broad terms that . . . there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see also Target Training Int'l, Ltd. v. Lee*, 1 F. Supp. 3d 927, 941 (N.D. Iowa 2014) (finding "absence of any statutory factors to guide the agency's decision-making process, in combination with the open-ended nature of the inquiry, generally supports the conclusion

that the agency action is committed to agency discretion by law"). As Congress did not specify which, if any, willful violations of the GCA to prioritize (or deprioritize), it is within ATF's discretion to make such determinations, and that discretion is not subject to judicial review.

### ii.   The AAP is not reviewable final agency action.

Review is further precluded because, as this Court also determined, the AAP is not final agency action. *See Morehouse*, 2024 WL 708954, at *8–9; *see also* 5 U.S.C. § 704; *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process," and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). In particular, to be final, agency action must "compel affirmative action or prohibit otherwise lawful action," and "inflict some legal injury upon the party seeking judicial review." *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps. of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018).

The AAP is a general statement of policy that merely sets forth ATF's enforcement priorities and is thus not reviewable final agency action. The AAP does not revoke any federal firearms licenses, nor does it determine the rights or obligations of any FFL. *See* AAP. Indeed, no legal consequences flow from it. The GCA prohibits FFLs from willfully violating the requirements of that statute and its implementing regulations, and subjects FFLs to license revocation for any willful violation. *Fairmont Cash Mgmt.*, 858 F.3d at 362 ("A single willful violation authorizes the ATF to revoke the violator's FFL, regardless how severe."). The AAP does not expand or contract that liability, nor does it compel any additional affirmative action or prohibit otherwise lawful action on the part of FFLs.[5] *See Morehouse*, 2024 WL 708954, at *10 ("The APA does not expand [] the Attorney General's power beyond that already latent in § 923(e), and it offers no safe harbor to FFLs."). Instead, the AAP simply sets forth

---

[5] The Complaint alleges that the AAP eliminates the GCA's "willfulness" requirement. Compl. ¶ 262. But that allegation is rebutted by the text of the AAP, as the AAP does not eliminate the willfulness requirement, *see infra* 17–19, and this argument provides no basis to hold that the AAP is final agency action.

how ATF will exercise its enforcement discretion and what administrative actions it will take when it discovers certain violations.

Lastly, the ineffectiveness of any court-ordered remedy demonstrates that the AAP is not final agency action. Even if this Court were to enjoin the AAP, as Plaintiffs request, ATF could still exercise its statutory authority to revoke a license for any willful violation of the GCA, including the five identified by the Enhanced Regulatory Enforcement Policy. This demonstrates that the AAP has no "actual legal effect . . . on regulated entities," and that, in reality, all obligations (and any corresponding legal injury) flow from the statute. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

## II.   Plaintiffs' Complaint fails to state a claim.

### a.   The Enhanced Regulatory Enforcement Policy and AAP are not contrary to the GCA.

Plaintiffs allege that the AAP conflicts with the GCA because it "[i]mpos[es] a strict liability standard" and "rejects the statutory concept of 'willfulness,'" Compl. ¶ 262, but these allegations are contradicted by the text of the AAP, as this Court has preliminarily suggested. *See Morehouse*, 2024 WL 708954, at *10 ("[T]he AAP does not appear to violate the GCA.").

The AAP specifically states that "ATF must establish willfulness to proceed with revocation under 18 U.S.C. § 923(e)." AAP at 6.[6] There is no qualification to this statement, and it appears at the top of the section titled, "Revocation Under 18 U.S.C. § 923(e)," indicating that it applies to all license revocations. AAP at 6. This alone disposes of Plaintiffs' contention that the AAP somehow eliminates the GCA's willfulness requirement. But if more were needed, even the portions of the AAP referencing the challenged Policy reiterate that ATF must demonstrate willfulness. *See, e.g., id.* at 3 ("ATF has zero tolerance for willful violations that can directly affect public safety and ATF's ability

---

[6] The Complaint incorporates the AAP by reference. *See Dittmer Props.*, 708 F.3d 1011 ("[W]hile courts primarily consider the allegations of the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim." (citation omitted)).

to trace firearms recovered in violent crime."); *id.* at 7 ("[T]he below five items merit revocation of the license if committed willfully unless extraordinary circumstances exist."). Further, the term willful and its derivatives appear over twenty times in the AAP, and nowhere does the AAP suggest that revocation is permitted for unintentional or inadvertent violations. *See generally* AAP. There is thus simply no support for the notion that, through the AAP, ATF has adopted a policy of strict liability.

Nor has ATF somehow redefined the term "willful" in a way that subverts the statutory requirement. Although the GCA does not define the term "willful," *see* 18 U.S.C. § 923(e), the AAP defines it in the same manner courts have: "[t]he term willful means a purposeful disregard of, or a plain indifference to, or reckless disregard of a known legal obligation." AAP at 2; *compare with On Target Sporting Goods, Inc. v. Att'y Gen. of the U.S.*, 472 F.3d 572, 575 (8th Cir. 2007) (defining willfulness in the GCA context as where "a licensee knew of its legal obligation and purposefully disregarded or was plainly indifferent to" that obligation (citation omitted)); *Am. Arms Int'l v. Herbert*, 563 F.3d 78, 85–86 (4th Cir. 2009) (same). And the ways that ATF can prove the "knowledge element" of that standard under the AAP are supported by prior judicial interpretations. *Compare* AAP at 6–7, *with On Target*, 472 F.3d at 572 (establishing knowledge through licensee's repeated failure to follow GCA); *CEW Props., Inc. v. DOJ*, 979 F.3d 1271 (10th Cir. 2020) (considering licensee's training and acknowledgment of training, quantity and seriousness of violations, occasional adherence to regulatory obligations, length of time license had been held, and licensee's statements to investigators in finding willfulness); *Best Loan Co. v. Herbert*, 601 F. Supp. 2d 749, 754–55 (E.D. Va. 2009) ("Best Loan signed an Acknowledgment of Federal Firearms Regulations, demonstrating that the company understood the regulatory requirements applicable to firearms dealing.").

Plaintiffs remaining contentions fail to plausibly allege that ATF adopted a policy contrary to the GCA. For instance, Plaintiffs' allegation that "ATF will presume that certain violations establish willfulness," "regardless of whether there are actually any facts to establish 'willfulness,'" misreads the

18

AAP. Compl. ¶ 263. Plaintiffs appear to reference a portion of the AAP that merely explains that "ATF *does not have to establish a history of prior violations* to demonstrate willfulness," and the agency may revoke based on initial violations if the circumstances of those violations demonstrate willfulness. *See* AAP at 6 (emphasis added). Read in context, there can be no serious doubt that ATF still requires willfulness for such violations. Likewise, there is no merit to the Complaint's allegation that ATF's Spartan case management system now makes the decision to revoke a license. *See* Compl. ¶ 262. The AAP does not mention Spartan, much less "put[] the decision to revoke" in Spartan's hands.[7] *Id.*; *see generally* AAP. In fact, the AAP explains the roles of ATF personnel who are involved in the decision to revoke a license, making clear which individuals are responsible for any final determination to revoke a license. *See, e.g.*, AAP at 12–13 ("[T]he DIO must conclude whether the Government has met its burden of proof by a preponderance of the evidence that the elements required to issue a Final Notice of . . . Revocation."). Plaintiffs' allegations are therefore simply not plausible.

In short, Plaintiffs' Complaint fails to allege facts to support the claim that ATF has adopted a policy contrary to the GCA, and the Court should dismiss this claim.

### b. The Enhanced Regulatory Enforcement Policy and AAP do not implicate or infringe the Second Amendment.

Plaintiffs separately allege that the AAP violates the Second Amendment, Compl. ¶¶ 269–94, but none of their theories states a plausible claim to relief.[8] *See Morehouse*, 2024 WL 708954, at *10.

The Supreme Court clarified the framework for assessing Second Amendment challenges to firearm regulations in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Under *Bruen*, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution

---

[7] Even assuming the AAP constitutes reviewable final agency action, the AAP does not reference Spartan, and the Complaint does not separately identify any final agency action involving Spartan.

[8] To the extent that Plaintiffs' Second Amendment claim relies on the AAP's purported elimination of the GCA's willfulness requirement, it fails for the reasons set forth above. *See supra* pp. 17–19; *see also Morehouse*, 2024 WL 708954, at *10.

presumptively protects that conduct." 597 U.S. at 24. A regulation governing such conduct is justified, however, so long as the government "demonstrat[es] that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Plaintiffs' Second Amendment claim fails under this standard on multiple fronts. As a threshold matter, Plaintiffs fail to adequately allege that the AAP burdens any conduct that is encompassed by the Second Amendment's plain text. And while the Court can dismiss Plaintiffs' claim without engaging in the "historical analysis prescribed by *Bruen*'s second step," *United States v. Sitladeen*, 64 F.4th 978, 986 n.3 (8th Cir. 2023), the licensing and inspection regime that the AAP implements is supported by a robust historical tradition of regulating commercial firearms sales.

### i. Plaintiffs fail to adequately allege that the AAP burdens conduct covered by the Second Amendment's text.

To determine whether a firearm regulation is constitutionally sound under *Bruen*, "a court must begin by asking whether" the regulation in question "governs conduct that falls within the plain text of the Second Amendment." *Sitladeen*, 64 F.4th at 985; *see U.S. v. Tilotta*, No. 3:19-cr-04768, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("[S]imply because a law involves firearms does not mean that the Second Amendment is necessarily implicated."). "Only if the answer is yes" should the court then "proceed to ask whether" the regulation "fits within America's historical tradition of firearm regulation." *Sitladeen*, 64 F.4th at 985. Because Plaintiffs fail to identify *any* constitutionally protected conduct that is meaningfully burdened by the AAP, they cannot satisfy this "threshold textual inquiry," and their Second Amendment claim should be dismissed. *Id.* at 986 n.3.

Plaintiffs first appear to allege that the mere possibility of a future license revocation pursuant to the AAP presently infringes BCO's and other FFLs' "right to manufacture . . . and sell firearms." Compl. ¶ 271; *see id.* ¶ 278. But the Second Amendment simply "does not confer a freestanding right" on private businesses to engage in the commercial sale of firearms. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 673 (9th Cir. 2017) (en banc). To the contrary, *District of Columbia v. Heller*, made clear that

the Second Amendment's text "guarantee[s] the *individual* right to possess and carry weapons" for purposes of *self-defense*. 554 U.S. 570, 592 (2008) (emphasis added); *see McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) ("[I]n *Heller*, we held that individual self-defense is 'the *central component*' of the Second Amendment right." (quoting *Heller*, 554 U.S. at 599)). And *Bruen* reiterated that the Second Amendment confers an "*individual*[] right" to "armed *self-defense*." 597 U.S. at 10, 29 (emphasis added). Accordingly, both before and after *Bruen*, courts routinely agreed that the Second Amendment does not additionally protect the right of a *private business* like BCO and other FFLs to *sell* firearms. *See Teixeira*, 873 F.3d at 683 ("Nothing in the text of the [Second] Amendment . . . suggests [it] confers an independent right to sell or trade weapons."); *U.S. v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022) ("[T]he Second Amendment does not protect the *commercial* dealing of firearms."); *U.S. v. Kazmende*, No. 1:22-cr-236, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023) (agreeing that the Second Amendment "simply does not extend to the commercial sale of firearms" and collecting cases concluding the same); *see also Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1018 (8th Cir. 2023) ("Regarding the business plaintiff in this case, we are left unsure what behavior it wishes to engage in, as an LLC, that is protected by the Second Amendment."); *Gazzola v. Hochul*, 645 F. Supp. 3d 37, 64 (N.D.N.Y. 2022) (concluding that the "individual right secured by the Second Amendment" does not "appl[y] to corporations or any other business organizations).

That Plaintiffs have failed to state a Second Amendment claim based on the speculative impact of the AAP on FFLs is reinforced by the Supreme Court's distinction between regulations implicating the "core" Second Amendment right of an individual "to use arms in defense of hearth and home," and those that "impos[e] conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27, 635; *see also Morehouse*, 2024 WL 708954, at *10. The Court described the latter type of regulations as "presumptively lawful" in *Heller*. *Id.* at 627 n.26. In *McDonald v. City of Chicago*, the Court "repeat[ed]" its "assurances" that *Heller* "did not cast doubt on . . . longstanding regulatory measures"

involving commercial firearms sales. 561 U.S. 742, 786 (2010). And in *Bruen*, three of the Justices in the six-Justice majority reiterated that the decision (1) "decide[d] nothing about . . . the requirements that must be met to buy a gun," 597 U.S. at 72 (Alito, J., concurring); (2) did not "disturb[] anything that [the Court] said in [*Heller*] about restrictions that may be imposed on the possession or carrying of guns," *id.*; and (3) still allowed for "a variety of gun regulations," including ones "imposing conditions and qualifications on the commercial sale of arms" as recognized in *Heller*, *id.* at 80–81 (Kavanaugh, J., joined by Roberts, C.J., concurring). This Court, too, recently explained that "[t]here is a longstanding distinction between the right to keep and bear arms and commercial regulation of firearm sales." *Morehouse Enters., LLC v. ATF*, No. 3:22-cv-116, 2022 WL 3597299, at *8 (D.N.D. Aug. 23, 2022).[9] Thus, because the AAP provides guidance regarding inspection and enforcement procedures involving FFLs engaged in the business of selling firearms, Plaintiffs cannot show that such a presumptively lawful commercial regulation violates the Second Amendment.

Plaintiffs also allege that the AAP unlawfully burdens the Second Amendment rights of "individual gun owners." Compl. ¶ 279. More specifically, they claim that the AAP is "designed to bottleneck" what they call the "Second Amendment supply chain" by facilitating the closure of gun stores, and that the resulting (yet wholly speculative) reduction in the "availability of firearms" to purchase "infringes citizens' . . . individual right of self-defense." *Id.* ¶¶ 244, 280–81. Plaintiffs, of course, do not identify a single gun store in imminent danger of closing because of the AAP, nor do they name a single customer—whether in Valley City, North Dakota, or elsewhere—whose ability to

---

[9] The Eighth Circuit has similarly cast doubt on challenges to commercial firearm regulations. *See, e.g.*, *U.S. v. Lehman*, 8 F.4th 754, 757 (8th Cir. 2021) ("It is far from plain or obvious that the Second Amendment protects Lehman's conduct—making a false statement or disregarding the ATF Form 4473 to obtain a firearm."); *U.S. v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Fincher has not directly attacked the federal registration requirements on firearms, and we doubt that any such attack would succeed in light of *Heller*.").

purchase firearms would be meaningfully impacted by such a closure.[10] Thus, as this Court recognized, Plaintiffs' claims are "too speculative to warrant analysis." *Morehouse*, 2024 WL 708954, at *10.

Even accepting Plaintiffs' conclusory assertions that a gun store closure "impos[es] additional hurdles to lawful gun ownership" and "rais[es] the cost and increas[es] the difficulty" of acquiring firearms in a certain area, Compl. ¶¶ 281, 275, such "vague allegations cannot possibly state a claim for relief under the Second Amendment, *Teixeira*, 873 F.3d at 679. The Second Amendment does not protect a right to purchase firearms from a preferred local retailer indefinitely with minimal inconvenience. *See id.* at 680 ("[T]he Second Amendment does not elevate convenience and preference over all other considerations."); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-02563, 2023 WL 8446495, at *8 (D. Colo. Nov. 13, 2023) ("Even if purchasing a firearm could be read into the terms 'keep' or 'bear,' receipt of a firearm *without any delay* could not be, as the Founders would not have expected instant, widespread availability of the firearm of their choice."), *appeal filed*, No. 23-1380 (10th Cir. Dec. 6, 2023). Plaintiffs make no allegations whatsoever that the AAP has prevented someone from keeping or carrying firearms they already own. And to the extent Plaintiffs claim that the AAP burdens a "constitutional right to acquire arms," Compl. ¶ 275, they do not identify a single individual who is unable to purchase firearms or a single jurisdiction whose residents cannot buy firearms. *See id.* ("[Plaintiff] fails to state a plausible claim on behalf of his potential customers that the ordinance meaningfully inhibits residents from acquiring firearms within their jurisdiction.").

---

[10] Plaintiffs do allege that one person "who lives near Plaintiff BCO" would have to "expend significant additional resources in the form of time and travel" to acquire new firearms if BCO's license were revoked and the store stopped selling firearms. Compl. ¶ 14. But such concerns have since been obviated by ATF's decision not to revoke BCO's license. Moreover, Plaintiffs admit that there are other establishments in Valley City, North Dakota, where residents can purchase firearms, *see id. See Teixeira*, 873 F.3d at 680 n.13 ("No case supports [the plaintiff's] suggestion that the Second Amendment . . . guarantees a certain type of retail experience."). And even assuming that BCO's closure might compel some customers to travel "a much further distance" in order to shop at another full-service gun store, Compl. ¶ 14, Plaintiffs make no allegations "as to what distance necessarily impairs Second Amendment rights." *Teixeira*, 873 F.3d at 680.

In sum, none of the firearms-related conduct Plaintiffs allege in their complaint is covered by the Second Amendment's plain text. *Bruen*, 597 U.S. at 17. Their Second Amendment claim thus fails at *Bruen*'s first step and should be dismissed on that basis alone. *See Second Amend. Found. v. ATF*, 2023 WL 7490149, at *12 (N.D. Tex. Nov. 13, 2023) ("Nothing in *Bruen* requires one to unconditionally proceed to the second step of the inquiry where the first step is not met."), *appeal filed*, No. 23-11157 (5th Cir. Nov. 14, 2023).

### ii. A robust historical tradition supports the regulation of commercial firearms dealers.

Although Defendants need not demonstrate that the AAP is consistent with historical firearms regulations, a robust historical tradition supports the government's authority to require licenses for and the inspection of firearms sellers. Under *Bruen*, to demonstrate that a regulation "is consistent with the Nation's historical tradition of firearm regulation," the government need only "identify a well-established and representative historical *analogue*" that is "relevantly similar" to the modern regulation being challenged. *Id.* at 24, 29–30. And a modern regulation can be "analogous enough" to a relevant historical precursor "to pass constitutional muster" if the "modern and historical regulations impose a comparable burden on the right of armed self-defense" that is "comparably justified." *Id.* at 29–30. Identifying a "historical *twin*" is not necessary. *Id.* at 30.

Plaintiffs are simply wrong to claim that there is no "national historical tradition of government regulation of the commercial sale[] of firearms."[11] Compl. ¶ 285. In fact, since colonial times, state and local governments have routinely exercised their authority to regulate the sale of firearms through licensing, inspections, and similar enforcement procedures.

---

[11] Plaintiffs further allege in relevant part that "there is no historical tradition of revoking licenses . . . based on nothing more than unintentional, technical, or paperwork violations like those at issue here." Compl. ¶ 286. The Court need not entertain this assertion at any length. As explained above, ATF does not—indeed, cannot—revoke FFLs absent a finding of willfulness, and that standard is reflected throughout the AAP. Plaintiffs' suggestion that FFLs are currently being revoked for "unintentional" "technical" violations is thus unfounded, and their Second Amendment claim cannot be based on a firearms regulation that does not exist.

The third U.S. Congress, for instance, made it unlawful for a limited period "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre," Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1 ("An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same"), which reveals a clear understanding on the part of Founding-era government officials that the Constitution permitted strict regulation of firearms sellers. As the en banc Ninth Circuit recounted in detail, colonial governments also "substantially controlled the firearms trade," including through "restrictions on the commercial sale of firearms." *Teixeira*, 873 F.3d at 685; *see id.* ("Governmental involvement in the provision, storage, and sale of arms and gunpowder is consistent with the purpose of maintaining an armed militia capable of defending the colonies."). "In response to the threat posed by Indian tribes," for example, "the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give or otherwise deliver firearms or ammunition to Indians." *Id.* Connecticut and Virginia further "controlled more generally where colonial settlers could transport or sell guns," with the former banning the "sale of firearms by its residents outside the colony," and the latter criminalizing the possession of "arms or ammunition above and beyond what . . . [was] need[ed] for personal use" "within an Indian town or more than three miles from an English plantation." *Id.* And in the early nineteenth century, multiple states regulated so-called "Bowie Knives" by taxing their sale or possession or prohibiting their sale entirely.[12]

Less restrictive yet still-analogous measures on firearms sellers were also commonplace historically. In the first decade of the 1800s, for instance, Massachusetts required that all musket and

---

[12] *See, e.g.*, 1837 Ala. Acts 7, §§ 1, 2 (imposed $100 tax on sale of Bowie Knives and "Arkansas tooth picks"); 1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1 (prohibited sale of such knives); 1841 Miss. 52, ch. 1 (imposed annual property tax on each Bowie knife); 1855-56 Tenn. L. 92, ch. 81 (prohibited sale of such knives and other arms to minors).

pistol barrels manufactured in the state and offered for sale be "proved"—that is, inspected and marked by designated individuals—upon payment of a fee to ensure the weapons' safe condition. *See* Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259–61 (1807). And Maine enacted similar requirements in 1821. *See* Laws of the State of Maine 546 (1830). Furthermore, multiple states—including Massachusetts (1651 and 1809), Connecticut (1775), New Jersey (1776), and New Hampshire (1820)—required licenses or inspection to export or sell gunpowder, which was the historical equivalent to modern ammunition.[13] *See also Rocky Mountain Gun Owners*, 2023 WL 8446495, at *19 (relying on expert testimony to conclude that the "longstanding history of firearm licensing regimes in the United States" provided sufficient historical analogues to uphold at the preliminary injunction stage the constitutionality of a state statute imposing a three-day waiting period for gun sales); *U.S. v. Libertad*, No. 22-cr-644, 2023 WL 4378863, at *7 (S.D.N.Y. July 7, 2023) (finding that various historical state firearms laws "demonstrate[d] the expansive authority exercised by colonial and early state legislatures as well as early congresses over the transfer of firearms between individuals and across borders," which included licensing and registration requirements); *cf. Bruen*, 597 U.S. at 38 n.9 (suggesting that shall-issue licensing regimes were not unconstitutional under

---

[13] *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823) (1809 statute providing for the appointment of an "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder," and imposing penalties for any sale or export of gunpowder "before the same has been inspected and marked"); 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 Connecticut law establishing, among other things, that no gunpowder manufactured in the colony "shall be exported out" of the colony "without [an applicable] licence," and no gunpowder manufactory "shall be erected . . . without the [applicable] licence"); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830) (authorizing "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state" and imposing penalties for any sale or disposition of gunpowder "before the same has been inspected and marked agreeably"); *see also* 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810) (1795 statute requiring that before any gunpowder be brought into the city, county, or port of Philadelphia, it be appropriately marked and deposited in a public magazine).

26

the two-step *Bruen* framework). Similar licensing and taxation requirements for the sale of gunpowder and certain arms were also enacted in the antebellum and Reconstruction eras.[14]

In short, early American governments closely controlled the sale and manufacture of firearms and ammunition, and in many cases delineated who could buy and sell such arms as well as the areas where firearms could be offered for sale. Accordingly, the licensing and inspection procedures described in the AAP—which similarly govern the commercial sale of firearms—are wholly "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. And that in turn means that Plaintiffs' Second Amendment challenge to the AAP should be dismissed.

### iii. The AAP is nothing like the licensing scheme invalidated in *Bruen*.

Finally, Plaintiffs allege that the AAP is unconstitutional because, like the New York licensing scheme that was invalidated in *Bruen*, it grants ATF officials "unbridled and 'open-ended discretion'" to revoke firearms licenses "at will for minor errors." Compl. ¶ 294; *see Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring) (noting that New York's "outlier" licensing regime was "constitutionally problematic" in part because it "grant[ed] open-ended discretion to licensing officials"). Such conclusory assertions can be dismissed outright. The AAP, which provides guidance as to what administrative actions are warranted when an FFL engaged in the business of selling guns violates federal firearms regulations, is nothing like the may-issue licensing regime at issue in *Bruen*, which allowed state licensing officials to bar "law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Bruen*, 597 U.S. at 60. Put another way, New York's licensing regime directly burdened its residents' "right to armed self-defense," which is the "*central component*" of the Second Amendment right, *Bruen*, 597 U.S. at 29 (quoting *McDonald*, 561 U.S. at 767); the AAP, in

---

[14] Ordinances of the City of Chicago, Ill., ch. 16, § 1 (1851 city law barring the sale of gunpowder absent written permission of the authorities); Ordinances of the City of St. Paul, Minn., ch. 21, § 1 (similar 1858 city law); 1874 Ala. L. 41, ch. 1 (imposed $25 occupational tax on dealers of pistols and certain knives); 1878 Ala. L. 437, ch. 314 (authorized town to license dealers of pistols and certain knives).

contrast, governs the commercial sale of firearms, which does not even "fall within the scope of" the Second Amendment's plain text. *Teixeira*, 873 F.3d at 683.

Additionally, Plaintiffs' allegation that the AAP gives ATF inspectors "unbridled" discretion, Compl. ¶ 294, is at odds with their insistence elsewhere in their Complaint that the AAP, as Plaintiffs construe it, "almost *entirely prohibits* the exercise of any discretion on the part of ATF field personnel," *id.* ¶ 59 (emphasis added). In any event, the discretion afforded to ATF inspectors by the AAP is not problematically "open-ended" like Plaintiffs claim for the simple reason that, per the AAP's express terms, revocation is only permissible for "willful" violations of firearms regulations. *See* AAP at 6 ("ATF must establish willfulness to proceed with revocation under 18 U.S.C. § 923(e)). Plaintiffs' flawed comparison between the AAP and the licensing scheme at issue in *Bruen* fails to state a plausible Second Amendment claim.

### c.   Plaintiffs cannot state a claim for vindictive prosecution.

Plaintiffs have also failed to state a claim for retaliatory or vindictive prosecution. *See* Compl. ¶¶ 295–313. Vindictive prosecution claims are typically brought in the context of a motion to dismiss a criminal indictment or charge. *See, e.g., U.S. v. Hirsch*, 360 F.3d 860, 863–84 (8th Cir. 2004); *U.S. v. Kelley*, 152 F.3d 881, 885–86 (8th Cir. 1988). To bring a vindictive prosecution claim, a defendant must demonstrate that the "prosecution [was] designed solely to punish a defendant for exercising a valid legal right." *U.S. v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004). This burden "is a heavy one." *Id.*

Here, Plaintiffs' claim fails for a variety of reasons. Importantly, there is no criminal prosecution at issue; Plaintiffs' claim is based solely on ATF's administrative licensing proceedings. Plaintiffs have cited no case bringing a vindictive prosecution claim based on an ATF revocation proceeding, and Defendants are aware of none. And ATF proceedings are not equivalent to criminal prosecutions, particularly given that (1) the most severe consequence is the revocation of a federal firearms license, (2) ATF ultimately decides not to revoke licenses following the majority of hearings,

*see supra* p. 8, and (3) license revocations are subject to *de novo* judicial review in district court, *see* 18 U.S.C. § 923(f)(3). Thus, to permit such a claim to move forward would be an unprecedented extension of the vindictive prosecution cause of action.

Even assuming this cause of action is available, the Complaint fails to plead facts supporting that ATF initiated revocation proceedings solely to punish BCO for exercising a valid right. *See U.S. v. Rodgers*, 18 F.3d 1425, 1431 (8th Cir. 1994) (explaining government may "rebut" showing or presumption of vindictiveness "by proffering legitimate, objective reasons for its conduct"). Importantly, the Complaint glosses over the regulatory framework in which ATF operates and the Enhanced Regulatory Enforcement Policy itself, both of which support that ATF's administrative actions with respect to BCO comported with the agency's standard practices. Pursuant to the GCA, ATF "may inspect or examine the inventory and records of" an FFL "*without such reasonable cause or warrant . . . for ensuring compliance with the record keeping requirements of [the GCA] . . . not more than once during any 12-month period*." 18 U.S.C. § 923(g)(1)(B) (emphasis added). Although ATF has statutory authority to inspect an FFL once per year, in practice, ATF inspects only a fraction of total FFLs per year, and an FFL may go multiple years between compliance inspections. *See* Fact Sheet (stating that in FY 2022, there were 136,563 active FFLs, but only 6,979 compliance inspections, and only 816 IOIs conducting inspections). Following an inspection, "[w]henever the Director has reason to believe that a licensee has willfully violated any provision of the [GCA] . . . a notice of revocation of the license, ATF Form 4500, may be issued." 27 C.F.R. § 478.73(a). And pursuant to the Enhanced Regulatory Enforcement Policy, adopted in 2021, "absent exceptional circumstances," ATF will initiate revocation proceedings upon the discovery of five specified violations. *See* AAP at 3, 7–8.

The Complaint alleges that BCO received its federal firearms license in 2019, was not inspected for several years, and then was subject to inspection in February 2023, an inspection timeline consistent with standard ATF practice. Compl. ¶¶ 147–150. Additionally, during the inspection, the

IOI found evidence of five violations of the GCA. *Id.* ¶ 158. Three of those violations implicated the Enhanced Regulatory Enforcement Policy, which provides that "absent exceptional circumstances," ATF will initiate revocation proceedings upon the discovery of those violations. *See* Notice to Revoke at 2 (citing BCO for transfer to a prohibited person, failure to run a required background check, and entry of false information into a firearms transaction form); *see also* Compl. ¶¶ 46; AAP at 7–8. Although Defendants largely disagree with how Plaintiffs have characterized that policy, even the Complaint acknowledges that where willful violations implicating the policy are detected, ATF's discretion is restricted, and revocation proceedings will ordinarily be initiated. *See, e.g.*, Compl. ¶¶ 59–62. ATF's initiation of revocation proceedings against BCO, then, is attributable to the policy, and not solely to punish BCO for exercising any right.

### d. Plaintiffs cannot state a claim for selective prosecution.

Plaintiffs' selective prosecution claim fails for many of the same reasons as their vindictive prosecution claim. *See supra* pp. 28–30. Additionally, a selective prosecution claim requires showing that (1) others "similarly situated" were "not prosecuted," and (2) "the decision to prosecute was motivated by a discriminatory purpose." *U.S. v. Peterson*, 652 F.3d 979, 981 (8th Cir. 2011). Courts have interpreted "discriminatory purpose" to mean that the decision to prosecute was "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification . . . including the exercise of protected statutory and constitutional rights." *Wayte v. U.S.*, 470 U.S. 598, 608 (1985) (citation omitted).

Plaintiffs' own allegations refute the plausibility of this claim. For instance, Plaintiffs repeatedly cite the increase in license revocations attributable to the Enhanced Regulatory Enforcement Policy. This supports that other similarly situated FFLs—that is, FFLs found to have violated the same provisions of the GCA as BCO—were also subject to initial notices of the revocation because of the Policy. *See* Compl. ¶¶ 74–79, 274; *see also* Fact Sheet. Further, that the AAP and Policy mandate that,

absent extraordinary circumstances, an initial notice of revocation be issued when one of the five specified violations are discovered supports there was no discriminatory purpose behind ATF's initial notice because that was the administrative action prescribed by the AAP. *See also supra* p. 4. For these reasons, Plaintiffs have failed to state a claim for selective prosecution.

**e.  Plaintiffs cannot state a First Amendment access to courts claim.**

Plaintiffs also bring a First Amendment access to courts claim. *See* Compl. ¶¶ 324–34. "The right to access courts have long been a fundamental constitutional right," and the Constitution "ensures that . . . . an aggrieved party [has] the opportunity to pursue a remedy for an actual injury." *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 732 (8th Cir. 2022). Critically, however, "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong," and caselaw rests "on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002). Accordingly, to state an access claim, the plaintiff "must identify a nonfrivolous, arguable underlying claim." *Id.* at 415 (citations omitted). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 416.

Plaintiffs have failed to allege an essential element of their claim because they have not identified an underlying cause of action they were prevented from bringing because of Defendants' actions. *See* Compl. ¶¶ 324–34; *Walz*, 30 F.4th at 732 ("To state a plausible claim . . . [Plaintiffs] must identify the claim [they] wished to bring."). And it is not plausible that Plaintiffs were prevented from bringing any claim. Plaintiffs filed this action before ATF's administrative proceedings had even concluded, and even if BCO's license had been subject to revocation, BCO would have had a statutory right of review where it could have litigated many of the same claims it has brought here.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.


Dated: March 7, 2024                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        BRIGHAM J. BOWEN
                                        Assistant Branch Director

                                        */s/ Taylor Pitz*
                                        TAYLOR PITZ (CA Bar No. 332080)
                                        BRIAN ROSEN-SHAUD (ME Bar No. 006018)
                                        ZACHARY SHERWOOD (IN Bar No. 3714749)
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street NW
                                        Washington, DC 20005
                                        Phone: (202) 305-5200
                                        Email: Taylor.N.Pitz@usdoj.gov

                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On March 7, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, District of North Dakota, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Taylor Pitz*
TAYLOR PITZ
Trial Attorney
U.S. Department of Justice